UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05 11573 RGS

_____
                                                            )
WARREN FREEDENFELD ASSOCIATES, INC.          )
as successor in interest to WARREN FREEDENFELD  )
& ASSOCIATES, INC.,                                  )
                    Plaintiff,                              )
                                                            )
v.                                                          )
                                                            )
MICHAEL P. MCTIGUE, DVM individually and as      )
Trustee of THE MCTIGUE FAMILY TRUST,            )
NANCY A. MCTIGUE, as Trustee of the             )
MCTIGUE FAMILY TRUST, BRIAN C. HURLEY, DVM, )
GARDNER ANIMAL CARE CENTER, LLC              )
d/b/a GARDNER ANIMAL HOSPITAL, EDWARD D.     )
CORMIER, ASSOCIATES INC., and BENNETT         )
BUILDING CORPORATION,                          )
                    Defendants.                         )
_____)

**PLAINTIFF'S MEMORANDUM IN RESPONSE TO THE REPLY BRIEF FILED
BY THE DEFENDANTS, MICHAEL P. MCTIGUE, NANCY A. MCTIGUE,
BRIAN C. HURLEY, AND GARDNER ANIMAL CARE CENTER D/B/A
GARDNER ANIMAL HOSPITAL IN REPONSE TO THE PLAINTIFF'S
OPPOSITION TO THEIR MOTION TO DISMISS**

## I.      INTRODUCTION

The defendants, Michael P. McTigue, Nancy A. McTigue, Brian C. Hurley, and

Gardner Animal Care Center d/b/a Gardner Animal Hospital (collectively, the "Hospital

Defendants"), have filed a Reply Memorandum to the memorandum of the plaintiff,

Warren Freedenfeld Associates, Inc., as successor in interest to Warren Freedenfeld &

Associates, Inc. (collectively, "Freedenfeld") to the defendants' Motion to Dismiss on the

basis that they believe that the three year statute of limitations had run on this

infringement action. In support of their motion, the Hospital Defendants appear to argue

that they did not hide the building that they constructed and that the plans were a matter of public record because they were filed with local governing bodies. Through their reasoning the Hospital Defendants argue that under these circumstances, any failure to discover the infringement is per se unreasonable.

Essentially the Hospital Defendants seek to carve out an exception to the copyright infringement "discovery rule" by arguing that an architect seeking to enforce his copyright against a former client has an affirmative duty to go to the project site or the local planning board to investigate whether the project was being built with his copyrighted plans. There is no authority for the Hospital Defendants' position. Indeed, case law makes clear that, as in other copyright infringement cases, examination of the facts of each particular case determines when the plaintiff should reasonably have discovered the infringing activity.

Here, the record demonstrates that prior to November of 2004, Freedenfeld had absolutely no reason to suspect that the defendants were infringing upon his copyrights because two of the defendants made clear to Freedenfeld that they had no intention of using the copyrighted works because they found them to be "useless" and had rolled them up and thrown them in the trash. Nor could it be said that Freedenfeld, or any reasonable person, could have foreseen that two years after the project was completed that defendants would then cause the copyrighted works to be published in a national and international trade magazine read by Freedenfeld's current and potential clients, without Freedenfeld's knowledge or permission. In further support of this response, the plaintiff states as follows:

## II.    <u>FACTUAL BACKGROUND</u>

This is a clear case of architectural copyright infringement and violation of the Lanham Act.  The facts of the case are more accurately plead in Freedenfeld's Complaint which for the purposes of this opposition, are adopted by reference.  In short, Freedenfeld is a national architecture firm licensed to practice architecture in 37 states and the U.S. territory of Puerto Rico.  Freedenfeld has designed hundreds of veterinary hospitals across the country and has won several awards for its work.

In 1999, the defendant, Michael McTigue, DVM ("Dr. McTigue"), retained Freedenfeld to design a new veterinary facility for the Gardner Animal Hospital ("the Hospital") in Gardner, Massachusetts (the "Project").  From the start of the Project, the parties understood that Freedenfeld retained exclusive ownership of all the designs and drawings that it prepared for the Project (collectively, the "Architectural Works").  Specifically, Dr. McTigue and the Hospital agreed that Freedenfeld was the author of the Architectural works and retained all common law, statutory, and other reserved rights, including the copyright.  This agreement was memorialized in the Owner Architect Agreement executed by the parties dated March 24, 1999 (the "AIA Agreement").  Article 6 of AIA Agreement provides in its entirety:

> 6.1.    ***The Drawings, Specifications and other documents prepared by the Architect for this Project are instruments of the Architect's service for use solely with respect to this Project, and the Architect shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright.*** The Owner shall be permitted to retain copies and other documents for information and reference in connection with the Owner's use and occupancy of the

Project. The Architect's Drawings, Specifications or other documents shall not be used by the Owner or others on other projects, for additions to this Project or for completion of this Project by others, unless the Architect is adjudged to be in default under this Agreement, except by agreement in writing and with appropriate compensation to the Architect.

6.2.    Submission or distribution of documents to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the Architect's reserved rights.

See Article 6 of Abbreviated Form of Agreement Between Owner and Architect (AIA Form B151), attached hereto as **Exhibit 1** at ¶ 6.1- 6.2.

The Architectural Works were the only architectural plans and drawings that were created for the Project and all were created by Freedenfeld.

After the Project gained the approval of the City of Gardner Zoning and Planning Board, Freedenfeld and McTigue engaged in a dispute over fees.  Dr. McTigue also alleged that Freedenfeld failed to substantially perform the architectural services. As a result of the fee dispute, Dr. McTigue threatened to terminate Freedenfeld as the Project architect.  During this period, Freedenfeld made clear to Dr. McTigue that if the Hospital decided to terminate Freedenfeld that the Hospital was prohibited from using the Architectural works to complete the Project.  When Freedenfeld requested that Dr. McTigue and the Hospital return the Architectural works, Dr. McTigue responded to Freedenfeld by letter stating that all the works that the plaintiff prepared for the Project had been "rolled up and discarded."  Dr. McTigue stated in the letter:

*Whatever plans, drawings etc. you did prepare have proven useless to us, and they have been rolled up and discarded.* This is in spite of my having paid tens of thousands of dollars; unfortunately, I again have to pay another architect another tens of thousands of dollars to complete the project.

 See  Dr. McTigue Letter attached hereto as **Exhibit 2.**

4

In August of 1999, to protect its rights in the Architectural Works, Freedenfeld properly filed an application and deposit fee with the U.S. Copyright Office. A copyright was later granted to Freedenfeld for the Architectural Works (Certificate VAU 656-367).

In September of 1999, Freedenfeld, Dr. McTigue, and the Hospital agreed to resolve the dispute over fees owed by the defendants for services performed in connection with the Project by entering into a Termination and Mutual Release Agreement (the "Termination Agreement"). As part of the Termination Agreement, Dr. McTigue and the Hospital agreed that they would not use the Architectural Works. The Termination Agreement did not modify in any way, Freedenfeld's exclusive ownership, proprietary rights, or right to enforce his copyright interests in the Architectural Works.

