UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05 11573 RGS

| | |
|---|---|
| WARREN FREEDENFELD ASSOCIATES, INC. as successor in interest to WARREN FREEDENFELD & ASSOCIATES, INC., Plaintiff, v. MICHAEL P. MCTIGUE, DVM individually and as Trustee of THE MCTIGUE FAMILY TRUST, NANCY A. MCTIGUE, as Trustee of the MCTIGUE FAMILY TRUST, BRIAN C. HURLEY, DVM, GARDNER ANIMAL CARE CENTER, LLC d/b/a GARDNER ANIMAL HOSPITAL, EDWARD D. CORMIER, ASSOCIATES INC., and BENNETT BUILDING CORPORATION, Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE MOTION OF THE
DEFENDANTS, MICHAEL P. MCTIGUE, NANCY A. MCTIGUE, BRIAN C.
HURLEY, AND GARDNER ANIMAL CARE CENTER D/B/A GARDNER
ANIMAL HOSPITAL, TO COMPEL PRODUCTION OF DOCUMENTS AND
REQUEST FOR SANCTIONS**

## I.    INTRODUCTION

The defendants, Michael P. McTigue, Nancy A. McTigue, Brian C. Hurley, and

Gardner Animal Care Center d/b/a Gardner Animal Hospital (collectively, the "Hospital

Defendants"), have filed a Motion to Compel the plaintiff, Warren Freedenfeld

Associates, Inc., as successor in interest to Warren Freedenfeld & Associates, Inc.

(collectively, "Freedenfeld") to produce certain proprietary design documents created by

the plaintiff for numerous other clients during a period stretching seven years.[1]  As

---

[1] It should be noted that the Hospital Defendants failed to comply with Massachusetts Local Rule 7.1(b)(1)
which requires that "a party filing a motion [to] at the same time file a [separate] memorandum of reasons,

grounds for the allowance of the motion, the Hospital Defendants contend that the documents are needed to a support a counterclaim or separate lawsuit for copyright infringement and violation of the Lanham Act which Dr. McTigue intends to file at some future date against Freedenfeld for what he claims are "52 violations of the [his] intellectual property rights." This allegation is premised on a misplaced and misguided assumption that Dr. McTigue is co-owner or joint author of the architectural works that Freedenfeld prepared for the Gardner Animal Hospital project. Apparently, it is Dr. McTigue's contention that Freedenfeld somehow "palmed of" the defendants purported architectural ideas as his own and incorporatated them in the plans that the plaintiff prepared for other clients over a seven year period.

The Hospital Defendant's Motion to Compel should be denied because there is absolutely no basis in either law or fact to support such a frivolous, outrageous, and incredible counterclaim or separate lawsuit. Moreover, while Fed. R. Civ. P. 26 is fairly liberal, the Hospital Defendants cannot reasonably claim that they are entitled to receive documents for the sole purpose of supporting a counterclaim or separate lawsuit which Dr. McTigue apparently intends to file at some unknown future date.

It is noteworthy that up until now, Dr. McTigue has never claimed to be either the co-owner or joint author of the subject architectural works that are the subject of this dispute. Indeed, two contracts executed by Dr. McTigue clearly acknowledge that Freedenfeld is the owner and sole author of the subject architectural works for the

---

including citation of supporting authorities, why the motion should be granted." No separate memorandum was filed in support of the Hospital Defendant's Motion to Compel. In addition, the Hospital Defendants' Rule 7.1(2) certification is disingenuous because opposing counsel abruptly hung up the phone while counsel for the plaintiff was discussing the plaintiff's objections to the Hospital Defendants' Document Requests. See Affidavit of Counsel filed contemporaneously with this opposition.

purposes of the Copyright Act. Second, even if McTigue contributed to the design of the Architectural Works by submitting ideas to Freedenfeld, which he did not, making certain changes to the design, and/or exercising approval power over various aspects of the plans, these alleged contributions would not, as a matter of law, be enough to confer upon Dr. McTigue any rights whatsoever as co-owner or joint author of the architectural works. See Meltzer v. Zoeller 520 F.Supp. 847, 856 (D.C.N.J., 1981)(ruling that, although plaintiff had prepared actual sketches illustrating in some detail features of a house which he and his wife required and had presented these sketches to the architect and although the plaintiff contributed ideas and made certain changes and exercised approval power, it was the architectural firm, rather than the plaintiff, which had created the plans for the house, and thus the architectural firm was the sole author of the plans for purpose of copyright interests). For the Court's convenience, a copy of the Meltzer decision is attached hereto as **Ex. A.**

Indeed, up until now, Dr. McTigue had disclaimed any interest in the Architectural Works.  Significantly, when Freedenfeld informed Dr. McTigue that he was prohibited from using the architectural works to complete the project, the defendant informed Freedenfeld in writing that he threw them in the trash because, according to Dr. McTigue,  they had "proven to be useless." For Dr. McTigue to now claim that he jointly authored the works, which he did not want to use is simply outrageous.[2]  Pursuant to Fed. Civ. 11(c), Freedenfeld requests that sanctions be imposed against the Hospital

---

[2] It should also be pointed out that Dr. McTigue never previously designed any animal hospitals. Indeed, it is undisputed that he has no architectural training whatsoever.  By contrast, Freedenfeld has designed hundreds of animal hospitals across the country, many of which are award winning. Freedenfeld is also nationally and internationally recognized as a specialist in the unique field of veterinary hospital design. For Dr. McTigue to even suggest that he ever gave Freedenfeld architectural design ideas is just plain ridiculous.

Defendant for its filing of an entirely frivolous motion. In further support of this opposition, Freedenfeld submits the Affidavit of Counsel filed contemporaneously with this opposition and states as follows:

## II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Gardner Animal Hospital Project and Article 6 of the AIA Agreement

In 1999, the defendant, Michael McTigue, DVM ("Dr. McTigue"), retained Freedenfeld to design a new veterinary facility for the Gardner Animal Hospital ("the Hospital") in Gardner, Massachusetts (the "Project"). Dr. McTigue was very familiar with Freedenfeld's work.[3]

Prior to Dr. McTigue's retaining Freedenfeld to design the subject Project, business records made available for inspection and copying to the defendants in this action, evidence that Dr. McTigue viewed floor plans for two other animal hospitals that Freedenfeld designed several years earlier for other clients. The first was the Wellesley/Natick Veterinary Hospital in Natick, MA. The second facility was the Post Road Veterinary Hospital in Charlton, MA. The Wellesley/ Natick facility won a Merit Design award in 1990. Dr. McTigue indicated to Freedenfeld that he wanted his project to combine and reflect elements of both these facilities.

When Dr. McTigue retained Freedenfeld to design the subject Project, the parties had agreed that Freedenfeld would retain exclusive ownership of all the designs and drawings that Freedenfeld prepared for the Project (collectively, the "Architectural Works"). Specifically, Dr. McTigue and the Hospital agreed that Freedenfeld would be the owner and the sole author of the Architectural Works and that Freedenfeld would

---

[3] Five years earlier, Dr. McTigue hired Freedenfeld to prepare plans for the renovation of an existing structure into an earlier Gardner Animal Hospital. Those plans were designed solely by Freedenfeld.

4

retain all common law, statutory, and other reserved rights, including the copyright. This agreement was memorialized in the Abbreviated Form of Agreement Between Owner and Architect executed by the parties dated March 24, 1999 (the "AIA O&A Agreement"). Article 6 of AIA O&A Agreement provides in its entirety:

> 6.1.    ***The Drawings, Specifications and other documents prepared by the Architect for this Project are instruments of the Architect's service for use solely with respect to this Project, and the Architect shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright.*** The Owner shall be permitted to retain copies and other documents for information and reference in connection with the Owner's use and occupancy of the Project. The Architect's Drawings, Specifications or other documents shall not be used by the Owner or others on other projects, for additions to this Project or for completion of this Project by others, unless the Architect is adjudged to be in default under this Agreement, except by agreement in writing and with appropriate compensation to the Architect.

See Article 6 of Abbreviated Form of Agreement Between Owner and Architect (AIA Document B151), attached hereto as **Exhibit B** at ¶ 6.1.

The Architectural Works were the only architectural plans and drawings that were created for the Project and all were created solely by Freedenfeld. Dr. McTigue did not prepare any sketches, renderings, blue prints, or drawings whatsoever.[4] In accordance with Article 6 of the AIA O&A Agreement, Freedenfeld retained the original versions of the Architectural Works.

After the Project gained the approval of the City of Gardner Zoning and Planning Board, Freedenfeld and McTigue had a falling out. Dr. McTigue also alleged that Freedenfeld failed to substantially perform the architectural services. As a result of the dispute, Dr. McTigue threatened to terminate Freedenfeld as the Project architect. During this period, Freedenfeld made clear to Dr. McTigue in writing that if the Hospital

---

[4] Even if Dr. McTigue did prepare any drawings (which he did not), under the terms of the AIA O&A Agreement, Freedenfeld is deemed to be the sole author of the plans and retains sole ownership over the final versions.

decided to terminate Freedenfeld that the Hospital was prohibited from using the
Architectural Works to complete the Project.  When Freedenfeld requested that Dr.
McTigue and the Hospital return the Architectural Works, Dr. McTigue responded to
Freedenfeld by letter stating that all the works that Freedenfeld prepared for the Project
had been "rolled up and discarded."  Dr. McTigue stated in his letter:

> ***Whatever plans, drawings etc. you did prepare have proven useless to us,
> and they have been rolled up and discarded.*** This is in spite of my having
> paid tens of thousands of dollars; unfortunately, I again have to pay
> another architect another tens of thousands of dollars to complete the
> project.

See  Dr. McTigue Letter attached hereto as **Ex. C.**

**B.      The Termination Agreement**

In August of 1999, to protect its rights in the Architectural Works, Freedenfeld
properly filed an application and deposited the required fee with the U.S. Copyright
Office in Washington, D.C.  The copyright was later granted to Freedenfeld for the
Architectural Works (Certificate VAU 656-367).

In September of 1999, Freedenfeld, Dr. McTigue, and the Hospital agreed to
resolve their dispute, including fees owed by the Hospital for the design services
Freedenfeld performed in connection with the Project, by entering into a Termination and
Mutual Release Agreement (the "Termination Agreement"). As part of the Termination
Agreement, Dr. McTigue and the Hospital specifically agreed that they would not use the
Architectural Works. The Termination Agreement did not modify, in any way,
Freedenfeld's exclusive ownership, proprietary rights, or right to enforce its copyright
interests in the Architectural Works.  Specifically, Paragraph 3 of the Termination
Agreement provides:

6

> **[the Hospital] agrees not to use any of the work solely produced by [Freedenfeld]. Article 6 of the [AIA O&A Agreement] shall remain in full force and affect [sic].**

<u>See</u> Termination and Mutual Release Agreement, attached hereto as **<u>Ex. D</u>**.

**C.    Freedenfeld's Discovery of the infringing Activity**

Freedenfeld has been a long term subscriber to a veterinary trade publication, *Veterinary Economics* (the "Magazine"). The Magazine is an international veterinary medicine and business management publication serving more than 50,000 subscribers in the United States and Canada. While perusing the November 2004 issue of the Magazine, Freedenfeld discovered an article appearing on pages 50 - 57 about the renovation and expansion of the Gardner Animal Hospital. According to the article, the design won a "Merit Award" in the 2004 Veterinary Hospital Design Competition, a national and international competition. The article is entitled "Giving an Old House a Cutting –Edge Extension." The article identifies the owners of the Hospital as Dr. McTigue and Brian Hurley DVM. Edward D. Cormier Associates Inc. is listed as the Architect. Pages 52-53 of the article contain drawings that are nearly identical to the Architectural Works prepared by Freedenfeld. After further investigation by Freedenfeld's counsel in early 2005, it was determined that the Project was built by the defendant, Bennett Building Corporation using the Freedenfeld Architectural Works and that the land where the Project was built is owned by the McTigue Family Trust. Both Dr. McTigue and his wife, Nancy McTigue are trustees of the McTigue Family Trust.

