THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05 11573 RGS

|  |  |
|---|---|
| WARREN FREEDENFELD ASSOCIATES, INC.<br>as successor in interest to WARREN FREEDENFELD<br>& ASSOCIATES, INC.,<br>　　　　　Plaintiff,<br><br>v.<br><br>MICHAEL P. MCTIGUE, DVM individually and as<br>Trustee of THE MCTIGUE FAMILY TRUST,<br>NANCY A. MCTIGUE, as Trustee of the<br>MCTIGUE FAMILY TRUST, BRIAN C. HURLEY, DVM,<br>GARDNER ANIMAL CARE CENTER, LLC<br>d/b/a GARDNER ANIMAL HOSPITAL, EDWARD D.<br>CORMIER, ASSOCIATES INC., and BENNETT<br>BUILDING CORPORATION,<br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE MOTION OF THE
DEFENDANT, MICHAEL P. MCTIGUE, TO AMEND HIS ANSWER
PURSUANT TO F.R.CP 15(a) TO ADD A COUNTERCLAIM AGAINST THE
PLAINTIFF**

## I.　　INTRODUCTION

In an egregious abuse of the normally broad application of Fed. R. Civ.P. Rule

15(a), the defendant Michael McTigue, DVM ("Dr. McTigue") has moved to amend his

Answer to the Complaint for the purpose of adding frivolous counterclaims which are

entirely based on the perceived "joint authorship" or "co-ownership" rights in

architectural works which he neither created, owns, copyrighted, or had previously

expressed any interest in using.  Dr. McTigue's proposed amendment should be denied

because the proposed claims are entirely futile since they would be subject to dismissal

under Fed. R. Civ. P. 12(b)(6) for failure to state a claim for which relief can be granted.

First, it is undisputed that Dr. McTigue never created any fixed expressions of his purported architectural ideas. Second, two contracts executed by Dr. McTigue, one at the start of the subject project, and the other during the parties' termination of their relationship, clearly and unambiguously state that Freedenfeld was the sole author and sole owner of the architectural works. Third, it is not in dispute that up until now, Dr. McTigue never objected to Freedenfeld's claim of sole authorship and sole ownership in the architectural works or took any action whatsoever to protect his purported "intellectual property rights." To the contrary, Dr. McTigue had informed Freedenfeld in writing in no uncertain terms, that he found the subject architectural works to be "useless" and had thrown them in the trash. For Dr. McTigue to now claim that he is a joint author or co-owner in plans he did not want to use is simply outrageous. Fourth, Dr. McTigue could never sell or license his purported architectural ideas to his veterinary colleagues because it would be illegal for him to do so since he is not a licensed architect. In further support of this opposition, Freedenfeld states as follows:

## II.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Gardner Animal Hospital Project and Article 6 of the AIA Agreement

In 1999, the defendant, Michael McTigue, DVM ("Dr. McTigue"), retained Freedenfeld to design a new veterinary facility for the Gardner Animal Hospital ("the Hospital") in Gardner, Massachusetts (the "Project"). Dr. McTigue was very familiar with Freedenfeld's work.[1]

---

[1] Five years earlier, Dr. McTigue hired Freedenfeld to prepare plans for the renovation of an existing structure into an earlier Gardner Animal Hospital. Those plans were designed solely by Freedenfeld.

2

Prior to Dr. McTigue's retaining Freedenfeld to design the subject Project, business records made available for inspection and copying to the defendants in this action, evidence that Dr. McTigue viewed floor plans for two other animal hospitals that Freedenfeld designed several years earlier for other clients. The first was the Wellesley/Natick Veterinary Hospital in Natick, MA. The second facility was the Post Road Veterinary Hospital in Charlton, MA. The Wellesley/ Natick facility won a Merit Design award in 1990. Dr. McTigue indicated to Freedenfeld that he wanted his project to combine and reflect elements of both these facilities.

**B.    Authorship and Ownership of the Architectural Works Created for the Project**

When Dr. McTigue retained Freedenfeld to design the subject Project, the parties had agreed that Freedenfeld would retain exclusive ownership of all the designs and drawings that Freedenfeld prepared for the Project (collectively, the "Architectural Works"). Specifically, Dr. McTigue and the Hospital agreed that Freedenfeld would be the owner and the sole author of the Architectural Works and that Freedenfeld would retain all common law, statutory, and other reserved rights, including the copyright. This agreement was memorialized in the Abbreviated Form of Agreement Between Owner and Architect executed by the parties dated March 24, 1999 (the "AIA O&A Agreement"). Article 6 of AIA O&A Agreement provides in its entirety:

> 6.1.    ***The Drawings, Specifications and other documents prepared by the Architect for this Project are instruments of the Architect's service for use solely with respect to this Project, and the Architect shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright.*** The Owner shall be permitted to retain copies and other documents for information and reference in connection with the Owner's use and occupancy of the Project. The Architect's Drawings, Specifications or other documents shall not be used by the Owner or others on other projects, for additions to this

Project or for completion of this Project by others, unless the Architect is adjudged to be in default under this Agreement, except by agreement in writing and with appropriate compensation to the Architect.

See Article 6 of Abbreviated Form of Agreement Between Owner and Architect (AIA Document B151), attached hereto as **Exhibit A** at ¶ 6.1.

The Architectural Works were the only architectural plans and drawings that were created for the Project and all were created solely by Freedenfeld.[2] Dr. McTigue did not prepare any sketches, renderings, blue prints, or drawings whatsoever.[3] In accordance with Article 6 of the AIA O&A Agreement, Freedenfeld retained the original versions of the Architectural Works.

After the Project gained the approval of the City of Gardner Zoning and Planning Board, Freedenfeld and McTigue had a falling out. Dr. McTigue also alleged that Freedenfeld failed to substantially perform the architectural services. As a result of the dispute, Dr. McTigue threatened to terminate Freedenfeld as the Project architect. During this period, Freedenfeld made clear to Dr. McTigue in writing that if the Hospital decided to terminate Freedenfeld that the Hospital was prohibited from using the Architectural Works to complete the Project. Consider the language in following letter which Freedenfeld's office sent to Dr. McTigue in July of 1999:

> It is …important for you to understand that your decision to Terminate [the O&A Agreement] precludes your use of any and all drawings and/or documents produced by this Office. ***These drawings and other documents are not only protected by Federal copyright laws but are also the sole legal and contractual property of this Office and cannot be used by the***

---

[2] Dr. McTigue alleges in his Motion to Amend that Freedenfeld's Complaint contains admissions which appear to suggest that the plaintiff was not the sole author of the Architectural Works. Dr. McTigue must be referring to a different complaint because there are no such admissions in Freedenfeld's Complaint or in any pleading filed by the plaintiff in this action. Freedenfeld has always maintained that he is the sole author and sole owner of all the architectural works that were created for the Project.

[3] Even if Dr. McTigue did prepare any drawings (which he did not), under the terms of the AIA O&A Agreement, Freedenfeld is deemed to be the sole author of the plans and retains sole ownership over the final versions.

> ***Owner or others for the completion of this Project. I believe that there is
> no dispute about this issue.*** In addition, any licensed architect will know
> the substantial jeopardy he will place his firm in by using another
> architect's copyrighted documents. All documents given to you by this
> office must be returned upon execution of the Termination Agreement.

<u>See</u> Letter Dated July 29, 1999, attached hereto as **<u>Exhibit. B.</u>**

At no time during the creation of the Architectural Works or during the parties'

termination of their relationship did Dr. McTigue ever claim that he was a joint author or

co-owner of the plans. Quite the opposite, Dr. McTigue responded to Freedenfeld's

request for the return of the Architectural Works by stating in writing that the

Architectural Works had "proven useless" and had been "rolled up and discarded." Dr.

McTigue stated in writing:

> ***Whatever plans, drawings etc. you did prepare have proven useless to us,
> and they have been rolled up and discarded.*** This is in spite of my having
> paid tens of thousands of dollars; unfortunately, I again have to pay
> another architect another tens of thousands of dollars to complete the
> project.

   <u>See</u>  Dr. McTigue Letter attached hereto as **<u>Exhibit C.</u>**

Indeed, all the plans, drawings, and related design documents that were ever

created for the Project were solely created by Freedenfeld at the plaintiff's office in

Boston through the use of an AutoCAD program. Dr McTigue's letter only reinforces this

fact.

**C.     The Termination Agreement**

In August of 1999, to protect its rights in the Architectural Works, Freedenfeld

properly filed an application and deposited the required fee with the U.S. Copyright

Office in Washington, D.C.  The copyright was later granted to Freedenfeld for the

Architectural Works (Certificate VAU 656-367). See Copyright Registration Certificate, attached hereto as **Exhibit D.**

In September of 1999, Freedenfeld, Dr. McTigue, and the Hospital agreed to resolve their dispute, including fees owed by the Hospital for the design services Freedenfeld performed in connection with the Project, by entering into a Termination and Mutual Release Agreement (the "Termination Agreement"). As part of the Termination Agreement, Dr. McTigue and the Hospital specifically agreed that they would not use the Architectural Works. The Termination Agreement did not modify, in any way, Freedenfeld's exclusive authorship, ownership, proprietary rights, or right to enforce its copyright interests in the Architectural Works. Specifically, Paragraph 3 of the Termination Agreement provides:

> **[the Hospital] agrees not to use any of the work solely produced by [Freedenfeld]. Article 6 of the [AIA O&A Agreement] shall remain in full force and affect [sic].**

See Termination and Mutual Release Agreement, attached hereto as **Exhibit E.**

The word "solely" was used in this paragraph of the Termination Agreement to reemphasize the fact that both parties clearly acknowledged that all the Architectural Works were ever created for the Project were solely created by Freedenfeld and that Dr. McTigue was prohibited from using any of the Architectural Works to complete the project. It was clearly understood by the parties that any replacement architect hired by McTigue would have to start completely from scratch. Unfortunately, after the parties terminated their relationship, Dr. McTigue, without Freedenfeld's knowledge or consent, decided to give the Architectural Works that Freedenfeld solely created to another architect to complete the Project. This was in direct violation of federal copyright laws

6

and in violation of the terms of both Article 6.1 of the AIA O&A Agreement and

Paragraph 3 of the Termination Agreement.

**D.     Freedenfeld's Discovery of the infringing Activity**

Freedenfeld has been a long term subscriber to a veterinary trade publication,

*Veterinary Economics* (the "Magazine"). The Magazine is an international veterinary

medicine and business management publication serving more than 50,000 subscribers in

the United States and Canada. While perusing the November 2004 issue of the Magazine,

Freedenfeld discovered an article appearing on pages 50 - 57 about the renovation and

expansion of the Gardner Animal Hospital. According to the article, the design won a

"Merit Award" in the 2004 Veterinary Hospital Design Competition, a national and

international competition. The article is entitled "Giving an Old House a Cutting –Edge

Extension." The article identifies the owners of the Hospital as Dr. McTigue and Brian

Hurley DVM. Edward D. Cormier Associates Inc. is listed as the Architect. Pages 52-53

of the article contain drawings that are nearly identical to the Architectural Works

prepared by Freedenfeld. After further investigation by Freedenfeld's counsel in early

2005, it was determined that the Project was built by the defendant, Bennett Building

Corporation using the Freedenfeld Architectural Works and that the land where the

Project was built is owned by the McTigue Family Trust. Both Dr. McTigue and his

wife, Nancy McTigue are trustees of the McTigue Family Trust.

**E.     The Instant Action**

On July 22, 2005, Freedenfeld instituted the instant action against the defendants

for copyright infringement and violation of the Lanham Act. On February 17, 2006, the

Hospital Defendants filed an Answer to the Complaint. The Answer filed by the Hospital

Defendants did not include any counterclaim.  <u>See</u> Answer of the Hospital Defendants, attached hereto as **Exhibit. F.**

### III.     LAW AND ARGUMENT

Fed.R.Civ.P.15(a) provides that "leave [to file an amendment] shall be freely given when justice so requires." Fed. R. Civ. P. 15(a); <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962). However, "a court has the discretion to deny [such a motion] if it believes that, as a matter of law, amendment would be futile". <u>Carlo v. Reed Rolled Thread Die Co.</u>, 49 F.3d  790, 792 (1st Cir.1995). The filing of a counterclaim is considered futile if it "would be subject to dismissal for failure to state a claim." <u>MacNeill Engineering Co., Inc. v. Trisport, Ltd.</u>, 59 F.Supp.2d 199, 200-01 (D.Mass.1999); <u>Smith v. Mitre Corp.</u>, 949 F.Supp. 943, 945 (D. Mass. 1997) ("[i]n considering a motion for leave to amend [ ] the trial court must first consider whether the proposed new claims are futile, that is, whether they would be subject to dismissal for failure to state a claim.").

**DR. MCTIGUE'S PROPOSED AMENDMENT SHOULD BE DENIED BECAUSE THE PROPOSED CLAIMS ARE ENTIRELY FUTILE SINCE THEY WOULD BE SUBJECT TO DISMISSAL UNDER FED. R. CIV. P. 12(b)(6) FOR FAILURE TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED.**

Dr. McTigue( a veterinarian) seeks to amend his answer to add various counterclaims against Freedenfeld (an architect) which are entirely based on an allegation that he is somehow the "joint author" or "co-owner" of the Architectural Works that Freedenfeld created for the Project. The proposed counterclaims are entirely futile because they would be subject to dismissal under Fed. R. Civ. P. 12b(6) for failure to state a claim for which relief can be granted. The absolute futility of the proposed amendment is discussed below:

(a).    **Dr. McTigue Never Created any Fixed Expressions of His Purported Architectural Ideas and any Alleged Contributions That He Made to Freedenfeld's Creation of The Architectural Works Cannot Be Said to be More Than *De Minimis* in Nature.**

It is undisputed that Dr. McTigue never created a single sketch, drawing, or other form of tangible expression of his purported architectural "ideas." The lack of any tangible expression is absolutely fatal to any claim that he may have premised on "joint authorship." This is because it is a fundamental axiom of copyright law that ideas themselves are not, as a matter of law, copyrightable. Mazer v. Stein, 347 U.S. 201, 217-18, 74 S. Ct. 460, 470-471 (1954). Rather it is the fixed expression of ideas in a tangible medium which are copyrightable (e.g., architectural plans). Pursuant to the Copyright Act, an architect, by fixing those ideas in a tangible medium, is deemed to be the creator.

