UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05 11573 RGS

|  |  |
|---|---|
| WARREN FREEDENFELD ASSOCIATES, INC.<br>as successor in interest to WARREN FREEDENFELD<br>& ASSOCIATES, INC.,<br>            Plaintiff,<br><br>v.<br><br>MICHAEL P. MCTIGUE, DVM individually and as<br>Trustee of THE MCTIGUE FAMILY TRUST,<br>NANCY A. MCTIGUE, as Trustee of the<br>MCTIGUE FAMILY TRUST, BRIAN C. HURLEY, DVM,<br>GARDNER ANIMAL CARE CENTER, LLC<br>d/b/a GARDNER ANIMAL HOSPITAL, EDWARD D.<br>CORMIER, ASSOCIATES INC., and BENNETT<br>BUILDING CORPORATION,<br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S SUR-REPLY BRIEF TO THE REPLY BRIEF FILED BY THE
HOSPITAL DEFENDANTS IN RESPONSE TO PLAINTIFF'S OPPOSITION TO
THEIR MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

The defendants, Michael McTigue, Nancy McTigue as Trustee of the McTigue

Family, Trust, Brian Hurley, DVM, and Gardner Animal Care Center, LLC d/b/a Gardner

Animal Hospital (collectively, the "Hospital Defendants"), have filed a reply brief to the

Plaintiff's Opposition to their Motion for Summary Judgment. In their reply brief, the

Hospital Defendants have urged this Court to adopt their overreaching and incorrect

interpretation of a decision from the Eastern District Pennsylvania, Nevyas v. Morgan,

309 F.Supp.2d. 673 (2004)(granting a patient's Motion to Dismiss a doctor's Lanham Act

claim on the grounds that defamatory remarks posted by a patient on the internet were not

sufficient to satisfy prudential standing requirement of false and deceptive advertising claim).

Contrary to the position taken by the Hospital Defendants in their reply brief, <u>Nevyas</u> is not dispositive of the case at bar. The facts are absolutely distinguishable in every possible way.[1] <u>Nevyas</u> was essentially a consumer defamation case. Unlike the instant action, there was no allegation made by the plaintiffs in <u>Nevyas</u> that the defendants were palming off the plaintiffs' work to third parties as their own. Indeed, even if the facts in <u>Nevyas</u> decision where similar to the case at bar, which they are not, the First Circuit has never restricted standing to bring suit under the Lanham Act to a situation where the plaintiff and defendant are direct competitors. On the contrary, the dispositive issue in this jurisdiction is not whether the parties are competing in the same industry, but rather, whether or not the plaintiff has a "reasonable interest" in being protected against the defendant's violation of the Lanham Act. Significantly, the plaintiff directs the court's attention to <u>Camel Hair and Cashmere Institute of America, Inc. v. Associated Dry Goods Corp.</u>, 799 F.2d 6, 11 (1st Cir. 1986)(where the First Circuit stated that in the context of a false advertising claim that "whether a plaintiff is a proper person to bring a claim under the Lanham Act, is whether the plaintiff has a reasonable interest in being protected against the false advertising … the plaintiff does not have to be a competitor in order to have standing to sue")(citations omitted). While <u>Camel Hair</u> is a false advertising case, there is no language in the Lanham Act that draws a distinction in

---

[1] The plaintiffs in <u>Nevys</u> alleged that the defendants/consumers where posting negative statements about the plaintiff's medical services on an internet website, www.lasiksucks.com." It is also noteworthy that none of the Hospital Defendants in this case are consumers; rather they are in the business of owning and operating a veterinary medical facility.

2

standing depending on the type of violation alleged (i.e. false advertising versus palming off).

Here, the plaintiff has a reasonable interest in preventing the Hospital Defendants from misappropriating the plaintiff's architectural design plans for their own gain by palming them off to the plaintiff's current and prospective veterinary clients as their own work and the work of another architect. This is exactly what the Hospital Defendants did when they caused the subject architectural plans to be published in a national trade publication read by members of veterinary industry.

In any event, regardless of the fact that there is no requirement in the First Circuit that the plaintiff and defendant be direct competitors for the plaintiff to have standing to maintain a suit under Section 1125(a)(1) of the Lanham Act, the Hospital Defendants' argument is completely undermined by the pleadings filed in this case by their ring leader and agent, Michael McTigue. As the Court knows, McTigue has taken the position in this case, both in the form of a counterclaim and in several other pleadings, that he was the "joint author" of the subject architectural plans and as such had the right to sell, license, or authorize third parties to make use of the architectural plans. This is tantamount to practicing architecture and no doubt, certainly reeks of direct competition. The hypocrisy here is self evident.

