# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **WARREN FREEDENFELD ASSOCIATES, INC.**, as successor in interest to Warren Freedenfeld & Associates, Inc., | |
| **Plaintiff,** | |
| **v.** | |
| **MICHAEL P. MCTIGUE, DVM**, individually and as Trustee of the McTigue Family Trust, **NANCY A. MCTIGUE**, as Trustee of the McTigue Family Trust, **BRIAN C. HURLEY, DVM**, **GARDNER ANIMAL CARE CENTER, LLC** d/b/a Gardner Animal Hospital, **EDWARD D. CORMIER ASSOCIATES, INC.**, and **BENNETT BUILDING CORPORATION**, | **CIVIL ACTION No. 05-11573 RGS** |
| **Defendants.** | |
| **MICHAEL P. MCTIGUE, DVM**, | |
| **Counter-Plaintiff,** | |
| **v.** | |
| **WARREN FREEDENFELD ASSOCIATES, INC.**, as successor in interest to Warren Freedenfeld & Associates, Inc., | |
| **Counter-Defendant.** | |

## DEFENDANT, EDWARD D. CORMIER ASSOCIATES, INC.'S MOTION FOR SUMMARY JUDGMENT ON THE PLAINTIFF'S LANHAM ACT CLAIMS

Pursuant to Federal Rule of Civil Procedure 56, Defendant, Edward Cormier Associates, Inc. hereby moves this Court for an order entering summary judgment in its favor and against Plaintiff, Warren Freedenfeld Associates, Inc.  In support of this motion, the Defendant submits the accompanying Memorandum in Support of Defendant's Motion for Summary Judgment, and Statement of Undisputed Facts as required by Local Rule 56.1 and citations in support of Defendant's motion.

WHEREFORE, Defendant, Edward D. Cormier Associates, Inc.  moves this Court for an Order rendering summary judgment in its favor.

## REQUEST FOR ORAL ARGUMENT

Defendant requests a hearing on this motion in accordance with Local Rule 7.1(D).


Respectfully submitted,

**Edward D. Cormier & Associates, Inc.**
Defendant
By its attorneys,


**Dated:**  February 1, 2007

/s/ Stephen D. Rosenberg
Stephen D. Rosenberg      [BBO#558415]
Eric L. Brodie            [BBO#639833]
Shayna W. Borakove        [BBO#663670]
**THE MCCORMACK FIRM, LLC**
One International Place - 7th Floor
Boston, MA    02110
Ph:  617•951•2929
Fax: 617•951•2672

2

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of **(1)** DEFENDANT, EDWARD D. CORMIER ASSOCIATES, INC.'S MOTION FOR SUMMARY JUDGMENT ON THE PLAINTIFF'S LANHAM ACT CLAIMS, **(2)** STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANT, EDWARD D. CORMIER ASSOCIATES INC.'S MOTION FOR SUMMARY JUDGMENT ON THE PLAINTIFF'S LANHAM ACT CLAIMS, **(3)** MEMORANDUM IN SUPPORT OF DEFENDANT, EDWARD D. CORMIER ASSOCIATES, INC.'S MOTION FOR SUMMARY JUDGMENT ON THE PLAINTIFF'S LANHAM ACT CLAIMS, and **(4)** COUNSEL FOR DEFENDANT, EDWARD D. CORMIER ASSOCIATES, INC.'S LOCAL RULE 7.1(A)(2) CERTIFICATION upon all counsel of record, via the Court's ECF system, to:

Barry S. Scheer, Esq.
Garrett J. Lee, Esq.
**Parker Scheer, LLP**
One Constitution Center
Boston, MA    02129
Phone: 617.886.0500
Fax:    617.886.0100

Robert D. City,  Esq.
Michael J. Dissette, Esq.
**City, Hayes & Dissette, PC**
50 Congress Street
Boston, MA    02109
Phone: 617.523.3050
Fax:    617.523.5612

Mary C. Casey,  Esq.
**Harbor Law Group**
385 South Street
Shrewsbury, MA    01545
Phone: 508.842.9244
Fax:    508.842.9311

Michael J. Stone, Esq.
Robert A. McCall, Esq.
**Peabody & Arnold LLP**
30 Rowes Wharf
Boston, MA  02110
Phone: 617.951.2100
Fax:    617.951.2125

Robert N. Meltzer, Esq.
P.O. Box 1459
Framingham, MA  01701
Phone: 508.872.7116
Fax:    508.872.8284

**Dated:**    February 1, 2007

/s/ Stephen D. Rosenberg
Stephen D. Rosenberg

**EXHIBIT A**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO._____

| | |
|---|---|
| WARREN FREEDENFELD ASSOCIATES, INC. as successor in interest to WARREN FREEDENFELD & ASSOCIATES, INC., Plaintiff, v. MICHAEL P. MCTIGUE, DVM individually and as Trustee of THE MCTIGUE FAMILY TRUST, NANCY A. MCTIGUE, as Trustee of the MCTIGUE FAMILY TRUST, BRIAN C. HURLEY, DVM, GARDNER ANIMAL CARE CENTER, LLC d/b/a GARDNER ANIMAL HOSPITAL, EDWARD D. CORMIER, ASSOCIATES INC., and BENNETT BUILDING CORPORATION, Defendants. | **COMPLAINT FOR COPYRIGHT INFRINGEMENT, AND UNFAIR COMPETITION** |

## INTRODUCTION

1.      This is an action for damages for copyright infringement in violation of 17 U.S.C. § 101 et seq., injunctive relief, false designation or description of origin and unfair competition in violation of 15 U.S.C. § 1125(a) in connection with architectural works created by the plaintiff in connection with the expansion and renovation of a veterinary hospital in Gardner, Massachusetts. The claims in this suit are based on the unauthorized copying and/or use of the plaintiff's architectural works by the defendants.

To plan and design [the Project], I have assembled an experienced team of specialists. ***The architect is Warren Freedenfeld and Associates from Boston. Warren has designed over 300 veterinary hospitals and has won many awards for his work. We have worked together on our hospital renovation project in 1994 and have been very pleased with his designs***.

See Letter to Gardner Zoning and Planning Board, attached as **Ex. B.**

## B.   **The Architectural Work**

13.     In connection with the Project, Freedenfeld prepared several original architectural works for the Hospital. The original architectural works are identified as any and all drawings, plans, or other architectural work that Freedenfeld prepared in connection with the Project, including, but not limited to, all schematic design progress drawings, partial construction drawings, reduced scale plans that were submitted to the City of Gardner or any of its agencies, including the Planning Board and the Zoning Board of Appeals, and those drawings identified as A1.1, A2.1, A.4.1, A4.2, and A5.1. ( "Architectural Work") See Gardner Animal Hospital Project dated March 11, 1999 (identified in the table of contents as "Reduced Scale Plans"), attached as **Ex. C**, and Gardner Animal Care Center plans attached as **Ex. D.** Each of the Reduced Scale Plans contained the logo in large bold type **"Warren Freedenfeld & Associates, Inc."**

14.     The A2.1 drawing is entitled "First Floor Plan." This drawing depicts the entire layout of the first floor, including the two front vestibules and exact room locations. A unique aspect of the First Floor Plan is the interrelationship between the rooms and configuration of the spaces. These rooms include but are not limited to the waiting area, restrooms, medical records room, laundry room, food prep, consultation room, surgery suite, doctor's work stations, surgery prep, treatment room, pharmacy, lab, canine hospital ward, feline/exotic hospital ward, storage rooms, canine exam rooms,

4

**D.**    **The Termination of the Architectural Services**

20.    By the end of June 1999, Freedenfeld billed the Hospital a total of

$50,036.33 in architectural services. Of this amount $15,013.70 remained unpaid by the

Hospital. When Freedenfeld attempted to raise the issue of the unpaid balance with the

Hospital, McTigue threatened to terminate Freedenfeld.

21.    In late July of 1999, Freedenfeld sent McTigue a letter which provided an

itemized list of all invoices and Hospital's payment history. See Freedenfeld letter dated

July 30, 1999, attached as **Ex. E.**  Despite the fact, that $15,013.70 had still remained

unpaid by the Hospital, and that Freedenfeld had performed the work that was billed, in

an effort to resolve the dispute and keep the Project moving, Freedenfeld offered to

compromise the unpaid invoices for a payment of $9,500.00.  However the letter made

clear that if McTigue went forward with his termination of Freedenfeld that McTigue was

precluded from using the Architectural Work and related documents to complete the

Project. Freedenfeld's letter stated:

> *It is also important for you to understand that your decision to terminate
> [the Services Agreement] precludes your use of any and all drawings
> and /or documents produced by this Office.  These documents are not
> only protected by Federal copyright laws but are also the sole legal and
> contractual property of this Office and cannot be used by the Owner or
> others for completion of the Project. I believe you know that there is no
> dispute about this issue.  In addition, any licensed architect will know the
> substantial jeopardy he will place his firm in by using another
> architect's copyrighted documents. All documents given to you by this
> Office must be returned upon Completion of the Termination
> Agreement.*

See Freedenfeld letter dated July 30, 1999 attached as **Ex. E.**

22.    In August of 1999, McTigue responded by letter to Freedenfeld's July 30,

1999 correspondence.  In the letter, McTigue alleged for the first time that Freedenfeld

had failed to substantially perform the architectural services. See McTigue Letter

attached as **Ex. F.**  But rather than return the Architectural Work to Freedenfeld as

specifically requested by Freedenfeld, McTigue stated in the letter that the Hospital

"rolled up" the plans and "discarded" them.  According to McTigue, the Architectural

Work had proven to be "useless."  McTigue stated:

> **Whatever plans, drawings etc. you did prepare have proven useless to us,
> and they have been rolled up and discarded.** This is in spite of my having
> paid tens of thousands of dollars; unfortunately, I again have to pay
> another architect another tens of thousands of dollars to complete the
> project.

See  McTigue Letter attached as **Ex. F.**

     23.     In August of 1999, Freedenfeld applied to the Register of

Copyrights for a Certificate of Registration for all the Architectural Work, and

properly filed an application deposit and fee with the U.S. Copyright Office.  A

copyright was granted to Freedenfeld as evidenced by Certificate VAU 656-367.

See Certificate of Registration, attached as **Ex. G.**

**E.**     **The Termination and Mutual Release Agreement**

     24.     On September 2, 1999, Freedenfeld and the Hospital agreed to

settle the dispute between the parties by entering into a Termination and Mutual

Release Agreement (the "Termination Agreement"). Under the terms of the

Termination Agreement, the parties agreed to release each other of all claims each

may have had against each other. However, the parties specifically agreed that the

Hospital would not use the Architectural Work.  See Termination and Mutual

Release Agreement dated September 2, 1999, attached as **Ex. H.**

25.    The Architectural Work furnished to the Hospital was solely produced by Freedenfeld.

**F.    The Infringing Activity**

26.    Upon information and belief, shortly after the Hospital and Freedenfeld discontinued their relationship, the Hospital retained Cormier as the new architect for the Project. The Hospital also retained Bennett to construct the Project.

27.    Upon information and belief, sometime during this period, McTigue, the Hospital, Cormier, and Bennett came to the conclusion that the preparation of new plans would be too costly and significantly delay the completion of the Project. The defendants knew that any new plans would have to be submitted to the Planning Board again for approval. However, neither McTigue, the Hospital, Cormier, nor Bennett wanted to pay Freedenfeld for the right to use the Architectural Work.  Without Freedenfeld's knowledge or consent, the defendants decided to use the Architectural Work but make only superficial changes in an attempt to disguise the fact that the Architectural Work was copied.  This way, the defendants could be assured that the Planning Board would not reject the plans and issue a building permit so that construction could begin.

28.    The defendants acquired the original Architectural Work from an unknown source or obtained them from the Hospital, which in truth, must have never discarded them.  Without notifying Freedenfeld and without Freedenfeld's approval, McTigue, the Hospital, Cormier, and Bennett, developed a new set of plans that substantially copied certain critical aspects of the Architectural Work, particularly those that formed the basis of the Planning Board's approval.

8

29.    Upon information and belief, in late 1999, the City of Gardner Building

Inspector issued a Building Permit for the Project to McTigue based on the plans and

design features that the defendants copied from the Architectural Work   See Copy of

Building Permit attached as **Ex. I**. Upon information and belief, the Project was

completed in 2000. See Copy of Occupancy Permit, attached as **Ex. J**

**G.    Freedenfeld's Discovery of the Infringing Activity**

30.    In late 2004, Freedenfeld was a subscriber to a veterinary trade

publication, *Veterinary Economics* (the "Magazine"). Upon information and belief, the

Magazine is an international business and management publication serving more than

50,000 subscribers in the United States and Canada. While perusing the November 2004

issue of the magazine, Freedenfeld discovered an article appearing on pages 50 - 57 about

the renovation and expansion of the Gardner Animal Hospital.  According to the article,

the design won a "Merit Award" in the 2004 Veterinary Hospital Design Competition, a

national and international competition.  The article is entitled "Giving an Old House a

Cutting –Edge Extension." The article identifies the owner of the Hospital as Michael

McTigue DVM, and Brian Hurley DVM.  Cormier is listed as the Architect.  Pages 52-53

of the article contain drawings that are nearly identical to the First Floor Plan contained

in the Architectural Work as A2.1 and submitted to the Planning Board as a schematic

design progress drawing in all important aspects, including, but not limited to, the

locations of two front vestibules and locations of the waiting area, medical records

room, laundry room, food prep, consultation room, canine and feline exam rooms,

surgery suite, doctor's work stations, surgery prep, treatment room, pharmacy, lab, canine

hospital ward, feline/exotic hospital ward, storage rooms, and canine and feline boarding areas.

31.    More importantly, a full size version of the First Floor Plan that was created by the defendants and obtained from the Planning Board and City of Gardner Building Department reveal that the defendants copied the unique interrelationship between the rooms and configuration of the spaces.

32.    All of the defendants named in this action either directly or indirectly infringed on Freedenfeld's copyrights in the Architectural Work. The infringement was willful and knowing. Further, each of the defendants substantially benefited from the infringement. Among other things, the copying of the Freedenfeld drawing allowed McTigue, the Hospital and Hurley to realize greater profits.  McTigue and Nancy McTigue in their capacity as trustees of the McTigue Family Trust, also benefited from an increase in value to the Property. Among other things, Cormier and Bennett profited from the use of the Architectural Work in connection with their receipt of design and construction fees from McTigue. Cormier also substantially benefited from a marketing standpoint through its ability to market to clients the firm's receipt of the 2004 Veterinary Hospital Design Competition Merit Award. Upon information and belief, Cormier has also used the Architectural Work in advertising.

## COUNT I- DIRECT VIOLATION OF COPYRIGHT
### (The Hospital, McTigue individually and as Trustee of the McTigue Family Trust, Cormier, and Bennett)

33.    Freedenfeld incorporates by reference the allegations contained in previous paragraphs as if fully set forth herein.

34.    Freedenfeld holds a valid copyright in the Architectural Work.

64.     Pursuant to 17 U.S.C. § 502, Freedenfeld is entitled to preliminary and

injunctive relief and permanent injunctions prohibiting the defendants from infringing on

Freedenfeld's copyrights.

## COUNT VI – FALSE DESIGNATION OR DESCRIPTION OF ORIGIN, AND UNFAIR COMPETITION

65.     Freedenfeld incorporates by reference the allegations contained in

previous paragraphs as if fully set forth herein.

66.     The actions of the defendants violate the provisions of 15 U.S.C. §

1125(a), under which Freedenfeld makes a claim.

67.     Freedenfeld is entitled to the greater of the value of the drawings or the

profits earned by the defendants as a result of this violation.

WHEREFORE, Freedenfeld prays for judgment against each of the defendants as

follows:

A.     For actual damages and lost profits, or statutory damages as the plaintiff
       may elect pursuant to 17 U.S.C. § 504;

B.     For the plaintiff's costs and reasonable attorneys' fees pursuant to 17
       U.S.C. § 505;

C.     For preliminary and permanent injunctive relief pursuant to 17 U.S.C. §
       502;

D.     For damages in connection with the defendants' violations of 15 U.S.C. §
       1125(a);

E.     For such other relief as the court deems just and proper.

Respectfully submitted,

WARREN FREEDENFELD &
ASSOCIATES, INC.

By its attorneys,

Barry S. Scheer
BBO No. 445100
Garrett J. Lee
BBO No. 641876
PARKER | SCHEER, LLP
One Constitution Center
Boston, MA  02129
Tel.: 617-886-0500
Fax: 617-886-0100
Email: bss@parkerscheer.com
       gjl@parkerscheer.com

Dated: July 2), 2005

**EXHIBIT B**

UNCERTIFIED ROUGH DRAFT

```
 1                                    VOLUME:    I
                                      PAGES:     1 - 190
 2                                    EXHIBITS:  15 - 38

 3                 UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
 4                 CIVIL ACTION NO. 06-1583-RGS

 5
        *************************************x
 6      WARREN FREEDENFELD ASSOCIATES, INC.
        as successor in interest to WARREN
 7      FREEDENFELD & ASSOCIATES, INC.,
                          Plaintiff,
 8
        v.
 9
        MICHAEL P. MCTIGUE, DVM, Individually
10      and as Trustee of THE MCTIGUE FAMILY
        TRUST, NANCY A. MCTIGUE, as Trustee of
11      the MCTIGUE FAMILY TRUST, BRIAN C.
        HURLEY, DVM, GARDNER ANIMAL CARE CENTER,
12      LLC d/b/a GARDNER ANIMAL HOSPITAL,
        EDWARD D. CORMIER ASSOCIATES INC.,
13      and BENNETT BUILDING CORPORATION,
                          Defendants.
14      *************************************x

15
                DEPOSITION OF GARDNER ANIMAL CARE CENTER,
16      THROUGH ITS DESIGNEE MICHAEL P. MCTIGUE
        DEPOSITION OF MICHAEL P. MCTIGUE, a witness called
17      on behalf of the Plaintiff, taken pursuant to the
        Massachusetts Rules of Civil Procedure, before
18      Carol A. Jackson, Registered Professional Reporter
        and Notary Public in and for the Commonwealth of
19      Massachusetts, at the offices of Parker|Scheer,
        LLP, One Constitution Center, Boston,
20      Massachusetts, on TUESDAY, JANUARY 23, 2007, at
        10:11 a.m.

21

22              EPPLEY COURT REPORTING, LLC
                    Post Office Box 382
23              Hopedale, Massachusetts 01747
                508.478.9795 ~ Fax: 508.478.0595
24                  leppley@msn.com
```

UNCERTIFIED ROUGH DRAFT

Page 2

```
 1                          APPEARANCES OF COUNSEL:

 2

 3     Representing the Plaintiff:
             PARKER|SCHEER, LLP
 4           One Constitution Center
             Boston, MA  02129
 5           BY:  GARRETT J. LEE, ESQ.
             617.886.0500 ~ Fax:  617.866.010
 6           gjl@parkerscheer.com

 7           PEABODY & ARNOLD LLP
             30 Rowes Wharf
 8           Boston, MA  02110-3342
             BY:  ROBERT A. McCALL, ESQ.
 9           617.951.2061 ~ 617.235.3534
             rmccall@peabodyarnold.com

10

11     Representing Michael P. McTigue, DVM, Individually
       and as Trustee of The McTigue Family Trust, NANCY A.
12     McTigue, as Trustee of the McTigue Family Trust,
       Brian C. Hurley, DVM, Gardner Animal Care Center,
13     LLC d/b/a Gardner Animal Hospital,
             THE MOUNTAIN STATES LAW GROUP
14           P. O. Box 1459
             Framingham, MA  01701
15           BY:  ROBERT N. MELTZER, ESQ.
             508.872.7116
16           robmeltzer@aol.com

17           THE HARBOR LAW GROUP
             385 South Street
18           Shrewsbury, MA  01545
             BY:  MARY C. CASEY, ESQ.
19           508.842.9244 ~ Fax: 508.842.9311
             casey@harborlaw.com

20

21     Representing Edward D. Cormier & Associates, Inc.:
             THE MCCORMACK FIRM, LLC
22           One International Place
             Boston, MA  02110
23           BY:  STEPHN D. ROSENBERG, ESQ.
             617.951.2929 ~ Fax: 617.951.2672
24           srosenberg@mccormackfirm.com
```

UNCERTIFIED ROUGH DRAFT

Page 3

```
 1    ALSO PRESENT:

 2         Warren Freedenfeld

 3

 4                              INDEX
 5    DEPOSITION OF
 6    MICHAEL P. MCTIGUE                        PAGE

 7

 8

 9

10

11                      INDEX OF EXHIBITS
12
13    EXHIBIT              DESCRIPTION                PAGE

14

15

16

17

18

19

20

21

22

23                      (Exhibit attached.)

24
```

Page 5

1              MR. LEE:  So by agreement, we're going to

2       start with Exhibit 15 in this deposition, and that is

3       a continuation in terms of exhibit numbers from

4       Warren Freedenfeld's deposition.

5              Again, usual stipulations.  All the parties

6       have agreed all objections except as to the form of

7       the question reserved until trial.  Motions to strike

8       reserved until the time of trial.

9              Read and sign, waive notary, agreeable to

10      everyone?

11             MR. MELTZER:  30 days.

12             MR. LEE:  30 days.  That is fine as well.

13

14             MICHAEL P. MCTIGUE, Deponent, having first

15      been satisfactorily identified and duly sworn by the

16      Notary Public, deposes and states as follows:

17      EXAMINATION BY

18      MR. LEE:

19         Q.  Good morning, Mr. McTigue.

20         A.  Good morning.

21         Q.  Actually, I would just ask you to state your

22      name for the record, please.

23         A.  Pardon me?

24         Q.  I would ask you to state your name for the

Page 9

1    Animal Hospital?

2         A.   It's the Gardner Animal Care Center, and

3    it's veterinarian.

4         Q.   Are you an officer or director of the

5    corporation?

6         A.   Yes.  Owner, partner.

7         Q.   Who are your other partners?

8         A.   Brian Hurley.

9         Q.   Anyone else?

10        A.   No.

11        Q.   And the Gardner Animal Care Center, is that

12   a limited liability company?

13        A.   Yes.

14        Q.   And when was it established?

15        A.   Gardner Animal Care Center was 2000.

16        Q.   And what was the predecessor to the Gardner

17   Animal Care Center?

18        A.   Gardner Animal Hospital.

19        Q.   What type of business entity was that?

20        A.   Sole proprietorship.

21        Q.   And when was the Gardner Animal Hospital

22   established?

23        A.   I bought it -- well, it was established in

24   1984.

Page 63

1    Gardner Animal Hospital.

2         Q.   (By Mr. Lee)  Again, this was a document

3    that you produced today?

4         A.   Yes.

5         Q.   And this is a copy of the November 2004

6    Veterinary Economics magazine?

7         A.   Yes.

8         Q.   And on page 56, in the first full paragraph

9    under the heading Room to Breathe, Room to Spare, it

10   says, "Dr. McTigue planned this space in advance to

11   make room for such educational meetings.  'I visited

12   30 practices to get ideas and advice before we built,

13   says Dr. McTigue."

14              Did you, in fact, visit 30 practices prior

15   to building -- prior to building the Gardner Animal

16   Hospital -- I'm sorry -- the Gardner Animal Care

17   Center?

18        A.   Whether it was exactly 30 or close to it, I

19   don't recall, but it was close -- at least close to

20   30.

21        Q.   And when did you visit the facilities?

22        A.   From February '98 through June of '98.

23        Q.   Were any of those facilities Warren

24   Freedenfeld-designed facilities?

UNCERTIFIED ROUGH DRAFT

Page 67

```
 1            (Luncheon recess, 12:11 p.m.)

 2

 3       (Deposition resumed at 12:57 p.m.)

 4

 5            MR. LEE:  Back on the record.

 6       Q.  (By Mr. Lee)  Dr. McTigue, prior to the

 7  break, I asked you some questions about the

 8  circumstances surrounding the creation of the plans

 9  marked as Exhibit 18; do you recall that?

10       A.  Yes.

11       Q.  Now, you stated that you did -- strike that.

12            To what extent were you involved in the

13  creation of the plan marked as Exhibit 18?

14       A.  In the -- I was involved in the

15  conceptualization of these plans.  This design could

16  not have occurred obviously without the person who

17  was paying for it to give their input as to what they

18  want.

19       Q.  And what input did you provide to Warren

20  Freedenfeld?

21       A.  Lots of information as far as what we

22  wanted, the size we wanted, the services we provide;

23  therefore, the rooms we would want.

24       Q.  Okay.  And what types of services did you
```

UNCERTIFIED ROUGH DRAFT

Page 68

1    tell -- strike that.

