UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **WARREN FREEDENFELD ASSOCIATES, INC.**, as successor in interest to Warren Freedenfeld & Associates, Inc.,<br>            **Plaintiff,**<br>v.<br>**MICHAEL P. MCTIGUE, DVM**, individually and as Trustee of the McTigue Family Trust, **NANCY A. MCTIGUE**, as Trustee of the McTigue Family Trust, **BRIAN C. HURLEY, DVM**, **GARDNER ANIMAL CARE CENTER, LLC** d/b/a Gardner Animal Hospital, **EDWARD D. CORMIER ASSOCIATES, INC.**, and **BENNETT BUILDING CORPORATION**,<br>            **Defendants.**<br>**MICHAEL P. MCTIGUE, DVM**,<br>            **Counter-Plaintiff,**<br>v.<br>**WARREN FREEDENFELD ASSOCIATES, INC.**, as successor in interest to Warren Freedenfeld & Associates, Inc.,<br>            **Counter-Defendant.** | **CIVIL ACTION**<br>**NO. 05-11573 RGS** |

### STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANT, EDWARD D. CORMIER ASSOCIATES INC.'S MOTION FOR SUMMARY JUDGMENT ON THE PLAINTIFF'S LANHAM ACT CLAIMS

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, the defendant, Edward D. Cormier Associates Inc. ("Cormier"), submits that, for purposes of summary judgment only, the following material facts are undisputed:

1. Plaintiff, Warren Freedenfeld Associates, Inc. ("Freedenfeld" or "WFA"), a successor in interest to Warren Freedenfeld & Associates, Inc., is in the business of providing architectural services. **Exhibit A: Complaint ¶ 1.**

2. Co-Defendant, Michael McTigue ("McTigue"), is a veterinarian who owned the Gardner Animal Care Center, LLC, d/b/a Gardner Animal Hospital ("Gardner Animal Hospital"). **Exhibit B: McTigue Dep. at 9.**

3. All times relevant to this matter, prior to November 2005, the defendant, Edward D. Cormier Associates, Inc., was a Massachusetts corporation specializing in architectural design services with a principal place of business located 113 Cedar

Street, Suite S4, Milford, MA 01757.  **Exhibit A: Complaint ¶ 30; Exhibit C: Cormier Answer ¶ 30.**

4. In 1999, McTigue retained Freedenfeld for architectural services in connection with the expansion and renovation of Gardner Animal Hospital, a veterinary hospital in Gardner, Massachusetts. (the "Project").  **Exhibit A: Complaint ¶ 1.**

5. McTigue retained Walter Bennett to construct the project.  **Exhibit A: Complaint ¶ 26; Exhibit C: Cormier Answer ¶ 26; Exhibit B: McTigue Dep. at 162-63.**

6. McTigue hired Dan McCarty of McCarty Associates, Inc. ("McCarty") as a development consultant to the Project.  **Exhibit D: Pl. Dep. at 76**.

7. The Project required special permitting from the City of Gardner Zoning and Planning Board ("Board").  **Exhibit D: Pl. Dep. at 132; Exhibit B: McTigue Dep. at 180-81.**  The approval process happened over a couple years.  **Exhibit D: Pl. Dep. at 133.**

## WFA'S PROGRESS PLANS

8. Chris Hanlon, an employee of WFA, drafted the initial construction documents.  **Exhibit D: Pl. Dep. at 15-16.**  The "initial construction documents" or "preliminary construction documents" prepared in connection with the Project included a Basement Plan ("2A"), a First Floor Plan ("2B"), a Roof Plan ("2C"), two Exterior Elevation plans ("2D" and "2E"), a Building Sections plan ("2F"), and a Finish Schedule ("2G").  *Id.* at 14-15, 75.

