**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **WARREN FREEDENFELD ASSOCIATES, INC.**, as successor in interest to Warren Freedenfeld & Associates, Inc.,<br>　　　　　　　　　　**Plaintiff,**<br>v.<br><br>**MICHAEL P. MCTIGUE, DVM**, individually and as Trustee of the McTigue Family Trust, **NANCY A. MCTIGUE**, as Trustee of the McTigue Family Trust, **BRIAN C. HURLEY, DVM, GARDNER ANIMAL CARE CENTER, LLC** d/b/a Gardner Animal Hospital, **EDWARD D. CORMIER ASSOCIATES, INC.**, and **BENNETT BUILDING CORPORATION**,<br>　　　　　　　　　　**Defendants.**<br>**MICHAEL P. MCTIGUE, DVM**,<br>　　　　　　　　　　**Counter-Plaintiff,**<br>v.<br><br>**WARREN FREEDENFELD ASSOCIATES, INC.**, as successor in interest to Warren Freedenfeld & Associates, Inc.,<br>　　　　　　　　　　**Counter-Defendant.** | **CIVIL ACTION**<br>**NO. 05-11573 RGS** |

**MEMORANDUM IN SUPPORT OF DEFENDANT, EDWARD D. CORMIER ASSOCIATES, INC.'S MOTION FOR SUMMARY JUDGMENT ON THE PLAINTIFF'S LANHAM ACT CLAIMS**

**I.   INTRODUCTION**

Defendant, Edward D. Cormier Associates, Inc. ("Cormier"), submits this Memorandum of Law in support of its Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c), as to the Plaintiff's, Warren Freedenfeld Associates, Inc. ("Freedenfeld" or "WFA"), remaining Count alleging false designation or description of origin and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a).

On July 26, 2005, the Plaintiff brought the present action seeking damages for violations of 17 U.S.C. § 101 and 15 U.S.C. § 1125(a), arising out the expansion and renovation of Gardner

Animal Care Center, LLC ("Gardner Animal Hospital"), a veterinary hospital in Gardner, MA (the "Project"). This Court's ruling of February 9, 2006 and corresponding order of February 13, 2006, dismissed the copyright infringement claims on the ground that plaintiff failed to comply with the applicable statute of limitations. The dismissal left Count VI under the Lanham Act as the only claim. Summary judgment on the plaintiff's sole remaining claim in this case is not only appropriate, but mandated on Freedenfeld's generic and conclusory allegations as a matter of law. From Freedenfeld's own testimony, discovery materials, pleadings, motions and supporting memoranda, as well as from the deposition of Dr. Michael McTigue and other discovery to date, it is clear that the evidence is deficient and fails to establish the necessary elements of any likely cause of action under the Lanham Act for either false designation of origin, § 1125(a)(1)(A), or false advertising, § 1125(a)(1)(B). In addition, *Dastar Corp. v. Twentieth Century Fox Film Corp.*, ("*Dastar*"), 539 U.S. 23, 35-36 (2003), bars plaintiff's Lanham Act claim, and therefore, it cannot stand as a matter of law.

## II. BACKGROUND

Viewed in a light most hospitable to the plaintiff, the facts relative to Count VI are the following:

In 1999, Michael McTigue, DVM, ("McTigue") a veterinarian, retained Walter Bennett to build the Project, Freedenfeld as the architect, and Dan McCarty of McCarty Associates, Inc. ("McCarty") as a development consultant to the Project. **Exhibit A: Complaint ¶ 26**; **Exhibit C: Cormier Answer ¶ 26; Exhibit D: Pl. Dep. at 78**.

Warren Freedenfeld's largest involvement in the Project related to the schematic design plan. **Exhibit D: Pl. Dep. at 16**. Generally, Freedenfeld's ideas as to what components and elements to include in the schematic design came from McTigue, who indicated the particular

components he wanted to include.[1]  **Exhibit D: Pl. Dep. at 23-24.**  Since 1975, Freedenfeld has used the same concepts of design, including "[t]raffic circulation patterns, [and] interrelationships of various components."  *Id.* at 51-55, 68.  These concepts were allegedly "invented" by Freedenfeld and have, over the last thirty years, "almost become industry standard."  *Id.* at 52 & 51-55.  The interrelation of those conceptual elements include, but are not limited to, the relationship of certain areas and transition spaces in the hospital, i.e., outpatient areas, reception area, treatment rooms, etc.  *Id.* at 53-55.  As indicated by the testimony, other hospitals have used and continue to use those concepts.  *Id.* at 51-55; **Exhibit B: McTigue Dep. at 72.**  All of the rooms or areas that appear in Freedenfeld's plans typically appear in veterinary hospitals.  **Exhibit D: Pl. Dep. at 128**; **Exhibit B: McTigue Dep. at 72.**  For example, waiting areas, reception desks, medical records' rooms, exam rooms, treatment rooms, surgical suites, laundry rooms, food prep areas, restrooms, labs, pharmacies, isolation rooms, doctors' offices, are common rooms and spaces usually found in veterinary hospitals.  *Id.* at 125-28.