In late 2004, Freedenfeld was a subscriber to a veterinary trade publication, *Veterinary Economics* (the "Magazine"). The Magazine is an international business and management publication serving more than 50,000 subscribers in the United States and Canada. While perusing the November 2004 issue of the Magazine, Freedenfeld discovered an article appearing on pages 50 - 57 about the renovation and expansion of the Gardner Animal Hospital. According to the article, the design won a "Merit Award" in the 2004 Veterinary Hospital Design Competition, a national and international competition. The article is entitled "Giving an Old House a Cutting –Edge Extension." The article identifies the owners of the Hospital as Dr. McTigue and Brian Hurley DVM. Cormier is listed as the Architect. Pages 52-53 of the article contain drawings that are nearly identical to the Architectural Works prepared by Freedenfeld. After a further investigation by Freedenfeld's counsel in early 2005, it was determined that the Project was built by the defendant , Bennett Building Corporation using the Architectural Works

and that the land where the Project was built is owned by the McTigue Family Trust.

Both Dr. McTigue and his wife, Nancy McTigue are trustees of the McTigue Family

Trust.  On July 22, 2005, Freedenfeld instituted the instant action against the defendants.

### III.     LAW AND ARGUMENT

**A.     The Discovery Rule**

17 U.S.C. § 507(b) states that "[n]o civil action shall be maintained under the

provisions of this title unless commenced within three years after the claim accrued." 17

U.S.C. § 507(b).  Courts applying this provision have held that a copyright claim accrues

when "when the plaintiff learns, or should a reasonable person have learned that the

defendant was violating his rights." Gaiman v. McFarlane, 360 F.3d 644, 653 (7th Cir.),

reh'g and reh'g en banc denied (7th Cir. 2004).

**B.     The Hospital Defendants seek to impose new and unreasonable obligations
on holders of copyrights in architectural plans.**

The Hospital defendants argue that more than three years passed between the

completion and occupancy of the subject project and Freedenfeld's filing of the lawsuit

and that they did not hide the building that they constructed and that the plans were a

matter of public record because they were filed with local governing bodies.  Through

their reasoning, the Hospital Defendants argue that under these circumstances, any failure

to discover the infringement is per se unreasonable.  Essentially, the Hospital Defendants

seek to create an exception to the discovery rule in copyright infringement actions by

suggesting that an architect seeking enforce his copyright against a former client has an

affirmative duty to go to the project site or the local planning board to investigate

whether the project was being built with his copyrighted plans.  In effect, what the

Hospital Defendants want is for the Court to create new precedent which requires every

architect to be chargeable with knowledge of each and every architectural plan ever filed

with any municipal agency in every state.  Alternatively, the architect must enter and

inspect each and every private and public construction site everywhere to compare the

buildings being created to their copyrighted plans.  If the infringer somehow escapes

detection for three years, the Architect loses all rights to enforce its copyright.  This is

clearly unprecedented and unreasonable.  Had Congress wished to impose what would be

essentially a statute of repose, it would have included language to that effect in the

Copyright Act.

**C.     Case law makes clear that, as in other copyright infringement cases, examination of the facts of each particular case determines when the plaintiff should reasonably have discovered the infringing activity.**

In is noteworthy that the Hospital Defendants cited <u>Zitz v. Pereira</u>, 199 F. Supp.2d

133 (E.D.N.Y. 1999) in their motion.  In <u>Zitz</u>, the plaintiff, Richard Zitz, a home framer

(not an architect), filed a complaint against a former client, Lionel Bernadino dos Santos

Pereira, and an architect, Peter T. Podlas.  The complaint alleged that Pereira and Podlas

infringed on Zitz's copyrights for two townhouses by copying the blueprints and erecting

and constructing two similar houses using Zitz's blueprints.  Zitz filed his complaint

against the defendants on February 4, 1997.

The case was tried before a magistrate judge (non jury) in 1999.  During the trial

Zitz testified that the first time he saw the first house was in late 1994 after someone

showed him a copy of *Homes & Land Magazine* that had pictured the house.  Zitz

claimed that he saw the second house sometime in the first half of 1996 in a different

issue of the same magazine.  Among other things, the defendants defended on the

grounds that Zitz's claim was time barred by the three year statute of limitations for

copyright actions.  The defendants argued that Zitz knew or should have known about the two houses as far back as 1991 -1993 when they were being constructed.  On cross examination, the defendants introduced deposition testimony of Zitz relevant to when he first became aware that one of his townhouses was being copied by Pereira.  The testimony related to a conversation that Zitz had with the purchaser of one of his townhouses sometime in 1991.  The purchaser reportedly commented to Zitz that he was "upset" because Pereria was constructing a house resembling his.  Zitz, 199 F.Supp. 2d at 137.

Pereira's fiancé', Trudy Hortnagl, also testified at trial that in July of 1993, she was visiting Pereira when they ran into Zitz and his wife while grocery shopping and that the Zitzes invited them to a party they were hosting the following week. Horthnagl testified that on the day of the party that Zitz's wife called Pereira's house and uninvited them both because '"because [Zitz] and [Pereira] are not friends anymore for what [Pereira] has done to him." Id. At 138.  The defendants also established that Zitz had observed Pereira copying his plans in a local public library in January of 1993.  In light of all these facts, the Magistrate judge determined that Zitz should have conducted a further investigation to determine whether Pereira was infringing upon his plans.  Zitz, 199 F.Supp 2d at 141-142.

Contrary to the position espoused by the Hospital Defendants in their Reply Memorandum, the Zitz case merely says that there needs to be some impetus for the investigation, so as to put the design professional on notice that his copyrighted plans are being infringed upon.  This inquiry is entirely fact driven and in line with the discovery rule adopted in other copyright infringement cases.  Significantly, the plaintiff directs the

Court's attention to <u>James W. Ross, Inc. v. Cecil Allen Construction, Inc., et.al</u> 2004, WL 1146104 (M.D. Fla)(applying the discovery rule in the house plan context and finding that the plaintiff's claim was not time barred based on the facts of the case).  For the Court's convenience a copy of this case is attached as **<u>Exhibit 3.</u>**

In <u>Ross</u>, the plaintiff, James W. Ross, Inc., prepared plans for a house for John and Mary Houston.  The Houstons ultimately built the house using another design professional.  The house was built in Orlando in 1999 and received a certificate of occupancy in January of 2003.  In April of 2003, Ross happened to be driving in the neighborhood and became "suspicious" of the home design because the rear of the house resembled one that he had previously built. <u>Ross</u> at * 1.  Ross then obtained plans for the Houstons' house from the local building department and compared them to one of the houses that he previously built.  Ross determined that the Houston house was a direct copy of his original model.  Ross then filed suit in June of 2003.

The defendants filed a motion for summary judgment on the issue of the three-year statute of limitations for copyright infringement actions because more than three years had passed between the completion and occupancy of the subject house and Ross' filing of the lawsuit. <u>Ross</u> at * 2.  The defendants argued that to the extent that the Eleventh Circuit had adopted the discovery rule in the copyright context, the application should be limited to cases involving house plans because such plans were available for inspection at the jobsite and were part of the public record since they were submitted to local governing bodies for approval. <u>Id</u>.  Essentially, the defendants argued that under these circumstances, any failure to discover an infringing house within the three years is

per se unreasonable. Citing <u>Zitz</u>, the Court rejected defendants' reasoning.  The Court

stated:

> The Defendants claim the discovery rule should be limited in these
> circumstances because house plans are available for inspection at the job
> site and because plans become part of the public record when they are
> submitted to governing bodies for approval. The Defendants further argue
> that under these circumstances, any failure to discover an infringing house
> within three years is per se unreasonable. Through their reasoning, the
> Defendants seem to be suggesting that every owner of a copyrighted house
> plan would need to employ a full-time investigator to scour public records
> and drive around every housing development to ensure that no infringing
> houses are being built. This argument is unpersuasive, and the Court
> declines to carve out an exception to application of the discovery rule
> merely because house plans rather than other copyrighted works are at
> issue. There is no authority for Defendants' position, and indeed there is
> case law to the contrary. Thus, as in other copyright cases, examination of
> the facts of each particular house-plan case determines whether the suit
> was brought within three years of when the plaintiff should reasonably
> have discovered the infringement of the copyrighted plans.