**D.    The Instant Action**

On July 22, 2005, Freedenfeld instituted the instant action against the defendants for copyright infringement and violation of the Lanham Act. On February 17, 2006, the

Hospital Defendants filed an Answer to the Complaint. The Answer filed by the Hospital Defendants did not include any counterclaim. See Answer of the Hospital Defendants, attached hereto as **Ex. E.**

**E.    Discovery**

On or about March 30, 2006, the Hospital Defendants served Freedenfeld with a First Request for Production of Documents. Request No. 2 sought the production of proprietary design documents created by Freedenfeld for various other clients over a period stretching seven years. Freedenfeld objected to the request because it was irrelevant to the subject matter of the action, overly burdensome and not reasonably calculated to the admission of discoverable evidence. It should also be noted that the request seeks confidential proprietary information on Freedenfeld's clients.[5] The Hospital Defendant's Document Request No.2 and Freedenfeld's response are set forth below:

**REQUEST NO.: 2**

Any and all plans for any and all veterinary hospitals designed by the Plaintiff from September, 1999 to the present.

**RESPONSE NO.: 2**

The defendant objects to this request on the grounds that it is irrelevant to the subject matter of the action, overly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

See Plaintiff's Response to the Hospital Defendants' First Request for Production of Documents, attached hereto as **Ex. F.**

---

[5] This is highly objectionable because one of the defendants, Edward D. Cormier Associates, Inc. is a competitor.

Doubtless, the proprietary documents requested by the Hospital Defendants have absolutely nothing to do with the instant action. They were created for other clients and years after Freedenfeld and Hospital Defendants parted ways. The production of these documents would also be unduly burdensome because of the sheer number of design documents involved.[6] More importantly, the request is not reasonably calculated to lead to the discovery of admissible evidence because the stated purpose of the request is to gather purported evidence to support alleged claims of copyright infringement and Lanham Act violations, both of which are claims that are not yet in suit. While it is true that Fed. R. Civ. 26 is fairly liberal, it is, to say the least, difficult to see how the Hospital Defendants would be entitled to documents to support claims which Dr. McTigue intends to bring against Freedenfeld at some undisclosed future date. More importantly, for the reasons stated above, these purported claims would be entirely frivolous because they have no basis in law or fact. The absolute frivolousness of Dr. McTigue's purported copyright infringement and Lanham Act claims are discussed in detail below.

---

[6] It should be noted, that the Hospital Defendant could obtain the documents in their request from other sources. In particular, the plans sought by the defendant would be public records and would be on file with the planning board and/or building department of each city in which the subject projects were submitted for approval. The Court should be aware of the fact that rather than requesting the plans from appropriate municipal bodies, the Hospital Defendants have threatened to place classified advertisements in national veterinary magazines read by Freedenfeld's clients. This would not only be defamatory but would be clearly sanctionable conduct. Freedenfeld has requested an order from this Court in plaintiff's Request for Relief at the end of this opposition, prohibiting the Hospital Defendants from placing such advertisements or otherwise taking any action which is intended solely or likely to cause harm to the plaintiff and/or its reputation.

## III.    ARGUMENT

**A.    THE MOTION SHOULD BE DENIED BECAUSE THE SOLE PURPOSE OF THE REQUEST IS TO GATHER PURPORTED EVIDENCE TO SUPPORT WHAT WOULD BE A FRIVOLOUS COUNTERCLAIM OR SEPARATE LAWSUIT FOR COPYRIGHT INFRINGMENT**

The Hospital Defendants' Document Request No. 2 is not reasonably calculated to lead to the discovery of admissible evidence because its stated purpose is to gather purported evidence to support a counterclaim or separate lawsuit predicated on co-ownership or joint authorship rights in copyrighted architectural works that Dr. McTigue never had, nor up until now, had even wanted. Significantly, from the very start of the Project, the parties understood and agreed in writing that Freedenfeld was the sole author of the Architectural Works for the purposes of the Copyright Act. This understanding was memorialized in both the AIA O&A Agreement and the Termination and Mutual Release Agreement. As previously stated, the clear and unambiguous language of the Termination Agreement specifically states that Article 6 of the AIA O&A Agreement shall remain in full force and effect. Article 6.1 of the AIA O&A agreement provides:

> 6.1.    *The Drawings, Specifications and other documents prepared by the Architect for this Project are instruments of the Architect's service for use solely with respect to this Project, and the Architect shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright.* The Owner shall be permitted to retain copies and other documents for information and reference in connection with the Owner's use and occupancy of the Project. *The Architect's Drawings, Specifications or other documents shall not be used by the Owner or others on other projects, for additions to this Project or for completion of this Project by others, unless the Architect is adjudged to be in default under this Agreement, except by agreement in writing and with appropriate compensation to the Architec*t.

Indeed, Freedenfeld copyrighted the Architectural Works and Dr. McTigue either had actual or constructive knowledge of Freedenfeld's copyright. Significantly, the

10

Architectural Works themselves bear Freedenfeld's logo in the title block of each drawing and contain the following copyright language: *"© 1999 Warren Freedenfeld & Associates, Inc."* Freedenfeld's copyright was also on file with the U.S. Patent and Trademark Office in Washington, D.C.

It is hard to see how Dr. McTigue could now reasonably claim that he is the co-owner or joint author of the Architectural Works. In fact, nowhere in the Hospital Defendants' Motion to Compel have they provided any facts whatsoever which are verified by affidavit or otherwise to support Dr. McTigue's contention of co-ownership or joint authorship in the plans. It is noteworthy that Dr. McTigue never at anytime filed an application for a copyright with the U.S. Patent and Trademark Office relative to the Architectural Works.

However, it is anticipated that the Hospital Defendants will attempt to argue that Dr. McTigue substantially contributed to the design of the Architectural Works by submitting ideas to Freedenfeld, requesting certain changes to the design, and by exercising approval power over various aspects of the Architectural Works. Even if true, this could never be enough to create rights of co-ownership or co-authorship in the Architectural Works. Indeed, this type of consultation between a client and architect, including coordination and incorporation of the client's desires in the design plans is a standard procedure in the architectural profession. Courts have held that whether a client submits ideas to the architect or exercises approval power over aspects of the design does not, as a matter of law, confer upon the client a right of co-ownership or joint authorship.

Indeed, it is a fundamental axiom of copyright law that ideas themselves are not, as a matter of law, copyrightable. Mazer v. Stein, 347 U.S. 201, 217-18, 74 S. Ct. 460,

11

470-471 (1954). Rather it is the fixed expression of ideas in a tangible medium which are copyrightable (e.g., architectural plans). Pursuant to the Copyright Act, the architect, by fixing those ideas in a tangible medium, is deemed to be the creator. This specific issue has been expressly addressed by the federal courts. Significantly, the plaintiff directs the Court's attention to Meltzer v. Zoeller, 520 F.Supp. 847, 856 (D.C.N.J, 1981)(ruling that although the plaintiff had prepared sketches illustrating in some detail features of house which he and his wife required and had presented such sketches to the architect and although the plaintiff contributed ideas and made certain changes and exercised approval power, it was the architectural firm, rather than plaintiff, which had created the plans for the house, and thus the architectural firm was the sole author of the plans for purpose of copyright interests). For the Court's convenience, a copy of Meltzer decision is attached hereto as **Ex. A.** In Meltzer the Court stated:

> The [architect], by fixing the ideas for the [plaintiff's] home in a tangible medium, 'created' those plans, for pursuant to 17 U.S.C. s. 101, a 'work' is "created" when "it is fixed in a copy ... for the first time." It logically follows, then, that the [architect] is the author of these plans for the purpose of copyright interests. In contrast, ideas are not, as a matter of law, copyrightable…The ideas and sketches contributed by plaintiff do not sufficiently constitute fixed expressions of ideas; therefore, plaintiff is not the 'creator' of the plans for his house for copyright purposes. Without authorship, the sine que non of copyright, plaintiff has no cause of action. Nor can the plaintiff be considered a 'joint author' of the plans with the [architect]. Under the 1976 Act, a joint work is one 'prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.' Of course, this would be a fiction here, since plaintiff's failure to have 'created' or 'prepared' the work within the meaning of the statute bars his asserting a copyright interest even as a joint author of the plans. ... For all of the foregoing reasons, this Court finds that plaintiff's claims of copyright infringement against each and every one of the defendants must be dismissed as a matter of law.

520 F. Supp. at 857; see also, M.G.B. Homes, Inc. v. Ameron Homes, Inc. 903 F.2d 1486, 1492-93 (11th Cir. 1990)(where the court found that a home builder was not a

joint author of architectural plans when he prepared a thumbnail sketch of the floor plan he wanted, reviewed drawings in progress, made suggestions and corrections and exercised final approval authority over the work); Aitken, Hazen, Hoffman, Miller, P.C. v. Empire Construction Co., 542 F.Supp. 252, 259 (D. Neb. 1982)(though contractor "communicated to the plaintiff [architect] through sketches and verbal descriptions its general ideas as to the type of apartment complex it intended to build...." contractor's "overall contribution to the plans cannot be said to be more than *de minimis* in nature").

Here, there are substantial factual similarities and differences with the Meltzer decision that destroy any hope that Dr. McTigue has of prevailing on a claim premised on co-ownership or joint ownership of the Architectural Works. First, similar to the plaintiff's in Meltzer, prior to retaining Freedenfeld to design the Project, Dr. McTigue viewed floor plans of two other Animal Hospital Projects that were designed by Freedenfeld, one in Natick, MA and the other in Charlton, MA. Certain elements of those designs were ultimately incorporated into the Project. Second, cutting against Dr. McTigue's claim of co-ownership or joint authorship is the fact that unlike the plaintiffs in Meltzer, here it is undisputed that Dr. McTigue never sought to copyright the Architectural Works. Third, Dr. McTigue never prepared any sketches or drawings. But even if Dr. McTigue had copyrighted the Architectural Works or gave Freedenfeld sketches or drawings during the design phase of the Project, the Meltzer decision makes clear that these actions would not have been enough to confer upon Dr. McTigue any right of co-ownership or joint authorship in the Architectural Works. Fourth, the most damaging blow is the fact that Dr. McTigue entered into two express agreements which clearly state that Freedenfeld is the sole author of the plans and retains the copyright. In

accordance with these signed agreements, Freedenfeld retained the original Architectural

Works which Freedenfeld then immediately copyrighted with the U.S. Patent and

Trademark Office in Washington, D.C. after the parties parted ways. Fifth, even more

significant from a factual standpoint is that up until now, Dr. McTigue never claimed any

right of co-authorship in the architectural works and never took any action to protect his

purported intellectual property interests.  In fact, Dr. McTigue told Freedenfeld in writing

that he had thrown the Architectural Works in the trash because they had "proven to be

useless" to the Hospital. For Dr. McTigue to now turn around and claim that he  jointly

authored the very plans which he did not want to use is not only hypocritical but

outrageous.  Accordingly, for the foregoing five(5) reasons, Hospital Defendants' Motion

to Compel should be denied because the production of the proprietary documents to

support what would obviously be a frivolous counterclaim for copyright infringement

would serve no purpose other than to substantially increase the cost of litigation and

delay the final resolution of the instant action.