Even if it could be said that Dr. McTigue contributed to Freedenfeld's creation of the Architectural Works by contributing ideas and exercising approval power over various aspects of the design, such contributions cannot be said to be more than *de minimis* in nature. This specific issue has already been addressed by the federal courts. Significantly, the plaintiff directs the court's attention to Meltzer v. Zoeller, 520 F.Supp. 847, 856 (D.C.N.J, 1981)(ruling that although the plaintiff had prepared sketches illustrating in some detail features of house which he and his wife required and had presented such sketches to the architect and although the plaintiff contributed ideas and made certain changes and exercised approval power, it was the architectural firm, rather than plaintiff, which had created the plans for the house, and thus the architectural firm was the sole author of the plans for purpose of copyright interests). For the Court's

convenience, a copy of Meltzer decision is attached hereto as **Exhibit G.** In Meltzer the

Court stated:

> The [architect], by fixing the ideas for the [plaintiff's] home in a tangible
> medium, 'created' those plans, for pursuant to 17 U.S.C. s. 101, a 'work'
> is "created" when "it is fixed in a copy ... for the first time." It logically
> follows, then, that the [architect] is the author of these plans for the
> purpose of copyright interests. In contrast, ideas are not, as a matter of
> law, copyrightable...The ideas and sketches contributed by plaintiff do not
> sufficiently constitute fixed expressions of ideas; therefore, plaintiff is not
> the 'creator' of the plans for his house for copyright purposes. Without
> authorship, the sine qua non of copyright, plaintiff has no cause of action.
> Nor can the plaintiff be considered a 'joint author' of the plans with the
> [architect]. Under the 1976 Act, a joint work is one 'prepared by two or
> more authors with the intention that their contributions be merged into
> inseparable or interdependent parts of a unitary whole.' Of course, this
> would be a fiction here, since plaintiff's failure to have 'created' or
> 'prepared' the work within the meaning of the statute bars his asserting a
> copyright interest even as a joint author of the plans. ... For all of the
> foregoing reasons, this Court finds that plaintiff's claims of copyright
> infringement against each and every one of the defendants must be
> dismissed as a matter of law.

See 520 F. Supp. at 857; see also, M.G.B. Homes, Inc. v. Ameron Homes, Inc. 903 F.2d

1486, 1492-93 (11th Cir. 1990)(where the court found that a home builder was not a joint

author of architectural plans when he prepared a thumbnail sketch of the floor plan he

wanted, reviewed drawings in progress, made suggestions and corrections and exercised

final approval authority over the work); Aitken, Hazen, Hoffman, Miller, P.C. v. Empire

Construction Co., 542 F.Supp. 252, 259 (D. Neb. 1982)(though contractor

"communicated to the plaintiff [architect] through sketches and verbal descriptions its

general ideas as to the type of apartment complex it intended to build...." contractor's

"overall contribution to the plans cannot be said to be more than de minimis in nature").

Here, there are substantial factual similarities and differences with the Meltzer

decision that destroy any hope that Dr. McTigue has of prevailing on a claim premised on

co-ownership or joint ownership of the Architectural Works. First, similar to the

plaintiff's in <u>Meltzer</u>, prior to retaining Freedenfeld to design the Project, Dr. McTigue

viewed floor plans of two other Animal Hospital Projects that were designed by

Freedenfeld, one in Natick, MA and the other in Charlton, MA.  Certain elements of

those designs were ultimately incorporated into the Project.  Second, cutting against Dr.

McTigue's claim of co-ownership or joint authorship is the fact that unlike the plaintiffs

in <u>Meltzer</u>, here it is undisputed that Dr. McTigue never sought to register a copyright in

the Architectural Works.[4]  Third as stated above, Dr. McTigue never prepared any

sketches or drawings.  But even if Dr. McTigue had copyrighted the Architectural Works

or gave Freedenfeld sketches or drawings during the design phase of the Project, the

<u>Meltzer</u> decision makes clear that these actions would not have been enough to confer

upon Dr. McTigue any right of co-ownership or joint authorship in the Architectural

Works.  In light of this decision, and the undisputed facts of this case, any claims asserted

by Dr. McTigue which are premised on allegation of co-ownership or joint authorship in

the Architectural Works are absolutely without merit.

**(b).    Dr. McTigue Entered Into Two Express Agreements Which Clearly and Unambiguously State that Freedenfeld was the Sole Author and Sole Owner of the Architectural Works for the Purposes of the Copyright Act.**

It is also undisputed that Dr. McTigue entered into two express agreements which

clearly state that Freedenfeld is the sole author of the plans and retains the copyright.

Specifically, Article 6.1 of the AIA O & A Agreement states in clear and unambiguous

language:

---

[4] This also significant from a procedural perspective since Section 411(a) of the Copyright Act expressly states that "[n]o action for infringement of the copyright in any United States work shall be instituted until registration of the copyright claim has been made in accordance with this title." <u>See</u> 17 U.S.C. § 411(a). It is undisputed that as of the date of the filing of this opposition, Dr. McTigue has not filed any application with the United States Patent and Trademark Mark Office relative to the Architectural Works or any elements of such works which he claims Freedenfeld is infringing upon.

6.1.    *The Drawings, Specifications and other documents prepared by the Architect for this Project are instruments of the Architect's service for use solely with respect to this Project, and the Architect shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright.* The Owner shall be permitted to retain copies and other documents for information and reference in connection with the Owner's use and occupancy of the Project. The Architect's Drawings, Specifications or other documents shall not be used by the Owner or others on other projects, for additions to this Project or for completion of this Project by others, unless the Architect is adjudged to be in default under this Agreement, except by agreement in writing and with appropriate compensation to the Architect.

<u>See</u>  Article 6 of Abbreviated Form of Agreement Between Owner and Architect (AIA Document B151), attached hereto as **Exhibit A** at ¶ 6.1.

The subsequent Termination Agreement  executed by the parties did not modify, in any way,  Freedenfeld's exclusive ownership, proprietary rights, or right to enforce its copyright interests in the Architectural Works.  Specifically, Paragraph 3 of the Termination Agreement provides:

**[the Hospital] agrees not to use any of the work solely produced by [Freedenfeld]. Article 6 of the [AIA O&A Agreement] shall remain in full force and affect [sic].**

<u>See</u> Termination and Mutual Release Agreement, attached hereto as **Ex. E**.

In accordance with these signed agreements, Freedenfeld retained the original Architectural Works which Freedenfeld then immediately copyrighted with the U.S. Patent and Trademark Office in Washington, D.C. after the parties parted ways.  It is well settled in Massachusetts that where the terms of a contract are unambiguous, it will be enforced according to its terms. <u>Freelander v. G. & K Realty Corp.</u>, 357 Mass. 512, 516 (1970).  Here is there is no ambiguity in the letter of intent between the parties. The parties clearly stated in no uncertain terms that Freedenfeld was sole author and sole owner of the Architectural Works. The words contained in the Termination Agreement

12

that Article 6.1 of the AIA O&A Agreement "shall remain in full force and effect" are

crystal clear.  In light of this clear contractual language, any claims asserted by Dr.

Mctigue which are premised on an allegation of joint authorship or co-ownership in the

Architectural Works would never pass muster to survive a Rule 12(b)(6). Accordingly,

the proposed amendment should be denied.

**(c).    Up Until Now Dr. McTigue Never Took Any Action Whatsoever To Protect His Purported Rights Of Joint Authorship In The Architectural Works.**

Even more significant from a factual standpoint is that up until now, Dr. McTigue

never claimed any right of co-authorship in the architectural works and never took any

action whatsoever to protect his purported intellectual property interests. Significantly, it

is undisputed that each of the Architectural Plans contained Freedenfeld's logo in the title

block. In addition, each drawing contained  the following copyright language: *"© 1999*

*Warren Freedenfeld & Associates, Inc."*  It is also undisputed that in July 1999,

Freedenfeld informed Dr. McTigue in writing that the Architectural Works were the *"sole*

*legal and contractual property of ["Freedenfeld] and [could not]  be used by [Dr.*

*McTigue] or others for the completion of [the] Project*." See letter See Letter Dated

July 30, 1999, attached hereto as **Exhibit. B.**

Up until the filing of this lawsuit, Dr. McTigue never once objected to or disputed

that Freedenfeld was the sole author of the Architectural Works and the sole owner of the

copyright.  Indeed, it is undisputed that that Dr. McTigue never once attempted to file an

application for a copyright with the U.S. Patent and Trademark Office relative to the

Architectural Works. Nor is there any allegation that he ever attempted to seek any credit

for the creation of the architectural plans (he could not). Obviously, had Dr. McTigue

sincerely believed that he was a joint author in the plans he would have sought some form

of credit relative to their creation by, among other things, filing a copyright application with the U.S. Patent and Trademark Office under a claim of joint authorship. Yet, up until now, Dr. McTigue raised no objection and took absolutely no action whatsoever to enforce whatever "intellectual property" rights which he felt that he had in the Architectural Works. The equitable doctrines of laches and waiver are particularly applicable here.

By comparison, Freedenfeld acted timely to protect his sole authorship and sole ownership rights in the Architectural Works by immediately filing a copyright application with the U.S. Patent and Trademark Office in August of 1999. See Copyright Registration Certificate, attached hereto as **Exhibit D.** It should be noted that the Copyright Registration Certificate itself creates "prima facie evidence of the validity of the copyright and of the facts stated in the certificate including ownership." Encore Shoe Corp. v. Bennett Industries, Inc., 1991 WL 27412 (D. Mass) citing 17 U.S.C. § 410(c); See also, Johnson v. Gordon, 409 F.3d 12, 17 (1st Cir. 2005).

Even more fatal to McTigue's position is that fact that during the period in which Freedenfeld and Dr. McTigue terminated their relationship, Dr. McTigue told Freedenfeld in writing that he had thrown the Architectural Works in the trash because they had "proven to be useless" to the Hospital. For Dr. McTigue to now turn around and claim that he jointly authored the very plans which he did not want to use is not only hypocritical but outrageous.

**(d).    Dr. McTigue could never sell or license his purported architectural ideas to his veterinary colleagues because it is illegal to practice architecture without a license.**

Dr. McTigue is apparently taking the position that he could have sold or licensed his purported architectural contributions relative to the creation of the Architectural Works to his veterinary colleagues. This position is not only preposterous but highly illegal. It is undisputed that Dr. McTigue has no architectural training whatsoever; rather he is a veterinarian. The practice of architecture is a licensed profession that is highly regulated by state legislative bodies and the American Institute of Architects. In Massachusetts as well as other states, it is illegal to practice architecture without a license. For example, Massachusetts General Laws Chapter 112 § 60K entitled "**Practice of architecture; use of titles; display of signs and other advertising matter**" provides:

> No person shall, directly or indirectly, engage in the practice of architecture in this commonwealth, except as hereinafter set forth in section sixty L, or use the title "architect", "registered architect", "architectural designer", or display or use any words, letters, figures, title, sign, card, advertisement or other device to indicate that such person offers to engage or engages in the practice of architecture unless he is registered under the provisions of sections sixty A to sixty O, inclusive.

Mass. Gen. Laws Chapter 112 § 60K.

By selling or licensing his purported architectural ideas to other veterinarians, Dr. McTigue would in effect be practicing architecture without a license and thus would be violating the law. In short, Dr. McTigue was never entitled, nor could he ever be entitled to sell or license what he claims were his architectural ideas to anyone. In order to do so, he would first need to satisfy the American Institute of Architect's stringent educational and training requirements and obtain a license to practice in states in which he intends to sell or license his architectural ideas. The public policy reasons for requiring that only

qualified architects who are properly registered within the state of practice be allowed to

provide architectural services to the public are obvious:

> One instance of untrained, unqualified, or unauthorized practice of
> architecture or professional engineering-- be it an isolated transaction or
> one act in a continuing series of transactions-- may be devastating to life,
> health or property. To exclude an isolated transaction from the
> proscription of the registration laws would seriously weaken the purpose
> of such laws at a point where their prohibition of professional services
> may be most needed.

Food Management, Inc. v. Blue Ribbon Beef Pack, Inc. 413 F.2d. 716, 723-724 (8th
Cir.1969)(citations omitted).

While Dr. McTigue may very well be able to copyright architectural concepts

with U.S. Patent and Trademark without being a registered architect (something which he

has not done) there is no doubt that he is prohibited from providing architectural services

to clients and charging a fee for use of any design plans that he creates. See e.g.,

American Store Equipment & Construction Corp. v. Jack Dempsey's Punch Bowl, Inc.,

174 Misc. 436, 21 N.Y.S.2d 117 (1939), aff'd 258 App. 794, 16 N.Y.S.2d 702, appeal

denied 258 App. 876, 17 N.Y.S.2d 220, aff'd 283 N.Y. 601, 28 N.E.2d 23 (construction

company which executed contract under which the company which was not licensed as

an architect agreed to perform architectural services, was engaged in "practicing

architecture" and could not recover for services performed under the contract).

Accordingly, for the foregoing reasons, Dr. McTigue's Motion to Amend should

be denied since the amendment would be utterly futile. Doubtless, as discussed above,

none of the purported claims could ever survive a motion to dismiss under Fed. R. Civ.

12(b)(6).

## IV.    CONCLUSION

Accordingly, for all the foregoing reasons, the Hospital Defendants' Motion to

Amend should be Denied

## V.    REQUEST FOR ORAL ARGUMENT

The plaintiff hereby requests that the Court hear oral arguments on this opposition.