While the Hospital Defendants appear to take the curiously new position in their reply brief, that the plans displayed in the subject article were created solely by their replacement architect, Edward D. Cormier, not only is this position in direct contradiction to their earlier pleadings in this case, but discovery completed to date indicates that McTigue gave the plaintiff's plans to Cormier and essentially told Cormier that Cormier

3

could copy them. At the very least, this remarkably new position taken by the Hospital

Defendants relative to the authorship of the plans displayed in the article creates a

question of fact absolutely precluding summary judgment on this issue. Accordingly, the

Hospital Defendants' Motion for Summary Judgment should be denied. In further

support of this reply, the plaintiff states as follows:

## II.    ARGUMENT

### A.    THE FIRST CIRCUIT HAS NEVER PREVIOUSLY RESTRICTED STANDING TO BRING SUIT UNDER THE LANHAM ACT TO A SITUATION WHERE THE PARTIES ARE DIRECT COMPETITORS.

The First Circuit has never previously restricted standing to bring suit under §

1125(a)(1) of the Lanham Act to a situation where the parties are "direct competitors."

On the contrary, a review of the case law in the First Circuit makes it clear that the

dispositive question in determining whether a plaintiff has standing to bring a claim

under the Lanham Act is whether the plaintiff has a "reasonable interest" in being

protected against the defendant's violation of the act. Camel Hair, 799 F.2d at 11 (1st Cir.

1986).

In Camel Hair, a nonprofit corporation formed to promote the use of camel hair

and cashmere fibers brought an action against clothing marketers, alleging that the

marketers were misrepresenting the cashmere content of one of its product lines

(mislabeling). In discussing the issue of standing, the First Circuit stated: "the plaintiff

[must have] a reasonable interest in being protected against false advertising… the

plaintiff does not have to be a competitor to have standing to sue." Camel Hair, 799 F.2d

at 11 (citations omitted). The Court reasoned that "[although] none of the [trade group's]

members compete with the defendant in the sense of selling coats…their position as

manufacturers and vendors of fabric and clothing containing cashmere gives them a

strong interest in preserving cashmere's reputation as a high quality fibre." Id. at 12. As

previously stated, while Camel Hair is a false advertising case, there is no language in the

Lanham Act that draws a distinction in standing depending on the type of violation

alleged (i.e. false advertising versus palming off).

In this case, although the Hospital Defendants are primarily in the business of

providing veterinary care services and are not licensed architects per se, the plaintiff as a

designer of veterinary care facilities, has a strong interest in assuring that others do not

misappropriate the plaintiff's unique architectural designs by palming them off to

members of the veterinary community as the work of others.   This is exactly what the

Hospital Defendants did when they caused the plaintiff's architectural designs to be

published in a national trade publication, *Veterinary Economics Magazine*, read by the

plaintiff's current and prospective clients without giving the plaintiff any credit or

attribution whatsoever for their creation.  The article is entitled "Giving an Old House a

Cutting –Edge Extension."[2]  A copy of the article is attached hereto as **Exhibit A**.

According to the article, the design won a "Merit Award" in the 2004 Veterinary Hospital

Design Competition, a national and international competition. The Hospital Defendants

and their replacement architect have jointly taken credit for the award and have reaped

the benefits of the notoriety that the article created.  The harm to the plaintiff is described

---

[2]  It should be noted that the *Veterinary Economics Magazine* article with the plaintiff's design is still being broadcast over the worldwide web through the website HospitalDesign.net. The article can be found at the following web address:

http://www.hospitaldesign.net/vethospitaldesign/article/articleDetail.jsp?id=131710&pageID=1&sk=&date =

in detail in the plaintiff's opposition to the Hospital Defendants' Motion for Summary Judgment.

It is noteworthy that despite the statement in their reply brief that <u>Nevyas</u> is "well respected and precedential", the Hospital Defendants did not include any citations whatsoever from other federal jurisdictions where "their" interpretation of the <u>Nevyas</u> holding was adopted or specifically followed. To say that <u>Nevyas</u> is the "current state of law" is quite a stretch especially given the obvious reality that the facts in that case are clearly distinguishable from the case at bar.[3]

However, even if the Court were to part with the <u>Camel Hair</u> decision and adopt the Hospital Defendants' incorrect interpretation of the <u>Nevyas</u> decision, which it should not, the Hospital Defendants should be judicially estopped from arguing that they are not directly competing with the plaintiff in the field of architecture since their ring leader and agent, Michael McTigue, has taken the hypocritical and contradictory position in this case, in the form of a counterclaim, that he was a "joint author" of the subject architectural designs and as such had the right to sell, license, or authorize other veterinarians to make use of the plaintiff's architectural plans.[4] Doubtless, this reeks of direct competition since it is undisputed that the plaintiff is in the business of designing veterinary hospitals and markets its architectural designs to veterinarians.