2            Did you have a discussion with Warren

3    Freedenfeld directly about the services you wanted to

4    provide in connection with this facility?

5        A.   Yes.

6        Q.   And what services did you tell Warren

7    Freedenfeld that you wanted to provide in connection

8    with this facility?

9        A.   Medicine, surgery, ancillary services such

10   as grooming and boarding and training, a retail

11   area.

12       Q.   Anything else?

13       A.   Those are the specific services we

14   discussed.

15       Q.   Were you providing any of those other

16   services prior to -- by "you," I mean the hospital.

17           Was the hospital providing any of those

18   services prior to Warren Freedenfeld's involvement --

19       A.   Yes.

20       Q.   -- in the Gardner Animal Care Center

21   project?

22       A.   Yes.

23       Q.   And which of those were you providing at the

24   time?

Page 69

```
 1          A.   As the Gardner Animal Hospital, medicine,

 2    surgery, retail, grooming.

 3          Q.   And did you provide any boarding

 4    facilities?

 5          A.   Not in the old hospital.

 6          Q.   Was that something you wanted in the new

 7    hospital?

 8          A.   Yes.

 9          Q.   And I think you mentioned something about

10    rooms; what do you mean by that?

11          A.   Can you rephrase the question?

12          Q.   Sure.  You mentioned that you provided

13    concepts to Warren Freedenfeld; is that correct?

14          A.   Yes.

15          Q.   And part of those concepts were the services

16    you wanted to provide for the new facility,

17    correct?

18          A.   Yes.

19          Q.   And I believe you also testified that you

20    had some discussion about the rooms that would be in

21    the hospital facility?

22          A.   Yes.  The inner relationship example, I

23    wanted to have a waiting room that was very

24    stimulating from a client's point of view.  I kind of
```

UNCERTIFIED ROUGH DRAFT

Page 70

1    viewed this from a client's perspective.

2              So I wanted the waiting area to be

3    stimulating.  So I wanted things like -- I wanted

4    grooming to be visible from the waiting area.

5    Clients, they find that a fascinating thing to watch.

6              We had cat adoption, just a small program to

7    help provide cats, and I wanted people to actually

8    see the cats from the waiting area.

9              A lot of people bring their kids, so I

10   wanted there to be something from the kids to do.  So

11   we wanted a play area in the waiting room.

12        Q.   And in your review of other facilities, did

13   you see any of those concepts displayed?

14        A.   Yes.

15        Q.   And were any of those concepts displayed in

16   any of the plans that you saw that were created by

17   Warren Freedenfeld previously?

18        A.   Yes.  I don't know if any concept had all

19   three of them visible from the waiting area, but they

20   certainly were not new concepts.

21        Q.   Did you provide any other input as it

22   relates to the rooms in the new facility in terms of,

23   you know, what the rooms would be used for to Warren

24   Freedenfeld?

UNCERTIFIED ROUGH DRAFT

UNCERTIFIED ROUGH DRAFT

Page 71

```
 1        A.  I mean, we had a lot of discussion on it, so

 2   the answer is yes.  The specifics -- there is a

 3   normal flow to a vet hospital.

 4           Obviously, you have people coming into a

 5   waiting area, and they move into an outpatient area.

 6   Behind that, there's always a lab and a pharmacy, and

 7   adjacent to that, there's usually surgery and a

 8   surgery prep area and ICU.

 9           So there's a normal relationship to the

10   different areas that allow you the services.  So we

11   certainly discussed those during the concept phase.

12        Q.  Any of those services you just referenced in

13   the flow in terms of the relationship to -- strike

14   that.

15           Any of those services as it relates to the

16   inner flow of a hospital facility, did you witness

17   any of that -- of those -- that relationship at any

18   other facilities that you viewed prior to this

19   project?

20           MR. MELTZER:  Objection to form.  You can

21   answer if you understand the question.

22        A.  I don't really understand.

23           MR. MELTZER:  You are missing a verb in

24   there somewhere.
```

Page 72

1       Q.   (By Mr. Lee)   It's late in the day.   Let me

2    try to rephrase it for you.

3           You just testified that some of the concepts

4    you wanted related to certain enter relationships

5    between rooms; is that correct?

6       A.   Yes.

7       Q.   And the flow between rooms?

8       A.   Yes.

9       Q.   Okay.   And the flow would include movement

10   from the reception area to the outpatient area,

11   pharmacy, and surgery; is that correct?

12      A.   Yes.

13      Q.   And did you have a chance in your -- a

14   chance during your visits to other hospitals to see a

15   similar type of flow between rooms?

16      A.   We absolutely saw it because they all have

17   it.   Obviously every hospital has a flow, so

18   certainly that was one of the things I was interested

19   in in all these visits.

20      Q.   Do you recall if any of the floor plans that

21   you viewed that were previously created by Warren

22   Freedenfeld created those elements in terms of flow

23   and interrelationships?

24      A.   Again, every plan has flow and

Page 73

1    interrelationships.

2        Q.  I'm trying to find out the exact concepts

3    you alleged provided to Warren Freedenfeld in

4    connection with this facility.

5        A.  I'm sorry, I'm not clear on what you're

6    getting at.

7        Q.  Okay.  You testified that you had discussion

8    with Warren Freedenfeld about certain things you

9    wanted in the new facility, correct?

10        A.  Yes.

11        Q.  And a part of that was certain concepts,

12    correct?

13        A.  Yes.

14        Q.  And that would include services such as

15    medicine, surgery, retail, grooming, boarding, etc.,

16    correct?

17        A.  (Nodding.)

18        Q.  And another part of that in terms of

19    discussions of what you wanted for the new facility

20    would be the flow between rooms, correct?

21        A.  Yes.

22        Q.  Okay.  And you testified that you viewed

23    other floor plans that were created by Warren

24    Freedenfeld prior to him being retained by you in

Page 74

1    connection with this new facility at the Gardner

2    Animal Care Center?

3        A.  Yes.

4        Q.  Okay.  And based on what you saw in some of

5    Warren Freedenfeld's prior plans, did that

6    influence -- strike that.

7            Did you take elements from Warren

8    Freedenfeld's prior plans basically that wanted to

9    include into the new facility at the Gardner Animal

10   Care Center?

11           MR. MELTZER:  Objection as to form answer if

12   you understand the question.

13       A.  I mean, I took elements from so many

14   different things.  Again, I can't tell you here what

15   elements I took from looking at 200 floor plans from

16   looking at the book.

17           I mean, basically I took the elements I got

18   from all this research and in my mind formulated a

19   concept and flow I wanted to see.

20       Q.  And that would include plans that you viewed

21   that were created by Warren Freedenfeld?

22       A.  Yes.

23       Q.  These concepts that you're discussing, are

24   these concepts that you presented to Warren

Page 75

1    Freedenfeld during your meetings with him?

2         A.   I'm sure they came up in one form or another

3    during our discussions.

4         Q.   Do you recall the first time that you had a

5    meeting with Warren Freedenfeld when you discussed

6    these concepts you just referenced?

7         A.   In our first meeting we had.

8         Q.   Do you recall approximately when that was?

9         A.   I believe it was in four -- April '98.

10         Q.   And was that at Warren Freedenfeld's

11    office?

12         A.   Yes.

13         Q.   And I think you testified earlier it was

14    between you and Warren Freedenfeld?

15         A.   Yes.

16         Q.   And no one else was present, correct?

17         A.   I don't believe so.

18         Q.   What happened after you presented these

19    particular concepts you just referenced to Warren

20    Freedenfeld?

21         A.   Once he has an understanding about what  I'm

22    looking for -- size, number, shape -- then we move on

23    to the design phase.

24              So you have the programming phase.  You go

Page 76

1    through the programming phase, and once that's --

2    you're clear on what you want, the objectives, then

3    you go into the design phase.

4          Q.   Can you tell me about the design phase?

5          A.   The design phase, you take the concepts,

6    flows, the interrelationships you discussed and start

7    sketching and designing different options for your

8    floor plan.

9          Q.   And did you sketch the different options for

10   the floor plan?

11         A.   I'm sorry?

12         Q.   Who was the person who sketched the floor

13   plan for the new floor plan for the Gardner Animal

14   Care Center?

15         A.   Warren Freedenfeld and Associates.

16         Q.   And associates, okay.  People from his

17   firm?

18         A.   Yes.

19         Q.   What was your involvement in sketching those

20   plans?

21              MR. MELTZER:  Objection.  Garrett, you've

22   gone as far as he's going.  I'm instructing him not

23   to answer any more questions about his involvement in

24   the joint authorship of these plans.

Page 79

1    counterclaim, that's what he's not doing.  He's not

2    answering that last question.  Move on.

3                MR. LEE:  Fine.  I'm going to move on.

4        Q.  (By Mr. Lee)  Is it your testimony that the

5    document marked as Exhibit 18 -- strike that.

6                Did you physically design any of the

7    elements contained in Exhibit 18?

8                MR. MELTZER:  Instruct him not to answer,

9    that's getting into the counterclaim.

10               MR. LEE:  Let's move on then.

11       Q.  (By Mr. Lee)  What happened after the design

12   phase?

13       A.  We didn't get through the design phase.

14       Q.  Why didn't you get through the design

15   phase?

16       A.  Because I terminated him.

17       Q.  And why did you terminate him Warren

18   Freedenfeld?

19       A.  Failure to perform.

20       Q.  And why do you allege that he failed to

21   perform?

22       A.  We needed to redesign the facility to lower

23   the estimated cost of the project which was over

24   budget, and he did not -- we asked for different

UNCERTIFIED ROUGH DRAFT

Page 113

1      Q.   Was there any discussions about --

2   discussion about any of the plans or designs that had

3   been previously created before the redesign?

4      A.   Yes.

5      Q.   What was the substance of the discussions?

6      A.   I think the first point was that we could

7   not use the exact drawings that were developed, that

8   we needed to develop new plans, redesign this, and

9   then move forward and price it out.

10     Q.   Why did you feel that you couldn't use the

11   exact drawings that were created in the redesign?

12          MR. MELTZER:   Objection as to form.  The

13   fact that was the basis of the termination -- I'm

14   sorry -- what are you asking?

15     A.   Could you rephrase the question?

16     Q.   Sure.  Why did you feel that you couldn't

17   use the exact designs that were previously created in

18   the redesign?

19          MR. MELTZER:   Objection as to form.  I don't

20   think that's what he testified to.  If you understand

21   the question, you can answer it.

22     A.   Yes.  I didn't want these plans.  These

23   plans were not -- I never accepted these plans.

24   These plans were not acceptable, and I needed -- they

UNCERTIFIED ROUGH DRAFT

Page 114

1    needed to be redesigned to move forward with this

2    project.

3         Q.  But the plans that you're referring to,

4    those plans created by Warren Freedenfeld &

5    Associates?

6              MR. MELTZER:  Objection.  I'm going to

7    instruct him not to answer if you use that phrase,

8    Garrett.  If you want to ask him the questions, stop

9    using that phrase.  You're getting to the

10   counterclaim.

11             MR. LEE:  I'll rephrase the question,

12   okay.

13        Q.  (By Mr. Lee)  Again, what was the reason why

14   you felt that you could not use the plans that were

15   previously created for the redesign?

16        A.  These plans were not in their final form.

17   These plans -- even while I was with Warren

18   Freedenfeld, this design phase was never signed off

19   on.  They were never completed.

20             These plans had to be redeveloped for us to

21   go forward with them; so they were not in the form

22   that they were left.  They were not acceptable.

23        Q.  Any other reason why you felt that you could

24   use not the plans that were previously created in the

Page 115

1   redesign of the project?

2          A.   I knew we could not use an exact copy of

3   those plans.

4          Q.   Did you believe that you could use certain

5   elements of those plans that were previously created

6   in the -- for the redesign of the project?

7          A.   Yes.

8          Q.   And what elements did you feel that you

9   could use in the redesign?

10         A.   All of them.

11         Q.   Did you, in fact, use all the elements in

12   the redesign of the project?

13         A.   No.

14         Q.   Again, which elements did you not use?

15         A.   Elements of detail.

16         Q.   Such as?

17         A.   We used -- we made new plans.  We did not

18   use the same plans.

19         Q.   But you did use certain elements from the

20   previously created plans in connection with the

21   redesign of the project, correct?

22         A.   Correct.

23         Q.   And part of that was the interrelationship

24   between the different rooms; is that correct?

UNCERTIFIED ROUGH DRAFT

Page 116

1        A.    Correct.

2        Q.    At that meeting did you have any discussion

3    with Edward Cormier about Warren

4    Freedenfeld -- strike that -- about the plans that

5    had previously been created?

6        A.    Yes.

7        Q.    And do you recall the substance of that

8    discussion?

9        A.    That we needed to redesign those plans and

10    make -- redesign them, redevelop them in an

11    acceptable format, both in what I wanted and what we

12    could afford.

13        Q.    And what did Edward Cormier say to you, if

14    anything?

15        A.    He agreed and said, Let's do it.

16        Q.    Did you provide Edward Cormier with a copy

17    of the plans that had previously been created in

18    connection -- during that meeting?

19        A.    Yes.

20        Q.    Were those the plans that were -- strike

21    that.

22            Were those the plans that are shown in

23    Exhibit 18.

24        A.    Yes.

UNCERTIFIED ROUGH DRAFT

Page 124

1        A.   We changed quite a bit.

2        Q.   Such as?

3        A.   We changed the area reception desk.  We

4    changed the receiving area.  We changed hugely this

5    grooming room.

6             There is no fireplace.  There is no work

7    station, traffic flow, doors.  It's a -- we changed

8    quite a bit of it.

9        Q.   I think you had previously testified that

10   you wanted to include a fireplace in the prior

11   design?

12       A.   I don't know if I testified to that, but it

13   was in the initial designs, yes.

14       Q.   And why did you want to take it out in the

15   redesign?

16       A.   It didn't work.

17       Q.   Did you want to include in the redesign a

18   feline exam room?

19       A.   Yes.

20       Q.   Essentially the same as it is depicted in

21   the first floor plan that we marked before as Exhibit

22   35?

23       A.   No.

24       Q.   What did you want to change about it?

UNCERTIFIED ROUGH DRAFT

Page 125

1      A.   It's location.

2      Q.   Did you, in fact, change the location?

3      A.   Yes.

4      Q.   And where is it?

5      A.   It's not on -- well, you have to show me a

6  plan.  It's over here in the new plans.

7      Q.   Over to the right?

8      A.   Yes.

9      Q.   I'm going to show you another document.  We

10 have to spread out quite a bit here.

11     A.   You need smaller plans.

12     Q.   I do have smaller versions.  We've already

13 marked these.  I can if you prefer.

14     A.   It just would be a lot easier to have two

15 8-by-11s if you want to compare the two of them.

16     Q.   Let's do that, okay.  If it's easier for

17 you, then that's what we'll do.

18          Who created the plan that's -- let's focus

19 on the Veterinary Economics article and use that

20 instead.  If you have the version of that, that's

21 great.

22          Looking at page 53 of the November 2004

23 Veterinary Economics article previously marked as

24 Exhibit 33, you are comparing it to the document

Page 140

1          A.    No.

2          Q.    Have you had any communications with

3    Veterinary Economics since the publication of the

4    article?

5          A.    No.   Other than they took my money for

6    subscriptions.

7          Q.    I believe in the Veterinary Economics,

8    there's a reference to a merit award?

9          A.    Yes.

10         Q.    Is that correct?

11         A.    Yes.

12         Q.    Did the redesign receive a merit award?

13         A.    Yes.

14         Q.    And when was that awarded?

15         A.    November of 2004.   It was awarded in --

16   actually, December '03 they picked the award, but I

17   believe I found out about the award in December

18   of '03 to be published sometime in '04.

19         Q.    By "they," who are you referring to?

20         A.    Veterinary Economics, the design contest

21   board.

22         Q.    Did you have to send in a separate

23   submission to the Veterinary Economics in connection

24   with being considered for the merit award?

UNCERTIFIED ROUGH DRAFT

Page 141

1      A.   It wasn't a separate one.   It was the only

2   one.

3      Q.   Have you ever displayed the November 2004

4   Veterinary Economics magazine article at the Gardner

5   Animal Care facility?

6      A.   Parts of it, yes.

7      Q.   Where did you display it?

8      A.   On the reception desk.

9      Q.   And when did you make the articles available

10  on the reception desk?

11     A.   Sometime in '05.

12     Q.   Did you ever send a copy of the article to

13  any of the Gardner Animal Hospital's clients or

14  prospective clients?

15     A.   I don't believe I sent it to any clients.

16     Q.   Did you ever send the article to anyone?

17     A.   I sent copies of it to the banker.   I

18  believe I sent copies of it to Dan McCarty, Walter

19  Bennett, Ed Cormier.   There may have been other

20  people I sent it to, but they come to mind.

21     Q.   Does the hospital do any advertising?

22     A.   Yes.

23     Q.   And exactly what does the hospital do for

24  advertising?

1    project?

2          A.   I'm sorry?

3          Q.   Did you enter into a written agreement with

4    Bennett Building Corporation in connection with the

5    redesign of the project?

6          A.   I don't recall if we had a written contract.

7    I don't remember seeing one or I don't remember

8    signing one.

9               MR. LEE:   Let's mark this as the next

10   exhibit.

11   (Exhibit No. 38, Abbreviated Form of

12                     Agreement Between Owner and

13                     Contractor, 9/1/99; so marked.)

14         Q.   (By Mr. Lee)  Dr. McTigue, I am putting

15   before you a document marked Exhibit 38 entitled

16   Abbreviated Form of Agreement Between Owner and

17   Contractor; would you take a look at that?

18         A.   (Witness complies.)

19         Q.   Do you recognize that document?

20         A.   Yes.

21         Q.   If you turn to the second to the last

22   page -- actually, the third to the last page, is that

23   your signature that appears on the document?

24         A.   Yes.

UNCERTIFIED ROUGH DRAFT

Page 163

1          Q.   Was this the agreement that you had with

2     Bennett Building Corporation in connection with the

3     construction of the facility?

4          A.   He signed it as the contractor, yes.

5          Q.   Does this refresh your recollection as to

6     whether there was a written agreement between Gardner

7     Animal Care Center and Bennett Building Corporation

8     in connection with the redesign -- I'm sorry -- in

9     connection with the construction of the project?

10         A.   Yes.

11         Q.   Okay.  Do you recall how much Ed Cormier --

12    Edward D. Cormier & Associates, Inc. was paid in

13    connection with the services they provided to the

14    Gardner Animal Care Center?

15         A.   The total was in the $45,000 range.

16         Q.   Do you recall what the total construction

17    cost was for the Gardner Animal Care Center?

18         A.   $1.1 million, although I can tell you

19    exactly if you I refer to something.

20         Q.   If there are documents that would refresh

21    your recollection, please feel free to look at the

22    documents that you previously produced if they are

23    exhibits in the case?

24         A.   The construction cost was $1.04 million.

Page 169

1          MR. MELTZER:  Objection as to form.  Answer

2     if you understand the question.

3          A.  No.

4          Q.  Did you have any discussion with Edward

5     Cormier about reducing the company's fee?

6          A.  I don't recall.  I don't recall any

7     discussions about reducing his fee.

8          Q.  Did you tell Edward Cormier that he had a

9     right to use the plans that were previously prepared

10     for the project?

11          A.  Can you rephrase that?

12          Q.  Sure.  You testified earlier that you gave

13     the plans that have been previously prepared for the

14     project to Edward Cormier at this June 1999 meeting,

15     correct?

16          A.  Yes.

17          Q.  During that meeting or anytime thereafter,

18     did you tell Edward Cormier that he had a right to

19     use the prior plans?

20          MR. MELTZER:  Objection as to form.  Answer

21     if you understand it.

22          A.  He had the right to use the information in

23     that plan.

24          Q.  The elements of the plan?

UNCERTIFIED ROUGH DRAFT

Page 170

1       A.   Information in that plan.

2       Q.   The prior plan, correct?

3       A.   Correct.

4       Q.   Did you have a specific discussion with

5    Edward Cormier about this issue?

6       A.   Yes.

7       Q.   When did that discussion take place?

8       A.   The first meeting in Dan McCarty's office,

9    in June of '99.

10       Q.   And what do you recall specifically about

11   that discussion?

12       A.   I recall specifically, as we already went

13   through, this note, that I had asked him if he would

14   agree that we had signed an AIA contract and he

15   needed to be comfortable with the fact that I had

16   signed that with the previous architect, and we

17   needed to move forward and redesign new plans.

18       Q.   But did you tell him he could use the design

19   that was previously created --

20           MR. MELTZER:  Objection as to form.

21       Q.   -- for the project?

22           MR. MELTZER:  It's been asked and answered

23   half a dozen times.  You can answer if you understand

24   the question.

UNCERTIFIED ROUGH DRAFT

UNCERTIFIED ROUGH DRAFT

Page 171

1          A.   No.  We needed and I wanted to redesign

2     these plans.

3          Q.   Did you tell him that he could use elements

4     of the prior plans?

5          A.   Information in those plans, yes.

6              MR. LEE:  I'm almost finished.  I just need

7     to take a three-minute break.

8              (Off the record, 3:53-4:00 p.m.)

9              MR. LEE:  Back on the record.

10         Q.   (By Mr. Lee)  In connection with the

11    publication of the Veterinary Economics article, did

12    you receive any referrals from other veterinarians,

13    client referrals?

14         A.   As a result of the article?

15         Q.   Yes.

16         A.   No.

17         Q.   Do you recall having any discussions with

18    any other veterinarians about the article itself or

19    the Design Merit Award?

20         A.   I've had a couple veterinarians come through

21    to look at the animal hospital, whether or not it was

22    a result of -- I don't think it was a result of the

23    article.

24              I think it was a result of our Webster rep

UNCERTIFIED ROUGH DRAFT

Page 176

1    had with Dr. Feisha or the doctor in Peterborough,

2    New Hampshire, did you inform them that the facility,

3    your facility, the Gardner Animal Care Center, was

4    designed by Edward Cormier?

5         A.  I don't know if that ever came up.

6         Q.  Okay.  Do you know whether the facility that

7    was built for the doctor from Peterborough, New

8    Hampshire whether that facility appeared in

9    Veterinary Economics magazine?

10        A.  No, it hasn't.

11        Q.  Do you know whether the floor plan ever

12   appeared in any Veterinary Economics publication?

13        A.  I don't think so.

14        MR. LEE:  That's all I have.

15        MR. ROSENBERG:  I have some questions.  I

16   know the witness has a meeting in another part of

17   Massachusetts at 6:30.  Why don't we take a few

18   minutes and see how far we can get and suspend if

19   need be?

20        MR. LEE:  Sure.

21

22   EXAMINATION BY

23   MR. ROSENBERG:

24        Q.  You testified earlier that you had told

Page 178

1          Q.  And if you provided it to -- well, to the

2     best of your recollection, did you provide it to

3     Warren Freedenfeld & Associates?

4          A.  I don't recall.

5          Q.  Okay.  Thank you.  Now, you had testified

6     that you told Cormier he had the right to use the

7     information in the plan -- I'll refer to as the

8     Warren Freedenfeld plan for these purposes -- is that

9     right?

10         A.  Yes.

11         Q.  Now, why did you believe Cormier had the

12    right to do that?

13         A.  Because of our Termination Agreement.

14         Q.  Now, did you have only one meeting with

15    Cormier in which you looked at the Freedenfeld plans

16    with him?

17         A.  I don't know.  I don't recall how many

18    meetings we had where the plans actually came up.

19              I know they were brought up in the first

20    meeting.  I don't remember subsequent meetings.  I

21    honestly never -- it's kind of a fog for me, years

22    ago, as to what the specifics of these meetings were,

23    so...

24         Q.  Do you recall going over the actual Warren

UNCERTIFIED ROUGH DRAFT

Page 179

1    Freedenfeld plans with Cormier?

2         A.  Yes.

3         Q.  Did you go over the plans and discuss with

4    Cormier specific elements that you wanted used or how

5    did you make use of the plans in those meetings?

6         A.  I used it as a template to kind of show him

7    the kind of flow and rooms and structure that I was

8    interested in.

9              So I used it as a kind of a framework that

10   we could then work from to develop and redesign the

11   plans.