9. In this Project, Warren Freedenfeld's "largest involvement [in preparing the plans] [wa]s with the schematic design."  **Exhibit D: Pl. Dep. at 16.**

10. WFA's Plans, 2A-2G, constitute the complete set of plans that WFA rendered in connection with the Project.  **Exhibit A: Complaint ¶ 13; Exhibit D: Pl. Dep. at 22; 55; Exhibit Nos. 2, 12.**

11. The Gardner Hospital could not have been built from the WFA Plans.  **Exhibit D: Pl. Dep. at 65-66, 180-81.**  More work would need to be done, including, for example, the addition of dimensions, material identifications, and interior details and exterior details.  *Id.*

## CONCEPTS AND IDEAS

12. The source of Freedenfeld's "ideas" as what items to include in the schematic designs comes from the owners who check off the particular items desired.  **Exhibit D: Pl. Dep. at 23-24;** *see also* **Exhibit B: McTigue Dep. at 67-76.**

13. Freedenfeld testified that he has seen his "overall concepts" used in other hospitals, which according to his testimony include, "[t]raffic circulation patterns, [and] interrelationships of various components," elements or areas, i.e., "nuclear

2

configuration." **Exhibit D: Pl. Dep. at 50-55; Exhibit B: McTigue Dep. at 63, 70-72.** Freedenfeld believes he invented those concepts. **Exhibit D: Pl. Dep. at 51-55.**

14. "Traffic circulation patterns, [and] interrelationships of various components," elements, or areas are concepts which have "almost become industry standard" over the last thirty-years. **Exhibit D: Pl. Dep. at 51-55;** *see* **Exhibit B: McTigue Dep. at 71-72.**

15. The interrelation of those conceptual elements or conceptual components identified in #13 and #14 above, include but are not limited to the relationship of certain areas and transition spaces in the hospital, i.e., outpatient areas, reception area, treatment rooms, etc. **Exhibit D: Pl. Dep. at 53-55.**

16. Waiting areas, reception desks, medical records' rooms, exam rooms, treatment rooms, surgical suites, laundry rooms, food prep areas, restrooms, labs, pharmacies, isolation rooms, doctors' offices, are common rooms and spaces usually found in veterinary hospitals. **Exhibit D: Pl. Dep. at 125-28;** *see also* **Exhibit B: McTigue Dep. at 72.**

17. No rooms appear in the WFA Plans that "don't usually appear in vet hospitals." **Exhibit D: Pl. Dep. at 128.**

18. WFA's Plans, 2A-2G, above could not be used "for someone else's hospital, because every veterinarian has unique goals, objectives, philosophies, requirements, priorities." **Exhibit D: Pl. Dep. at 68.** WFA has "used the same concepts throughout all of [WFA's] hospitals over the past 30 years." *Id.*


## WFA's Termination

19. On or about June 25, 1999, McTigue and WFA, by telephone conversation, verbally agreed to terminate the contract entered into between the Gardner Animal Hospital by Michael McTigue, and WFA by Warren Freedenfeld, and thus terminate the services of WFA. **Exhibit E: Dep. Ex. 9.**

20. McTigue terminated the services of WFA prior to the completion of the design phase. **Exhibit B: McTigue Dep. at 79; Exhibit D: Pl. Dep. at 167.**

21. Throughout July and August 1999, Freedenfeld and McTigue negotiated the terms of the termination. **Exhibit A: Complaint ¶¶ 20-25; Exhibit E: Dep. Exs. 5-8.**

22. On September 2, 1999, the "Termination and Mutual Release Agreement between Gardner Animal Hospital and Warren Freedenfeld & Associates," was signed by Warren Freedenfeld and Michael P. McTigue. **Exhibit E: Dep. Ex. 11.**


## Gardner Animal Hospital's Retention of Cormier as the Project's Architect

23. McCarty contacted Cormier on or about July 1, 1999, and asked Cormier to review building designs drafted by WFA. **Exhibit F: No. 2.**

24. Cormier agreed to prepare a proposal, as requested by McCarty, if McTigue confirmed that (1) it had notified WFA that it had been terminated; (2) WFA had been paid for the design services to date; and (3) McTigue had the right to use the WFA design information.  **Exhibit F: No. 2; Exhibit B: McTigue Dep. at 169-70, 178-79.**