After the schematic design proposal, Project Manager Chris Hanlon of WFA, drafted "preliminary construction documents."  *Id.* at 15-16.  The preliminary documents prepared in connection with this Project included a Basement Plan ("2A"), a First Floor Plan ("2B"), a Roof Plan ("2C"), two Exterior Elevation plans ("2D" and "2E"), a Building Sections plan ("2F"), and a Finish Schedule ("2G").  *Id.* at 14-15.  That set of plans, 2A-2G, constitutes the entirety of the plans WFA prepared relating to the Project.  **Exhibit A: Complaint ¶ 13; Exhibit D: Pl. Dep. at 22; Exhibit F: Nos. 2, 12**.  Freedenfeld testified that those plans could not be used "for someone else's hospital, because every veterinarian has unique goals, objectives, philosophies, requirements, priorities."  **Exhibit D: Pl. Dep. at 68.**

On June 25, 1999, McTigue and WFA verbally agreed to terminate the contract entered into

---

[1] The *Veterinary Economics* article quoted McTigue, who said, "I visited 30 practices to get ideas and advice before we built . . . . The owners were unanimous about two things: build big and include plenty of storage space."  **Exhibit D: Dep. Ex. 4 at p. 56; Exhibit B: McTigue Dep. at 63.**

between the Gardner Animal Hospital and WFA, and terminate the services of WFA.  **Exhibit E: Dep. Ex. 9**.  Throughout July and August 1999, Freedenfeld and McTigue negotiated the terms of the termination.  **Exhibit A: Complaint ¶¶ 20-25; Exhibit E: Dep. Exs. 5-8**.  On September 2, 1999, Warren Freedenfeld and Dr. McTigue signed a "Termination and Mutual Release Agreement between Gardner Animal Hospital and Warren Freedenfeld & Associates."  **Exhibit E: Dep. Ex. 11.**

McCarty contacted Cormier on or about July 1, 1999, and asked him to review building designs drafted by WFA.  **Exhibit F: No. 2**.  Cormier agreed to prepare a proposal, as requested by McCarty, upon certain conditions.  *Id.*

On or about July 6, 1999, Cormier submitted a draft of a design prepared as a proposal to McCarty for review and comment.  *Id.*  The proposal was limited to architectural services only, including review of documents and savings, conceptual drawings, and construction documents and administration.  *Id.*  Cormier again met with McCarty in or around July 14, 1999.  At that time, McCarty provided Cormier with a set of "schematic design progress drawings."  **Exhibit A: Complaint ¶ 13; Exhibit F: No. 2**.  These drawings, 2A-2G, were plans that WFA rendered for the Project.  *Id.*

On or about July 23, 1999, Edward Cormier attended a meeting with Dan McCarty, Michael McTigue, and Walter Bennett at the office of McCarty Associates, Inc.  *Id.*  At that time, Cormier was assured that Freedenfeld had been terminated and paid, as well as assured that McTigue had the right to use the designs.  **Exhibit F: No. 2; Exhibit E: Dep. Ex. 12 at No. 1.**  It was also explained that WFA's designs had not satisfied McTigue's requirements.  **Exhibit A: Complaint ¶ 26; Exhibit A: Cormier Answer ¶ 26; Exhibit F: No. 2**.  Although McCarty initially provided Cormier with WFA's progress plans for purposes of securing suggestions that might bring the proposed project under budget, Cormier was informed that WFA's proposed designs dissatisfied McTigue, and that McTigue had therefore terminated WFA's services.  **Exhibit F: No. 16**.  Cormier agreed to undertake the project as the new architect and produce new plans reflecting McTigue's

4

requirements.  *Id.*; **Exhibit A: Complaint ¶ 26; Exhibit C: Cormier Answer ¶ 26.**

Cormier produced all thirty-four final drawings listed in the Defendant's Statement of Undisputed Facts, No. 29, in connection with the Project.  The "new set of plans" developed by Cormier constituted the final drawings used to build the Gardner Animal Hospital.  **Exhibit A: Complaint ¶ 28; Exhibit D: Pl. Dep. at 180-81; Exhibit F: Nos. 5, 9**.  Those physical plans were used to build the project.  **Exhibit D: Pl. Dep. at 181**.  At no time did WFA give input into the drawings produced by Cormier.  **Exhibit F: No. 9**.

The Project required special permitting from the City of Gardner Zoning and Planning Board.  **Exhibit D: Pl. Dep. at 132**.  The approval process "took a couple years."  *Id.* at 133.  The Board limited the size of the building among other limitations.  *Id.* at 134; **Exhibit B: McTigue Dep. at 180-81.**  Cormier did not submit WFA's physical drawings to the planning board for approval.  **Exhibit D: Pl. Dep. at 61-62; Exhibit E: Dep. Ex. 12 at No. 1; Exhibit F: No. 6.**  The City of Gardner Planning Board and Building Department had a full-size version of the first floor plan that Cormier produced, which Freedenfeld later obtained.  **Exhibit A: Complaint ¶ 31**.  Freedenfeld testified that the first floor plan, as well as all the other remaining tangible plans which Cormier produced for the Project, differed and contained deviations from WFA's Plans.  **Exhibit D: Pl. Dep. at 22; Exhibit E: Dep. Ex. 12 at No. 1.**  No plan produced by Cormier is identical or duplicate in all respects to any plan prepared by WFA in connection with the Project.  **Exhibit D: Pl. Dep. at 147-48**.  Freedenfeld testified that significant omissions, deviations, and differences existed between WFA progress plans and Cormier's final plans, including, but not limited to those listed in the Defendant's Statement of Undisputed Facts, No. 39.