<u>Ross</u>, 2004 WL 1146104 at * 3, citing <u>Zitz v. Pereira</u>, 119 F. Supp.2d 133 (E.D.N.Y.
1999), aff'd 225 F.3d 646 (2d Cir. 2000).

**D.    The uncontroverted record in this case demonstrates that prior to November
of 2004, Freedenfeld had no reason to suspect that the defendants were
infringing on the plaintiff's copyrights in the Architectural Works.**

In the case at bar, the record demonstrates that Freedenfeld first discovered that

the Architectural Works were being infringed upon when the plaintiff discovered an

article in the November 2004 edition of *Veterinary Economics Magazine*.  As stated in

the Complaint, Page 52 of the article specifically lists Edward D. Cormier as the

"Architect" for the project and states that the facility was completed in "2000."  A further

investigation, by Freedenfeld's counsel at the Gardner Zoning and Planning Board's

offices in early 2005 determined that Bennett Building Corporation built the project.

There is absolutely no evidence to suggest that Freedenfeld knew or should have

known or that even a reasonable person would have known that the defendants were

infringing on the Architectural Works at anytime prior to November of 2004.  Further, the Hospital defendants have not offered any evidence to contradict this position by way of affidavit or otherwise.  The only thing that the Hospital Defendants can point to suggest that Freedenfeld should have conducted an investigation prior to November of 2004 to determine whether the defendants were infringing on the Architectural Works, is an exhibit attached to their Reply Memorandum which purports to be correspondence addressed to McTigue with Freedenfeld's letterhead appearing at the top. The letter is dated July 22, 1999.  This so called evidence is weak.  The letter simply states that "it is our understanding that you intend to redesign the Project utilizing the services of another architect."  This language only says that the defendants were going to hire another architect to create entirely new plans for the project.  Its says nothing about the use of Freedenfeld's copyrighted works.  Nor would it, since during this time, Dr. McTigue and the Hospital made it clear to Freedenfeld that they had no intention of using the Architectural Works because according to McTigue and the Hospital, the Architectural Works had "proven useless" and had been "discarded."  <u>See</u> Dr. McTigue Letter attached as **<u>Exhibit 2</u>**.   Based on the above uncontroverted facts, no reasonable person would have assumed that the defendants had any intention whatsoever of using the Architectural Works to complete the project.

Absent, any evidence that a reasonable person under similar conditions would have disbelieved the representations made by McTigue and the Hospital about their disposal of the Architectural Works and their purported intentions to hire a new architect to "redesign" the project, it cannot be said that Freedenfeld had any purported duty to conduct an investigation by scouring the planning and zoning board's records to

determine whether the defendants copied elements of the Architectural Works or alternatively, conducted frequent visits to the jobsite, without the defendants' permission to compare what was actually built.  Nor could it be said that Freedenfeld could have foreseen that two years after the project was completed that defendants would then cause the Architectural Works to be published in a national and international trade magazine read by Freedenfeld's current and potential clients, without Freedenfeld's knowledge or permission or without giving the plaintiff any credit whatsoever for the design.  This is exactly what the defendants did.  The defendants' publication of the Architectural Works in *Veterinary Economics Magazine* in November of 2004 constitutes a second and/or ongoing act of infringement in violation of Freedenfeld's rights.

This suit was commenced on July 22, 2005, which is only eight months after Freedenfeld first discovered that the defendants were infringing on the plaintiff's copyrights in the Architectural Works. During those eight months, counsel for the plaintiff made several trips to the Town of Gardner's Planning and Zoning Board's offices to determine the extent of the infringement.  Accordingly, for the foregoing reasons, and the reasons set forth in Freedenfeld's original opposition, the Hospital Defendants' Motion to Dismiss should be <u>DENIED</u>.

Respectfully submitted,

WARREN FREEDENFELD &
ASSOCIATES, INC.

By its attorneys,

/s/ Garrett J. Lee
Barry S. Scheer
BBO No. 445100
Garrett J. Lee
BBO No. 641876
PARKER | SCHEER, LLP
One Constitution Center
Boston, MA  02129
Tel.: 617-886-0500
Fax: 617-886-0100
Email: bss@parkerscheer.com
        gjl@parkerscheer.com

Dated: December 2, 2005

13

CERTIFICATE OF SERVICE

I, Garrett J. Lee, attorney for the plaintiff, Warren Freedenfeld Associates, Inc. as successor in interest to Warren Freedenfeld & Associates, Inc., hereby certify that on this 2nd day of December, 2005 a true copy of the following was served on all counsel record:

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE MOTION OF THE DEFENDANTS, MICHAEL P. MCTIGUE, NANCY A. MCTIGUE, BRIAN C. HURLEY, AND GARDNER ANIMAL CARE CENTER D/B/A GARDNER ANIMAL HOSPITAL, TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

By first-class mail postage pre-paid, addressed to:

Robert N. Meltzer, Esq.
P.O. Box 1459
Framingham, MA 01701

Stephen D. Rosenberg
The McCormack Firm, LLC
One International Place
7th Floor
Boston, MA 02110

F. Joseph Gentili, Esq.
Capobianco & Gentili, PC
15 West Central Street
Natick, MA 01760

Robert D. City, Esq.
Michael J. Dissette, Esq.
City, Hayes & Dissette, PC
50 Congress Street
Boston, MA 02109

Mary C. Casey, Esq.
Harbor Law Group
385 South Street
Shrewsbury, MA 01545

_____
Garrett J. Lee



*AIA Document B151*

# Abbreviated Form of Agreement Between Owner and Architect

*for Construction Projects of Limited Scope*

### 1987 EDITION

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES; CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION.*

## AGREEMENT

made as of the     24th     day of     March     in the year of Nineteen Hundred and Ninety Eight

**BETWEEN** the Owner:
*(Name and address)*

Mike McTigue, DVM
GARDNER ANIMAL HOSPITAL
7 Pearson Boulevard
Gardner, MA  01440

and the Architect:
*(Name and address)*

WARREN FREEDENFELD & ASSOCIATES INC.
39 Church Street
Boston, MA  02116

For the following Project:    GARDNER ANIMAL HOSPITAL
*(Include detailed description of Project, location, address and scope.)*

Project Location:     2 acres of existing 19 acre lot
Typanny Road / Route 68
(Across from Walmart)
Gardner, Massachusetts

Scope of Work    :     New veterinary facility

The Owner and Architect agree as set forth below.

Copyright 1974, 1978, © 1987 by The American Institute of Architects, 1735 New York Avenue, N.W., Washington, D.C. 20006. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will be subject to legal prosecution.