**B.**     **THE GROUNDS FOR DR. MCTIGUE'S  ANTICIPATED LANHAM ACT**
         **COUNTERCLAIM ARE ENTIRELY FRIVOLOUS BECAUSE THE**
         **DEFENDANT COULD NEVER SELL OR LICENSE HIS PURPORTED**
         **ARCHITECTURAL IDEAS TO OTHER VETERINARIANS SINCE IT**
         **WOULD BE TANTANMOUNT TO PRACTICING ARCHICETURE**
         **WITHOUT A LICENSE**

The Lanham Act,  15 U.S.C. § 1125(a), covers copyright infringement as well as

a host of other deceptive practices that courts loosely term as "unfair competition." One

such form of unfair competition is the false designation of origin. The act imposes

liability on "[a]ny person who, or in connection with any goods or services…uses in

commerce…any false designation of origin, false or misleading  description of fact, or

false misleading representation of fact, which … is likely to cause confusion, or cause

mistake, or to deceive…as to the origin…of his or her goods, services, or commercial activities." See 15 U.S.C. § 1125(a). However, the greatest obstacle in obtaining relief in an action for unfair competition under the Lanham Act is a showing of competitive injury. See Rainbow Play Systems, Inc. v. Groundscape Technologies, LLC, 364 F.Supp.2d. 1026, 1033 D. Minn. 2005) citing, Blue Dane Simmental Corp., 178 F.3D 1035, 1042 (8th Cir. 1999); See also, Brown v. Armstrong, 957 F.Supp. 1293, 1304 (D.Mass. 1997).

Dr. McTigue is apparently taking the position that he could have sold or licensed his purported architectural contributions relative to the creation of the Architectural Works to his veterinary colleagues. This position is not only preposterous but highly illegal. It is undisputed that Dr. McTigue has no architectural training whatsoever; rather he is a veterinarian. Unlike your typical run-of-the mill Lanham Act claim, the practice of architecture is a licensed profession that is highly regulated by state legislative bodies and the American Institute of Architects. In Massachusetts as well as other states, it is illegal to practice architecture without a license. For example, Massachusetts General Laws Chapter 112 § 60K entitled "**Practice of architecture; use of titles; display of signs and other advertising matter**" provides:

> No person shall, directly or indirectly, engage in the practice of architecture in this commonwealth, except as hereinafter set forth in section sixty L, or use the title "architect", "registered architect", "architectural designer", or display or use any words, letters, figures, title, sign, card, advertisement or other device to indicate that such person offers to engage or engages in the practice of architecture unless he is registered under the provisions of sections sixty A to sixty O, inclusive.

Mass. Gen. Laws Chapter 112 § 60K.

By selling or licensing his purported architectural ideas to other veterinarian, Dr.

McTigue would in effect be practicing architecture without a license and thus would be

violating the law.  In short, Dr. McTigue was never entitled, nor could he ever be entitled

to sell or license what he claims were his architectural ideas to anyone.  In order to do so,

he would first need to satisfy the American Institute of Architect's educational and

training requirements and obtain a license to practice in states in which he intends to sell

or license his architectural ideas.  The public policy reasons for requiring that only

qualified architects who are properly registered within the state of practice be allowed to

provide architectural services to the public are obvious:

> One instance of untrained, unqualified, or unauthorized practice of
> architecture or professional engineering-- be it an isolated transaction or
> one act in a continuing series of transactions-- may be devastating to life,
> health or property. To exclude an isolated transaction from the
> proscription of the registration laws would seriously weaken the purpose
> of such laws at a point where their prohibition of professional services
> may be most needed.

Food Management, Inc. v. Blue Ribbon Beef Pack, Inc. 413 F.2d. 716, 723-724 (8th
Cir.1969)(citations omitted).

While Dr. McTigue may very well be able to copyright architectural concepts

with U.S. Patent and Trademark without being a registered architect (something which he

has not done) there is no doubt that he is prohibited from providing architectural services

to clients and charging a fee for use of any design plans that he creates.  See e.g.,

American Store Equipment & Construction Corp. v. Jack Dempsey's Punch Bowl, Inc.,

174 Misc. 436, 21 N.Y.S.2d 117 (1939), aff'd 258 App. 794, 16 N.Y.S.2d 702, appeal

denied 258 App. 876, 17 N.Y.S.2d 220, aff'd 283 N.Y. 601, 28 N.E.2d 23 (construction

company which executed contract under which the company which was not licensed as

an architect agreed to perform architectural services, was engaged in "practicing architecture" and could not recover for services performed under the contract).[7]

Further it should be noted that Dr. McTigue could never satisfy the interstate commerce element of his purported Lanham Act claim because he is not licensed to practice architecture in Massachusetts or any other state.  He is simply a veterinarian with practice entirely limited to providing animal care services in Massachusetts. Accordingly, for the foregoing reasons the Hospital Defendant's Motion to Compel should be denied because the production of the proprietary documents to support what would be a frivolous counterclaim under the Lanham Act would serve no purpose other than to harass Freedenfeld and increase the plaintiff's litigation costs.

## IV.    CONCLUSION

Accordingly, for all the foregoing reasons, the Hospital Defendants' frivolous Motion to Compel should be <u>Denied</u>

## V.    REQUEST FOR RELIEF

The plaintiff hereby requests the following relief:

1.    That the Hospital Defendants' Motion to Compel be <u>denied;</u>

2.    That the Hospital Defendants be prohibited from placing an advertisement in any publication seeking documents created by Freedenfeld or otherwise discussing or referencing the plaintiff in any way or taking any action which might result in harm to the plaintiff or the plaintiff's reputation;

---

[7] It should be noted that if Dr. McTigue takes the position that he would have not charged a fee for the use of his purported architectural ideas, this would completely undermine his Lanham Act claims since their would be no cognizable injury which the Courts could recognize.

3.    That sanctions be imposed against the Hospital Defendants for each such

violation of the preceding paragraph of this Request for Relief in an amount to

be determined by the Court, but not less than $1,000,000.00 per violation; and

4.    That sanctions be imposed against the Hospital Defendants pursuant to Fed.

Civ. P. 11(c) in the form of attorneys' fees and costs incurred by Freedenfeld

in connection with its preparation of this opposition.

## VI.    REQUEST FOR ORAL ARGUMENT

The plaintiff hereby requests that the Court hear oral arguments on this opposition.

Respectfully submitted,

WARREN FREEDENFELD
ASSOCIATES, INC. as successor in
Interest to WARREN
FREEDENFELD & ASSOCIATES,
INC.,

By its attorneys,

/s/ Garrett J. Lee_____
Barry S. Scheer
BBO No. 445100
Garrett J. Lee
BBO No. 641876
PARKER | SCHEER, LLP
One Constitution Center
Dated: June 13, 2006                     Boston, MA  02129
Tel.: 617-886-0500
Fax: 617-886-0100
Email: bss@parkerscheer.com
        gjl@parkerscheer.com

## CERTIFICATE OF SERVICE

I, Garrett J. Lee, attorney for the plaintiff, Warren Freedenfeld Associates, Inc. as successor in interest to Warren Freedenfeld & Associates, Inc., hereby certify that on this 13th day of June, 2006 a true copy of the following was served on all counsel record:

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE MOTION OF THE DEFENDANTS, MICHAEL P. MCTIGUE, NANCY A. MCTIGUE, BRIAN C. HURLEY, AND GARDNER ANIMAL CARE CENTER D/B/A GARDNER ANIMAL HOSPITAL, TO COMPEL PRODUCTION OF DOCUMENTS AND REQUEST FOR SANCTIONS**

By first-class mail postage pre-paid, addressed to:

Robert N. Meltzer, Esq.
P.O. Box 1459
Framingham, MA 01701

Stephen D. Rosenberg
The McCormack Firm, LLC
One International Place
7th Floor
Boston, MA 02110

F. Joseph Gentili, Esq.
Capobianco & Gentili, PC
15 West Central Street
Natick, MA 01760

Robert D. City, Esq.
Michael J. Dissette, Esq.
City, Hayes & Dissette, PC
50 Congress Street
Boston, MA 02109

Mary C. Casey, Esq.
Harbor Law Group
385 South Street
Shrewsbury, MA 01545

/s/ Garrett J. Lee_____
Garrett J. Lee

West Reporter Image (PDF)

520 F.Supp. 847, 1981 Copr.L.Dec. P 25,312, 216 U.S.P.Q. 776

United States District Court, D. New Jersey.
Harvey R. MELTZER, Plaintiff,
v.
Meir ZOLLER, Mrs. Meir Zoller, Ralph E. Mitschele, Robert V. Doran, Mitschele Construction Corp.,
Xenco, Inc., William G. Chirgotis, Matthew R. Zito, jointly, severally and in the alternative,
Defendants/Third Party Plaintiffs,
v.
William G. CHIRGOTIS and Matthew R. Zito, Third Party Defendants.
Civ. A. No. 79-3176.
Aug. 17, 1981.

Homeowner brought suit, claiming copyright in architectural plans for his house and alleging that defendants had infringed copyright, and defendants filed third-party complaints against architect and architectural firm, alleging breach of implied warranty of title and breach of contract. The District Court, Whipple, Senior District Judge, held that: (1) where plans utilized in connection with plaintiff's home were not created until after effective date of revised Copyright Act, any possible cause of action for copyright infringement arose only after that date, and thus new Act governed suit; (2) plaintiff could not take advantage of work for hire doctrine; and (3) although plaintiff had prepared sketches illustrating in some detail features of house which he and his wife required and had presented such sketches to architect and although plaintiff contributed ideas and made certain changes and exercised approval power, it was architectural firm, rather than plaintiff, which had created the plans for the house, and thus architectural firm was author of plan for purpose of copyright interests.
Judgment against plaintiff.

West Headnotes

[1] KeyCite Notes

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(A) Nature and Subject Matter
            99k2 k. Constitutional and Statutory Provisions. Most Cited Cases

Where plans created in connection with plaintiff's house were unpublished as of effective date of revised Copyright Act but plans utilized in connection with house were not created until after effective date of revised Act, any possible cause of action for copyright infringement arose only after that date, and thus plaintiff's infringement suit was governed by revised Act. 17 U.S.C.A. §§ 301, 301(a, b), (b)(2), 303, 501 note.

[2] KeyCite Notes

99 Copyrights and Intellectual Property
    99II Intellectual Property
        99k101 k. Nature of Property; Common Law Copyright in General. Most Cited Cases

Copyright Act section governing duration of copyrights and works created but not published or copyrighted before January 1, 1978 must be read in conjunction with exemption section, which not only confers exclusive jurisdiction in copyright cases in federal court but also declares that new statutes preempt any common-law rights except those specifically exempted pertaining to all causes of action arising subsequent to January 1, 1978, and thus former section does not extend duration of

common law copyright in unpublished work irrespective of mandate of latter statute. 17 U.S.C.A. §§ 301, 301(a), (b)(2), 303.

[3] KeyCite Notes

⇐99 Copyrights and Intellectual Property
   ⇐99I Copyrights
      ⇐99I(D) Ownership
         ⇐99k41 Ownership
            ⇐99k41(2) k. Works Made for Hire. Most Cited Cases
               (Formerly 99k41.1)

Under Copyright Act, not every work prepared by an independent contractor on special order or hire is considered the equivalent of a "work made for hire," but, rather, the only works made for hire are those which fall within one of the statutory categories set forth in section of Act and concerning which parties enter into express written agreement designating work as such. 17 U.S.C.A. §§ 101, 201(a, b).

[4] KeyCite Notes

⇐361 Statutes
   ⇐361VI Construction and Operation
      ⇐361VI(A) General Rules of Construction
         ⇐361k180 Intention of Legislature
            ⇐361k181 In General
               ⇐361k181(1) k. In General. Most Cited Cases

Language of a statute is best indication of legislative intent.

[5] KeyCite Notes

⇐99 Copyrights and Intellectual Property
   ⇐99I Copyrights
      ⇐99I(D) Ownership
         ⇐99k41 Ownership
            ⇐99k41(2) k. Works Made for Hire. Most Cited Cases
               (Formerly 99k41.1)

Architectural drawings do not qualify as works made for hire within Copyright Act. 17 U.S.C.A. §§ 101, 201(a, b).