Respectfully submitted,

WARREN FREEDENFELD
ASSOCIATES, INC. as successor in
Interest to WARREN
FREEDENFELD & ASSOCIATES,
INC.,

By its attorneys,

/s/ Garrett J. Lee_____
Barry S. Scheer
BBO No. 445100
Garrett J. Lee
BBO No. 641876
PARKER | SCHEER, LLP
One Constitution Center
Dated: June 13, 2006                          Boston, MA  02129
Tel.: 617-886-0500
Fax: 617-886-0100
Email: bss@parkerscheer.com
        gjl@parkerscheer.com

## CERTIFICATE OF SERVICE

I, Garrett J. Lee, attorney for the plaintiff, Warren Freedenfeld Associates, Inc. as successor in interest to Warren Freedenfeld & Associates, Inc., hereby certify that on this 13th day of June, 2006 a true copy of the following was served on all counsel record:

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE MOTION OF THE DEFENDANTS, MICHAEL P. MCTIGUE, NANCY A. MCTIGUE, BRIAN C. HURLEY, AND GARDNER ANIMAL CARE CENTER D/B/A GARDNER ANIMAL HOSPITAL, TO COMPEL PRODUCTION OF DOCUMENTS AND REQUEST FOR SANCTIONS**

By first-class mail postage pre-paid, addressed to:

Robert N. Meltzer, Esq.
P.O. Box 1459
Framingham, MA 01701

Stephen D. Rosenberg
The McCormack Firm, LLC
One International Place
7th Floor
Boston, MA 02110

F. Joseph Gentili, Esq.
Capobianco & Gentili, PC
15 West Central Street
Natick, MA 01760

Robert D. City, Esq.
Michael J. Dissette, Esq.
City, Hayes & Dissette, PC
50 Congress Street
Boston, MA 02109

Mary C. Casey, Esq.
Harbor Law Group
385 South Street
Shrewsbury, MA 01545

/s/ Garrett J. Lee_____
Garrett J. Lee

THE AMERICAN INSTITUTE OF ARCHITECTS



*AIA Document B151*

# Abbreviated Form of Agreement Between Owner and Architect

*for Construction Projects of Limited Scope*

## 1987 EDITION

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES; CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION.*

## AGREEMENT

made as of the                24th           day of              March              in the year of
Nineteen Hundred and Ninety Eight

**BETWEEN** the Owner:        Mike McTigue, DVM
*(Name and address)*          GARDNER ANIMAL HOSPITAL
                              7 Pearson Boulevard
                              Gardner, MA  01440


and the Architect:            WARREN FREEDENFELD & ASSOCIATES INC.
*(Name and address)*          39 Church Street
                              Boston, MA  02116



For the following Project:    GARDNER ANIMAL HOSPITAL
*(Include detailed description of Project, location, address and scope.)*

Project Location:             2 acres of existing 19 acre lot
                              Typanny Road / Route 68
                              (Across from Walmart)
                              Gardner, Massachusetts

Scope of Work       :         New veterinary facility

The Owner and Architect agree as set forth below.

Copyright 1974, 1978, ©1987 by The American Institute of Architects, 1735 New York Avenue, N.W., Washington, D.C. 20006. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will be subject to legal prosecution.

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

data comprising the Contractor's Application for Payment, that the Work, to the best of the Architect's knowledge, information and belief, has progressed to the point indicated and that quality of the Work is in accordance with the Contract Documents. The issuance of a Certificate for Payment shall not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment or (4) ascertained how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

**2.4.10** The Architect shall have authority to reject Work which does not conform to the Contract Documents and will have authority to require additional inspection or testing of the Work whenever, in the Architect's reasonable opinion, it is necessary or advisable for the implementation of the intent of the Contract Documents.

**2.4.11** The Architect shall review and approve or take other appropriate action upon Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action shall be taken with such reasonable promptness as to cause no delay. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component. When professional certification of performance characteristics of materials, systems or equipment is required by the Contract Documents, the Architect shall be entitled to rely upon such certification to establish that the materials, systems or equipment will meet the performance criteria required by the Contract Documents.

**2.4.12** The Architect shall prepare Change Orders and Construction Change Directives, with supporting documentation and data if authorized or confirmed in writing by the Owner as provided in Paragraphs 3.1 and 3.3, for the Owner's approval and execution in accordance with the Contract Documents, and may authorize minor changes in the Work not involving an adjustment in the Contract Sum or an extension of the Contract Time which are not inconsistent with the intent of the Contract Documents.

**2.4.13** The Architect shall conduct inspections to determine the dates of Substantial Completion and final completion and shall issue a final Certificate for Payment.

**2.4.14** The Architect shall interpret and decide matters concerning performance of the Owner and Contractor under the requirements of the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests shall be made with reasonable promptness and within any time limits agreed upon. When making such interpretations and initial decisions, the Architect shall endeavor to secure faithful performance by both Owner and Contractor, shall not show partiality to either, and shall not be liable for results of interpretations or decisions so rendered in good faith.

### ARTICLE 3
### ADDITIONAL SERVICES

**3.1** Additional Services shall be provided if authorized or confirmed in writing by the Owner or if included in Article 12, and

they shall be paid for by the Owner as provided in this Agreement. Such Additional Services shall include, in addition to those described in Paragraphs 3.2 and 3.3, budget analysis, financial feasibility studies, planning surveys, environmental studies, measured drawings of existing conditions, coordination of separate contractors or independent consultants, coordination of construction or project managers, detailed Construction Cost estimates, quantity surveys, interior design, planning of tenant or rental spaces, inventories of materials or equipment, preparation of record drawings, and any other services not otherwise included in this Agreement under Basic Services or not customarily furnished in accordance with generally accepted architectural practice.

**3.2** If more extensive representation at the site than is described in Subparagraph 2.4.5 is required, such additional project representation shall be provided and paid for as set forth in Articles 11 and 12.

**3.3** As an Additional Service in connection with Change Orders and Construction Change Directives, the Architect shall prepare Drawings, Specifications and other documentation and data, evaluate Contractor's proposals, and provide any other services made necessary by such Change Orders and Construction Change Directives.

### ARTICLE 4
### OWNER'S RESPONSIBILITIES

**4.1** The Owner shall provide full information, including a program which shall set forth the Owner's objectives, schedule, constraints, budget with reasonable contingencies, and criteria.

**4.2** The Owner shall furnish surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, and a written legal description of the site and the services of geotechnical engineers or other consultants when such services are requested by the Architect.

**4.3** The Owner shall furnish structural, mechanical, chemical, air and water pollution tests, tests for hazardous materials, and other laboratory and environmental tests, inspections and reports required by law or the Contract Documents.

**4.4** The Owner shall furnish all legal, accounting and insurance counseling services as may be necessary at any time for the Project, including auditing services the Owner may require to verify the Contractor's Applications for Payment or to ascertain how or for what purposes the Contractor has used the money paid by the Owner.

**4.5** The foregoing services, information, surveys and reports shall be furnished at the Owner's expense, and the Architect shall be entitled to rely upon the accuracy and completeness thereof.

**4.6** Prompt written notice shall be given by the Owner to the Architect if the Owner becomes aware of any fault or defect in the Project or nonconformance with the Contract Documents.

**4.7** The proposed language of certificates or certifications requested of the Architect or Architect's consultants shall be submitted to the Architect for review and approval at least 14 days prior to execution.

**AIA DOCUMENT B151** • ABBREVIATED OWNER-ARCHITECT AGREEMENT • THIRD EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

## ARTICLE 5
## CONSTRUCTION COST

### 5.1    DEFINITION

**5.1.1** The Construction Cost shall be the total cost or estimated cost to the Owner of all elements of the Project designed or specified by the Architect.

**5.1.2** The Construction Cost shall include the cost at current market rates of labor and materials furnished by the Owner and equipment designed, specified, selected or specially provided for by the Architect, plus a reasonable allowance for the Contractor's overhead and profit. In addition, a reasonable allowance for contingencies shall be included for market conditions at the time of bidding and for changes in the Work during construction.

**5.1.3** Construction Cost does not include the compensation of the Architect and Architect's consultants, the costs of the land, rights-of-way, financing or other costs which are the responsibility of the Owner as provided in Article 4.

### 5.2    RESPONSIBILITY FOR CONSTRUCTION COST

**5.2.1** It is recognized that neither the Architect nor the Owner has control over the cost of labor, materials or equipment, over the Contractor's methods of determining bid prices, or over competitive bidding, market or negotiating conditions. Accordingly, the Architect cannot and does not warrant or represent that bids or negotiated prices will not vary from any estimate of Construction Cost or evaluation prepared or agreed to by the Architect.

**5.2.2** No fixed limit of Construction Cost shall be established as a condition of this Agreement by the furnishing, proposal or establishment of a Project budget, unless a fixed limit has been agreed upon in writing and signed by the parties hereto. Fixed limits, if any, shall be increased in the amount of an increase in the Contract Sum occurring after execution of the Contract for Construction.

**5.2.3** Any Project budget or fixed limit of Construction Cost may be adjusted to reflect changes in the general level of prices in the construction industry between the date of submission of the Construction Documents to the Owner and the date on which proposals are sought.

**5.2.4** If a fixed limit of Construction Cost is exceeded by the lowest bona fide bid or negotiated proposal, the Owner shall:

.1   give written approval of an increase in such fixed limit;

.2   authorize rebidding or renegotiating of the Project within a reasonable time;

.3   if the Project is abandoned, terminate in accordance with Paragraph 8.3; or

.4   cooperate in revising the Project scope and quality as required to reduce the Construction Cost.

**5.2.5** If the Owner chooses to proceed under Clause 5.2.4.4, the Architect, without additional charge, shall modify the Contract Documents as necessary to comply with the fixed limit, if established as a condition of this Agreement. The modification of Contract Documents shall be the limit of the Architect's responsibility arising out of the establishment of a fixed limit. The Architect shall be entitled to compensation in accordance with this Agreement for all services performed whether or not the Construction Phase is commenced.

## ARTICLE 6
## USE OF ARCHITECT'S DRAWINGS, SPECIFICATIONS AND OTHER DOCUMENTS

**6.1** The Drawings, Specifications and other documents prepared by the Architect for this Project are instruments of the Architect's service for use solely with respect to this Project, and the Architect shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright. The Owner shall be permitted to retain copies, including reproducible copies, of the Architect's Drawings, Specifications and other documents for information and reference in connection with the Owner's use and occupancy of the Project. The Architect's Drawings, Specifications or other documents shall not be used by the Owner or others on other projects, for additions to this Project or for completion of this Project by others, unless the Architect is adjudged to be in default under this Agreement, except by agreement in writing and with appropriate compensation to the Architect.

**6.2** Submission or distribution of documents to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the Architect's reserved rights.

## ARTICLE 7
## ARBITRATION

**7.1** Claims, disputes or other matters in question between the parties to this Agreement arising out of or relating to this Agreement or breach thereof shall be subject to and decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise. No arbitration arising out of or relating to this Agreement shall include, by consolidation, joinder or in any other manner, an additional person or entity not a party to this Agreement, except by written consent containing a specific reference to this Agreement signed by the Owner, Architect, and any other person or entity sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by the parties to this Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

**7.2** In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of limitations.

**7.3** The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

## ARTICLE 8
## TERMINATION, SUSPENSION OR ABANDONMENT

**8.1** This Agreement may be terminated by either party upon not less than seven days' written notice should the other party

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

fail substantially to perform in accordance with the terms of this Agreement through no fault of the party initiating the termination.

**8.2** If the Project is suspended by the Owner for more than 30 consecutive days, the Architect shall be compensated for services performed prior to notice of such suspension. When the Project is resumed, the Architect's compensation shall be equitably adjusted to provide for expenses incurred in the interruption and resumption of the Architect's services.

**8.3** This Agreement may be terminated by the Owner upon not less than seven days' written notice to the Architect in the event that the Project is permanently abandoned. If the Project is abandoned by the Owner for more than 90 consecutive days, the Architect may terminate this Agreement by giving written notice.

**8.4** Failure of the Owner to make payments to the Architect in accordance with this Agreement shall be considered substantial nonperformance and cause for termination.

**8.5** If the Owner fails to make payment when due the Architect for services and expenses, the Architect may, upon seven days' written notice to the Owner, suspend performance of services under this Agreement. Unless payment in full is received by the Architect within seven days of the date of the notice, the suspension shall take effect without further notice. In the event of a suspension of services, the Architect shall have no liability to the Owner for delay or damage caused the Owner because of such suspension of services.

**8.6** In the event of termination not the fault of the Architect, the Architect shall be compensated for services performed prior to termination, together with Reimbursable Expenses then due and all Termination Expenses.

**8.7** Termination Expenses are in addition to compensation for Basic and Additional Services, and include expenses which are directly attributable to termination.

## ARTICLE 9
### MISCELLANEOUS PROVISIONS

**9.1** Unless otherwise provided, this Agreement shall be governed by the law of the principal place of business of the Architect.

**9.2** Terms in this Agreement shall have the same meaning as those in AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.

**9.3** Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion, or the date of issuance of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion.

**9.4** The Owner and Architect waive all rights against each other and against the contractors, consultants, agents and employees of the other for damages, but only to the extent covered by property insurance during construction, except such rights as they may have to the proceeds of such insurance as set forth in the edition of AIA Document A201, General Con-

ditions of the Contract for Construction, current as of the date of this Agreement. The Owner and Architect each shall require similar waivers from their contractors, consultants and agents.

**9.5** The Owner and Architect, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Agreement and to the partners, successors, assigns and legal representatives of such other party with respect to all covenants of this Agreement. Neither Owner nor Architect shall assign this Agreement without the written consent of the other.

**9.6** This Agreement represents the entire and integrated agreement between the Owner and Architect and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Architect.

**9.7** Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Owner or Architect.

**9.8** The Architect and Architect's consultants shall have no responsibility for the discovery, presence, handling, removal or disposal of or exposure of persons to hazardous materials in any form at the Project site, including but not limited to asbestos, asbestos products, polychlorinated biphenyl (PCB) or other toxic substances.

## ARTICLE 10
### PAYMENTS TO THE ARCHITECT

**10.1   DIRECT PERSONNEL EXPENSE**

**10.1.1** Direct Personnel Expense is defined as the direct salaries of the Architect's personnel engaged on the Project and the portion of the cost of their mandatory and customary contributions and benefits related thereto, such as employment taxes and other statutory employee benefits, insurance, sick leave, holidays, vacations, pensions and similar contributions and benefits.