---

[3] While <u>Camel Hair</u> is also factually distinguishable from the instant action, it is a First Circuit case and as such clearly trumps <u>Nevyas</u>. The plaintiff will leave to the Court the applicability of the cases cited by the plaintiff in its Opposition to the Hospital Defendants' Motion for Summary Judgment, except to say that the facts presented in those cases offer substantially more insight into how the language of 15 U.S.C. § 1125(a) should be applied when the parties are not actual direct competitors.

[4] See <u>Intergen N.V. v. Girna</u>, 344 F.3d 134, 144 (1st Cir. 2003)("[T]he doctrine of judicial estoppel prevents a litigant from pressing a claim that is *inconsistent* with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding.").

**B.   THE HOSPITAL DEFENDANTS HAVE MISSTATED THE PLAINTIFF'S POSITION RELATIVE TO THE AUTHORSHIP OF THE PLANS CONTAINED IN THE ARTICLE.**

In their reply brief, the Hospital Defendants appear to have taken the new position that the architectural plans displayed in the November 2004 issue of *Veterinary Economics Magazine* were created solely by their replacement architect, Edward D. Cormier. The Hospital Defendants position is inconsistent with their earlier pleadings in this case where they have stated unequivocally that the designs that were used to create the facility were the result of a collaborative effort between McTigue and the plaintiff. Indeed, this is fact alleged by McTigue himself in paragraph 4 of his counterclaim which is premised on McTigue's alleged rights of "joint authorship."

Indeed, discovery completed to date indicates that McTigue gave the plaintiff's architectural designs to Cormier, and told Cormier that Cormier could use the designs to complete the Gardner Animal Care facility. This is a fact that can now be proven. Significantly, Cormier stated under the pains and penalties of perjury in his answer to Plaintiff's Interrogatory No. 2 that:

> On or about July 23, 1999, Edward Cormier attended a meeting with Dan McCarty, Michael McTigue and Walter Bennett at the office of McCarty Associates, Inc. *At that time, Cormier was advised by McTigue that Freedenfeld had been paid for his services, and that McTigue had the right to use the designs generated by Freedenfeld. In reliance upon these assurances, Cormier agreed to provide design services for the project*....

See Defendant, Edward D. Cormier Associates, Inc.'s Responses and Objections to Plaintiff's First Set of Interrogatories, attached hereto as **Exhibit B.**

It is the plaintiff's position, that McTigue instructed Cormier to copy the plaintiff's architectural designs and submit them to the municipal planning board for approval. The copying had the intended effect of removing the plaintiff's logos from the

7

original designs. As part of a scheme to disguise the fact that the designs were copied, Cormier made minor superficial changes to some aspects of the design and then placed his own logos on the copied plans.

It should be noted that in his responses to the Plaintiff's First Request for Production of Documents, Cormier produced copies of the plaintiff's plans with the plaintiff's logos "Warren Freedenfeld & Associates" thereon which contained handwritten notes made by either McTigue or Cormier referencing some of the superficial changes. Copies of theses marked up plans have been made available to the Hospital Defendants for inspection and copying. For the Court's convenience a copy of a document entitled "First Floor Plan" with the plaintiff's logo and the subject handwritten notes made by either Cormier or McTigue is attached hereto as **Exhibit C.** This document was produced by Cormier as evidenced by Cormier's bate stamp "Cormier-019" which can be found in the lower left hand corner of the document.

It does not take an architectural expert to recognize that **Exhibit C**, which the "First Floor Plan" that the plaintiff created for the facility and which Cormier admits was given to him by McTigue, is identical to the "Main Level" plan contained on page 53 of the November 2004 *Veterinary Economics Magazine* article in all important aspects, including, but not limited to, the locations of the front vestibules and locations of the waiting area, medical records room, laundry room, food prep, consultation room, canine and feline exam rooms, surgery suite, doctor's work stations, surgery prep, treatment room, pharmacy, lab, canine hospital ward, feline/exotic hospital ward, storage rooms, and canine and feline boarding areas. At the very least, the position taken by the Hospital

8

Defendants relative to the authorship of the plans displayed in the article creates a question of fact absolutely precluding summary judgment on this issue.

For all the foregoing reasons, the Hospital Defendants' Motion for Summary Judgment should be <u>Denied</u>.