12        Q.  Did you point out to Cormier at that time

13   things you didn't like by the plan or wanted changed

14   in the plan?

15        A.  Yes.

16        Q.  The information you were pointing out to

17   Cormier about the elements, is that information

18   that -- it was your understanding under the

19   Termination Agreement you could make use of?

20        A.  Yes.

21        Q.  And that information that you are referring

22   to, had you developed that on your own before you met

23   with Warren Freedenfeld for the first time on this

24   project?

1        A.   I certainly had concepts, and I knew what I

2    wanted.   I was -- I had done enough research and

3    visits to know what I wanted in an animal hospital.

4            I knew the flow.   I knew the rooms.   I knew

5    the interrelationship, what the clients saw, what

6    worked with us.   I owned my own practice for a while

7    and worked in several others, so I knew what I

8    wanted.

9        Q.   And what was the source -- how did you learn

10   these concepts of what you wanted?

11       A.   Through the -- looking at Veterinary

12   Economics award-winning hospitals, from my visits to

13   other hospitals throughout New England, from that

14   Veterinary Economics floor plan book that I bought.

15       Q.   And some of those sources were not Warren

16   Freedenfeld-designed hospitals; is that right?

17       A.   Most of them were not.

18       Q.   Well, when you were working with Warren

19   Freedenfeld & Associates before they were terminated,

20   did you explain that information, those concepts that

21   you talked about, to Warren Freedenfeld & Associates

22   in explaining what you wanted in the hospital?

23       A.   Yes.

24       Q.   Were there any aspects of the plan that were

Page 181

1    always fixed in terms of the Town's requirements for

2    the project?

3         A.   Yes.   We had -- because we were putting the

4    hospital in a water protection district, the City had

5    very specifically wanted us to build within the

6    footprint of the preexisting building so we did not

7    increase the surface area which would affect the

8    water shed.

9              So the Town dictated to us the size and the

10   shape of the layout of this hospital.

11        Q.   When you say "the size and the shape," did

12   the Town requirements include the footprint?

13        A.   Yes.   The footprint was determined by the

14   previous building.   It had a barn and a breezeway

15   which we demolished to make room for this, and we had

16   to incorporate that footprint into this site, into

17   this building.

18        Q.   What about visually in terms of how it

19   appeared to the street, were there any requirements

20   that the Town dictated?

21        A.   Because it was not a registered historic

22   house, they didn't say you have to have a

23   historic-looking, you know, building.   So how it

24   looked, the Town didn't really tell us how it

Page 182

1    looked.

2         Q.   Okay.  You were talking about having made

3    your submission to the Veterinary Economics magazine

4    and putting those materials together.

5         In the Veterinary Economics article there's

6    an actual floor plan that's published; is that right?

7         A.   Yes.

8         Q.   Did you submit that actual floor plan to

9    Veterinary Economics magazine?

10        A.   Yes.

11        Q.   The actual floor plan that you submitted,

12   where did you get it?

13        A.   From Edward Cormier.

14        Q.   Did he produce it for you specifically for

15   this submission or was it a preexisting plan from

16   when the project was being built?

17        A.   It was a pre -- it was a preexisting plan,

18   but he, for example, made different writing on it

19   because we didn't want lines showing up, the

20   architectural drawing lines showing up on the

21   submission.

22        So he ran the plans through and made them

23   what I would call a cleaner version, a version which

24   just showed the design without, you know, the length

UNCERTIFIED ROUGH DRAFT

Page 183

1    and the lines going -- the architect lines going

2    through it that shows the depth and the length and

3    the height and all that.

4        Q.   Did you ask him to do that?

5        A.   Yes.

6        Q.   Did he then come back to you and deliver the

7    completed plans for you to submit?

8        A.   Yes.

9        Q.   If you can locate Exhibit 34, that's your

10   July 30, 1999 letter to you from Michael (sic) Cimino

11   from Warren Freedenfeld & Associates?

12       A.   34?

13       Q.   Yes.  I believe you had testified that on

14   page 2 Mr. Cimino had written that you can't use the

15   plans and the drawings, and they're the property of

16   Warren Freedenfeld & Associates; is that a fair

17   statement?

18       A.   Yes.

19       Q.   Did you respond to this letter?

20       A.   Yes.

21       Q.   In responding to Warren Freedenfeld &

22   Associates about this letter, did you address this

23   question of whether or not you could use the plans?

24       A.   Yes.

Page 188

1                    C E R T I F I C A T E

2

3    COMMONWEALTH OF MASSACHUSETTS

4    COUNTY OF NORFOLK, ss.

5

6            I, Carol A. Jackson, a Registered

7    Professional Reporter and Notary Public in and for

8    the Commonwealth of Massachusetts, do hereby certify

9    that the foregoing transcript of the deposition of

10   MICHAEL P. MCTIGUE, having been duly sworn, on

11   TUESDAY, JANUARY 23, 2007, is true and accurate to

12   the best of my knowledge, skill and ability.

13            IN WITNESS WHEREOF, I have hereunto set my

14   hand and seal this  day of    , 2007.

15

16

17            _____

                 Carol A. Jackson, RPR
18               Notary Public
                 My commission expires:
19               October 27, 2011

20

21

22

23

24

UNCERTIFIED ROUGH DRAFT

Page 189

1                    ERRATA SHEET

2    ATTACH TO THE DEPOSITION OF MICHAEL P. MCTIGUE,
     JANUARY 23, 2007, WARREN FREEDENFELD ASSOCIATES, INC.
3    v. MICHAEL P. MCTIGUE, DVM, et al.

4

     PAGE        LINE     CHANGE              REASON
5

6    _____|_____|_____|_____  _____

7    _____|_____|_____|_____  _____

8    _____|_____|_____|_____

9    _____|_____|_____|_____

10   _____|_____|_____|_____

11   _____|_____|_____|_____

12   _____|_____|_____|_____

13   _____|_____|_____|_____

14   _____|_____|_____|_____

15   _____|_____|_____|_____

16   _____|_____|_____|_____

17   _____|_____|_____|_____

18   _____|_____|_____|_____

19   _____|_____|_____|_____

20

            I have read the foregoing transcript of my
21   deposition and except for any corrections or changes
     noted above, I hereby subscribe to the transcript as
22   an accurate record of the statements made by me.

23

24   _____
         MICHAEL P. MCTIGUE      Date

**EXHIBIT C**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WARREN FREEDENFELD ASSOCIATES, INC.,
as successor in interest to
Warren Freedenfeld & Associates, Inc.,
                              **Plaintiff**

v.

MICHAEL P. MCTIGUE, DVM, individually
and as Trustee of the McTigue Family Trust,
NANCY A. MCTIGUE, as Trustee
of the McTigue Family Trust,
BRIAN C. HURLEY, DVM,
GARDNER ANIMAL CARE CENTER, LLC
d/b/a Gardner Animal Hospital,
EDWARD D. CORMIER ASSOCIATES, INC.,
and
BENNETT BUILDING CORPORATION,
                              **Defendants**

CIVIL ACTION NO.:

05 11573 RGS

ANSWER AND COUNTERCLAIM
OF DEFENDANT EDWARD D. CORMIER ASSOCIATES, INC.

1.    The first sentence of this paragraph states a conclusion of law as to which no
response is required.  To the extent that sentence may be construed as requiring
an answer from this defendant, all such allegations are denied.  The defendant
denies the allegations contained in the second sentence of this paragraph.

2.    The defendant admits only that Warren Freedenfeld Associates, Inc. is the plaintiff.
The defendant is otherwise without sufficient information to enable it to either admit
or deny the remaining allegations contained in this paragraph.

22.    The defendant states only that the exhibit referenced in this paragraph speaks for itself, and states that it is otherwise without sufficient information to enable it to either admit or deny the allegations contained in this paragraph.

23.    The defendant states only that the exhibit referenced in this paragraph speaks for itself, and states that it is otherwise without sufficient information to enable it to either admit or deny the allegations contained in this paragraph.

24.    The defendant states only that the exhibit referenced in this paragraph speaks for itself, and denies the characterization of that exhibit alleged by the plaintiff in this paragraph.  Further responding, the defendant and states that it is without sufficient information to enable it to either admit or deny the remaining allegations contained in this paragraph.

25.    Upon information and belief, the defendant denies the allegations of this paragraph.

26.    The defendant admits only that it was retained as the architect on the project to construct the veterinary hospital and that Bennett was retained to construct the project, but is otherwise without sufficient information to enable it to either admit or deny the remaining allegations in this paragraph.

27.    This defendant denies all allegations in this paragraph directed at it.

28.    This defendant denies all allegations in this paragraph directed at it.

29.    The defendant denies the allegations of copying contained in this paragraph and any other allegations contained in the paragraph that are directed against it, but further responding, states that it is without sufficient information to enable it to either admit or deny the remaining allegations contained in this paragraph.

30.    The defendant is without sufficient information to enable it to either admit or deny the allegations contained in the first three sentences of this paragraph.  Further answering, the defendant, upon information and belief, admits that the design won

- 4 -

a merit award in the 2004 Veterinary Hospital Design Competition, that the article was titled "Giving an Old House a Cutting-Edge Extension," that the article identified Michael McTigue and Brian Hurley as the owner and the defendant as the architect. The defendant denies all remaining allegations in this paragraph.

31.     The defendant denies the allegations contained in this paragraph that are directed against it.

32.     The defendant denies the allegations in this paragraph that are directed against it.

33-64.  The court has dismissed all counts in the complaint that contain these paragraphs, and as such no answer is required.  To the extent that the complaint and the court's order might be construed as requiring an answer to one or more of these paragraphs, all allegations contained in them that are directed at this defendant are denied.

65.     The defendant incorporates and restates as though fully set forth herein its answers to paragraphs 1 - 64 above.

66.     The defendant denies the allegations contained in this paragraph.

67.     The defendant denies the allegations contained in this paragraph.


## Defendant's Prayer for Judgment

The defendant denies that the plaintiff is entitled to any of the relief requested.


## First Affirmative Defense

The Complaint fails to state a claim against this defendant upon which relief can be granted.

## COUNTERCLAIM

### Count I - *Breach of Contract*

1.    The "Termination and Mutual Release Agreement" between Gardner Animal Hospital and Warren Freedenfeld & Associates, Inc. attached as Exhibit H to the plaintiff's Complaint, is a binding contractual agreement.

2.    The defendant and plaintiff-in-counterclaim, Edward D. Cormier Associates, Inc. ("Cormier") is a third-party beneficiary to that contract.

3.    The plaintiff's institution of the instant lawsuit is a breach of its contractual obligations.

4.    Cormier has been damaged by the plaintiff's breach of these contractual obligations.

**WHEREFORE**, Cormier prays for judgment against the plaintiff as follows:

A.    For all damages arising out of the breach of contract;

B.    For costs and attorney's fees;

C.    For such other relief as the court deems just and proper.

### JURY DEMAND

The defendant demands a trial by jury as to all issues so triable.

Edward D. Cormier Associates, Inc.
by its attorneys,

*/s/ Stephen D. Rosenberg*

Stephen D. Rosenberg
THE MCCORMACK FIRM, LLC
One International Place - 7th Floor
Boston, MA    02110
Ph:    617•951•2929
Fax:    617•951•2672

78189.1

- 7 -

# CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing *Answer and Counterclaim of Defendant, Edward D. Cormier Associates, Inc.* upon all counsel of record, via electronic transmittal, to:

Barry S. Scheer, Esq.
**Parker Sheer, LLP**
One Constitution Center
Boston, MA    02129

Robert D. City, Esq.
Michael J. Dissette, Esq.
**City, Hayes & Dissette, PC**
50 Congress Street
Boston, MA    02109

Robert N. Meltzer, Esq.
P.O. Box 1459
Framingham, MA   01701

Mary C. Casey, Esq.
**Harbor Law Group**
385 South Street
Shrewsbury, MA    01545

**DATED** this 23rd day of February, 2006.

/s/ *Stephen D. Rosenberg*

_____
Stephen D. Rosenberg

- 8 -

**EXHIBIT D**

Page 1

VOLUME: I

PAGES: 1-183

EXHIBITS: 1-14

CERTIFIED ORIGINAL
LEGALINK BOSTON

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

WARREN FREEDENFELD ASSOCIATES, INC., as

successor in interest to Warren Freedenfeld

& Associates, Inc.,

             Plaintiff,      C.A. No.

    v.                 05-11573 RGS

MICHAEL P. McTIGUE, DVM, individually

And as Trustee of the McTigue Family

Trust, NANCY A. McTIGUE, as Trustee of

The McTigue Family Trust, BRIAN C. HURLEY,

DVM, GARDNER ANIMAL CARE CENTER, LLC d/b/a

Gardner Animal Hospital, EDWARD A. CORMIER

ASSOCIATES, INC., and BENNETT BUILDING

CORPORATION,

             Defendants.

- - - - - - - - - - - - - - - - - - x

(Caption Continued on Page 2)

      DEPOSITION of WARREN C. FREEDENFELD

         December 28, 2006

Page 2

1    - - - - - - - - - - - - - - - - x

2    MICHAEL P. McTIGUE, DVM,

3                      Counter-Plaintiff,

4    V.

5    WARREN FREEDENFELD ASSOCIATES, INC., as

6    successor in interest to Warren Freedenfeld

7    & Associates, Inc.,

8                      Counter-Defendant.

9    - - - - - - - - - - - - - - - - x

10

11              DEPOSITION of WARREN C. FREEDENFELD

12                   December 28, 2006

13                       9:07 a.m.

14            City, Hayes & Dissette, P.C.

15                 50 Congress Street

16               Boston, Massachusetts

17

18        Reporter: Michael D. O'Connor, RPR

19

20

21

22

23

24

Page 5

1                          I N D E X

2    Deposition of:        Direct  Cross  Redirect  Recross

3    WARREN C. FREEDENFELD

4    By Mr. Rosenberg        9                 180

5    By Mr. Meltzer                 108

6    By Mr. Dissette                173

7    By Mr. McCall                  178

8

9                        E X H I B I T S

10   No.                                           Page

11   1    Renotice of Taking Deposition of Warren

12        Freedenfeld Associates, Inc.            13

13   2A   Gardner Animal Care Center plan labeled

14        "Basement Plan"                         14

15   2B   Gardner Animal Care Center first floor

16        plan                                    14

17   2C   Gardner Animal Care Center roof plan    14

18   2D   Gardner Animal Care Center exterior

19        elevations                              14

20   2E   Gardner Animal Care Center exterior

21        elevations                              14

22   2F   Gardner Animal Care Center building

23        sections                                14

24

Page 6

1                E X H I B I T S (Cont'd)

2    No.                                              Page

3    2G   Gardner Animal Care Center fitness

4         schedule                                     14

5    3A-W Collection of plans labeled as Cormier

6         026 through Cormier 048                      19

7    4    Document entitled "Veterinary Economics"     56

8    5    Transmittal to Michael P. McTigue from

9         Warren Freedenfeld, dated 6/22/99            84

10   6    Letter to Warren Freedenfeld & Associates

11        from Michael P. McTigue, undated             88

12   7    Letter to Michael P. McTigue from Charles

13        Cimino, dated 7/29/99                        89

14   8    Letter to Warren Freedenfeld Associates,

15        Inc. from Michael P. McTigue, undated        95

16   9    Letter to Warren Freedenfeld Associates

17        from Michael P. McTigue, undated             96

18   10   Document entitled, "Termination and

19        Mutual Release Agreement Between Gardner

20        Animal Hospital and Warren Freedenfeld &

21        Associates, Inc."                            99

22

23

24

Page 7

1                    E X H I B I T S  (Cont'd)

2     No.                                              Page

3     11    Document entitled "Termination and Mutual

4           Release Agreement Between Gardner Animal

5           Hospital and Warren Freedenfeld &

6           Associates, Inc."                          106

7     12    Document entitled, "Plaintiff's Supplemental

8           Answers to the Interrogatories of the

9           Defendant, Edward D. Cormier Associates,

10          Inc."                                      145

11    13    Document entitled, "Commercial Lease

12          Between McTigue Family Trust and Gardner

13          Animal Care Center, LLC"                   154

14    14    Declaration of Trust                       155

15

16

17       (Mr. Rosenberg has retained the original exhibits)

18

19

20

21

22

23

24

**Warren C. Freedenfeld**                              12/28/2006

Page 8

```
 1                    P R O C E E D I N G S

 2

 3                    WARREN C. FREEDENFELD

 4

 5    having been satisfactorily identified by the

 6    production of his driver's license, and duly sworn

 7    by the Notary Public, was examined and testified as

 8    follows:

 9

10            MR. ROSENBERG:  Usual stipulations?

11            MR. McCALL:  Why don't you state them for

12    the record so it's clear.

13            MR. ROSENBERG:  All objections, except as

14    to form, and motions to strike reserved until the

15    time of trial.  Do you want the client to read and

16    sign?

17            MR. McCALL:  Yes, I would like him to have

18    an opportunity to read and sign.  We'll waive

19    notarization.

20            MR. ROSENBERG:  Okay.  Is 30 days enough?

21            MR. McCALL:  I believe so.

22            MR. ROSENBERG:  Okay.  If it's not read and

23    signed within 30 days of receipt, we'll deem the

24    requirement of the signature waived.
```

Page 14

1       Q.    Are you here to testify on behalf of Warren

2   Freedenfeld Associates in this case?

3       A.    Yes, I am.

4             (Documents marked as Exhibits 2A through 2G

5             for identification)

6             MR. ROSENBERG:    Exhibit 2A is a Gardner

7   Animal Care Center plan labeled "Basement Plan," and

8   at the bottom is the identifier Cormier 019.

9             Exhibit 2B is Gardner Animal Care Center

10  first floor plan, and at the bottom is the

11  identifier Cormier 020.

12            Exhibit 2C is Gardner Animal Care Center

13  roof plan, and the identifier at the bottom is

14  Cormier 021.

15            Exhibit 2D is Gardner Animal Care Center

16  exterior elevations labeled at the bottom Cormier

17  022.

18            Exhibit 2E is Gardner Animal Care Center

19  exterior elevations, labeled at the bottom Cormier

20  023.

21            Exhibit 2F is Gardner Animal Care Center

22  building sections, and the identifier at the bottom

23  is Cormier 024.

24            Exhibit 2G is Gardner Animal Care Center

Page 15

1    fitness schedule, labeled at the bottom Cormier 025.

2        Q.   Mr. Freedenfeld, I'm showing you what's

3    been labeled as Exhibits 2A to 2G.  Can you identify

4    these for me, please?

5        A.   As a group or individually?

6        Q.   Do you recognize them.

7        A.   Yes, I do.

8        Q.   Tell me what they are?

9        A.   These are the initial construction

10   documents for the Gardner Animal Care Center in

11   Gardner, Massachusetts.

12       Q.   Were these prepared by you or your office?

13       A.   Yes.

14       Q.   Who prepared these actually within the

15   office?

16       A.   I believe Chris Hanlon.

17       Q.   Chris Hanlon was a employee of Warren

18   Freedenfeld Associates?

19       A.   He was at that time.

20       Q.   Is he still?

21       A.   No, he is not.

22       Q.   When did he leave your firm?

23       A.   I don't remember.

24       Q.   Now, with regard to the drafting of these

Warren C. Freedenfeld                              12/28/2006

Page 16

1   plans, was anyone else at your firm involved in

2   drafting the plans?

3       A.   It's possible.  Chris, I believe, was the

4   project manager at the time, and he might have had

5   other draftsmen helping him.

6       Q.   What would your involvement have been in

7   the preparation of these plans?

8       A.   I primarily -- my largest involvement is

9   with the schematic design, and then on a day-to-day

10  basis would review the production of the drawings,

11  correct errors or make changes as they developed.

12      Q.   On the first plan, Exhibit 2A, there are

13  various handwritten notes across it.  Is that your

14  handwriting or Chris' handwriting?

15           MR. McCALL:  Objection.

16           THE WITNESS:  Should I answer?

17           MR. McCALL:  Unless I instruct you not to

18  answer, you're to answer the question.

19      Q.   Is any of the handwriting on this document

20  your handwriting?

21      A.   No, it's not my handwriting.

22      Q.   Okay.  Do you recognize any of it as Chris

23  Hanlon's handwriting?

24      A.   I don't believe so.

Warren C. Freedenfeld                               12/28/2006

Page 21

1    this copies from?

2        A.    Your Exhibit 2B.

3        Q.    And just to be clear, it's your testimony

4    that Exhibit 2B, prepared by Warren Freedenfeld

5    Associates, and Exhibit 3B, the plans of Edward

6    Cormier Associates, are not exactly identical?

7        A.    Well, first of all, 2B is a full plan, and

8    3B is a partial plan.

9        Q.    Are all the drawings in 3B taken verbatim

10    and exactly from document 2B?

11            MR. McCALL:  Objection.

12        A.    Restate your question, please.

13        Q.    Sure.  Are all the drawings and contents of

14    Exhibit 3B taken verbatim from one or more of the

15    plans prepared by Warren Freedenfeld Associates?

16            MR. McCALL:  Objection.

17        A.    The partial plan on 3B is taken from 2B,

18    and there is a building section that is somewhat

19    similar to 2F or part of 2F.

20        Q.    Okay.  Let's go in order.  Let's go with

21    the first section you were referring to.  How did

22    you describe that; the partial plan?

23        A.    The partial plan, yes.

24        Q.    When you were talking about the partial

Warren C. Freedenfeld                                    12/28/2006

Page 22

1    plan in Exhibit 3B, am I correct that you were

2    talking about the section of Exhibit 3B that shows

3    the interior of the building and is written over the

4    top of the identifier "Part Plan One-Eighth Inch

5    Equals 1.-0?

6        A.    Correct.

7        Q.    Is that partial plan exactly identical to

8    any of the contents of Exhibit 2B prepared by Warren

9    Freedenfeld Associates?

10            MR. McCALL:   Objection.

11       A.    It is not 100 percent identical.   There are

12   areas of deviation.

13       Q.    Could you identify the areas of deviation

14   for me?

15       A.    The grooming room has been relocated.   The

16   reception desk has been slightly reconfigured.   The

17   waiting area seating has been reconfigured.   The

18   access corridor between the inpatient and outpatient

19   areas has been moved.   The adoption room has been

20   moved, and the children's play area has been moved.

21   Everything else is -- oh, and the fireplace has been

22   replaced with another exam room.

23       Q.    Okay.   The parts of this part plan that

24   you've just identified as being different in the

Warren C. Freedenfeld                           12/28/2006

Page 23

1   part plan than the one of Warren Freedenfeld

2   Associates?

3       A.   Yes.

4       Q.   Are those same elements and parts of the

5   project included in the Warren Freedenfeld plan?

6           MR. McCALL:   Objection.

7       Q.   The grooming room, the children's play

8   area, and so forth, are they also part of your plan,

9   but just in a different location?

10      A.   Yes.

11      Q.   What was the source of the idea to include

12  each of those pieces in this project?

13          MR. McCALL:   Objection.

14      A.   At the beginning of every project, I sit

15  down with an owner and I conduct what I call a

16  programming workshop in which I determine what an

17  owner's goals and objectives are, what they want to

18  have in their hospital, and I write each of those

19  down.

20          Then I confirm -- I put all of those

21  elements into a program and send it to the owner, to

22  make sure that what an owner has asked for is what

23  I've heard, and what I've heard is what I'm

24  confirming.

**Warren C. Freedenfeld**                                    12/28/2006

Page 24

1          I then don't start the schematic design

2    until an owner has approved that program, to make

3    sure that he's going to get exactly what he wants,

4    and that I haven't missed anything or misunderstood

5    anything, and that is how this project again, as all

6    of my projects

7          Q.   And that occurred before this Exhibit 2B

8    was created?

9          A.   Yes.

10         Q.   Now, these various pieces of the project

11   that you listed, when describing the differences and

12   what had been moved in Exhibit 3B, when you did your

13   programming meeting, did the owner ask for those

14   pieces in the project or did you recommend them be

15   included in the project?

16         MR. McCALL:   Objection.

17         A.   Neither.   Actually, I have kind of a

18   checklist that I go through, and I asked the owner

19   if he wants this, if he wants that.   In other words,

20   I go item by item; does it want he, yes, does he

21   want it, no.   Then I record that and put it into a

22   single document which I call a project program.

23         Q.   That is how these elements would have come

24   to be included in your plan that's been labeled as

Warren C. Freedenfeld                          12/28/2006

Page 25

1    Exhibit 2B?

2        A.    Correct.

3        Q.    You had also said that the cross-section

4    shown in Exhibit 3B, which is over the top of the

5    words "Section No. 5" is comparable to another one

6    of the plans developed by Warren Freedenfeld?