25. On or about July 6, 1999, Cormier submitted a draft of a design prepared as a proposal to McCarty for review and comment**.  Exhibit F: No. 2.**  The proposal was limited to architectural services only, including review of documents and savings, conceptual drawings, and construction documents and administration.  *Id.*

26. On or about July 14, 1999, Cormier again met with McCarty, and McCarty provided Cormier with a set of "schematic design *progress* drawings," **Exhibit A: Complaint ¶ 13**, which appeared to be progress prints.  **Exhibit F: Nos. 2, 16.**  These drawings were prepared by WFA and included WFA Plans 2A-2G referred to in #8 above.  **Exhibit A: Complaint ¶ 13**; **Exhibit F: Nos. 2, 12.**

27. On or about July 23, 1999, Edward Cormier attended a meeting with Dan McCarty, Michael McTigue, and Walter Bennett at the office of McCarty Associates, Inc.  **Exhibit F: No. 2.**  At that time, Cormier was assured that WFA had been notified of the termination of its services, paid for its services, as well as that McTigue had the right to use the designs.  **Exhibit B: McTigue Dep. at 169-70, 178-79; Exhibit F: No. 2; Exhibit E: Dep. Ex. 12 at No. 1.**

28. Cormier was retained as the architect on the project to construct the Gardner Animal Hospital, a veterinary hospital.  **Exhibit A: Complaint ¶ 26; Exhibit C: Cormier Answer ¶ 26.**


## THE TANGIBLE GOOD

29. Cormier produced the following final drawings in connection with the Project:  1. Title Sheet ("3A"); 2. First Floor Plan ("3D"); 3. First Floor Dimension Plan ("3E"); 4. Basement Floor & Ceiling Plan ("3F"); 5. Roof Plan & Details ("3G"); 6. First Floor Reflected Ceiling Plan ("3H"); 7. First Floor - Floor Finish Plan ("3I"); 8. Front and Right Side Elevations ("3J"), 9. Rear and Left Side Elevations ("3K"); 10. Sections Nos. 1 & 2 ("3L"); 11.-12. Wall Sections ("3M" and "3N"); 13. Wall Sections & Details ("3(O)"); 14. Door Schedule & Details ("3P"); 15. Room Finish Schedule ("3Q"); 16. Miscellaneous Details & Wall Types ("3R"); 17. General Notes and Typical Details ("3S"); 18. Kennel Title Sheet; 19. Kennel Floor Plan & Rear Elevation; 20. Kennel Roof Plan & Side Elevation; 21. Kennel Wall Section; 22. Kennel Foundation & Roof Framing Plan; 23. Foundation Plan ("3T"); 24. First Floor Framing Plan & Truss Types("3U"); 25. Roof Framing Plan ("3V"); and 26. Sections Details ("3w"), all dated August 9, 1999; 27.-28. two Alternate Truss Plans & Details ("3B" and "3C"), dated October 7, 1999; 29. Reception Area Plan & Elevations; 30. Partial Floor Plan; 31. Partial Reflected Ceiling Plan; 32. Partial Plan at Grooming Room; 33. Partial Basement Plan; 34. Partial Plan at Basement.  *See* **Exhibit F: No. 5.**

30. All thirty-four drawings produced by Cormier listed in #29, incorporated the requirements of the Project as dictated by Michael McTigue.  **Exhibit F: No. 9.**

4

31. In addition to those listed plans in #29, Cormier prepared prior draft editions of various individual drawings, which Cormier revised and discarded as part of a routine design process.  **Exhibit F: No. 9.**

32. Cormier's plans were used to build the project.  **Exhibit D: Pl. Dep. at 181.**  The "new set of plans" developed by Cormier constituted the final drawings used to build the Gardner Animal Hospital.  *Id.* at 180-81; **Exhibit A: Complaint ¶ 28; Exhibit B: McTigue Dep. at 113; Exhibit F: Nos. 5, 9.**