McTigue and the Hospital submitted an application to *Veterinary Economics* magazine for a hospital design competition in December of 2003.  **Exhibit B: McTigue Dep. at 140-41; Exhibit F: No. 5**.  In 2004, the Project received a Merit Award in the 2004 Veterinary Hospital Design Competition from the publishers of *Veterinary Economics*.  **Exhibit A: Complaint ¶ 30; Exhibit B:**

5

**McTigue Dep. at 140; Exhibit C: Cormier Answer ¶ 30.** Cormier did not receive any design award related to its involvement in the Project. **Exhibit F: No. 2**. Corresponding with that award, the magazine published an article titled "Giving an Old House a Cutting-Edge Extension," pages 50-57, which depicted certain portions of plans relating to the Gardner Animal Hospital **Exhibit A: Complaint ¶ 30; Exhibit C: Cormier Answer ¶ 30; Exhibit E: Dep. Ex. 4.** The article identified Michael McTigue and Brian Hurley as the owner and Cormier as the architect. **Exhibit A: Complaint ¶ 30; Exhibit E: Dep. Ex. 4 at p. 52; Exhibit F: No. 2**.

Freedenfeld contends that the plan titled "Main Level," displayed on page 53 of the article and produced by Cormier, was "virtually identical" to WFA's first floor plan. **Exhibit D: Pl. Dep. at 57-58, 129**. Yet, Freedenfeld testified that WFA produced none of the actual plans depicted on pages 52 through 53 of the article. *Id.* at 57-58, 60, 129. In fact, WFA never produced any drawing of the main level and lower level of the Gardner Animal Hospital with WFA's name on it. *Id.* at 129. Freedenfeld admits that Cormier and McTigue never submitted WFA's actual, physical drawings to the *Veterinary Economics* magazine. **Exhibit D: Pl. Dep. at 60, 129.** Moreover, the actual physical plan submitted to the magazine was created by Cormier at McTigue's request; was created after the hospital was built (long before which WFA was terminated from the project); and was provided to McTigue by Cormier for the purpose of submitting it to the magazine. **Exhibit B: McTigue Dep. at 182-83; Exhibit D: Pl. Dep. at 60, 129.** Cormier had no communications with the publishers of the magazine. **Exhibit F: No.15.**

In addition, Cormier has never advertised or marketed its involvement in the Project or the Merit Award in any manner, including in print, television, radio, e-mail, internet, or other media. **Exhibit F: No. 10**. Freedenfeld testified that he had never seen any advertising, in any form, for Edward D. Cormier, Associates Inc. **Exhibit D: Pl. Dep. at 66**. Further, plaintiff has no knowledge whether Cormier had ever used the article or Merit Award in any advertising. *Id.* at 66. Freedenfeld also testified that WFA lost no specific job resulting from the Gardner Animal Hospital's 2004 Merit

Award, and in fact, Cormier has not received any additional work because of the article or award. *Id.* at 64.

### III. ARGUMENT

Count VI of Freedenfeld's Complaint claims a violation of the Lanham Act. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1) makes civilly liable "[a]ny person who, on or in connection with any goods or services, . . . uses in commerce . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact." Subsection (a)(1) creates two separate federal causes of action for unfair competition. *Dastar*, 539 U.S. at 29; *Ultra-Temp Corp. v. Adv. Vacuum Sys., Inc.*, 27 F. Supp. 86, 90 (D. Mass. 1998). The first cause of action creates liability for false designation of origin; whereas the second creates liability for false advertising. *Id.* at 90. Here, the Supreme Court's decision in *Dastar* precludes Freedenfeld's false designation of origin claim alleging false authorship, and thus, that claim fails as a matter of law. In addition, the material facts mandate summary judgment on Freedenfeld's Lanham Act claims because the evidence fails to support essential elements of either type of claim.

####    A.    False Designation of Origin

To prevail on a claim for false designation of origin under § 1125(a)(1)(A), the plaintiff must prove that the alleged false designation "[wa]s likely to cause confusion, or to cause mistake, or to deceive as to . . . the *origin*, sponsorship, or approval of his or her *goods*, services, or commercial activities by another person." *Id.* (emphasis added). In this case, Freedenfeld contends that Cormier produced a "new set of plans" for the Project, which allegedly misrepresented the origin of the design for the project. Exhibit E: Dep. Ex. 12 at No. 1. Freedenfeld further alleges that Cormier's plans copied "distinctive elements" and the "interrelation between the rooms and configuration of spaces" from WFA's progress plans, and wrongfully passed the plans off as Cormier's work without WFA's knowledge or permission and "*without giving credit*" to WFA. *Id.;* Complaint ¶1. The copying of certain portions or aspects of WFA's plans, without crediting WFA,

Freedenfeld alleges, "confuse[d] . . . the national public about the true *authorship* and *origin*" of the new plans.  Exhibit E:  No. 1 (emphasis added).  However, as the following discussion demonstrates, Supreme Court decisional law precludes Freedenfeld's Lanham Act claim, and therefore, Freedenfeld's claim under § 1125(a)(1)(A) fails in its essential elements, warranting summary judgment as a matter of law.