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

data comprising the Contractor's Application for Payment, that the Work, to the best of the Architect's knowledge, information and belief, has progressed to the point indicated and that quality of the Work is in accordance with the Contract Documents. The issuance of a Certificate for Payment shall not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment or (4) ascertained how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

**2.4.10** The Architect shall have authority to reject Work which does not conform to the Contract Documents and will have authority to require additional inspection or testing of the Work whenever, in the Architect's reasonable opinion, it is necessary or advisable for the implementation of the intent of the Contract Documents.

**2.4.11** The Architect shall review and approve or take other appropriate action upon Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action shall be taken with such reasonable promptness as to cause no delay. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component. When professional certification of performance characteristics of materials, systems or equipment is required by the Contract Documents, the Architect shall be entitled to rely upon such certification to establish that the materials, systems or equipment will meet the performance criteria required by the Contract Documents.

**2.4.12** The Architect shall prepare Change Orders and Construction Change Directives, with supporting documentation and data if authorized or confirmed in writing by the Owner as provided in Paragraphs 3.1 and 3.3, for the Owner's approval and execution in accordance with the Contract Documents, and may authorize minor changes in the Work not involving an adjustment in the Contract Sum or an extension of the Contract Time which are not inconsistent with the intent of the Contract Documents.

**2.4.13** The Architect shall conduct inspections to determine the dates of Substantial Completion and final completion and shall issue a final Certificate for Payment.

**2.4.14** The Architect shall interpret and decide matters concerning performance of the Owner and Contractor under the requirements of the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests shall be made with reasonable promptness and within any time limits agreed upon. When making such interpretations and initial decisions, the Architect shall endeavor to secure faithful performance by both Owner and Contractor, shall not show partiality to either, and shall not be liable for results of interpretations or decisions so rendered in good faith.

## ARTICLE 3
## ADDITIONAL SERVICES

**3.1** Additional Services shall be provided if authorized or confirmed in writing by the Owner or if included in Article 12, and

they shall be paid for by the Owner as provided in this Agreement. Such Additional Services shall include, in addition to those described in Paragraphs 3.2 and 3.3, budget analysis, financial feasibility studies, planning surveys, environmental studies, measured drawings of existing conditions, coordination of separate contractors or independent consultants, coordination of construction or project managers, detailed Construction Cost estimates, quantity surveys, interior design, planning of tenant or rental spaces, inventories of materials or equipment, preparation of record drawings, and any other services not otherwise included in this Agreement under Basic Services or not customarily furnished in accordance with generally accepted architectural practice.

**3.2** If more extensive representation at the site than is described in Subparagraph 2.4.5 is required, such additional project representation shall be provided and paid for as set forth in Articles 11 and 12.

**3.3** As an Additional Service in connection with Change Orders and Construction Change Directives, the Architect shall prepare Drawings, Specifications and other documentation and data, evaluate Contractor's proposals, and provide any other services made necessary by such Change Orders and Construction Change Directives.

## ARTICLE 4
## OWNER'S RESPONSIBILITIES

**4.1** The Owner shall provide full information, including a program which shall set forth the Owner's objectives, schedule, constraints, budget with reasonable contingencies, and criteria.

**4.2** The Owner shall furnish surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, a written legal description of the site and the services of geotechnical engineers or other consultants when such services are requested by the Architect.

**4.3** The Owner shall furnish structural, mechanical, chemical, air and water pollution tests, tests for hazardous materials, and other laboratory and environmental tests, inspections and reports required by law or the Contract Documents.

**4.4** The Owner shall furnish all legal, accounting and insurance counseling services as may be necessary at any time for the Project, including auditing services the Owner may require to verify the Contractor's Applications for Payment or to ascertain how or for what purposes the Contractor has used the money paid by the Owner.

**4.5** The foregoing services, information, surveys and reports shall be furnished at the Owner's expense, and the Architect shall be entitled to rely upon the accuracy and completeness thereof.

**4.6** Prompt written notice shall be given by the Owner to the Architect if the Owner becomes aware of any fault or defect in the Project or nonconformance with the Contract Documents.

**4.7** The proposed language of certificates or certifications requested of the Architect or Architect's consultants shall be submitted to the Architect for review and approval at least 14 days prior to execution.

AIA DOCUMENT B151 • ABBREVIATED OWNER-ARCHITECT AGREEMENT • THIRD EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

## ARTICLE 5
### CONSTRUCTION COST

### 5.1 DEFINITION

**5.1.1** The Construction Cost shall be the total cost or estimated cost to the Owner of all elements of the Project designed or specified by the Architect.

**5.1.2** The Construction Cost shall include the cost at current market rates of labor and materials furnished by the Owner and equipment designed, specified, selected or specially provided for by the Architect, plus a reasonable allowance for the Contractor's overhead and profit. In addition, a reasonable allowance for contingencies shall be included for market conditions at the time of bidding and for changes in the Work during construction.

**5.1.3** Construction Cost does not include the compensation of the Architect and Architect's consultants, the costs of the land, rights-of-way, financing or other costs which are the responsibility of the Owner as provided in Article 4.

### 5.2 RESPONSIBILITY FOR CONSTRUCTION COST

**5.2.1** It is recognized that neither the Architect nor the Owner has control over the cost of labor, materials or equipment, over the Contractor's methods of determining bid prices, or over competitive bidding, market or negotiating conditions. Accordingly, the Architect cannot and does not warrant or represent that bids or negotiated prices will not vary from any estimate of Construction Cost or evaluation prepared or agreed to by the Architect.

**5.2.2** No fixed limit of Construction Cost shall be established as a condition of this Agreement by the furnishing, proposal or establishment of a Project budget, unless a fixed limit has been agreed upon in writing and signed by the parties hereto. Fixed limits, if any, shall be increased in the amount of an increase in the Contract Sum occurring after execution of the Contract for Construction.

**5.2.3** Any Project budget or fixed limit of Construction Cost may be adjusted to reflect changes in the general level of prices in the construction industry between the date of submission of the Construction Documents to the Owner and the date on which proposals are sought.

**5.2.4** If a fixed limit of Construction Cost is exceeded by the lowest bona fide bid or negotiated proposal, the Owner shall:

.1 give written approval of an increase in such fixed limit;

.2 authorize rebidding or renegotiating of the Project within a reasonable time;

.3 if the Project is abandoned, terminate in accordance with Paragraph 8.3; or

.4 cooperate in revising the Project scope and quality as required to reduce the Construction Cost.

**5.2.5** If the Owner chooses to proceed under Clause 5.2.4.4, the Architect, without additional charge, shall modify the Contract Documents as necessary to comply with the fixed limit, if established as a condition of this Agreement. The modification of Contract Documents shall be the limit of the Architect's responsibility arising out of the establishment of a fixed limit. The Architect shall be entitled to compensation in accordance with this Agreement for all services performed whether or not the Construction Phase is commenced.

## ARTICLE 6
### USE OF ARCHITECT'S DRAWINGS, SPECIFICATIONS AND OTHER DOCUMENTS

**6.1** The Drawings, Specifications and other documents prepared by the Architect for this Project are instruments of the Architect's service for use solely with respect to this Project, and the Architect shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright. The Owner shall be permitted to retain copies, including reproducible copies, of the Architect's Drawings, Specifications and other documents for information and reference in connection with the Owner's use and occupancy of the Project. The Architect's Drawings, Specifications or other documents shall not be used by the Owner or others on other projects, for additions to this Project or for completion of this Project by others, unless the Architect is adjudged to be in default under this Agreement, except by agreement in writing and with appropriate compensation to the Architect.