[6] KeyCite Notes

⇐99 Copyrights and Intellectual Property
   ⇐99I Copyrights
      ⇐99I(D) Ownership
         ⇐99k41 Ownership
            ⇐99k41(1) k. In General. Most Cited Cases
               (Formerly 99k41)

99 Copyrights and Intellectual Property <u>KeyCite Notes</u>
    99I Copyrights
        99I(D) Ownership
           99k41 Ownership
                99k41(2) k. Works Made for Hire. <u>Most Cited Cases</u>
                (Formerly 99k41.1)

Although plaintiff prepared sketches illustrating in some details features of house which he and his wife required, presented sketches to architect, and, throughout evolution of plans, contributed ideas and made certain changes and exercised approval power, where architectural firm was creator of plans, designed the plans and contributed most of the ideas contained therein, and fixed ideas for house in a tangible medium, architectural firm "created" the plans and was "author" of the plans for purpose of copyrights interests; ideas and sketches contributed by plaintiff did not sufficiently constitute fixed expressions of ideas, and therefore plaintiff was not creator of plans for his house for copyright purposes and had no cause of action either under work for hire doctrine or as owner of plans. <u>17 U.S.C.A. § 101</u>.

[7] <u>KeyCite Notes</u>

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(D) Ownership
           99k41 Ownership
                99k41(3) k. Joint Works; Contributions to Collective Works. <u>Most Cited Cases</u>
                (Formerly 99k41.2)

Plaintiff could not be considered "joint author" of plans for house with architectural firm, where plaintiff had not created or prepared the plans within meaning of statute. <u>17 U.S.C.A. § 101</u>.

[8] <u>KeyCite Notes</u>

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(D) Ownership
           99k41 Ownership
                99k41(3) k. Joint Works; Contributions to Collective Works. <u>Most Cited Cases</u>
                (Formerly 99k41.2)

Each contributor to a joint work automatically acquires undivided ownership in entire work.

**848* Harvey R. Meltzer, pro se.
Barry L. Shapiro, Sills, Beck, Cummins, Radin & Tischman, Newark, N. J., for defendants/third party plaintiffs.
David C. Dreifuss, Lum, Biunno & Tompkins, Newark, N. J., for third party defendants.

**849* OPINION

WHIPPLE, Senior District Judge.
This is an action for infringement of a claimed copyright in the architectural plans for plaintiff's house in Livingston, New Jersey. Jurisdiction is invoked pursuant to <u>28 U.S.C. s 1338(a)</u>; the underlying action is premised on the Federal Copyright Act of 1976, <u>17 U.S.C. s 101</u> et seq. ("The 1976 Act").

The case was tried to the Court sitting without a jury during five (5) days in April and May, 1981. At the end of the plaintiff's case, defendants moved to dismiss, and the Court reserved decision. Neither defendants nor third party defendants presented witnesses. All parties submitted trial briefs and written summations, as well as proposed findings of fact and conclusions law. After careful consideration of all the testimony, exhibits, memoranda, and oral arguments, the Court hereby adopts the following findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

FINDINGS OF FACT

Plaintiff Harvey R. Meltzer is an attorney at law in the District of Columbia who appeared pro se in this matter. In the spring of 1977, plaintiff and his wife, who resided at that time in Maryland, contacted Doris Gelvan, a real estate agent in New Jersey, regarding the purchase of a home in New Jersey. Ms. Gelvan initially showed plaintiff and Mrs. Meltzer pre-existing homes for sale. After viewing a few resale homes, the Meltzers decided to investigate having a new home built. Thereupon, on or about June 27, 1977, Doris Gelvan brought plaintiff to meet Mr. Robert V. Doran, a defendant-third party plaintiff in this action, for the purpose of discussing the construction of a single family residence to be located in Livingston, New Jersey. Mr. Doran was the vice president of Xenco, Inc. (hereinafter referred to as "Xenco"), a New Jersey corporation which constructs private homes, as well as vice president of Deerco, Inc., a corporation which purchases land for future sale, and Mitschele Construction Corp., a New Jersey corporation engaged in the preparation of land for the construction of homes.[FN1]

> FN1. These three corporations are also defendants and third party plaintiffs in the instant action.

The Meltzers explained to Mr. Doran that they basically wanted a four bedroom, center hall colonial. Mr. Doran indicated that Xenco would commission an architect to prepare the architectural plans for the construction of plaintiff's home. At this time, the Meltzers indicated that they had only $2,000.00 to expend. Mr. Doran thereupon agreed to accept a check from the Meltzers for $500.00 payable to Xenco to defray at least a portion of the cost to Xenco for the preparation of the architectural plans should a contract between plaintiff and Xenco not be consummated. It was understood that if a contract were signed, the $500.00 would be credited toward the total purchase price; but, should a contract not be signed, Xenco would absorb the architect's fees in excess of $500.00. Accordingly, plaintiff presented Mr. Doran with a check payable to Xenco, Inc. in the amount of $500.00. Plaintiff had no further discussions with any representative of Xenco concerning the cost of the architectural plans.

Subsequently, Mr. Doran brought plaintiff, along with Mrs. Meltzer and Doris Gelvan, to the office of Matthew Zito, an architect associated with the architectural firm of William Chirgotis (hereinafter referred to as "Chirgotis"). This architectural firm operated as an independent contractor. At this meeting, Mr. Zito and the Meltzers engaged in a general consultation regarding the design and type of house in which the Meltzers were interested. Mr. Zito proceeded to prepare some schematic sketches based upon Chirgotis plans previously designed, but adjusted according to the Meltzers' stated requirements.[FN2]

> FN2. Plaintiff had prepared "thumbnail" sketches indicating his requirements; it is uncertain, however, when these sketches were shown to Mr. Zito. Contrary to the testimony of plaintiff's wife, Mr. Zito testified that he was not shown these sketches at the initial meeting.

**\*850** One of the Chirgotis plans, a French colonial home called the Chateau Gaye, was discussed in some detail at this initial meeting, with particular reference to the front elevation. The Meltzers also indicated interest in some aspects of the Eastbrooke, another Chirgotis plan. These two plans were contained in a plan book prepared by the Chirgotis firm called "101 Custom Homes", which Mr. Zito gave to the Meltzers at some time during this initial meeting. At no time during this meeting or thereafter did plaintiff discuss with any representative of the Chirgotis firm the cost of architectural plans to be prepared in connection with the Meltzer home.

The evolution of the plans for the Meltzer home progressed during the month of July, 1977. Mr. Zito

coordinated his designs with plaintiff's desires as expressed in part in plaintiff's thumbnail drawings. Plaintiff and Mr. Zito conferred on various occasions regarding plaintiff's desires, and Mr. Doran was advised of any changes made in the plans. The plans upon which construction of the Meltzer home was ultimately based incorporated Mr. Zito's work as well as suggestions of Mr. Doran, the requirements of the Meltzers as derived in part from plaintiff's sketches, and the designs of the stock plans for the Chateau Gaye and Eastbrooke, products of the Chirgotis firm.[FN3] Annotations to these two latter designs appear on the preliminary plans dated "7/77". Indeed, the contract between Xenco and plaintiff dated September 30, 1977 specifically states that the exterior of plaintiff's home "shall be substantially similar to a home designated the Chateau Gaye as prepared by William G. Chirgotis."

> FN3. To quote Mr. Zito: "The design (of the Meltzer home) is from my mind, through my hand, my hand and then it goes to draftspeople." (Tr. 3.14, 3-4). And later, "The Meltzer plans, yes, they came from the Chateau Gaye was the base was the footprint that we started with." (Tr. 3.39).

The Chirgotis firm considered the architectural plans for the Meltzer home to be stock plans; part of the inventory of architectural drawings in which the architect claims ownership and which he is free to utilize as he deems appropriate. This understanding stemmed from the practice of the architectural profession as well as the prior business dealings between the Chirgotis firm and Xenco over the course of at least fifteen years.[FN4] Placement of the Meltzer name in the title block on the plans where the name of the client or commissioning party, in this case, Xenco, is usually put, does not affect the superior proprietary interest of the Chirgotis architectural firm in the plans. [FN5]

> FN4. As Mr. Zito testified on cross examination regarding the plans for plaintiff's home: "The drawings are plans I prepare, are instruments of service. And we are providing a design, with our design ideas, and the drawings after they are completed are used to construct his residence. And the drawings themselves are property of me or our firm .... Upon completion of the Meltzer home, yes. I would consider them another stock plan in my library plans." (Tr. 3.36, 3.40).

> FN5. In this regard, Mr. Zito testified on cross examination that Mr. Doran had mentioned to the Chirgotis office manager that he desired the Meltzer name to be on the title block in lieu of Xenco, the commissioning party.

On September 30, 1977 plaintiff entered into a contract with Xenco for the construction of a residential home located at 4 Drummond Terrace, Livingston, New Jersey. The purchase price of the Meltzer home was $140,700.00. At the time of execution of this real estate contract, the Meltzers had available only $1500.00.[FN6] The contract therefore provided that upon execution, the Meltzers would pay Xenco $2000.00, $500.00 of which had already been paid. An additional $12,000.00 was to be paid within two weeks. Accordingly, on the date of execution the Meltzers remitted to Xenco a check in the amount of $1500.00, but not until November 9, 1977, did they pay the additional $12,000.00.

> FN6. Plaintiff's wife testified that AT&T, plaintiff's employer, agreed to make available to plaintiff $50,000 to cover relocation expenses; however, the record demonstrates that this money was not available at the time the construction contract was executed.

**\*851** The final design was approved by the Meltzers on November 4, 1977, upon which plaintiffs received a copy of the plans. The Chirgotis architectural firm, with full knowledge of all concerned parties, retained the originals.[FN7] No discussion ever took place between plaintiff and any member of the Chirgotis architectural firm concerning the ownership of the architectural plans for the Meltzer home; nor did the contract between plaintiff and Xenco contain any provision as to the exclusivity of the plans for the Meltzer home or otherwise restraining Xenco from constructing other homes similar to the Meltzer home. [FN8] In December of 1977, the Chirgotis firm submitted a bill to Xenco in the amount of $1,914.00 for the work performed in preparing the architectural drawings for the Meltzer home. This bill was duly paid by Xenco.[FN9]

FN7. The only purpose for retaining original plans is for duplication. Mrs. Meltzer testified that during the period of construction, she discovered that every subcontractor had a copy of the plans, and that when she requested of Mr. Doran to return the plans, he advised that he would do so. She further testified that plaintiff was present on many of the occasions when these requests were made. The credibility of this testimony is undercut, however, by Uncontested Fact 30 in the Pretrial Order of December 11, 1980, which states:

30. The plaintiff cannot recall whether prior to the institution of litigation he ever requested that Xenco, or any representative thereof, return copies of any plans of the Meltzer home which might be in their possession.

Litigation was not instituted until July 10, 1979.

FN8. Mr. Zito testified that when a client purchases a set of plans of which they seek to retain exclusive use, the Chirgotis firm would insert a paragraph in the contract with the client to the effect that the plans in question would never be reused or reproduced for another structure without the client's written consent. No contract existed between the Chirgotis firm and the Meltzers, since Xenco was the commissioning party. At the same time, the agreement between the Chirgotis firm and Xenco was an oral contract and contained no such understanding as to exclusivity.

FN9. According to Mr. Zito's testimony, the Meltzer plans were stock plans, not custom plans. While the charge for custom plans is a percentage for the total cost of the home, excluding land, the charge for stock plans, such as the Meltzer plans, is determined according to an oral understanding with the developer (Mr. Doran) on an hourly fee basis times a multiplier, or two and one-half times the actual drafting cost. This fee is predicated on the assumption that the architect will be able to use the plans again.