**10.2   REIMBURSABLE EXPENSES**

**10.2.1** Reimbursable Expenses include expenses incurred by the Architect in the interest of the Project for:

  .1  expense of transportation and living expenses in connection with out-of-town travel authorized by the Owner;

  .2  long-distance communications;

  .3  fees paid for securing approval of authorities having jurisdiction over the Project;

  .4  reproductions;

  .5  postage and handling of Drawings and Specifications;

  .6  expense of overtime work requiring higher than regular rates, if authorized by the Owner;

  .7  renderings and models requested by the Owner;

  .8  expense of additional insurance coverage or limits, including professional liability insurance, requested by the Owner in excess of that normally carried by the Architect and Architect's consultants; and

  .9  ~~expense of computer-aided design and drafting equipment time when used in connection with the Project.~~



AIA DOCUMENT B151 • ABBREVIATED OWNER-ARCHITECT AGREEMENT • THIRD EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

**10.3    PAYMENTS ON ACCOUNT OF BASIC SERVICES**

**10.3.1**  An initial payment as set forth in Paragraph 11.1 is the minimum payment under this Agreement.

**10.3.2**  Subsequent payments for Basic Services shall be made monthly and, where applicable, shall be in proportion to services performed within each phase of service.

**10.3.3**  If and to the extent that the time initially established in Subparagraph 11.5.1 of this Agreement is exceeded or extended through no fault of the Architect, compensation for any services rendered during the additional period of time shall be computed in the manner set forth in Subparagraph 11.3.2.

**10.3.4**  When compensation is based on a percentage of Construction Cost and any portions of the Project are deleted or otherwise not constructed, compensation for those portions of the Project shall be payable to the extent services are performed on those portions, in accordance with the schedule set forth in Sub-

paragraph 11.2.2, based on (1) the lowest bona fide bid or negotiated proposal, or (2) if no such bid or proposal is received, the most recent preliminary estimate of Construction Cost or detailed estimate of Construction Cost for such protions of the Project.

**10.4    PAYMENTS ON ACCOUNT OF ADDITIONAL SERVICES AND REIMBURSABLE EXPENSES**

**10.4.1**  Payments on account of the Architect's Additional Services and for Reimbursable Expenses shall be made monthly upon presentation of the Architect's statement of services rendered or expenses incurred.

**10.4    PAYMENTS WITHHELD**

**10.5.1**  No deductions shall be made from the Architect's compensation on account of sums withheld from payments to contractors.

<u>**ARTICLE 11**</u>
**BASIS OF COMPENSATION**

The owner shall compensate the Architect as follows:

**11.1    AN INITIAL PAYMENT OF**   Three Thousand   Dollars (  $3,000.00  )
shall be made upon execution of this Agreement and credited to the Owner's account at final payment.

**11.2    BASIC COMPENSATION**

**11.2.1**  FOR BASIC SERVICES, as described in Article 2, and any other services included in Article 12 as part of Basic Services, Basic Compensation shall be computed as follows:
*(Insert basis of compensation, including stipulated sums, multiples or percentages, and identify phases to which particular methods of compensation apply, if necessary.)*

The Base Fee for Architectural Services shall be $9.00 per gross square foot area of the Project.

See Article 12 for Engineering Services    $3 sq/ft   unfinished space (basement, attic) or empty & COVERED EXTERIOR

**11.2.2**  Where compensation is based on a stipulated sum or percentage of Construction Cost, progress payments for Basic Services in each phase shall total the following percentages of the total Basic Compensation payable:

| | | |
|---|---|---|
| Programming | @ | $1,500.00 |
| Design Phase: | @ | 35% of Total Base Fee  less ($1,500.00)<br>(i.e. 35% x $9.00 x s. f. area of Approved Project Program) |
| Construction Documents Phase | @ | 50% of Total Base Fee<br>(i.e. 50% x $9.00 x s. f. area of Approved Project Floor Plan) |
| Construction Phase | @ | 15% of Total Base Fee<br>(i.e. 15% x $9.00 x s.f. area of Project under construction) |
| Total Basic Compensation | @ | 100% of Total Base Fee |

AIA DOCUMENT B151 · ABBREVIATED OWNER-ARCHITECT AGREEMENT · THIRD ADDITION · AIA® · © 1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**B151-1987  6**

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

## 11.3   COMPENSATION FOR ADDITIONAL SERVICES

**11.3.1** FOR PROJECT REPRESENTATION BEYOND BASIC SERVICES, as described in paragraph 3.2, compensation shall be computed as follows:

| | | |
|---|---|---|
| Principal Time | @ | $120.00 per Hour |
| Associate Time | @ | 110.00 per Hour |
| Project Manager Time | @ | 100.00 per Hour |
| Technical Designer Time | @ | 90.00 per Hour |
| Draftsman Time | @ | 80.00 per Hour |
| Secretarial Time | @ | 70.00 per Hour |
| Consultant Time | @ | 1.2x Direct Expense |

**11.3.2** FOR ADDITIONAL SERVICES OF THE ARCHITECT provided under Article 3 or identified in Article 12, compensation shall be computed as follows:

*(Insert basis of compensation, including rates and/or multiples of Direct Personnel Expense for Principals and employees, and identify Principals and classify employees, if required.  Identify specific services to which particular methods of compensation apply, if necessary.)*

| | | |
|---|---|---|
| Principal Time | @ | $120.00 per Hour |
| Associate Time | @ | 110.00 per Hour |
| ~~Project Manager Time~~ | ~~@~~ | ~~100.00 per Hour~~ |
| Technical Designer Time | @ | 90.00 per Hour |
| Draftsman Time | @ | 80.00 per Hour |
| Secretarial Time | @ | 70.00 per Hour |
| Consultant Time | @ | 1.2x Direct Expense |
| Principal Consultation Time | @ | 200.00 per Hour (For consultation not related to an ongoing project) |

**11.3.3** FOR ADDITIONAL SERVICES OF CONSULTANTS, including additional structural, mechanical and electrical engineering services and those provided under Article 3 or identified in Article 12 as part of Additional Services, a multiple of ( 1.2 ) times the amounts billed to the Architect for such services.
*(Identify specific types of consultants in Article 12, if required.)*

## 11.4   REIMBURSABLE EXPENSES

**11.4.1** FOR REIMBURSABLE EXPENSES, as described in Paragraph 10.2, and any other items included in Article 12 as Reimbursable Expenses, a multiple of          One & 2/10          ( 1.2 ) times the expenses incurred by the Architect, the Architect's employees and consultants in the interest of the Project.

## 11.5   ADDITIONAL PROVISIONS

**11.5.1** IF THE BASIC SERVICES covered by this Agreement have not been completed within          ~~Twelve~~ EIGHTEEN
( 12 18 ) months of the date hereof, through no fault of the Architect, extension of the Architect's services beyond that time shall be compensated as provided in Subparagraphs 10.3.3 and 11.3.2.

**11.5.2** Payments are due and payable          Ten          ( 10 ) days from the date of the Architect's invoice. Amounts unpaid          Thirty          ( 30 ) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Architect.
*(Insert rate of interest agreed upon.)*

Interest Rate shall be 1.8% per month
*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Architect's principal places of business, the location of the Project and elsewhere may affect the validity of this provision.  Specific legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

**11.5.3** The rates and multiples set forth for Additional Services shall be annually adjusted in accordance with normal salary review practices of the Architect.

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

<u>ARTICLE 12</u>
OTHER CONDITIONS OR SERVICES

**12.1    SCHEMATIC DESIGN PHASE**
Once the Project Program is approved, the Schematic Design Drawings shall be developed and shall consist of Floor Plans of all levels, Exterior Elevations, and a Site Plan, if applicable. A Construction Cost Estimate, based on square foot area of the Project, shall be included. The Fee for Schematic Design shall be based on the Project Program approved by the Owner. If the Project Program is reduced by the Owner after Schematic Design has begun, then the necessary revisions to the Schematic Design Drawings shall be made as an Additional Service on an hourly basis, in addition to the initial Schematic Design Fee.  If the Project Program is increased, the Schematic Design Fee shall be adjusted to include the additional square foot area of the project.

**12.2    EXISTING CONDITIONS**
The Owner shall provide the Architect with Drawings of all existing conditions of the Project. The Architect shall be entitled to rely upon the accuracy and completeness of such Drawings. If the Architect must record and document existing conditions, then such work shall be considered an Additional Service and shall be provided in accordance with Article 11.3.

**12.3    ENGINEERING SERVICES**
The Architect shall provide normal Structural Engineering Services at a not-to-exceed fee of $2,000.  The Architect shall provide normal Mechanical, Plumbing and Electrical Engineering Services in either one of two (2) ways at the Owner's option.
Option 1: the Architect shall provide performance criteria for a design/build system by the Contractor at no additional fee.
Option 2: the Architect shall provide full Engineering Services for each engineering discipline at an additional fee of not-to-exceed
         $2,000 per discipline.

**12.4    FEE FOR CONSTRUCTION ADMINISTRATION**
The fee for Construction Administration shall be divided into equal weekly amounts over the period of time set aside for Construction as stipulated in the Owner and Contractor Agreement. If the Construction Period goes beyond that which is stipulated in the Owner and Contractor Agreement, then the Architect shall be reimbursed for each additional week of Construction in an amount equal to each previous weekly amount until such time as Final Completion of the Project is reached. Billing for Construction Administration shall occur monthly.

**12.5    SITEWORK & SITE IMPROVEMENTS**
As part of the Architect's Basic Services, the Architect shall design an overall site plan, including a layout for vehicular parking and pedestrian walkways. However, Construction Documents for all sitework and site improvement work, outside the limit of the building perimeter foundation walls, shall be provided as an Additional Services on an hourly basis in accordance with Article 11.3.

**12.6    DISPUTE RESOLUTION LOCALE**
The locale for the resolution of any dispute between the parties to this Agreement shall be in the principal place of business of the Architect.

**12.7    PROJECT APPROVAL APPEARANCES**
One (1) appearance before local agencies that have jurisdiction over the approval of the Project is included in the Architect's fee for Basic Services. Any additional appearances shall be provided as required as an Additional Service on an hourly basis in accordance with Article 11.3.

**12.8    TAXES OR FEES ENACTED BY THE GOVERNMENT**
Any taxes or fees enacted by local, state, or Federal Government, based on gross receipts or revenues which must be paid by the Architect, will be added to amounts due under this Agreement.

**12.9    UNPAID ARCHITECTURAL FEES**
If the Architect must make a claim for unpaid architectural fees, then such claim shall be heard in arbitration, in accordance with Article 7. All other claims of any nature, including any counterclaims and/or crossclaims, shall be heard in a court of law of proper jurisdiction. The American Arbitration Association shall not have jurisdiction over any such other claims. If the Architect must expend legal fees to collect unpaid architectural fees, then such expenditures shall be considered a Reimbursable Expense in accordance with Article 11.4.

This Agreement entered into as of the day and year first written above.

OWNER:                                              ARCHITECT

_(Signature)_ Mike McTigue, DVM                     _(Signature)_ Warren Freedenfeld, AIA, President

GARDNER ANIMAL HOSPITAL                             WARREN FREEDENFELD & ASSOCIATES, INC.
_(Printed name and title)_                          _(Printed name and title)_

AIA DOCUMENT B151 • ABBREVIATED OWNER-ARCHITECT AGREEMENT • THIRD ADDITION • AIA® © 1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006                    B151-1987   8

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

**Architecture**
**Planning**
**Interior Design**

39 Church Street
Boston MA 02116
**Phone:** 617.338.0050
**Fax:** 617.426.2557

30 July 1999

Michael P. McTigue, DVM
Gardner Animal Hospital
7 Pearson Boulevard
Gardner, MA  01440

Project:  **Gardner Animal Hospital (Project #9818)**
Re:       **Termination Agreement**

Dear Dr. McTigue:

Warren has asked me to respond to your last correspondence (undated) regarding our Termination Agreement.  We would like to offer clarification and a summary of the transactions, to date.  In your presentation, you neglected to include reimbursable expenses from all invoices.  Therefore, the correct total billed to dated is as itemized below.

| Date | Invoice # | Amount | Payments | Check Date |
|------|-----------|--------|----------|------------|
| Retainer | N.A. | $ 3,000.00 | $ 3,000.00 | 20 Apr 98 |
| 30 Apr 98 | 5109 | 1,513.62 | 1,513.62 | 08 Jul 98 |
| 31 Jan 99 | 5500 | 14,615.23 | 14,615.23 | 22 Feb 98 |
| 28 Feb 99 | 5524 | 5,478.32 | | |
| 31 Mar 99 | 5553 | 10,340.30 | 7,500.00 | 07 Apr 99 |
| 30 Apr 99 | 5592 | 75.16 | 8,393.78 | 10 May 99 |
| 31 May 99 | 5620 | 17,865.71 | | |
| 30 Jun 99 | 5644 | 147.99 | | |
| Totals   = | | $50,036.33 | $35,022.63 | |

As noted above, your payments to date amount to $35,022.63, as stated in your letter, leaving an unpaid balance of $15,013.70.

Our offer to settle for $9,500.00 included all payments made by Gardner Animal Hospital, including the initial retainer (deposit) and falls below the break-even point for this Project.  This figure was arrived at in an attempt to cut the substantial losses that our Office has incurred on your behalf.

**Warren Freedenfeld & Associates**

Architecture
Planning
Interior Design

Michael McTigue, DVM
29 July 1999
Page 2

It is also important for you to understand that your decision to terminate our Owner and Architect Agreement precludes your use of any and all drawings and/or documents produced by this Office. These drawings and other documents are not only protected by Federal copyright laws but are also the sole legal and contractual property of this Office and cannot be used by the Owner or others for completion of this Project. I believe you know there is no dispute about this issue. In addition, any licensed architect will know the substantial jeopardy he will place his firm in by using another architect's copyrighted documents. All documents given to you by this Office must be returned upon execution of the Termination Agreement.

For whatever it's worth, Warren has asked me to, once again, convey to you his desire to continue working together toward the successful completion of this Project. He has indicated to me that he is ready and willing to resolve any issue and to do everything and anything possible to work together in harmony. If there is any possibility of this, then Warren will remain involved and available. My intervening in this matter will become necessary, only if termination is the only course open to us.