Respectfully submitted

WARREN FREEDENFELD
ASSOCIATES, INC. as successor in
interest to WARREN
FREEDENFELD & ASSOCIATES,
INC.,

By its attorneys,

/s/ Garrett J. Lee
Barry S. Scheer, BBO # 445100
Garrett J. Lee, BBO # 641876
PARKER │ SCHEER LLP
One Constitution Center
Boston, MA  02129
(617) 886-0500
Email: bss@parkerscheer.com
          gjl@parkerscheer.com

Dated: December 4, 2006

## CERTIFICATE OF SERVICE

I, Garrett J. Lee, attorney for the plaintiff, Warren Freedenfeld Associates, Inc. as successor in interest to Warren Freedenfeld & Associates, Inc., hereby certify that on this 4th day of December, 2006 a true copy of the following was served on all counsel record:

**PLAINTIFF'S SUR-REPLY BRIEF TO THE REPLY BRIEF FILED BY THE HOSPITAL DEFENDANTS IN RESPONSE TO PLAINTIFF'S OPPOSITION TO THEIR MOTION FOR SUMMARY JUDGMENT**

By first-class mail postage pre-paid, addressed to:

Michael J. Stone,
Robert A. McCall
Peabody & Arnold LLP
30 Rowes Wharf
Boston, MA 02110

Robert N. Meltzer, Esq.
P.O. Box 1459
Framingham, MA 01701

Stephen D. Rosenberg
The McCormack Firm, LLC
One International Place
7th Floor
Boston, MA 02110

F. Joseph Gentili, Esq.
Capobianco & Gentili, PC
15 West Central Street
Natick, MA 01760

Robert D. City, Esq.
Michael J. Dissette, Esq.
City, Hayes & Dissette, PC
50 Congress Street
Boston, MA 02109
Mary C. Casey, Esq.
Harbor Law Group
385 South Street
Shrewsbury, MA 01545

/s/ Garrett J. Lee
Garrett J. Lee

# Hospital Design



The nine-acre outdoor space includes benches, picnic tables, gardens, pet relief areas, grassy walking areas, and wildlife.

PHOTOS BY CRAIG ROSCOE AND BRIAN C. HURLEY

# *Giving an old house a cutting-edge extension*

**MERIT AWARD**

A New England practice blends a restored 233-year-old farmhouse with a new facility that offers all the perks of the 21st century. The next chapter for both the historic home and the practice team: Growth

*By Jessica Kellner, Staff Editor*

Combining history with innovation is a hallmark of New England. And Gardner Animal Care Center pays homage to that tradition by building its modern, high-tech veterinary hospital adjacent to a 233-year-old restored Massachusetts farmhouse.

It wasn't easy for practice owner Dr. Michael McTigue to blend what's possibly the oldest home in Gardner, Mass., with a modern animal care facility. The team

tackled the building as a three-part process: developing the new 7,848-square-foot veterinary facility in 2000, adding boarding in 2001, and completing the renovation of the 1,840-square-foot historical home in 2003.

The result is a building that he says offers "endless possibilities to improve and grow." The icing on the cake: The design won a merit award in the 2004 *Veterinary Economics* Hospital Design Competition. ▶

# Hospital Design

*award-winning floor plan*

## Gardner Animal Care Center

### *a look at the numbers*

73 Eaton St.
Gardner, MA 01440
(978) 632-7110
fax (978) 632-7354
hgvet@aol.com

**Owners:** Michael McTigue,
DVM; Brian Hurley, DVM

**Associates:** 1 full time

**Hospital team:**
15 full time, 7 part time

**Practice type:**
100 percent small animal

**Building size:** 9,688 square
feet (new facility: 7,848;
remodeled house: 1,840);
3,250 square feet unfinished
lower level

**Number of cages:**
26 hospital, 15 boarding

**Number of runs:**
7 hospital indoor; 30 boarding
indoor; 17 boarding outdoor

**Number of parking spaces:**
14 client, 17 staff

**Construction cost:**
$1.04 million for new facility;
$75,400 for house remodel

**Land purchase cost:**
$235,000

**Site improvement fees:**
$261,600

**Professional fees:** $135,197

**Equipment cost:** $93,500

**Furnishing cost:** $4,100

**Computer cost:** $9,630

**Additional fees:**
$21,000 (includes permit,
city, and impact fees)

**Year built:** new facility, 2000;
remodeled house, 2003

**Architect:**
Edward D. Cormier
Edward D. Cormier
Associates Inc.
113 Cedar St., Suite S4
Milford, MA 01757
(508) 634-8366
fax (508) 634-8038



**Lower Level**





Joining the modern with the treasured: Dr. McTigue says the TV show,
*This Old House*, was interested in his unique project, but unfortunately
Gardner was too far away from the show's operating base out of Boston.



Every e
play ar
and Bea



**Main Level**

Every exam room and the children's play area features murals of cats, dogs, and Beatrix Potter characters.

The surgery room with pass-through windows allows practice team members easy access to supplies.

## Zoning woes

"Although I'm thrilled with the result," says Dr. McTigue, "had I known how difficult it would be, I might have reconsidered." He searched for land for more than two years. When he finally found a site he liked, it was in a district that was zoned only for private residences. But the threat of other buyers interested in the property and the lack of other viable options forced him to purchase the $235,000 property before obtaining a building permit.