7        A.    Yes.

8        Q.    Could you show us which plan that is?

9        A.    It's Exhibit 2F.  This is the section,

10   which is a partial section of 2F.

11       Q.    The partial section being on the Cormier

12   plan Exhibit 3B, right?

13       A.    Yes.

14       Q.    Is this Section No. 5, this partial section

15   on Exhibit 3B, a verbatim exact copy from Warren

16   Freedenfeld Associates' plan marked as Exhibit 2F?

17            MR. McCALL:  Objection.

18       A.    There are minor differences.

19       Q.    Could you identify what those differences

20   are?

21       A.    The configuration of the roof truss has

22   been modified and the configuration of the entry

23   canopy has been modified.

24       Q.    Are there any other differences?

Warren C. Freedenfeld                          12/28/2006

Page 26

1    A.    Those are the primary differences.

2    Q.    When you say "primary," does that mean

3    there are other differences between them?

4    A.    Well, the construction drawings 3B are a

5    little bit more developed than our initial building

6    section.

7    Q.    Okay.

8    A.    But the configuration of the spaces appear

9    to be pretty much the same.

10   Q.    In Exhibit 2F developed by Warren

11   Freedenfeld Associates, what's the source of that

12   layout for roofing; was this a standard form, are

13   you done it before?  How was this developed?

14   A.    This is not a standard form.  It was

15   basically developed specifically for this project.

16   Q.    Are there other plans of Edward Cormier

17   Associates that you believe are copied from Warren

18   Freedenfeld Associates' plans?

19   A.    Again, Section 3C, Section 5, is again,

20   similar to 2F.  The partial plan is the same partial

21   plan as on 3B.

22   Q.    Before you move on, I want to clear

23   something up for the record.  The partial plan on 3C

24   is the same one we were discussing as on 3B; is that

Warren C. Freedenfeld                    12/28/2006

Page 27

1    correct?

2         A.   Yes.

3         Q.   And the Section No. 5 roofing cross-section

4    on 3C is also taken, you say, from your Exhibit 2F?

5         A.   Yes.  Cormier doesn't show where his

6    section cuts are on his plan.  So I'm not sure where

7    he's cutting the sections.  I would venture to guess

8    it's another section through the waiting area at

9    another point.  What's interesting, he calls Section

10   5 on 3B, also Section 5 on 3C, yet there are

11   differences.

12              The only thing I can guess, and I'm

13   guessing here, is that these might have been various

14   options for the framing of that roof.

15        Q.   Before you move on, Section No. 5 on 3C,

16   which is the roofing cross-section, is that exactly

17   the same as the roofing cross-section shown on 2F

18   developed by Warren Freedenfeld Associates?

19        A.   The overall configuration is quite the

20   same, except for the configuration of the roof

21   truss.

22        Q.   So they are not exactly the same?

23        A.   No.

24        Q.   Are there any other Edward Cormier plans

Page 28

1    that are comparable to Warren Freedenfeld

2    Associates?

3         A.    Yes.   3D has many identical components to

4    Exhibit 2B.

5         Q.    Okay.   Is Exhibit 3D exactly identical to

6    Exhibit 2B?

7         A.    In all essential parts, yes.

8         Q.    When you say "essential parts," describe to

9    me what's identical with the two?

10        A.    Do you want me to point out what's

11   identical or what the minor differences are?

12        Q.    Why don't we start out with what's

13   identical.

14        A.    I will start with the rear and work

15   forward.  The location of bathing is the same.  The

16   location of the canine run ward is the same.  The

17   location of surgery is the same.  The location of

18   pack prep is the same.  The location of x-ray is the

19   same.  The location of special procedures is the

20   same.  The location and configuration of the canine

21   hospital ward is the same.  The canine hospital ward

22   two is the same.  Feline exotic hospital ward is the

23   same.  The lab is the same.  The pharmacy is the

24   same.  The surgery prep is the same.  Treatment is

Page 29

1    the same.  The doctors' workstations are the same.

2    The public toilette is the same.  The canine

3    boarding ward is the same.  The feline boarding ward

4    is the same, with a minor change.

5            All of the components of food prep, laundry

6    and storage are in same general location, only

7    slightly reconfigured.  Other than that, the two

8    plans are virtually identical.

9        Q.   Now, as you were going through this, you

10   said that these various pieces were the same, with

11   the exception of when you qualified it as a minor

12   deviation.

13       A.   Yes.

14       Q.   The ones that you say are the same, are

15   they exactly identical in terms of their details and

16   location in the project as on the Warren Freedenfeld

17   plan?

18       A.   They appear to be.

19       Q.   Now, what is different about Exhibit 3D as

20   opposed to the Warren Freedenfeld plan, Exhibit 2B?

21       A.   The differences are that the isolation room

22   has been moved and, as I said, the location of

23   laundry and food prep and storage have been

24   reconfigured.  The feline exercise room has been

Page 30

1    eliminated, and the second egress stair on the -- I

2    don't see a north arrow here -- on the top left-hand

3    side has been eliminated.

4              Other than that, it's pretty much identical

5    plans, and I can see that even by the column lines.

6    In other words, between what I call Column A and B

7    and he calls Column 2 and 3, if you run that right

8    through, they are more or less identical.

9         Q.   When you say "more or less," they are not

10   exactly identical to each other?

11             MR. McCALL:  Objection.

12        A.   Virtually identical.

13        Q.   I don't want to play word games with you,

14   but I just want to make sure I understand you.

15   "Virtually" connotes something other than exactly

16   the same.  Are they different?

17        A.   Only in extremely minor ways.

18        Q.   But they are not exactly identical?

19        A.   They are not 100 percent identical.

20        Q.   Going back to the Warren Freedenfeld plan,

21   Exhibit 2B, how is this developed by your office in

22   terms of the decision to include these components

23   and how to put them together on the floor plan; is

24   that done from scratch by Chris Hanlon or how does

Warren C. Freedenfeld                         12/28/2006

Page 31

1      this occur?

2         A.   I take the program and basically develop

3      the design.  Sometimes I will work with other

4      members of my staff, but the design is my greatest

5      involvement in the project, taking the project from

6      the program to the schematic design.  Then once the

7      schematic design is approved, it then goes into the

8      hands of a project manager.

9         Q.   Plan 2B, this is after the schematic design

10     is approved; is that right?

11        A.   Yes.

12        Q.   Now, when you're doing the design and

13     you're deciding how to assemble all of these

14     consents on the floor plan, you have experience in

15     developing animal hospitals; is that correct?

16        A.   Yes.

17        Q.   What do you draw on; is there a template

18     for how you're going to lay out a floor plan that

19     includes these types of concepts or are there other

20     projects you've done that you draw upon or is this

21     an original creation, for lack of a better word?

22             What I'm trying to understand is, this is

23     obviously a complex layout of pieces.  Do you sit

24     down with a blank piece of paper and this is how it

Page 32

1      all fits together best for you or do you work with

2      something from past experience?

3              MR. McCALL:   Objection.

4          A.    I always draw on my experience.   Every

5      hospital I've done has oftentimes drawn on things

6      I've developed in previous hospitals.

7          Q.    In the creation of this floor plan, do you

8      also draw on your experience of observing other

9      architects' animal hospitals and projects?

10         A.    No.

11         Q.    Are there other plans developed by Edward

12     Cormier Associates that you believe copy from Warren

13     Freedenfeld Associates' plans?

14         A.    Plan 3E is basically the same plan, but

15     it's only being used for dimensioning.

16         Q.    3E is the same as 3D?

17         A.    Yes.   3F, which is the basement plan, is,

18     again, virtually identical to 2A, except that it is

19     smaller.   The stairs are in the exact same place,

20     but the basement has been made about half the size

21     of what it was in our 2A, and I would suspect that

22     the balance was slab on grade, with a smaller area

23     for the basement.   But in terms of its location and

24     the stair that connects the upper and lower levels,

Page 33

1    is pretty much identical.  It's in the exact same

2    location.

3        Q.   By that, when you say "it," you mean the

4    stairs?

5        A.   Yes.

6        Q.   Just to clarify, when you say "smaller," 3F

7    actually shows a smaller square footage basement

8    than your plan does?

9        A.   Yes.  3F is composed of two bays, whereas

10   2A has four bays.

11       Q.   Okay.  I see that the Cormier plan, 3F,

12   includes bathrooms, mechanical rooms.  Are there

13   elements of that type contained in 3F that are

14   identical to the placement of the same elements in

15   Freedenfeld Exhibit 2A?

16       A.   We did not add the bathrooms, and we had a

17   mechanical room upstairs, which has been moved into

18   this lower level.

19       Q.   Okay.  So it's been moved into the lower

20   level in Exhibit 3F?

21       A.   That's correct.

22       Q.   Are there other Edward Cormier plans that

23   you believe copy from Warren Freedenfeld plans?

24       A.   Yes.  The roof plans, again, are pretty

**Warren C. Freedenfeld**                              12/28/2006

Page 34

1   much identical in terms of where we have the flat

2   area for the mechanical equipment, and where we have

3   the sloped areas as part of the development of the

4   exterior facade.

5         In concept, again, it is identical.  The

6   location of the dormer has been slid over.  But

7   other than that, in concept, both of these plans are

8   pretty much virtually identical.

9         Q.   **First of all, to clarify for the record,**

10  **you're comparing Exhibit 2C with Exhibit 3G?**

11        A.   Yes.

12        Q.   **Now, are these two plans exactly identical**

13  **in the roof plan?**

14        A.   In concept, they are virtually identical.

15        Q.   **Okay.  When you say "concept," could you**

16  **explain what you mean by that?**

17        A.   What I mean by the concept, the concept was

18  to create an inner flat area for mechanical

19  equipment that would be concealed by perimeter

20  sloped areas so that when you view the building, it

21  appears more like a conventional sloped roof, and

22  you wouldn't know that the mechanical equipment,

23  which there is a lot of in the hospital, is

24  concealed within the flat area, and those sloped

**Warren C. Freedenfeld**                              12/28/2006

Page 35

1    roofs continue around the entire perimeter kind of

2    like a square doughnut.

3              That component is identical in both plans,

4    and the intersection of those components, even how

5    the slopes appear -- I don't have a north arrow, so

6    I can't refer to which elevation, and I know I can't

7    say "this."  But the way the front roof

8    configuration intersects with the right side

9    configuration on both are the same, both in the rear

10   and in the front, the way the rear roof intersects

11   with the side roofs are identical.

12             The only major difference is that the peak

13   that faces the front has been slid over from the

14   right side of Column Line 5 on the 2C to the left

15   side of Column Line A on 3G.

16        Q.   Are the dimensions or any other aspect of

17   how the roof will be laid out different in 3G than

18   the way they are shown in Exhibit 2C?

19        A.   The dimensions on 3G are indicated.  There

20   are no dimensions on 2C.  But if you go by the

21   column lines, they appear to be pretty much the

22   same.

23        Q.   You say they appear to be pretty much the

24   same.  Looking at the two plans, can you tell

Warren C. Freedenfeld                              12/28/2006

Page 36

1    whether the dimensions would be exactly the same on

2    the Warren Freedenfeld plan as on the Edward Cormier

3    plan?

4        A.    They appear to be.  Again, without actually

5    having a scale.  Based on the column lines, they

6    appear to be virtually identical.  If you look at

7    Column Line F and Column Line 5, even the turn of

8    the roof is the same.  If you go up to column line

9    C, on 2C and 2 on 3G, again, the roof intersections

10   are again identical.

11       Q.    I noticed on 3G it includes a row of

12   Anderson skylights, what I assume are windows?

13       A.    Skylights.

14       Q.    Is that shown also on the Warren

15   Freedenfeld plan?

16       A.    They are not shown on 2C.  I need to look

17   at something.  It appears what we had proposed to do

18   instead of clear story windows in order to get light

19   in the canine run ward.  So where we are using clear

20   story lighting, he is coming in -- Cormier is coming

21   in with skylights.

22       Q.    So skylights are different than clear story

23   lights?

24       A.    They are different.

Page 37

1      Q.    Could you explain to me what clear story

2   lights are?  I understand what skylights are.

3      A.    A clear story window is a window that's

4   high up in a roof that allows natural light to enter

5   a space, and a clear story is usual vertical.  It

6   can also be sloped.  It allows light to enter a

7   space from high above.

8            Cormier took the same configuration of the

9   space, but instead of using the clear story, used

10  skylights to bring that natural light into the

11  canine run ward.

12     Q.    Are there any other plans developed by

13  Edward Cormier that you believe copy from the Warren

14  Freedenfeld plans?

15     A.    Each plan after this, like 3H, is a

16  reflected ceiling plan base on the floor plan.

17     Q.    Based on the Edward Cormier floor plan?

18     A.    Yes.

19     Q.    The first floor reflected ceiling plan

20  you're talking about is 3H; is that right?

21     A.    Yes.

22     Q.    In the Warren Freedenfeld plans, is there a

23  Warren Freedenfeld plan that's identically matching

24  to this first floor reflected ceiling plan document?

Page 38

1     A.    I don't believe we had a reflected ceiling

2   plan that was computerized.

3     Q.    Okay.  In the Warren Freedenfeld plans, is

4   there a reflected ceiling plan?

5     A.    Not in our electronic documents.

6     Q.    So none of the documents that have been

7   marked as Exhibit 2A through, I believe it's G, are

8   a reflected ceiling plan for the first floor; is

9   that right?

10     A.    Correct.

11     Q.    Okay.

12     A.    On Exhibit 2I, the configuration of the

13   rooms is identical.

14     Q.    When you say "the configuration of the

15   rooms is identical" --

16     A.    To Cormier's base plan.  This includes

17   floor finishes, which we did not have a floor finish

18   schedule or floor finish plan.

19          The exterior elevations, we can start with

20   Exhibit 2D, the front elevation.  Again, in concept,

21   it's more or less identical, except that the

22   location of the front dormer has been slid over to

23   the left.  The right side elevation on Exhibit 3J

24   appears to be, again, more or less, or virtually

**Warren C. Freedenfeld**                                    12/28/2006

Page 39

1   identical to the configuration of 2E in terms of its

2   massing.  The differences are the actual window

3   locations.  In terms of the configurations of the

4   overall envelope of the building, they are pretty

5   much identical, in terms of the end cables, and like

6   I said, the overall massing.

7       Q.   The right side elevation on Exhibit 3I, you

8   believe that's comparable to the elevation shown on

9   Exhibit 2E?

10          MR. McCALL:  Objection.  I think it's 3J

11  you're looking at.

12      Q.   It's Exhibit 3J of the Cormier plans that's

13  the right side elevation that you are testifying is

14  comparable to Exhibit 2E developed by Warren

15  Freedenfeld?

16      A.   Correct.

17      Q.   Is the right side elevation shown on the

18  Cormier plan exactly the same as the elevation shown

19  on Freedenfeld plan 2E?

20      A.   It's virtually identical.

21      Q.   When you say "virtually identical," are

22  there details of the Cormier plan that are different

23  than what is shown on the Freedenfeld plan?

24      A.   Yes.

Warren C. Freedenfeld                                    12/28/2006

Page 40

1       Q.   Can you tell me what those are?

2       A.   The location and configuration of the

3   windows is different and a lower level entry element

4   has been added.  The egress door out of the stairs

5   is in the same location and the overall massing is

6   identical.

7       Q.   Now, on the Cormier right side elevation,

8   it shows features, such as the clapboard siding; is

9   that right?

10      A.   Yes.

11      Q.   Now, that is not shown on the Freedenfeld

12  plan; is that right?

13      A.   It's not shown.

14      Q.   The Cormier plan 3J also shows the front

15  elevation; is that correct?

16      A.   Yes.

17      Q.   That, you said, is comparable to

18  Freedenfeld plan 2D; is that right?

19      A.   Yes.

20      Q.   Is the front elevation on the Cormier plan

21  exactly identical to the front elevation shown on

22  the Freedenfeld plan?

23      A.   It's not identical, but very similar.

24      Q.   Can you tell me what is different about the

Warren C. Freedenfeld                              12/28/2006

Page 41

1    two plans?

2        A.   What's different is that the location and

3    configuration of the entry dormer has been moved.

4    The concept is the same, again, to create an

5    intersecting roof line identifying the entrance into

6    the building, with a smaller element projecting

7    forward to identify the actual door.

8            Cormier took what was a single

9    configuration and divided up into two in which there

10   was a shed roof on the right side, which has been

11   separated from the actual dormer, and the dormers

12   have been slid to the left.

13           So it's the window configurations and the

14   location of that dormer.  But the concept of the two

15   dormers projecting forward has been maintained in

16   the same concept.

17       Q.   And the Cormier plan shows for the front

18   elevation details the vinyl clapboard siding?

19       A.   That's correct.

20       Q.   That detail, for instance, is not included

21   in the Freedenfeld front elevation; is that right?

22       A.   Right.  We didn't show the clapboard

23   siding.

24       Q.   Are there any other Cormier plans that you

Page 42

1    believe are copied from Freedenfeld plans?

2        A.   The left side elevation, again, in terms of

3    massing and its integration with the existing house,

4    again, appears to be virtually identical in terms of

5    the left side roof intersection is the same as 2D on

6    the lower drawing, and the rear elevation on 2E, in

7    terms of massing, is similar.  It's less similar,

8    but again, in terms of the massing, it's virtually

9    identical.

10       Q.   Since we have that one there, let's talk

11   about the rear elevation for a minute.  The rear

12   elevation is shown in Cormier plan Exhibit 3K; is

13   that correct?

14       A.   Yes.

15       Q.   And the Freedenfeld plan shows the rear

16   elevation --

17       A.   2E.

18       Q.   Are the rear elevations shown on both plans

19   identical?

20       A.   No, they are not.

21       Q.   The left side elevation shown on Exhibit 3K

22   compares to, I believe you said, Exhibit 2D of the

23   Freedenfeld plans; is that right?

24       A.   2D, the lower plan, yes.

Warren C. Freedenfeld                                          12/28/2006

Page 43

1    Q.   Are the left side elevations shown on each

2    plan identical?

3    A.   The massing is identical.

4    Q.   When you say "massing," what are you

5    referring to that's identical about the two?

6    A.   The overall volume and configuration of the

7    mass of the building.

8    Q.   Are the details showed in the Cormier left

9    side elevation different than the details shown on

10   the Freedenfeld left side elevation?

11   A.   Yes, they are.

12   Q.   How do they differ?

13   A.   The window configurations are different,

14   and we had an exterior enclosed run area, which has

15   been deleted from the Cormier plans.

16   Q.   Okay.  Are there any other Cormier plans

17   that you believe are copied from Freedenfeld plans?

18   A.   Yes.  Section 1 on Cormier's 3L appears to

19   be, more or less, identical to building Section No.

20   2 on the WFA Exhibit 2F.

21   Q.   Are they exactly the same?

22   A.   They are virtually the same.

23   Q.   When you say "virtually," how do they

24   differ?

Warren C. Freedenfeld                                    12/28/2006

Page 44

1     A.    The location and configuration of the roof

2   assembly is different, and we show steel beams,

3   whereas Section 1 on 3L is using wood trusses and

4   wood beams.

5     Q.    Section 1 on 3L contains various details

6   about siding, the plywood and joint filler.  Do you

7   see that?

8     A.    Yes.

9     Q.    Are those details also shown on the

10  Freedenfeld plan?

11    A.    No.

12    Q.    Exhibit 3L also contains another drawing,

13  which is Section 2; is that right?

14    A.    Yes.

15    Q.    Is there a Freedenfeld plan that you

16  believe Section 2 is copied from?

17    A.    I believe it's developed from building

18  Section No. 2 on Exhibit 2F.

19    Q.    When you say "it's developed from," do you

20  believe it's copied directly from it?

21    A.    In concept.

22    Q.    But it's not identical to any plan in the

23  Freedenfeld plans?

24    A.    No, it is not identical.

Warren C. Freedenfeld                          12/28/2006

Page 45

1      Q.    Are there any other Cormier plans that you

2  believe are copied from the Freedenfeld plans?

3      A.    Yes.   On Exhibit 3M, Section 3 and Section

4  4, are both, again, derivative of sections 1 and 2

5  on Exhibit 2F.

6      Q.    When you say "derivative," they are not

7  directly copied from the Freedenfeld plans; is that

8  right?

9      A.    The configuration is the same.

10     Q.    The details shown on the Cormier plan are

11 not included on the Freedenfeld plan; is that right?

12     A.    That's correct.

13     Q.    Sections 3 and 4 shown on Exhibit 3M, are

14 they exactly identical to the Warren Freedenfeld

15 plans?

16     A.    Ask your question again, please.

17     Q.    Are Sections 3 and 4 on Cormier Plan 3M

18 exactly identical to the Freedenfeld plan?

19     A.    Virtually identical.

20     Q.    But they are not exactly identical?

21     A.    Correct.

22     Q.    How do they differ from the Freedenfeld

23 plan?

24     A.    The configuration of the roof trusses are

Page 46

1    different, and there is more detail included in

2    Cormier's plans than was included in our plans.

3        Q.    Are there any other Cormier plans that you

4    believe are copied from the Freedenfeld plans?

5        A.    On Exhibit 3N, Section 5, it appears to be

6    based on Section 1 of Exhibit 2F, and Section 6.

7    I'm not sure where Section 6 is taken, so I would

8    have to look at -- Cormier didn't appear to include

9    building sections on his plans.  Oh, wait.  I am

10   going to guess that Section 6 is through the

11   connecting vestibule between the new building and

12   the existing house, although Cormier doesn't show

13   it, I'm guessing that's what that is.

14       Q.    Before we move on, let's break that down.

15   Section 5 on the Cormier drawing Exhibit 3N you say

16   --

17       A.    Is virtually identical to part of building

18   Section 1 on Exhibit 2F.

19       Q.    Does it differ from the Freedenfeld

20   drawing?

21       A.    Not in concept.

22       Q.    How about in its details?

23       A.    Actually, a lot of the details are quite

24   similar as well.

Warren C. Freedenfeld                                      12/28/2006

Page 47

1        Q.    Why don't you tell me the details that are

2   similar?

3        A.    Well, the open web steel joists are the

4   same on the lower level.   The scissors truss and the

5   configuration of the roof between Column Lines G and

6   F are the same, and the intersection of the flat

7   room with the sloping roof at Column Line F is

8   virtually identical to the intersection of the flat

9   roof and slope roof at Cormier's Column Line 5.

10       Q.    Can you identify for me how these two

11  drawings differ?

12       A.    Section 5 is a partial section, whereas

13  Building Section 1 on 2F is a full building section.

14       Q.    Does Section 5 contain details that are

15  absent from the Freedenfeld drawing?

16       A.    Yes.

17       Q.    Section 6, is there an identical drawing

18  anywhere in the Freedenfeld drawings?

19       A.    No.

20       Q.    Are there any other Cormier plans that you

21  believe are copied from the Freedenfeld plans?

22       A.    Wow, yes.   It appears that the entire

23  finish schedule from what I'm seeing, even the way

24  the rooms are numbered and the way that they are

Warren C. Freedenfeld                                    12/28/2006

Page 48

1    listed on 3Q, it looks like it's virtually identical

2    to Exhibit 2G.

3         Q.    **Now, could you explain to us what these**

4    **documents are, this finish schedule you're looking**

5    **at?**

6         A.    The finish schedule is a list of all the

7    rooms and spaces in the project, and the room

8    numbering system used to identify those rooms.  For

9    instance, the entry vestibule is 100 on the WFA

10   plans, and it also coincidentally is 100 on the

11   Cormier plans.  Room 101, the children's play area,

12   reception area, the same location.  The waiting

13   area, 102.  Waiting area 102 -- I can skip around.

14             If you go down the list, and I'm just

15   looking at really for the first time, it's amazing

16   how a lot of the rooms appear to be in the same

17   order.  It looks like there are some deviations.

18   The further I go down, I do see some differences,

19   but the numbering seems to be very similar, even how

20   the schedule itself is laid out is very similar from

21   room to flooring, floor base, wainscot, material

22   height, wall material, north, south, east, west,

23   ceiling material, height, remarks.  The schedules

24   are pretty similar.

Warren C. Freedenfeld                                    12/28/2006

Page 49

1      Q.   Looking at the schedules, when you say they

2  are pretty similar, are they identical?