### ORIGIN OF THE TANGIBLE GOOD

33. At no time did WFA have any input into the drawings produced by Cormier.  **Exhibit F: No. 9.**

34. Cormier did not submit WFA's physical drawings to the planning board for approval.  **Exhibit D: Pl. Dep. at 61-62; Exhibit E: Dep. Ex. 12 at No. 1; Exhibit F: No. 6.**

35. Cormier produced the full-size version of the Project's First Floor Plan, which Freedenfeld obtained from the Board.  **Exhibit A: Complaint ¶ 31.**

36. Cormier produced physical plans different from the design in WFA's Plans.  **Exhibit E: Dep. Ex. 12 at No. 1.**  The Project had to be redone from scratch to embody McTigue's vision for the renovated Gardner Animal Hospital.  **Exhibit B: McTigue Dep. at 113-16, 124-25; Exhibit F: No. 16.**

37. No plan produced by Cormier in this suit is identical or duplicate in all respects to any plan prepared by WFA in connection with the Project.  **Exhibit D: Pl. Dep. at 147-48.**

38. WFA's Plans and Cormier's Plans both incorporate structures that have roofs, walls, windows, doors, etc. that are common to any structure.  **Exhibit F: No. 16.**  No element of Freedenfeld's plans was specifically copied, and the final product of Cormier's efforts differs significantly from the progress prints of Freedenfeld.  *Id.*

39. WFA's Plans 2A-2G are not "100% identical" to any plans produced by Cormier.  **Exhibit D: Pl. Dep. at 22.**  Cormier's plans contain "areas of deviation."  *Id.*  Freedenfeld explained the deviations, which included but are not limited to the following:

    a. WFA had no floor finish plan or schedule plan similar to the Floor Finish Plan 3G produced by Cormier.  **Exhibit D: Pl. Dep. at 38.**

    b. WFA had no plan similar in any respect to Plan 3N, Section 6 produced by Cormier.  **Exhibit D: Pl. Dep. at 46-47.**

    c. Cormier Plan 3B is not identical to WFA Plan 2B.  **Exhibit D: Pl. Dep. at 21.**  WFA Plan 2B was a full plan, whereas Cormier Plan 3B was a partial.  *Id.*  Cormier Plan 3B deviates from WFA Plan 2B: "The grooming room has been relocated.  The reception desk has been slightly

5

   reconfigured.  The waiting area seating has been reconfigured.  The access corridor between the inpatient and outpatient areas has been moved.  The adoption room has been moved, and the children's play area has been moved. . . . , and the fireplace has been replaced with another exam room." *Id.* at 22.

d. Cormier Plan 3B is more developed than WFA Plan 2F.  **Exhibit D: Pl. Dep. at 26.**  Cormier Plan 3B contains configurations of the roof truss and entry canopy different from WFA Plan 2F.  *Id.* at 25-26.

e. Cormier Plan 3C, Section 5 contains a roof configuration different from WFA Plan 2F.  **Exhibit D: Pl. Dep. at 27.**

f. Cormier Plan 3D contains components different from WFA Plan 2B.  **Exhibit D: Pl. Dep. at 28-29.**  WFA Plan 2B has rooms or structural component that Cormier Plan 3D does not.  *Id.* at 29-30.  Cormier Plan 3D's isolation room, laundry room, food prep area, and storage rooms have locations and configurations different from WFA Plan 2B.  *Id.* at 29.  Cormier Plan 3D contains no feline exercise room and no second egress staircase, whereas WFA Plan 2B contains those elements.  *Id.* at 29-30.