### i.    *Dastar* Controls Freedenfeld's False Authorship Claim

In the instant case, *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 25 (2003), controls Freedenfeld's claim of false authorship. *Zyla v. Wadsworth*, 360 F.3d 243, 251-52 (1st Cir. 2004) (holding that *Dastar* controls in the First Circuit, and bars false authorship claims brought under the Lanham Act).  In *Dastar*, the Court addressed whether the false designation of origin provision of § 1125(a) of the Lanham Act prohibited the unaccredited copying of an original work.  539 U.S. at 25.  The resolution of that question turned on the meaning of "origin" of "goods" under § 1125(a)(1)(A).  *Id.* at 31 (determining inconsequential defendant's "*nearly* wholesale" reliance on the plaintiff's good).  Ultimately, the Court held that "origin" of "goods" for this purpose "referr[ed] to the producer of the tangible goods that are offered for sale."  *Id.* at 37 (explaining that the Lanham Act covers the producer of a product and not the producer of the design).  The Court continued, adding that "origin" of "goods" did not mean "the author of any idea, concept, or communication embodied in those goods."  *Id.*  The Lanham Act was simply "incapable of [protecting] the person or entity that originated the *ideas* or communications that [the] 'goods' embody or contain," or the "creator of the content that the physical item convey[ed]."  *Dastar*, 539 U.S. at 32-34 & n.5 (emphasis added) (stretching of the act beyond its original purpose would render it "inconsistent with precedent," and duplicate protection of areas traditionally occupied and protected by copyright laws).

The First Circuit has held that the Supreme Court's decision in *Dastar* precludes claims alleging false authorship of creative content, and instead, only allows claims alleging

8

misrepresentation of the origin of the specific physical good at issue. *Zyla*, 360 F.3d at 251-52; *see also Williams v. UMG Recordings, Inc.*, 281 F. Supp. 2d 1177, 1180, 1185 (C.D. Cal. 2003) (finding "origin" of "goods" to mean the "producer" and not the "creator"). In *Zyla v. Wadsworth*, the First Circuit explained that the defendant in *Dastar* had accurately identified itself as the manufacturer of the good, and therefore, made no false designation of origin, despite not crediting others for the creative content of the good. *Id.*

Freedenfeld's Lanham Act claim for false attribution fails because it is based on allegations that Cormier copied elements of WFA's plans and caused the *Veterinary Economics* article to display the alleged copies, labeled "Main Level" and "Lower Level," without crediting WFA as the author. However, the actual plans generated by Cormier and provided to the magazine were physically produced by Cormier and differ substantially from the WFA drawings. *See* Defs. Stmt. Undisputed Facts No. 29. Freedenfeld himself admits that the plans submitted to the magazine are not WFA's exact plans. Exhibit D: Pl. Dep. at 147-48. Without doubt, *Dastar* bars Freedenfeld's false authorship or attribution claim under these circumstances. 539 U.S. at 31; *see also Alponte v. Seventh Day Adventist Church InterAm. Div.*, 443 F. Supp. 2d 228, 230-31 (D.P.R. 2006) (denying plaintiff's leave to amend because the Supreme Court had already rejected argument that "unauthorized publishing and editing of [such] work [wa]s likely to 'cause[] confusion in consumers as to the origin of the work."); *Francois v. Jack Ruch Quality Homes*, No. 03-1419, 2006 U.S. Dist. LEXIS 57062, at *37 (C.D. Ill. Aug. 14, 2006) ("[C]opying, revising, and using a copyrightable work" including architectural plans, outside Lanham Act protection).

  **ii. Cormier is the "Origin" of the Relevant Tangible "Good"**

As an initial inquiry into a false designation of origin claim, the relevant "tangible good" at issue must be pinpointed. *Bob Creeden & Assocs., Ltd. v. Infosoft, Inc.*, 326 F. Supp. 2d 876, 879-

80 (N.D. Ill. 2004).² Next, the court must decide who produced the physical goods. Whoever physically produced that tangible object, is the originator, the "origin" of the goods, and the person afforded the right of correct identification and designation under *Dastar*. *Beckwith Builders, Inc. v. Depietri*, No. 04-CV-282-SM, 2006 U.S. Dist. LEXIS 67060, at *13-14 (D.N.H. Sept. 15, 2006) (unpublished) (relying on "origin of goods" analysis in *Dastar*).

Here, based on the undisputed facts, Cormier's first floor plan and basement plan, pictured in the *Veterinary Economics* article as the "Main Level" plan and the "Lower Level" plan, as well as any other plan produced by Cormier claimed to be used in commerce, are the subject of Freedenfeld's false authorship claim and constitute the relevant "tangible good" as a matter of law. *See* Exhibit A: Complaint ¶¶ 28, 30, 31; Exhibit D: Pl. Dep. at 16, 22, 57-60, 129, 180-81. Exhibit E: Dep. Ex. 4 at pp. 52-53. Similarly, the undisputed facts establish that Cormier produced the relevant tangible goods, including the first floor plan and basement plans, that were submitted to *Veterinary Economics* and all other plans at issue. *See* Defs. Stmt. Undisputed Facts Nos. 28-39. Freedenfeld's own testimony confirms that Cormier produced the physical plans -- the relevant tangible goods -- as he admits that the Cormier-produced plans are not identical to, and differ from, the WFA drawings.