**6.2** Submission or distribution of documents to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the Architect's reserved rights.

## ARTICLE 7
### ARBITRATION

**7.1** Claims, disputes or other matters in question between the parties to this Agreement arising out of or relating to this Agreement or breach thereof shall be subject to and decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise. No arbitration arising out of or relating to this Agreement shall include, by consolidation, joinder or in any other manner, an additional person or entity not a party to this Agreement, except by written consent containing a specific reference to this Agreement signed by the Owner, Architect, and any other person or entity sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by the parties to this Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

**7.2** In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of limitations.

**7.3** The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

## ARTICLE 8
### TERMINATION, SUSPENSION OR ABANDONMENT

**8.1** This Agreement may be terminated by either party upon not less than seven days' written notice should the other party

---

AIA DOCUMENT B151 • ABBREVIATED OWNER-ARCHITECT AGREEMENT • THIRD EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**B151-1987    4**

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

fail substantially to perform in accordance with the Agreement through no fault of the party initiating the termination.

**8.2** If the Project is suspended by the Owner for more than 30 consecutive days, the Architect shall be compensated for services performed prior to notice of such suspension. When the Project is resumed, the Architect's compensation shall be equitably adjusted to provide for expenses incurred in the interruption and resumption of the Architect's services.

**8.3** This Agreement may be terminated by the Owner upon not less than seven days' written notice to the Architect in the event that the Project is permanently abandoned. If the Project is abandoned by the Owner for more than 90 consecutive days, the Architect may terminate this Agreement by giving written notice.

**8.4** Failure of the Owner to make payments to the Architect in accordance with this Agreement shall be considered substantial nonperformance and cause for termination.

**8.5** If the Owner fails to make payment when due the Architect for services and expenses, the Architect may, upon seven days' written notice to the Owner, suspend performance of services under this Agreement. Unless payment in full is received by the Architect within seven days of the date of the notice, the suspension shall take effect without further notice. In the event of a suspension of services, the Architect shall have no liability to the Owner for delay or damage caused the Owner because of such suspension of services.

**8.6** In the event of termination not the fault of the Architect, the Architect shall be compensated for services performed prior to termination, together with Reimbursable Expenses then due and all Termination Expenses.

**8.7** Termination Expenses are in addition to compensation for Basic and Additional Services, and include expenses which are directly attributable to termination.

## ARTICLE 9
## MISCELLANEOUS PROVISIONS

**9.1** Unless otherwise provided, this Agreement shall be governed by the law of the principal place of business of the Architect.

**9.2** Terms in this Agreement shall have the same meaning as those in AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.

**9.3** Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion, or the date of issuance of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion.

**9.4** The Owner and Architect waive all rights against each other and against the contractors, consultants, agents and employees of the other for damages, but only to the extent covered by property insurance during construction, except such rights as they may have to the proceeds of such insurance as set forth in the edition of AIA Document A201, General Con-

ditions of the Contract for Construction, current as of the date of this Agreement. The Owner and Architect each shall require similar waivers from their contractors, consultants and agents.

**9.5** The Owner and Architect, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Agreement and to the partners, successors, assigns and legal representatives of such other party with respect to all covenants of this Agreement. Neither Owner nor Architect shall assign this Agreement without the written consent of the other.

**9.6** This Agreement represents the entire and integrated agreement between the Owner and Architect and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Architect.

**9.7** Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Owner or Architect.

**9.8** The Architect and Architect's consultants shall have no responsibility for the discovery, presence, handling, removal or disposal of or exposure of persons to hazardous materials in any form at the Project site, including but not limited to asbestos, asbestos products, polychlorinated biphenyl (PCB) or other toxic substances.

## ARTICLE 10
## PAYMENTS TO THE ARCHITECT

### 10.1 DIRECT PERSONNEL EXPENSE

**10.1.1** Direct Personnel Expense is defined as the direct salaries of the Architect's personnel engaged on the Project and the portion of the cost of their mandatory and customary contributions and benefits related thereto, such as employment taxes and other statutory employee benefits, insurance, sick leave, holidays, vacations, pensions and similar contributions and benefits.

### 10.2 REIMBURSABLE EXPENSES

**10.2.1** Reimbursable Expenses include expenses incurred by the Architect in the interest of the Project for:

.1 expense of transportation and living expenses in connection with out-of-town travel authorized by the Owner;

.2 long-distance communications;

.3 fees paid for securing approval of authorities having jurisdiction over the Project;

.4 reproductions;

.5 postage and handling of Drawings and Specifications;

.6 expense of overtime work requiring higher than regular rates, if authorized by the Owner;

.7 renderings and models requested by the Owner;

.8 expense of additional insurance coverage or limits, including professional liability insurance, requested by the Owner in excess of that normally carried by the Architect and Architect's consultants; and

.9 expense of computer-aided design and drafting equipment time when used in connection with the Project.

AIA DOCUMENT B151 • ABBREVIATED OWNER-ARCHITECT AGREEMENT • THIRD EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

**10.3** PAYMENTS ON ACCOUNT OF BASIC Services

**10.3.1** An initial payment as set forth in Paragraph 11.1 is the minimum payment under this Agreement.

**10.3.2** Subsequent payments for Basic Services shall be made monthly and, where applicable, shall be in proportion to services performed within each phase of service.

**10.3.3** If and to the extent that the time initially established in Subparagraph 11.5.1 of this Agreement is exceeded or extended through no fault of the Architect, compensation for any services rendered during the additional period of time shall be computed in the manner set forth in Subparagraph 11.3.2.

**10.3.4** When compensation is based on a percentage of Construction Cost and any portions of the Project are deleted or otherwise not constructed, compensation for those portions of the Project shall be payable to the extent services are performed on those portions, in accordance with the schedule set forth in Sub-

paragraph 11.2.2, based on (1) the lowest bona fide bid or negotiated proposal, or (2) if no such bid or proposal is received, the most recent preliminary estimate of Construction Cost or detailed estimate of Construction Cost for such protions of the Project.

**10.4** PAYMENTS ON ACCOUNT OF ADDITIONAL SERVICES AND REIMBURSABLE EXPENSES

**10.4.1** Payments on account of the Architect's Additional Services and for Reimbursable Expenses shall be made monthly upon presentation of the Architect's statement of services rendered or expenses incurred.

**10.4** PAYMENTS WITHHELD

**10.5.1** No deductions shall be made from the Architect's compensation on account of sums withheld from payments to contractors.

<br>

## ARTICLE 11
### BASIS OF COMPENSATION

The owner shall compensate the Architect as follows:

**11.1** AN INITIAL PAYMENT OF  Three Thousand  Dollars (  $3,000.00  )
shall be made upon execution of this Agreement and credited to the Owner's account at final payment.

**11.2** BASIC COMPENSATION

**11.2.1** FOR BASIC SERVICES, as described in Article 2, and any other services included in Article 12 as part of Basic Services, Basic Compensation shall be computed as follows:
*(Insert basis of compensation, including stipulated sums, multiples or percentages, and identify phases to which particular methods of compensation apply, if necessary.)*

<br>

The Base Fee for Architectural Services shall be $9.00 per gross square foot area of the Project.