On May 3, 1978, plaintiff went to settlement on the Meltzer home. Mr. Doran subsequently requested access to the Meltzer home to show prospective clients the workmanship on a finished Mitschele-Xenco product, and because the Meltzer home "was always so clean and it showed well." (Tr. 2.6, 16-22). The Meltzers granted Doran permission and he eventually brought over approximately eight or ten couples.
On or about February, 1979, defendants Mr. and Mrs. Meir Zoller contacted Mr. Doran concerning the construction of a single family dwelling. On February 11, 1979, Mr. Doran telephoned plaintiff to request access to the Meltzer home for the Zollers, but was told that it was not convenient. Subsequently, Mr. Zoller visited plaintiff to ask if he could see the Meltzer residence, and later that same day, the Zollers were admitted into the Meltzer home.[FN10]

FN10. Mrs. Meltzer testified that before showing her home she obtained assurances from Mr. Zoller that he would not duplicate the home. In contrast, Mr. Zoller set forth in his affidavit that no such promises or assurances were ever made to the Meltzers. (P-Exh. 19-A).

The Zollers determined to build a home for themselves in Livingston substantially similar to the Meltzer home, and invited the Meltzers to their home to advise them of this intention. Plaintiff was upset by this news and conveyed his unhappiness to Mr. Doran; nevertheless, he conceded that if certain changes in the Zoller home would be made, he had no objections. There were no discussions, however, between the Meltzers and the Zollers concerning any copyright or other proprietary interest in the architectural drawings for the Meltzer home.[FN11]

FN11. Mr. Zito never agreed with plaintiff or his wife not to utilize the plans for the Meltzer home for the erection of any other home; indeed the matter was never discussed. When the Court queried whether the Meltzers had ever told Mr. Zito not to use these plans, Mr. Zito responded, "No sir." (Tr. 3.28-3.29).

**\*852** Again, Xenco, through Robert Doran, commissioned the architectural firm of Chirgotis to prepare the plans for the Zoller home. Mr. Doran contacted Mr. Zito and asked if he would prepare another set of plans using the plans prepared in connection with the Meltzer home, albeit with certain changes. The real estate contract between Xenco and Meir Zoller specified that:

"A dwelling is to be erected on the subject premises, substantially in accordance with plans of William Chirgotis, architect, known as plan # 77-870, all substantial changes from said plans must be approved by purchaser." (P-12, Tr. 3.28).

Plan # 77-870 is the plan for the Meltzer home.

The final Zoller plan contained the name Xenco in the client section of the title block, with the annotation "Residence for Mr. & Mrs. Zoller" to the left of the title block. The plans required approximately seven and one-half hours of preparation by Mr. Zito. The bill to Xenco, which was for $765.00, referred to the Zoller plans as "stock plans." The Zoller plans are substantially similar to the Meltzer plans, and both are substantially similar to the plans for the Chateau Gaye.[FN12]

> FN12. The parties do not seriously dispute the similarity of these three plans; nevertheless, there is a question as to the extent of such similarity. Plaintiff insists that the Zoller plans are identical to the Meltzer plans, which, he argues, in turn are significantly different from the Chateau Gaye plans. In contract, Mr. Zito testified that while both the Zoller and Meltzer plans derived from the same basic "footprint" of the Chateau Gaye, the two homes are not identical. As will be explained infra, the Court finds that the resolution of this issue is not germane to the disposition of the case.

On July 10, 1979, plaintiff filed a complaint in the Superior Court of New Jersey alleging copyright infringement of the "Meltzer plans." [FN13] The case was dismissed on the grounds of federal preemption; subsequently, plaintiff copyrighted the plans and brought suit in this Court under the Federal Copyright Act, 17 U.S.C. s 101 et seq. The defendants include the Zollers, Xenco, Inc., which constructed both the Meltzer and the Zoller homes; Ralph E. Mitschele and Robert Doran, president and vice president of Xenco, Inc., respectively; Mitschele Construction Co., which dug the foundations for both homes and Deerco, Inc., which initially purchased the undeveloped land for both homes.

> FN13. In this regard, Uncontested Facts paragraphs 15 and 16 of the Pretrial Order of December 11, 1980, state:
>
> 15. At no time prior to the institution of litigation, did Mr. Meltzer request that the architectural firm of William G. Chirgotis give him the original architectural drawings used in the construction of the Meltzer home.
>
> 16. Prior to the institution of a lawsuit in the Superior Court of New Jersey on July 10, 1979, the plaintiff had not advised Matthew R. Zito, or anybody associated with the architectural firm of William G. Chirgotis, that he claimed either exclusive ownership of the architectural drawings for the Meltzer home or a copyright thereon. There was no discussion between the plaintiff and Matthew R. Zito, or anyone else associated with the architectural firm of William G. Chirgotis that the plans would be utilized exclusively for the Meltzer home.

The defendants have in turn filed third party complaints against William G. Chirgotis and Matthew Zito, alleging, among other things, breach of implied warranty of title pursuant to N.J.S.A. 12A:2-312 (3), and breach of contract. [FN14]

> FN14. The direct claims by plaintiff against the third party defendants have been settled.

## CONCLUSIONS OF LAW

The gravamen of plaintiff's suit is that defendants conspired to and indeed did copy without authorization the architectural plans for the Meltzer home in which plaintiff alone had copyrightable interest. Plaintiff claims that the copyright interest in the plans vests in him as the author by virtue of

the common law work for hire doctrine. Plaintiff also claims ownership in the plans by reason of their being "original in plaintiff"; additionally, plaintiff argues that the prima facie proof of ownership of the plans established by the Copyright Registration Certificate issued in plaintiff's name has not been rebutted by defendants. *853 For the reasons which follow, this Court concludes that plaintiff does not have the authorship interest in the plans requisite for copyright protection and consequently, his cause of action must fail.

The initial issue for this Court to resolve is which law applies to plaintiff's claims; the revised Federal Copyright Act of 1976, 17 U.S.C. s 101 et seq., as defendants contend, or, as plaintiff contends, the common law. [FN15]

FN15. It is unclear whether plaintiff relies on the common law or the Copyright Act of 1909. In view of the conclusions of this Court, however, a discussion of this issue would be academic.

The power to provide copyright protection is delegated to the Congress by the United States Constitution. Article 1, section 8, clause 8, of the Constitution grants to Congress the power "to promote the progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries."

Copyright did not exist at common law but was created by statute enacted pursuant to this Constitutional authority. See Mazer v. Stein, 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954); see also MCA, Inc. v. Wilson, 425 F.Supp. 443, 455 (S.D.N.Y.1976); Mura v. Columbia Broadcasting System, Inc., 245 F.Supp. 587, 589 (S.D.N.Y.1965), and cases cited therein.

Prior to January 1, 1978, the effective date of the revised Copyright Act of 1976, there existed a dual system of copyright protection which had been in effect since the first federal copyright statute in 1790. Under this dual system, unpublished works enjoyed perpetual copyright protection under state common law, while published works were copyrightable under the prevailing federal statute. The new Act was intended to accomplish "a fundamental and significant change in the present law by adopting a single system of Federal statutory copyright ... (to replace the) anachronistic, uncertain, impractical, and highly complicated dual system." H.R.Rep.No.94-1476; 94th Cong.2d Sess. 129-130, reprinted in (1976) 5 U.S.Code Cong. & Ad.News 5745. This goal was effectuated through the bedrock provision of 17 U.S.C. s 301, which brought unpublished works within the scope of federal copyright law and preempted state statutory and common law rights equivalent to copyright. Id. at 5745-47. Thus, under s 301(a), Congress provided that Title 17 of the United States Code, the Federal Copyright Act, preempts all state and common law rights pertaining to all causes of action which arise subsequent to the effective date of the 1976 Act, i. e., January 1, 1978:

(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by Section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. s 301(a).

Three general areas left unaffected by the preemption are listed in the numbered clauses of subsection (b) of Section 301. Under s 301(b)(2) the new Title 17 does not annul or limit any right or remedy under the common law or state statutes with respect to "any cause of action arising from undertakings commenced before January 1, 1978." As explicated by the Committee on the Judiciary, this exemption refers to "causes of action arising under State law before the effective date of the statute (January 1, 1978)." H.R.Rep.No.94-1476, 94th Cong., 2d Sess. 132, reprinted in (1976) 5 U.S.Code Cong. & Ad.News 5747.[FN16] No *854 specific reference is made to the ambiguous phrase "undertakings commenced" in s 301(b)(2).

FN16. See also Pub.L. No. 94-553, s 112, 90 Stat. 2600 (1976), 17 U.S.C. s 501 note, which states:

"All causes of action that arose under (the former) Title 17 (Act of 1909) before January 1, 1978 shall be governed by Title 17 as it existed when the cause of action arose."

THE AMERICAN INSTITUTE OF ARCHITECTS



*AIA Document B151*

# Abbreviated Form of Agreement
# Between Owner and Architect

*for Construction Projects of Limited Scope*

## 1987 EDITION

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES; CONSULTATION WITH
AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION.*

## AGREEMENT

made as of the      24th      day of      March      in the year of
Nineteen Hundred and Ninety Eight

**BETWEEN** the Owner:
*(Name and address)*

     Mike McTigue, DVM
     GARDNER ANIMAL HOSPITAL
     7 Pearson Boulevard
     Gardner, MA  01440

and the Architect:
*(Name and address)*

     WARREN FREEDENFELD & ASSOCIATES INC.
     39 Church Street
     Boston, MA  02116

For the following Project:    GARDNER ANIMAL HOSPITAL
*(Include detailed description of Project, location, address and scope.)*

Project Location:      2 acres of existing 19 acre lot
                       Typanny Road / Route 68
                       (Across from Walmart)
                       Gardner, Massachusetts

Scope of Work    :      New veterinary facility

The Owner and Architect agree as set forth below.

Copyright 1974, 1978, ©1987 by The American Institute of Architects, 1735 New York Avenue, N.W., Washington, D.C. 20006.
Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the
copyright laws of the United States and will be subject to legal prosecution.

AIA DOCUMENT B151 • ABBREVIATED OWNER-ARCHITECT AGREEMENT • THIRD EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006      **B151-1987**    **1**

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

data comprising the Contractor's Application for Payment, that the Work, to the best of the Architect's knowledge, information and belief, has progressed to the point indicated and that quality of the Work is in accordance with the Contract Documents. The issuance of a Certificate for Payment shall not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment or (4) ascertained how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

**2.4.10** The Architect shall have authority to reject Work which does not conform to the Contract Documents and will have authority to require additional inspection or testing of the Work whenever, in the Architect's reasonable opinion, it is necessary or advisable for the implementation of the intent of the Contract Documents.

**2.4.11** The Architect shall review and approve or take other appropriate action upon Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action shall be taken with such reasonable promptness as to cause no delay. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component. When professional certification of performance characteristics of materials, systems or equipment is required by the Contract Documents, the Architect shall be entitled to rely upon such certification to establish that the materials, systems or equipment will meet the performance criteria required by the Contract Documents.

**2.4.12** The Architect shall prepare Change Orders and Construction Change Directives, with supporting documentation and data if authorized or confirmed in writing by the Owner as provided in Paragraphs 3.1 and 3.3, for the Owner's approval and execution in accordance with the Contract Documents, and may authorize minor changes in the Work not involving an adjustment in the Contract Sum or an extension of the Contract Time which are not inconsistent with the intent of the Contract Documents.

**2.4.13** The Architect shall conduct inspections to determine the dates of Substantial Completion and final completion and shall issue a final Certificate for Payment.

**2.4.14** The Architect shall interpret and decide matters concerning performance of the Owner and Contractor under the requirements of the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests shall be made with reasonable promptness and within any time limits agreed upon. When making such interpretations and initial decisions, the Architect shall endeavor to secure faithful performance by both Owner and Contractor, shall not show partiality to either, and shall not be liable for results of interpretations or decisions so rendered in good faith.