Sincerely,

Charles Cimino, AIA
Director of Operations

CC: aeb

cc: Warren Freedenfeld, AIA
    Richard Ahern, Business Manager
    File



**Michael P. McTigue, D.V.M.**
**Brian C. Hurley, D.V.M.**
**Kathleen J. O'Brien, D.V.M.**

GARDNER ANIMAL HOSPITAL
7 Pearson Blvd.
Gardner, MA 01440
Telephone: (978) 632-7110

Warren Freedenfeld & Associates, Inc.
39 Church Street
Boston, MA  02116

Dear Mr. Freedenfeld:

This letter is sent to you pursuant to the terms of Article 8.1 of the AIA Document B151 executed by and between us dated March 24, 1998, regarding the proposed construction of the Gardner Animal Hospital on my behalf. Furthermore, this letter is sent to you as written confirmation of the termination of the contract entered into by and between us verbally during our phone discussion on June 25, 1999, which termination was further confirmed by you in your letter of July 22, 1999 to me.

The reason for the termination action taken on June 25, 1999, and for this letter in confirmation of same, is that you failed substantially to perform in accordance with the terms of the Agreement above referenced through no fault of mine.

Some, and this list is not all inclusive, of the reasons for this termination are as follows:

1.    Although I was charged nearly $50,000 for work you purport to have done, substantial portions of that work had not, indeed, ever been completed by you. For example, foundation drawings were never developed by you, nor were the proper elevations used. Additionally, there were residual questions as to whether work you had said had been done, and billed me for, had ever actually been done.

2.    Whatever plans, drawings etc. You did prepare have proven to be useless to us, and they have been rolled up and discarded. This, in spite of my having paid you tens of thousands of dollars; unfortunately, I again have to pay another architect another tens of thousands of dollars to complete the project.

3.    Most importantly, you continued to refuse to recognize that a redesign of the plans, etc. was required to reduce the cost of the project to a manageable financial level. You knew full well that my bank had limited me to construction costs of $1,000,000.00, while everyone to whom I spoke in the construction industry and elsewhere indicated that the project as you had designed it could not be completed for less than approximately $1.3 million, some 30% over my project budget.

I regret having had to take this action and I wish you success in your future endeavors.

Sincerely,

Michael P. McTigue, DVM



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Form VA**
For a Work of the Visual Arts

REG   **VAu 656 – 367**



*#VAU0006656367a*

EFFECTIVE DATE OF REGISTRATION

8 · 11 · 1999
Month    Day    Year

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**1**
Title of This Work ▼   NOT YET CONSTRUCTED
Gardner Animal Care Center (WFA Project #9818)

NATURE OF THIS WORK ▼ See instructions
Architectural Design

Previous or Alternative Titles ▼
Gardner Animal Care Center (WFA Project #9323)

Publication as a Contribution If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared. Title of Collective Work ▼
N/A

If published in a periodical or serial give   Volume ▼   Number ▼   Issue Date ▼   On Pages ▼
N/A

**2**
NAME OF AUTHOR ▼
a   Warren Freedenfeld & Associates, Inc

DATES OF BIRTH AND DEATH
Year Born ▼   Year Died ▼
N/A       N/A

Was this contribution to the work a "work made for hire"?
☑ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of   USA
     Domiciled in   USA

Was This Author's Contribution to the Work
Anonymous?   ☐ Yes ☒ No
Pseudonymous?   ☐ Yes ☒ No
If the answer to either of these questions is "Yes" see detailed instructions

**NOTE**
Under the law the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was made for hire check "Yes" in the space provided give the employer (or other person for whom the work was prepared) as "Author" of that part and leave the space for dates of birth and death blank.

Nature of Authorship Check appropriate box(es) See instructions
☐ 3-Dimensional sculpture   ☐ Map   ☐ Technical drawing
☐ 2-Dimensional artwork   ☐ Photograph   ☐ Text
☐ Reproduction of work of art   ☐ Jewelry design   ☒ Architectural work

b   Name of Author ▼

Dates of Birth and Death
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of _____
     Domiciled in _____

Was This Author's Contribution to the Work
Anonymous?   ☐ Yes ☐ No
Pseudonymous?   ☐ Yes ☐ No
If the answer to either of these questions is "Yes" see detailed instructions.

Nature of Authorship Check appropriate box(es) See instructions
☐ 3-Dimensional sculpture   ☐ Map   ☐ Technical drawing
☐ 2-Dimensional artwork   ☐ Photograph   ☐ Text
☐ Reproduction of work of art   ☐ Jewelry design   ☒ Architectural work

**3**
a   Year in Which Creation of This Work Was
Completed   1999   This information must be given Year in all cases

b   Date and Nation of First Publication of This Particular Work
Complete this information Month _____ Day _____ Year _____
ONLY if this work has been published   Nation

**4**
COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2 ▼
Warren Freedenfeld & Associates Inc
39 Church Street
Boston MA 02116

Transfer If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2 give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

APPLICATION RECEIVED
FEB 0 4 2005   8/11/99
ONE DEPOSIT RECEIVED
FEB 0 4 2005   8/11/99
TWO DEPOSITS RECEIVED

FUNDS RECEIVED
8/11/99

DO NOT WRITE HERE OFFICE USE ONLY

MORE ON BACK ▶ • Complete all applicable spaces (numbers 5-9) on the reverse side of this page
• See detailed instructions   • Sign the form at line 8

DO NOT WRITE HERE
Page 1 of 2 pages

EXAMINED BY _____ FORM VA

CHECKED BY

☒ CORRESPONDENCE
Yes

FOR
COPYRIGHT
OFFICE
USE
ONLY

DO NOT WRITE ABOVE THIS LINE  IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET

**PREVIOUS REGISTRATION** Has registration for this work  or for an earlier version of this work  already been made in the Copyright Office?

☐ Yes  ☒ No  If your answer is  Yes  why is another registration being sought? (Check appropriate box ) ▼

a  ☐ This is the first published edition of a work previously registered in unpublished form

b  ☐ This is the first application submitted by this author as copyright claimant

c  ☐ This is a changed version of the work  as shown by space 6 on this application

If your answer is "Yes  give  Previous Registration Number ▼                 Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation

a  Preexisting Material  Identify any preexisting work or works that this work is based on or incorporates ▼

N/A

**6**

a  See Instructions
before completing
this space

b  Material Added to This Work  Give a brief  general statement of the material that has been added to this work and in which copyright is claimed ▼

N/A

**b**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office  give name and number of Account

Name ▼                                  Account Number ▼

N/A                                      N/A

**7**

a

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent  Name/Address/Apt/City/State/ZIP ▼

Warren Freedenfeld, AIA, President
Warren Freedenfeld & Associates, Inc
39 Church Street
Boston, MA 02116

**b**

Area code and daytime telephone number    ( 617 ) 338-0050                    Fax number    ( 617 ) 426-2557

Email   warren@freedenfeld com

**CERTIFICATION*** I, the undersigned, hereby certify that I am the

check only one ▶

☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☒ authorized agent of  Warren Freedenfeld & Associates, Inc

Name of author or other copyright claimant  or owner of exclusive right(s) ▲

**8**

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date

Warren Freedenfeld, AIA, President                                Date  21 Jan 2005

Handwritten signature (X) ▼

X _____

Certificate
will be
mailed in
window
envelope
to this
address

Name ▼
Warren ,Freedenfeld, AIA

Number/Street Apt ▼
39 Church Street

City/State/ZIP ▼
Boston, MA 02116

**YOU MUST:**
• Complete all necessary spaces
• Sign your application in space 8

**SEND ALL 3 ELEMENTS
IN THE SAME PACKAGE:**
1 Application form
2 Nonrefundable filing fee in check or money
  order payable to Register of Copyrights
3 Deposit material

**MAIL TO:**
Library of Congress
Copyright Office
101 Independence Avenue  S E
Washington  D C 20559 6000

Fees are subject to
change  For current
fees  check the
Copyright Office
website at
www copyright gov
or the Copyright
Office  or call
(202) 707-3000

**9**

17 U S C  § 506(e)  Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 403 or in any written statement filed in connection
with the application  shall be fined not more than $2 500

Rev  August 2003—30 000   Web Rev  June 2002   ⊕ Printed on recycled paper                              U S Government Printing Office  2003-496-605/60 029

# TERMINATION AND MUTUAL RELEASE AGREEMENT
# BETWEEN GARDNER ANIMAL HOSPITAL AND
# WARREN FREEDENFELD & ASSOCIATES INC.

WHEREAS Michael P. McTigue, DVM, and Gardner Animal Hospital, collectively ("GAH") and Warren Freedenfeld & Associates Inc. ("WFA") had previously entered into an Owner and Architect Agreement dated 24 March 1998 ("Agreement"), for the provision of architectural services in connection with the Gardner Animal Hospital, located at 73 Eaton Street, Gardner, Massachusetts ("the Project"), and

WHEREAS the Schematic Design and partial Construction Drawings for such Project has been substantially completed, and

WHEREAS the parties desire to terminate their Agreement without the provision of any further services by WFA,

NOW THEREFORE, in consideration of the mutual agreements contained herein, the parties agree as follows:

1.  The Agreement is terminated and the parties shall have no further obligations except as set forth in this Termination and Mutual Release Agreement.

2.  Upon execution of this Agreement, GAH shall pay WFA Seven Thousand Five Hundred Dollars ($7,500.00) as final and total payment for all services provided and expenses incurred to date. This amount shall be in addition to all previous amounts paid by GAH and/or received by WFA.

3.  GAH agrees not to use any of the work produced by WFA. Article 6 of the Owner and Architect Agreement shall remain in full force and affect.

4.  GAH and WFA agree to release each other of and from all loss, expense, claim, or action of any kind arising at any time from this date forward, whether arising out of the Agreement or otherwise, intending thereby to give each other a general release of all claims each may have against each other to date, and in the future, except as to the obligations under this Termination and Mutual Release Agreement, which are not being released.

Executed as a contract under seal this _____**2 ND**_____ day of _____**SEP**_____, 1999.

Owner:

Gardner Animal Hospital
7 Pearson Boulevard
Gardner, MA  01440

By _____
Michael P. McTigue, DVM

Witness:

By _____
Name: Brian C. Hurley DVM

Architect:

Warren Freedenfeld & Associates Inc.
39 Church Street
Boston, MA  02116

By _____
Warren Freedenfeld AIA, President

Witness:

By _____
Name:  Sasha A. Chanaka

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| WARREN FREEDENFELD ASSOCIATES INC., as successor to WARREN FREEDENFELD & ASSOCIATES, INC. | ) ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | CIVIL ACTION NO:05-11573-RGS |
| MICHAEL P. MCTIGUE, D.V.M., Individually and as Trustee of the MCTIGUE FAMILY TRUST, NANCY A. MCTIGUE, as Trustee of the MCTIGUE FAMILY TRUST, BRIAN C. HURLEY, D.V.M., GARDNER ANIMAL CARE CENTER, LLC d/b/a GARDNER ANIMAL HOSPITAL, EDWARD D. CORMIER ASSOCIATES, INC. and BENNETT BUILDING CORPORATION | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants | ) | |

ANSWER AND AFFIRMATIVE DEFENSES OF ANSWERING DEFENDANTS MICHAEL
P. MCTIGUE, NANCY A. MCTIGUE, BRIAN C. HURLEY AND GARDNER ANIMAL
CARE CENTER LLC d/b/a GARDNER ANIMAL HOSPITAL

Now come the above-captioned defendants ("the Answering Defendants") and answer the

Plaintiff's Complaint as follows:

1. To the extent that any answer is required to this paragraph, the Answering Defendants

    deny that they have engaged in any unlawful conduct.

2. The Answering Defendants lacks sufficient information to admit or deny this allegation

    and calls upon the Plaintiff to prove the same.

3. Admitted

4. Admitted

5. Admitted

6. Admitted

7. The Answering Defendants lacks sufficient information to admit or deny this allegation and calls upon the Plaintiff to prove the same.

8. The Answering Defendants lacks sufficient information to admit or deny this allegation and calls upon the Plaintiff to prove the same.

9. The Answering Defendants do not question jurisdiction

10. The Answering Defendants accept this venue

11. All necessary documents speak for themselves

12. All necessary documents speak for themselves, and are not, per se, admissions to be cited against the Answering Defendants

13. Admitted that the Plaintiff prepared plans

14. Admitted that the Plaintiff prepared plans

15. Admitted that the Plaintiff prepared plans

16. Admitted that the Plaintiff prepared plans

17. Admitted that the Plaintiff prepared plans

18. Admitted that the Plaintiff prepared plans

19. Documents speak for themselves. The Answering Defendants deny the spin placed upon those documents, or otherwise lacks sufficient information to admit or deny this allegation and calls upon the Plaintiff to prove the same.

20. The Answering Defendants lacks sufficient information to admit or deny and call upon the Plaintiff to prove the same. However, the Answering Defendants question the

numbers cited, or whether any funds were due and owing based upon the Plaintiff's breach of its contract.

21. Documents speak for themselves. The Answering Defendants deny the spin placed upon those documents, or otherwise lacks sufficient information to admit or deny this allegation and calls upon the Plaintiff to prove the same.

22. Documents speak for themselves.

23. The Answering Defendants lacks sufficient information to admit or deny this allegation and calls upon the Plaintiff to prove the same. To the extent it was done, the Answering Defendants deny that the Plaintiff had the legal right to do so.

24. Admitted that an agreement was reached. Denied as to the spin on what the Answering Defendants were entitled to use by contract.

25. Denied

26. Admitted

27. Denied

28. Denied

29. Public records speak for themselves

30. The Answering Defendants lacks sufficient information to admit or deny this allegation and calls upon the Plaintiff to prove the same.

31. Admitted that the plans were a matter of public record, but denied that the Answering Defendants "copied" any work belonging to the Plaintiff

32. Denied

(COUNTS 1-V HAVE BEEN DISMISSED, SUCH THAT NO ANSWER IS NECESSARY)

65. The Answering Defendants incorporate their prior answers

3

66. Denied

67. Denied

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Plaintiff has failed to state a cause of action upon which relief may be granted

### SECOND AFFIRMATIVE DEFENSE

The Plaintiff's claim is barred by the doctrine of unclean hands.