To convince the necessary boards—including the local planning, health, and conservation boards, among others—to allow a veterinary practice on the site, Dr. McTigue hired a team to design and present the plans. "We had a veterinary architect, a project manager who was a permit specialist, a general contractor, and an engineer working on the design, and they put together a book that explained what we were planning to do and why we should be allowed to proceed," he says.

Although the various groups liked the plan, they couldn't approve it because there was no legal precedent for allowing a business in a protected watershed area. So the doctor and his team told the boards that if he couldn't use his property for a veterinary hospital, he'd divide the nine acres of prime real estate and build a subdivision of seven houses. "They had to ask themselves which is better for watershed protection, one veterinary hospital or seven houses. They actually got a kick out of that," he says. Finally, the boards had cause to approve the building of Gardner Animal Care Center. ▶

## Hospital Design



Using the kitchen and staff lounge in the restored home "feels like eating lunch and relaxing at home," says owner Dr. McTigue. The large, brick fireplace adds to the homey feel on cold Massachusetts days.



The restored home provides ample space for relaxation and a place to get away from the hustle and bustle in the new facility. The doctors' office features a collection of veterinary antiques and original hand-hewn chestnut beams.

### Educate the employee, educate the client

Dr. McTigue began doing some heavy lifting to prepare for the move long before the construction began. "Knowing we were taking on a big new project, I delegated a lot of management responsibility to free myself up," he says. "But this wasn't just a temporary coping mechanism. We knew we needed both a better shoebox and a comprehensive renovation of our management and team systems. For as much energy as we spent on the new building, we spent even more to make sure our team was prepared to provide the best quality care," he says.

In the first step of the system overhaul, he handed off many practice management duties to then-associate, now-partner Dr.

Brian Hurley. He also created an official head technician position and identified a front-office manager.

"Before we moved in, we started raising the level of care by creating standards for the practice team to follow," says Dr. Hurley. "Since coming to this building, we've implemented a standards handbook. The practice team also chose a uniform dress code: colored scrubs. And we opted to close the hospital for three hours each Tuesday for mandatory team meetings."

For the first half of the meeting, the team focuses on client service and staff issues. In the last half, they learn about some specific aspect of care. "We stay with one clinical topic for two to three months," says Dr. Hurley. "For example, we just finished three months on behavior, and now we're starting vaccinations. With this level of training, our staff members can answer all of clients' questions, right down to the mechanism of how the vaccines work."

After completing each training section, staff members take a test on the material. Those who earn 90 percent or better get a 25-cent per hour raise. "Arming all team members to educate clients has been very effective, because their contribution frees the veterinarians' time to do what only we can do, like diagnose, prescribe, and perform surgery," Dr. Hurley says.

Staff members also conduct free educational sessions for the public about once every two months. They cover information like performing CPR, administering first aid, caring for a new puppy or kitten, and at-home dental care. "For example, we show people how to brush their pets' teeth, recommending that they start with ten seconds a night, letting the pet lick the toothpaste off their finger, and then moving to the brush," says head technician Tracey Nowers, CVT.

Staff members also introduce clients to other dental health products, demonstrating each product, showing before-and-after dental photographs, and sending attendees home with a goodie bag. The



## Hospital Design

practice notifies the local newspaper of sessions, hands out fliers, and posts a notice on the waiting room bulletin board to improve attendance, Nowers says. For each session, 20 to 30 clients fill the conference room in the old house.

### Room to breathe, room to spare

Dr. McTigue planned the space in advance to make room for such educational meetings. "I visited 30 practices to get ideas and advice before we built," says Dr. McTigue. "The owners were unanimous about two things: build big and include plenty of storage space."

And that he did, planning for space in the new facility to add such ancillary services as grooming, boarding, and training. "Gardner has 22,000 people, and when we built, there were no boarding or training facilities

within 15 miles," says Dr. McTigue. "Although I knew adding these services might produce headaches and growing pains, I knew it would also add to the quality of our bond with pets and families and generate revenue."

For example, the two agility courses—one outside and another in the padded, unfinished basement—offer pets both physical and social benefits. "For active dogs, it helps burn some of that energy," says Nowers. "It's also good for the human-animal bond because owner and pet are doing something together. And the training helps reinforce the idea that the dog works for the owner, which can help control some behavior problems," she says.

Dr. McTigue considers the space he devotes to ancillary services a high-quality investment. "Some services may not take off right



The unfi
houses 1
program
the bond

away, l
he say
more 1
have t
then g
examp
aren't
townh
to crea

If th
add m
they
room.
ished
the in
also p
The ac
able s]
tors pl
serve a
unusee

"W
says D
sulate
We ha
thing.
the on
ing."
memb
kitche
floors,
firepla

### take-away lesson

## Building changes enable critical management changes

"Today we give clients the information they need before they ask us. And a lot of that is training," says Dr. Hurley. "But we never could have accomplished these goals in the old facility because it involved almost doubling our staff."