3      A.   I don't know.  I'd have to go word for

4  word, but there does appear to be some differences,

5  but they are quite similar.

6      Q.   Speaking more broadly about Exhibit 3Q and

7  Freedenfeld 2G, are there portions of Freedenfeld 2G

8  that are not present on Cormier 3Q?

9      A.   Yes.  We have partition types shown on 2G

10 that Cormier has probably placed somewhere else.

11     Q.   But they are not on Exhibit 3Q?

12     A.   No.

13     Q.   Are there any other Cormier plans that you

14 believe are copied from the Freedenfeld plans?

15     A.   The rest are structural.  No, I believe

16 that's it.

17          MR. McCALL:  Did you look at them all?

18     A.   They are all structural.  We didn't have

19 any structural drawings.  The structural drawings

20 are based on the same floor plan, but we didn't have

21 structural drawings.

22     Q.   Okay.

23          MR. ROSENBERG:  Why don't we go record for

24 a second and clean this up before we move on.

Warren C. Freedenfeld                              12/28/2006

Page 50

1          (Recess)

2     BY MR. ROSENBERG:

3     Q.    Do you have an area that you specialize in

4     as an architect?

5     A.    Yes.

6     Q.    What is that?

7     A.    Veterinary hospitals.

8     Q.    How many veterinary hospitals have you

9     designed in your career?

10    A.    Probably over 350 animal care facilities in

11    general.

12    Q.    Are there unique features that you put in

13    each animal hospital you design?

14    A.    Every hospital has certain unique features.

15    The overall concepts usually carry from one hospital

16    to another.

17    Q.    What are those overall concepts?

18    A.    Traffic circulation patterns,

19    interrelationships of various components.

20    Q.    Is the traffic flow and those

21    interrelationships consistent in each animal

22    hospital you develop?

23    A.    There are different types of patterns,

24    depending on the practice philosophy of each doctor.

Warren C. Freedenfeld                                    12/28/2006

Page 51

1    Q.    What about the interrelationships of the

2    elements, does that vary hospital to hospital?

3    A.    Sometimes, according to the practice

4    philosophies of the veterinarian.

5    Q.    Starting with the traffic flow, the traffic

6    flow that you design in, what's your source for how

7    that traffic should flow; is it a unique way you've

8    done it, is it industry standards?

9         MR. McCALL:   Objection.

10   A.    It's the way I developed it with the very

11   first hospital I ever did over 30 years ago.

12   Q.    Have you visited or seen plans for animal

13   hospitals done by other architects?

14   A.    Oh, yes.

15   Q.    Leaving aside the Edward Cormier plans

16   here, are there other architects' animal hospitals

17   you've seen?

18   A.    Yes.

19   Q.    Do any of them have traffic flow patterns

20   that are similar to the ones you use in your

21   hospitals?

22   A.    Today, yes.

23   Q.    When you say "today," when did you first

24   see a similarity?

Warren C. Freedenfeld                                        12/28/2006

Page 52

1       A.   I first developed these concepts with the

2   Animal Hospital of Wakefield in 1975, '76, which was

3   the first hospital I ever did, and I traveled

4   throughout New England visiting every animal

5   hospital I could find learning everything I could

6   about the successes and failures, the problems that

7   were impacting the industry, the veterinary

8   industry.  I tried to understand all of the

9   difficulties that these hospitals were confronted

10  with, and I tried to solve every problem I could

11  identify with that very first hospital.

12           A lot of the concepts I developed then,

13  which is over 30 years ago, which I believe were the

14  first time they appeared in public, have almost

15  become industry standard today.  That particular

16  hospital became hospital of the year.

17       Q.   The Wakefield hospital?

18       A.   Yes.  Back in 1976.

19       Q.   Now, separate from traffic flow, you had

20  mentioned, I believe you phrased it as the enter

21  relationship of conceptual elements?

22       A.   The components.

23       Q.   Could you break that down and identify

24  which components and how the interrelationship

Warren C. Freedenfeld                                    12/28/2006

Page 53

1    that's consistent in the animal hospitals you

2    designed?

3         A.    It depends on how detailed you want to get.

4         Q.    Why don't you explain it to me in as much

5    detail as you think I need to understand how they

6    relate.

7         A.    There's the enter relationship of the

8    outpatient areas, the waiting area, reception,

9    examining rooms, doctors' offices, consultation

10   room, and then there's the inpatient areas.

11              The lab and pharmacy are essentially

12   buffers, transition spaces between the inpatient and

13   outpatient areas.  The treatment room is the core,

14   the nucleus, of the inpatient areas, usually

15   surrounded by surgery, x-ray, pack prep, wards,

16   special procedures.  They form a -- the treatment is

17   kind of a nuclear configuration

18        Q.    What do you mean by a nuclear

19   configuration?

20        A.    The treatment room is the center around

21   which those other elements revolve, just as the

22   reception desk is the nucleus of the outpatient

23   areas.  These are concepts that were first developed

24   at the animal hospital in Wakefield.

Warren C. Freedenfeld                                    12/28/2006

Page 54

1     Q.    Did you carry this forward through all the

2     animal hospitals you've designed?

3     A.    Yes, with variations, but, yes.

4     Q.    So it varied from animal hospital to

5     another animal hospital?

6     A.    Yes.

7     Q.    Have you ever accompanied clients or

8     potential clients to other animal hospitals you've

9     designed in the past?

10    A.    Once or twice.  Usually I will send them to

11    go visit certain hospitals that might be in their

12    area, because we've designed hospitals in almost

13    every state in the United States.

14    Q.    Okay.  Are the relationship of these

15    conceptual elements, do you find them or see them in

16    animal hospitals designed by other architects at

17    this point?

18    A.    Today, a lot of those concepts that we

19    developed at Wakefield have almost become industry

20    standard.

21    Q.    Okay.  So have you seen them in other

22    architects' animal hospitals?

23    A.    Some of them.

24    Q.    If someone went to an animal hospital

Warren C. Freedenfeld                          12/28/2006

Page 55

1    without knowing in advance who designed it, are

2    there features in the hospitals that you've designed

3    that would make them say this is a Warren

4    Freedenfeld-designed hospital?

5             MR. McCALL:  Objection.

6        A.   Yes.

7        Q.   What are those features?

8        A.   There's probably many.  I've often had it

9    said when I meet veterinarians, they would look at

10   floor plans that we've done and say, this is a

11   Freedenfeld floor plan or if they would go into a

12   hospital they oftentimes will know that we've done

13   it.  I don't know whether it's a feeling, but it

14   seems to have become -- our work is very well

15   recognized, not only throughout the United States,

16   but even in Western Europe, Central South America,

17   up into Canada, and now in china.

18       Q.   When you say it's well recognized, are

19   there particular people who have told you I've seen

20   a hospital or a plan, and I recognized it as one you

21   would have done?

22       A.   I often hear that.

23       Q.   Who do you hear that from?

24       A.   I can't tell you specific people.

Warren C. Freedenfeld                              12/28/2006

Page 56

1    Q.    What category?

2    A.    Veterinarians.

3    Q.    Okay.

4          MR. ROSENBERG:  I would like to mark this

5    as Exhibit 4.

6          (Document marked as Exhibit 4

7          for identification)

8    Q.    Could you take a look at what's been marked

9    as Exhibit 4, and tell me if you've seen this

10   before?

11   A.    Yes, I have.

12   Q.    Can you tell us what it is?

13   A.    This is the November, 2004 edition of

14   "Veterinary Economics" magazine in which the merit

15   award was given to the Gardner Animal Hospital.

16   Q.    Are you familiar with this magazine?

17   A.    Yes.

18   Q.    Do you subscribe to it?

19   A.    Yes.

20   Q.    The exhibit has an article entitled "Giving

21   an Old House a Cutting Edge Extension"; is that

22   right?

23   A.    Yes.

24   Q.    Is this the article that accompanies the

Warren C. Freedenfeld                              12/28/2006

Page 57

1    merit award given to the Gardner Animal Hospital?

2        A.    Yes.

3        Q.    Does the article and the merit award

4    include copies of any plans for the Gardner Animal

5    Hospital?

6        A.    Yes.

7        Q.    Can you identify where in the exhibit they

8    are located?   The page numbers of the article are on

9    the bottom?

10       A.    The floor plan is on Page 53.

11       Q.    Who drew the floor plan shown on Page 53?

12       A.    I suspect Edward Cormier.

13       Q.    When you say you suspect, why do you use

14   that word?

15       A.    Because I don't -- because he is noted as

16   the architect for this project.

17       Q.    The floor plan on Page 53, was that drawn

18   by Warren Freedenfeld Associates?

19            MR. McCALL:   Objection.

20       Q.    The exact floor plan, without any change?

21       A.    The floor plan that we did is virtually

22   identical to this floor plan.

23       Q.    How is it different from this floor plan?

24       A.    I believe you asked, and I believe I

Warren C. Freedenfeld                                    12/28/2006

Page 58

1    answered that previously, when we were going through

2    the documents.

3        Q.    Okay.  Let's try it this way.  Do you claim

4    that the floor plan shown on Page 53 of "Veterinary

5    Economics" magazine is an exact copy of any plan

6    done by Warren Freedenfeld Associates for the

7    Gardner Animal Hospital?

8            MR. McCALL:   Objection.

9        A.    It's virtually identical.

10        Q.    Virtually is not the same as exactly

11    identical.  Is this plan exactly identical to any

12    plan done by Warren Freedenfeld Associates?

13            MR. McCALL:   Objection.

14        A.    There are very minor differences.

15        Q.    But it is different than your plan?

16        A.    In only very minor ways.

17        Q.    Okay.  I've kept available Exhibit 2, which

18    are the Warren Freedenfeld plans.  Can you identify

19    for me which of the Warren Freedenfeld plans is

20    virtually identical to the plans shown on Page 53?

21        A.    Exhibit 2B is virtually identical to the

22    floor plans shown on Page 53 of the "Veterinary

23    Economics" magazine.

24        Q.    Based on your earlier testimony, is it

Warren C. Freedenfeld                        12/28/2006

Page 59

1   correct that Exhibit 2B is different in some aspects

2   from the plan shown on Page 53 of this exhibit?

3        A.    Only in very minor ways.

4        Q.    But it is not exactly the same?

5        A.    It is not 100 percent identical.

6        Q.    Do you know who submitted the plan shown on

7   Page 53 to "Veterinary Economics" magazine?

8        A.    I believe Dr. McTigue submitted this.

9        Q.    The floor plan that was submitted, was that

10  your floor plan as you originally drafted it in

11  Exhibit 2B?

12            MR. McCALL:   Objection.

13       A.    It is my floor plan with minor changes.

14       Q.    Do you know whether Dr. McTigue submitted

15  Exhibit 2B to "Veterinary Economics" magazine?

16       A.    I have no knowledge of that.

17       Q.    Are there any other plans shown in the

18  article that you believe are identical to your

19  plans?

20            MR. McCALL:   Objection.

21       A.    Yes.

22       Q.    What plan is that?  What page are they on?

23       A.    Page 52.

24       Q.    What are those floor plans of?

Warren C. Freedenfeld                                      12/28/2006

Page 60

1    A.    The lower level is virtually identical,

2    except that it is half the size of our lower level

3    plans shown on Exhibit 2A.  The house plan we didn't

4    have anything to do with.

5    Q.    So going to the basement plan, this shows a

6    basement that in square footage is half the size of

7    the square footage of the basement shown on 2A?

8    A.    It appears that way.

9    Q.    So the basement plan on Page 52 is not the

10   plan that was for the basement drafted by Warren

11   Freedenfeld Associates; is that right?

12        MR. McCALL:  Objection.

13   A.    That's incorrect.

14   Q.    The basement plan, the lower level plan on

15   Page 52, is that exactly identical to any Warren

16   Freedenfeld plan?

17   A.    It is virtually identical.

18   Q.    But it is not exactly identical?

19   A.    It is not 100 percent exact.

20   Q.    Okay.  What is the closest comparable

21   Freedenfeld plan?

22   A.    Exhibit 2A.

23   Q.    How is the plan on Page 52 of the magazine

24   different from Plan 2A?

Warren C. Freedenfeld                                    12/28/2006

Page 61

1        A.    The longitudinal size of the plan is

2    identical.   The location of the stair is identical.

3    The only difference is that the left two bays have

4    been removed.

5        Q.    Do you know whether the plans as shown on

6    Page 52 of the magazine reflect the hospital as it

7    was built?

8        A.    I don't know that.

9        Q.    Have you seen the hospital after it was

10    built?

11        A.    No.

12        Q.    Do you know whether the hospital was built

13    with a basement that would be identical to what's

14    shown in Exhibit 2A?

15        A.    I have no knowledge of that.

16        Q.    Do you know who submitted to "Veterinary

17    Economics" magazine the drawings and plans on Page

18    52?

19        A.    You asked me that.   I will answer it again.

20    I believe it was Dr. McTigue.

21        Q.    With regard to the plan for the basement

22    shown on Page 52, do you know whether Dr. McTigue

23    submitted the plans drawn by Warren Freedenfeld to

24    the magazine?

Warren C. Freedenfeld                                          12/28/2006

Page 62

1       A.    I would assume that he submitted plans

2    drawn by Edward Cormier.

3       Q.    Do you know what plans were submitted to

4    the "Veterinary Economic" magazine?

5       A.    No.

6       Q.    How did you learn of this article?

7       A.    When I received the magazine and opened it

8    up and came to the merit award.

9       Q.    Do you know in this magazine article who

10   was identified as the architect of the plans shown

11   in this publication?

12      A.    Yes.

13      Q.    Who was that?

14      A.    Edward D. Cormier.

15      Q.    Is it your position the architect should

16   have been identified as someone else?

17      A.    Yes.

18      Q.    Who should it have been?

19      A.    It should have been Warren Freedenfeld

20   Associates.

21      Q.    What do you base that on?

22      A.    Because we designed the project.

23      Q.    Was there any harm suffered by Warren

24   Freedenfeld Associates as a result of this article

Page 63

1    identifying someone other than Warren Freedenfeld

2    Associates as the architect?

3            MR. LEE:   Objection.

4    A.    Yes.

5    Q.    **What was that harm?**

6            MR. LEE:   Objection.

7    A.    We derive our clients primarily from

8    publications in this magazine, which goes to every

9    veterinarian in the United States.   This is how we

10   get our exposure.   This is how we attract new

11   clients.   Had this been an honest publication, it

12   could have easily led to new clients, especially in

13   our own home state.

14   Q.    **Now, you say it could have easily led to**

15   **new clients.   What do you base that on?**

16   A.    On 30 years of experience with publications

17   in this magazine and the recognition that we get

18   from veterinarians as a result of that.

19   Q.    **In your past experience, have veterinarians**

20   **contacted you about possible projects based on**

21   **awards you've won or articles in "Veterinary**

22   **Economics" magazine?**

23           MR. McCALL:   Objection.

24   A.    Yes.

Warren C. Freedenfeld                                    12/28/2006

Page 64

1      Q.    How often does that occur?

2      A.    Very often.

3      Q.    Do you know of any particular jobs that you

4    did not get because you were not identified as the

5    architect in this magazine article?

6          MR. LEE:  Objection.

7      A.    I can't give you a specific job.

8      Q.    Do you know whether Edward Cormier

9    Associates received any additional work or projects

10   as a result of this publication?

11     A.    I have no idea.

12     Q.    How many animal hospitals a year does

13   Warren Freedenfeld Associates design?

14         MR. McCALL:  Objection.

15     A.    We used to do between 30 and 40.  We now --

16   I know I limit it to about 20, just to maintain

17   quality.

18     Q.    Is this 20 ongoing projects at a time or is

19   this 20 new a year?

20     A.    Yes, at every phase of the development

21   starting with programming, schematic design, design

22   development, construction documents, bidding, cost

23   negotiations and construction, they could all be at

24   various phases of the development.  They are not all

Warren C. Freedenfeld

12/28/2006

Page 65

1    in schematic design or in any one phase.

2        Q.    About how many new projects a year, on

3    average, does Warren Freedenfeld Associates do?

4        A.    Currently we get somewhere between 20 and

5    24 a year.

6        Q.    New projects?

7        A.    Yes.

8        Q.    The "Veterinary Economics" magazine that's

9    Exhibit 4 was published in November, 2004.  Had you

10   merged at that point or were you still Warren

11   Freedenfeld Associates?

12       A.    Still Warren Freedenfeld.

13       Q.    At that point in 2004, how many new

14   veterinary hospital projects did Warren Freedenfeld

15   Associates begin that year?

16       A.    I don't know.  I can't tell you exactly.

17       Q.    Would it have been more than ten or less

18   than ten?

19            MR. McCALL:  Objection.

20       A.    It would have been more than ten.

21       Q.    Okay.  How recently was the merger?

22       A.    A little over a year ago.

23       Q.    The drawings that Warren Freedenfeld

24   Associates did that are the Exhibit 2 group, are

Warren C. Freedenfeld                                    12/28/2006

Page 66

1   they in form to be built from or would more work

2   need to be done before construction could begin?

3           MR. McCALL:   Objection.

4       A.   More work would need to be done.

5       Q.   What more work would need to be done had

6   you stayed on the project to go from these drawings

7   to as-built plans or whatever is the level of plans

8   needed for the builder to move forward?

9       A.   There is dimensions, there's material

10  identifications, there are interior details,

11  exterior details, that sort of thing.

12      Q.   Other than the "Veterinary Economics"

13  magazine, are you aware of Cormier's plans being

14  submitted to any public entity or any publication or

15  organization?

16      A.   Not that I'm aware of.

17      Q.   Have you ever seen any advertising by

18  Edward Cormier Associates?

19      A.   No.

20      Q.   Do you know whether Edward Cormier

21  Associates ever used the "Veterinary Economics"

22  magazine and merit award in its advertising?

23      A.   I don't know that.

24      Q.   Now, you testified a little bit ago about

Warren C. Freedenfeld                                    12/28/2006

Page 67

1    the potential harm to you from the "Veterinary

2    Economics" magazine identifying Cormier rather than

3    Freedenfeld, and that you lost the exposure from

4    that to your potential client base; is that an

5    accurate way of putting it?

6            MR. McCALL:  Objection.

7        A.    I believe that's correct.

8        Q.    Is there any other harm that Warren

9    Freedenfeld Associates suffered from Edward Cormier

10   Associates' development of their plans and work on

11   this project?

12           MR. LEE:  Objection.

13       A.    Well, there would be the completion of the

14   work that we started and the fees associated with

15   that.  But I think the primary harm is the lost

16   opportunity for exposure to other veterinarians, and

17   again, the loss is here in my home state.

18       Q.    So aside from the exposure to the other

19   veterinarians and potential clients, your losses

20   would have been the additional earnings you would

21   have made on this contract to build this hospital?

22           MR. LEE:  Objection.

23       A.    I believe that's correct.  I don't know if

24   that's the total, but that's, at least, what's

Warren C. Freedenfeld                                    12/28/2006

Page 68

1    coming to mind at the moment.

2        Q.    Okay.   The drawings you made for the

3    Gardner Animal Hospital, could these drawings be

4    used on other projects by you or are they only

5    useful for building the Gardner Animal Hospital?

6            MR. McCALL:   Objection.

7        A.    They are primarily for the Gardner Animal

8    Hospital.   As I said before, every project has

9    certain unique aspects to it.   So I couldn't just

10   take those plans and use them for someone else's

11   hospital, because every veterinarian has unique

12   goals, objectives, philosophies, requirements,

13   priorities.

14       Q.    So each animal hospital you did down the

15   road, you couldn't just use exactly the same plans

16   you had developed for the Gardner hospital; is that

17   right?

18       A.    Well, yes.   I've used the same concepts

19   throughout all of my hospitals over the past 30

20   years.

21       Q.    But the plans themselves, you would have to

22   change them to fit the needs of the next client?

23       A.    Oh, yes.

24       Q.    And you'd also have to change them to fit

Warren C. Freedenfeld                                    12/28/2006

Page 75

1    McTigue wanted.  Once we reached that point, he

2    signed off on the program, and we started schematic

3    design.

4         Q.   Okay.  When you say you started schematic

5    design, is that the process that leads to the

6    drawings developed by Warren Freedenfeld?

7         A.   Yes.

8         Q.   What was the next step in Warren

9    Freedenfeld's involvement with the Gardner hospital

10   project?

11        A.   Once the schematic design was approved --

12        Q.   Who approved it?

13        A.   Dr. McTigue.  Once it was approved, we then

14   start the construction drawings.

15        Q.   Did you start construction drawings on this

16   project?

17        A.   Yes.

18        Q.   Are they included within the Exhibit 2

19   documents that we looked at earlier?

20        A.   Yes.  These are the preliminary

21   construction documents.

22        Q.   Okay.  Then what takes place?

23        A.   Well --

24             MR. McCALL:  Objection.

Warren C. Freedenfeld                                    12/28/2006

Page 76

1    A.    -- could you be more specific?

2    Q.    Sure.  You do the schematics, it's been

3    approved by Dr. McTigue.  Then you move on to

4    drawing the construction plans.  What's the next

5    thing you did on the Gardner Animal Hospital

6    project?

7    A.    Well, we continued to develop the

8    construction drawings up until the point in which

9    our contract with Dr. McTigue terminated.

10   Q.    Okay.  Now, why did the contract get

11   terminated?

12   A.    Dr. McTigue hired a development consultant,

13   a guy named Dan McCarty, and Dan McCarty kind of

14   took over the responsibility of developing the whole

15   project.  This is an unusual thing, but it does

16   happen, and we've done it before, and we worked with

17   someone -- veterinarians often are so busy with

18   their practice they can't devote their personal time

19   and attention to all the details, and I think that's

20   what happened here.

21        For me to answer your question, I have to

22   speculate a little bit.

23   Q.    Well, let's refocus the question a little

24   bit.  You were a participant in the conversations

Warren C. Freedenfeld

12/28/2006

Page 125

1    Q.    Do you know how many vet hospitals there

2    are in New England today?

3    A.    No.

4    Q.    Do you know how many you've designed that

5    are currently in operation in New England today?

6    A.    No.

7    Q.    Could you pull out a copy of "Veterinary

8    Economics," please.  I can't remember what exhibit

9    number it was.

10         MR. ROSENBERG:    Exhibit 4.

11   Q.    Turn to Page 52 and 53.

12   A.    Okay.

13   Q.    The veterinary hospitals that you've been

14   to, is it typical to have a waiting area in a

15   veterinary hospital?

16   A.    Yes.

17   Q.    How about a reception desk?

18   A.    Yes.

19   Q.    How about a room for medical records?

20   A.    Sometimes.

21   Q.    Have you been to ones that don't have

22   places for medical records?

23   A.    Yes.

24   Q.    Where?

Warren C. Freedenfeld                                12/28/2006

Page 126

1        A.    I can't recall specifically, but a lot of

2    hospitals today are paperless.

3        Q.    Okay.  Most of them have exam rooms?

4        A.    Yes.

5        Q.    Have you ever been to a vet hospital that

6    doesn't have exam rooms?

7        A.    No.

8        Q.    Most of the vet hospitals that you've been

9    to, do they have treatment rooms?

10       A.    Yes.

11       Q.    Have you ever seen a vet hospital that

12   doesn't have a treatment room?

13       A.    No.

14       Q.    Do all vet hospitals have places for

15   inpatients staying for their patients?

16       A.    Usually.

17       Q.    Do you see ones that don't?

18       A.    Not usually.

19       Q.    How about surgical suites, are they common

20   in veterinary hospitals?

21       A.    Usually.

22       Q.    Do you see ones that don't have surgical

23   suites?

24       A.    Yes.

Warren C. Freedenfeld                                        12/28/2006

Page 127

1      Q.    How often do you see ones that don't have

2    surgical suites?

3      A.    Occasionally.

4      Q.    Okay.  Can you think of one that doesn't?

5      A.    I believe there's one on Charles Street.

6    It's a referral clinic.  They don't do surgery.

7      Q.    How about things like laundry, are they

8    common in veterinary clinics?

9      A.    Usually.

10     Q.    Food prep areas?

11     A.    Usually.

12     Q.    Restrooms, I assume for the people who work

13   there?

14     A.    Yes.

15     Q.    Labs, are they fairly common?

16     A.    Yes.

17     Q.    Pharmacies?

18     A.    Yes.

19     Q.    Isolation wards?

20     A.    Usually.  Not always.

21     Q.    Offices for the doctors?

22     A.    Usually.

23     Q.    Looking at Page 53, is there anything in

24   this particular main level section that strikes you

Warren C. Freedenfeld                                    12/28/2006

Page 128

1    as unusual that you haven't seen at any other

2    veterinary hospital?