g. The square footage in Cormier Plan 3F differs from the square footage in WFA Plan 2A.  **Exhibit D: Pl. Dep. at 32-33.**  Cormier Plan 3F has fifty percent less square footage than WFA Plan 2A.  *Id.*

h. Cormier Plan 3F contains two bays.  **Exhibit D: Pl. Dep. at 33.**  WFA Plan 2A depicts four bays.  *Id.*  Cormier Plan 3F includes bathrooms and a mechanical room.  *Id.*  WFA Plan 2A contains no bathroom or mechanical room.  *Id.*

i. The location of a dormer in WFA Plan 2C differs from the Cormier Plan 3G.  **Exhibit D: Pl. Dep. at 33-34.**  Cormier Plan 3G incorporates skylights into the roof design, and it does not propose a story of clear windows.  *Id.* at 36-37.  WFA Plan 2C proposes no skylights but does incorporate an entire story of clear windows into its roof design.  *Id.*

j. WFA has no "reflected ceiling plan" the same or similar to the one produced by Cormier in Cormier Plan 3G.  **Exhibit D: Pl. Dep. at 38.**

k. The front elevation on Cormier Plan 3J is not identical to the front elevation on WFA Plan 2E.  **Exhibit D: Pl. Dep. at 40.**  The location of windows in Cormier Plan 3J differs from the location of windows in WFA Plan 2E.  *Id.*  Cormier Plan 3J contains a lower-level entry and details vinyl clapboard siding, whereas WFA Plan 2E contains no lower-level entry element and shows no vinyl clapboard siding.  *Id.* at 40-41.

l. WFA Plan 2E contains different "massing aspects," or different overall volume and configuration of the building mass, from the massing aspects of Cormier Plan 3K.  **Exhibit D: Pl. Dep. at 42-43.**  The rear elevations

6

      shown on WFA Plan 2E are not identical to the rear elevations in Cormier Plan 3K.  *Id.* at 42.

   m. WFA Plan 2D has different window configurations from Cormier Plan 3K.  **Exhibit D: Pl. Dep. at 43.**  WFA Plan 2D contains an exterior enclosed run area that the Cormier Plan 3K does not contain.  *Id.*

   n. Cormier Plan 3L, Section 1 shows wood trusses, whereas WFA Plan 2F, Section 2 proposed steel beams.  **Exhibit D: Pl. Dep. at 44.**

   o. Plan 3L, Section 1 shows siding, plywood, and joint filler details, whereas Plan 2F, Section 2 contains no details as to siding, plywood, or joint filler.  **Exhibit D: Pl. Dep. at 44.**

   p. Freedenfeld testified that it is his belief that Cormier copied the concept which Cormier developed from Plan 2F, Section 2, in Cormier's Plan 3L, Section 2.  **Exhibit D: Pl. Dep. at 45.**

   q. Finish schedules of Cormier Plan 3Q and WFA Plan 2G contain deviations and differences.  **Exhibit D: Pl. Dep. at 48.**

   r. Finish schedule of WFA Plan 2G shows partition types, but Cormier Plan 3Q does not mention partition types.  **Exhibit D: Pl. Dep. at 49.**

### *VETERINARY ECONOMICS* MERIT AWARD AND CORRESPONDING ARTICLE

40. "The hospital submitted a completed application for the hospital design competition in December of 2003."  **Exhibit G: No. 5.**

41. Gardner Animal Hospital received a Merit Award in the 2004 Veterinary Hospital Design Competition from the publishers of *Veterinary Economics*.  **Exhibit A: Complaint ¶ 30; Exhibit B: McTigue Dep. at 140; Exhibit C: Cormier Answer ¶ 30; Exhibit F: No. 1**;

42. Cormier is not the direct recipient of any design awards related to its involvement in the Project.  **Exhibit F: No. 2.**

43. In 2004, *Veterinary Economics* published certain portions of plans of the Gardner Animal Hospital design, including the "Main Level" and "Lower Level," in the article "Giving an Old House a Cutting-Edge Extension," pages 50-57, in 2004.  **Exhibit A: Complaint ¶ 30; Exhibit C: Cormier Answer ¶ 30; Exhibit D: Pl. Dep. at 56-57; Exhibit E: Dep. Ex. 4.**