### iii. "Reverse Passing Off" Claim Not Established

All of the plans produced by Cormier were physically produced by Cormier, and, as Freedenfeld admits, were different than the plaintiff's drawings for the same project; moreover, the plans provided to and published in *Veterinary Economics* were created by Cormier for the purpose of submitting them to the magazine. Exhibit B: McTigue Dep. at 182-83. There is no support in the

---

² *See also Williams*, 281 F. Supp. 2d at 1184 (explaining that the relevant "goods" under *Dastar* were the defendants' goods). *But cf. Larkin Group, Inc. v. Aquatic Design Consultants, Inc.*, 323 F. Supp. 2d 1121, 1126-27 (D. Kan. 2004) (concluding that the proposals submitted by defendants were not "tangible goods [or services]" offered for sale within the meaning of the Lanham Act); *Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 299 F. Supp. 2d 565, 572 (E.D. Va. 2004) (rejecting plaintiff's reverse passing off claim based on *Dastar*, since the aeronautical engineering services proposal was not a good or service; even if it was, the plaintiff had not produced the physical proposal).

record for any claim that Cormier tried to pass off WFA's actual *physical* renderings as its own, or otherwise committed reverse passing off.[3]  *See, e.g.*, *Moser Pilon Nelson Architects, LLC v. HNTB Corp.*, ("*Moser Pilon*"), No. 05-CV-422-MRK, 2006 U.S. Dist. LEXIS 58334, at *33 (D. Conn. Aug. 8, 2006).  Typically "reverse passing off" involves the actual taking of one's name or seal off the plaintiff's plans, and the replacing of that name or seal with the defendant's.  *Johnson v. Jones*, 149 F.3d 494, 503-504 (6th Cir. 1998) (noting that the defendant did not dispute that he spent no effort on the plans but merely had re-labeled some of the plaintiff's plans and had made exact tracings of others).[4]  The *Dastar* decision and its progeny make clear that the failure of a defendant's goods to give credit to a plaintiff is "actionable only where the defendant *literally repackages the plaintiff's goods and sells them* as the defendant's own." *Williams*, 281 F. Supp. 2d at 1185;[5] *accord Dastar*, 539 U.S. at 31; *Larkin Group, Inc.*, 323 F. Supp. 2d at 1127 (holding plaintiff's claims alleging defendant had taken the plaintiff's design proposals and layouts and had adopted portions of those designs foreclosed under *Dastar*); *Moser Pilon*, 2006 U.S. Dist. LEXIS 58334, at *31-33 (dismissing plaintiff's Lanham Act claim since no allegation was made that the defendant passed off any specific "physical rendering" of the plaintiff's design which was continuously being shown on defendants' website).

---

[3] Reverse passing off is where "a producer of a product 'misrepresents someone else's goods or services as his own.'" *Dastar*, 539 U.S. at 27 n.1; *Danielson v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 45-46 (1st Cir. 2003) ("Reverse passing off, [is] where the defendant falsely attributes the plaintiff's product to itself or a third party.").

[4] The undisputed proof in *Johnson v. Jones*, established that the defendant took the plaintiff's entire product, and without alteration, represented the entire product as its own.  149 F.3d at 503-504.  In *Moser Pilon,* the court explained that in *Johnson v. Jones*, the defendant *physically* took the plaintiff's *original* architectural drawings, and then, removed the plaintiff's *actual* seal or mark from those materials. *Moser Pilon*, 2006 U.S. Dist. LEXIS 58334, at *31-*34.  Nothing appeared virtual or conceptual about the defendant's conduct. Such physical misappropriation, of which there is no evidence in the instant case, is necessary to trigger Lanham Act application.  *See id.*

[5] The Court's discussion in *Williams* is worth close scrutiny in the current case.  To quote the Court: "The claim [in] *Dastar* . . . . - just as Plaintiff here claims that Defendants made false or misleading representations on Defendants' own goods . . . . The "goods" are the defendants', not the plaintiff's.  *Dastar* makes clear that a claim that a defendant's failure to credit the plaintiff on the defendant's goods is actionable only where the defendant literally repackages the plaintiff's goods and sells them as the defendant's own -- not where, as here, Defendants are accused only of failing to identify someone who contributed not goods, but ideas or communications (or . . . "services") to Defendants' product."  *Williams*, 281 F. Supp. 2d at 1184.