See Article 12 for Engineering Services  $3 sq/ft unfinished space (basement, attic) or empty & COVERED EXTERIOR

**11.2.2** Where compensation is based on a stipulated sum or percentage of Construction Cost, progress payments for Basic Services in each phase shall total the following percentages of the total Basic Compensation payable:

| | | |
|---|---|---|
| Programming | @ | $1,500.00 |
| Design Phase: | @ | 35% of Total Base Fee  less ($1,500.00)<br>(i.e. 35% x $9.00 x s. f. area of Approved Project Program) |
| Construction Documents Phase | @ | 50% of Total Base Fee<br>(i.e. 50% x $9.00 x s. f. area of Approved Project Floor Plan) |
| Construction Phase | @ | 15% of Total Base Fee<br>(i.e. 15% x $9.00 x s.f. area of Project under construction) |
| Total Basic Compensation | @ | 100% of Total Base Fee |

AIA DOCUMENT B151 · ABBREVIATED OWNER-ARCHITECT AGREEMENT · THIRD ADDITION · AIA® · © 1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

WARNING: Unlicensed photocopying violuates U.S. copyright laws and is subject to legal prosecution.

**11.3.1** FOR PROJECT REPRESENTATION BEYOND BASIC SERVICES, as described in paragraph 3.2, compensation shall be computed as follows:

| | | |
|---|---|---|
| Principal Time | @ | $120.00 per Hour |
| Associate Time | @ | 110.00 per Hour |
| Project Manager Time | @ | 100.00 per Hour |
| Technical Designer Time | @ | 90.00 per Hour |
| Draftsman Time | @ | 80.00 per Hour |
| Secretarial Time | @ | 70.00 per Hour |
| Consultant Time | @ | 1.2x Direct Expense |

**11.3.2** FOR ADDITIONAL SERVICES OF THE ARCHITECT provided under Article 3 or identified in Article 12, compensation shall be computed as follows:
*(Insert basis of compensation, including rates and/or multiples of Direct Personnel Expense for Principals and employees, and identify Principals and classify employees, if required. Identify specific services to which particular methods of compensation apply, if necessary.)*

| | | |
|---|---|---|
| Principal Time | @ | $120.00 per Hour |
| Associate Time | @ | 110.00 per Hour |
| Project Manager Time | @ | 100.00 per Hour |
| Technical Designer Time | @ | 90.00 per Hour |
| Draftsman Time | @ | 80.00 per Hour |
| Secretarial Time | @ | 70.00 per Hour |
| Consultant Time | @ | 1.2x Direct Expense |
| Principal Consultation Time | @ | 200.00 per Hour (For consultation not related to an ongoing project) |

**11.3.3** FOR ADDITIONAL SERVICES OF CONSULTANTS, including additional structural, mechanical and electrical engineering services and those provided under Article 3 or identified in Article 12 as part of Additional Services, a multiple of ( 1.2 ) times the amounts billed to the Architect for such services.
*(Identify specific types of consultants in Article 12, if required.)*

**11.4    REIMBURSABLE EXPENSES**

**11.4.1** FOR REIMBURSABLE EXPENSES, as described in Paragraph 10.2, and any other items included in Article 12 as Reimbursable Expenses, a multiple of One & 2/10 ( 1.2 ) times the expenses incurred by the Architect, the Architect's employees and consultants in the interest of the Project.

**11.5 ADDITIONAL PROVISIONS**

**11.5.1** IF THE BASIC SERVICES covered by this Agreement have not been completed within ~~Twelve~~ EIGHTEEN ( ~~12~~ 18 ) months of the date hereof, through no fault of the Architect, extension of the Architect's services beyond that time shall be compensated as provided in Subparagraphs 10.3.3 and 11.3.2.

**11.5.2** Payments are due and payable Ten ( 10 ) days from the date of the Architect's invoice. Amounts unpaid Thirty ( 30 ) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Architect.
*(Insert rate of interest agreed upon.)*

Interest Rate shall be 1.8% per month
*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Architect's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Specific legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

**11.5.3** The rates and multiples set forth for Additional Services shall be annually adjusted in accordance with normal salary review practices of the Architect:

WARNING: Unlicensed photocopying vioulates U.S. copyright laws and is subject to legal prosecution.

**12.1 SCHEMATIC DESIGN PHASE**
Once the Project Program is approved, the Schematic Design Drawings shall be developed and shall consist of Floor Plans of all levels, Exterior Elevations, and a Site Plan, if applicable. A Construction Cost Estimate, based on square foot area of the Project, shall be included. The Fee for Schematic Design shall be based on the Project Program approved by the Owner. If the Project Program is reduced by the Owner after Schematic Design has begun, then the necessary revisions to the Schematic Design Drawings shall be made as an Additional Service on an hourly basis, in addition to the initial Schematic Design Fee. If the Project Program is increased, the Schematic Design Fee shall be adjusted to include the additional square foot area of the project.

**12.2 EXISTING CONDITIONS**
The Owner shall provide the Architect with Drawings of all existing conditions of the Project. The Architect shall be entitled to rely upon the accuracy and completeness of such Drawings. If the Architect must record and document existing conditions, then such work shall be considered an Additional Service and shall be provided in accordance with Article 11.3.

**12.3 ENGINEERING SERVICES**
The Architect shall provide normal Structural Engineering Services at a not-to-exceed fee of $2,000. The Architect shall provide normal Mechanical, Plumbing and Electrical Engineering Services in either one of two (2) ways at the Owner's option.
Option 1: the Architect shall provide performance criteria for a design/build system by the Contractor at no additional fee.
Option 2: the Architect shall provide full Engineering Services for each engineering discipline at an additional fee of not-to-exceed
$2,000 per discipline.

**12.4 FEE FOR CONSTRUCTION ADMINISTRATION**
The fee for Construction Administration shall be divided into equal weekly amounts over the period of time set aside for Construction as stipulated in the Owner and Contractor Agreement. If the Construction Period goes beyond that which is stipulated in the Owner and Contractor Agreement, then the Architect shall be reimbursed for each additional week of Construction in an amount equal to each previous weekly amount until such time as Final Completion of the Project is reached. Billing for Construction Administration shall occur monthly.

**12.5 SITEWORK & SITE IMPROVEMENTS**
As part of the Architect's Basic Services, the Architect shall design an overall site plan, including a layout for vehicular parking and pedestrian walkways. However, Construction Documents for all sitework and site improvement work, outside the limit of the building perimeter foundation walls, shall be provided as an Additional Services on an hourly basis in accordance with Article 11.3.

**12.6 DISPUTE RESOLUTION LOCALE**
The locale for the resolution of any dispute between the parties to this Agreement shall be in the principal place of business of the Architect.

**12.7 PROJECT APPROVAL APPEARANCES**
One (1) appearance before local agencies that have jurisdiction over the approval of the Project is included in the Architect's fee for Basic Services. Any additional appearances shall be provided as required as an Additional Service on an hourly basis in accordance with Article 11.3.

**12.8 TAXES OR FEES ENACTED BY THE GOVERNMENT**
Any taxes or fees enacted by local, state, or Federal Government, based on gross receipts or revenues which must be paid by the Architect, will be added to amounts due under this Agreement.