## ARTICLE 3
### ADDITIONAL SERVICES

**3.1** Additional Services shall be provided if authorized or confirmed in writing by the Owner or if included in Article 12, and they shall be paid for by the Owner as provided in this Agreement. Such Additional Services shall include, in addition to those described in Paragraphs 3.2 and 3.3, budget analysis, financial feasibility studies, planning surveys, environmental studies, measured drawings of existing conditions, coordination of separate contractors or independent consultants, coordination of construction or project managers, detailed Construction Cost estimates, quantity surveys, interior design, planning of tenant or rental spaces, inventories of materials or equipment, preparation of record drawings, and any other services not otherwise included in this Agreement under Basic Services or not customarily furnished in accordance with generally accepted architectural practice.

**3.2** If more extensive representation at the site than is described in Subparagraph 2.4.5 is required, such additional project representation shall be provided and paid for as set forth in Articles 11 and 12.

**3.3** As an Additional Service in connection with Change Orders and Construction Change Directives, the Architect shall prepare Drawings, Specifications and other documentation and data, evaluate Contractor's proposals, and provide any other services made necessary by such Change Orders and Construction Change Directives.

## ARTICLE 4
### OWNER'S RESPONSIBILITIES

**4.1** The Owner shall provide full information, including a program which shall set forth the Owner's objectives, schedule, constraints, budget with reasonable contingencies, and criteria.

**4.2** The Owner shall furnish surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, a written legal description of the site and the services of geotechnical engineers or other consultants when such services are requested by the Architect.

**4.3** The Owner shall furnish structural, mechanical, chemical, air and water pollution tests, tests for hazardous materials, and other laboratory and environmental tests, inspections and reports required by law or the Contract Documents.

**4.4** The Owner shall furnish all legal, accounting and insurance counseling services as may be necessary at any time for the Project, including auditing services the Owner may require to verify the Contractor's Applications for Payment or to ascertain how or for what purposes the Contractor has used the money paid by the Owner.

**4.5** The foregoing services, information, surveys and reports shall be furnished at the Owner's expense, and the Architect shall be entitled to rely upon the accuracy and completeness thereof.

**4.6** Prompt written notice shall be given by the Owner to the Architect if the Owner becomes aware of any fault or defect in the Project or nonconformance with the Contract Documents.

**4.7** The proposed language of certificates or certifications requested of the Architect or Architect's consultants shall be submitted to the Architect for review and approval at least 14 days prior to execution.

AIA DOCUMENT B151 • ABBREVIATED OWNER-ARCHITECT AGREEMENT • THIRD EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

## ARTICLE 5
## CONSTRUCTION COST

**5.1    DEFINITION**

**5.1.1**  The Construction Cost shall be the total cost or estimated cost to the Owner of all elements of the Project designed or specified by the Architect.

**5.1.2**  The Construction Cost shall include the cost at current market rates of labor and materials furnished by the Owner and equipment designed, specified, selected or specially provided for by the Architect, plus a reasonable allowance for the Contractor's overhead and profit. In addition, a reasonable allowance for contingencies shall be included for market conditions at the time of bidding and for changes in the Work during construction.

**5.1.3**  Construction Cost does not include the compensation of the Architect and Architect's consultants, the costs of the land, rights-of-way, financing or other costs which are the responsibility of the Owner as provided in Article 4.

**5.2    RESPONSIBILITY FOR CONSTRUCTION COST**

**5.2.1**  It is recognized that neither the Architect nor the Owner has control over the cost of labor, materials or equipment, over the Contractor's methods of determining bid prices, or over competitive bidding, market or negotiating conditions. Accordingly, the Architect cannot and does not warrant or represent that bids or negotiated prices will not vary from any estimate of Construction Cost or evaluation prepared or agreed to by the Architect.

**5.2.2**  No fixed limit of Construction Cost shall be established as a condition of this Agreement by the furnishing, proposal or establishment of a Project budget, unless a fixed limit has been agreed upon in writing and signed by the parties hereto. Fixed limits, if any, shall be increased in the amount of an increase in the Contract Sum occurring after execution of the Contract for Construction.

**5.2.3**  Any Project budget or fixed limit of Construction Cost may be adjusted to reflect changes in the general level of prices in the construction industry between the date of submission of the Construction Documents to the Owner and the date on which proposals are sought.

**5.2.4**  If a fixed limit of Construction Cost is exceeded by the lowest bona fide bid or negotiated proposal, the Owner shall:

.1   give written approval of an increase in such fixed limit;

.2   authorize rebidding or renegotiating of the Project within a reasonable time;

.3   if the Project is abandoned, terminate in accordance with Paragraph 8.3; or

.4   cooperate in revising the Project scope and quality as required to reduce the Construction Cost.

**5.2.5**  If the Owner chooses to proceed under Clause 5.2.4.4, the Architect, without additional charge, shall modify the Contract Documents as necessary to comply with the fixed limit, if established as a condition of this Agreement. The modification of Contract Documents shall be the limit of the Architect's responsibility arising out of the establishment of a fixed limit. The Architect shall be entitled to compensation in accordance with this Agreement for all services performed whether or not the Construction Phase is commenced.

## ARTICLE 6
## USE OF ARCHITECT'S DRAWINGS, SPECIFICATIONS AND OTHER DOCUMENTS

**6.1**  The Drawings, Specifications and other documents prepared by the Architect for this Project are instruments of the Architect's service for use solely with respect to this Project, and the Architect shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright. The Owner shall be permitted to retain copies, including reproducible copies, of the Architect's Drawings, Specifications and other documents for information and reference in connection with the Owner's use and occupancy of the Project. The Architect's Drawings, Specifications or other documents shall not be used by the Owner or others on other projects, for additions to this Project or for completion of this Project by others, unless the Architect is adjudged to be in default under this Agreement, except by agreement in writing and with appropriate compensation to the Architect.

**6.2**  Submission or distribution of documents to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the Architect's reserved rights.

## ARTICLE 7
## ARBITRATION

**7.1**  Claims, disputes or other matters in question between the parties to this Agreement arising out of or relating to this Agreement or breach thereof shall be subject to and decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise. No arbitration arising out of or relating to this Agreement shall include, by consolidation, joinder or in any other manner, an additional person or entity not a party to this Agreement, except by written consent containing a specific reference to this Agreement signed by the Owner, Architect, and any other person or entity sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by the parties to this Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

**7.2**  In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of limitations.

**7.3**  The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

## ARTICLE 8
## TERMINATION, SUSPENSION OR ABANDONMENT

**8.1**  This Agreement may be terminated by either party upon not less than seven days' written notice should the other party

fail substantially to perform in accordance with the terms of this Agreement through no fault of the party initiating the termination.

**8.2** If the Project is suspended by the Owner for more than 30 consecutive days, the Architect shall be compensated for services performed prior to notice of such suspension. When the Project is resumed, the Architect's compensation shall be equitably adjusted to provide for expenses incurred in the interruption and resumption of the Architect's services.

**8.3** This Agreement may be terminated by the Owner upon not less than seven days' written notice to the Architect in the event that the Project is permanently abandoned. If the Project is abandoned by the Owner for more than 90 consecutive days, the Architect may terminate this Agreement by giving written notice.

**8.4** Failure of the Owner to make payments to the Architect in accordance with this Agreement shall be considered substantial nonperformance and cause for termination.

**8.5** If the Owner fails to make payment when due the Architect for services and expenses, the Architect may, upon seven days' written notice to the Owner, suspend performance of services under this Agreement. Unless payment in full is received by the Architect within seven days of the date of the notice, the suspension shall take effect without further notice. In the event of a suspension of services, the Architect shall have no liability to the Owner for delay or damage caused the Owner because of such suspension of services.

**8.6** In the event of termination not the fault of the Architect, the Architect shall be compensated for services performed prior to termination, together with Reimbursable Expenses then due and all Termination Expenses.

**8.7** Termination Expenses are in addition to compensation for Basic and Additional Services, and include expenses which are directly attributable to termination.

## ARTICLE 9
## MISCELLANEOUS PROVISIONS

**9.1** Unless otherwise provided, this Agreement shall be governed by the law of the principal place of business of the Architect.

**9.2** Terms in this Agreement shall have the same meaning as those in AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.

**9.3** Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion, or the date of issuance of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion.

**9.4** The Owner and Architect waive all rights against each other and against the contractors, consultants, agents and employees of the other for damages, but only to the extent covered by property insurance during construction, except such rights as they may have to the proceeds of such insurance as set forth in the edition of AIA Document A201, General Con-

ditions of the Contract for Construction, current as of the date of this Agreement. The Owner and Architect each shall require similar waivers from their contractors, consultants and agents.

**9.5** The Owner and Architect, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Agreement and to the partners, successors, assigns and legal representatives of such other party with respect to all covenants of this Agreement. Neither Owner nor Architect shall assign this Agreement without the written consent of the other.

**9.6** This Agreement represents the entire and integrated agreement between the Owner and Architect and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Architect.

**9.7** Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Owner or Architect.

**9.8** The Architect and Architect's consultants shall have no responsibility for the discovery, presence, handling, removal or disposal of or exposure of persons to hazardous materials in any form at the Project site, including but not limited to asbestos, asbestos products, polychlorinated biphenyl (PCB) or other toxic substances.

## ARTICLE 10
## PAYMENTS TO THE ARCHITECT

**10.1    DIRECT PERSONNEL EXPENSE**

**10.1.1** Direct Personnel Expense is defined as the direct salaries of the Architect's personnel engaged on the Project and the portion of the cost of their mandatory and customary contributions and benefits related thereto, such as employment taxes and other statutory employee benefits, insurance, sick leave, holidays, vacations, pensions and similar contributions and benefits.

**10.2    REIMBURSABLE EXPENSES**

**10.2.1** Reimbursable Expenses include expenses incurred by the Architect in the interest of the Project for:

.1    expense of transportation and living expenses in connection with out-of-town travel authorized by the Owner;

.2    long-distance communications;

.3    fees paid for securing approval of authorities having jurisdiction over the Project;

.4    reproductions;

.5    postage and handling of Drawings and Specifications;

.6    expense of overtime work requiring higher than regular rates, if authorized by the Owner;

.7    renderings and models requested by the Owner;

.8    expense of additional insurance coverage or limits, including professional liability insurance, requested by the Owner in excess of that normally carried by the Architect and Architect's consultants; and

.9    expense of computer-aided design and drafting equipment time when used in connection with the Project.



AIA DOCUMENT B151 • ABBREVIATED OWNER-ARCHITECT AGREEMENT • THIRD EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

**10.3    PAYMENTS ON ACCOUNT OF BASIC SERVICES**

**10.3.1**  An initial payment as set forth in Paragraph 11.1 is the minimum payment under this Agreement.

**10.3.2**  Subsequent payments for Basic Services shall be made monthly and, where applicable, shall be in proportion to services performed within each phase of service.

**10.3.3**  If and to the extent that the time initially established in Subparagraph 11.5.1 of this Agreement is exceeded or extended through no fault of the Architect, compensation for any services rendered during the additional period of time shall be computed in the manner set forth in Subparagraph 11.3.2.

**10.3.4**  When compensation is based on a percentage of Construction Cost and any portions of the Project are deleted or otherwise not constructed, compensation for those portions of the Project shall be payable to the extent services are performed on those portions, in accordance with the schedule set forth in Sub-

paragraph 11.2.2, based on (1) the lowest bona fide bid or negotiated proposal, or (2) if no such bid or proposal is received, the most recent preliminary estimate of Construction Cost or detailed estimate of Construction Cost for such portions of the Project.

**10.4    PAYMENTS ON ACCOUNT OF ADDITIONAL SERVICES AND REIMBURSABLE EXPENSES**

**10.4.1**  Payments on account of the Architect's Additional Services and for Reimbursable Expenses shall be made monthly upon presentation of the Architect's statement of services rendered or expenses incurred.