### THIRD AFFIRMATIVE DEFENSE

The Plaintiff's claim is barred by the doctrine of laches

### FOURTH AFFIRMATIVE DEFENSE

The Plaintiff's claim is barred by the doctrine of estoppel

### FIFTH AFFIRMATIVE DEFENSE

The Plaintiff's claim is barred by the doctrine of waiver

### SIXTH AFFIRMATIVE DEFENSE

The Plaintiff's claim is barred as moot

### SEVENTH AFFIRMATIVE DEFENSE

The Plaintiff lacks standing to bring suit

### EIGHTH AFFIRMATIVE DEFENSE

The claim is barred by the doctrine of prior settlement

THE ANSWERING DEFENDANTS DEMAND A TRIAL BY JURY ON ALL COUNTS

Respectfully Submitted,

**The Answering Defendants,**

By their attorneys,


s/Robert N. Meltzer_____
Robert N. Meltzer, BBO #564745
P.O. Box 1459
Framingham, MA 01701
Phone: (508) 872-7116

s/Mary C. Casey_____
Mary C. Casey, BBO #636250
Harbor Law Group
385 South Street
Shrewsbury, MA 01545
Phone: (508) 842-9244


Dated: February 17, 2006

## CERTIFICATE OF SERVICE

I, Robert N. Meltzer, do hereby certify that on this day I have served the foregoing by providing a copy of the same by first class mail, postage prepaid, to:

Barry S. Scheer, Esq.
Parker Scheer, LLP
One Constitution Center
Boston, MA 02129

Stephen D. Rosenberg, Esq.
The McCormack Firm
One International Place
Seventh Floor
Boston, MA 02110

F. Joseph Gentili, Esq.
Capobianco & Gentili, PC
15 West Central Street
Natick, MA 01760

Robert D.City, Esq.
Michael J. Dissette, Esq.
City, Hayes & Dissette, PC
50 Congress Street
Boston, MA 02109

_____

February 17, 2006

Westlaw.

520 F.Supp. 847

520 F.Supp. 847, 1981 Copr.L.Dec. P 25,312, 216 U.S.P.Q. 776
(Cite as: 520 F.Supp. 847)

Page 1

▷

United States District Court, D. New Jersey.
Harvey R. MELTZER, Plaintiff,
v.
Meir ZOLLER, Mrs. Meir Zoller, Ralph E.
Mitschele, Robert V. Doran, Mitschele
Construction Corp., Xenco, Inc., William G.
Chirgotis, Matthew R. Zito, jointly, severally and in
the alternative, Defendants/Third Party Plaintiffs,
v.
William G. CHIRGOTIS and Matthew R. Zito,
Third Party Defendants.
**Civ. A. No. 79-3176.**

Aug. 17, 1981.

Homeowner brought suit, claiming copyright in
architectural plans for his house and alleging that
defendants had infringed copyright, and defendants
filed third-party complaints against architect and
architectural firm, alleging breach of implied
warranty of title and breach of contract. The
District Court, Whipple, Senior District Judge, held
that: (1) where plans utilized in connection with
plaintiff's home were not created until after effective
date of revised Copyright Act, any possible cause of
action for copyright infringement arose only after
that date, and thus new Act governed suit; (2)
plaintiff could not take advantage of work for hire
doctrine; and (3) although plaintiff had prepared
sketches illustrating in some detail features of house
which he and his wife required and had presented
such sketches to architect and although plaintiff
contributed ideas and made certain changes and
exercised approval power, it was architectural firm,
rather than plaintiff, which had created the plans for
the house, and thus architectural firm was author of
plan for purpose of copyright interests.

Judgment against plaintiff.

West Headnotes

**[1] Copyrights and Intellectual Property 99 ⬅2**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(A) Nature and Subject Matter
            99k2 k. Constitutional and Statutory
Provisions. Most Cited Cases
Where plans created in connection with plaintiff's
house were unpublished as of effective date of
revised Copyright Act but plans utilized in
connection with house were not created until after
effective date of revised Act, any possible cause of
action for copyright infringement arose only after
that date, and thus plaintiff's infringement suit was
governed by revised Act. 17 U.S.C.A. §§ 301,
301(a, b), (b)(2), 303, 501 note.

**[2] Copyrights and Intellectual Property 99⬅
101**

99 Copyrights and Intellectual Property
    99II Intellectual Property
        99k101 k. Nature of Property; Common Law
Copyright in General. Most Cited Cases
Copyright Act section governing duration of
copyrights and works created but not published or
copyrighted before January 1, 1978 must be read in
conjunction with exemption section, which not only
confers exclusive jurisdiction in copyright cases in
federal court but also declares that new statutes
preempt any common-law rights except those
specifically exempted pertaining to all causes of
action arising subsequent to January 1, 1978, and
thus former section does not extend duration of
common law copyright in unpublished work
irrespective of mandate of latter statute. 17
U.S.C.A. §§ 301, 301(a), (b)(2), 303.

**[3] Copyrights and Intellectual Property 99⬅
41(2)**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(D) Ownership

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 F.Supp. 847                                                           Page 2

520 F.Supp. 847, 1981 Copr.L.Dec. P 25,312, 216 U.S.P.Q. 776
(Cite as: 520 F.Supp. 847)

99k41 Ownership
    99k41(2) k. Works Made for Hire.
Most Cited Cases
    (Formerly 99k41.1)
Under Copyright Act, not every work prepared by an independent contractor on special order or hire is considered the equivalent of a "work made for hire," but, rather, the only works made for hire are those which fall within one of the statutory categories set forth in section of Act and concerning which parties enter into express written agreement designating work as such. 17 U.S.C.A. §§ 101, 201(a, b).

**[4] Statutes 361 ☜181(1)**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k180 Intention of Legislature
                361k181 In General
                    361k181(1) k. In General. Most Cited Cases
Language of a statute is best indication of legislative intent.

**[5] Copyrights and Intellectual Property 99☜41(2)**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(D) Ownership
            99k41 Ownership
                99k41(2) k. Works Made for Hire.
Most Cited Cases
    (Formerly 99k41.1)
Architectural drawings do not qualify as works made for hire within Copyright Act. 17 U.S.C.A. §§ 101, 201(a, b).

**[6] Copyrights and Intellectual Property 99☜41(1)**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(D) Ownership
            99k41 Ownership
                99k41(1) k. In General. Most Cited Cases
    (Formerly 99k41)

**Copyrights and Intellectual Property 99☜41(2)**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(D) Ownership
            99k41 Ownership
                99k41(2) k. Works Made for Hire.
Most Cited Cases
    (Formerly 99k41.1)
Although plaintiff prepared sketches illustrating in some details features of house which he and his wife required, presented sketches to architect, and, throughout evolution of plans, contributed ideas and made certain changes and exercised approval power, where architectural firm was creator of plans, designed the plans and contributed most of the ideas contained therein, and fixed ideas for house in a tangible medium, architectural firm " created" the plans and was "author" of the plans for purpose of copyrights interests; ideas and sketches contributed by plaintiff did not sufficiently constitute fixed expressions of ideas, and therefore plaintiff was not creator of plans for his house for copyright purposes and had no cause of action either under work for hire doctrine or as owner of plans. 17 U.S.C.A. § 101.

**[7] Copyrights and Intellectual Property 99☜41(3)**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(D) Ownership
            99k41 Ownership
                99k41(3) k. Joint Works; Contributions to Collective Works. Most Cited Cases
    (Formerly 99k41.2)
Plaintiff could not be considered "joint author" of plans for house with architectural firm, where plaintiff had not created or prepared the plans within meaning of statute. 17 U.S.C.A. § 101.

**[8] Copyrights and Intellectual Property 99☜41(3)**

99 Copyrights and Intellectual Property
    99I Copyrights

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 F.Supp. 847

520 F.Supp. 847, 1981 Copr.L.Dec. P 25,312, 216 U.S.P.Q. 776
(Cite as: 520 F.Supp. 847)

99I(D) Ownership
    99k41 Ownership
        99k41(3) k. Joint Works;
Contributions to Collective Works. Most Cited
Cases
    (Formerly 99k41.2)
Each contributor to a joint work automatically
acquires undivided ownership in entire work.

*848 Harvey R. Meltzer, pro se.
Barry L. Shapiro, Sills, Beck, Cummins, Radin &
Tischman, Newark, N. J., for defendants/third party
plaintiffs.
David C. Dreifuss, Lum, Biunno & Tompkins,
Newark, N. J., for third party defendants.

### *849 OPINION

WHIPPLE, Senior District Judge.
This is an action for infringement of a claimed
copyright in the architectural plans for plaintiff's
house in Livingston, New Jersey. Jurisdiction is
invoked pursuant to 28 U.S.C. s 1338(a); the
underlying action is premised on the Federal
Copyright Act of 1976, 17 U.S.C. s 101 et seq. ("
The 1976 Act").

The case was tried to the Court sitting without a
jury during five (5) days in April and May, 1981.
At the end of the plaintiff's case, defendants moved
to dismiss, and the Court reserved decision. Neither
defendants nor third party defendants presented
witnesses. All parties submitted trial briefs and
written summations, as well as proposed findings of
fact and conclusions of law. After careful
consideration of all the testimony, exhibits,
memoranda, and oral arguments, the Court hereby
adopts the following findings of fact and
conclusions of law. Fed.R.Civ.P. 52(a).

### FINDINGS OF FACT

Plaintiff Harvey R. Meltzer is an attorney at law in
the District of Columbia who appeared pro se in this
matter. In the spring of 1977, plaintiff and his wife,
who resided at that time in Maryland, contacted
Doris Gelvan, a real estate agent in New Jersey,

regarding the purchase of a home in New Jersey.
Ms. Gelvan initially showed plaintiff and Mrs.
Meltzer pre-existing homes for sale. After viewing
a few resale homes, the Meltzers decided to
investigate having a new home built. Thereupon,
on or about June 27, 1977, Doris Gelvan brought
plaintiff to meet Mr. Robert V. Doran, a
defendant-third party plaintiff in this action, for the
purpose of discussing the construction of a single
family residence to be located in Livingston, New
Jersey. Mr. Doran was the vice president of Xenco,
Inc. (hereinafter referred to as "Xenco"), a New
Jersey corporation which constructs private homes,
as well as vice president of Deerco, Inc., a
corporation which purchases land for future sale,
and Mitschele Construction Corp., a New Jersey
corporation engaged in the preparation of land for
the construction of homes.[FN1]

    FN1. These three corporations are also
    defendants and third party plaintiffs in the
    instant action.

The Meltzers explained to Mr. Doran that they
basically wanted a four bedroom, center hall
colonial. Mr. Doran indicated that Xenco would
commission an architect to prepare the architectural
plans for the construction of plaintiff's home. At
this time, the Meltzers indicated that they had only
$2,000.00 to expend. Mr. Doran thereupon agreed
to accept a check from the Meltzers for $500.00
payable to Xenco to defray at least a portion of the
cost to Xenco for the preparation of the
architectural plans should a contract between
plaintiff and Xenco not be consummated. It was
understood that if a contract were signed, the
$500.00 would be credited toward the total
purchase price; but, should a contract not be signed,
Xenco would absorb the architect's fees in excess of
$500.00. Accordingly, plaintiff presented Mr.
Doran with a check payable to Xenco, Inc. in the
amount of $500.00. Plaintiff had no further
discussions with any representative of Xenco
concerning the cost of the architectural plans.

Subsequently, Mr. Doran brought plaintiff, along
with Mrs. Meltzer and Doris Gelvan, to the office of
Matthew Zito, an architect associated with the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 F.Supp. 847, 1981 Copr.L.Dec. P 25,312, 216 U.S.P.Q. 776
**(Cite as: 520 F.Supp. 847)**

architectural firm of William Chirgotis (hereinafter referred to as "Chirgotis"). This architectural firm operated as an independent contractor. At this meeting, Mr. Zito and the Meltzers engaged in a general consultation regarding the design and type of house in which the Meltzers were interested. Mr. Zito proceeded to prepare some schematic sketches based upon Chirgotis plans previously designed, but adjusted according to the Meltzers' stated requirements.[FN2]

> FN2. Plaintiff had prepared "thumbnail" sketches indicating his requirements; it is uncertain, however, when these sketches were shown to Mr. Zito. Contrary to the testimony of plaintiff's wife, Mr. Zito testified that he was not shown these sketches at the initial meeting.

*850 One of the Chirgotis plans, a French colonial home called the Chateau Gaye, was discussed in some detail at this initial meeting, with particular reference to the front elevation. The Meltzers also indicated interest in some aspects of the Eastbrooke, another Chirgotis plan. These two plans were contained in a plan book prepared by the Chirgotis firm called "101 Custom Homes", which Mr. Zito gave to the Meltzers at some time during this initial meeting. At no time during this meeting or thereafter did plaintiff discuss with any representative of the Chirgotis firm the cost of architectural plans to be prepared in connection with the Meltzer home.

The evolution of the plans for the Meltzer home progressed during the month of July, 1977. Mr. Zito coordinated his designs with plaintiff's desires as expressed in part in plaintiff's thumbnail drawings. Plaintiff and Mr. Zito conferred on various occasions regarding plaintiff's desires, and Mr. Doran was advised of any changes made in the plans. The plans upon which construction of the Meltzer home was ultimately based incorporated Mr. Zito's work as well as suggestions of Mr. Doran, the requirements of the Meltzers as derived in part from plaintiff's sketches, and the designs of the stock plans for the Chateau Gaye and Eastbrooke, products of the Chirgotis firm.[FN3]

Annotations to these two latter designs appear on the preliminary plans dated "7/77". Indeed, the contract between Xenco and plaintiff dated September 30, 1977 specifically states that the exterior of plaintiff's home "shall be substantially similar to a home designated the Chateau Gaye as prepared by William G. Chirgotis."

> FN3. To quote Mr. Zito: "The design (of the Meltzer home) is from my mind, through my hand, my hand and then it goes to draftspeople." (Tr. 3.14, 3-4). And later, "The Meltzer plans, yes, they came from the Chateau Gaye was the base was the footprint that we started with." (Tr. 3.39).