And Dr. Hurley says clients are responding to the changes, with benefits for pets' health and for the practice. For example, compliance with the practice team's recommendations continues to improve, as evidenced by the practice's rising average client transaction, from $70.80 in 1999 to $96.25 today for medical and ancillary services.

"Our clients are receptive to our recommendations because of all the information we give them," says Dr. Hurley. "And when team members talk to clients about care, they de-emphasize the price, focusing instead on what we'd like to do for the pet, why it's important, and what results we're expecting," he says.

Clients get instructional, product, and cost brochures for every recommended service. And receptionists, assistants, technicians, and veterinarians all help give clients the information to make good decisions on behalf of their pets, Dr. Hurley says. "When clients feel informed, they're willing to do more for their pets."

The time was right to sell.
The time was right to call
Simmons & Associates.

Is the time right for you?

Simmons, the nation's premier
broker of veterinary practices.

SALES • APPRAISALS
FINANCING • EXIT STRATEGIES
Call 800-333-1984
www.simmons2000.com

SIMMONS & ASSOCIATES

Circle 127 on reply card

## Hospital Design

Mc-
ling
.uce
1s, I
the
and
†
ility
ther
ase-
.ical
tive
that
also
ond
)ing
ain-
that
ner,
be-

)ace
es a
)me
ght



The unfinished basement with padded floors houses the indoor agility course. The agility program gives the team another way to build the bond between clients and pets.



The reception area (view from behind check-in) includes windows into adoption and grooming so clients can watch the dogs getting a trim and the kittens at play.

away, but that's OK; we have time," he says. "We're offering so much more than before that people first have to learn about these services, then get used to using them. For example, we're finding that people aren't used to boarding their cats in townhouses. In this case, we have to create the market."

If the practice owners decide to add more services to the practice, they have more than enough room. The 3,250-square-foot unfinished basement currently houses the indoor agility course, but it's also plumbed and ready to finish. The adjoining house also has available space. On the first floor, doctors plan to redo two bedrooms to serve as offices, and there are two unused finished bedrooms upstairs.

"We've already done so much," says Dr. McTigue. "It was an uninsulated, horse-hair plaster house. We had to basically replace everything. But we fought to retain all the original woodwork and framing." The house also offers staff members a lounge in its former kitchen, complete with original floors, restored cabinets, and a large fireplace. The team holds meetings in the house's former living room, next to another massive fireplace.

The team says the new facility has been great for morale: "The fun part is that the possibilities to improve and grow are endless," says Nowers. "We're always asking ourselves, 'What else can we add?' and 'How could we do this better?' In the old place, we couldn't consider doing or adding more. Now, our staff has practically tripled, output has increased, and technicians really get to use their skills. And if we have ideas, they're always heard, which makes us feel valued."

Dr. McTigue also feels the move was invaluable. "We wanted the practice to have an old New England feel, but we wanted it to have everything a hospital needs, too. It was a tricky goal to achieve. But this renovated house is a bigger pleasure than I ever thought. I really didn't anticipate that it would actually make practicing veterinary medicine more enjoyable, both for me and my staff." ✦

*Editors' note: Don't forget, applications for the 2005 Hospital Design Competition are due Nov. 29.*



The time was right to buy.
The time was right to call
Simmons & Associates

SIMMONS & ASSOCIATES

Circle 128 on reply card

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WARREN FREEDENFELD ASSOCIATES, INC.,
as successor in interest to
Warren Freedenfeld & Associates, Inc.,

**Plaintiff**

v.

MICHAEL P. MCTIGUE, DVM, individually
and as Trustee of the McTigue Family Trust,
NANCY A. MCTIGUE, as Trustee
of the McTigue Family Trust,
BRIAN C. HURLEY, DVM,
GARDNER ANIMAL CARE CENTER, LLC
d/b/a Gardner Animal Hospital,
EDWARD D. CORMIER ASSOCIATES, INC.,
and
BENNETT BUILDING CORPORATION,

**Defendants**

Civil Action No. 05-11573 RGS

## DEFENDANT EDWARD D. CORMIER ASSOCIATES, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

I.    **General Objections**

1.    Cormier objects to the instructions and definitions set forth in the Plaintiff's First Set of Interrogatories to the extent they impose upon Cormier a burden that is greater than, or inconsistent with, the applicable Rules of Civil Procedure. Cormier will respond to the Plaintiff's First Set of Interrogatories in accordance with the Federal Rules of Civil Procedure and the relevant Local Rules.

2.    Cormier objects to the instructions and definitions set forth in the Plaintiff's First Set of Interrogatories to the extent that they are vague, ambiguous, and seek to define terms in an expansive and overly broad manner, beyond the meaning that is given to those terms in general usage.