3         A.    The rooms and spaces are common.  It is the

4    arrangement that makes each hospital unique.

5         Q.    My question was, is there anything on Page

6    53 on this main level that strikes you as not

7    existing in any other veterinary hospital?

8              MR. McCALL:  Objection.

9         Q.    I'm asking in looking at this, is there

10   anything that jumps out at you that says, wow, I've

11   never seen that before?

12             MR. McCALL:  Objection.

13        A.    If your question is, are there any rooms

14   here that don't usually appear in vet hospitals, the

15   answer is, no.

16        Q.    Putting these two pages together, so you

17   have the whole layout of the lower level and the

18   main level, does your company have in its possession

19   this identical layout, lower level and main level,

20   I'm saying identical, with your company name on it?

21             MR. McCALL:  Objection.

22        A.    What we have is virtually identical.

23        Q.    That's a yes or no question.  I'm asking

24   whether you've got this main level and lower level

**Warren C. Freedenfeld**                    12/28/2006

Page 129

1    drawing that's identical to this that has the name

2    of your company on it?

3              MR. McCALL:  Objection.

4         A.    It is virtually identical.

5         Q.    I can sit here and we can ask the question

6    over again.  It's a yes or no question.  Do you have

7    one that is as shown on Page 52 and 53 identical,

8    this drawing with your name on it?

9              MR. McCALL:  Objection.

10        A.    In my mind, it's identical.

11        Q.    If you were to take those plans, it is this

12   drawing here on Page 52 and 53, it's the same as the

13   one marked in Exhibit 2, except it has your name on

14   it; that's the difference?

15             MR. McCALL:  Objection.

16        A.    No.  There are minor differences.

17        Q.    So it's your testimony you do not have a

18   drawing shown on 52 and 53 with your name on it?

19        A.    Not every line.

20        Q.    I'm still not getting the answer.  I'm

21   asking whether you have this drawing, lower level

22   and main level, as shown on Page 52 and 53, with

23   your name on it?

24        A.    No.

Warren C. Freedenfeld                                    12/28/2006

Page 132

1    Q.    Was there anything unusual about the house

2    and the barn?

3    A.    Nothing exceptional.

4    Q.    How old was the house?

5    A.    I don't recall.

6    Q.    Would you turn to Page 53.  There's a

7    section called "Zoning Woes."  Do you recall this

8    house being a historic house that he bought?

9    A.    I don't know that it was on the National

10   Historic Register, if that's what you're asking.

11   Q.    Was it an old house?

12   A.    It was an old house, yes.

13   Q.    Did it require special permitting from the

14   Town of Gardner?

15   A.    The project required special permitting.

16   Q.    What kind of permitting did it require?

17   A.    I believe it required a use variance,

18   because it, I believe, was in a residential zone.

19   Q.    Did you ever go to any meetings with Dr.

20   McTigue or anybody else from the Gardner Animal Care

21   Center to meet with town boards?

22   A.    I believe I did.

23   Q.    Which boards did you meet with?

24   A.    I don't recall specifically.

Warren C. Freedenfeld                              12/28/2006

Page 133

1    Q.    Do you recall the substance of those

2  meetings?

3    A.    The substance was that we presented the

4  project as a proposal to the town for approval.

5    Q.    Do you know how long the approval process

6  took?

7    A.    I think it actually took a couple years.

8    Q.    Do you know how many meetings took place

9  that discussed this project?

10    A.    I don't recall.

11    Q.    Do you know why it took a couple of years?

12    A.    There were other issues, too.  I think

13  there were some -- I believe there might have been

14  some wetland issues.  I'm not positive.  It's been a

15  while.

16    Q.    Are you aware of any restrictions placed

17  upon this project by the City of Gardner?

18    A.    Not off the top of my head, no.

19    Q.    Do you recall that there were at one time

20  some restrictions on this?

21    A.    I think there might have been some

22  restrictions, but I don't recall exactly what they

23  are.

24    Q.    Do you know if there were ever any kind of

**Warren C. Freedenfeld**                                    12/28/2006

Page 134

1   written orders issued by the City of Gardner that

2   dictated ways in which this project could go

3   forward?

4        A.   I believe there were.

5        Q.   Do you recall who generated those

6   documents?

7        A.   It was one of the jurisdictional agencies

8   within the Town of Gardner.

9        Q.   You don't know which one?

10       A.   I don't recall.

11       Q.   Do you recall if the Town of Gardner

12  limited the size of the building?

13       A.   I believe they did.

14       Q.   Do you know if they dictated what the

15  building would look like?

16            MR. McCALL:  Objection.

17       A.   No, I don't believe they dictated what it

18  had to look like.

19       Q.   Did they say anything about roof lines?

20       A.   I don't recall.

21       Q.   Did they dictate anything about building

22  materials?

23       A.   I don't recall.

24       Q.   Did they dictate anything about the square

Warren C. Freedenfeld

12/28/2006

Page 147

1   the mechanics of how he did it.  I can only tell you

2   that the end result of what he did was to take our

3   plans and to, in one way or another, transfer them

4   onto his own stationery.

5       Q.   Is there a Cormier document that you've

6   seen that is exactly and identically in all manner

7   your drawings with the Cormier name on them?

8            MR. McCALL:  Objection.

9       A.   His drawings are virtually identical.

10      Q.   My question is, have you seen a Cormier

11  document that is your drawing with Cormier's name on

12  it, identical in all respects?

13           MR. McCALL:  Objection.

14      A.   If you're talking about to the most

15  minuscule detail, no.

16      Q.   I'm saying is there a document that is an

17  exact copy which your logo was removed and the

18  Cormier name was put on it?

19           MR. McCALL:  Objection.

20      A.   It is for all intents and purposes

21  identical.

22      Q.   My question is a yes or no.  Is there a

23  document that is a copy in every manner and respect

24  of your drawings that has the Cormier logo in place

Warren C. Freedenfeld                                    12/28/2006

Page 148

1   of your logo; yes or no?

2       A.   If you're talking about every single line,

3   the answer is, no.

4       Q.   So there's nothing that we would call a

5   duplicate of your work in all respects with the

6   Cormier logo on it?

7            MR. McCALL:   Objection.

8       A.   90 percent of it is identical.

9       Q.   It's a yes or no question.   Is there an

10  identical duplicate of your drawings with the

11  Cormier name on it?

12           MR. McCALL:   Objection.

13      A.   Not 100 percent identical.

14      Q.   That's a no?

15      A.   That's a no.

16      Q.   Now, you say in there that the copying had

17  the intended effect, prior to that sentence, where

18  it says "Cormier then copied the Plaintiff's

19  architectural designs and submitted them to the

20  municipal planning board for approval"?

21      A.   Yes.

22      Q.   Had your drawings ever reached a level of

23  completion that they had been approved by a

24  municipal planning board?

Warren C. Freedenfeld

12/28/2006

Page 167

1      Q.    So when Dr. McTigue were to you say that he

2  paid you to do work on these plans, even though you

3  didn't finish them, would that be a lie to say that

4  you were the architect on this project?

5            MR. McCALL:  Objection.

6      A.    Could you restate that, please.

7      Q.    Sure.  You agree that you didn't finish

8  this particular project?

9      A.    Correct.

10     Q.    You did some work on the drawings, correct?

11     A.    Yes.

12     Q.    And you were paid for that work, correct?

13     A.    Correct.

14     Q.    But didn't finish it, see it through to

15  completion?

16     A.    Correct.

17     Q.    So if Dr. McTigue said that you were his

18  architect, wouldn't that be lying under the same

19  logic?

20            MR. LEE:  Objection.

21     A.    No.

22     Q.    Why not?

23     A.    Because we were the designers of this

24  project.

Warren C. Freedenfeld                          12/28/2006

Page 180

1    South Miami was not completed by us.  It was

2    completed by another architect, and it actually

3    became a Hospital of the Year.

4         Q.    Is that the project you referenced earlier

5    on in response to Mr. Rosenberg's question about any

6    other litigation or disputes about ownership?

7         A.    Yes.

8              MR. McCALL:  Okay.  That's it.

9              MR. ROSENBERG:  I have a couple questions.

10                   REDIRECT EXAMINATION

11    BY MR. ROSENBERG:

12         Q.    Could Bennett build from the plans

13    developed by Warren Freedenfeld & Associates as they

14    existed at the time that you were terminated from

15    the project?

16         A.    No.

17         Q.    What more had to be done?

18         A.    I think this was asked and answered, but I

19    will repeat it.  There were a lot of details that

20    had to be completed, dimensions that had to be

21    added, interior details, exterior details, things of

22    that nature.

23         Q.    Warren Freedenfeld & Associates did not do

24    that work on this project; is that right?

Warren C. Freedenfeld                                    12/28/2006

Page 181

1       A.    No, we did not.

2       Q.    Do you know what plans Bennett used to

3   build from, the actual plans they had physically

4   that they were using that had those details?

5       A.    I'm assuming that he used Cormier's plans

6   to build the project.

7       Q.    Now, you were testifying a minute ago about

8   the forms that are submitted to "Veterinary

9   Economics" magazine for a merit award.  Do you know

10  whether anyone from Edward Cormier Associates filled

11  out any part of a submission to "Veterinary

12  Economics" magazine?

13      A.    I have no knowledge of that.

14          MR. ROSENBERG:  That's all I have.  Thank

15  you.

16          MR. McCALL:  Anybody else?

17          MR. ROSENBERG:  Looks like we're finished.

18          (Whereupon the deposition

19          concluded at 2:45 p.m.)

20

21

22

23

24

Page 182

1              C E R T I F I C A T E

2        I, WARREN C. FREEDENFELD, do hereby certify

3    that I have read the foregoing transcript of my

4    testimony, and further certify that it is a true and

5    accurate record of my testimony (with the exception

6    of the corrections listed below):

7    Page    Line              Correction

8

9

10

11

12

13

14

15

16

17

18

19        Signed under the pains and penalties of perjury

20    this       day of              , 2006.

21

22                          WARREN C. FREEDENFELD

23

24

Warren C. Freedenfeld

12/28/2006

Page 183

1                                CERTIFICATE

2    Commonwealth of Massachusetts

3    Suffolk, ss.

4

5         I, Michael D. O'Connor, Registered Professional

6    Reporter and Notary Public in and for the

7    Commonwealth of Massachusetts, do hereby certify

8    that WARREN C. FREEDENFELD, the witness whose

9    deposition is hereinbefore set forth, was duly sworn

10   by me and that such deposition is a true record of

11   the testimony given by the witness.

12        I further certify that I am neither related to

13   or employed by any of the parties in or counsel to

14   this action, nor am I financially interested in the

15   outcome of this action.

16        In witness whereof, I have hereunto set my hand

17   and seal this 28th day of December, 2006.

18

19                          *Michael D. O'Connor*

20                          Notary Public

21

22

23   My commission expires                CERTIFIED ORIGINAL
                                           LEGALINK BOSTON
24   November 7, 2008

**EXHIBIT E**

November 2004
www.vetmedpub.com
Case 1:05-cv-11573-RGS    Document 82-6    Filed 02/01/2007    Page 2 of 21

# Veterinary **Economics**®

*The business of client and patient care*

- ✦ Is your practice a great place to work?
- ✦ Giving an old house a cutting-edge extension
- ✦ Banishing dust bunnies from high-tech tools
- ✦ Planning your transition to ownership

Freedenfelt
EXHIBIT NO. 4
12/28/06
M.D. O'CONNOR

# You **are** what you **wear**



The nine-acre outdoor space includes benches, picnic tables, gardens, pet relief areas, grassy walking areas, and wildlife.

PHOTOS BY CRAIG ROSCOE AND BRIAN C. HURLEY

# G*iving* an old house a cutting-edge extension



**MERIT AWARD**

A New England practice blends a restored 233-year-old farmhouse with a new facility that offers all the perks of the 21st century. The next chapter for both the historic home and the practice team: Growth

*By Jessica Kellner, Staff Editor*

Combining history with innovation is a hallmark of New England. And Gardner Animal Care Center pays homage to that tradition by building its modern, high-tech veterinary hospital adjacent to a 233-year-old restored Massachusetts farmhouse.

It wasn't easy for practice owner Dr. Michael McTigue to blend what's possibly the oldest home in Gardner, Mass., with a modern animal care facility. The team tackled the building as a three-part process: developing the new 7,848-square-foot veterinary facility in 2000, adding boarding in 2001, and completing the renovation of the 1,840-square-foot historical home in 2003.

The result is a building that he says offers "endless possibilities to improve and grow." The icing on the cake: The design won a merit award in the 2004 *Veterinary Economics* Hospital Design Competition. ▶

Hospital Design

*award-winning floor plan*

## Gardner Animal Care Center

### *a look at the numbers*

73 Eaton St.
Gardner, MA 01440
(978) 632-7110
fax (978) 632-7354
tigvet@aol.com

**Owners:** Michael McTigue,
DVM; Brian Hurley, DVM

**Associates:** 1 full time

**Hospital team:**
15 full time, 7 part time

**Practice type:**
100 percent small animal

**Building size:** 9,688 square
feet (new facility: 7,848;
remodeled house: 1,840),
3,250 square feet unfinished
lower level

**Number of cages:**
26 hospital, 15 boarding

**Number of runs:**
7 hospital indoor; 30 boarding
indoor, 17 boarding outdoor

**Number of parking spaces:**
14 client, 17 staff

**Construction cost:**
$1.04 million for new facility;
$75,400 for house remodel

**Land purchase cost:**
$235,000

**Site improvement fees:**
$261,600

**Professional fees:** $135,197

**Equipment cost:** $83,500

**Furnishing cost:** $4,100

**Computer cost:** $9,630

**Additional fees:**
$21,000 (includes permit,
city, and impact fees)

**Year built:** new facility, 2000;
remodeled house, 2003

**Architect:**
Edward D. Cormier
Edward D. Cormier
Associates Inc.
113 Cedar St., Suite S4
Milford, MA 01757
(508) 634-8366
fax (508) 634-8038



**Lower Level**



Joining the modern with the treasured: Dr. McTigue says the TV show, *This Old House*, was interested in his unique project, but unfortunately Gardner was too far away from the show's operating base out of Boston.



**Main Level**



Every exam room and the children's play area features murals of cats, dogs, and Beatrix Potter characters.



The surgery room with pass-through windows allows practice team members easy access to supplies.

## Zoning woes

"Although I'm thrilled with the result," says Dr. McTigue, "had I known how difficult it would be, I might have reconsidered." He searched for land for more than two years. When he finally found a site he liked, it was in a district that was zoned only for private residences. But the threat of other buyers interested in the property and the lack of other viable options forced him to purchase the $235,000 property before obtaining a building permit.

To convince the necessary boards—including the local planning, health, and conservation boards, among others—to allow a veterinary practice on the site, Dr. McTigue hired a team to design and present the plans. "We had a veterinary architect, a project manager who was a permit specialist, a general contractor, and an engineer working on the design, and they put together a book that explained what we were planning to do and why we should be allowed to proceed," he says.

Although the various groups liked the plan, they couldn't approve it because there was no legal precedent for allowing a business in a protected watershed area. So the doctor and his team told the boards that if he couldn't use his property for a veterinary hospital, he'd divide the nine acres of prime real estate and build a subdivision of seven houses. "They had to ask themselves which is better for watershed protection, one veterinary hospital or seven houses. They actually got a kick out of that," he says. Finally, the boards had cause to approve the building of Gardner Animal Care Center. ▶

# Hospital Design



Using the kitchen and staff lounge in the restored home "feels like eating lunch and relaxing at home," says owner Dr. McTigue. The large, brick fireplace adds to the homey feel on cold Massachusetts days.



The restored home provides ample space for relaxation and a place to get away from the hustle and bustle in the new facility. The doctors' office features a collection of veterinary antiques and original hand-hewn chestnut beams.

## Educate the employee, educate the client

Dr. McTigue began doing some heavy lifting to prepare for the move long before the construction began. "Knowing we were taking on a big new project, I delegated a lot of management responsibility to free myself up," he says. "But this wasn't just a temporary coping mechanism. We knew we needed both a better shoebox and a comprehensive renovation of our management and team systems. For as much energy as we spent on the new building, we spent even more to make sure our team was prepared to provide the best quality care," he says.

In the first step of the system overhaul, he handed off many practice management duties to then-associate, now-partner Dr.

Brian Hurley. He also created an official head technician position and identified a front-office manager.

"Before we moved in, we started raising the level of care by creating standards for the practice team to follow," says Dr. Hurley. "Since coming to this building, we've implemented a standards handbook. The practice team also chose a uniform dress code: colored scrubs. And we opted to close the hospital for three hours each Tuesday for mandatory team meetings."

For the first half of the meeting, the team focuses on client service and staff issues. In the last half, they learn about some specific aspect of care. "We stay with one clinical topic for two to three months," says Dr. Hurley. "For example, we just finished three months on behavior, and now we're starting vaccinations. With this level of training, our staff members can answer all of clients' questions, right down to the mechanism of how the vaccines work."

After completing each training section, staff members take a test on the material. Those who earn 90 percent or better get a 25-cent per hour raise. "Arming all team members to educate clients has been very effective, because their contribution frees the veterinarians' time to do what only we can do, like diagnose, prescribe, and perform surgery," Dr. Hurley says.

Staff members also conduct free educational sessions for the public about once every two months. They cover information like performing CPR, administering first aid, caring for a new puppy or kitten, and at-home dental care. "For example, we show people how to brush their pets' teeth, recommending that they start with ten seconds a night, letting the pet lick the toothpaste off their finger, and then moving to the brush," says head technician Tracey Nowers, CVT.

Staff members also introduce clients to other dental health products, demonstrating each product, showing before-and-after dental photographs, and sending attendees home with a goodie bag. The

Hospital Design



**The time was right to sell.**
**The time was right to call**
**Simmons & Associates.**

Is the time right for you?

Since 1977, the nation's premier
brokers of veterinary practices.

SALES • APPRAISALS
FINANCING • EXIT STRATEGIES

Call 800-333-1984
www.simmons2000.com

SIMMONS & ASSOCIATES

practice notifies the local newspaper of sessions, hands out fliers, and posts a notice on the waiting room bulletin board to improve attendance, Nowers says. For each session, 20 to 30 clients fill the conference room in the old house.

## Room to breathe, room to spare

Dr. McTigue planned the space in advance to make room for such educational meetings. "I visited 30 practices to get ideas and advice before we built," says Dr. McTigue. "The owners were unanimous about two things: build big and include plenty of storage space."

And that he did, planning for space in the new facility to add such ancillary services as grooming, boarding, and training. "Gardner has 22,000 people, and when we built, there were no boarding or training facilities

within 15 miles," says Dr. McTigue. "Although I knew adding these services might produce headaches and growing pains, I knew it would also add to the quality of our bond with pets and families and generate revenue."

For example, the two agility courses—one outside and another in the padded, unfinished basement—offer pets both physical and social benefits. "For active dogs, it helps burn some of that energy," says Nowers. "It's also good for the human-animal bond because owner and pet are doing something together. And the training helps reinforce the idea that the dog works for the owner, which can help control some behavior problems," she says.

Dr. McTigue considers the space he devotes to ancillary services a high-quality investment. "Some services may not take off right

---

*take-away lesson*

## Building changes enable critical management changes

"Today we give clients the information they need before they ask us. And a lot of that is training," says Dr. Hurley. "But we never could have accomplished these goals in the old facility because it involved almost doubling our staff."

And Dr. Hurley says clients are responding to the changes, with benefits for pets' health and for the practice. For example, compliance with the practice team's recommendations continues to improve, as evidenced by the practice's rising average client transaction, from $70.80 in 1999 to $96.25 today for medical and ancillary services.

"Our clients are receptive to our recommendations because of all the information we give them," says Dr. Hurley. "And when team members talk to clients about care, they de-emphasize the price, focusing instead on what we'd like to do for the pet, why it's important, and what results we're expecting," he says.

Clients get instructional, product, and cost brochures for every recommended service. And receptionists, assistants, technicians, and veterinarians all help give clients the information to make good decisions on behalf of their pets, Dr. Hurley says. "When clients feel informed, they're willing to do more for their pets."

Circle **127** on reply card

## Hospital Design



The unfinished basement with padded floors houses the indoor agility course. The agility program gives the team another way to build the bond between clients and pets.



The reception area (view from behind check-in) includes windows into adoption and grooming so clients can watch the dogs getting a trim and the kittens at play.

away, but that's OK; we have time," he says. "We're offering so much more than before that people first have to learn about these services, then get used to using them. For example, we're finding that people aren't used to boarding their cats in townhouses. In this case, we have to create the market."

If the practice owners decide to add more services to the practice, they have more than enough room. The 3,250-square-foot unfinished basement currently houses the indoor agility course, but it's also plumbed and ready to finish. The adjoining house also has available space. On the first floor, doctors plan to redo two bedrooms to serve as offices, and there are two unused finished bedrooms upstairs.

"We've already done so much," says Dr. McTigue. "It was an uninsulated, horse-hair plaster house. We had to basically replace everything. But we fought to retain all the original woodwork and framing." The house also offers staff members a lounge in its former kitchen, complete with original floors, restored cabinets, and a large fireplace. The team holds meetings in the house's former living room, next to another massive fireplace.

The team says the new facility has been great for morale: "The fun part is that the possibilities to improve and grow are endless," says Nowers. "We're always asking ourselves, 'What else can we add?' and 'How could we do this better?' In the old place, we couldn't consider doing or adding more. Now, our staff has practically tripled, output has increased, and technicians really get to use their skills. And if we have ideas, they're always heard, which makes us feel valued."

Dr. McTigue also feels the move was invaluable. "We wanted the practice to have an old New England feel, but we wanted it to have everything a hospital needs, too. It was a tricky goal to achieve. But this renovated house is a bigger pleasure than I ever thought. I really didn't anticipate that it would actually make practicing veterinary medicine more enjoyable, both for me and my staff."

*Editors' note: Don't forget, applications for the 2005 Hospital Design Competition are due Nov. 29.*



The time was right to buy.
The time was right to call
Simmons & Associates.

Is the time right for you?

Since 1977, the nation's premier brokers of veterinary practices.

SALES • APPRAISALS
FINANCING • EXIT STRATEGIES
**Call 800-333-1984**
www.simmons2000.com

SIMMONS & ASSOCIATES

Circle **128** on reply card



**Warren Freedenfeld & Associates**

Architecture
Planning
Interior Design



*Freedenfeld*

EXHIBIT NO. _5_
12/28/06
M.D. O'CONNOR

39 Church Street

Boston, MA 02116

Phone: 617.338.0050

Fax: 617.426.2557

## TRANSMITTAL

| To: | Michael P. McTigue, DVM | Date: | 22 Jun 99 |
|---|---|---|---|
| | **Gardner Animal Care Center** | Project No: | 9818 |
| | 7 Pearson Boulevard | Project: | Gardner Animal Care Center |
| | Gardner, MA 01440 | | |
| From: | Warren Freedenfeld, AIA | Via: | 978–632–7354 |

### Enclosures:

| Copies | Date | Description |
|---|---|---|
| 1 | 22 Jul 99 | Proposed Termination Agreement |

### Remarks:

☑ For Your Information    ☑ For Your Approval    ☑ Please Return    ☑ As Requested

\\server\server\projects\9800\9818.p]\documents\transmittals\mctiguem\mctiguem22jul99.doc



**Warren Freedenfeld & Associates**

**Architecture**
**Planning**
**Interior Design**

39 Church Street
Boston MA 02116
Phone: 617.338.0050
Fax: 617.426.2557

22 July 1999

Mike McTigue, DVM
Gardner Animal Hospital
7 Pearson Boulevard
Gardner, MA  01440

Project:    **Gardner Animal Hospital** (Project #9818)
Re:         **Termination of Owner and Architect Agreement**

Dear Mike:

This letter shall confirm our agreement to terminate our Owner and Architect Agreement.  It is understood that the current outstanding invoice (Invoice #5644) totals $18,013.70.  It is agreed that a settlement amount of $9,500.00, over and above all payments made to date, shall be considered payment, in full, for all expenses incurred and for all services rendered, to date.

It is our understanding that you intend to redesign the Project utilizing the services of another architect. We wish you the best of luck in that endeavor.