44. The *Veterinary Economics* article identifies Michael McTigue and Brian Hurley as the owner and Cormier as the architect.  **Exhibit A: Complaint ¶ 30; Exhibit E: Dep. Ex. 4 at p. 52.**

45. Cormier did not submit WFA's actual, physical drawings to the *Veterinary Economics* magazine.  **Exhibit D: Pl. Dep. at 60-61**

46. Page 53 of the *Veterinary Economics* article depicts the floor plan titled "Main Level," which was the first floor level of the Gardner Animal Hospital, the actual, tangible plan of which Cormier produced.  **Exhibit D: Pl. Dep. at 57-58; Exhibit E: Dep. Ex. 4 at pp. 52-53; Exhibit B: McTigue Dep. at 182-83.**

47. The actual physical plan submitted to the magazine was created by Cormier at McTigue's request; was created after the hospital was built (long before which WFA was terminated from the project); and was provided to McTigue by Cormier for the purpose of submitting it to the magazine.  **Exhibit B: McTigue Dep. at 181-83; Exhibit D: Pl. Dep. at 60, 129.**

48. WFA did not produce and had no involvement in producing the actual, physical plans that were submitted to *Veterinary Economics* and depicted in that magazine on pages 52 and 53.  **Exhibit B: McTigue Dep. at 181-83; Exhibit D: Pl. Dep. at 60, 129.**

49. WFA does not have a drawing like that shown on pages 52 and 53 of the *Veterinary Economics* article of the main level and lower level of the Gardner Animal Hospital with his name on it.  **Exhibit D: Pl. Dep. at 129.**

50. Cormier had no communications with the publishers of the *Veterinary Economics* magazine.  **Exhibit F: No. 2.**

51. Cormier did not provide any of WFA's plans, drawings, or other documents in connection with the Gardner Animal Hospital project to Walter Bennett, the Publishers of *Veterinary Economics*, or any other person, firm, or entity.  **Exhibit F: No. 15.**

52. The "Lower Level" plan of the basement produced by Cormier depicted in the article on page 52 is "half the size of [WFA's] lower level plans" in that Cormier's plan contains fifty-percent less square footage.  **Exhibit D: Pl. Dep. at 59-60.**

53. Freedenfeld has never seen any advertising in any form for Edward D. Cormier, Associates Inc.  **Exhibit D: Pl. Dep. at 66.**

54. Freedenfeld testified that he has no knowledge whether Cormier had ever used the article or Merit Award in any advertising.  **Exhibit D: Pl. Dep. at 66.**

55. Cormier has never advertised or marketed its involvement in the Project or as to the Merit Award in any manner, including print, television, radio, e-mail, internet, or other media.  **Exhibit F: No. 10.**

56. Freedenfeld has lost no specific job because of the Merit Award or *Veterinary Economics* article.  **Exhibit D: Pl. Dep. at 64**.

57. Freedenfeld has no knowledge and no evidence whether Cormier received any additional work because of this article.  **Exhibit D: Pl. Dep. at 64**.

58. Freedenfeld testified that WFA years ago limited the number of projects it would take to twenty for purposes of ensuring the quality of WFA projects.  **Exhibit D: Pl. Dep. at 64**.  Prior to that time, WFA had taken between thirty to forty veterinary hospital projects a year.  *Id.*

                                          Respectfully submitted,

                                          **Edward D. Cormier & Associates, Inc.**
                                          Defendant
                                          By its attorneys,

**Dated:**  February 1, 2007               */s/ Stephen D. Rosenberg*
                                          Stephen D. Rosenberg   [BBO#558415]
                                          Eric L. Brodie              [BBO#639833]
                                          Shayna W. Borakove    [BBO#663670]
                                          **THE MCCORMACK FIRM, LLC**
                                          One International Place - 7th Floor
                                          Boston, MA    02110
                                          Ph:   617•951•2929
                                          Fax:  617•951•2672