This is not a case where defendant has taken the plaintiff's name off of the plaintiff's original plans, replaced the name with its own, and then, palmed off the plan as being produced by the defendant. Nor does this case involve a situation where defendant has produced one set of plans by tracing the plaintiff's plans. No evidence exists in this case showing that Cormier otherwise re-labeled WFA's physical plans with his own logo, or even produced exact copies, 100% identical tracings, or carbon-copy duplicates of WFA's plans. Indeed, the evidence shows the opposite. Freedenfeld admits that no Cormier Plan is an exact copy or physical rendering of any WFA Plan. Exhibit D: Pl. Dep. at 147-48. The undisputed record, *passim*, and this memorandum conclusively demonstrate that Cormier produced the plans claimed as falsely designated, that Cormier originated those plans, and that Freedenfeld had no involvement in producing those actual, physical plans. Evasive and repetitive use of conclusory words by the plaintiff in this case to describe Cormier's plans -- such as, "virtually identical," "nearly identical," "more or less identical," or "pretty much identical" to the WFA plans -- merely provide a distraction, yet change nothing. *See, e.g.*, *Dastar*, 539 U.S. at 31 (mentioning that the defendant's alleged wrongdoing of taking a creative work, copying it, and modifying it, was vastly different from repackaging plaintiff's goods as its own). Those characterizations by the plaintiff merely establish that Cormier never reproduced or repackaged any *actual, unchanged physical rendering* of any WFA progress plan.

Therefore, since Cormier irrefutably produced the physical plans at issue, and as a result, is the "origin" of those plans under *Dastar* and for purposes of § 1125(a)(1)(A), Freedenfeld's claim for false designation of origin is barred. Accordingly, Cormier is entitled to summary judgment as a matter of law.

      **iv.**    **The Lanham Act Does Not Protect Concepts or Ideas and *Dastar* Precludes Reverse Passing Off Claims Based on Concepts or Ideas**

In addition, the Lanham Act imposes no civil liability for the failure to identify creators of concepts or ideas. *Larkin Group, Inc.*, 323 F. Supp. 2d at 1126-27 (no protection against

plagiarism); *Williams*, 281 F. Supp. 2d at 1184; *Francois*, 2006 U.S. Dist. LEXIS 58334, at *36-38. Any such protection would be under the Copyright Act, 17 U.S.C. § 101 et seq., and not the Lanham Act which does not cover or protect creativity or originality. *Dastar*, 539 U.S. at 34, 37; *see Zyla*, 360 F.3d at 251-52 (noting that claims of false authorship should be pursued under copyright law instead); *Larkin Group, Inc*, 323 F. Supp. 2d at 1127; *Williams*, 281 F. Supp. 2d at 1180, 1185.

Here, Freedenfeld maintains that Cormier's plans and the WFA progress plans contained similar -- but he admits not identical -- ideas and concepts, and as such, WFA should have been identified as the architect for purposes of the Lanham Act "because [WFA] *designed* the project." Exhibit D: Pl. Dep. at 60 (emphasis added); *see, e.g.*, *Attia v. Soc'y of N.Y. Hosp.*, 201 F.3d 50, 56 (2d Cir. 1999) ("Our conclusion that Defendants took no more than ideas from Plaintiff's drawings is corroborated to some extent by Plaintiff's own characterization of the materials . . . . [that the drawings had] the purpose of demonstrating a concept."). Freedenfeld admits that there are multiple deviations, differences, omissions and variations between Cormier's thirty-four plans and WFA's five progress plans and all other testimony and evidence in this case is to the same effect. Exhibit B: McTigue Dep. at 113-116, 124-25; Exhibit F: No. 16. The Supreme Court has deemed this <u>exact</u> situation to preclude liability under the Lanham Act. *Dastar*, 539 U.S. at 36-37 (noting that even where the defendant only made minor modifications to original designs the Lanham Act will not provide protection). The *Dastar* decision unequivocally established, and its progeny has consistently affirmed, that the Lanham Act does not provide a cause of action to a party whose ideas or concepts were taken and embodied or incorporated into goods offered for sale. *Dastar*, 539 U.S. at 37; *Tao of Sys. Integration, Inc.*, 299 F. Supp. 2d at 572; *Bob Creeden & Assocs., Ltd.*, 326 F. Supp. 2d at 880.

The Supreme Court in *Dastar* did not eliminate all protections and consequences stemming from plagiarism, i.e., one person taking credit for another's work. *Id.* at 37; *see Williams*, 281 F. Supp. 2d at 1184. Rather, that decision clarified that copyright law provides whatever protection

exists, not the false designation of origin prong of the Lanham Act. *Zyla*, 360 F.3d at 251-52 (noting the Supreme Court considered that claims of false authorship, should be pursued under copyright law instead); *Williams*, 281 F. Supp. 2d at 1185.

The law is clear under *Dastar* that a claim alleging the copying of creative content such as ideas or concepts, cannot survive dismissal, let alone summary judgment. Therefore, plaintiff's claim alleging that Cormier's final plans "confuse[d] . . . the national public about the true *authorship* and *origin*" by copying certain aspects of WFA's progress plans without crediting WFA, fails in its essential elements and in proof. Accordingly, based on the undisputed facts and for the reasons discussed above, summary judgment is warranted here, as a matter of law, on Freedenfeld's Lanham Act claim for false designation of origin under § 1125(a)(1)(A).

### B.  False Advertising

It is unclear whether Freedenfeld also presents a claim for false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), but even if the plaintiff does press such a claim, it too fails as a matter of law given the undisputed facts. Specifically, Freedenfeld alleges that "as a vehicle for promoting the defendant's misrepresentation of the nature, distinct characteristics and origin of the Architectural Works, Cormier, with the assistance of the other defendants, caused the Architectural Works *or elements thereof* to be published in *Veterinary Economics* magazine" and on the worldwide web. Exhibit E: Dep. Ex. 12 at No. 1 (emphasis added).