**12.9 UNPAID ARCHITECTURAL FEES**
If the Architect must make a claim for unpaid architectural fees, then such claim shall be heard in arbitration, in accordance with Article 7. All other claims of any nature, including any counterclaims and/or crossclaims, shall be heard in a court of law of proper jurisdiction. The American Arbitration Association shall not have jurisdiction over any such other claims. If the Architect must expend legal fees to collect unpaid architectural fees, then such expenditures shall be considered a Reimbursable Expense in accordance with Article 11.4.

This Agreement entered into as of the day and year first written above.

OWNER: _____

_(Signature)_ Mike McTigue, DVM

ARCHITECT _____

_(Signature)_ Warren Freedenfeld, AIA, President

GARDNER ANIMAL HOSPITAL _____
_(Printed name and title)_

WARREN FREEDENFELD & ASSOCIATES, INC. _____
_(Printed name and title)_

RECEIVED  16 AUG  11



**Michael P. McTigue, D.V.M.**
**Brian C. Hurley, D.V.M.**
**Kathleen J. O'Brien, D.V.M.**

GARDNER ANIMAL HOSPITAL
7 Pearson Blvd.
Gardner, MA 01440
Telephone: (978) 632-7110

Warren Freedenfeld & Associates, Inc.
39 Church Street
Boston, MA  02116

Dear Mr. Freedenfeld:

This letter is sent to you pursuant to the terms of Article 8.1 of the AIA Document B151 executed by and between us dated March 24, 1998, regarding the proposed construction of the Gardner Animal Hospital on my behalf.  Furthermore, this letter is sent to you as written confirmation of the termination of the contract entered into by and between us verbally during our phone discussion on June 25, 1999, which termination was further confirmed by you in your letter of July 22, 1999 to me.

The reason for the termination action taken on June 25, 1999, and for this letter in confirmation of same, is that you failed substantially to perform in accordance with the terms of the Agreement above referenced through no fault of mine.

Some, and this list is not all inclusive, of the reasons for this termination are as follows:

1.      Although I was charged nearly $50,000 for work you purport to have done, substantial portions of that work had not, indeed, ever been completed by you.  For example, foundation drawings were never developed by you, nor were the proper elevations used.  Additionally, there were residual questions as to whether work you had said had been done, and billed me for, had ever actually been done.

2.      Whatever plans, drawings etc. You did prepare have proven to be useless to us, and they have been rolled up and discarded.  This, in spite of my having paid you tens of thousands of dollars; unfortunately, I again have to pay another architect another tens of thousands of dollars to complete the project.

3.      Most importantly, you continued to refuse to recognize that a redesign of the plans, etc. was required to reduce the cost of the project to a manageable financial level.  You knew full well that my bank had limited me to construction costs of $1,000,000.00, while everyone to whom I spoke in the construction industry and elsewhere indicated that the project as you had designed it could not be completed for less than approximately $1.3 million, some 30% over my project budget.

I regret having had to take this action and I wish you success in your future endeavors.

Sincerely,

Michael P. McTigue, DVM

Not Reported in F.Supp.2d, 2004 WL 1146104 (M.D.Fla.), 17 Fla. L. Weekly Fed. D 557

<u>Motions, Pleadings and Filings</u>

United States District Court,
M.D. Florida.
JAMES W. ROSS, INC., Plaintiff,
v.
CECIL ALLEN CONSTRUCTION, INC., Cecil B. Allen, Terry R. Callahan, John Houston, Jr., Mary D. Houston, Defendants.
No. 6:03CV792ORL28KRS.
Filed June 10, 2003.
April 26, 2004.

Jon Douglas Parrish, Parrish, White & Lawhon, P.A., Naples, FL, for James W. Ross, Inc. dba Ross Design Group, plaintiff.
<u>David W. Henry</u>, Allen, Dyer, Doppelt, Milbrath & Gilchrist, P.A., Orlando, FL, <u>Jeffrey Katz</u>, Dalan & Katz, P.L., Clearwater, FL, for Cecil Allen Construction, Inc., defendant.
<u>David W. Henry</u>, <u>Jeffrey Katz</u>, (See above), for Cecil B. Allen, defendant.
Terry R. Callahan, Leesburg, FL, for Terry R. Callahan, defendant.
<u>Brian R. Gilchrist</u>, Allen, Dyer, Doppelt, Milbrath & Gilchrist, P .A., Orlando, FL, for John Houston, Jr., defendant.
<u>Brian R. Gilchrist</u>, (See above), for Mary D. Houston, defendant.

ORDER

ANTOON, J.
*1 James W. Ross, Inc. ("Ross") brings this action against Defendants Cecil Allen Construction, Inc., Cecil B. Allen, Terry R. Callahan, and John and Mary Houston ("the Houstons") alleging copyright infringement under the Copyright Act of 1976, <u>17 U.S.C. § 101</u> *et seq.* Ross claims that the Defendants built a house that infringed on his copyrighted architectural work entitled the Greenbriar Model 3658.
The Houstons have filed a Motion for Summary Judgment on the Issue of Statute of Limitations (Doc. 39, filed January 12, 2004), asserting that this action is barred by the three-year statute of limitations in <u>17 U.S.C. § 507(b)</u>. After the Court heard oral argument on the Houstons' motion, Defendants Cecil Allen Construction, Inc. and Cecil B. Allen (collectively "Allen") filed a motion for summary judgment (Doc. 50, filed April 5, 2004) making the same statute-of-limitations argument made by the Houstons.<u>FN1</u> Upon consideration of the record in this matter, argument of counsel, and relevant case law, and as more specifically set forth below, the Court concludes that both motions must be denied.

<u>FN1.</u> Ross has filed responses to both motions. (Docs. 43 & 52).

*I. Factual Background*

The Houstons built a home in Orlando in 1999 and received a Certificate of Occupancy on January 5, 2000. (Doc. 39 at 1). On April 13, 2003, Ross was driving in the neighborhood and became suspicious of the home's design because the rear of the house resembled one he had previously designed and built, and for which he ultimately received a copyright. (Ross Aff., Doc. 45, at 1-2). Ross then obtained copies of the Houston's house plans from the Orange County Building Department and compared them to his Greenbriar model. (Doc. 45 at 2). Ross claims that the Houstons' house was a direct copy of his original model because the floor plan and elevations were exact and because the Greenbriar has a "very unique roof design." *Id.* Ross then filed this lawsuit on June 10, 2003.

*II. Discussion*

*A. Summary Judgment Standards*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain. *Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).* When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir.1997).* "The evidence presented cannot consist of conclusory allegations or legal conclusions." *Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir.1991); see also* Fed.R.Civ.P. 56(e) (providing that nonmovant's response "must set forth specific facts showing that there is a genuine issue for trial").