**10.4    PAYMENTS WITHHELD**

**10.5.1**  No deductions shall be made from the Architect's compensation on account of sums withheld from payments to contractors.

### ARTICLE 11
### BASIS OF COMPENSATION

The owner shall compensate the Architect as follows:

**11.1    AN INITIAL PAYMENT OF**  Three Thousand  Dollars (  $3,000.00  ) shall be made upon execution of this Agreement and credited to the Owner's account at final payment.

**11.2    BASIC COMPENSATION**

**11.2.1**  FOR BASIC SERVICES, as described in Article 2, and any other services included in Article 12 as part of Basic Services, Basic Compensation shall be computed as follows:
*(Insert basis of compensation, including stipulated sums, multiples or percentages, and identify phases to which particular methods of compensation apply, if necessary.)*

The Base Fee for Architectural Services shall be $9.00 per gross square foot area of the Project.

See Article 12 for Engineering Services      $3 sq/ft  unfinished space  (basement, attic) or empty & COVERED EXTERIOR

**11.2.2**  Where compensation is based on a stipulated sum or percentage of Construction Cost, progress payments for Basic Services in each phase shall total the following percentages of the total Basic Compensation payable:

| | | |
|---|---|---|
| Programming | @ | $1,500.00 |
| Design Phase: | @ | 35% of Total Base Fee  less ($1,500.00)<br>(i.e. 35% x $9.00 x s. f. area of Approved Project Program) |
| Construction Documents Phase | @ | 50% of Total Base Fee<br>(i.e. 50% x $9.00 x s. f. area of Approved Project Floor Plan) |
| Construction Phase | @ | 15% of Total Base Fee<br>(i.e. 15% x $9.00 x s.f. area of Project under construction) |
| Total Basic Compensation | @ | 100% of Total Base Fee |

AIA DOCUMENT B151 • ABBREVIATED OWNER-ARCHITECT AGREEMENT • THIRD ADDITION • AIA® • © 1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**B151-1987   6**

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

**11.3    COMPENSATION FOR ADDITIONAL SERVICES**

**11.3.1**  FOR PROJECT REPRESENTATION BEYOND BASIC SERVICES, as described in paragraph 3.2, compensation shall be computed as follows:

| | | |
|---|---|---|
| Principal Time | @ | $120.00 per Hour |
| Associate Time | @ | 110.00 per Hour |
| Project Manager Time | @ | 100.00 per Hour |
| Technical Designer Time | @ | 90.00 per Hour |
| Draftsman Time | @ | 80.00 per Hour |
| Secretarial Time | @ | 70.00 per Hour |
| Consultant Time | @ | 1.2x Direct Expense |

**11.3.2**  FOR ADDITIONAL SERVICES OF THE ARCHITECT provided under Article 3 or identified in Article 12, compensation shall be computed as follows:
*(Insert basis of compensation, including rates and/or multiples of Direct Personnel Expense for Principals and employees, and identify Principals and classify employees, if required. Identify specific services to which particular methods of compensation apply, if necessary.)*

| | | |
|---|---|---|
| Principal Time | @ | $120.00 per Hour |
| Associate Time | @ | 110.00 per Hour |
| Project Manager Time | @ | 100.00 per Hour |
| Technical Designer Time | @ | 90.00 per Hour |
| Draftsman Time | @ | 80.00 per Hour |
| Secretarial Time | @ | 70.00 per Hour |
| Consultant Time | @ | 1.2x Direct Expense |
| Principal Consultation Time | @ | 200.00 per Hour (For consultation not related to an ongoing project) |

**11.3.3**  FOR ADDITIONAL SERVICES OF CONSULTANTS, including additional structural, mechanical and electrical engineering services and those provided under Article 3 or identified in Article 12 as part of Additional Services, a multiple of ( 1.2 ) times the amounts billed to the Architect for such services.
*(Identify specific types of consultants in Article 12, if required.)*

**11.4    REIMBURSABLE EXPENSES**

**11.4.1**  FOR REIMBURSABLE EXPENSES, as described in Paragraph 10.2, and any other items included in Article 12 as Reimbursable Expenses, a multiple of    One & 2/10    ( 1.2 ) times the expenses incurred by the Architect, the Architect's employees and consultants in the interest of the Project.

**11.5 ADDITIONAL PROVISIONS**

**11.5.1**  IF THE BASIC SERVICES covered by this Agreement have not been completed within   ~~Twelve~~ EIGHTEEN ( ~~12~~ 18 ) months of the date hereof, through no fault of the Architect, extension of the Architect's services beyond that time shall be compensated as provided in Subparagraphs 10.3.3 and 11.3.2.

**11.5.2**  Payments are due and payable   Ten   ( 10 ) days from the date of the Architect's invoice. Amounts unpaid   Thirty   ( 30 ) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Architect.
*(Insert rate of interest agreed upon.)*

Interest Rate shall be 1.8% per month
*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Architect's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Specific legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

**11.5.3**  The rates and multiples set forth for Additional Services shall be annually adjusted in accordance with normal salary review practices of the Architect.

## ARTICLE 12
## OTHER CONDITIONS OR SERVICES

**12.1   SCHEMATIC DESIGN PHASE**

Once the Project Program is approved, the Schematic Design Drawings shall be developed and shall consist of Floor Plans of all levels, Exterior Elevations, and a Site Plan, if applicable. A Construction Cost Estimate, based on square foot area of the Project, shall be included. The Fee for Schematic Design shall be based on the Project Program approved by the Owner.  If the Project Program is reduced by the Owner after Schematic Design has begun, then the necessary revisions to the Schematic Design Drawings shall be made as an Additional Service on an hourly basis, in addition to the initial Schematic Design Fee.  If the Project Program is increased, the Schematic Design Fee shall be adjusted to include the additional square foot area of the project.

**12.2   EXISTING CONDITIONS**

The Owner shall provide the Architect with Drawings of all existing conditions of the Project. The Architect shall be entitled to rely upon the accuracy and completeness of such Drawings. If the Architect must record and document existing conditions, then such work shall be considered an Additional Service and shall be provided in accordance with Article 11.3.

**12.3   ENGINEERING SERVICES**

The Architect shall provide normal Structural Engineering Services at a not-to-exceed fee of $2,000.  The Architect shall provide normal Mechanical, Plumbing and Electrical Engineering Services in either one of two (2) ways at the Owner's option.
Option 1: the Architect shall provide performance criteria for a design/build system by the Contractor at no additional fee.
Option 2: the Architect shall provide full Engineering Services for each engineering discipline at an additional fee of not-to-exceed $2,000 per discipline.

**12.4   FEE FOR CONSTRUCTION ADMINISTRATION**

The fee for Construction Administration shall be divided into equal weekly amounts over the period of time set aside for Construction as stipulated in the Owner and Contractor Agreement. If the Construction Period goes beyond that which is stipulated in the Owner and Contractor Agreement, then the Architect shall be reimbursed for each additional week of Construction in an amount equal to each previous weekly amount until such time as Final Completion of the Project is reached. Billing for Construction Administration shall occur monthly.

**12.5   SITEWORK & SITE IMPROVEMENTS**

As part of the Architect's Basic Services, the Architect shall design an overall site plan, including a layout for vehicular parking and pedestrian walkways. However, Construction Documents for all sitework and site improvement work, outside the limit of the building perimeter foundation walls, shall be provided as an Additional Services on an hourly basis in accordance with Article 11.3.

**12.6   DISPUTE RESOLUTION LOCALE**

The locale for the resolution of any dispute between the parties to this Agreement shall be in the principal place of business of the Architect.

**12.7   PROJECT APPROVAL APPEARANCES**

One (1) appearance before local agencies that have jurisdiction over the approval of the Project is included in the Architect's fee for Basic Services. Any additional appearances shall be provided as required as an Additional Service on an hourly basis in accordance with Article 11.3.

**12.8   TAXES OR FEES ENACTED BY THE GOVERNMENT**

Any taxes or fees enacted by local, state, or Federal Government, based on gross receipts or revenues which must be paid by the Architect, will be added to amounts due under this Agreement.

**12.9   UNPAID ARCHITECTURAL FEES**

If the Architect must make a claim for unpaid architectural fees, then such claim shall be heard in arbitration, in accordance with Article 7. All other claims of any nature, including any counterclaims and/or crossclaims, shall be heard in a court of law of proper jurisdiction. The American Arbitration Association shall not have jurisdiction over any such other claims. If the Architect must expend legal fees to collect unpaid architectural fees, then such expenditures shall be considered a Reimbursable Expense in accordance with Article 11.4.

This Agreement entered into as of the day and year first written above.

OWNER:

_(Signature)_ Mike McTigue, DVM

ARCHITECT:

_(Signature)_ Warren Freedenfeld, AIA, President

GARDNER ANIMAL HOSPITAL
_(Printed name and title)_

WARREN FREEDENFELD & ASSOCIATES, INC.
_(Printed name and title)_

AIA DOCUMENT B151 • ABBREVIATED OWNER-ARCHITECT AGREEMENT • THIRD ADDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

B151-1987   8

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.



**Michael P. McTigue, D.V.M.**
**Brian C. Hurley, D.V.M.**
**Kathleen J. O'Brien, D.V.M.**

GARDNER ANIMAL HOSPITAL
7 Pearson Blvd.
Gardner, MA 01440
Telephone: (978) 632-7110

Warren Freedenfeld & Associates, Inc.
39 Church Street
Boston, MA 02116

Dear Mr. Freedenfeld:

This letter is sent to you pursuant to the terms of Article 8.1 of the AIA Document B151 executed by and between us dated March 24, 1998, regarding the proposed construction of the Gardner Animal Hospital on my behalf. Furthermore, this letter is sent to you as written confirmation of the termination of the contract entered into by and between us verbally during our phone discussion on June 25, 1999, which termination was further confirmed by you in your letter of July 22, 1999 to me.

The reason for the termination action taken on June 25, 1999, and for this letter in confirmation of same, is that you failed substantially to perform in accordance with the terms of the Agreement above referenced through no fault of mine.

Some, and this list is not all inclusive, of the reasons for this termination are as follows:

1.  Although I was charged nearly $50,000 for work you purport to have done, substantial portions of that work had not, indeed, ever been completed by you. For example, foundation drawings were never developed by you, nor were the proper elevations used. Additionally, there were residual questions as to whether work you had said had been done, and billed me for, had ever actually been done.

2.  Whatever plans, drawings etc. You did prepare have proven to be useless to us, and they have been rolled up and discarded. This, in spite of my having paid you tens of thousands of dollars; unfortunately, I again have to pay another architect another tens of thousands of dollars to complete the project.

3.  Most importantly, you continued to refuse to recognize that a redesign of the plans, etc. was required to reduce the cost of the project to a manageable financial level. You knew full well that my bank had limited me to construction costs of $1,000,000.00, while everyone to whom I spoke in the construction industry and elsewhere indicated that the project as you had designed it could not be completed for less than approximately $1.3 million, some 30% over my project budget.

I regret having had to take this action and I wish you success in your future endeavors.

Sincerely,

Michael P. McTigue, DVM

## TERMINATION AND MUTUAL RELEASE AGREEMENT
## BETWEEN GARDNER ANIMAL HOSPITAL AND
## WARREN FREEDENFELD & ASSOCIATES INC.

WHEREAS Michael P. McTigue, DVM, and Gardner Animal Hospital, collectively ("GAH") and Warren Freedenfeld & Associates Inc. ("WFA") had previously entered into an Owner and Architect Agreement dated 24 March 1998 ("Agreement"), for the provision of architectural services in connection with the Gardner Animal Hospital, located at 73 Eaton Street, Gardner, Massachusetts ("the Project"), and

WHEREAS the Schematic Design and partial Construction Drawings for such Project has been substantially completed, and

WHEREAS the parties desire to terminate their Agreement without the provision of any further services by WFA,

NOW THEREFORE, in consideration of the mutual agreements contained herein, the parties agree as follows:

1.  The Agreement is terminated and the parties shall have no further obligations except as set forth in this Termination and Mutual Release Agreement.