The Chirgotis firm considered the architectural plans for the Meltzer home to be stock plans; part of the inventory of architectural drawings in which the architect claims ownership and which he is free to utilize as he deems appropriate. This understanding stemmed from the practice of the architectural profession as well as the prior business dealings between the Chirgotis firm and Xenco over the course of at least fifteen years.[FN4] Placement of the Meltzer name in the title block on the plans where the name of the client or commissioning party, in this case, Xenco, is usually put, does not affect the superior proprietary interest of the Chirgotis architectural firm in the plans. [FN5]

> FN4. As Mr. Zito testified on cross examination regarding the plans for plaintiff's home: "The drawings are plans I prepare, are instruments of service. And we are providing a design, with our design ideas, and the drawings after they are completed are used to construct his residence. And the drawings themselves are property of me or our firm .... Upon completion of the Meltzer home, yes. I would consider them another stock plan in my library plans." (Tr. 3.36, 3.40).

> FN5. In this regard, Mr. Zito testified on cross examination that Mr. Doran had

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 F.Supp. 847                                                                     Page 5

520 F.Supp. 847, 1981 Copr.L.Dec. P 25,312, 216 U.S.P.Q. 776
(Cite as: 520 F.Supp. 847)

mentioned to the Chirgotis office manager that he desired the Meltzer name to be on the title block in lieu of Xenco, the commissioning party.

On September 30, 1977 plaintiff entered into a contract with Xenco for the construction of a residential home located at 4 Drummond Terrace, Livingston, New Jersey. The purchase price of the Meltzer home was $140,700.00. At the time of execution of this real estate contract, the Meltzers had available only $1500.00.[FN6] The contract therefore provided that upon execution, the Meltzers would pay Xenco $2000.00, $500.00 of which had already been paid. An additional $12,000.00 was to be paid within two weeks. Accordingly, on the date of execution the Meltzers remitted to Xenco a check in the amount of $1500.00, but until November 9, 1977, did they pay the additional $12,000.00.

> FN6. Plaintiff's wife testified that AT&T, plaintiff's employer, agreed to make available to plaintiff $50,000 to cover relocation expenses; however, the record demonstrates that this money was not available at the time the construction contract was executed.

*851 The final design was approved by the Meltzers on November 4, 1977, upon which plaintiffs received a copy of the plans. The Chirgotis architectural firm, with full knowledge of all concerned parties, retained the originals.[FN7] No discussion ever took place between plaintiff and any member of the Chirgotis architectural firm concerning the ownership of the architectural plans for the Meltzer home; nor did the contract between plaintiff and Xenco contain any provision as to the exclusivity of the plans for the Meltzer home or otherwise restraining Xenco from constructing other homes similar to the Meltzer home. [FN8] In December of 1977, the Chirgotis firm submitted a bill to Xenco in the amount of $1,914.00 for the work performed in preparing the architectural drawings for the Meltzer home. This bill was duly paid by Xenco.[FN9]

FN7. The only purpose for retaining original plans is for duplication. Mrs. Meltzer testified that during the period of construction, she discovered that every subcontractor had a copy of the plans, and that when she requested of Mr. Doran to return the plans, he advised that he would do so. She further testified that plaintiff was present on many of the occasions when these requests were made. The credibility of this testimony is undercut, however, by Uncontested Fact 30 in the Pretrial Order of December 11, 1980, which states:

30. The plaintiff cannot recall whether prior to the institution of litigation he ever requested that Xenco, or any representative thereof, return copies of any plans of the Meltzer home which might be in their possession.
Litigation was not instituted until July 10, 1979.

FN8. Mr. Zito testified that when a client purchases a set of plans of which they seek to retain exclusive use, the Chirgotis firm would insert a paragraph in the contract with the client to the effect that the plans in question would never be reused or reproduced for another structure without the client's written consent. No contract existed between the Chirgotis firm and the Meltzers, since Xenco was the commissioning party. At the same time, the agreement between the Chirgotis firm and Xenco was an oral contract and contained no such understanding as to exclusivity.

FN9. According to Mr. Zito's testimony, the Meltzer plans were stock plans, not custom plans. While the charge for custom plans is a percentage for the total cost of the home, excluding land, the charge for stock plans, such as the Meltzer plans, is determined according to an oral understanding with the developer (Mr. Doran) on an hourly fee basis times a multiplier, or two and one-half times the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 F.Supp. 847

520 F.Supp. 847, 1981 Copr.L.Dec. P 25,312, 216 U.S.P.Q. 776
(Cite as: 520 F.Supp. 847)

actual drafting cost. This fee is predicated on the assumption that the architect will be able to use the plans again.

On May 3, 1978, plaintiff went to settlement on the Meltzer home. Mr. Doran subsequently requested access to the Meltzer home to show prospective clients the workmanship on a finished Mitschele-Xenco product, and because the Meltzer home "was always so clean and it showed well." (Tr. 2.6, 16-22). The Meltzers granted Doran permission and he eventually brought over approximately eight or ten couples.

On or about February, 1979, defendants Mr. and Mrs. Meir Zoller contacted Mr. Doran concerning the construction of a single family dwelling. On February 11, 1979, Mr. Doran telephoned plaintiff to request access to the Meltzer home for the Zollers, but was told that it was not convenient. Subsequently, Mr. Zoller visited plaintiff to ask if he could see the Meltzer residence, and later that same day, the Zollers were admitted into the Meltzer home.[FN10]

FN10. Mrs. Meltzer testified that before showing her home she obtained assurances from Mr. Zoller that he would not duplicate the home. In contrast, Mr. Zoller set forth in his affidavit that no such promises or assurances were ever made to the Meltzers. (P-Exh. 19-A).

The Zollers determined to build a home for themselves in Livingston substantially similar to the Meltzer home, and invited the Meltzers to their home to advise them of this intention. Plaintiff was upset by this news and conveyed his unhappiness to Mr. Doran; nevertheless, he conceded that if certain changes in the Zoller home would be made, he had no objections. There were no discussions, however, between the Meltzers and the Zollers concerning any copyright or other proprietary interest in the architectural drawings for the Meltzer home.[FN11]

FN11. Mr. Zito never agreed with plaintiff or his wife not to utilize the plans for the

Meltzer home for the erection of any other home; indeed the matter was never discussed. When the Court queried whether the Meltzers had ever told Mr. Zito not to use these plans, Mr. Zito responded, "No sir." (Tr. 3.28-3.29).

*852 Again, Xenco, through Robert Doran, commissioned the architectural firm of Chirgotis to prepare the plans for the Zoller home. Mr. Doran contacted Mr. Zito and asked if he would prepare another set of plans using the plans prepared in connection with the Meltzer home, albeit with certain changes. The real estate contract between Xenco and Meir Zoller specified that:

"A dwelling is to be erected on the subject premises, substantially in accordance with plans of William Chirgotis, architect, known as plan # 77-870, all substantial changes from said plans must be approved by purchaser." (P-12, Tr. 3.28).

Plan # 77-870 is the plan for the Meltzer home.

The final Zoller plan contained the name Xenco in the client section of the title block, with the annotation "Residence for Mr. & Mrs. Zoller" to the left of the title block. The plans required approximately seven and one-half hours of preparation by Mr. Zito. The bill to Xenco, which was for $765.00, referred to the Zoller plans as " stock plans." The Zoller plans are substantially similar to the Meltzer plans, and both are substantially similar to the plans for the Chateau Gaye.[FN12]

FN12. The parties do not seriously dispute the similarity of these three plans; nevertheless, there is a question as to the extent of such similarity. Plaintiff insists that the Zoller plans are identical to the Meltzer plans, which, he argues, in turn are significantly different from the Chateau Gaye plans. In contract, Mr. Zito testified that while both the Zoller and Meltzer plans derived from the same basic " footprint" of the Chateau Gaye, the two homes are not identical. As will be explained infra, the Court finds that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 F.Supp. 847

520 F.Supp. 847, 1981 Copr.L.Dec. P 25,312, 216 U.S.P.Q. 776
**(Cite as: 520 F.Supp. 847)**

resolution of this issue is not germane to the disposition of the case.

On July 10, 1979, plaintiff filed a complaint in the Superior Court of New Jersey alleging copyright infringement of the "Meltzer plans." [FN13] The case was dismissed on the grounds of federal preemption; subsequently, plaintiff copyrighted the plans and brought suit in this Court under the Federal Copyright Act, 17 U.S.C. s 101 et seq. The defendants include the Zollers, Xenco, Inc., which constructed both the Meltzer and the Zoller homes; Ralph E. Mitschele and Robert Doran, president and vice president of Xenco, Inc., respectively; Mitschele Construction Co., which dug the foundations for both homes and Deerco, Inc., which initially purchased the undeveloped land for both homes.

> FN13. In this regard, Uncontested Facts paragraphs 15 and 16 of the Pretrial Order of December 11, 1980, state:
> 15. At no time prior to the institution of litigation, did Mr. Meltzer request that the architectural firm of William G. Chirgotis give him the original architectural drawings used in the construction of the Meltzer home.
> 16. Prior to the institution of a lawsuit in the Superior Court of New Jersey on July 10, 1979, the plaintiff had not advised Matthew R. Zito, or anybody associated with the architectural firm of William G. Chirgotis, that he claimed either exclusive ownership of the architectural drawings for the Meltzer home or a copyright thereon. There was no discussion between the plaintiff and Matthew R. Zito, or anyone else associated with the architectural firm of William G. Chirgotis that the plans would be utilized exclusively for the Meltzer home.

The defendants have in turn filed third party complaints against William G. Chirgotis and Matthew Zito, alleging, among other things, breach of implied warranty of title pursuant to N.J.S.A. 12A:2-312(3), and breach of contract. [FN14]

> FN14. The direct claims by plaintiff against the third party defendants have been settled.

CONCLUSIONS OF LAW

The gravamen of plaintiff's suit is that defendants conspired to and indeed did copy without authorization the architectural plans for the Meltzer home in which plaintiff alone had copyrightable interest. Plaintiff claims that the copyright interest in the plans vests in him as the author by virtue of the common law work for hire doctrine. Plaintiff also claims ownership in the plans by reason of their being "original in plaintiff"; additionally, plaintiff argues that the prima facie proof of ownership of the plans established by the Copyright Registration Certificate issued in plaintiff's name has not been rebutted by defendants. **\*853** For the reasons which follow, this Court concludes that plaintiff does not have the authorship interest in the plans requisite for copyright protection and consequently, his cause of action must fail.

The initial issue for this Court to resolve is which law applies to plaintiff's claims; the revised Federal Copyright Act of 1976, 17 U.S.C. s 101 et seq., as defendants contend, or, as plaintiff contends, the common law. [FN15]

> FN15. It is unclear whether plaintiff relies on the common law or the Copyright Act of 1909. In view of the conclusions of this Court, however, a discussion of this issue would be academic.

The power to provide copyright protection is delegated to the Congress by the United States Constitution. Article 1, section 8, clause 8, of the Constitution grants to Congress the power "to promote the progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries."

Copyright did not exist at common law but was created by statute enacted pursuant to this Constitutional authority. See Mazer v. Stein, 347

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 F.Supp. 847                                                                    Page 8

520 F.Supp. 847, 1981 Copr.L.Dec. P 25,312, 216 U.S.P.Q. 776
**(Cite as: 520 F.Supp. 847)**

U.S., 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954); see also MCA, Inc. v. Wilson, 425 F.Supp. 443, 455 (S.D.N.Y.1976); Mura v. Columbia Broadcasting System, Inc., 245 F.Supp. 587, 589 (S.D.N.Y.1965) , and cases cited therein.

Prior to January 1, 1978, the effective date of the revised Copyright Act of 1976, there existed a dual system of copyright protection which had been in effect since the first federal copyright statute in 1790. Under this dual system, unpublished works enjoyed perpetual copyright protection under state common law, while published works were copyrightable under the prevailing federal statute. The new Act was intended to accomplish "a fundamental and significant change in the present law by adopting a single system of Federal statutory copyright ... (to replace the) anachronistic, uncertain, impractical, and highly complicated dual system." H.R.Rep.No.94-1476; 94th Cong.2d Sess. 129-130, reprinted in (1976) 5 U.S.Code Cong. & Ad.News 5745. This goal was effectuated through the bedrock provision of 17 U.S.C. s 301, which brought unpublished works within the scope of federal copyright law and preempted state statutory and common law rights equivalent to copyright. Id. at 5745-47. Thus, under s 301(a), Congress provided that Title 17 of the United States Code, the Federal Copyright Act, preempts all state and common law rights pertaining to all causes of action which arise subsequent to the effective date of the 1976 Act, i. e., January 1, 1978:

(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by Section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. s 301(a).

Three general areas left unaffected by the preemption are listed in the numbered clauses of

subsection (b) of Section 301. Under s 301(b)(2) the new Title 17 does not annul or limit any right or remedy under the common law or state statutes with respect to "any cause of action arising from undertakings commenced before January 1, 1978." As explicated by the Committee on the Judiciary, this exemption refers to "causes of action arising under State law before the effective date of the statute (January 1, 1978)." H.R.Rep.No.94-1476, 94th Cong., 2d Sess. 132, reprinted in (1976) 5 U.S.Code Cong. & Ad.News 5747.[FN16] No *854 specific reference is made to the ambiguous phrase "undertakings commenced" in s 301(b)(2).

> FN16. See also Pub.L. No. 94-553, s 112, 90 Stat. 2600 (1976), 17 U.S.C. s 501 note, which states:
>
> "All causes of action that arose under (the former) Title 17 (Act of 1909) before January 1, 1978 shall be governed by Title 17 as it existed when the cause of action arose."
>
> Indeed, Congress recognized that Section 301 preemption might abrogate rights which existed before the effective date of the revised Title 17. In this regard, the Committee on the Judiciary stated:
>
> "The preemption of rights under State law is complete with respect to any work coming within the scope of the bill, even though the scope of exclusive rights given the work under the bill is narrower than the scope of common law rights in the work might have been.
>
> H.R.Rep. No. 94-1476, 94th Cong. 2d Sess. 131, reprinted in (1976) 5 U.S.Code Cong. & Ad.News 5747.