3.    Cormier objects to the Plaintiff's First Set of Interrogatories to the extent they seek information that is protected from disclosure by the attorney-client privilege, the work product doctrine, the joint-defense privilege or any other applicable privileges.

4.    The answers below shall not be deemed to constitute a waiver of any claims of privilege or immunity Cormier may have as to any response, document, or thing, or of any right of objection to competency, relevancy, materiality, admissibility, or any other evidentiary objection Cormier may assert.

5.    Discovery in this matter is ongoing, and accordingly Cormier reserves the right to modify, amend, or supplement any of the answers below.

6.    The following answers and specific objections to the Interrogatories are made subject to these General Objections.

## II.    Interrogatory Responses

### INTERROGATORY NO. 1
*Please state your full name, residential address, business address, your occupation, the name and address of your employer and the duties in that position.*

**Response:**    Edward D. Cormier
113 Cedar Street, Suite S4
Milford, MA  01757

Administration Manager, Edward D. Cormier Associates, Inc., now retired.  In addition, Edward D. Cormier Associates, Inc. is now a voluntarily dissolved corporation.

### INTERROGATORY NO. 2
*If you or anyone on your behalf had any communication in any form, written or oral, with GAH or any person acting on its behalf relating to or concerning any of the facts, events, occurrences or allegations set forth in the Complaint, please state:*
  a.    *The specific date and time (if applicable) of each such communication;*
  b.    *The manner in which each such communication was made on each of the dates listed in your answer to subpart a. of this interrogatory, i.e., whether by telephone, letter, face-to-face conversation, etc.;*
  c.    *The name and address of all persons who engaged or in any way participated in each such communication listed in your answer to subpart a. of this interrogatory; and*
  d.    *In full and complete detail of the entire contents of each such communication made on each of the dates listed in your answer to subpart a. of this interrogatory, indicating what was said or communicated by each of the persons listed in your answer to subpart c.*
*If any of these communications were in written form, you may respond by attaching a copy of such communications to your answers to these interrogatories.*

**Response:**    Objection.  In the wake of the court's ruling of February 9, 2006 and the corresponding order of February 13, 2006, this interrogatory addresses matters that are irrelevant to what remains of the plaintiff's complaint, and is not reasonably calculated to lead to the discovery of admissible evidence.  To the extent that this interrogatory seeks communications between counsel for Cormier and counsel for GAH, Cormier further objects on the grounds of the attorney client and joint-defense privileges.  Cormier further objects that the request is unduly burdensome, in that the burden and expense of the discovery requested outweighs its likely benefit, and overbroad.  In addition, the interrogatory is vague and unclear as to certain points.

Without waiving any of the foregoing objections, Cormier answers that it is impossible to detail each communication that Cormier had in connection with the Project, in that Cormier had periodic conversations with McCarty, Bennett, or Michael McTigue (any of whom might be considered persons "acting on behalf" of GAH) regarding the progress of the hospital renovation and amendments to design drawings. However, Cormier can provide details as to the following conversations.

Cormier was first contacted telephonically by Dan McCarty of McCarty Associates, Inc. on or about July 1, 1999. At that time, McCarty advised that construction costs for the McTigue project had been determined to be in excess of $1.3 million, when only $1 million had been budgeted for the project by McTigue. On other unrelated projects, McCarty and Cormier had consulted with each other. On this project, McCarty asked Cormier to review building designs drafted by Freedenfeld to determine whether there were any areas for construction cost savings. McCarty also advised Cormier that McTigue was dissatisfied with Freedenfeld's performance and was considering terminating Freedenfeld's services. McCarty asked whether Cormier would be interested in carrying the project forward, and if so, whether Cormier could prepare a proposal. Cormier responded that it would be interested and could prepare a proposal, but only if McTigue confirmed that it had notified Freedenfeld that it had been terminated, that Freedenfeld had been paid for the design services to date, and that McTigue had the right to use the Freedenfeld design information.

On or about July 6, 1999, Cormier prepared and submitted a draft of a design proposal to McCarty for review and comment. The proposal was limited to architectural services only, including review of documents and savings, conceptual drawings, and construction documents and administration. Structural, mechanical, electrical, plumbing were a part of the draft proposal as estimated engineering fees.

On or about July 14, 1999, Cormier met with McCarty and Bennett, at which time Cormier was provided with a set of the drawings that had been prepared by Freedenfeld. The documents provided at that time appeared to be progress prints dated May 14, 1999 and June 21, 1999.

On or about July 23, 1999, Edward Cormier attended a meeting with Dan McCarty, Michael McTigue, and Walter Bennett at the office of McCarty Associates, Inc. At that time, Cormier was advised by McTigue that Freedenfeld had been notified in writing of the termination of his services, that Freedenfeld had been paid for his services, and that McTigue had the right to use the designs generated by Freedenfeld. In reliance upon these assurances, Cormier agreed to provide design services for the project. McTigue advised that many areas of the Freedenfeld layout did not meet McTigue's requirements. Therefore, Cormier agreed to design a plan that reflected those requirements.