Sincerely,

Warren Freedenfeld, AIA
Principal

WF:sac

The Settlement Agreement is **approved** and **accepted**:

_____          _____
Michael McTigue, DVM                                    Date

cc:  Charles Cimino, AIA  –  WFA
     Richard Ahern        –  WFA
     File





**MICHAEL P. McTIGUE, D.V.M.**

GARDNER ANIMAL HOSPITAL
7 Pearson Blvd.
Gardner, MA 01440
Telephone: (508) 632-7110

Warren Freedenfeld and Associates
39 Church Street
Boston, MA 02116
(617) 338-0050

Dear Warren:

I have reviewed your termination agreement dated July 22, 1999 and find two issues needing further clarification. First, the letter is confusing in that it discusses the invoice total as billed to date of $47,598.00 plus $147.99 of reimbursable expenses totaling $47,746.00. The letter also states that there is balance due of $18,013.70 without detailing any of the payments made. By my calculations according to these figures, you are stating that the payments made total $29,732.30. According to my documentation (cancelled checks), the following payments have been made as of this date:

| | |
|---|---|
| April 20, 1998 | $3,000.00 (Deposit) |
| July 8, 1998 | $1,513.62 |
| February 22, 1999 | $14,615.23 |
| April 7, 1999 | $7,500.00 |
| May 10, 1999 | $8,393.78 |
| Total paid | $35,022.63 |

We both agree that the total amount of service billed to date according to the June 1999 statement is $47,746.00. Taking this amount and subtracting the amount of the payments made ($47,746.00 - $35,022.63) would leave the outstanding balance of $12,723.37.

Our phone conversation pertaining to a settlement amount was based on the invoice total of $18,013.70. At that time, we agreed on a settlement amount of $9,500.00. As a result, Warren Freedenfeld and Associates accepted to issue a settlement credit amount of $8,513.70 (the difference of the invoice minus the $9,500).

Therefore, the remaining balance owed based on the documentation provided by WFA and the payments made would be for $4,209.67. This figure comes from the amount billed to date minus the amount paid to date minus the issued settlement credit agreed upon in the July 22, 1999 termination letter.

Second, although we are utilizing the services of another architect, we plan to utilize any and all the information shown on the drawings designed by WFA. Please make note of this in the general release statement.

Sincerely,

Michael P. McTigue



**Warren Freedenfeld & Associates**

Architecture
Planning
Interior Design

39 Church Street
Boston MA 02116
Phone: 617.338.0050
Fax: 617.426.2557

*Freedenfeld*
EXHIBIT NO. 7
12/28/06
M.D. O'CONNOR

30 July 1999

Michael P. McTigue, DVM
Gardner Animal Hospital
7 Pearson Boulevard
Gardner, MA 01440

Project: **Gardner Animal Hospital (Project #9818)**
Re:     **Termination Agreement**

Dear Dr. McTigue:

Warren has asked me to respond to your last correspondence (undated) regarding our Termination Agreement. We would like to offer clarification and a summary of the transactions, to date. In your presentation, you neglected to include reimbursable expenses from all invoices. Therefore, the correct total billed to dated is as itemized below.

| Date | Invoice # | Amount | Payments | Check Date |
|------|-----------|--------|----------|------------|
| Retainer | N.A. | $ 3,000.00 | $ 3,000.00 | 20 Apr 98 |
| 30 Apr 98 | 5109 | 1,513.62 | 1,513.62 | 08 Jul 98 |
| 31 Jan 99 | 5500 | 14,615.23 | 14,615.23 | 22 Feb 98 |
| 28 Feb 99 | 5524 | 5,478.32 | | |
| 31 Mar 99 | 5553 | 10,340.30 | 7,500.00 | 07 Apr 99 |
| 30 Apr 99 | 5592 | 75.16 | 8,393.78 | 10 May 99 |
| 31 May 99 | 5620 | 17,865.71 | | |
| 30 Jun 99 | 5644 | 147.99 | | |
| Totals = | | $50,036.33 | $35,022.63 | |

As noted above, your payments to date amount to $35,022.63, as stated in your letter, leaving an unpaid balance of $15,013.70.

Our offer to settle for $9,500.00 included all payments made by Gardner Animal Hospital, including the initial retainer (deposit) and falls below the break-even point for this Project. This figure was arrived at in an attempt to cut the substantial losses that our Office has incurred on your behalf.



**Warren Freedenfeld & Associates**

Architecture
Planning
Interior Design

Michael McTigue, DVM
29 July 1999
Page 2


It is also important for you to understand that your decision to terminate our Owner and Architect Agreement precludes your use of any and all drawings and/or documents produced by this Office. These drawings and other documents are not only protected by Federal copyright laws but are also the sole legal and contractual property of this Office and cannot be used by the Owner or others for completion of this Project. I believe you know there is no dispute about this issue. In addition, any licensed architect will know the substantial jeopardy he will place his firm in by using another architect's copyrighted documents. All documents given to you by this Office must be returned upon execution of the Termination Agreement.

For whatever it's worth, Warren has asked me to, once again, convey to you his desire to continue working together toward the successful completion of this Project. He has indicated to me that he is ready and willing to resolve any issue and to do everything and anything possible to work together in harmony. If there is any possibility of this, then Warren will remain involved and available. My intervening in this matter will become necessary, only if termination is the only course open to us.

Sincerely,

Charles Cimino, AIA
Director of Operations


CC: aeb

cc:  Warren Freedenfeld, AIA
     Richard Ahern, Business Manager
     File



**Michael P. McTigue, D.V.M.**
**Brian C. Hurley, D.V.M.**
**Kathleen J. O'Brien, D.V.M.**

RECEIVED  9 AUG 99

GARDNER ANIMAL HOSPITAL
7 Pearson Blvd.
Gardner, MA 01440
Telephone: (978) 632-7110

Warren Freedenfeld & Associates, Inc.
39 Church Street
Boston, MA  02116



Freedenfeld
EXHIBIT NO. 8
12/28/06
M.D. O'CONNOR

Dear Mr. Freedenfeld:

I have again reviewed our contract, all of our prior correspondence, your invoices and my payments.
Frankly, I too have incurred substantial losses in this matter, and I continue to incur significant costs and
expenses as a result of the events as they have unfolded.  Rather than attempting to work through the maze
of numbers to reach a final conclusion on mutually agreeable settlement, I have decided to focus upon just
one.

Specifically, I call your attention to Mr. Cimino's letter to me of July 30, 1999, and to the table on the first
page thereof.  All of the items listed in Mr. Cimino's "Invoice" column are for invoices for work you
purport to have actually done, except for the first line called "Retainer," it appears that you are also
attempting to charge me for it by placing the amount of $3,000.00 in the "Invoice" column of your numbers
as well.  The retainer was paid for work to be performed; however, it was never credited to what was owed
to you in your calculations.

Utilizing the figures set out in Mr. Cimino's letter to me of July 30, 1999, therefore, but deleting from the
"Invoice" column the "Retainer" amount, the totals become $47,036.33 for the "Amount" column, and
remain at $35,022.63 for the "Payment" column, leaving a balance of $12,013.70 and not $15,013.70 as
you indicate or the $18,013.70 that I continue to currently receive bills.

Our $9,500.00 agreement was clearly and repeatedly negotiated with the incorrect balance of $18013.70 in
mind.  However, for the sake of argument, I will still agree to the figure of $9,500.00, but the $3,000.00
deposit must be credited against this balance, as stated in section 11.1 of our contract.  If the sum of
$6,500.00 is agreeable, please let me know and I will arrange for a mutual release to be prepared and
forwarded to you.

Sincerely,

Michael P. McTigue, DVM

RECEIVED  16 AUG 99



**Michael P. McTigue, D.V.M.**
**Brian C. Hurley, D.V.M.**
**Kathleen J. O'Brien, D.V.M.**

GARDNER ANIMAL HOSPITAL
7 Pearson Blvd.
Gardner, MA 01440
Telephone: (978) 632-7110

Warren Freedenfeld & Associates, Inc.
39 Church Street
Boston, MA  02116

*Freedenfeld*

EXHIBIT NO. 9
12/28/06
M.D. O'CONNOR

Dear Mr. Freedenfeld:

This letter is sent to you pursuant to the terms of Article 8.1 of the AIA Document B151 executed by and between us dated March 24, 1998, regarding the proposed construction of the Gardner Animal Hospital on my behalf.  Furthermore, this letter is sent to you as written confirmation of the termination of the contract entered into by and between us verbally during our phone discussion on June 25, 1999, which termination was further confirmed by you in your letter of July 22, 1999 to me.

The reason for the termination action taken on June 25, 1999, and for this letter in confirmation of same, is that you failed substantially to perform in accordance with the terms of the Agreement above referenced through no fault of mine.

Some, and this list is not all inclusive, of the reasons for this termination are as follows:

1.    Although I was charged nearly $50,000 for work you purport to have done, substantial portions of that work had not, indeed, ever been completed by you.  For example, foundation drawings were never developed by you, nor were the proper elevations used.  Additionally, there were residual questions as to whether work you had said had been done, and billed me for, had ever actually been done.

2.    Whatever plans, drawings etc. You did prepare have proven to be useless to us, and they have been rolled up and discarded.  This, in spite of my having paid you tens of thousands of dollars; unfortunately, I again have to pay another architect another tens of thousands of dollars to complete the project.

3.    Most importantly, you continued to refuse to recognize that a redesign of the plans, etc. was required to reduce the cost of the project to a manageable financial level.  You knew full well that my bank had limited me to construction costs of $1,000,000.00, while everyone to whom I spoke in the construction industry and elsewhere indicated that the project as you had designed it could not be completed for less than approximately $1.3 million, some 30% over my project budget.

I regret having had to take this action and I wish you success in your future endeavors.

Sincerely,

Michael P. McTigue, DVM

**TERMINATION AND MUTUAL RELEASE AGREEMENT
BETWEEN GARDNER ANIMAL HOSPITAL AND
WARREN FREEDENFELD & ASSOCIATES INC.**

*Freedenfeld*
EXHIBIT NO. __11__
12/28/06
M.D. O'CONNOR

WHEREAS Michael P. McTigue, DVM, and Gardner Animal Hospital, collectively ("GAH") and Warren Freedenfeld & Associates Inc. ("WFA") had previously entered into an Owner and Architect Agreement dated 24 March 1998 ("Agreement"), for the provision of architectural services in connection with the Gardner Animal Hospital, located at 73 Eaton Street, Gardner, Massachusetts ("the Project"), and

WHEREAS the Schematic Design and partial Construction Drawings for such Project has been substantially completed, and

WHEREAS the parties desire to terminate their Agreement without the provision of any further services by WFA,

NOW THEREFORE, in consideration of the mutual agreements contained herein, the parties agree as follows:

1.  The Agreement is terminated and the parties shall have no further obligations except as set forth in this Termination and Mutual Release Agreement.

2.  Upon execution of this Agreement, GAH shall pay WFA Seven Thousand Five Hundred Dollars ($7,500.00) as final and total payment for all services provided and expenses incurred to date. This amount shall be in addition to all previous amounts paid by GAH and/or received by WFA.

3.  GAH agrees not to use any of the work produced by WFA. Article 6 of the Owner and Architect Agreement shall remain in full force and affect.  *SOLELY WF@*

4.  GAH and WFA agree to release each other of and from all loss, expense, claim, or action of any kind arising at any time from this date forward, whether arising out of the Agreement or otherwise, intending thereby to give each other a general release of all claims each may have against each other to date, and in the future, except as to the obligations under this Termination and Mutual Release Agreement, which are not being released.

Executed as a contract under seal this ___2ND___ day of ___SEP___, 1999.

Owner:

Gardner Animal Hospital
7 Pearson Boulevard
Gardner, MA  01440

By _____
    Michael P. McTigue, DVM

Witness:

By _____
Name: Brian C. Hurley DVM

Architect:

Warren Freedenfeld & Associates Inc.
39 Church Street
Boston, MA  02116

By _____
Warren Freedenfeld AIA, President

Witness:

By _____
Name: Sasha A. Chanaka

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05 11573 RGS



|  |  |
|---|---|
| WARREN FREEDENFELD ASSOCIATES, INC. as successor in interest to WARREN FREEDENFELD & ASSOCIATES, INC., Plaintiff, | ) ) ) ) ) |
| v. | ) ) |
| MICHAEL P. MCTIGUE, DVM individually and as Trustee of THE MCTIGUE FAMILY TRUST, NANCY A. MCTIGUE, as Trustee of the MCTIGUE FAMILY TRUST, BRIAN C. HURLEY, DVM, GARDNER ANIMAL CARE CENTER, LLC d/b/a GARDNER ANIMAL HOSPITAL, EDWARD D. CORMIER, ASSOCIATES INC., and BENNETT BUILDING CORPORATION, Defendants. | ) ) ) ) ) ) ) ) ) ) |

**PLAINTIFF'S SUPPLEMENTAL ANSWERS TO THE INTERROGATORIES OF
THE DEFENDANT, EDWARD D. CORMIER ASSOCIATES, INC.**

Pursuant to Fed.R.Civ.P.33, plaintiff, Warren Freedenfeld Associates, Inc.

("Freedenfeld"), as successor in interest to Warren Freedenfeld & Associates, Inc. hereby

supplements its answers to the First Set of Interrogatories of the defendant, Edward D.

Cormier Associates, Inc. ("Cormier") as follows:

**GENERAL OBJECTIONS**

Freedenfeld generally objects to each interrogatory to the extent that it seeks the

disclosure of information protected by the attorney/client privilege, work product

privilege, or beyond the scope of discovery permitted by Fed. R. Civ. P. 26 and 33.

Freedenfeld further objects to each interrogatory to the extent that it is overly broad,

unduly burdensome, or fails to specify with reasonable particularity the information requested. Without waiving the foregoing objections, Freedenfeld responds to the individually numbered paragraphs of the defendant's interrogatories as follows:

## INTERROGATORIES

### INTERROGATORY NO. 1:

State in detail all facts upon which you base your cause of action set forth in Count VI of the complaint, including in your answer all acts by this defendant that allegedly support liability and all acts by any other defendant that allegedly support liability.

### ANSWER NO. 1:

Freedenfeld objects to Interrogatory No. 1 on the grounds that it seeks disclosure of information protected by the attorney-client, work product privilege or other applicable privilege. Freedenfeld further objects to this interrogatory on the grounds that it calls for a legal conclusion. However, without waiving the foregoing objections, Freedenfeld incorporates by reference the allegations contained in paragraphs 1-67 of the Complaint. Further answering, my firm is a national architecture firm with clients across the country. Bennett and the other defendants misrepresented the origin of the Architectural Works which my firm solely created for the project and the distinctive elements of the works by among other actions, wrongfully passing them off to the world as their own work without my firm's knowledge or permission and without giving my firm any credit or compensation whatsoever for their use. The defendant's wrongful actions were calculated to confuse and deceive the national public about the true authorship and origin of the Architectural Works. Significantly, among other actions, as a vehicle for promoting the defendant's misrepresentation of the nature, distinctive characteristics and origin of the

2

Architectural Works, Cormier, with the assistance of the other defendants, caused the

Architectural Works or elements thereof to be published in *Veterinary Economics*

*Magazine*, a national and international business and management publication serving

more than 50,000 subscribers in the United States and Canada. Moreover, it recently

came to my attention that the article is continuing to be broadcast over the worldwide

web through the web site HospitalDesign.net.  Freedenfeld reserves the right to

supplement its answer to this interrogatory as more information becomes available during

the course of discovery.

## SUPPLEMENTAL ANSWER NO. 1

Discovery completed to date indicates that McTigue gave the plaintiff's architectural

designs to Cormier, and told Cormier that Cormier could use the designs to complete the

Gardner Animal Care facility. Significantly, on or about July 23, 1999, Edward Cormier

attended a meeting with Dan McCarty, Michael McTigue and Walter Bennett at the

office of McCarty Associates, Inc. At this meeting, Cormier was advised by McTigue

that the plaintiff had been paid for his services, and that McTigue had the right to use the

plaintiff's designs.  Cormier then copied the plaintiff's architectural designs and

submitted them to the municipal planning board for approval. The copying had the

intended effect of removing the plaintiff's logos from the original designs.  As part of a

scheme to disguise the fact that the designs were copied, Cormier made minor superficial

changes to some aspects of the design and then placed his own logos on the copied plans.

It should be noted that in his responses to the Plaintiff's First Request for Production of

Documents, Cormier produced copies of the plaintiff's plans with the plaintiff's logos

"Warren Freedenfeld & Associates" thereon which contained handwritten notes made by

3

either McTigue or Cormier referencing some of the superficial changes. One of these documents is the "First Floor Plan" that the plaintiff created for the facility and which Cormier admits was given to him by McTigue. This plan is virtually identical to the "Main Level" plan contained on page 53 of the November 2004 *Veterinary Economics Magazine* article in all important aspects, including, but not limited to, the locations of the front vestibules and locations of the waiting area, medical records room, laundry room, food prep, consultation room, canine and feline exam rooms, surgery suite, doctor's work stations, surgery prep, treatment room, pharmacy, lab, canine hospital ward, feline/exotic hospital ward, storage rooms, and canine and feline boarding areas. Essentially, Cormier stole the plaintiff's plans by deliberately disguising the true origin of the plans in violation of the Lanham Act. Freedenfeld reserves the right to supplement its answer to this interrogatory as more information becomes available during the course of discovery.

**INTERROGATORY NO. 2:**

Explain in detail how this defendant violated 15 U.S.C. § 1125(a), as alleged in paragraph 66 of the complaint, including in your answer all of the actions, omissions or other conduct of this defendant that violate the provisions of 15 U.S.C. § 1125(a) as alleged in paragraph 66 of the complaint.

**ANSWER NO. 2:**

Freedenfeld objects to Interrogatory No. 2 on the grounds that it seeks disclosure of information protected by the attorney-client, work product privilege, or other applicable privilege. Freedenfeld further objects to this interrogatory on the grounds that it calls for a legal conclusion. However, without waiving the foregoing objections, please see my

4


DEC. 27. 2006 4:44PM PARKER SCHEER LLP    NO. 482    P. 19/21

the complaint,"[t]he architectural work furnished to the hospital was solely produced by Freedenfeld."

### ANSWER NO. 20:

Please See Answer to interrogatory No. 1.

### SUPPLEMENTAL ANSWER NO. 20

See Supplemental Answer No. 19.

### INTERROGATORY NO. 21:

If not previously identified in a response to preceding interrogatory, please identify all additional evidence of which you are aware on which you base your claim(s) set forth in Count VI of the complaint.

### ANSWER NO. 21:

Please see my answer to interrogatory No. 1 and the documents made available for inspection and copying in connection with Freedenfeld's responses to the defendants' document requests in this action. Freedenfeld reserves the right to supplement its answer to this interrogatory as more information becomes available during the course of discovery and prior to trial.

### SUPPLEMENTAL ANSWER NO. 21

See Supplemental Answer No. 1. Freedenfeld reserves the right to supplement this answer as more information becomes available during the course of discovery and prior to trial.

Signed under the penalties of perjury this 27TH day of December 2006

Warren Freedenfeld

18

**EXHIBIT F**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

<table>
<tr><td>

WARREN FREEDENFELD ASSOCIATES, INC.,
as successor in interest to
Warren Freedenfeld & Associates, Inc.,

**Plaintiff**

v.

MICHAEL P. MCTIGUE, DVM, individually
and as Trustee of the McTigue Family Trust,
NANCY A. MCTIGUE, as Trustee
of the McTigue Family Trust,
BRIAN C. HURLEY, DVM,
GARDNER ANIMAL CARE CENTER, LLC
d/b/a Gardner Animal Hospital,
EDWARD D. CORMIER ASSOCIATES, INC.,
and
BENNETT BUILDING CORPORATION,

**Defendants**

</td><td>

Civil Action No. 05-11573 RGS

</td></tr>
</table>

### DEFENDANT EDWARD D. CORMIER ASSOCIATES, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

**I.    General Objections**

1.    Cormier objects to the instructions and definitions set forth in the Plaintiff's First Set of Interrogatories to the extent they impose upon Cormier a burden that is greater than, or inconsistent with, the applicable Rules of Civil Procedure. Cormier will respond to the Plaintiff's First Set of Interrogatories in accordance with the Federal Rules of Civil Procedure and the relevant Local Rules.

2.    Cormier objects to the instructions and definitions set forth in the Plaintiff's First Set of Interrogatories to the extent that they are vague, ambiguous, and seek to define terms in an expansive and overly broad manner, beyond the meaning that is given to those terms in general usage.

3.    Cormier objects to the Plaintiff's First Set of Interrogatories to the extent they seek information that is protected from disclosure by the attorney-client privilege, the work product doctrine, the joint-defense privilege or any other applicable privileges.

4.    The answers below shall not be deemed to constitute a waiver of any claims of privilege or immunity Cormier may have as to any response, document, or thing, or of any right of objection to competency, relevancy, materiality, admissibility, or any other evidentiary objection Cormier may assert.

5.    Discovery in this matter is ongoing, and accordingly Cormier reserves the right to modify, amend, or supplement any of the answers below.

6.    The following answers and specific objections to the Interrogatories are made subject to these General Objections.

## II.    Interrogatory Responses

### INTERROGATORY NO. 1

*Please state your full name, residential address, business address, your occupation, the name and address of your employer and the duties in that position.*

**Response:**    Edward D. Cormier
113 Cedar Street, Suite S4
Milford, MA  01757

Administration Manager, Edward D. Cormier Associates, Inc., now retired.  In addition, Edward D. Cormier Associates, Inc. is now a voluntarily dissolved corporation.

### INTERROGATORY NO. 2

*If you or anyone on your behalf had any communication in any form, written or oral, with GAH or any person acting on its behalf relating to or concerning any of the facts, events, occurrences or allegations set forth in the Complaint, please state:*

  *a.    The specific date and time (if applicable) of each such communication;*
  *b.    The manner in which each such communication was made on each of the dates listed in your answer to subpart a. of this interrogatory, i.e., whether by telephone, letter, face-to-face conversation, etc.;*
  *c.    The name and address of all persons who engaged or in any way participated in each such communication listed in your answer to subpart a. of this interrogatory; and*
  *d.    In full and complete detail of the entire contents of each such communication made on each of the dates listed in your answer to subpart a. of this interrogatory, indicating what was said or communicated by each of the persons listed in your answer to subpart c.*

*If any of these communications were in written form, you may respond by attaching a copy of such communications to your answers to these interrogatories.*

**Response:**    Objection.  In the wake of the court's ruling of February 9, 2006 and the corresponding order of February 13, 2006, this interrogatory addresses matters that are irrelevant to what remains of the plaintiff's complaint, and is not reasonably calculated to lead to the discovery of admissible evidence.  To the extent that this interrogatory seeks communications between counsel for Cormier and counsel for GAH, Cormier further objects on the grounds of the attorney client and joint-defense privileges.  Cormier further objects that the request is unduly burdensome, in that the burden and expense of the discovery requested outweighs its likely benefit, and overbroad.  In addition, the interrogatory is vague and unclear as to certain points.

Without waiving any of the foregoing objections, Cormier answers that it is impossible to detail each communication that Cormier had in connection with the Project, in that Cormier had periodic conversations with McCarty, Bennett, or Michael McTigue (any of whom might be considered persons "acting on behalf" of GAH) regarding the progress of the hospital renovation and amendments to design drawings. However, Cormier can provide details as to the following conversations.

Cormier was first contacted telephonically by Dan McCarty of McCarty Associates, Inc. on or about July 1, 1999. At that time, McCarty advised that construction costs for the McTigue project had been determined to be in excess of $1.3 million, when only $1 million had been budgeted for the project by McTigue. On other unrelated projects, McCarty and Cormier had consulted with each other. On this project, McCarty asked Cormier to review building designs drafted by Freedenfeld to determine whether there were any areas for construction cost savings. McCarty also advised Cormier that McTigue was dissatisfied with Freedenfeld's performance and was considering terminating Freedenfeld's services. McCarty asked whether Cormier would be interested in carrying the project forward, and if so, whether Cormier could prepare a proposal. Cormier responded that it would be interested and could prepare a proposal, but only if McTigue confirmed that it had notified Freedenfeld that it had been terminated, that Freedenfeld had been paid for the design services to date, and that McTigue had the right to use the Freedenfeld design information.

On or about July 6, 1999, Cormier prepared and submitted a draft of a design proposal to McCarty for review and comment. The proposal was limited to architectural services only, including review of documents and savings, conceptual drawings, and construction documents and administration. Structural, mechanical, electrical, plumbing were a part of the draft proposal as estimated engineering fees.