Section 1125(a)(1)(B), creates a federal cause of action against any person who "in commercial advertising or promotion, misrepresents the nature of his or her or another person's goods, services, or commercial activities." Congress designed the statute "to protect consumers and competitors from any duplicitous advertising or packaging which results in unfair competition." *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 310 (1st Cir. 2002).

False advertising under § 1125(a)(1)(B) requires proof of the following elements:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience;[6] (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Cashmere & Camel Hair Mfrs. Inst.*, 284 F.3d at 310-11 (citing *Clorox Co. P.R. v. Procter & Gamble Commercial Co.*, 228 F.3d 24, 33 n.6 (1st Cir. 2000)). This Court has reduced those same elements on their essential parts, as follows: (1) Defendants made false or deceptive advertisements or representations to customers; (2) those advertisements deceived a significant portion of the consuming public; and (3) Plaintiffs were injured by Defendants' conduct. *Ultra-Temp Corp.*, 27 F. Supp. 2d at 89-90.

Given those elements, summary judgment in Cormier's favor on any claim for false advertising by Freedenfeld is warranted because: (i) Cormier has made no false statement; (ii) the Merit Award and corresponding *Veterinary Economics* article are not "advertising" or "promotion" for purposes of the Lanham Act; (iii) Cormier made no false statement which deceived any consumer; and (iv) Freedenfeld can point to no injury suffered stemming from any statement made in advertising or promotion by Cormier.

### i.    No Evidence Proves Cormier Made Any False Statement

As a threshold matter, the plaintiff in such a case must prove that the defendant made a false statement. *Cf. Cashmere & Camel Hair Mfrs. Inst.*, 284 F.3d at 311 & n.9 (noting that the defendant did not dispute the falsity of its representations); *Ultra-Temp Corp.*, 27 F. Supp. 2d at 89-

---

[6] The First Circuit recognizes an elevated burden of proof where the plaintiff seeks monetary damages, as compared with the burden of proof when requesting injunctive relief in an action based on the Lanham Act. *Cashmere & Camel Hair Mfrs. Inst.*, 284 F.3d at 311. Where monetary damages are sought, plaintiff must show that the alleged representations actually deceived consumers. *Id.* at 311 & n.9 (noting that the defendant did not dispute the falsity of its representations).

90 ("Plaintiff[] must identify an advertisement or promotion containing false information."). In this matter, the facts do not warrant moving past that element.

No evidence establishes here any falsity in the V*eterinary Economics* magazine article's statement that Cormier was the Project's architect, and thus, the architect who produced the plans pictured. As discussed *infra* at Part III.A.iii, it is undisputed that Cormier produced the actual plans pictured in the article, and is the "origin" of the tangible good, the plans, under § 1125(a)(1)(A). The undisputed facts provide additional support that no false statement was made, in that Cormier never submitted WFA's physical plans to *Veterinary Economics*, and Cormier, not WFA, produced the physical plans pictured in the article. *See* Defs. Stmt. Undisputed Facts Nos. 45-51.

Further, Cormier was the architect of record of the Project. Freedenfeld entered into a binding contract that terminated WFA as the architect on September 2, 1999, well before the publishers of *Veterinary Economics* presented the 2004 Veterinary Hospital Design Competition Merit Award to the Gardner Animal Hospital and published the *Veterinary Economics* article, and substantially before the Project was even built. Exhibit D: Dep. Exs. 4, 11. In fact, Freedenfeld admits that the hospital could not have been built from the WFA drawings, and that further architectural work beyond that performed by WFA before it was fired from the project was necessary before construction could proceed. Exhibit D: Pl. Dep. at 65-66.

Thus, regardless of who should be charged with having actually made the statement in the magazine that Cormier was the architect, the simple fact of the matter is that this statement was correct and not false when made; as such, it cannot be the basis for any claim of false advertising. Since Freedenfeld can point to no other alleged advertising by Cormier related to the design of the Gardner Animal Care Center, the plaintiff cannot prove the existence of any false statement made in the course of advertising, and any claim for false advertising in violation of the Lanham Act must fail. Exhibit E: Dep. Exs. 4, 11.

### ii. The Merit Award and Veterinary Economics Article are Not "Advertisements" or "Promotions" under the Lanham Act

Even if a dispute existed over the veracity of any information published in the article or in reference to the Merit Award given to the Gardner Hospital, however unlikely, Freedenfeld's false advertising claim would still fail. A plaintiff making such a claim must also prove that the alleged false statement or information appeared in an actual "advertisement" or "promotion." *See Cashmere & Camel Hair Mfrs. Inst.*, 284 F.3d at 310-11; *Ultra-Temp Corp.*, 27 F. Supp. 2d at 89-90; *see, e.g.*, *Zyla*, 360 F.3d at 251-52 (stating that to trigger Lanham Act protection, plaintiff must show that the medium used, alleged to have failed to give credit, was in the "form of commercial advertising or promotion"). This requires that the alleged advertisement or promotion be: (i) commercial speech; (ii) made by a commercial competitor of the plaintiff; (iii) "for purposes of influencing consumers to buy defendant's goods;" and (iv) "disseminated sufficiently to the relevant purchasing public." *Ultra-Temp Corp.*, 27 F. Supp. 2d at 89-90. Based on the record, it is obvious that neither the Merit Award nor its corresponding article qualify as any type of advertisement or promotion under the Lanham Act.