**2** In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).* However, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." *Celotex, 477 U.S. at 322.* At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson, 477 U.S. at 249.*

*B. The Merits of the Defendants' Motions*

The Defendants argue that because more than three years passed between completion and occupancy of the Houstons' home in January 2000 and filing of this suit in June 2003, Ross's claim is barred by the Copyright Act's three-year statute of limitations. That provision states that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."17 U.S.C. § 507(b). At issue here is when Ross's infringement claim accrued. Courts in other circuits have applied the discovery rule to claims brought under the Copyright Act. In other words, those courts have held a copyright claim accrues "when the plaintiff learns, or should as a reasonable person have learned, that the defendant was violating his rights." *Gaiman v. McFarlane, 360 F.3d 644, 653 (7th Cir.), reh'g and reh'g en banc denied (7th Cir.2004); see also Lyons P'ship. L.P. v. Morris Costumes, Inc., 243 F.3d 789, 796 (4th Cir.2001)* ("The limitations period for bringing copyright infringement claims is three years after the claim accrues. And a claim accrues when 'one has knowledge of a violation or is chargeable with such knowledge.' ") (citations omitted); *Roley v. New World Pictures, Inc., 19 F.3d 479, 481 (9th Cir.1994)* (same); [FN2] *Stone v. Williams, 970 F.2d 1043, 1048 (2d Cir.1992)* (same); *John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 186 F.Supp.2d 1, 24 (D.Mass.2002)* (same), *aff'd, 322 F.3d 26 (1st Cir.2003); Barbour v. Head, 178 F.Supp.2d 758, 765 (S.D.Tex.2001)* (noting "that nothing in the law of the Fifth Circuit forecloses the application of the discovery rule or any other equitable tolling rules to copyright infringement actions" and finding implicit acceptance of such application by the Fifth Circuit in two cases).

> FN2. Defendants cite *Los Angeles News Service v. Reuters Television International, Ltd., 149 F.3d 987, 993 (9th Cir.1998),* for the statement therein that "a claim accrues when an act of infringement occurs, not when consequent damage is suffered." However, in that case the Ninth Circuit was discussing the domestic (versus extraterritorial) application of the Copyright Act rather than a straightforward statute-of-limitations argument, and it cited *Roley* for the quoted statement. Thus, in *Los Angeles News Service* the Ninth Circuit did not overturn its holding in *Roley* regarding application of the discovery rule in copyright actions.

As acknowledged by both parties, the Eleventh Circuit has not squarely addressed the issue of whether the discovery rule applies to copyright suits. However, the rule has been mentioned in a

concurring opinion in an Eleventh Circuit copyright case. *See Calhoun v. Lillenas Publ'g*, 298 F.3d 1228, 1236 (11th Cir.2002) (Birch, J., specially concurring) ("The limitations period may be triggered when a plaintiff knows or, in the exercise of reasonable diligence, should have known about an infringement."), *cert. denied,*123 S.Ct. 2251 (2003). The Defendants argue, however, that to the extent the Eleventh Circuit has endorsed the discovery rule in the copyright context, the rule's application should be limited in cases involving house plans. (Defs.' Mot. for Summ. J., Doc. 39, at 5).

***3** The Defendants claim the discovery rule should be limited in these circumstances because house plans are available for inspection at the job site and because plans become part of the public record when they are submitted to governing bodies for approval. *Id.* The Defendants further argue that under these circumstances, any failure to discover an infringing house within three years is per se unreasonable. *Id.* Through their reasoning, the Defendants seem to be suggesting that every owner of a copyrighted house plan would need to employ a full-time investigator to scour public records and drive around every housing development to ensure that no infringing houses are being built.

This argument is unpersuasive, and the Court declines to carve out an exception to application of the discovery rule merely because house plans rather than other copyrighted works are at issue. There is no authority for Defendants' position, and indeed there is caselaw to the contrary. *See, e.g., Zitz v. Pereira*, 119 F.Supp.2d 133 (E.D.N.Y.1999) (applying discovery rule in the house-plan context and finding claim time-barred on the facts of that case), *aff'd,*225 F.3d 646 (2d Cir.2000). Thus, as in other copyright cases, examination of the facts of each particular house-plan case determines whether the suit was brought within three years of when the plaintiff should reasonably have discovered the infringement of the copyrighted plans.

In *Zitz,* the court concluded that the infringement claim was time-barred because the court found that the plaintiff had learned of the infringement more than three years prior to filing suit; the defendant had been observed photocopying the plans in the public library in January 1993 but suit was not filed until March 1996. 119 F.Supp.2d at 136. In contrast, in the instant case there is no record evidence suggesting that Ross knew or should have known about the infringement at issue prior to April 2003 or that Ross did not act diligently in discovering the alleged infringement. Ross testified that he first learned of the alleged infringement in April 2003 and filed this lawsuit only two months later. (Ross Aff., Doc. 45, at 1). The Defendants have not presented evidence that Ross should reasonably have discovered the infringement prior to April 2003, and certainly not that he should reasonably have discovered it prior to June 2000-three years before this suit was filed. Thus, the Defendants have not established their entitlement to summary judgment on this issue.

### Conclusion

In accordance with the foregoing analysis, it is ORDERED and ADJUDGED that Defendants' Motion for Summary Judgment on the Issue of Statute of Limitations (Doc. 39, filed January 12, 2004) filed by Defendants John and Mary Houston and Defendants' Motion for Summary Judgment on the Issue of Statute of Limitations (Doc. 50, filed April 4, 2004) filed by Defendants Cecil Allen Construction, Inc. and Cecil B. Allen are DENIED.

M.D.Fla.,2004.

James W. Ross, Inc. v. Cecil Allen Const., Inc.

Not Reported in F.Supp.2d, 2004 WL 1146104 (M.D.Fla.), 17 Fla. L. Weekly Fed. D 557

Motions, Pleadings and Filings (Back to top)

• 2004 WL 2036490 (Trial Motion, Memorandum and Affidavit) Defendant's Response to Plaintiff's Second Emergency Motion for Protective Order and Memorandum of Law (Aug. 06, 2004)
• 2004 WL 2036480 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendants' Motion to Strike Plaintiff's Expert and Memorandum of Law in Support Thereof (Aug. 05, 2004)
• 2004 WL 2036485 (Trial Motion, Memorandum and Affidavit) Plaintiff's Second Emergency Motion for Protective Order and Memorandum of Law (Aug. 05, 2004)
• 2004 WL 2036475 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum in Opposition to Motion for Summary Judgment (Apr. 13, 2004)
• 2004 WL 2036471 (Trial Motion, Memorandum and Affidavit) Defendant's Motion and Memorandum for Summary Judgment on the Issue of Statute of Limitations (Apr. 05, 2004)
• 2004 WL 2036469 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum in Opposition

to Motion for Summary Judgment (Jan. 30, 2004)
- 2004 WL 2036467 (Trial Motion, Memorandum and Affidavit) Defendants' Motion and Memorandum for Summary Judgment on the Issue of Statute of Limitations (Jan. 12, 2004)
- 2003 WL 23771977 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Order to Show Cause (Nov. 19, 2003)
- 2003 WL 23771975 (Trial Motion, Memorandum and Affidavit) Order to Show Cause: (Nov. 12, 2003)
- 2003 WL 23771972 (Trial Pleading) Answer, Affirmative Defenses and Demand for Jury Trial (Oct. 14, 2003)
- 2003 WL 23771968 (Trial Pleading) Defendants Houston's Answer to Complaint (Oct. 09, 2003)
- 2003 WL 23771966 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum in Response to Defendants' Motions to Dismiss (Jul. 16, 2003)
- 2003 WL 23771961 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion to Strike Pleading and Memorandum of Law in Support (Jul. 11, 2003)
- 2003 WL 23771958 (Trial Motion, Memorandum and Affidavit) Defendants' Motion and Memorandum to Dismiss for Lack of Subject Matter Jurisdiction (Jul. 01, 2003)
- 2003 WL 23771954 (Trial Pleading) Complaint - Injunctive Relief Sought (Jun. 10, 2003)
- 6:03CV00792 (Docket) (Jun. 10, 2003)
END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.