2.  Upon execution of this Agreement, GAH shall pay WFA Seven Thousand Five Hundred Dollars ($7,500.00) as final and total payment for all services provided and expenses incurred to date. This amount shall be in addition to all previous amounts paid by GAH and/or received by WFA.

3.  GAH agrees not to use any of the work produced by WFA. *SOLELY* *Uff @* Article 6 of the Owner and Architect Agreement shall remain in full force and affect.

4.  GAH and WFA agree to release each other of and from all loss, expense, claim, or action of any kind arising at any time from this date forward, whether arising out of the Agreement or otherwise, intending thereby to give each other a general release of all claims each may have against each other to date, and in the future, except as to the obligations under this Termination and Mutual Release Agreement, which are not being released.

Executed as a contract under seal this ___2 ND___ day of ___SEP___, 1999.

Owner:

Gardner Animal Hospital
7 Pearson Boulevard
Gardner, MA  01440

By _____
    Michael P. McTigue, DVM

Witness:

By _____

Name: Brian C. Hurley DVM

Architect:

Warren Freedenfeld & Associates Inc.
39 Church Street
Boston, MA  02116

By _____
    Warren Freedenfeld AIA, President

Witness:

By _____

Name: Sasha A. Chanaka

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MASSACHUSETTS

WARREN FREEDENFELD ASSOCIATES )
INC., as successor to WARREN )
FREEDENFELD & ASSOCIATES, INC. )
             )
   Plaintiff      )
             )
v.           )  CIVIL ACTION NO:05-11573-RGS
             )
MICHAEL P. MCTIGUE, D.V.M., )
Individually and as Trustee of the )
MCTIGUE FAMILY TRUST, NANCY )
A. MCTIGUE, as Trustee of the MCTIGUE )
FAMILY TRUST, BRIAN C. HURLEY, )
D.V.M., GARDNER ANIMAL CARE )
CENTER, LLC d/b/a GARDNER ANIMAL )
HOSPITAL, EDWARD D. CORMIER )
ASSOCIATES, INC. and BENNETT )
BUILDING CORPORATION )
             )
   Defendants     )

ANSWER AND AFFIRMATIVE DEFENSES OF ANSWERING DEFENDANTS MICHAEL
P. MCTIGUE, NANCY A. MCTIGUE, BRIAN C. HURLEY AND GARDNER ANIMAL
CARE CENTER LLC d/b/a GARDNER ANIMAL HOSPITAL

Now come the above-captioned defendants ("the Answering Defendants") and answer the

Plaintiff's Complaint as follows:

1. To the extent that any answer is required to this paragraph, the Answering Defendants

  deny that they have engaged in any unlawful conduct.

2. The Answering Defendants lacks sufficient information to admit or deny this allegation

  and calls upon the Plaintiff to prove the same.

3. Admitted

4. Admitted

5. Admitted

6. Admitted

7. The Answering Defendants lacks sufficient information to admit or deny this allegation and calls upon the Plaintiff to prove the same.

8. The Answering Defendants lacks sufficient information to admit or deny this allegation and calls upon the Plaintiff to prove the same.

9. The Answering Defendants do not question jurisdiction

10. The Answering Defendants accept this venue

11. All necessary documents speak for themselves

12. All necessary documents speak for themselves, and are not, per se, admissions to be cited against the Answering Defendants

13. Admitted that the Plaintiff prepared plans

14. Admitted that the Plaintiff prepared plans

15. Admitted that the Plaintiff prepared plans

16. Admitted that the Plaintiff prepared plans

17. Admitted that the Plaintiff prepared plans

18. Admitted that the Plaintiff prepared plans

19. Documents speak for themselves. The Answering Defendants deny the spin placed upon those documents, or otherwise lacks sufficient information to admit or deny this allegation and calls upon the Plaintiff to prove the same.

20. The Answering Defendants lacks sufficient information to admit or deny and call upon the Plaintiff to prove the same. However, the Answering Defendants question the

numbers cited, or whether any funds were due and owing based upon the Plaintiff's

breach of its contract.

21. Documents speak for themselves. The Answering Defendants deny the spin placed upon

those documents, or otherwise lacks sufficient information to admit or deny this

allegation and calls upon the Plaintiff to prove the same.

22. Documents speak for themselves.

23. The Answering Defendants lacks sufficient information to admit or deny this allegation

and calls upon the Plaintiff to prove the same. To the extent it was done, the Answering

Defendants deny that the Plaintiff had the legal right to do so.

24. Admitted that an agreement was reached. Denied as to the spin on what the Answering

Defendants were entitled to use by contract.

25. Denied

26. Admitted

27. Denied

28. Denied

29. Public records speak for themselves

30. The Answering Defendants lacks sufficient information to admit or deny this allegation

and calls upon the Plaintiff to prove the same.

31. Admitted that the plans were a matter of public record, but denied that the Answering

Defendants "copied" any work belonging to the Plaintiff

32. Denied

(COUNTS 1-V HAVE BEEN DISMISSED, SUCH THAT NO ANSWER IS NECESSARY)

65. The Answering Defendants incorporate their prior answers

3

66. Denied

67. Denied

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Plaintiff has failed to state a cause of action upon which relief may be granted

### SECOND AFFIRMATIVE DEFENSE

The Plaintiff's claim is barred by the doctrine of unclean hands.

### THIRD AFFIRMATIVE DEFENSE

The Plaintiff's claim is barred by the doctrine of laches

### FOURTH AFFIRMATIVE DEFENSE

The Plaintiff's claim is barred by the doctrine of estoppel

### FIFTH AFFIRMATIVE DEFENSE

The Plaintiff's claim is barred by the doctrine of waiver

### SIXTH AFFIRMATIVE DEFENSE

The Plaintiff's claim is barred as moot

### SEVENTH AFFIRMATIVE DEFENSE

The Plaintiff lacks standing to bring suit

### EIGHTH AFFIRMATIVE DEFENSE

The claim is barred by the doctrine of prior settlement

THE ANSWERING DEFENDANTS DEMAND A TRIAL BY JURY ON ALL COUNTS

Respectfully Submitted,

**The Answering Defendants,**

By their attorneys,

s/Robert N. Meltzer
Robert N. Meltzer, BBO #564745
P.O. Box 1459
Framingham, MA 01701
Phone: (508) 872-7116

s/Mary C. Casey
Mary C. Casey, BBO #636250
Harbor Law Group
385 South Street
Shrewsbury, MA 01545
Phone: (508) 842-9244

Dated: February 17, 2006

CERTIFICATE OF SERVICE

     I, Robert N. Meltzer, do hereby certify that on this day I have served the foregoing by providing a copy of the same by first class mail, postage prepaid, to:

Barry S. Scheer, Esq.
Parker Scheer, LLP
One Constitution Center
Boston, MA 02129

Stephen D. Rosenberg, Esq.
The McCormack Firm
One International Place
Seventh Floor
Boston, MA 02110

F. Joseph Gentili, Esq.
Capobianco & Gentili, PC
15 West Central Street
Natick, MA 01760

Robert D.City, Esq.
Michael J. Dissette, Esq.
City, Hayes & Dissette, PC
50 Congress Street
Boston, MA 02109

_____

February 17, 2006

6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05 11573 RGS

|  |  |
|---|---|
| WARREN FREEDENFELD ASSOCIATES, INC. as successor in interest to WARREN FREEDENFELD & ASSOCIATES, INC., Plaintiff, <br><br> v. <br><br> MICHAEL P. MCTIGUE, DVM individually and as Trustee of THE MCTIGUE FAMILY TRUST, NANCY A. MCTIGUE, as Trustee of the MCTIGUE FAMILY TRUST, BRIAN C. HURLEY, DVM, GARDNER ANIMAL CARE CENTER, LLC d/b/a GARDNER ANIMAL HOSPITAL, EDWARD D. CORMIER, ASSOCIATES INC., and BENNETT BUILDING CORPORATION, Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## PLAINTIFF'S RESPONSES TO THE FIRST REQUEST FOR PRODUCTION OF DOCUMENTS OF DEFENDANTS MICHAEL P. MCTIGUE, NANCY A. MCTIGUE, BRIAN C. HURLEY AND GARDNER ANIMAL CARE CENTER LLC d/b/a GARDNER ANIMAL HOSPITAL ("THE REQUESTING DEFENDANTS")

Pursuant to Fed. R.Civ.P.34, the plaintiff, Warren Freedenfeld Associates, Inc. as

successor in interest to Warren Freedenfeld & Associates, Inc.("Freedenfeld"), responds to the

First Request for Production of Documents of the Requesting Defendants as follows:

### GENERAL OBJECTIONS

Freedenfeld generally objects to each request to the extent that it seeks production of

documents protected by the attorney/client privilege, or protected by the work product privilege.

Freedenfeld further objects to each request to the extent that it is overly broad, unduly

burdensome and fails to specify with reasonable particularity the documents requested.  Without

waiving any of the foregoing objections, Freedenfeld responds to the individually numbered

paragraphs of the Requesting Defendants' document requests as follows:

## DOCUMENT RESPONSES

### REQUEST NO.: 1

The work which the Plaintiff claims to be covered by his copyright with regard to this matter in

the form in which the copyright was issued.

### RESPONSE NO.: 1

Subject to the above general objections, the plaintiff will make available for inspection and

copying the documents in its possession that are responsive to this request.

### REQUEST NO.: 2

Any and all plans for any and all veterinary hospitals designed by the Plaintiff from September,

1999 to the present.

### RESPONSE NO.: 2

The defendant objects to this request on the grounds that it is irrelevant to the subject matter of

the action, overly burdensome and not reasonably calculated to lead to the discovery of

admissible evidence.

Respectfully submitted,

WARREN FREEDENFELD
ASSOCIATES, INC. as successor in
Interest to WARREN FREEDENFELD &
ASSOCIATES, INC.,

By its attorneys,

Barry S. Scheer
BBO No. 445100
Garrett J. Lee
BBO No. 641876
PARKER | SCHEER, LLP
One Constitution Center
Boston, MA  02129
Tel.: 617-886-0500
Fax: 617-886-0100
Email: bss@parkerscheer.com
         gjl@parkerscheer.com

Dated: May 25, 2006

3

## CERTIFICATE OF SERVICE

I, Garrett J. Lee, attorney for the plaintiff, Warren Freedenfeld Associates, Inc. as successor in interest to Warren Freedenfeld & Associates, Inc., hereby certify that on this 29th day of May, 2006 a true copy of the following was served on all counsel record:

**PLAINTIFF'S RESPONSES TO THE FIRST REQUEST FOR PRODUCTION OF DOCUMENTS OF DEFENDANTS MICHAEL P. MCTIGUE, NANCY A. MCTIGUE, BRIAN C. HURLEY AND GARDNER ANIMAL CARE CENTER LLC d/b/a GARDNER ANIMAL HOSPITAL ("THE REQUESTING DEFENDANTS")**

By first-class mail postage pre-paid, addressed to:

Robert N. Meltzer, Esq.
P.O. Box 1459
Framingham, MA 01701

Stephen D. Rosenberg
The McCormack Firm, LLC
One International Place
7th Floor
Boston, MA 02110

F. Joseph Gentili, Esq.
Capobianco & Gentili, PC
15 West Central Street
Natick, MA 01760

Robert D. City, Esq.
Michael J. Dissette, Esq.
City, Hayes & Dissette, PC
50 Congress Street
Boston, MA 02109

Mary C. Casey, Esq.
Harbor Law Group
385 South Street
Shrewsbury, MA 01545

Garrett J. Lee