(1)(2) The plans created in connection with the Meltzer home were unpublished as of the effective date of the revised Title 17. Therefore, any copyright interest in these plans was initially determined by common law. Nevertheless, the plans utilized in connection with the Zoller home were not created until after the effective date of the revised Copyright Act, so that any possible cause of action for copyright infringement arose only after that date. Hence, the new Act governs this action.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 F.Supp. 847, 1981 Copr.L.Dec. P 25,312, 216 U.S.P.Q. 776
**(Cite as: 520 F.Supp. 847)**

Strout Realty, Inc. v. Country 22 Real Estate Corporation, 493 F.Supp. 997, 1000 (W.D.Mo.1980); Bromhall v. Rorvik, 478 F.Supp. 361, 366 (E.D.Pa.1979).[FN17] Any other interpretation would contravene both the letter of the statute and the intent of Congress as evidenced in the legislative history.[FN18]

FN17. The First and Second Circuit courts have also implied that s 301(b)(2) should be construed as preserving rights under state law only for causes of action arising before January 1, 1978. Burke v. National Broadcasting Co., 598 F.2d 688, 691 n.2 (2d Cir.), cert. denied, 444 U.S. 869, 100 S.Ct. 144, 62 L.Ed.2d 93 (1979); Birnbaum v. United States, 588 F.2d 319, 326 n.15 (2d Cir. 1978). This reading is consistent with s 301(a), the plain meaning of which is that the 1976 Act abolished by preemption common law copyright in all works eligible for copyright protection, regardless of whether the work was created before or after January 1, 1978.

FN18. Plaintiff's assertion that 17 U.S.C. s 303 serves to preserve his cause of action under common law copyright is misguided and misconstrues the intended impact of s 301 preemption. Section 303, entitled Duration of Copyright: Works created but not published or copyrighted before January 1, 1978, provides in pertinent part that copyright in such works "subsists from January 1, 1978, and endures for the term provided by section 302." Although not specifically so stating, s 303 addresses duration of existing common law copyrights which are still valid under the new Act; it does not address the issue of which common law copyrights are preempted. Indeed, in regard to preemption, s 303 must be read in conjunction with s 301, which not only confers exclusive jurisdiction in copyright cases in federal court, but also declares that the new Title 17 preempts any common law rights except those

specifically exempted, pertaining to all causes of action arising subsequent to January 1, 1978, such as the case at hand. To interpret s 303 as extending the duration of common law copyrights in unpublished works irrespective of the mandate of s 301 would render nonsensical the clear statutory language of that section and the legislative intention behind the revision of Title 17.

The revised Federal Copyright Act of 1976 provides that statutory copyright in a work "vests initially in the author or authors of the work." 17 U.S.C. s 201(a). In the case of a work made for hire:

(T)he employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright. 17 U.S.C. s 201(b).

(3) Not every work prepared by an independent contractor on special order or commission is considered the equivalent of a "work made for hire." Rather, the only "works made for hire" are those which fall within one of the statutory categories set forth in 17 U.S.C. s 101, and concerning which the parties enter into an express written agreement designating the work as such. As defined by Section 101, a work made for hire is:

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audio-visual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made **\*855** for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forwards, afterwards, pictorial illustrations, maps, charts, tables, editorial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 F.Supp. 847                                                                                                    Page 10

520 F.Supp. 847, 1981 Copr.L.Dec. P 25,312, 216 U.S.P.Q. 776
**(Cite as: 520 F.Supp. 847)**

notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities. (Emphasis added.)

(4)(5) As a rule, "(a statutory) definition which declares what a term 'means' ... excludes any meaning that is not stated." 2A C. Sands, Statutes and Statutory Construction s 47.07 (4th ed. Supp. 1978), cited in Colautti v. Franklin, 439 U.S. 379, 392-93 n.10, 99 S.Ct. 675, 684 n.10, 58 L.Ed.2d 596 (1979); Reliable Volkswagon Sales and Service Co. v. World Wide Auto Corp., 216 F.Supp. 141, 143 (D.N.J.1963). In this regard, it is a well-known canon of construction that the language of the statute is the best indication of legislative intent. Browder v. United States, 312 U.S. 335, 61 S.Ct. 599, 85 L.Ed. 862 (1941), cited in AFL & CIO v. Marshall, 570 F.2d 1030, 1036 (D.C.Cir.1978). Architectural drawings are not included in the categories set forth in Section 101; and hence in accordance with the above-stated principles, do not qualify as works made for hire with the special legal consequences which flow from this designation. May v. Morganelli-Heumann & Assoc., 618 F.2d 1363, 1368 n.4 (9th Cir. 1980); [FN19] 1 Nimmer on Copyright s 5.03(B)(2)(a) at 5-18, 5-19 (revised ed. 1981). This is true even though the 1909 Act and certain common law jurisdictions included architectural drawings within the rubric of works made for hire, for it may be presumed that Congress was aware of the prior construction of the terms in the original act, and deliberately limited the scope of the new Act to exclude architectural plans. See 1A Sands, Statutes and Statutory Construction s 22.30 at 178 (3d ed. revised 1972).

> FN19. The Court of Appeals in May v. Morganelli Heumann & Assoc., in determining a case of copyright infringement regarding architectural plans under the works for hire doctrine, indicated that it hesitated to apply the 1976 Act retroactively for fear of Constitutional problems. In that case, as in the instant

case, application of the new Act would annul plaintiff's claims. The May court did not have to determine whether the new Act applied because neither party had raised the issue. Nevertheless, this Court notes that the cause of action in the May case arose before the effective date of the new Act, whereas in the instant case, the cause of action arose after that date. This fact changes the complexion of the case and obviates any due process concerns.

In the instant case, plaintiff argues that the architectural plans of the Meltzer home are commissioned works for hire of which he is the author. However, plaintiff may not take advantage of the works for hire doctrine of authorship since architectural plans do not fall within one of the statutorily prescribed categories of work. Nor does there exist the requisite express written agreement between plaintiff and the architect designating the architectural plans as a work made for hire. 17 U.S.C. s 101. Instead, the only agreement evidenced in the record is an oral agreement between Xenco and the architect, Mr. Zito, pursuant to which the Chirgotis architectural firm was to be the author of the plans. Accordingly, any copyright interest which exists in the plans for the Meltzer home belongs to the Chirgotis architectural firm as preparers of the plans.

(6) Even under the common law works for hire doctrine, plaintiff is not the author of the plans for his house. At common law, the work for hire doctrine initially applied only to the employer-employee relationship, although it was expanded in some jurisdictions to include commissioned works. See generally, 1 Nimmer on Copyright, supra, s 5.03(B) at 5-12 to 5-19. And, a line of cases developed which held that the works for hire doctrine, as articulated in the 1909 Copyright Act, 17 U.S.C. s 26, applied to *856 works where the parties bore the relationship of employer and independent contractor. Brattleboro Publishing Co. v. Winmill Publishing Corp., 369 F.2d 565 (2d Cir. 1966), 1 Nimmer on Copyright, supra, s 5.03(B) at 5-13.

In such cases, whether copyright initially vested in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 F.Supp. 847, 1981 Copr.L.Dec. P 25,312, 216 U.S.P.Q. 776
**(Cite as: 520 F.Supp. 847)**

the independent contractor preparing the work on commission or in the commissioning party always turned on the intention of the parties where such could be ascertained. If the intention of the parties was not expressly articulated, copyright was presumed to vest in the commissioning party. Brattleboro Publishing Co. v. Winmill Publishing Co., supra, at 567 (applying 1909 Act). This presumption was rebuttable, and evidence of custom of the industry or pattern of dealings may establish an agreement to the contrary. May v. Morganelli-Heumann & Assoc., supra at 1368-69; see generally 1 Nimmer on Copyright, supra s 5.03(B)(2)(c) at 5-20, 5-22.

In the instant case, there is no agreement explicitly articulating the intention of any of the parties regarding who owns any copyright interest. Accordingly, the presumption that the parties mutually intended copyright to vest in the commissioning party becomes operable absent any persuasive evidence to the contrary. The record does not establish, however, that plaintiff is the commissioning party, despite his input in the plans. To the contrary, the evidence demonstrates that it is Xenco which commissioned the architectural plans for the Meltzer house. Plaintiff never engaged in any conversation with the architectural firm of Chirgotis regarding payment for, ownership of, or copyright interest in the architectural plans in question. Rather, the Chirgotis firm considered that its services were engaged by Xenco, with which it had an oral understanding in conformity with fifteen years of prior dealings. At no time did the Chirgotis firm consider that it had a contract with the Meltzers, notwithstanding the placement of the Meltzer name in the title block of the plans and the control over modification in the plans that plaintiff purportedly exercised. Indeed, all monies received by the Chirgotis firm for these plans were paid by Xenco, not plaintiff. Accordingly, as it is Xenco, and not plaintiff, who is the commissioning party, plaintiff cannot establish copyright interest in the plans even under the common law or the 1909 Act.

And in any event, the presumption that copyright interest vested in the commissioning party was overcome here by evidence that the parties intended for the architect to retain copyright interest in the plans. Not only is it the custom of the architectural profession that architects retain ownership of plans unless an express agreement to the contrary exists, but also it is in keeping with the prior dealings of Xenco and the Chirgotis firm as developed over fifteen years for the architectural firm to retain ownership of the plans unless otherwise explicitly agreed. Indeed, the charge for the Meltzer house plans was predicated upon the assumption that such plans would be reusable by the architect at will. And, in accordance with this understanding, Chirgotis retained the original plans. Consequently, the presumption of ownership by the commissioning party has been overcome in favor of ownership by the architectural firm.[FN20]

> FN20. Of course, Xenco and Mr. Zito of the Chirgotis firm agree that the latter is the owner of the plans for the Meltzer home.

Having determined that plaintiff may not prevail as author of the plans and therefore owner of any copyright interests therein by virtue of the work for hire doctrine in either its current statutory expression, the common law, or the pre-existing 1909 Act, the Court now turns to plaintiff's contention that he is owner of the plans as they are " original in him." Plaintiff's Trial Summary pp. 12-13. Again, this Court finds that this contention is without merit.

True, plaintiff prepared sketches illustrating in some detail features of the house which he and his wife required, and presented such sketches to the architect, *857 Mr. Zito. It is also true that throughout the evolution of the plans, plaintiff contributed ideas and made certain changes and exercised approval power. But it cannot be gainsaid that the Chirgotis firm, as the architects, are the creators of the plans, and that the architectural firm designed plans and contributed most of the ideas contained therein. The home, a four-bedroom French colonial, is substantially similar to the Eastbrooke and the Chateau-Gaye, two plans designed by the Chirgotis firm and incorporated in the Chirgotis manual, "101 Custom Homes." The plaintiff does not deny this similarity,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 F.Supp. 847

520 F.Supp. 847, 1981 Copr.L.Dec. P 25,312, 216 U.S.P.Q. 776
**(Cite as: 520 F.Supp. 847)**

nor does he dispute that he was familiar with these two plans, and even designated them by name on the preliminary plans for his home.[FN21] Indeed, Mr. Zito testified that this type of consultation between client and architect, including the presentation of plans for other houses to the client, and coordination of the client's desires in the plans, is typical in the architectural profession, as well as standard practice at the Chirgotis firm. As further attested to by Mr. Zito:

> FN21. Mrs. Gelvan testified that plaintiff was especially interested in the Chateau Gaye plan which Mr. Zito showed to him at their initial meeting and that the layout of the Meltzer home plans is virtually the same as that of the Chateau Gaye. (Tr. 4.58-21 to 59-21). In this regard, Mr. Zito testified that the "fenestration of the Meltzer house is a combination of the Chateau Gaye and Eastbrooke." (Tr. 3.47, 17 to 18).

We designed the structure. We incorporated the Meltzers' requirements, many specific details they had required in certain areas, bedrooms had nooks and crannies that would accommodate specific furniture. They had specific window requirements. They had little thumbnail sketches that they afforded us as to location of lighting fixtures in certain rooms and switching thereof. That type of input. We worked with them hand-in-hand. But no, we didn't scribe the building, no. (T. 3.46, 22 to T. 3.47, 5).[FN22]

> FN22. In addition, Mr. Zito prepared the majority of the exterior design of the Meltzer home, and determined the pitch of the roof in consultation with his client, Mr. Doran. (Tr. 3.47, 17 to 48, 4).

The Chirgotis firm, by fixing the ideas for the Meltzer home in a tangible medium, "created" those plans, for pursuant to 17 U.S.C. s 101, a "work" is " created" when "it is fixed in a copy ... for the first time." It logically follows, then, that the Chirgotis firm is the author of these plans for the purpose of copyright interests. In contrast, ideas are not, as a matter of law, copyrightable. Mazer v. Stein, 347 U.S. 201, 217-18, 74 S.Ct. 460, 470-71, 98 L.Ed. 630 (1954); Hoehling v. Universal Studies, Inc., 618 F.2d 972, 978 (2d Cir.), cert. denied, -- U.S. --, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). The ideas and sketches contributed by plaintiff do not sufficiently constitute fixed expressions of ideas; therefore, plaintiff is not the "creator" of the plans for his house for copyright purposes. Without authorship, the sine qua non of copyright, plaintiff has no cause of action.

(7)(8) Nor can the plaintiff be considered a "joint author" of the plans with the Chirgotis firm. Under the 1976 Act, a joint work is one "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. s 101. [FN23] Of course, this would be a fiction here, since plaintiff's failure to have "created" or " prepared" the work within the meaning of the statute bars his asserting a copyright interest even as a joint author of the plans.

> FN23. Each contributor to a joint work automatically acquires an undivided ownership in the entire work. Pye v. Mitchell, 574 F.2d 476 (9th Cir. 1978); 1 Nimmer on Copyright, supra s 6.03 at 6-6.

For all of the foregoing reasons, this Court finds that plaintiff's claims of copyright infringement against each and every one of the defendants must be dismissed as a matter of law.[FN24]

> FN24. This decision renders irrelevant any discussion of the similarities and differences between the Meltzer and the Zoller plans, or indeed, a determination of any of the other issues raised by any party.

**\*858** Judgment shall be entered against the plaintiff and in favor of the defendants, with costs. Defendants' third party claims are consequently moot.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.