Following Cormier's formal retention, Cormier had periodic meetings with McTigue, McCarty, and Bennett as the plans were reviewed and revised throughout the redesign, permitting, and construction phases of the project. The exact dates and the matters discussed cannot be stated with particularity at this time.

c.      *Any other person, firm, or entity concerning or relating to the Project.*

**Response:**    Cormier did not provide any plans, drawings, or other documents created by Freedenfeld in connection with the Project to Bennett, the Publishers of Veterinary Economic Magazine, or any other person, firm, or entity.

## INTERROGATORY NO. 16

*Please state whether you incorporated any elements of the plans or design drawings created by Freedenfeld relative to Project in any plans or design documents that you created for the Project or for any of the structures on the Property, specifying each such element copied.*

**Response:**    Objection.  In the wake of the court's ruling of February 9, 2006 and the corresponding order of February 13, 2006, this interrogatory addresses matters that are irrelevant to what remains of the plaintiff's complaint, and is not reasonably calculated to lead to the discovery of admissible evidence. Further objecting, as all copyright infringement claims have been dismissed from this action and this information is not relevant to the only claim remaining in this litigation, this interrogatory is overbroad and unduly burdensome.

Subject to and without waiving the foregoing and the general objections, Cormier answers further:  Although McCarty initially provided Cormier with progress prints apparently drafted by Freedenfeld for purposes of securing suggestions that might bring the proposed project under budget, it is Cormier's belief that McTigue was so dissatisfied with Freedenfeld's proposed designs that Freedenfeld was terminated. The entire Project was then reworked by Cormier independent of Freedenfeld. Although there are elements that are common to the Freedenfeld progress prints and the final design drawings by Cormier, i.e. both incorporate structures that have roofs, walls, windows, doors, etc. that would be common to any structure, in reality the entire project had to be redone from scratch to embody McTigue's vision for the renovated Gardner Animal Hospital.  No element of Freedenfeld's plans was specifically copied, and the final product of Cormier's efforts differs significantly from the progress prints of Freedenfeld.

## INTERROGATORY NO. 17

*Please state the name and address of each person whom you expect to call as a witness at the time of trial and include in your answer the anticipated subject matter of each such person's testimony.*

**Response:**    Cormier has not yet decided whom it will call as a witness at the time of trial, and reserves the right to supplement this answer in a timely fashion.

Answering further, it is anticipated that Warren Freedenfeld, Edward D. Cormier, Michael McTigue, Dan McCarty, and Walter Bennett would be called as witnesses at trial.

**INTERROGATORY NO. 18**
*If you expect to call an expert witness(es) at trial, please state:*
   a.    *the name, business address and field of expertise of each such person;*
   b.    *the subject matter on which each expert is expected to testify;*
   c.    *the substance of the facts and opinions to which each expert is expected to testify;*
          *and*
   d.    *a summary of the grounds for each such opinion.*

**Response:**    Cormier has not yet decided what person or persons it will call as an expert witness
                 or witnesses at the time of trial, and reserves the right to supplement this answer
                 in a timely fashion.

Under penalties of perjury, the undersigned certifies that the foregoing answers are true.

Dated: April 28 2006

_____
Edward D. Cormier
Administration Manager
Edward D. Cormier Associates, Inc.

As to objections:

Dated: April 29 , 2006

_____
Stephen D. Rosenberg  BBO#558415
Eric L. Brodie  BBO#639833
THE MCCORMACK FIRM, LLC
One International Place - 7th Floor
Boston, MA    02110
Ph:    617•951•2929
Fax:    617•951•2672

## CERTIFICATE OF SERVICE

I hereby certify that today, May __02__, 2006, I served a copy of Defendant Edward D. Cormier Associates, Inc.'s Responses and Objections to Plaintiff's First Set of Interrogatories upon all counsel of record via first class mail to:

Barry S. Scheer, Esq.
Garrett J. Lee, Esq.
**Parker Scheer, LLP**
One Constitution Center
Boston, MA     02129

Robert D. City, Esq.
Michael J. Dissette, Esq.
**City, Hayes & Dissette, PC**
50 Congress Street
Boston, MA     02109

Robert N. Meltzer, Esq.
P.O. Box 1459
Framingham, MA   01701

Mary C. Casey, Esq.
**Harbor Law Group**
385 South Street
Shrewsbury, MA     01545

Eric L. Brodie

84167.1



FIRST FLOOR PLAN

GARDNER ANIMAL CARE CENTER
GARDNER, MASSACHUSETTS

Warren Freedenfeld & Associates

A2