On or about July 14, 1999, Cormier met with McCarty and Bennett, at which time Cormier was provided with a set of the drawings that had been prepared by Freedenfeld. The documents provided at that time appeared to be progress prints dated May 14, 1999 and June 21, 1999.

On or about July 23, 1999, Edward Cormier attended a meeting with Dan McCarty, Michael McTigue, and Walter Bennett at the office of McCarty Associates, Inc. At that time, Cormier was advised by McTigue that Freedenfeld had been notified in writing of the termination of his services, that Freedenfeld had been paid for his services, and that McTigue had the right to use the designs generated by Freedenfeld. In reliance upon these assurances, Cormier agreed to provide design services for the project. McTigue advised that many areas of the Freedenfeld layout did not meet McTigue's requirements. Therefore, Cormier agreed to design a plan that reflected those requirements.

Following Cormier's formal retention, Cormier had periodic meetings with McTigue, McCarty, and Bennett as the plans were reviewed and revised throughout the redesign, permitting, and construction phases of the project. The exact dates and the matters discussed cannot be stated with particularity at this time.

**INTERROGATORY NO. 3**

*If you or anyone on your behalf had any communication in any form, written or oral, with any of the other defendants named in this action or any person acting on their behalf relating to or concerning any of the facts, events, occurrences or allegations set forth in the Complaint, please state:*

      *a.    The specific date and time (if applicable) of each such communication;*

      *b.    The manner in which each such communication was made on each of the dates listed in your answer to subpart a. of this interrogatory, i.e., whether by telephone, letter, face-to-face conversation, etc.;*

      *c.    The name and address of all persons who engaged or in any way participated in each such communication listed in your answer to subpart a. of this interrogatory; and*

      *d.    In full and complete detail of the entire contents of each such communication made on each of the dates listed in your answer to subpart a. of this interrogatory, indicating what was said or communicated by each of the persons listed in your answer to subpart c.*

*If any of these communications were in written form, you may respond by attaching a copy of such communications to your answers to these interrogatories.*

**Response:**    Cormier incorporates its objections to Interrogatory No. 2 as its objections to Interrogatory No. 3. Answering further, Cormier responds:

                None other than those disclosed in response to Interrogatory No. 2.

**INTERROGATORY NO. 4**

*If you or anyone on your behalf had any communication in any form, written or oral, with the Publishers of Veterinary Economics Magazine or any person acting on its behalf relating to or concerning any of the facts, events, occurrences or allegations set forth in the Complaint, please state:*

      *a.    The specific date and time (if applicable) of each such communication;*

      *b.    The manner in which each such communication was made on each of the dates listed in your answer to subpart a. of this interrogatory, i.e., whether by telephone, letter, face-to-face conversation, etc.;*

      *c.    The name and address of all persons who engaged or in any way participated in each such communication listed in your answer to subpart a. of this interrogatory; and*

      *d.    In full and complete detail of the entire contents of each such communication made on each of the dates listed in your answer to subpart a. of this interrogatory, indicating what was said or communicated by each of the persons listed in your answer to subpart c.*

*If any of these communications were in written form, you may respond by attaching a copy of such communications to your answers to these interrogatories.*

**Response:**    Cormier did not have any communications with the publishers of Veterinary Economics Magazine.

**INTERROGATORY NO. 5**
*Please identify all plans, drawings, sketches, and other design related documents created by Cormier in connection with the Project or any of the structures at the Property and state the name and address of the person who created each such document.*

**Response:**    Objection.   In the wake of the court's ruling of February 9, 2006 and the corresponding order of February 13, 2006, this interrogatory addresses matters that are irrelevant to what remains of the plaintiff's complaint, and is not reasonably calculated to lead to the discovery of admissible evidence. Further objecting, as all copyright infringement claims have been dismissed from this action and this information is not relevant to the only claim remaining in this litigation, this interrogatory is overbroad and unduly burdensome.

Subject to and without waiving this objection, this defendant identifies the following design drawings that were created by Edward D. Cormier in connection with the Project:

| Document No. | Title of Document | Date |
|---|---|---|
| A001 | Title Sheet | 8/9/1999 |
| A100 | First Floor Plan | 8/9/1999 |
| A101 | First Floor Dimension Plan | 8/9/1999 |
| A102 | Basement Floor & Ceiling Plan | 8/9/1999 |
| A103 | Roof Plan & Details | 8/9/1999 |
| A104 | First Floor Reflected Ceiling Plan | 8/9/1999 |
| A105 | First Floor - Floor Finish Plan | 8/9/1999 |
| A200 | Front and Right Side Elevations | 8/9/1999 |
| A201 | Rear and Left Side Elevations | 8/9/1999 |
| A300 | Sections #1 & #2 | 8/9/1999 |
| A301 | Wall Sections | 8/9/1999 |
| A302 | Wall Sections | 8/9/1999 |
| A303 | Wall Sections & Details | 8/9/1999 |
| A500 | Door Schedule & Details | 8/9/1999 |
| A501 | Room Finish Schedule | 8/9/1999 |
| A600 | Miscellaneous Details & Wall Types | 8/9/1999 |
| A-A1 | Alternate Truss Plan & Details | 10/7/1999 |
| A-A1a | Alternate Truss Plan & Details | 10/7/1999 |
| A111 | Reception Area Plan & Elevations | ● |
| SK100 | Partial Floor Plan | ● |
| SK101 | Partial Reflected Ceiling Plan | ● |
| SK102 | Partial Plan at Grooming Room | ● |
| SK103 | Partial Basement Plan | ● |
| SK103A | Partial Plan at Basement | ● |
| S001 | General Notes and Typical Details | 8/9/1999 |
| S100 | Foundation Plan | 8/9/1999 |
| S101 | First Floor Framing Plan & Truss Types | 8/9/1999 |
| S102 | Roof Framing Plan | 8/9/1999 |

| Document No. | Title of Document | Date |
|---|---|---|
| S300 | Sections Details | 8/9/1999 |
| T-1 | Kennel Title Sheet | ● |
| A-1 | Kennel Floor Plan & Rear Elevation | ● |
| A-2 | Kennel Roof Plan & Side Elevation | ● |
| A-3 | Kennel Wall Section | ● |
| S-1 | Kennel Foundation & Roof Framing Plan | ● |

In addition to the foregoing plans, prior draft editions of various individual drawings were revised and discarded in the routine course of the design process. Additionally, some of the foregoing drawings were revised at various times and as indicated on the drawings themselves.

**INTERROGATORY NO. 6**
*Please identify any documents which Cormier submitted to the City of Gardner relative to the Project or the Property and include in your answer:*
      *a.     The date each document was submitted;*
      *b.     the purpose for which each document was submitted; and*
      *c.     the creator of each document.*

**Response:**    Cormier did not submit any documents to the City of Gardner.

**INTERROGATORY NO. 7**
*Please identify each and every complaint made against you, excluding this litigation. For the purposes of this interrogatory, a complaint is a court filing, administrative filing, criminal complaint, government filing, or communication, written or oral, seeking payment for any wrong allegedly committed.*

**Response:**    Objection. This interrogatory addresses matters that are irrelevant to the issues raised in what remains of the plaintiff's complaint, nor is it reasonably calculated to lead to the discovery of admissible evidence.

**INTERROGATORY NO. 8**
*Please state the basis of each and every Affirmative Defense set forth in your Answer to the Complaint.*

**Response:**    As to Defendant's First Affirmative Defense, the factual basis includes, but is not limited to, the combination of the lack of evidence to support the Plaintiff's allegations, either as to liability or damages.

             As to Defendant's Second Affirmative Defense, the factual basis includes, but is not limited to, the Plaintiff's own conduct, in particular, but not limited to, its inaction in the wake of the open and obvious construction of the Gardner Animal Hospital, and its decision to resolve all ownership claims related to the plans by means of a binding contractual agreement.

As to Defendant's Third Affirmative Defense, the factual basis includes, but is not limited to, the anticipated lack of evidence of a key element of recovery under the Lanham Act.

As to Defendant's Fourth Affirmative Defense, the factual basis includes, but is not limited to, a potential lack of evidence regarding plaintiff's status as a successor to Warren Freedenfeld & Associates, Inc.

As to Defendant's Fifth Affirmative Defense, the factual basis includes, but is not limited to, the evidence and arguments set forth in this defendant's previously filed motion to dismiss, as well as evidence expected to be elicited from witnesses concerning the same.

As to Defendant's Sixth Affirmative Defense, the factual basis includes, but is not limited to, a comparison between drawings by Freedenfeld with drawings by Cormier and testimony expected to be elicited concerning said drawings.

As to Defendant's Seventh Affirmative Defense, the factual basis includes, but is not limited to, a potential lack of evidence of a key element of recovery under the Lanham Act.

As to Defendant's Eighth Affirmative Defense, the factual basis includes, but is not limited to, Exhibit H to the Plaintiff's complaint and testimony expected to be elicited from all parties to said agreement.

Defendant Cormier Associates, Inc. reserves the right to supplement this answer with additional affirmative defenses and evidence as revealed by discovery that has yet to occur at the time of the filing of these interrogatory responses.

**INTERROGATORY NO. 9**
*If it is your position that Freedenfeld did not solely produce all the plans or design documents related to the Project, please identify in complete detail the elements of the plans or designs which were solely created by Cormier or any person or entity acting on its behalf without any input from Freedenfeld and identify and state in your answer:*
    *a.    The title of the design or drawing;*
    *b.    The date(s) when such elements were created;*
    *c.    Whether such elements were rejected or accepted by GAH;*
    *d.    Whether such elements were incorporated in the plans or design drawings for the Project; and*
    *e.    The name of the person or persons who created such elements.*

**Response:**    Objection.   In the wake of the court's ruling of February 9, 2006 and the corresponding order of February 13, 2006, this interrogatory addresses matters that are irrelevant to what remains of the plaintiff's complaint, and is not reasonably calculated to lead to the discovery of admissible evidence. Further objecting, as all copyright infringement claims have been dismissed from this action and this information is not relevant to the only claim remaining in this litigation, this interrogatory is overbroad and unduly burdensome.

Subject to and without waiving the foregoing and the general objections, Cormier states the following: See response to Interrogatory No. 5 for the titles, dates, and authors of drawings produced by Cormier in connection with the Project. All of the drawings referenced in Interrogatory No. 5 are final drawings that incorporated the requirements of the Project and their corresponding elements, all as dictated by Michael McTigue. At no time did Freedenfeld have any input into the drawings identified in Interrogatory No. 5.

**INTERROGATORY NO. 10**
*Please state whether you advertised or marketed your involvement in the Project in any print, television, radio, mail, e-mail, internet or other media and identify:*

   a.    *The date of such advertisements;*
   b.    *Where such advertisements appeared;*
   c.    *The person or entity who created such advertisements;*
   d.    *The name and address or all persons who approved such advertisements or marketing material;*
   e.    *The name and address of each person or entity that received or viewed such advertisements, if available.*

**Response:**    Cormier did not advertise or market its involvement in the Project in any print, television, radio, e-mail, internet or other media.

**INTERROGATORY NO. 11**
*Please state in detail how you came to be involved in the Project, and identify the date when you first became involved.*

**Response:**    See response to Interrogatory No. 2.

**INTERROGATORY NO. 12**
*Please state in detail whether you were ever provided with any plans or design documents that were prepared by Freedenfeld relative to the Project and identify the title of each such document, and the name and address of the persons or entities that provided you with such design documents, and the dates when such documents were provided.*

**Response:**    Objection. In the wake of the court's ruling of February 9, 2006 and the corresponding order of February 13, 2006, this interrogatory addresses matters that are irrelevant to what remains of the plaintiff's complaint, and is not reasonably calculated to lead to the discovery of admissible evidence. Further objecting, as all copyright infringement claims have been dismissed from this action and this information is not relevant to the only claim remaining in this litigation, this interrogatory is overbroad and unduly burdensome.

Subject to and without waiving the foregoing and the general objections, Cormier states the following: On or about July 14, 1999, Dan McCarty of McCarty Associates

provided Edward D. Cormier with the following, which appeared to be progress prints:

| Document No. | Title of Document | Date |
|---|---|---|
| A1.1 | Basement Plan | 14 May 1999 |
| A2.1 | First Floor Plan | 14 May 1999 |
| A3.1 | Roof Plan | 21 Jun 1999 |
| A4.1 | Exterior Elevations | 21 Jun 1999 |
| A4.2 | Exterior Elevations | 21 Jun 1999 |
| A5.1 | Building Sections | 21 Jun 1999 |
| A9.2 | Finish Schedule | 14 May 1999 |

## INTERROGATORY. NO. 13

*Please identify all design awards that you received relative to your involvement in the Project or the design of any of the buildings on the Property, and in your answer please identify the title of each such award, date of each award, and the name, address and telephone number of the awarding authority, entity, or person.*

**Response:**    Upon information and belief, Gardner Animal Hospital received a Merit Award from the publishers of Veterinary Economics Magazine in connection with the Project. However, Cormier itself was not the direct recipient of any design awards relative to its involvement in the Project or the design of any of the buildings on the Property.

## INTERROGATORY NO. 14

*Please state whether you were named or covered under any policy of liability insurance effective on the date of the occurrence alleged in the Complaint and, if so, state the name of each such company, each such policy number, the effective period and the maximum liability limits for each such policy.*

**Response:**    Objection.  This interrogatory is vague, as the complaint does not contain a "date of occurrence."

Answering further, Edward D. Cormier Associates, Inc. was named as an insured under a liability insurance policy issued by Travelers Property Casualty, policy number I-660-490R4568-TIA-99, with effective dates of August 17, 1999 to August 17, 2000 and applicable limits of insurance of $1,000,000.  Travelers Property Casualty has issued a reservation of rights letter to Cormier in connection with the present litigation.

## INTERROGATORY NO. 15

*Please state the date in which you provided any of the plans, drawing, or other documents created by Freedenfeld in connection with the Project to any of the following parties:*
    *a.     Bennett;*
    *b     The Publishers of Veterinary Economic Magazine; and*

      c.       *Any other person, firm, or entity concerning or relating to the Project.*

**Response:**     Cormier did not provide any plans, drawings, or other documents created by Freedenfeld in connection with the Project to Bennett, the Publishers of Veterinary Economic Magazine, or any other person, firm, or entity.

## INTERROGATORY NO. 16

*Please state whether you incorporated any elements of the plans or design drawings created by Freedenfeld relative to Project in any plans or design documents that you created for the Project or for any of the structures on the Property, specifying each such element copied.*

**Response:**     Objection.  In the wake of the court's ruling of February 9, 2006 and the corresponding order of February 13, 2006, this interrogatory addresses matters that are irrelevant to what remains of the plaintiff's complaint, and is not reasonably calculated to lead to the discovery of admissible evidence.  Further objecting, as all copyright infringement claims have been dismissed from this action and this information is not relevant to the only claim remaining in this litigation, this interrogatory is overbroad and unduly burdensome.

               Subject to and without waiving the foregoing and the general objections, Cormier answers further:  Although McCarty initially provided Cormier with progress prints apparently drafted by Freedenfeld for purposes of securing suggestions that might bring the proposed project under budget, it is Cormier's belief that McTigue was so dissatisfied with Freedenfeld's proposed designs that Freedenfeld was terminated. The entire Project was then reworked by Cormier independent of Freedenfeld. Although there are elements that are common to the Freedenfeld progress prints and the final design drawings by Cormier, i.e. both incorporate structures that have roofs, walls, windows, doors, etc. that would be common to any structure, in reality the entire project had to be redone from scratch to embody McTigue's vision for the renovated Gardner Animal Hospital.  No element of Freedenfeld's plans was specifically copied, and the final product of Cormier's efforts differs significantly from the progress prints of Freedenfeld.

## INTERROGATORY NO. 17

*Please state the name and address of each person whom you expect to call as a witness at the time of trial and include in your answer the anticipated subject matter of each such person's testimony.*

**Response:**     Cormier has not yet decided whom it will call as a witness at the time of trial, and reserves the right to supplement this answer in a timely fashion.

               Answering further, it is anticipated that Warren Freedenfeld, Edward D. Cormier, Michael McTigue, Dan McCarty, and Walter Bennett would be called as witnesses at trial.

**INTERROGATORY NO. 18**

*If you expect to call an expert witness(es) at trial, please state:*

    *a.    the name, business address and field of expertise of each such person;*

    *b.    the subject matter on which each expert is expected to testify;*

    *c.    the substance of the facts and opinions to which each expert is expected to testify; and*

    *d.    a summary of the grounds for each such opinion.*

**Response:**    Cormier has not yet decided what person or persons it will call as an expert witness or witnesses at the time of trial, and reserves the right to supplement this answer in a timely fashion.

Under penalties of perjury, the undersigned certifies that the foregoing answers are true.

Dated: April 28 2006

Edward D. Cormier
Administration Manager
Edward D. Cormier Associates, Inc.

As to objections:

Dated: April 29, 2006

Stephen D. Rosenberg  BBO#558415
Eric L. Brodie  BBO#639833
THE MCCORMACK FIRM, LLC
One International Place - 7th Floor
Boston, MA    02110
Ph:    617•951•2929
Fax:    617•951•2672

# CERTIFICATE OF SERVICE

I hereby certify that today, May __02__, 2006, I served a copy of Defendant Edward D. Cormier Associates, Inc.'s Responses and Objections to Plaintiff's First Set of Interrogatories upon all counsel of record via first class mail to:

Barry S. Scheer, Esq.
Garrett J. Lee, Esq.
**Parker Scheer, LLP**
One Constitution Center
Boston, MA    02129

Robert D. City, Esq.
Michael J. Dissette, Esq.
**City, Hayes & Dissette, PC**
50 Congress Street
Boston, MA    02109

Robert N. Meltzer, Esq.
P.O. Box 1459
Framingham, MA   01701

Mary C. Casey, Esq.
**Harbor Law Group**
385 South Street
Shrewsbury, MA    01545

_____
Eric L. Brodie

84167.1

**EXHIBIT G**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05 11573 RGS

|  |  |
|---|---|
| WARREN FREEDENFELD ASSOCIATES, INC. <br> as successor in interest to WARREN FREEDENFELD <br> & ASSOCIATES, INC., <br>       Plaintiff, <br><br> v. <br><br> MICHAEL P. MCTIGUE, DVM individually and as <br> Trustee of THE MCTIGUE FAMILY TRUST, <br> NANCY A. MCTIGUE, as Trustee of the <br> MCTIGUE FAMILY TRUST, BRIAN C. HURLEY, DVM, <br> GARDNER ANIMAL CARE CENTER, LLC <br> d/b/a GARDNER ANIMAL HOSPITAL, EDWARD D. <br> CORMIER, ASSOCIATES INC., and BENNETT <br> BUILDING CORPORATION, <br>       Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## SUPPLEMENTAL ANSWERS OF THE DEFENDANT, MICHAEL P. MCTIGUE, DVM TO THE PLAINTIFF'S INTERROGATORIES

Now comes the defendant,   Michael P. McTigue, DVM, ("the Answering Defendant") and answers the Plaintiff's interrogatories as follows:

## INTERROGATORY NO. 1

Please state your full name, social security number, date of birth, country of birth, your

business address, your business phone number, your primary residential address and

phone number.

Answer 1 as supplemented: Michael P. McTigue, Manager, Gardner Animal Care Center, LLC, 73 Eaton Street, Gardner. I am a veterinarian for Gardner Animal Care Center, LLC. (978) 632-7110. I live at 2 Squire Road, Ashburnham.

**INTERROGATORY NO. 4**

Please identify all persons or entities with whom you dealt with in connection with the

Project.

Answer 4: Objection. The Answering Defendant objects on the grounds that this question
is vague, unclear and unduly burdensome, and not reasonably calculated to lead to the
discovery of admissible evidence as required by F.R.C.P. 26.

Supplementary Answer 4: I cannot answer this question, as the number of persons or
entities involved in the construction of a complex veterinary hospital is too vast to recall.
Also, after seven or eight years, I simply cannot recall the list of individuals or entities
involved.

**INTERROGATORY NO. 5**

If you or anyone on your behalf had any communication in any form, written or oral, with

The Publishers of Veterinary Economics Magazine or any person acting on its behalf

relating to or concerning any of the facts, events, occurrences or allegations set forth in

the Complaint, please state:

    a.    the specific date and time (if applicable) of each such communication;

    b.    the manner in which each such communication was made on each of the
dates listed in your answer to subpart a. of this interrogatory, i.e., whether
by telephone, letter, face-to-face conversation, etc.;

    c.    the name and address of all persons who engaged or in any way
participated in each such communication listed in your answer to subpart
a. of this interrogatory; and

    d.    in full and complete detail of the entire contents of each such
communication made on each of the dates listed in your answer to subpart
a. of this interrogatory, indicating what was said or communicated by
each of the persons listed in your answer to subpart c.

If any of these communications were in written form, you may respond by attaching a

copy of such communications to your answers to these interrogatories.

3

Answer 5: Objection. The Answering Defendant objects on the grounds that this question is vague, unclear and unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence as required by F.R.C.P. 26.

Supplementary Answer 5: The hospital submitted a completed application for the hospital design competition in December of 2003.

## INTERROGATORY NO. 6

If you or anyone on your behalf had any communication in any form, written or oral, with

the U.S. Patent and Trademark Office or any person acting on its behalf relating to or

concerning any of the facts, events, occurrences or allegations set forth in the Complaint,

please state:

    a.    the specific date and time (if applicable) of each such communication;

    b.    the manner in which each such communication was made on each of the dates listed in your answer to subpart a. of this interrogatory, i.e., whether by telephone, letter, face-to-face conversation, etc.;

    c.    the name and address of all persons who engaged or in any way participated in each such communication listed in your answer to subpart a. of this interrogatory; and

    d.    in full and complete detail of the entire contents of each such communication made on each of the dates listed in your answer to subpart a. of this interrogatory, indicating what was said or communicated by each of the persons listed in your answer to subpart c.

If any of these communications were in written form, you may respond by attaching a

copy of such communications to your answers to these interrogatories.

Answer 6: Objection. The Answering Defendant objects on the grounds that this question is vague, unclear and unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence as required by F.R.C.P. 26.

Supplemental Answer 6: None

Answer 18: The Answering Defendant has not yet determined what witnesses it intends to use, as it is unlikely this matter will proceed to trial. However, the Answering Defendant reserves the right to supplement this answer in a timely manner

Supplemental Answer 18. I still cannot answer this question and I continue to reserve my rights to answer in a timely manner.

### INTERROGATORY NO. 19

If you expect to call an expert witness(es) at trial, please state:

    a.  the name, business address and field of expertise of each such person;

    b.  the subject matter on which each expert is expected to testify;

    c.  the substance of the facts and opinions to which each expert is expected to testify; and

    d.  a summary of the grounds for each such opinion.

Answer 19: The Answering Defendant has not yet determined what expert it intends to use, as it is unlikely this matter will proceed to trial. However, the Answering Defendant reserves the right to supplement this answer in a timely manner.

Supplemental Answer 19. I still cannot answer this question and I continue to reserve my rights to answer in a timely manner.

Sworn under the pains and penalties of perjury this 1st day of November, 2006

As to Objections,
The Answering Defendant,

By his attorneys,

Robert N. Meltzer, BBO #564745
P.O. Box 1459
Framingham, MA 01701
Phone: (508) 872-7116

13

Mary C. Casey, BBO #636250
Harbor Law Group
385 South Street
Shrewsbury, MA 01545
Phone: (508) 842-9244

Dated: November 1, 2006

<u>CERTIFICATE OF SERVICE</u>

I, Robert N. Meltzer, do hereby certify that on this day I have served the foregoing by providing a copy of the same by first class mail, postage prepaid, to:

Barry S. Scheer, Esq.
Parker Scheer, LLP
One Constitution Center
Boston, MA 02129

Stephen D. Rosenberg, Esq.
The McCormack Firm
One International Place
Seventh Floor
Boston, MA 02110

F. Joseph Gentili, Esq.
Capobianco & Gentili, PC
15 West Central Street
Natick, MA 01760

Robert D.City, Esq.
Michael J. Dissette, Esq.
City, Hayes & Dissette, PC
50 Congress Street
Boston, MA 02109

Robert A. McCall, Esq.
Peabody & Arnold, LLP
30 Rowes Wharf
Boston, MA 02110

November 1, 2006
Dec 20