To be considered commercial speech for these purposes, an advertisement or promotion must at least propose a commercial transaction. *Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108, 112 (6th Cir. 1995); *cf. Galierie Gmurzynska v. Hutton*, 355 F.3d 206 (2d Cir. 2004) (holding a museum exhibition catalogue as neither commercial advertising nor commercial promotion, and regardless, the defendants had not caused the journalist to write the statements). Further, the advertising or promotion alleged must be "part of a pattern or campaign to penetrate more of the relevant market" to qualify as having been made for the purpose of influencing the public's purchasing decisions. *See Ultra-Temp Corp.*, 27 F. Supp. 2d at 93 (discussing whether a letter constituted advertising).

In this case, the facts are not complex. It is apparent that neither the article nor the Merit Award constitutes an advertisement or promotion under these standards. Cormier proposed no

commercial transaction in connection with the Merit Award or the corresponding article in *Veterinary Economics.* It is undisputed that it was the *Veterinary Economics* publishers who awarded Gardner Animal Hospital the 2004 Merit Award and not Cormier. Exhibit G: No. 5. Cormier itself made no proposal for a commercial transaction in the magazine article or as part of the award. Indeed, besides identifying Cormier as the architect on page 52, the *Veterinary Economics* article simply makes no other specific reference to Cormier. Exhibit E: Dep. Ex. 4. It is illogical that either the Gardner Animal Hospital's receipt of the Merit Award[7] or the corresponding *Veterinary Economics* article could be deemed a proposal by Cormier to the public made for the purposes of conducting a commercial transaction.

The evidence in the case also cannot establish that the statement was used to influence the purchasing public. No facts even suggest that Cormier has ever used the Merit Award and its corresponding article in *Veterinary Economics* as part of any pattern or campaign intended to penetrate more of the veterinary hospital market. Indeed, the undisputed facts demonstrate the opposite. Cormier has never advertised or marketed its involvement in the Project or the Gardner Animal Hospital's receipt of the Merit Award in any manner, including in print, television, radio, e-mail, internet, or other media. Exhibit F: No. 10. Corroborating this, Freedenfeld, a *Veterinary Economics* long-time subscriber, testified that he had never seen any advertising for Edward D. Cormier, Associates Inc. in the magazine or in any other media. Exhibit D: Pl. Dep. at 66.

       iii.    **No Evidence Shows that Consumers were Deceived and No Evidence Shows Any Injury**

Any false advertising claim would also fail because the evidence does not demonstrate any

---

[7] There is no evidence that Cormier ever promoted the merit award or the magazine article, and in fact Cormier did not do so. Exhibit F: Nos. 10, 15. The mere award by the magazine cannot logically constitute actionable advertising by the recipient absent subsequent acts by the same to publicly advertise the award. Otherwise, the awarding authority would have the power to make unsuspecting members of the public liable for false advertising by the mere fact of granting them an award. The Lanham Act certainly cannot grant such power to every magazine or other form of media that deems itself qualified to grant awards.

consumer confusion or deception, or injury to the plaintiff. There is no evidence, and the plaintiff cannot come forward with any, that Cormier made any alleged representation, let alone false representation, which actually deceived consumers. *Cashmere & Camel Hair Mfrs. Inst.*, 284 F.3d at 311 & n.9; *Ultra-Temp Corp.*, 27 F. Supp. 2d at 89-90. Next, Freedenfeld's claim unquestionably fails because no evidence shows Freedenfeld suffered any injury. *Ultra-Temp Corp.*, 27 F. Supp. 2d at 89-90. WFA has lost no specific job because of the Merit Award or article. Exhibit D: Pl. Dep. at 64. Further, Freedenfeld has no knowledge and no evidence that Cormier received any additional work because of the Merit Award or article. *Id.* at 64.

As the plaintiff bears the burden of proof on these issues, its inability to come forward with any evidence establishing the existence of these elements of a false advertising claim preclude liability and warrants summary judgment in favor of Cormier.

## V. CONCLUSION

For the reasons detailed above, the plaintiff's claim under the Lanham Act fails as a matter of law and under the undisputed facts of this case, whether it is prosecuted under 15 U.S.C. § 1125(a)(1)(A), or instead, under subsection (B) of the Act.

Respectfully submitted,

**Edward D. Cormier & Associates, Inc.**
Defendant
By its attorneys,

**Dated:** February 1, 2007

*/s/ Stephen D. Rosenberg*
Stephen D. Rosenberg        [BBO#558415]
Eric L. Brodie              [BBO#639833]
Shayna W. Borakove          [BBO#663670]
**THE MCCORMACK FIRM, LLC**
One International Place - 7th Floor
Boston, MA   02110
Ph:   617•951•2929
Fax:  617•951•2672