# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **WARREN FREEDENFELD ASSOCIATES, INC.**, as successor in interest to Warren Freedenfeld & Associates, Inc., <br><br>                    **Plaintiff,** <br><br> v. <br><br> **MICHAEL P. MCTIGUE, DVM**, individually and as Trustee of the McTigue Family Trust, **NANCY A. MCTIGUE**, as Trustee of the McTigue Family Trust, **BRIAN C. HURLEY, DVM**, **GARDNER ANIMAL CARE CENTER, LLC** d/b/a Gardner Animal Hospital, **EDWARD D. CORMIER ASSOCIATES, INC.**, and **BENNETT BUILDING CORPORATION**, <br><br>                    **Defendants.** | **CIVIL ACTION No. 05-11573 RGS** |
| **MICHAEL P. MCTIGUE, DVM**, <br>                    **Counter-Plaintiff,** <br><br> v. <br><br> **WARREN FREEDENFELD ASSOCIATES, INC.**, as successor in interest to Warren Freedenfeld & Associates, Inc., <br><br>                    **Counter-Defendant.** | |
| **EDWARD D. CORMIER ASSOCIATES, INC.**, <br>                    **Counter-Plaintiff,** <br><br> v. <br><br> **WARREN FREEDENFELD ASSOCIATES, INC.**, as successor in interest to Warren Freedenfeld & Associates, Inc., <br><br>                    **Counter-Defendant.** | |

## DEFENDANT EDWARD D. CORMIER ASSOCIATES, INC.'S MOTION FOR SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT COUNTERCLAIM

Defendant/Counter-Plaintiff Edward D. Cormier Associates, Inc. ("Cormier") hereby moves

this Court for summary judgment in its favor on Comier's breach of contract counterclaim against

the plaintiff, Warren Freedenfeld Associates, Inc.  As grounds for this motion, Cormier states as follows:

1.     The plaintiff and defendant Michael McTigue executed a binding contract, known as the termination agreement, that ended their business relationship.  This agreement was executed years before the instant lawsuit was instituted.

2.     Cormier is a third party beneficiary of that contract.

3.     The contract granted McTigue and Cormier the right to make certain uses of preliminary architectural drawings rendered by the plaintiff prior to execution of the termination agreement.

4.     As a matter of undisputed fact, McTigue and Cormier only utilized those drawings in the exact manner authorized by the plaintiff in the termination agreement.

5.     As a result, plaintiff's subsequent lawsuit against Cormier alleging copyright infringement and violations of the Lanham Act was barred by the terms of the termination agreement, and represents a breach of contract for which plaintiff is liable to Cormier.

6.     As further support for this motion, Cormier submits the accompanying Statement of Undisputed Facts and its Memorandum in Support of its Motion for Summary Judgment on the Breach of Contract Counterclaim, which cites supporting authorities and provides further argument demonstrating that this motion should be granted.


### REQUEST FOR ORAL ARGUMENT

7.     Pursuant to Local Rule 7.1(D), Cormier requests this Court entertain oral argument.


WHEREFORE, Defendant Edward D. Cormier Associates, Inc. requests that this Court enter summary judgment in its favor on its breach of contract counterclaim against the plaintiff, Warren Freedenfeld Associates, Inc.

2

Respectfully submitted,

**Edward D. Cormier Associates, Inc.**,
Defendant/Counter-Plaintiff
By its attorneys,

**Dated:** February 1, 2007

/s/ Stephen D. Rosenberg
Stephen D. Rosenberg, Esq.   [BBO #558415]
Eric L. Brodie, Esq.,            [BBO #639833]
THE MCCORMACK FIRM, LLC
One International Place
Boston, MA    02110
**Ph:**   617•951•2929
**Fax:**  617•951•2672

### CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of *(1) DEFENDANT EDWARD D. CORMIER ASSOCIATES, INC.'S MOTION FOR SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT COUNTERCLAIM, (2) STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANT EDWARD D. CORMIER ASSOCIATES INC.'S MOTION FOR SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT COUNTERCLAIM, (3) MEMORANDUM IN SUPPORT OF DEFENDANT EDWARD D. CORMIER ASSOCIATES, INC.'S MOTION FOR SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT COUNTERCLAIM, and (4) LOCAL RULE 7.1 CERTIFICATION* upon all counsel of record, via the Court's ECF system, to:

Barry S. Scheer, Esq.
Garrett J. Lee, Esq.
**Parker Scheer, LLP**
One Constitution Center
Boston, MA    02129
Phone:  617.886.0500
Fax:      617.886.0100

Robert D. City,  Esq.
Michael J. Dissette, Esq.
**City, Hayes & Dissette, PC**
50 Congress Street
Boston, MA    02109
Phone:  617.523.3050
Fax:      617.523.5612

Mary C. Casey,  Esq.
**Harbor Law Group**
385 South Street
Shrewsbury, MA    01545
Phone:  508.842.9244
Fax:      508.842.9311

Michael J. Stone, Esq.
Robert A. McCall, Esq.
**Peabody & Arnold LLP**
30 Rowes Wharf
Boston, MA  02110
Phone:  617.951.2100
Fax:      617.951.2125

Robert N. Meltzer, Esq.
P.O. Box 1459
Framingham, MA  01701
Phone:  508.872.7116
Fax:      508.872.8284

**Dated:**   February 1, 2007

/s/ Stephen D. Rosenberg
Stephen D. Rosenberg

93806.1

3

**Exhibit A**

**Excerpts from the deposition
of
Michael P. McTigue**

UNCERTIFIED ROUGH DRAFT

VOLUME:    I
PAGES:     1 - 190
EXHIBITS:  15 - 38

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO. 06-1583-RGS

*************************************x
WARREN FREEDENFELD ASSOCIATES, INC.
as successor in interest to WARREN
FREEDENFELD & ASSOCIATES, INC.,
                    Plaintiff,

v.

MICHAEL P. MCTIGUE, DVM, Individually
and as Trustee of THE MCTIGUE FAMILY
TRUST, NANCY A. MCTIGUE, as Trustee of
the MCTIGUE FAMILY TRUST, BRIAN C.
HURLEY, DVM, GARDNER ANIMAL CARE CENTER,
LLC d/b/a GARDNER ANIMAL HOSPITAL,
EDWARD D. CORMIER ASSOCIATES INC.,
and BENNETT BUILDING CORPORATION,
                    Defendants.
*************************************x

        DEPOSITION OF GARDNER ANIMAL CARE CENTER,
THROUGH ITS DESIGNEE MICHAEL P. MCTIGUE
DEPOSITION OF MICHAEL P. MCTIGUE, a witness called
on behalf of the Plaintiff, taken pursuant to the
Massachusetts Rules of Civil Procedure, before
Carol A. Jackson, Registered Professional Reporter
and Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Parker|Scheer,
LLP, One Constitution Center, Boston,
Massachusetts, on TUESDAY, JANUARY 23, 2007, at
10:11 a.m.

EPPLEY COURT REPORTING, LLC
Post Office Box 382
Hopedale, Massachusetts 01747
508.478.9795 ~ Fax: 508.478.0595
leppley@msn.com

Draft Copy

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 19

1    architect?

2          A.   The decision was based on I wanted someone

3    who had done veterinary architecture.  And I was

4    familiar with the architects as I had been kind of

5    following veterinary architect since I graduated.  So

6    I explored avenues with different veterinary

7    architects contacting them.

8          Q.   You said that you were interested at the

9    time -- in the time period when you graduated from

10   veterinary school; what I understand you to mean is

11   that you looked at particular facilities?

12         A.   Yes.  I'd been -- I'd looked at some

13   facilities more so just in the architecture as it was

14   published in Veterinary Economics.  They always --

15   every month they would publish a hospital, a hospital

16   design, so that would be the first thing that I would

17   always turn to.

18         Q.   Was that immediately after you graduated

19   from veterinary school?

20         A.   Yes.  That was close to that, yes.

21         Q.   Were you a subscriber to Veterinary

22   Economics magazine at that time?

23         A.   Yes.

24         Q.   Do you still have a subscription to that

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 20

1    magazine?

2         A.   Yes.

3         Q.   Has that subscription been constant

4    throughout your veterinary care?

5         A.   Yes.

6         Q.   Did you actually go visit animal hospitals

7    in 1993?

8         A.   With the specifics -- I visited a lot of

9    animal hospitals just in seeing colleagues.  So yes,

10   I did.

11        Okay.  Do you recall the facilities that you

12   visited at that time?

13        A.   I'd been at -- well, Valley Veterinary

14   Hospital in Connecticut which was an award-winning

15   hospital and that was a long time ago.

16        Q.   Okay.

17        A.   Althol Animal Hospital.  I don't recall

18   specific other hospitals.

19        Q.   And at some point in time, did you actually

20   select an architect to perform work as related to the

21   73 Eaton Street site?

22        A.   73 Eaton, yes.

23        Q.   And who did you retain?

24        A.   Warren Freedenfeld.

UNCERTIFIED ROUGH DRAFT

Page 36

1    Mr. McTigue's briefcase that he brought with him

2    today?

3             MR. MELTZER:  That's what he has, and the

4    reason we're producing them is the vast majority

5    except for 19 have been produced before.  Exhibit 19

6    is handwritten notes that appear to be irrelevant to

7    this case.  If you want to see them, we're producing

8    them without acknowledging any relevance to them.

9             MR. LEE:  That is noted for the record.

10   Let's move on.

11        Q.  (By Mr. Lee)  Going back to the 1993

12   project -- was that it?  I'm sorry, was it the 1999

13   project where you hired Warren Freedenfeld, that was

14   '99, correct?

15        A.  What was in '99?

16        Q.  Let's go back for a second.  At some point

17   in time, you said that you retained Warren

18   Freedenfeld to design a facility at the 73 Eaton

19   Street site, correct?

20             MR. MELTZER:  Objection.

21        A.  Yes.

22        Q.  What year was that?

23        A.  We signed the contract in March of '98.

24        Q.  Okay.  And did Warren Freedenfeld prepare

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 37

1    plans in connection with that project?

2         A.  Yes.

3         Q.  And did you pay Warren Freedenfeld for those

4    plans?

5         A.  Yes.

6         Q.  Were you satisfied with Warren Freedenfeld's

7    services at that time?

8              MR. MELTZER:  Note the objection.  What

9    time?

10             MR. LEE:  In 1999.

11             MR. MELTZER:  What point in '99?

12        Q.  (By Mr. Lee)  Let me go back for a second.

13   You just testified that you were provided by plans by

14   Warren Freedenfeld in '99, correct?

15        A.  Yes.

16        Q.  And that was in connection with a new

17   facility at the 73 Eaton Street site, correct?

18        A.  Yes.

19        Q.  Okay.  And at the time when you when you

20   were provided with those plans by Warren Freedenfeld,

21   did you review those plans?

22        A.  Yes.

23        Q.  Did you have any issues with the plans?

24             MR. MELTZER:  Objection.

UNCERTIFIED ROUGH DRAFT

Draft Copy

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 38

1        Q.  (By Mr. Lee)  In other words, did you have

2   any complaints as it related to any of the services

3   that Warren Freedenfeld provided you at that time?

4            MR. MELTZER:  Same objection.  Objection to

5   time frame, Garrett.  Can you nail it down?

6            MR. LEE:  I think I said it was '99.

7        A.  Yes.

8        Q.  (By Mr. Lee)  What objection did you have to

9   the plans or to Warren Freedenfeld or his services?

10       A.  Through the whole project, can you clarify

11  as to time?

12       Q.  Let's go back to that particular project in

13  1999.  Did you have any specific complaints as it

14  relates to any of the services that Warren

15  Freedenfeld provided you with at that time?

16       A.  Yes.

17       Q.  And what were those specific complaints?

18       A.  When the plans that Freedenfeld had produced

19  were estimated, they were over budget.  We needed to

20  get the -- the estimate came in at about

21  $1.3 million.  The budget was $1 million.

22            We needed to lower the cost of the project.

23  We met and set as our goal to lower the cost.  As we

24  went forward, Warren Freedenfeld and his associate,

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 39

1   Chris Hanlon, were not lowering -- they were not

2   producing the documents and the information that was

3   requested by the team to help lower the cost of the

4   project.

5          Q.  Who were the other members of the project

6   team in 1999?

7          A.  Primarily, Walter Bennett, Dan McCarty, Ed

8   Cormier.

9          Q.  Go ahead.

10         A.  Ed Cormier was 1999, post-Freedenfeld.

11         Q.  Looking at an exhibit that has been

12  previously marked as Exhibit 21, can you take a look

13  at that.

14              Again, it was stipulated on the record that

15  this was part -- this was one of the documents that

16  you brought with you today that were in your

17  briefcase; is that correct?

18         A.  Yes.

19         Q.  And what is this document?

20         A.  AIA agreement between Warren Freedenfeld and

21  myself.

22         Q.  Do you know who prepared this agreement?

23         A.  The AIA, Warren Freedenfeld.

24         Q.  Was this a document that Warren Freedenfeld

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 58

1        MR. MELTZER:  Objection.  Answer if you

2    understand the question.

3        A.  I believe Warren Freedenfeld.

4        Q.  Were you involved at all in the

5    design -- strike that.

6        Were you involved at all in the creation of

7    this particular document?

8        A.  Can you clarify "creation of" it?

9        Q.  This document, Exhibit 18, is a set of

10   plans, correct?

11       A.  Yes.

12       MR. MELTZER:  My objection, Garrett, is he

13   testified he took them off the summons, so apparently

14   these designs, the plans, were created by your

15   firm.

16       MR. LEE:  That's fine.

17       Q.  (By Mr. Lee)  My question, Dr. McTigue, is:

18   Were you involved at all in the creation of these

19   plans?

20       A.  Yes.

21       Q.  And what was your involvement?

22       A.  We worked with Warren Freedenfeld to create

23   the help in the conceptual design of our animal

24   hospital.

Draft Copy

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 59

1    Q.  And what do you mean by you worked with him

2    and helped?

3    A.  To get a design on paper, he has to

4    understand what I'm looking for, what I want, my

5    desires, my experience.  So through a series of

6    programs and discussions and programs, we developed

7    that, what I wanted, and got it on paper

8    Q.  And what did you want?

9    A.  I wanted an animal hospital designed.

10   Q.  And did you provide Warren Freedenfeld with

11   any designs that you created yourself?

12   A.  Drawings, no.

13   Q.  Okay.  Did you create any drawings in

14   connection with the Gardner Animal Hospital --

15   sorry -- Gardner Animal Care Center at any time?

16   A.  Yes.

17   Q.  You created your own plans?

18   A.  Rough sketches, yes.

19   Q.  Do you have copies of the rough sketches?

20   A.  No.

21   Q.  When did you prepare the rough sketches?

22   A.  At home during the project, just playing

23   around, just rough sketches of the design.

24   Q.  What exactly do you mean by "rough

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 63

1    Gardner Animal Hospital.

2        Q.  (By Mr. Lee)  Again, this was a document

3    that you produced today?

4        A.  Yes.

5        Q.  And this is a copy of the November 2004

6    Veterinary Economics magazine?

7        A.  Yes.

8        Q.  And on page 56, in the first full paragraph

9    under the heading Room to Breathe, Room to Spare, it

10   says, "Dr. McTigue planned this space in advance to

11   make room for such educational meetings.  'I visited

12   30 practices to get ideas and advice before we built,

13   says Dr. McTigue."

14            Did you, in fact, visit 30 practices prior

15   to building -- prior to building the Gardner Animal

16   Hospital -- I'm sorry -- the Gardner Animal Care

17   Center?

18       A.  Whether it was exactly 30 or close to it, I

19   don't recall, but it was close -- at least close to

20   30.

21       Q.  And when did you visit the facilities?

22       A.  From February '98 through June of '98.

23       Q.  Were any of those facilities Warren

24   Freedenfeld-designed facilities?

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 64

1    A.   I don't believe any were.

2    Q.   As you sit here today, do you recall the

3  names of any of those facilities?

4    A.   I went on a trip with our Webster drug rep

5  on his calls, and basically, we would go -- we did

6  four -- I believe we did four trips including one

7  overnighter.

8        So we would go into a vet hospital for about

9  an hour.  While he did his drug orders with the team

10 member, I usually talked to the owner about floor

11 plans.  I do not recall all the names at all because

12 these were fairly brief visits, but we went to

13 Vermont.

14       We went to Rutland, Vermont, Rutland Animal

15 Hospital.  We went to Norwich.  I don't recall the

16 animal hospital.  I believe there was a hospital

17 called Green Mountain Animal Hospital.

18       We went up to Burlington, saw the Burlington

19 Animal Hospital, the Brown Animal Hospital.  A

20 hospital in Shelburne, a hospital in Montpelier,

21 Middlebury Animal Hospital.  That's a partial list.

22       Again, these -- and then we went to New

23 Hampshire, another trip, and I know one of the

24 hospitals was called Weir Animal Hospital.

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 65

1        We went to Western Massachusetts where I

2    visited Valley Vet -- where I visited Montgomery Road

3    Animal Hospital, Boston Road Animal Hospital.  Rowley

4    Memorial Animal Hospital on another visit.  Valley

5    Veterinary hospital in Hadley.

6            Those are the ones I can recall offhand.

7    There were more.

8        Q.  What's the name of this person you went

9    with?

10       A.  Butch Roder.

11       Q.  Do you know Mr. Roder's address?

12       A.  Keene, New Hampshire is all I know.

13       Q.  Do you have a phone number for him?

14       A.  No, I don't.  He's no longer with the

15   company, with Webster.

16       Q.  Are you still in contact with him?

17       A.  Occasionally.

18       Q.  When was the last time that you spoke with

19   him?

20       A.  Three or four months ago.

21           MR. LEE:  Off the record.

22           (Off the record, 12:08-12:09 p.m.)

23           MR. LEE:  Back on the record.

24       Q.  (By Mr. Lee)  In connection with creating

Draft Copy

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 67

1          (Luncheon recess, 12:11 p.m.)

2

3      (Deposition resumed at 12:57 p.m.)

4

5          MR. LEE:  Back on the record.

6      Q.  (By Mr. Lee)  Dr. McTigue, prior to the

7  break, I asked you some questions about the

8  circumstances surrounding the creation of the plans

9  marked as Exhibit 18; do you recall that?

10      A.  Yes.

11      Q.  Now, you stated that you did -- strike that.

12          To what extent were you involved in the

13  creation of the plan marked as Exhibit 18?

14      A.  In the -- I was involved in the

15  conceptualization of these plans.  This design could

16  not have occurred obviously without the person who

17  was paying for it to give their input as to what they

18  want.

19      Q.  And what input did you provide to Warren

20  Freedenfeld?

21      A.  Lots of information as far as what we

22  wanted, the size we wanted, the services we provide;

23  therefore, the rooms we would want.

24      Q.  Okay.  And what types of services did you

UNCERTIFIED ROUGH DRAFT

UNCERTIFIED ROUGH DRAFT

Page 68

1  tell -- strike that.

2          Did you have a discussion with Warren

3  Freedenfeld directly about the services you wanted to

4  provide in connection with this facility?

5          A.  Yes.

6          Q.  And what services did you tell Warren

7  Freedenfeld that you wanted to provide in connection

8  with this facility?

9          A.  Medicine, surgery, ancillary services such

10 as grooming and boarding and training, a retail

11 area.

12         Q.  Anything else?

13         A.  Those are the specific services we

14 discussed.

15         Q.  Were you providing any of those other

16 services prior to -- by "you," I mean the hospital.

17         Was the hospital providing any of those

18 services prior to Warren Freedenfeld's involvement --

19         A.  Yes.

20         Q.  -- in the Gardner Animal Care Center

21 project?

22         A.  Yes.

23         Q.  And which of those were you providing at the

24 time?

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 69

1        A.  As the Gardner Animal Hospital, medicine,

2    surgery, retail, grooming.

3        Q.  And did you provide any boarding

4    facilities?

5        A.  Not in the old hospital.

6        Q.  Was that something you wanted in the new

7    hospital?

8        A.  Yes.

9        Q.  And I think you mentioned something about

10   rooms; what do you mean by that?

11       A.  Can you rephrase the question?

12       Q.  Sure.  You mentioned that you provided

13   concepts to Warren Freedenfeld; is that correct?

14       A.  Yes.

15       Q.  And part of those concepts were the services

16   you wanted to provide for the new facility,

17   correct?

18       A.  Yes.

19       Q.  And I believe you also testified that you

20   had some discussion about the rooms that would be in

21   the hospital facility?

22       A.  Yes.  The inner relationship example, I

23   wanted to have a waiting room that was very

24   stimulating from a client's point of view.  I kind of

UNCERTIFIED ROUGH DRAFT

UNCERTIFIED ROUGH DRAFT

Page 70

1    viewed this from a client's perspective.

2          So I wanted the waiting area to be

3    stimulating.  So I wanted things like -- I wanted

4    grooming to be visible from the waiting area.

5    Clients, they find that a fascinating thing to watch.

6          We had cat adoption, just a small program to

7    help provide cats, and I wanted people to actually

8    see the cats from the waiting area.

9          A lot of people bring their kids, so I

10   wanted there to be something from the kids to do.  So

11   we wanted a play area in the waiting room.

12        Q.  And in your review of other facilities, did

13   you see any of those concepts displayed?

14        A.  Yes.

15        Q.  And were any of those concepts displayed in

16   any of the plans that you saw that were created by

17   Warren Freedenfeld previously?

18        A.  Yes.  I don't know if any concept had all

19   three of them visible from the waiting area, but they

20   certainly were not new concepts.

21        Q.  Did you provide any other input as it

22   relates to the rooms in the new facility in terms of,

23   you know, what the rooms would be used for to Warren

24   Freedenfeld?

Draft Copy

UNCERTIFIED ROUGH DRAFT

UNCERTIFIED ROUGH DRAFT

Page 71

1    A.  I mean, we had a lot of discussion on it, so

2  the answer is yes.  The specifics -- there is a

3  normal flow to a vet hospital.

4         Obviously, you have people coming into a

5  waiting area, and they move into an outpatient area.

6  Behind that, there's always a lab and a pharmacy, and

7  adjacent to that, there's usually surgery and a

8  surgery prep area and ICU.

9         So there's a normal relationship to the

10  different areas that allow you the services.  So we

11  certainly discussed those during the concept phase.

12    Q.  Any of those services you just referenced in

13  the flow in terms of the relationship to -- strike

14  that.

15         Any of those services as it relates to the

16  inner flow of a hospital facility, did you witness

17  any of that -- of those -- that relationship at any

18  other facilities that you viewed prior to this

19  project?

20         MR. MELTZER:  Objection to form.  You can

21  answer if you understand the question.

22    A.  I don't really understand.

23         MR. MELTZER:  You are missing a verb in

24  there somewhere.

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 72

1    Q.  (By Mr. Lee)  It's late in the day.  Let me

2  try to rephrase it for you.

3        You just testified that some of the concepts

4  you wanted related to certain enter relationships

5  between rooms; is that correct?

6    A.  Yes.

7    Q.  And the flow between rooms?

8    A.  Yes.

9    Q.  Okay.  And the flow would include movement

10  from the reception area to the outpatient area,

11  pharmacy, and surgery; is that correct?

12    A.  Yes.

13    Q.  And did you have a chance in your -- a

14  chance during your visits to other hospitals to see a

15  similar type of flow between rooms?

16    A.  We absolutely saw it because they all have

17  it.  Obviously every hospital has a flow, so

18  certainly that was one of the things I was interested

19  in in all these visits.

20    Q.  Do you recall if any of the floor plans that

21  you viewed that were previously created by Warren

22  Freedenfeld created those elements in terms of flow

23  and interrelationships?

24    A.  Again, every plan has flow and

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 74

1  connection with this new facility at the Gardner

2  Animal Care Center?

3        A.  Yes.

4        Q.  Okay.  And based on what you saw in some of

5  Warren Freedenfeld's prior plans, did that

6  influence -- strike that.

7        Did you take elements from Warren

8  Freedenfeld's prior plans basically that wanted to

9  include into the new facility at the Gardner Animal

10 Care Center?

11       MR. MELTZER:  Objection as to form answer if

12 you understand the question.

13       A.  I mean, I took elements from so many

14 different things.  Again, I can't tell you here what

15 elements I took from looking at 200 floor plans from

16 looking at the book.

17       I mean, basically I took the elements I got

18 from all this research and in my mind formulated a

19 concept and flow I wanted to see.

20       Q.  And that would include plans that you viewed

21 that were created by Warren Freedenfeld?

22       A.  Yes.

23       Q.  These concepts that you're discussing, are

24 these concepts that you presented to Warren

UNCERTIFIED ROUGH DRAFT

UNCERTIFIED ROUGH DRAFT

Page 75

1    Freedenfeld during your meetings with him?

2         A.  I'm sure they came up in one form or another

3    during our discussions.

4         Q.  Do you recall the first time that you had a

5    meeting with Warren Freedenfeld when you discussed

6    these concepts you just referenced?

7         A.  In our first meeting we had.

8         Q.  Do you recall approximately when that was?

9         A.  I believe it was in four -- April '98.

10        Q.  And was that at Warren Freedenfeld's

11   office?

12        A.  Yes.

13        Q.  And I think you testified earlier it was

14   between you and Warren Freedenfeld?

15        A.  Yes.

16        Q.  And no one else was present, correct?

17        A.  I don't believe so.

18        Q.  What happened after you presented these

19   particular concepts you just referenced to Warren

20   Freedenfeld?

21        A.  Once he has an understanding about what  I'm

22   looking for -- size, number, shape -- then we move on

23   to the design phase.

24             So you have the programming phase.  You go

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 82

1      Q.   Okay.  At some point in time, did you inform
2  Warren Freedenfeld that you no longer required his
3  services?
4      A.   Yes.
5      Q.   When was that?
6      A.   I believe it was the end of May '99.  Yes,
7  the end of May.
8      Q.   Was that something that you -- was that a
9  discussion that you had with Warren Freedenfeld in
10  person?
11      A.   No.
12      Q.   Over the phone?
13      A.   Yes.
14      Q.   And could you tell me about the substance of
15  the conversation?
16      A.   That I was terminating him from -- as the
17  architect of the project.
18      Q.   Did you explain why?
19      A.   I believe we did go into the details, some
20  of them.
21      Q.   What did you say to him and what did he say
22  to you?
23      A.   The exact words, I can't recall, but it had
24  to do with the fact that I wasn't happy with the

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 83

1   fact -- he did not redesign this project to bring it

2   into budget, that he wasn't -- he seemed very

3   resistant to it.

4           He seemed to simply want to move forward

5   with this design and go into the construction

6   document phase, and I could not proceed until he

7   redesigned it.  And we had asked him multiple times,

8   and he would not do it.

9       Q.  I believe you testified that the design that

10  Warren Freedenfeld prepared for you was a design

11  where you gave input as to what you wanted,

12  correct?

13      A.  Correct.

14      Q.  Okay.  And the concepts that appear in the

15  plan are concepts that you provided to Warren

16  Freedenfeld?

17      A.  Some of them, correct.

18      Q.  Okay.  And did the concepts that you claim

19  to have provided to Warren Freedenfeld -- let me just

20  go back.

21          Those concepts were actually included in the

22  plan that Warren Freedenfeld created, correct?

23          MR. MELTZER:  Objection.  I will instruct

24  him not to answer that question as phrased.  If you

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 84

1    can rephrase it.

2         Q.  (By Mr. Lee)  You testified that you gave

3    concepts to Warren Freedenfeld in terms of what you

4    wanted in connection with the design of the medical

5    facility?

6         A.  Correct.

7         Q.  Okay.  And were those concepts that you gave

8    Warren Freedenfeld included in the plan marked as

9    Exhibit 18?

10        A.  Yes.

11        Q.  Now, why is it that you had a problem with

12   the design given that what you claim -- given that

13   you stated that the plan includes concepts that you

14   wanted?

15        A.  The concepts weren't the problem.  The cost

16   was the problem.

17        Q.  But again, these are concepts that you said

18   that you wanted to be included in the design,

19   correct?

20        A.  Correct.

21        Q.  And if you recall from that telephone

22   conversation that you just referenced, what did

23   Warren Freedenfeld say to you?

24        A.  Something to the effect that he was working

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 92

1        A.   Earlier revisions, later revisions.   There
2   were more than this.
3        Q.   Were you involved at all in any of those
4   revisions?
5        A.   Yes.
6        Q.   To what extent were you involved?
7        A.   The same extent in most of them.   I'm not
8   sure what you mean.
9            In the conceptualization of what I wanted, I
10  was involved.   In other words, these were -- what was
11  put down was a -- my ideas of what I wanted in the
12  vet hospital.
13       Q.   And did you physically draw any of the lines
14  on any of these plans?
15       A.   Some of the lines that might have been
16  penciled -- I don't know about these plans, in other
17  words, I don't know if -- this is my writing, so yes.
18  Yes.
19       Q.   What's your writing?
20       A.   This is my writing.   This is my writing.
21  That's my writing.   That's my writing.
22       Q.   Those are notes.
23            MR. MELTZER:   Yep.   It's writing.
24       Q.   (By Mr. Lee)   Okay.   But did you design any

UNCERTIFIED ROUGH DRAFT

Draft Copy

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 93

1  of the physical lines contained in this plan marked

2  as Exhibit 20?

3          A.  Well, there are some lines here that I --

4  they were penciled in, so I can assume I did it.

5          Q.  That's your writing?

6          A.  This here is, yeah.

7          Q.  Okay.  I am making a reference to the

8  fireplace area adjacent to the existing breezeway

9  where you wrote in the word "brick"; is that

10  correct?

11          A.  Correct.

12          Q.  When did you make that mark on that plan or

13  insert that word "brick" in the plan?

14          A.  The plan is dated 18 February '99, so

15  probably shortly thereafter.  I don't know the

16  date.

17          Q.  Did you provide a copy of that particular

18  plan with your markings to Warren Freedenfeld?

19          A.  I don't know.

20          Q.  Do you know if you provided -- strike that.

21          Did you provide a copy of -- strike that

22  again.

23          In the exhibit marked as Exhibit 16, do you

24  know who drew the lines in this plan?

UNCERTIFIED ROUGH DRAFT

UNCERTIFIED ROUGH DRAFT

Page 99

1   letter from -- strike that.

2           This is a letter from Charles Cimino.  Do

3   you know Mr. Cimino?

4           A.  No.

5           Q.  Did you ever --

6           A.  I didn't -- I'm sorry.

7           Q.  Go ahead.  Have you ever met Mr. Cimino?

8           A.  I don't believe I did.  I may have.  I do

9   not remember him.

10          Q.  You recall receiving this letter from

11  Charles Cimino in July of '99, correct?

12          A.  Yes.

13          MR. MELTZER:  By the way, Garrett, the

14  record should show that Exhibit 29 -- you said this

15  exhibit was not in documents we produced today.  It

16  is, in fact, in Exhibit 29.

17          MR. LEE:  If I misstated it, then it's my

18  mistake, but we can, just since it's already marked,

19  refer to this particular version, okay.

20          Q.  (By Mr. Lee)  At some point in time, was a

21  Termination Agreement circulated between Warren

22  Freedenfeld & Associates and yourself?

23          A.  Yes.

24          Q.  Do you know who drafted the Termination

Draft Copy

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 100

1   Agreement?

2          A.   I believe Warren Freedenfeld & Associates

3   did.

4          Q.   If you look at the second page of this

5   exhibit --

6          A.   34?

7          -- 34 -- thank you -- it states on the

8   second page, "It is also important for you to

9   understand that your decision to understand our Owner

10  and Architect Agreement precludes the use of any and

11  all drawings and/or documents produced by this

12  office.  These drawings and other documents are

13  normally protected by federal copyright laws, but are

14  also the sole legal and contractual property of this

15  office and may not be used by owner and others for

16  completion of this project.  I believe you know there

17  is no dispute about this issue.

18          "In addition, any licensed architect will

19  know the substantial jeopardy he will place his firm

20  in by using another architect's copyrighted

21  documents.  All documents given to you by this office

22  must be returned upon execution of the termination

23  agreement"; do you see that?

24          A.   Yes.

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 101

1     Q.  Did you read this letter when you received

2  it?

3     A.  Yes.

4     Q.  Did you read that particular paragraph?

5     A.  Yes.

6     Q.  And did you form an understanding as to what

7  that particular paragraph meant at the time when you

8  read it?

9     A.  Yes.

10    Q.  And what did it mean to you?

11    A.  To me?

12    Q.  Yes.

13    A.  I didn't agree with it.  I'm not sure --

14  if -- I will try to answer your question.

15  Specifically, what are you asking me?

16    Q.  I'm asking you:  When you read this

17  particular paragraph, what was your understanding as

18  to what that paragraph said?

19    A.  My understanding was that what their -- that

20  their relaying to me is not what I agree with.

21    Q.  Okay.

22    A.  That the information with -- how they are

23  stating this paragraph, in fact, is not my belief on

24  the termination of this project.

UNCERTIFIED ROUGH DRAFT

Page 102

1      Q.  What was your belief as to termination of

2  the project -- strike that.

3          What belief did you have -- strike that.

4          You say you had a different view of any

5  rights -- strike that.

6          You are saying that you just testified that

7  you disagreed with the statement contained in the

8  first paragraph on page 2, correct?

9      A.  Correct.

10     Q.  In what way did you disagree?

11     A.  It precludes your use of -- your decision to

12 terminate our owner/architect agreement precludes the

13 use of any and all drawings or documents produced by

14 this office.

15         These drawings and other documents are not

16 only protected by federal copyright laws but are also

17 the sole legal, contractual property of this office;

18 I did not agree with that portion.

19     Q.  And --

20     A.  The whole paragraph, I could take it apart,

21 but I pretty much disagree with everything.

22     Q.  Can you tell me why you disagree with the

23 paragraph, what language contained in the

24 paragraph?

UNCERTIFIED ROUGH DRAFT

Page 103

1     A.  "The sole legal and contractual property of

2  this office," as the drawings and the documents were

3  not solely produced by Freedenfeld that, therefore,

4  they were not solely his property.

5     Q.  In what way do you claim the documents were

6  not produced by Warren Freedenfeld & Associates?

7     A.  Because they were not solely produced by

8  Warren Freedenfeld.  They were a collaboration that I

9  had a lot of input into these plans.

10     Q.  And what input did you have in connection

11  with the preparation of the plans?

12        MR. MELTZER:  I'm going to object and

13  instruct him not to answer.  You are now into the

14  counterclaim, Garrett.

15        MR. LEE:  I disagree.  Instruct him not to

16  answer.

17        MR. MELTZER:  I am instructing him not to

18  answer.

19        MR. LEE:  That's noted for the record.

20     Q.  (By Mr. Lee)  Outside of claiming that the

21  documents that are created for the project were not

22  solely produced by Warren Freedenfeld, what other

23  issues do you have with the language contained in the

24  first paragraph on page 2 of this particular

UNCERTIFIED ROUGH DRAFT

UNCERTIFIED ROUGH DRAFT

Page 104

1    document?

2         A.   "All documents given to you by this office

3    must be returned upon execution of the Termination

4    Agreement."

5         Q.   Okay.  Did you have a discussion with Warren

6    Freedenfeld about the return of the documents that

7    were create bid his him?

8              MR. MELTZER:  Objection I will instruct him

9    not to answer in that form.  If you want to rephrase

10   it in a way it doesn't again try to claim ownership

11   of this you can go ahead and rephrase the question.

12        Q.   Did Warren Freedenfeld & Associates ask for

13   any of the plans that were created for the project

14   back?

15        A.   In this document, they did.

16        Q.   Okay.

17        A.   In this letter.

18        Q.   Did you, in fact, give the plans back to

19   Warren Freedenfeld & Associates?

20        A.   No.

21        Q.   Why not?

22        A.   Because they weren't his property.

23        Q.   Did you make this known to Warren

24   Freedenfeld, that you weren't returning the plans?

UNCERTIFIED ROUGH DRAFT

Draft Copy

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 105

1          A.  I don't know.

2          Q.  In fact, did you tell Warren

3   Freedenfeld & Associates or their representatives

4   that you threw the plans in the trash?

5          A.  No.

6          Q.  Did you tell Warren Freedenfeld & Associates

7   or any of their representatives that you found the

8   plans to be useless?

9          A.  Yes.

10         Q.  Did you tell anyone at Warren

11  Freedenfeld & Associates that you discarded the

12  plans?

13         A.  Yes.

14         Q.  Did you, in fact, discard the plans?

15         MR. MELTZER:  Objection to the form.  If you

16  understand it.

17         A.  Discard to me meant reject, did not use, so

18  correct, I did discard them.  I did not use them.  I

19  did reject those plans.

20         Q.  Did you use any portions of the plans that

21  were created in connection with the project?

22         MR. MELTZER:  Objection to form.  If he

23  understands the question.

24         Q.  (By Mr. Lee)  By "the project," I'm

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 106

1    referring to the project as it was during the period

2    immediately prior to Warren Freedenfeld's

3    termination.

4              MR. MELTZER:  Same objection to form.

5    Garrett, are you saying he used any of the same ideas

6    or --

7              MR. LEE:  I'm asking if he used any of the

8    elements of the plans.

9              MR. MELTZER:  Objection to the form.  If you

10   understand what he means by elements, you can answer

11   it.

12        A.   Yes.

13        Q.   Okay.  And what elements did you use?

14        A.   We used the conceptual -- some of the

15   conceptual elements as developed in the plan.

16        Q.   Such as?  Would any of these documents help

17   you with your testimony?

18        A.   We can look at this one.

19        Q.   Looking at Exhibit No. 18.

20        A.   We went forward and used a lot of the

21   information that had been discussed, conceptualized,

22   developed during this phase.  A lot of the

23   information was taken forward and used in the

24   redesign of this project.

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 107

1    Q.  And can you be more specific?

2         What information was used in the redesign of

3    the project?

4    A.  Essentially, we used information in the

5    entire redesign.

6    Q.  So are you saying you used information from

7    the plans that had been produced prior to Warren

8    Freedenfeld's termination?

9    A.  Yes.

10    * Q.  And that would include the information

11    that's contained on Exhibit 18?

12         MR. MELTZER:  Objection to the form.  Why

13    don't you look at that thing and see what Exhibit 18

14    includes before you answer that.

15    A.  Some of the -- restate the question, please.

16         MR. LEE:  Could you read the question?

17         (*Testimony read.)

18    Q.  (By Mr. Lee)  Let me ask the question again.

19         You just testified that you used information

20    from the plans that were previously created before

21    Warren Freedenfeld's termination in the redesign of

22    the project, correct?

23         MR. MELTZER:  Objection to the form.

24    Garrett, you are twisting his testimony.  He said it

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 108

1    was contained, not from it.

2          Q.   (By Mr. Lee)   If you can clarify that for

3    me?

4          A.   We took information, and again, the

5    information -- some of the information in this

6    document --

7          Q.   Exhibit 18?

8          A.   -- specifically the front page, these other

9    ones, we didn't -- were not relevant.  We went

10   forward and developed new plans.

11         Q.   Did you copy aspects of or portions of the

12   plan that's contained in Exhibit 18 in the redesign

13   of the project?

14              MR. MELTZER:  Objection as to form, the word

15   "copy," and instruct him not to answer, same as

16   before, if you want to use a better word that doesn't

17   sneak into the counterclaim.

18         Q.   (By Mr. Lee)   What elements -- do you

19   understand what I mean by "elements"?

20         A.   Maybe you could specify that.

21         Q.   By "elements," I'm referring to the none of

22   the lines contained on Exhibit 18 but the location of

23   the rooms contained in the plan, the function of the

24   rooms contained in the plan; does that clarify it for

UNCERTIFIED ROUGH DRAFT

UNCERTIFIED ROUGH DRAFT

Page 109

1   you?

2        MR. MELTZER:  Same objection as to form.

3   Answer if you understand it.

4        Q.  (By Mr. Lee)  My question is:  Of those

5   elements and functions I just -- lines that are

6   contained in this plan, Exhibit 18, what aspects --

7   what parts of that did you include in the redesign of

8   the project?

9        MR. MELTZER:  Same objection.  You can

10  answer if you understand the question.

11       A.  We took information contained in these

12  drawings and went forward and redesigned new

13  drawings.

14       Q.  What do you mean by "took information"?

15  What are you -- define "information" for me.  That's

16  the problem I'm having.  What do you mean by

17  "information"?

18       A.  We took information relating the rooms that

19  we wanted and the relationship the rooms and the

20  spaces had with one another.  We took that

21  information and went forward and drew new plans for

22  the project.

23       Q.  By "we," who are you referring to?

24       A.  Myself -- well, Ed Cormier and myself.

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 110

1        Q.  When did you first meet Edward Cormier?

2        A.  I believe June of '99.  It's possible it was

3  early July.  I don't know the exact date.

4        Q.  And how did you come to meet him?

5        A.  He was referred to me.

6        Q.  Who referred you -- I'm sorry -- who

7  referred him to you?

8        A.  Dan McCarty.

9        Q.  And do you recall when Dan made the

10  referral?

11        A.  I think it was June of '99.

12        Q.  When Warren Freedenfeld was still involved

13  in the project?

14        A.  No.

15        Q.  Was this referral made before you

16  executed -- strike that.

17        At some point did you execute a termination

18  with Warren Freedenfeld?

19        A.  Yes.

20        Q.  Was the referral from Dan McCarty, did that

21  occur before you executed the Termination

22  Agreement?

23        A.  Yes.

24        Q.  Did you have a face-to-face meeting with

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 111

1    Edward Cormier at that time?

2        A.  Yes.

3        Q.  Where did that meeting take place?

4        A.  Where or when?

5        Q.  Yes, where.

6        A.  Dan McCarty's office.

7            MR. LEE:  Take a five-minute break.

8            (Off the record, 1:58-2:06 p.m.)

9            MR. LEE:  Back on the record.

10       Q.  (By Mr. Lee)  Just to step back from that

11   June meeting that you just -- the meeting that you

12   just discussed with Ed Cormier, you testified that

13   you took information from Exhibit 18 in connection

14   with the redesign of the project, correct?

15       A.  Correct.

16       Q.  As part of the information, did you take

17   into relationship between the different spaces?

18       A.  Yes.

19       Q.  Okay.  You included the information from

20   Exhibit 18, the interrelationship between the spaces

21   in the new redesign, correct?

22       A.  Yes.

23       Q.  Going back to this meeting -- by which I

24   believe you testified took place in June between

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 112

1    yourself and Ed Cormier, correct?

2         A.   Yes.

3         Q.   -- can you tell me was anyone else at that

4    meeting?

5         A.   Dan McCarty was there and I believe Walter

6    Bennett was there.

7         Q.   What was the purpose of that meeting?

8         A.   To get the project back on track, get it

9    redesigned, redeveloped, and moved forward.

10        Q.   Who called the meeting?

11        A.   I believe Dan McCarty did.

12        Q.   And do you recall what the substance of the

13   discussions were during that meeting between the

14   parties?

15        A.   Can you be more specific?

16        Q.   Did you have some discussions about

17   redesigning the project at that point?

18        A.   Yes.

19        Q.   And can you tell me what was said and by

20   who?

21        A.   Again, I don't remember the exact words, but

22   the general gist of the meeting was we need to

23   redesign it, get costs down, move forward and get

24   this thing built.

UNCERTIFIED ROUGH DRAFT

Page 113

1        Q.  Was there any discussions about --

2    discussion about any of the plans or designs that had

3    been previously created before the redesign?

4        A.  Yes.

5        Q.  What was the substance of the discussions?

6        A.  I think the first point was that we could

7    not use the exact drawings that were developed, that

8    we needed to develop new plans, redesign this, and

9    then move forward and price it out.

10       Q.  Why did you feel that you couldn't use the

11   exact drawings that were created in the redesign?

12           MR. MELTZER:  Objection as to form.  The

13   fact that was the basis of the termination -- I'm

14   sorry -- what are you asking?

15       A.  Could you rephrase the question?

16       Q.  Sure.  Why did you feel that you couldn't

17   use the exact designs that were previously created in

18   the redesign?

19           MR. MELTZER:  Objection as to form.  I don't

20   think that's what he testified to.  If you understand

21   the question, you can answer it.

22       A.  Yes.  I didn't want these plans.  These

23   plans were not -- I never accepted these plans.

24   These plans were not acceptable, and I needed -- they

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 114

1  needed to be redesigned to move forward with this

2  project.

3       Q.  But the plans that you're referring to,

4  those plans created by Warren Freedenfeld &

5  Associates?

6           MR. MELTZER:  Objection.  I'm going to

7  instruct him not to answer if you use that phrase,

8  Garrett.  If you want to ask him the questions, stop

9  using that phrase.  You're getting to the

10  counterclaim.

11          MR. LEE:  I'll rephrase the question,

12  okay.

13      Q.  (By Mr. Lee)  Again, what was the reason why

14  you felt that you could not use the plans that were

15  previously created for the redesign?

16      A.  These plans were not in their final form.

17  These plans -- even while I was with Warren

18  Freedenfeld, this design phase was never signed off

19  on.  They were never completed.

20          These plans had to be redeveloped for us to

21  go forward with them; so they were not in the form

22  that they were left.  They were not acceptable.

23      Q.  Any other reason why you felt that you could

24  use not the plans that were previously created in the

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 115

1  redesign of the project?

2       A.  I knew we could not use an exact copy of

3  those plans.

4       Q.  Did you believe that you could use certain

5  elements of those plans that were previously created

6  in the -- for the redesign of the project?

7       A.  Yes.

8       Q.  And what elements did you feel that you

9  could use in the redesign?

10       A.  All of them.

11       Q.  Did you, in fact, use all the elements in

12  the redesign of the project?

13       A.  No.

14       Q.  Again, which elements did you not use?

15       A.  Elements of detail.

16       Q.  Such as?

17       A.  We used -- we made new plans.  We did not

18  use the same plans.

19       Q.  But you did use certain elements from the

20  previously created plans in connection with the

21  redesign of the project, correct?

22       A.  Correct.

23       Q.  And part of that was the interrelationship

24  between the different rooms; is that correct?

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 116

1        A.   Correct.

2        Q.   At that meeting did you have any discussion

3   with Edward Cormier about Warren

4   Freedenfeld -- strike that -- about the plans that

5   had previously been created?

6        A.   Yes.

7        Q.   And do you recall the substance of that

8   discussion?

9        A.   That we needed to redesign those plans and

10  make -- redesign them, redevelop them in an

11  acceptable format, both in what I wanted and what we

12  could afford.

13       Q.   And what did Edward Cormier say to you, if

14  anything?

15       A.   He agreed and said, Let's do it.

16       Q.   Did you provide Edward Cormier with a copy

17  of the plans that had previously been created in

18  connection -- during that meeting?

19       A.   Yes.

20       Q.   Were those the plans that were -- strike

21  that.

22            Were those the plans that are shown in

23  Exhibit 18.

24       A.   Yes.

UNCERTIFIED ROUGH DRAFT

UNCERTIFIED ROUGH DRAFT

Page 117

1      Q.  Okay.  Do you recall whether Edward Cormier

2  took those plans which you just stated were -- strike

3  that.

4         Do you recall whether Edward Cormier took

5  those plans?  By "plans," I mean the plans that were

6  previously created with him at the end of the

7  meeting.

8      A.  Yes.

9      Q.  What, if anything, did Edward Cormier tell

10  you he would do with those plans?

11      A.  He would look at the information and try to

12  get a feel of what I wanted and then try to come up

13  with some -- a redesign of the plans.

14      Q.  Prior to that meeting, had you ever seen any

15  plans that were created by Edward Cormier or his

16  firm?

17      A.  No.

18      Q.  Do you know if Edward Cormier had any or his

19  firm had any experience designing veterinary medical

20  facilities?

21      A.  Not that I knew of.

22      Q.  Did he tell you that he had any experience

23  in that area?

24      A.  No.

Draft Copy

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 118

1        Q.   Did you enter some form of contract with

2    Edward Cormier & Associates in connection with the

3    redesign of the project?

4            MR. MELTZER:   Objection as to form.   Answer

5    if you understand the question.

6        A.   We had no written contract.

7        Q.   Do you know if he had Cormier or his firm

8    entered into a contract with Dan McCarty in

9    connection with the redesign of the project?

10        A.   Not that I know of.

11        Q.   Did you ask to review any plan that Edward

12    Cormier had previously created at any time prior to

13    his beginning work on the project?  By "the project,"

14    I mean the redesign.

15        A.   Can you rephrase the timing of that?

16        Q.   Sure.  At some point in time was Edward

17    Cormier retained to redesign the project?

18        A.   Yes.

19        Q.   And when was that?

20        A.   June '99.

21        Q.   And who retained him or his firm, I should

22    say?

23        A.   I did.

24        Q.   Prior to retaining Edward Cormier or his

UNCERTIFIED ROUGH DRAFT

Draft Copy

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 123

1   hospital.

2          My plans, my desires then changed when I

3   fired Warren Freedenfeld.  They went forward.  What I

4   wanted did not change.

5      Q.  Okay.  So, for instance, in the redesign you

6   wanted to include a waiting area; is that correct?

7      A.  Correct.

8      Q.  Did you want to include a waiting area as

9   depicted in the first floor plan credited by Warren

10  Freedenfeld?

11         MR. MELTZER:  Objection as to form and

12  instruct him not to answer as stated.

13         MR. LEE:  That's noted Ford.

14         MR. MELTZER:  It's an objection.  You keep

15  referring to Warren Freedenfeld's plans and they're

16  not his plans.

17         MR. LEE:  I will restate the question.

18         MR. MELTZER:  Good.

19     Q.  (By Mr. Meltzer)  Did you want to include in

20  the redesign of the project the waiting area as it is

21  depicted in the first floor plan, again, marked as

22  Exhibit 35?

23     A.  No.

24     Q.  And what did you want to change?

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 124

1        A.   We changed quite a bit.

2        Q.   Such as?

3        A.   We changed the area reception desk.   We

4   changed the receiving area.   We changed hugely this

5   grooming room.

6             There is no fireplace.   There is no work

7   station, traffic flow, doors.   It's a -- we changed

8   quite a bit of it.

9        Q.   I think you had previously testified that

10  you wanted to include a fireplace in the prior

11  design?

12       A.   I don't know if I testified to that, but it

13  was in the initial designs, yes.

14       Q.   And why did you want to take it out in the

15  redesign?

16       A.   It didn't work.

17       Q.   Did you want to include in the redesign a

18  feline exam room?

19       A.   Yes.

20       Q.   Essentially the same as it is depicted in

21  the first floor plan that we marked before as Exhibit

22  35?

23       A.   No.

24       Q.   What did you want to change about it?

UNCERTIFIED ROUGH DRAFT

UNCERTIFIED ROUGH DRAFT

Page 125

1        A.    It's location.

2        Q.    Did you, in fact, change the location?

3        A.    Yes.

4        Q.    And where is it?

5        A.    It's not on -- well, you have to show me a

6    plan.  It's over here in the new plans.

7        Q.    Over to the right?

8        A.    Yes.

9        Q.    I'm going to show you another document.  We

10   have to spread out quite a bit here.

11       A.    You need smaller plans.

12       Q.    I do have smaller versions.  We've already

13   marked these.  I can if you prefer.

14       A.    It just would be a lot easier to have two

15   8-by-11s if you want to compare the two of them.

16       Q.    Let's do that, okay.  If it's easier for

17   you, then that's what we'll do.

18            Who created the plan that's -- let's focus

19   on the Veterinary Economics article and use that

20   instead.  If you have the version of that, that's

21   great.

22            Looking at page 53 of the November 2004

23   Veterinary Economics article previously marked as

24   Exhibit 33, you are comparing it to the document

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 126

1    produced as Exhibit 18, correct?

2         A.  Correct.  These are identical so these --

3    this and this are identical.

4         Q.  Exhibit 17 is that what you claim is

5    identical to the article --

6         A.  Yes.

7         Q.  -- the plan in the article on page 53 --

8         A.  Yes.

9         Q.  -- of Veterinary Economics?

10        A.  Yes.  Virtually, yes.

11        Q.  Let's just refer to the article itself, the

12   plan itself.

13             Can you tell me looking at Exhibit 18, the

14   first floor plan, what the differences are as

15   compared to the plan depicted on page 53 in the

16   Veterinary Economics article?

17        A.  Okay.

18        Q.  Start room by room.

19        A.  In the entry, the location of the entry and

20   exit are different.  They are not spatially the same.

21   The location -- the layout and flow around the

22   reception desk is different.

23             The waiting area seating is entirely

24   different.  The grooming room is entirely different.

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 127

1  The hallway leading along the top right to the
2  outside is totally different.
3           There's no exam room.   There's no isolation
4  room here.   There's no feline exam room here.
5  There's no first place or work station.
6           There is no hallway here.   There is no x-ray
7  storage or janitor's closet.   There is no public ADA
8  toilet here.
9           There is -- the isolation room is here.
10  There's a mechanical room here.   We have no
11  mechanical room.
12       Q.   Let's try to narrow this down because you're
13  referring --
14       A.   They're so much different I don't know where
15  to start.
16       Q.   Let's start with the waiting area.   What is
17  different about the waiting area from Exhibit No. 18
18  of the first floor plan and the Veterinary Economics
19  plan depicted on page 53 of the article?
20       A.   The waiting area has totally different
21  seating and reception desk layout.
22       Q.   But the waiting area is in essentially the
23  same location, correct?
24       A.   Essentially, yes.

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 133

1    They're not generally the same.  They're not the

2    same.

3         Q.  Okay.

4              MR. LEE:  Let's take a five-minute break.

5              (Off the record, 2:44-2:53 p.m.)

6              MR. LEE:  Back on the record.

7         Q.  (By Mr. Lee)  Again, comparing Exhibit 18

8    and the Veterinary Economics article with the plan

9    that's referenced in the article -- by the way, who

10   created the plan that's referenced in the Veterinary

11   Economics article on page 53?

12        A.  Ed Cormier.

13        Q.  Were you at all involved in the design of

14   that plan?

15        A.  Yes.

16        Q.  In what way were you involved in the plan?

17        A.  Giving him the information of what I wanted,

18   how I wanted it.  The interrelationship between the

19   flow and the function of all the rooms and all the

20   areas of the hospital.

21        Q.  And that included giving him the first floor

22   plan that was previously created for the project,

23   correct?

24             MR. MELTZER:  Objection as to form.  I

UNCERTIFIED ROUGH DRAFT

Draft Copy

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 150

1    with Warren Freedenfeld & Associates?

2         A.   Correct.

3         Q.   And what was the purpose of writing that

4    note?

5         A.   Prior to meeting with Ed Cormier, I

6    wanted -- I made a note to myself to make sure that

7    Ed Cormier knew that Warren Freedenfeld and I had an

8    AIA Agreement and there was an article in there that

9    would relate to documents.

10        Q.   Do you know whether Ed Cormier reviewed

11   Article 6 of the AIA Agreement that you had with

12   Warren Freedenfeld & Associates?

13        A.   He was familiar with it.

14        Q.   Okay.  Do you recall specific discussions

15   about Article 6 of the AIA Agreement?

16        A.   Yes.  We wanted to make sure that we were

17   not -- that we were comfortable going forward with

18   these plans.

19        Q.   Okay.  By "comfortable," what do you mean by

20   that?

21        A.   That we would not be using these exact

22   drawings.

23             Okay.  And do you recall exactly what Ed

24   Cormier said to you and what you said to him?

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

Page 151

1        A.   He said, We won't be using them because we

2   already discussed we needed to redesign the drawings.

3   So he said that we would not be -- we would not have

4   any problem with Article 6.

5        Q.   That was an opinion that Edward Cormier

6   expressed?

7        A.   Yes.

8             MR. MELTZER:   Objection as to form.

9        Q.   And he expressed that to you?

10       A.   Yes.

11       Q.   was this during the June meeting that you

12  referenced earlier?

13       A.   Yes.

14       Q.   In which Dan McCarty was also present?

15       A.   Yes.

16       Q.   And Walter Bennett was present at the

17  meeting as well?

18       A.   Yes.

19       Q.   Did Dan McCarty express any opinion as to

20  Article 6 as it relates to any of the plans that had

21  previously been created in connection with the

22  hospital?

23       A.   I don't remember Dan McCarty's input on

24  Article 6.

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 153

1          MR. LEE:  I am going to move on.

2          MR. MELTZER:  Good.

3      Q.  (By Mr. Lee)  Do you recognize this

4  document?

5      A.  Yes.

6      Q.  Was this the Termination and Release

7  Agreement that you entered into with Warren

8  Freedenfeld & Associates?

9      A.  Yes.

10      Q.  And was this to terminate the AIA

11  Agreement?

12      A.  It was to terminate Warren Freedenfeld, WFA,

13  with this project.

14      Q.  In fact, if you look at paragraph 3 which

15  states, GH agrees not to use any of the work, and

16  inserted there, and unless solely produced by WFA

17  agreement.  Article 6 of the Owner and Architect

18  shall remain in full force and effect; do you see

19  that?

20      A.  Yes.

21      Q.  Did you review this document prior to

22  signing it?

23      A.  Yes.

24      Q.  And you did, in fact, sign this document?

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 154

1        A.   Yes.

2        Q.   Is that your signature on the document?

3        A.   Yes.

4        Q.   Did you have an understanding as to what

5    paragraph 3 meant --

6        A.   Yes.

7        Q.   -- when you signed the document?

8        A.   Yes.

9        Q.   And what was your understanding?

10       A.   My understanding was that Gardner Animal

11   Hospital could not use any of the work solely

12   produced by WFA.

13       Q.   Was there work that was not solely produced

14   by WFA?

15       A.   Yes.

16       Q.   What work was not solely produced by WFA?

17       A.   The design.

18       Q.   Which design are you referring to?

19       A.   18.

20       Q.   Exhibit 18?

21       A.   Yes.

22            MR. MELTZER:   That's a multipage document,

23   so just be careful.

24       Q.   Which pages of Exhibit 18 are you referring

UNCERTIFIED ROUGH DRAFT

UNCERTIFIED ROUGH DRAFT

Page 155

1    to?

2         A.  18, page 1.

3         Q.  The first page?

4         A.  Yes.

5         Q.  And what part of that design was not created

6    by Warren Freedenfeld & Associates?

7              MR. MELTZER:  Objection as to form.

8    Instructed not to answer in that format.  Rephrase

9    it.

10        Q.  You just testified that there were

11   aspects -- strike that.

12             You just testified that there was work

13   created for the project that was created by someone

14   other than Warren Freedenfeld & Associates, correct?

15             MR. MELTZER:  That's not what he testified

16   to.  If you want to read back his question and

17   answer, you would agree.

18             MR. LEE:  I'll re-ask the question.

19        Q.  (By Mr. Lee)  Did you just testify that your

20   understanding of paragraph 3 of the Termination

21   Agreement was that -- strike that.

22             Could you state again what your

23   understanding of paragraph 3 of Termination Agreement

24   Mutual Release Agreement was?

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 156

1          A.  Gardner Animal Hospital agrees not to use

2    any of the work solely produced by WFA.

3          Q.  And did you just testify that there was

4    work -- that work that was created for that project

5    was created by someone other than WFA?

6          A.  Yes.

7          Q.  And who was that person?

8          A.  Edward Cormier.

9          Q.  So you are --

10         A.  I'm sorry.  Can you rephrase that question?

11              MR. MELTZER:  When?

12         A.  When?

13         Q.  This agreement was signed on September 2,

14    1999, correct?

15         A.  Correct.

16         Q.  By that time, had you received plans from

17    Edward Cormier?

18         A.  Preliminary plans, yes.

19         Q.  Okay.  But you understood that Article 6 of

20    the Owner and Architect Agreement was still in force

21    and effect at the time --

22              MR. MELTZER:  Objection as to form.

23         Q.  -- or would remain in full force and effect

24    when you signed this agreement, correct?

UNCERTIFIED ROUGH DRAFT

UNCERTIFIED ROUGH DRAFT

Page 157

1      A.  Except as modified by this agreement.

2      Q.  Okay.  Who inserted the word "solely" in

3  paragraph 3?

4      A.  Who actually wrote it?  I believe Warren

5  Freedenfeld wrote it.

6      Q.  Did you ask Warren Freedenfeld to insert

7  that language in the agreement?

8      A.  Yes.

9      Q.  And what was the purpose for inserting that

10  language or the word "solely" in the agreement?

11      A.  I wanted to make sure that the work -- there

12  was work performed that was not solely Warren

13  Freedenfeld's and, in fact, was a collaboration and

14  included my ideas, my desires, and my concepts about

15  what I wanted for this animal hospital, work that I

16  had spent many years developing, and I wanted to make

17  sure it was clearly understood that this work, that

18  this work that was on this front page, was not solely

19  his; in fact, it incorporates my information and

20  concepts.

21      Q.  Did you ever tell Warren Freedenfeld that

22  you had retained Edward Cormier to redesign the

23  project?

24      A.  No.  I don't believe I did tell a specific

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 176

1    had with Dr. Feisha or the doctor in Peterborough,

2    New Hampshire, did you inform them that the facility,

3    your facility, the Gardner Animal Care Center, was

4    designed by Edward Cormier?

5         A.  I don't know if that ever came up.

6         Q.  Okay.  Do you know whether the facility that

7    was built for the doctor from Peterborough, New

8    Hampshire whether that facility appeared in

9    Veterinary Economics magazine?

10        A.  No, it hasn't.

11        Q.  Do you know whether the floor plan ever

12   appeared in any Veterinary Economics publication?

13        A.  I don't think so.

14        MR. LEE:  That's all I have.

15        MR. ROSENBERG:  I have some questions.  I

16   know the witness has a meeting in another part of

17   Massachusetts at 6:30.  Why don't we take a few

18   minutes and see how far we can get and suspend if

19   need be?

20        MR. LEE:  Sure.

21

22   EXAMINATION BY

23   MR. ROSENBERG:

24        Q.  You testified earlier that you had told

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 177

1   Warren Freedenfeld you were going to hire a new

2   architect to redesign the project; is that right?

3        A.  I don't know if I told him verbally.  I know

4   we put it in writing in a correspondence.

5        Q.  Was this before the written Termination

6   Agreement was executed?

7        A.  Yes.

8        Q.  You had looked at, and if you need to take a

9   look at it you can.  It's Exhibit 4, a Release of All

10  Demands; do you recall taking a look at that?

11       A.  Yes.

12       Q.  Was that ever agreed to by Warren

13  Freedenfeld & Associates?

14       A.  This was a rough draft that I don't --

15  obviously, we didn't use this as our Termination

16  Agreement.

17            I think this was just one that I may have

18  drawn up or someone from the team, but we didn't use

19  this one.  This was never executed to my knowledge.

20       Q.  Did you provide that to Warren

21  Freedenfeld & Associates?

22       A.  I believe I did.  I can't remember

23  actually -- if I actually did.  I mean, obviously, I

24  got it into this form so...

UNCERTIFIED ROUGH DRAFT

UNCERTIFIED ROUGH DRAFT

Page 178

1    Q.  And if you provided it to -- well, to the

2    best of your recollection, did you provide it to

3    Warren Freedenfeld & Associates?

4        A.  I don't recall.

5        Q.  Okay.  Thank you.  Now, you had testified

6    that you told Cormier he had the right to use the

7    information in the plan -- I'll refer to as the

8    Warren Freedenfeld plan for these purposes -- is that

9    right?

10       A.  Yes.

11       Q.  Now, why did you believe Cormier had the

12   right to do that?

13       A.  Because of our Termination Agreement.

14       Q.  Now, did you have only one meeting with

15   Cormier in which you looked at the Freedenfeld plans

16   with him?

17       A.  I don't know.  I don't recall how many

18   meetings we had where the plans actually came up.

19           I know they were brought up in the first

20   meeting.  I don't remember subsequent meetings.  I

21   honestly never -- it's kind of a fog for me, years

22   ago, as to what the specifics of these meetings were,

23   so...

24       Q.  Do you recall going over the actual Warren

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 179

1  Freedenfeld plans with Cormier?

2         A.  Yes.

3         Q.  Did you go over the plans and discuss with

4  Cormier specific elements that you wanted used or how

5  did you make use of the plans in those meetings?

6         A.  I used it as a template to kind of show him

7  the kind of flow and rooms and structure that I was

8  interested in.

9              So I used it as a kind of a framework that

10 we could then work from to develop and redesign the

11 plans.

12        Q.  Did you point out to Cormier at that time

13 things you didn't like by the plan or wanted changed

14 in the plan?

15        A.  Yes.

16        Q.  The information you were pointing out to

17 Cormier about the elements, is that information

18 that -- it was your understanding under the

19 Termination Agreement you could make use of?

20        A.  Yes.

21        Q.  And that information that you are referring

22 to, had you developed that on your own before you met

23 with Warren Freedenfeld for the first time on this

24 project?

UNCERTIFIED ROUGH DRAFT

UNCERTIFIED ROUGH DRAFT

Page 180

1      A.  I certainly had concepts, and I knew what I
2  wanted.  I was -- I had done enough research and
3  visits to know what I wanted in an animal hospital.
4          I knew the flow.  I knew the rooms.  I knew
5  the interrelationship, what the clients saw, what
6  worked with us.  I owned my own practice for a while
7  and worked in several others, so I knew what I
8  wanted.
9      Q.  And what was the source -- how did you learn
10  these concepts of what you wanted?
11      A.  Through the -- looking at Veterinary
12  Economics award-winning hospitals, from my visits to
13  other hospitals throughout New England, from that
14  Veterinary Economics floor plan book that I bought.
15      Q.  And some of those sources were not Warren
16  Freedenfeld-designed hospitals; is that right?
17      A.  Most of them were not.
18      Q.  Well, when you were working with Warren
19  Freedenfeld & Associates before they were terminated,
20  did you explain that information, those concepts that
21  you talked about, to Warren Freedenfeld & Associates
22  in explaining what you wanted in the hospital?
23      A.  Yes.
24      Q.  Were there any aspects of the plan that were

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 181

1 always fixed in terms of the Town's requirements for

2 the project?

3      A.  Yes.  We had -- because we were putting the

4 hospital in a water protection district, the City had

5 very specifically wanted us to build within the

6 footprint of the preexisting building so we did not

7 increase the surface area which would affect the

8 water shed.

9      So the Town dictated to us the size and the

10 shape of the layout of this hospital.

11      Q.  When you say "the size and the shape," did

12 the Town requirements include the footprint?

13      A.  Yes.  The footprint was determined by the

14 previous building.  It had a barn and a breezeway

15 which we demolished to make room for this, and we had

16 to incorporate that footprint into this site, into

17 this building.

18      Q.  What about visually in terms of how it

19 appeared to the street, were there any requirements

20 that the Town dictated?

21      A.  Because it was not a registered historic

22 house, they didn't say you have to have a

23 historic-looking, you know, building.  So how it

24 looked, the Town didn't really tell us how it

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 182

1    looked.

2        Q.  Okay.  You were talking about having made

3    your submission to the Veterinary Economics magazine

4    and putting those materials together.

5            In the Veterinary Economics article there's

6    an actual floor plan that's published; is that right?

7        A.  Yes.

8        Q.  Did you submit that actual floor plan to

9    Veterinary Economics magazine?

10       A.  Yes.

11       Q.  The actual floor plan that you submitted,

12   where did you get it?

13       A.  From Edward Cormier.

14       Q.  Did he produce it for you specifically for

15   this submission or was it a preexisting plan from

16   when the project was being built?

17       A.  It was a pre -- it was a preexisting plan,

18   but he, for example, made different writing on it

19   because we didn't want lines showing up, the

20   architectural drawing lines showing up on the

21   submission.

22           So he ran the plans through and made them

23   what I would call a cleaner version, a version which

24   just showed the design without, you know, the length

UNCERTIFIED ROUGH DRAFT

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

UNCERTIFIED ROUGH DRAFT

Page 183

1    and the lines going -- the architect lines going

2    through it that shows the depth and the length and

3    the height and all that.

4         Q.  Did you ask him to do that?

5         A.  Yes.

6         Q.  Did he then come back to you and deliver the

7    completed plans for you to submit?

8         A.  Yes.

9         Q.  If you can locate Exhibit 34, that's your

10    July 30, 1999 letter to you from Michael (sic) Cimino

11    from Warren Freedenfeld & Associates?

12         A.  34?

13         Q.  Yes.  I believe you had testified that on

14    page 2 Mr. Cimino had written that you can't use the

15    plans and the drawings, and they're the property of

16    Warren Freedenfeld & Associates; is that a fair

17    statement?

18         A.  Yes.

19         Q.  Did you respond to this letter?

20         A.  Yes.

21         Q.  In responding to Warren Freedenfeld &

22    Associates about this letter, did you address this

23    question of whether or not you could use the plans?

24         A.  Yes.

UNCERTIFIED ROUGH DRAFT

UNCERTIFIED ROUGH DRAFT

Page 184

1        Q.  Who did you respond to, Michael -- Charles

2    Cimino rather or Warren Freedenfeld?

3        A.  I addressed all my letters to Warren

4    Freedenfeld.

5        Q.  So did you respond in writing?

6        A.  Yes.

7        Q.  To your recollection, how did you respond or

8    what did you tell them about this question of whether

9    you could use the plans?

10       A.  That I could use the information in the

11   plans.

12       Q.  And did Warren Freedenfeld & Associates

13   respond at that point?

14       A.  Yes.  We had a lot of communications, yes.

15       Q.  What did Warren Freedenfeld & Associates

16   tell you in response to you telling them that you

17   wanted to use the information in the plans?

18       A.  I would have to look at their response

19   because it was all in writing, what I remember, and

20   I'm not sure exactly which document comes after this

21   July 30th document.  So if you had a number that I

22   could refer to, I could tell you.

23       Q.  I don't.  I'm trying to be as brief as

24   possible so we can get out of here.

UNCERTIFIED ROUGH DRAFT

Page 185

1          A.   Okay.

2          Q.   So to your recollection, this was all taken

3     care of in writing after this July letter from

4     Charles Cimino?

5          A.   Yes.  Our Termination Agreement did, in

6     fact, encapsulate, summarize my understanding of

7     our -- what we had agreed to.

8          Q.   So the communications go on, but then it's

9     finally captured and included in the Termination

10    Agreement to your understanding?

11         A.   Yes.

12             MR. ROSENBERG:  And that, true to my word,

13    are all of my questions.  Thank you.

14             MR. LEE:  I have a follow-up question.

15

16    RE-EXAMINATION

17    BY MR. LEE:

18         Q.   Did you enter into any form of

19    Indemnification Agreement with Edward D. Cormier

20    whereby you would agree to defend him if there was a

21    lawsuit relating to the design plans created with the

22    Gardner Animal Care Center?

23         A.   When?  I don't remember any indemnification

24    agreement.

Draft Copy

cfe5bfa3-4597-4a0a-a467-8b5c2801a38e

**<u>Exhibit B</u>**

**Excerpts from the deposition
of
Warren C. Freedenfeld**

Page 1

VOLUME: I

PAGES: 1-183

EXHIBITS: 1-14

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - x

WARREN FREEDENFELD ASSOCIATES, INC., as

successor in interest to Warren Freedenfeld

& Associates, Inc.,

                    Plaintiff,        C.A. No.

        v.                            05-11573 RGS

MICHAEL P. McTIGUE, DVM, individually

And as Trustee of the McTigue Family

Trust, NANCY A. McTIGUE, as Trustee of

The McTigue Family Trust, BRIAN C. HURLEY,

DVM, GARDNER ANIMAL CARE CENTER, LLC d/b/a

Gardner Animal Hospital, EDWARD A. CORMIER

ASSOCIATES, INC., and BENNETT BUILDING

CORPORATION,

                    Defendants.

- - - - - - - - - - - - - - - - - x

(Caption Continued on Page 2)

            DEPOSITION of WARREN C. FREEDENFELD

                 December 28, 2006

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                          12/28/2006

Page 18

1    work on this project; is that a fair statement?

2        A.   Yes.

3        Q.   For starters, tell me what Cormier

4    Associates did that involved using your plans?

5        A.   I don't know what they did.  I'm not sure I

6    understand the question.

7        Q.   Do you allege in this case that Edward

8    Cormier Associates copied from your plans in

9    developing the plans they used to continue with the

10   hospital project?

11       A.   Yes.

12       Q.   Did they copy these plans exactly and use

13   them?

14            MR. McCALL:  Objection.

15       A.   I would have to go line by line.

16       Q.   Well, sir, you have answered interrogatory

17   answers in this case in which Warren Freedenfeld

18   Associates says that the plans developed by Edward

19   Cormier were virtually identical to yours.  Is that

20   a correct statement?

21            MR. McCALL:  Objection.

22       A.   Yes, that's correct.

23       Q.   To your knowledge, were the plans developed

24   by Edward Cormier Associates for the hospital

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                          12/28/2006

Page 19

1    project exactly identical to any of these plans that

2    Warren Freedenfeld Associates developed?

3            MR. McCALL:   Objection.

4        A.    They appear to be virtually identical.

5        Q.    When you say "virtually identical," is that

6    different from exactly the same?

7        A.    It means that there might be minor

8    deviations.

9        Q.    To your knowledge as you sit here today,

10   how do those plans deviate from this group of plans

11   that Warren Freedenfeld Associates developed?

12       A.    The plans in front of me here are our

13   plans.  I don't have Cormier's plans here.  If you

14   have them, I could point out the minor differences.

15       Q.    Okay.

16           MR. ROSENBERG:  Let's go off the record.

17           (Discussion off the record)

18           (Documents marked as Exhibits 3A through 3W

19           for identification)

20       Q.    We've marked a collection of plans as

21   Exhibits 3A through 3W, which are in sequential

22   order labeled as Cormier 026 through Cormier 048.

23   Can you identify what these set of documents are?

24       A.    Are you talking to me?

Merrill Legal Solutions
(617) 542-0039

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 20

1        Q.    Yes.

2        A.    These are the construction drawings

3    prepared by Edward Cormier.

4        Q.    Have you seen any of these before?

5        A.    Yes, I have.

6        Q.    Have you seen all of them before?

7        A.    I don't know.

8        Q.    Now, you testified earlier that if you saw

9    the Edward Cormier plans, you could point out the

10   minor differences between those plans and the plans

11   Warren Freedenfeld Associates did on the project?

12       A.    Yes, that's correct.

13       Q.    Could you identify the plan or plans

14   developed by Edward Cormier Associates that copy

15   from your plans?

16       A.    Yes.

17       Q.    Could you do that for me, please?

18       A.    Part of 3B.

19       Q.    Why don't we stop there.  On plan 3B, is

20   this identical to any of the plans that were

21   developed by Warren Freedenfeld Associates?

22       A.    Except for minor differences.

23       Q.    Now, if you could first identify which of

24   the plans developed by Warren Freedenfeld Associates

c4cc9198-4728-4a22-b00d-6351dcf91f41

Page 21

1   this copies from?

2       A.    Your Exhibit 2B.

3       Q.    And just to be clear, it's your testimony

4   that Exhibit 2B, prepared by Warren Freedenfeld

5   Associates, and Exhibit 3B, the plans of Edward

6   Cormier Associates, are not exactly identical?

7       A.    Well, first of all, 2B is a full plan, and

8   3B is a partial plan.

9       Q.    Are all the drawings in 3B taken verbatim

10  and exactly from document 2B?

11          MR. McCALL:   Objection.

12      A.    Restate your question, please.

13      Q.    Sure.  Are all the drawings and contents of

14  Exhibit 3B taken verbatim from one or more of the

15  plans prepared by Warren Freedenfeld Associates?

16          MR. McCALL:   Objection.

17      A.    The partial plan on 3B is taken from 2B,

18  and there is a building section that is somewhat

19  similar to 2F or part of 2F.

20      Q.    Okay.  Let's go in order.  Let's go with

21  the first section you were referring to.  How did

22  you describe that; the partial plan?

23      A.    The partial plan, yes.

24      Q.    When you were talking about the partial

Warren C. Freedenfeld                          12/28/2006

Page 22

1    plan in Exhibit 3B, am I correct that you were

2    talking about the section of Exhibit 3B that shows

3    the interior of the building and is written over the

4    top of the identifier "Part Plan One-Eighth Inch

5    Equals 1.-0?

6        A.    Correct.

7        Q.    Is that partial plan exactly identical to

8    any of the contents of Exhibit 2B prepared by Warren

9    Freedenfeld Associates?

10            MR. McCALL:  Objection.

11       A.    It is not 100 percent identical.  There are

12   areas of deviation.

13       Q.    Could you identify the areas of deviation

14   for me?

15       A.    The grooming room has been relocated.  The

16   reception desk has been slightly reconfigured.  The

17   waiting area seating has been reconfigured.  The

18   access corridor between the inpatient and outpatient

19   areas has been moved.  The adoption room has been

20   moved, and the children's play area has been moved.

21   Everything else is -- oh, and the fireplace has been

22   replaced with another exam room.

23       Q.    Okay.  The parts of this part plan that

24   you've just identified as being different in the

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 23

1    part plan than the one of Warren Freedenfeld

2    Associates?

3         A.   Yes.

4         Q.   Are those same elements and parts of the

5    project included in the Warren Freedenfeld plan?

6              MR. McCALL:   Objection.

7         Q.   The grooming room, the children's play

8    area, and so forth, are they also part of your plan,

9    but just in a different location?

10        A.   Yes.

11        Q.   What was the source of the idea to include

12   each of those pieces in this project?

13             MR. McCALL:   Objection.

14        A.   At the beginning of every project, I sit

15   down with an owner and I conduct what I call a

16   programming workshop in which I determine what an

17   owner's goals and objectives are, what they want to

18   have in their hospital, and I write each of those

19   down.

20             Then I confirm -- I put all of those

21   elements into a program and send it to the owner, to

22   make sure that what an owner has asked for is what

23   I've heard, and what I've heard is what I'm

24   confirming.

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                              12/28/2006

Page 24

1          I then don't start the schematic design

2     until an owner has approved that program, to make

3     sure that he's going to get exactly what he wants,

4     and that I haven't missed anything or misunderstood

5     anything, and that is how this project again, as all

6     of my projects

7          Q.    And that occurred before this Exhibit 2B

8     was created?

9          A.    Yes.

10          Q.    Now, these various pieces of the project

11     that you listed, when describing the differences and

12     what had been moved in Exhibit 3B, when you did your

13     programming meeting, did the owner ask for those

14     pieces in the project or did you recommend them be

15     included in the project?

16          MR. McCALL:   Objection.

17          A.    Neither.   Actually, I have kind of a

18     checklist that I go through, and I asked the owner

19     if he wants this, if he wants that.   In other words,

20     I go item by item; does it want he, yes, does he

21     want it, no.   Then I record that and put it into a

22     single document which I call a project program.

23          Q.    That is how these elements would have come

24     to be included in your plan that's been labeled as

Warren C. Freedenfeld                                    12/28/2006

Page 25

1    Exhibit 2B?

2          A.    Correct.

3          Q.    You had also said that the cross-section

4    shown in Exhibit 3B, which is over the top of the

5    words "Section No. 5" is comparable to another one

6    of the plans developed by Warren Freedenfeld?

7          A.    Yes.

8          Q.    Could you show us which plan that is?

9          A.    It's Exhibit 2F.  This is the section,

10   which is a partial section of 2F.

11         Q.    The partial section being on the Cormier

12   plan Exhibit 3B, right?

13         A.    Yes.

14         Q.    Is this Section No. 5, this partial section

15   on Exhibit 3B, a verbatim exact copy from Warren

16   Freedenfeld Associates' plan marked as Exhibit 2F?

17               MR. McCALL:  Objection.

18         A.    There are minor differences.

19         Q.    Could you identify what those differences

20   are?

21         A.    The configuration of the roof truss has

22   been modified and the configuration of the entry

23   canopy has been modified.

24         Q.    Are there any other differences?

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 26

1        A.    Those are the primary differences.

2        Q.    When you say "primary," does that mean

3    there are other differences between them?

4        A.    Well, the construction drawings 3B are a

5    little bit more developed than our initial building

6    section.

7        Q.    Okay.

8        A.    But the configuration of the spaces appear

9    to be pretty much the same.

10        Q.    In Exhibit 2F developed by Warren

11    Freedenfeld Associates, what's the source of that

12    layout for roofing; was this a standard form, are

13    you done it before?  How was this developed?

14        A.    This is not a standard form.  It was

15    basically developed specifically for this project.

16        Q.    Are there other plans of Edward Cormier

17    Associates that you believe are copied from Warren

18    Freedenfeld Associates' plans?

19        A.    Again, Section 3C, Section 5, is again,

20    similar to 2F.  The partial plan is the same partial

21    plan as on 3B.

22        Q.    Before you move on, I want to clear

23    something up for the record.  The partial plan on 3C

24    is the same one we were discussing as on 3B; is that

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                          12/28/2006

Page 27

1    correct?

2         A.    Yes.

3         Q.    And the Section No. 5 roofing cross-section

4    on 3C is also taken, you say, from your Exhibit 2F?

5         A.    Yes.  Cormier doesn't show where his

6    section cuts are on his plan.  So I'm not sure where

7    he's cutting the sections.  I would venture to guess

8    it's another section through the waiting area at

9    another point.  What's interesting, he calls Section

10   5 on 3B, also Section 5 on 3C, yet there are

11   differences.

12           The only thing I can guess, and I'm

13   guessing here, is that these might have been various

14   options for the framing of that roof.

15        Q.    Before you move on, Section No. 5 on 3C,

16   which is the roofing cross-section, is that exactly

17   the same as the roofing cross-section shown on 2F

18   developed by Warren Freedenfeld Associates?

19        A.    The overall configuration is quite the

20   same, except for the configuration of the roof

21   truss.

22        Q.    So they are not exactly the same?

23        A.    No.

24        Q.    Are there any other Edward Cormier plans

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                          12/28/2006

Page 28

1    that are comparable to Warren Freedenfeld

2    Associates?

3         A.   Yes.   3D has many identical components to

4    Exhibit 2B.

5         Q.   Okay.   Is Exhibit 3D exactly identical to

6    Exhibit 2B?

7         A.   In all essential parts, yes.

8         Q.   When you say "essential parts," describe to

9    me what's identical with the two?

10        A.   Do you want me to point out what's

11   identical or what the minor differences are?

12        Q.   Why don't we start out with what's

13   identical.

14        A.   I will start with the rear and work

15   forward.  The location of bathing is the same.  The

16   location of the canine run ward is the same.  The

17   location of surgery is the same.  The location of

18   pack prep is the same.  The location of x-ray is the

19   same.  The location of special procedures is the

20   same.  The location and configuration of the canine

21   hospital ward is the same.  The canine hospital ward

22   two is the same.  Feline exotic hospital ward is the

23   same.  The lab is the same.  The pharmacy is the

24   same.  The surgery prep is the same.  Treatment is

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                           12/28/2006

Page 29

1    the same.  The doctors' workstations are the same.

2    The public toilette is the same.  The canine

3    boarding ward is the same.  The feline boarding ward

4    is the same, with a minor change.

5             All of the components of food prep, laundry

6    and storage are in same general location, only

7    slightly reconfigured.  Other than that, the two

8    plans are virtually identical.

9         Q.   Now, as you were going through this, you

10   said that these various pieces were the same, with

11   the exception of when you qualified it as a minor

12   deviation.

13        A.   Yes.

14        Q.   The ones that you say are the same, are

15   they exactly identical in terms of their details and

16   location in the project as on the Warren Freedenfeld

17   plan?

18        A.   They appear to be.

19        Q.   Now, what is different about Exhibit 3D as

20   opposed to the Warren Freedenfeld plan, Exhibit 2B?

21        A.   The differences are that the isolation room

22   has been moved and, as I said, the location of

23   laundry and food prep and storage have been

24   reconfigured.  The feline exercise room has been

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                    12/28/2006

Page 30

1   eliminated, and the second egress stair on the -- I

2   don't see a north arrow here -- on the top left-hand

3   side has been eliminated.

4           Other than that, it's pretty much identical

5   plans, and I can see that even by the column lines.

6   In other words, between what I call Column A and B

7   and he calls Column 2 and 3, if you run that right

8   through, they are more or less identical.

9       Q.   When you say "more or less," they are not

10  exactly identical to each other?

11          MR. McCALL:   Objection.

12      A.   Virtually identical.

13      Q.   I don't want to play word games with you,

14  but I just want to make sure I understand you.

15  "Virtually" connotes something other than exactly

16  the same.  Are they different?

17      A.   Only in extremely minor ways.

18      Q.   But they are not exactly identical?

19      A.   They are not 100 percent identical.

20      Q.   Going back to the Warren Freedenfeld plan,

21  Exhibit 2B, how is this developed by your office in

22  terms of the decision to include these components

23  and how to put them together on the floor plan; is

24  that done from scratch by Chris Hanlon or how does

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                              12/28/2006

Page 32

1  all fits together best for you or do you work with

2  something from past experience?

3           MR. McCALL:  Objection.

4      A.   I always draw on my experience.  Every

5  hospital I've done has oftentimes drawn on things

6  I've developed in previous hospitals.

7      Q.   In the creation of this floor plan, do you

8  also draw on your experience of observing other

9  architects' animal hospitals and projects?

10     A.   No.

11     Q.   Are there other plans developed by Edward

12 Cormier Associates that you believe copy from Warren

13 Freedenfeld Associates' plans?

14     A.   Plan 3E is basically the same plan, but

15 it's only being used for dimensioning.

16     Q.   3E is the same as 3D?

17     A.   Yes.  3F, which is the basement plan, is,

18 again, virtually identical to 2A, except that it is

19 smaller.  The stairs are in the exact same place,

20 but the basement has been made about half the size

21 of what it was in our 2A, and I would suspect that

22 the balance was slab on grade, with a smaller area

23 for the basement.  But in terms of its location and

24 the stair that connects the upper and lower levels,

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 33

1   is pretty much identical.  It's in the exact same

2   location.

3        Q.   By that, when you say "it," you mean the

4   stairs?

5        A.   Yes.

6        Q.   Just to clarify, when you say "smaller," 3F

7   actually shows a smaller square footage basement

8   than your plan does?

9        A.   Yes.  3F is composed of two bays, whereas

10  2A has four bays.

11       Q.   Okay.  I see that the Cormier plan, 3F,

12  includes bathrooms, mechanical rooms.  Are there

13  elements of that type contained in 3F that are

14  identical to the placement of the same elements in

15  Freedenfeld Exhibit 2A?

16       A.   We did not add the bathrooms, and we had a

17  mechanical room upstairs, which has been moved into

18  this lower level.

19       Q.   Okay.  So it's been moved into the lower

20  level in Exhibit 3F?

21       A.   That's correct.

22       Q.   Are there other Edward Cormier plans that

23  you believe copy from Warren Freedenfeld plans?

24       A.   Yes.  The roof plans, again, are pretty

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 34

1    much identical in terms of where we have the flat

2    area for the mechanical equipment, and where we have

3    the sloped areas as part of the development of the

4    exterior facade.

5            In concept, again, it is identical.  The

6    location of the dormer has been slid over.  But

7    other than that, in concept, both of these plans are

8    pretty much virtually identical.

9        Q.   First of all, to clarify for the record,

10   you're comparing Exhibit 2C with Exhibit 3G?

11       A.   Yes.

12       Q.   Now, are these two plans exactly identical

13   in the roof plan?

14       A.   In concept, they are virtually identical.

15       Q.   Okay.  When you say "concept," could you

16   explain what you mean by that?

17       A.   What I mean by the concept, the concept was

18   to create an inner flat area for mechanical

19   equipment that would be concealed by perimeter

20   sloped areas so that when you view the building, it

21   appears more like a conventional sloped roof, and

22   you wouldn't know that the mechanical equipment,

23   which there is a lot of in the hospital, is

24   concealed within the flat area, and those sloped

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                           12/28/2006

Page 35

1   roofs continue around the entire perimeter kind of

2   like a square doughnut.

3           That component is identical in both plans,

4   and the intersection of those components, even how

5   the slopes appear -- I don't have a north arrow, so

6   I can't refer to which elevation, and I know I can't

7   say "this."  But the way the front roof

8   configuration intersects with the right side

9   configuration on both are the same, both in the rear

10  and in the front, the way the rear roof intersects

11  with the side roofs are identical.

12          The only major difference is that the peak

13  that faces the front has been slid over from the

14  right side of Column Line 5 on the 2C to the left

15  side of Column Line A on 3G.

16      Q.   Are the dimensions or any other aspect of

17  how the roof will be laid out different in 3G than

18  the way they are shown in Exhibit 2C?

19      A.   The dimensions on 3G are indicated.  There

20  are no dimensions on 2C.  But if you go by the

21  column lines, they appear to be pretty much the

22  same.

23      Q.   You say they appear to be pretty much the

24  same.  Looking at the two plans, can you tell

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                           12/28/2006

Page 36

1   whether the dimensions would be exactly the same on

2   the Warren Freedenfeld plan as on the Edward Cormier

3   plan?

4        A.    They appear to be.  Again, without actually

5   having a scale.  Based on the column lines, they

6   appear to be virtually identical.  If you look at

7   Column Line F and Column Line 5, even the turn of

8   the roof is the same.  If you go up to column line

9   C, on 2C and 2 on 3G, again, the roof intersections

10  are again identical.

11       Q.    I noticed on 3G it includes a row of

12  Anderson skylights, what I assume are windows?

13       A.    Skylights.

14       Q.    Is that shown also on the Warren

15  Freedenfeld plan?

16       A.    They are not shown on 2C.  I need to look

17  at something.  It appears what we had proposed to do

18  instead of clear story windows in order to get light

19  in the canine run ward.  So where we are using clear

20  story lighting, he is coming in -- Cormier is coming

21  in with skylights.

22       Q.    So skylights are different than clear story

23  lights?

24       A.    They are different.

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 37

1     Q.    Could you explain to me what clear story

2   lights are?  I understand what skylights are.

3     A.    A clear story window is a window that's

4   high up in a roof that allows natural light to enter

5   a space, and a clear story is usual vertical.  It

6   can also be sloped.  It allows light to enter a

7   space from high above.

8          Cormier took the same configuration of the

9   space, but instead of using the clear story, used

10   skylights to bring that natural light into the

11   canine run ward.

12     Q.    Are there any other plans developed by

13   Edward Cormier that you believe copy from the Warren

14   Freedenfeld plans?

15     A.    Each plan after this, like 3H, is a

16   reflected ceiling plan base on the floor plan.

17     Q.    Based on the Edward Cormier floor plan?

18     A.    Yes.

19     Q.    The first floor reflected ceiling plan

20   you're talking about is 3H; is that right?

21     A.    Yes.

22     Q.    In the Warren Freedenfeld plans, is there a

23   Warren Freedenfeld plan that's identically matching

24   to this first floor reflected ceiling plan document?

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                              12/28/2006

Page 38

1      A.    I don't believe we had a reflected ceiling
2   plan that was computerized.
3      Q.    Okay.   In the Warren Freedenfeld plans, is
4   there a reflected ceiling plan?
5      A.    Not in our electronic documents.
6      Q.    So none of the documents that have been
7   marked as Exhibit 2A through, I believe it's G, are
8   a reflected ceiling plan for the first floor; is
9   that right?
10     A.    Correct.
11     Q.    Okay.
12     A.    On Exhibit 2I, the configuration of the
13  rooms is identical.
14     Q.    When you say "the configuration of the
15  rooms is identical" --
16     A.    To Cormier's base plan.  This includes
17  floor finishes, which we did not have a floor finish
18  schedule or floor finish plan.
19          The exterior elevations, we can start with
20  Exhibit 2D, the front elevation.  Again, in concept,
21  it's more or less identical, except that the
22  location of the front dormer has been slid over to
23  the left.  The right side elevation on Exhibit 3J
24  appears to be, again, more or less, or virtually

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                              12/28/2006

Page 39

1   identical to the configuration of 2E in terms of its

2   massing.  The differences are the actual window

3   locations.  In terms of the configurations of the

4   overall envelope of the building, they are pretty

5   much identical, in terms of the end cables, and like

6   I said, the overall massing.

7        Q.   The right side elevation on Exhibit 3I, you

8   believe that's comparable to the elevation shown on

9   Exhibit 2E?

10           MR. McCALL:  Objection.  I think it's 3J

11  you're looking at.

12       Q.   It's Exhibit 3J of the Cormier plans that's

13  the right side elevation that you are testifying is

14  comparable to Exhibit 2E developed by Warren

15  Freedenfeld?

16       A.   Correct.

17       Q.   Is the right side elevation shown on the

18  Cormier plan exactly the same as the elevation shown

19  on Freedenfeld plan 2E?

20       A.   It's virtually identical.

21       Q.   When you say "virtually identical," are

22  there details of the Cormier plan that are different

23  than what is shown on the Freedenfeld plan?

24       A.   Yes.

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                              12/28/2006

Page 40

1        Q.    Can you tell me what those are?

2        A.    The location and configuration of the

3   windows is different and a lower level entry element

4   has been added.   The egress door out of the stairs

5   is in the same location and the overall massing is

6   identical.

7        Q.    Now, on the Cormier right side elevation,

8   it shows features, such as the clapboard siding; is

9   that right?

10       A.    Yes.

11       Q.    Now, that is not shown on the Freedenfeld

12  plan; is that right?

13       A.    It's not shown.

14       Q.    The Cormier plan 3J also shows the front

15  elevation; is that correct?

16       A.    Yes.

17       Q.    That, you said, is comparable to

18  Freedenfeld plan 2D; is that right?

19       A.    Yes.

20       Q.    Is the front elevation on the Cormier plan

21  exactly identical to the front elevation shown on

22  the Freedenfeld plan?

23       A.    It's not identical, but very similar.

24       Q.    Can you tell me what is different about the

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 41

1    two plans?

2        A.    What's different is that the location and

3    configuration of the entry dormer has been moved.

4    The concept is the same, again, to create an

5    intersecting roof line identifying the entrance into

6    the building, with a smaller element projecting

7    forward to identify the actual door.

8            Cormier took what was a single

9    configuration and divided up into two in which there

10   was a shed roof on the right side, which has been

11   separated from the actual dormer, and the dormers

12   have been slid to the left.

13           So it's the window configurations and the

14   location of that dormer.  But the concept of the two

15   dormers projecting forward has been maintained in

16   the same concept.

17       Q.    And the Cormier plan shows for the front

18   elevation details the vinyl clapboard siding?

19       A.    That's correct.

20       Q.    That detail, for instance, is not included

21   in the Freedenfeld front elevation; is that right?

22       A.    Right.  We didn't show the clapboard

23   siding.

24       Q.    Are there any other Cormier plans that you

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 42

1  believe are copied from Freedenfeld plans?

2      A.   The left side elevation, again, in terms of

3  massing and its integration with the existing house,

4  again, appears to be virtually identical in terms of

5  the left side roof intersection is the same as 2D on

6  the lower drawing, and the rear elevation on 2E, in

7  terms of massing, is similar.  It's less similar,

8  but again, in terms of the massing, it's virtually

9  identical.

10     Q.   Since we have that one there, let's talk

11 about the rear elevation for a minute.  The rear

12 elevation is shown in Cormier plan Exhibit 3K; is

13 that correct?

14     A.   Yes.

15     Q.   And the Freedenfeld plan shows the rear

16 elevation --

17     A.   2E.

18     Q.   Are the rear elevations shown on both plans

19 identical?

20     A.   No, they are not.

21     Q.   The left side elevation shown on Exhibit 3K

22 compares to, I believe you said, Exhibit 2D of the

23 Freedenfeld plans; is that right?

24     A.   2D, the lower plan, yes.

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 43

1      Q.   Are the left side elevations shown on each

2  plan identical?

3      A.   The massing is identical.

4      Q.   When you say "massing," what are you

5  referring to that's identical about the two?

6      A.   The overall volume and configuration of the

7  mass of the building.

8      Q.   Are the details showed in the Cormier left

9  side elevation different than the details shown on

10  the Freedenfeld left side elevation?

11      A.   Yes, they are.

12      Q.   How do they differ?

13      A.   The window configurations are different,

14  and we had an exterior enclosed run area, which has

15  been deleted from the Cormier plans.

16      Q.   Okay.  Are there any other Cormier plans

17  that you believe are copied from Freedenfeld plans?

18      A.   Yes.  Section 1 on Cormier's 3L appears to

19  be, more or less, identical to building Section No.

20  2 on the WFA Exhibit 2F.

21      Q.   Are they exactly the same?

22      A.   They are virtually the same.

23      Q.   When you say "virtually," how do they

24  differ?

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 44

1        A.    The location and configuration of the roof
2    assembly is different, and we show steel beams,
3    whereas Section 1 on 3L is using wood trusses and
4    wood beams.
5        Q.    Section 1 on 3L contains various details
6    about siding, the plywood and joint filler.  Do you
7    see that?
8        A.    Yes.
9        Q.    Are those details also shown on the
10   Freedenfeld plan?
11       A.    No.
12       Q.    Exhibit 3L also contains another drawing,
13   which is Section 2; is that right?
14       A.    Yes.
15       Q.    Is there a Freedenfeld plan that you
16   believe Section 2 is copied from?
17       A.    I believe it's developed from building
18   Section No. 2 on Exhibit 2F.
19       Q.    When you say "it's developed from," do you
20   believe it's copied directly from it?
21       A.    In concept.
22       Q.    But it's not identical to any plan in the
23   Freedenfeld plans?
24       A.    No, it is not identical.

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                              12/28/2006

Page 45

1      Q.    Are there any other Cormier plans that you

2  believe are copied from the Freedenfeld plans?

3      A.    Yes.  On Exhibit 3M, Section 3 and Section

4  4, are both, again, derivative of sections 1 and 2

5  on Exhibit 2F.

6      Q.    When you say "derivative," they are not

7  directly copied from the Freedenfeld plans; is that

8  right?

9      A.    The configuration is the same.

10     Q.    The details shown on the Cormier plan are

11  not included on the Freedenfeld plan; is that right?

12     A.    That's correct.

13     Q.    Sections 3 and 4 shown on Exhibit 3M, are

14  they exactly identical to the Warren Freedenfeld

15  plans?

16     A.    Ask your question again, please.

17     Q.    Are Sections 3 and 4 on Cormier Plan 3M

18  exactly identical to the Freedenfeld plan?

19     A.    Virtually identical.

20     Q.    But they are not exactly identical?

21     A.    Correct.

22     Q.    How do they differ from the Freedenfeld

23  plan?

24     A.    The configuration of the roof trusses are

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 46

1    different, and there is more detail included in

2    Cormier's plans than was included in our plans.

3        Q.    Are there any other Cormier plans that you

4    believe are copied from the Freedenfeld plans?

5        A.    On Exhibit 3N, Section 5 it appears to be

6    based on Section 1 of Exhibit 2F, and Section 6.

7    I'm not sure where Section 6 is taken, so I would

8    have to look at -- Cormier didn't appear to include

9    building sections on his plans.  Oh, wait.  I am

10   going to guess that Section 6 is through the

11   connecting vestibule between the new building and

12   the existing house, although Cormier doesn't show

13   it, I'm guessing that's what that is.

14       Q.    Before we move on, let's break that down.

15   Section 5 on the Cormier drawing Exhibit 3N you say

16   --

17       A.    Is virtually identical to part of building

18   Section 1 on Exhibit 2F.

19       Q.    Does it differ from the Freedenfeld

20   drawing?

21       A.    Not in concept.

22       Q.    How about in its details?

23       A.    Actually, a lot of the details are quite

24   similar as well.

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                        12/28/2006

Page 47

1      Q.    Why don't you tell me the details that are

2   similar?

3      A.    Well, the open web steel joists are the

4   same on the lower level.  The scissors truss and the

5   configuration of the roof between Column Lines G and

6   F are the same, and the intersection of the flat

7   room with the sloping roof at Column Line F is

8   virtually identical to the intersection of the flat

9   roof and slope roof at Cormier's Column Line 5.

10     Q.    Can you identify for me how these two

11  drawings differ?

12     A.    Section 5 is a partial section, whereas

13  Building Section 1 on 2F is a full building section.

14     Q.    Does Section 5 contain details that are

15  absent from the Freedenfeld drawing?

16     A.    Yes.

17     Q.    Section 6, is there an identical drawing

18  anywhere in the Freedenfeld drawings?

19     A.    No.

20     Q.    Are there any other Cormier plans that you

21  believe are copied from the Freedenfeld plans?

22     A.    Wow, yes.  It appears that the entire

23  finish schedule from what I'm seeing, even the way

24  the rooms are numbered and the way that they are

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 48

1   listed on 3Q, it looks like it's virtually identical

2   to Exhibit 2G.

3       Q.   Now, could you explain to us what these

4   documents are, this finish schedule you're looking

5   at?

6       A.   The finish schedule is a list of all the

7   rooms and spaces in the project, and the room

8   numbering system used to identify those rooms.  For

9   instance, the entry vestibule is 100 on the WFA

10  plans, and it also coincidentally is 100 on the

11  Cormier plans.  Room 101, the children's play area,

12  reception area, the same location.  The waiting

13  area, 102.  Waiting area 102 -- I can skip around.

14       If you go down the list, and I'm just

15  looking at really for the first time, it's amazing

16  how a lot of the rooms appear to be in the same

17  order.  It looks like there are some deviations.

18  The further I go down, I do see some differences,

19  but the numbering seems to be very similar, even how

20  the schedule itself is laid out is very similar from

21  room to flooring, floor base, wainscot, material

22  height, wall material, north, south, east, west,

23  ceiling material, height, remarks.  The schedules

24  are pretty similar.

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 49

1    Q.    Looking at the schedules, when you say they
2    are pretty similar, are they identical?
3    A.    I don't know.  I'd have to go word for
4    word, but there does appear to be some differences,
5    but they are quite similar.
6    Q.    Speaking more broadly about Exhibit 3Q and
7    Freedenfeld 2G, are there portions of Freedenfeld 2G
8    that are not present on Cormier 3Q?
9    A.    Yes.  We have partition types shown on 2G
10   that Cormier has probably placed somewhere else.
11   Q.    But they are not on Exhibit 3Q?
12   A.    No.
13   Q.    Are there any other Cormier plans that you
14   believe are copied from the Freedenfeld plans?
15   A.    The rest are structural.  No, I believe
16   that's it.
17   MR. McCALL:  Did you look at them all?
18   A.    They are all structural.  We didn't have
19   any structural drawings.  The structural drawings
20   are based on the same floor plan, but we didn't have
21   structural drawings.
22   Q.    Okay.
23   MR. ROSENBERG:  Why don't we go record for
24   a second and clean this up before we move on.

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 65

1    in schematic design or in any one phase.

2         Q.   About how many new projects a year, on

3    average, does Warren Freedenfeld Associates do?

4         A.   Currently we get somewhere between 20 and

5    24 a year.

6         Q.   New projects?

7         A.   Yes.

8         Q.   The "Veterinary Economics" magazine that's

9    Exhibit 4 was published in November, 2004.  Had you

10   merged at that point or were you still Warren

11   Freedenfeld Associates?

12        A.   Still Warren Freedenfeld.

13        Q.   At that point in 2004, how many new

14   veterinary hospital projects did Warren Freedenfeld

15   Associates begin that year?

16        A.   I don't know.  I can't tell you exactly.

17        Q.   Would it have been more than ten or less

18   than ten?

19             MR. McCALL:  Objection.

20        A.   It would have been more than ten.

21        Q.   Okay.  How recently was the merger?

22        A.   A little over a year ago.

23        Q.   The drawings that Warren Freedenfeld

24   Associates did that are the Exhibit 2 group, are

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 66

1    they in form to be built from or would more work

2    need to be done before construction could begin?

3            MR. McCALL:   Objection.

4        A.   More work would need to be done.

5        Q.   What more work would need to be done had

6    you stayed on the project to go from these drawings

7    to as-built plans or whatever is the level of plans

8    needed for the builder to move forward?

9        A.   There is dimensions, there's material

10   identifications, there are interior details,

11   exterior details, that sort of thing.

12       Q.   Other than the "Veterinary Economics"

13   magazine, are you aware of Cormier's plans being

14   submitted to any public entity or any publication or

15   organization?

16       A.   Not that I'm aware of.

17       Q.   Have you ever seen any advertising by

18   Edward Cormier Associates?

19       A.   No.

20       Q.   Do you know whether Edward Cormier

21   Associates ever used the "Veterinary Economics"

22   magazine and merit award in its advertising?

23       A.   I don't know that.

24       Q.   Now, you testified a little bit ago about

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 72

1        Q.    These are all published in "Veterinary

2    Economics" magazine?

3        A.    Yes.

4        Q.    How did you get hired for the Gardner

5    Animal Hospital project?

6        A.    Dr. McTigue read about us in "Veterinary

7    Economics" magazine, and I believe either he called

8    our office or one of his staff called our office, I

9    think it was, five years earlier.  We had actually

10   worked with Dr. McTigue on a previous project.

11       Q.    What was the previous project about?

12       A.    It started out being what essentially is

13   now this project, but he was having a hard time

14   finding property.  When he did find property, there

15   was a long approval process.  So in the interim, he

16   had us renovate his existing hospital on a interim

17   basis, which we did, which he was very pleased with.

18       Q.    Now, take me through the steps after you

19   were contacted by Dr. McTigue or someone on your

20   staff was leading up to the development of these

21   drawings; what happens?

22       A.    When we get a call, we'll respond, and

23   we'll answer questions.  We'll send the client

24   whatever information they ask for.  We try to be

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 79

1       Q.    There came a point at which someone must
2    have told Warren Freedenfeld Associates that they
3    were being terminated from the project?
4       A.    Yes.
5       Q.    Who communicated that to you?
6       A.    Dr. McTigue.
7       Q.    Was this in writing or orally, the first
8    time, the first instance?
9       A.    I know it was in writing.  I'm trying to
10   remember if there was oral conversations.  I don't
11   recall the oral.  There might have been some.  I
12   know that we did meet face to face to try to work
13   all of this out, but it wasn't a very nice meeting.
14      Q.    Who attended the meeting?
15      A.    Dan McCarty, I believe Walter Bennett was
16   there.  I have meeting notes of that meeting which
17   are in the file that I'm sure you have, which
18   documents what was said and what was discussed, and
19   how much I tried to restore the relationship I had
20   had with Dr. McTigue, but it was of no avail.
21           MR. McCALL:  I think the question was who
22   was at the meeting.
23      A.    I was at the meeting, Dr. McTigue was
24   there, Chris Hanlon was there, Dan McCarty, and I

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 80

1    believe Walter Bennett.

2         Q.    What subjects were discussed at the

3    meeting?

4         A.    I'd have to go back into the notes.

5         Q.    Were there particular issues with the work

6    of Warren Freedenfeld Associates that were raised at

7    the meeting?

8         A.    There were some, but they weren't real

9    substantive.

10        Q.    What were they?

11        A.    I don't recall exactly.  I would have to

12   look in the notes.

13        Q.    Was an issue ever raised about the cost of

14   building the hospital as designed by Warren

15   Freedenfeld Associates?

16        A.    There were some issues about cost, yes.

17        Q.    What were those issues?

18        A.    Well, originally Dr. McTigue wanted to

19   build the hospital for $1.1 million.  I think it was

20   coming in, according to Bennett, at $1.3 million.  I

21   think I had developed a whole list of things that we

22   could delete or revise, but we never had the

23   opportunity to really pursue those value engineering

24   suggestions before we were terminated.

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 81

1        Q.    What were those suggestions?

2        A.    I don't recall.

3        Q.    Were they communicated to Dr. McTigue?

4        A.    I believe so.

5        Q.    With regard to the termination, did you

6    reach an agreement with Dr. McTigue as to any monies

7    owed to Warren Freedenfeld Associates?

8        A.    Yes.

9        Q.    What was the agreement reached on that?

10       A.    In terms of the money?

11       Q.    Yes.

12       A.    I think the agreement was something like

13   $9,500.

14       Q.    Was this less than the amount of money that

15   Warren Freedenfeld Associates believed it was owed

16   by Dr. McTigue at that point?

17       A.    I think so, but I'm not positive.

18       Q.    As part of the termination, was an

19   agreement reached with regard to what use could be

20   made of the Warren Freedenfeld Associates plans?

21       A.    Very definitely.

22       Q.    What was that agreement?

23       A.    That our plans could not be used.

24       Q.    Did you communicate that to Dr. McTigue?

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 82

1        A.    Yes, in a number of different ways.

2        Q.    What were those different ways?

3        A.    Well, our director of operations at that

4    time, Charlie Cimino, wrote to Dr. McTigue,

5    explaining to him that if the project was

6    terminated, he absolutely in no way could use our

7    drawings, and at the end of that letter, emphasizing

8    I was willing to do anything I could to continue to

9    work with Dr. McTigue, but apparently that was

10    ignored.

11        Q.    Was it communicated in any other ways to

12    Dr. McTigue?

13        A.    Yes.   In our termination agreement, it made

14    it absolutely clear he could not use our drawings.

15        Q.    Did Dr. McTigue ever tell you that he

16    understood that and that he could not use them?

17        A.    In a letter to me, prior to signing the

18    termination agreement, he indicated that he had

19    every intention of using the drawings.   It was, I

20    believe, in response to that letter that Charlie

21    Cimino wrote back to him and told him he could not

22    use the drawings, and that was finally memorialized

23    in our termination agreement.

24        Q.    Did Dr. McTigue ever express to you that he

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                    12/28/2006

Page 83

1  agreed with you that the termination agreement did

2  not allow him to use those plans?

3      A.   Not only did he communicate that, but he

4  even told me again in writing that the drawings were

5  worthless, and he threw them in the trash.

6      Q.   Now, you said that he had communicated that

7  to you separate from that writing?

8      A.   In another writing.

9      Q.   In another writing.  Did he ever orally

10 tell you in a conversation that that was his

11 understanding?

12     A.   No.

13     Q.   Do you recall what that other writing was

14 in which he indicated that?

15     A.   It was in a letter.

16     Q.   Did you have any discussions directly with

17 Dr. McTigue about the terms of the termination?

18     A.   I believe so.

19     Q.   Did anyone else at Warren Freedenfeld

20 Associates speak with Dr. McTigue about that

21 subject?

22     A.   I don't think so.

23     Q.   The letter that Charlie Cimino wrote, where

24 did he get his information for that letter?

Warren C. Freedenfeld                                    12/28/2006

Page 84

1        A.    From the contract.

2        Q.    Did you instruct him to send the letter?

3        A.    It was his role and responsibility to deal

4    with contractual issues.

5        Q.    Well, how did this information about this

6    discussion with Dr. McTigue get to Charlie Cimino?

7        A.    Charlie and I, of course, talked about it.

8        Q.    Is Charlie Cimino still with your company?

9        A.    No, he is not.

10       Q.    Do you know where he is today?

11       A.    He is a professor at Wentworth Institute.

12             (Document marked as Exhibit 5

13             for identification)

14       Q.    Could you take a look at Exhibit 5, and

15   tell me if you recognize the document?

16       A.    I recognize it.

17       Q.    What is it?

18       A.    It is, I think, the initial termination

19   agreement and the transmittal letter that went with

20   it.

21       Q.    On the first page, the transmittal letter,

22   it reflects that you sent this to Dr. McTigue; is

23   that right?

24       A.    Yes.

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 85

1      Q.    So you actually sent this to Dr. McTigue?

2      A.    Yes.

3      Q.    I see on the transmittal page it refers to

4    the enclosure as a proposed termination agreement;

5    is that right?

6      A.    Yes.

7      Q.    The next page, which is dated July 22,

8    1999, is that the proposed termination agreement?

9      A.    At that time, yes.

10     Q.    Who drafted this?

11     A.    I did.

12     Q.    So this was sent by you to Dr. McTigue?

13     A.    That's correct.

14     Q.    On the transmittal page, are those your

15   initials next to Warren Freedenfeld?

16     A.    Yes.

17     Q.    What was the purpose of sending this?

18     A.    Because Dr. McTigue wanted to terminate the

19   agreement, and so I sent him the termination

20   agreement.

21     Q.    Was the purpose to have Dr. McTigue execute

22   this and return it to you as the termination

23   agreement?

24     A.    At that time, it looks like it.

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 86

1          Q.    What is it about it that gives you that
2     belief at this point?
3          A.    Because there's a place for him to sign and
4     return.
5          Q.    Now, at the time you sent this, you knew
6     that Dr. McTigue would bring in another architect
7     for the project; is that right?
8          A.    Yes.
9          Q.    And, in fact, you note that in the proposed
10    termination letter; is that right?
11         A.    Correct.
12         Q.    What response did you get from Dr. McTigue
13    to this document?
14         A.    There were a few responses.  Number one, he
15    wanted to negotiate the actual settlement amount,
16    and he also wanted the right to use our drawings.
17         Q.    How did he communicate that to you?
18         A.    Well, both of those were in letters.
19         Q.    Now, in the proposed termination agreement
20    of July 22, 1999, you state that the outstanding
21    invoice totals a little over $18,000; is that right?
22         A.    Yes.
23         Q.    Then you proposed in this agreement to
24    settle for an additional $9,500; is that right?

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 87

1        A.    Yes.

2        Q.    Then Dr. McTigue wanted to negotiate, I

3    assume, downward that amount?

4        A.    I believe that's my memory.

5        Q.    Now, when Dr. McTigue advised you in

6    response to this that he wanted the right to use the

7    drawings, how did you respond?

8        A.    That's when I turned the whole situation

9    over to Charlie, and I said, Why don't you deal with

10   him.

11       Q.    After that occurred, after you turned it

12   over to Charlie Cimino, did Charlie Cimino handle it

13   from that point forward or were you involved from

14   that point forward in further discussions about

15   that?

16       A.    Well, I remained involved, you know.

17   Charlie wrote to him about both the settlement

18   amount and about the use of our drawings.  He

19   covered both of those topics in his letter to Dr.

20   McTigue.

21       Q.    Did Dr. McTigue respond to Charlie Cimino?

22       A.    He responded, but I think he wrote to me

23   instead of to Charlie.

24       Q.    When Dr. McTigue responded writing to you,

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 88

1   did you then continue to communicate with Dr.

2   McTigue or did you just turn it over to Charlie

3   Cimino?

4        A.   No.  I kind of took it back over and

5   figured I would try to bring it to closure.

6        Q.   What steps did you take at that point to

7   try to bring it to closure?

8        A.   I drafted a more extensive termination

9   agreement that covered all of the issues from the

10  settlement amount to the use of our drawings.

11       Q.   Okay.  And in the termination agreement

12  that you drafted, what did it provide with regard to

13  the use of your drawings?

14       A.   That he absolutely could not use them.

15            (Document marked as Exhibit 6

16            for identification)

17       Q.   Do you recognize what's been marked as

18  Exhibit 6?

19       A.   Yes.

20       Q.   Can you tell me what that is?

21       A.   This is the letter that Dr. McTigue wrote

22  back to me in response to Charlie Cimino's letter.

23       Q.   This was in response to Charlie Cimino's

24  letter rather than in response to your July 22

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 89

1    communication?

2         A.    Let me just take a closer look.  One thing

3    I have to say is Dr. McTigue had a hard time with

4    dates.  He never dated anything.

5         Q.    I note the first sentence says, "I have

6    reviewed your termination agreement dated July 22,

7    1999."

8         A.    Which is Exhibit 5.

9         Q.    Okay.  Does that refresh your recollection

10   as to whether you received this in response to your

11   July 22 letter or instead in response to Charlie

12   Cimino's letter?

13        A.    Do you have Charlie Cimino's letter?

14        Q.    Yes.

15             MR. ROSENBERG:  Why don't we mark this as

16   the next exhibit.

17             (Document marked as Exhibit 7

18             for identification)

19        A.    He refers to $47,598, and I'm trying to see

20   where he's getting that from.  It says first the

21   letter is confusing, and then it discusses the

22   invoice total as billed to date as $47,598.  I'm

23   looking for where he's getting that from.  He

24   definitely is referring to my July 22nd letter,

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 90

1    because there's is $18,013.70.  He might be

2    referring to an invoice.  I'm kind of speculating

3    here.  It looks like he is referring to more than

4    just my July 22nd letter, because my July 22nd

5    letter doesn't even mention the $47,598 or the

6    $147.99 of reimbursable expenses, totaling $47,746.

7    So he must be referring to an invoice.

8         Q.   Do you remember getting this letter?

9         A.   Yes, I do.

10        Q.   How did you respond to this letter?

11        A.   We might have had some phone conversations,

12   but I'm not positive about that.  Although, at some

13   point we arrived at a number that was agreeable.

14   That number was memorialized in a final

15   comprehensive termination agreement, which was dated

16   September 2, '99.

17        Q.   Is it fair to say you and Dr. McTigue went

18   back and forth on a number, and you eventually

19   reached an agreement on what the final number should

20   be?

21        A.   Yes.

22        Q.   This letter, in the last paragraph, Dr.

23   McTigue states, "Although we are utilizing the

24   services of another architect, we plan to utilize

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 91

1    any and all of the information shown on the drawings

2    designed by WFA.  Please make note of this in the

3    general release statement."  Do you recall reading

4    that at the time you were working this out?

5        A.    Absolutely.  That went diametrically

6    opposite what we had indicated to him, and it was

7    for that reason that I included language about the

8    use of our drawings in the final termination

9    agreement.

10        Q.    So in this letter, Dr. McTigue communicated

11    to you that he wanted the termination agreement

12    revised to reflect that?

13        A.    Yes.

14        Q.    How specifically did you respond to that

15    request?

16        A.    I believe very specifically.

17        Q.    What did you tell Dr. McTigue in response?

18        A.    It wasn't what I told him, it's what I put

19    into the termination agreement.

20        Q.    So you don't remember having any

21    conversations with Dr. McTigue in response to that

22    statement?

23        A.    Not relative to that.  We hadn't changed

24    our position on that from day one.  I will add that,

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                          12/28/2006

Page 92

1    in fact, I addressed it in my July 22nd letter in

2    which I said, "It is our understanding that you

3    intend to redesign the project utilizing the

4    services of another architect."

5              So I was consistently clear to him in every

6    writing that he could not use our drawings, and that

7    it was our understanding he was going to redesign

8    the project.

9         Q.   Well, in fact, the project did change from

10   what you had proposed and drawn by the time it was

11   built, correct?

12        A.   Only in very minor ways.

13        Q.   But it wasn't built exactly as designed by

14   Warren Freedenfeld Associates, was it?

15             MR. McCALL:  Objection.

16        A.   It was built virtually identical to what we

17   designed.

18        Q.   But not exactly as to what you designed?

19        A.   It was virtually identical.

20        Q.   The basement was smaller, and that had been

21   to be redesigned, correct?

22        A.   No.  They cut off half of what we had

23   designed.

24        Q.   The dormers were moved, for instance; is

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 93

1    that correct?

2         A.   Yes.

3         Q.   The letter you received from Dr. McTigue,

4    which is Exhibit 6, to your recollection, did you

5    receive that after your July 22, 1999 proposed

6    termination agreement was sent to Dr. McTigue?

7         A.   Yes.

8         Q.   Would you take a look at what's been marked

9    as Exhibit 7?

10        A.   Yes.

11        Q.   Can you identify that document for me?

12        A.   This was the letter that was written to Dr.

13   McTigue from our director of operations, Charlie

14   Cimino.

15        Q.   In it, it appears to me he addresses two

16   issues; the negotiation of the final settlement

17   payment and the use of the plans going forward; is

18   that right?

19        A.   And the third.

20        Q.   What's the third issue?

21        A.   The last paragraph.

22        Q.   He expresses that you would like to

23   continue to work with Dr. McTigue?

24        A.   Correct.  Those are the three issues that

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                              12/28/2006

Page 94

1    were addressed in this letter.

2         Q.   And you turned, I think you testified, at

3    this point, the matter over to Charlie Cimino to

4    deal with Dr. McTigue?

5         A.   Yes.

6         Q.   In this letter, what did Mr. Cimino tell

7    Dr. McTigue about any future use of the plans after

8    the termination?

9         A.   Would you like me to read it to you?

10        Q.   What's your understanding of what was

11   communicated by Warren Freedenfeld Associates in

12   this letter?

13        A.   It made it absolutely clear that Dr.

14   McTigue had no right whatsoever to utilize our

15   drawings after the termination of this agreement.

16        Q.   Did Dr. McTigue respond to Warren

17   Freedenfeld Associates with regard to that issue

18   raised by Mr. Cimino?

19        A.   Yes.

20        Q.   How did he respond; in writing or verbally?

21        A.   Writing.

22        Q.   What did he communicate?

23        A.   He signed the termination agreement,

24   stipulating that he could not use the drawings.

Warren C. Freedenfeld                                    12/28/2006

Page 95

1       Q.    Okay.  So he responded by executing the
2   termination agreement?
3       A.    Yes.
4       Q.    Did he respond in any other manner to this
5   statement?
6       A.    Not that I'm aware of, no, not that I
7   recall.
8             (Document marked as Exhibit 8
9             for identification)
10      Q.    If you could review Exhibit 8, and then
11  tell us if you've seen it before?
12      A.    I have seen this.
13      Q.    Do you recall receiving this from Dr.
14  McTigue?
15      A.    Yes, I do.
16      Q.    What is this letter?
17      A.    It was undated.  I received it on August 9,
18  1999.
19      Q.    Is that your handwriting at the top?
20      A.    Yes, that is my handwriting.  This here
21  letter was in response to Charlie Cimino's letter.
22      Q.    Does it reflect further negotiations over
23  the settlement payment to be made?
24      A.    Yes, it does.

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 96

1      Q.    Did anyone from Warren Freedenfeld

2   Associates respond further to Dr. McTigue regarding

3   the settlement amount in response to this letter?

4      A.    Probably me.

5      Q.    Do you recall doing so?

6      A.    I don't have specific recollection, but I

7   must have, because the final number is different

8   than the number here, which means we must have

9   discussed it.

10     Q.    Okay.

11           (Document marked as Exhibit 9

12           for identification)

13     Q.    Would you take a look at that, and tell me

14   if you recognize that document?

15     A.    Oh, yes.

16     Q.    Once again, at the top there's handwriting

17   that says "Received 16 August 1999."  Is that your

18   handwriting?

19     A.    Yes.

20     Q.    Could you tell me what this document is?

21     A.    This was a letter that confirmed in writing

22   that Dr. McTigue wanted to terminate the agreement,

23   and gave some reasons why, and indicated that he

24   felt that the drawings were absolutely worthless,

Merrill Legal Solutions
(617) 542-0039

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 97

1   and that he has -- he was supposed to return all the

2   drawings, but instead of returning them, he said he

3   rolled them up and discarded them, because they were

4   useless to him.

5              So that kind of put closure on the whole

6   issue of the use of our drawings.

7        Q.   Did he advise you in this letter that he

8   needed to retain another architect to complete the

9   project?

10       A.   He had said that earlier.

11       Q.   Did he say it again in this letter that you

12  received in August?

13       A.   Yes.  He says that he's going to have to

14  pay tens of thousands of dollars to another

15  architect to complete this project.

16       Q.   Did Warren Freedenfeld Associates respond

17  to this communication from Dr. McTigue?

18       A.   Well, it was subsequent to this that we

19  executed the termination agreement.

20       Q.   Before the termination agreement, were

21  there any communications with Dr. McTigue about the

22  issues raised in this letter?

23       A.   Nothing that I think was in writing.

24       Q.   Okay.

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                  12/28/2006

Page 98

1          A.    It's possible we may have discussed it, but

2     I think at this point I felt that repairing the

3     relationship was beyond the point of no return.

4          Q.    Okay.  So was the next thing that happened

5     the execution of the termination agreement?

6          A.    I believe that was, because it was -- this

7     was received on August 15th, and we executed the

8     termination agreement about two weeks later on

9     September 2nd.

10          Q.    At this point when you received this

11     letter, had you and Dr. McTigue reached a final

12     conclusion on the settlement number, the dollar

13     figure that will be paid, or is there still more

14     work to be done on that?

15          A.    I guess we must have, because, you know, we

16     signed our agreement within a couple of weeks after

17     this.

18          Q.    Do you recall having any conversations with

19     Dr. McTigue between the time you received this

20     letter and the execution of the termination

21     agreement?

22          A.    I don't recall any conversations.

23          Q.    Okay.  Who prepared the termination

24     agreement?

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 99

1        A.    I did.

2              (Document marked as Exhibit 10

3              for identification)

4        Q.    Would you take a look at what's been marked

5    as Exhibit 10, and tell me if you recognize these

6    documents?

7        A.    Yes.  This is the termination agreement.

8    While this particular document is only signed by me,

9    it hadn't apparently yet been signed by the doctor.

10       Q.    Now, your office prepared this agreement?

11       A.    Yes.

12       Q.    Who in your office actually did this?

13       A.    Me.

14       Q.    Did you have a source for this or is this

15   something that you just came up with?

16             MR. McCALL:  Objection.

17       Q.    How did you come up with this document?

18       A.    Over the course of 30 years, and having met

19   with various attorneys, I came up with the whereases

20   and the wherefores, and made it seem as much of a

21   legal document as I could.

22       Q.    But you wrote the actual text of this?

23       A.    I wrote the text myself, yes.

24       Q.    Did you copy of from anything?

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 100

1        A.    I don't think so.

2        Q.    This first copy is only signed by you; is

3    that correct?

4        A.    Yes.

5        Q.    Was this termination agreement that you

6    wrote ever provided to Dr. McTigue before you signed

7    it?

8        A.    Yes.  I think it was faxed to him.

9        Q.    Okay.

10       A.    I think.  I'm not positive.  Eventually I

11   did get an original signature.

12       Q.    Now, if you turn to the second page of

13   Exhibit 10, can you identify for me what that is?

14       A.    This is a transmittal of the termination

15   agreement, dated September 2, and this does confirm

16   what I said.  This was faxed to him.

17       Q.    Okay.

18       A.    Apparently it was faxed -- I think it was

19   faxed to him on August 26th, and I guess signed on

20   September 2nd.

21       Q.    Okay.  Now, in the "Remarks," there are

22   remarks on that; do you see that?

23       A.    Yes, I do.

24       Q.    Can you tell from this transmittal letter

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                                    12/28/2006

Page 101

1    what date this was sent to Dr. McTigue?

2         A.    Well, the transmittal date is August 26th,

3    but I would guess that this -- oh, yes, because that

4    was the draft.  The draft was sent on August 26th,

5    and the final was sent on September 2nd.

6         Q.    When you say "the final," that's the one

7    signed by you?

8         A.    Right.

9         Q.    But not yet signed by Dr. McTigue?

10        A.    Correct.

11        Q.    Now, the "Remarks" section on this, do you

12   know whether those remarks were on the August 26th

13   transmittal of the draft or were those added when

14   you sent the September 2nd agreement?

15        A.    You know, I'm not sure.

16        Q.    Who wrote these remarks?

17        A.    Well, I did.

18        Q.    Is that your signature underneath?

19        A.    Yes, it is.

20        Q.    It says, "I have modified your proposed

21   termination agreement to make it somewhat more

22   comprehensive."  What were you modifying, if you

23   wrote the termination agreement?

24        A.    I'm not positive.

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                          12/28/2006

Page 102

1        Q.    Why did you modify it?

2        A.    It might have been based on discussions we

3    might have had.

4        Q.    Do you recall any conversations with him

5    about modifying it?

6        A.    Not specifically.

7        Q.    Now, if you turn to the next page, there is

8    a transmittal letter dated September 2; is that

9    correct?

10       A.    Yes.

11       Q.    This was sent by you?

12       A.    Yes.

13       Q.    What are you sending at that point?

14       A.    I guess the first one I sent him hadn't

15   been side, but this one had been signed.

16       Q.    Okay.

17       A.    Signed and initialed on September 2nd.

18       Q.    At that time are you sending him the copy

19   that has been signed by both Dr. McTigue and

20   yourself?

21       A.    I'm not positive.

22       Q.    Okay.  Now, if you turn back to the first

23   page, in Paragraph 3, it says, "GAH agrees not to

24   use any of the work," and then there's a caret

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                              12/28/2006

Page 103

1    handwritten "solely produced by WFA."  Who wrote in

2    the word "solely"?

3         A.   I did.

4         Q.   Did you ever provide this to Dr. McTigue

5    without the word "solely" written in?

6         A.   Yes.

7         Q.   What prompted you to add the word "solely"

8    to it?

9         A.   It was a word we mutually agreed to add to

10   the agreement.

11        Q.   What was your conversation with Dr. McTigue

12   about adding it?

13        A.   I don't recall the conversation, except

14   that the word was perfectly fine with me, because

15   there was never a question who solely produced the

16   drawings.

17        Q.   Did Dr. McTigue tell you what he understood

18   adding the word "solely" to that to mean?

19        A.   No, he did not.

20        Q.   In your understanding, when you added this

21   word, how did adding the word "solely" change what

22   you were saying in Paragraph 3?

23        A.   Not one iota.

24        Q.   Is that your initial next to the word

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                          12/28/2006

Page 104

1      "solely"?

2          A.   Yes, it is.

3          Q.   Did you communicate to Dr. McTigue that

4      this made no change in the text?

5          A.   Yes.

6          Q.   Or in the meaning of the text?

7          A.   Yes.  I said it's perfectly okay, because

8      it doesn't change anything.

9          Q.   Okay.  Now, in Charlie Cimino's letter of

10     July 29th, which, I believe, is Exhibit 7, he had

11     written that "Your decision to terminate the

12     agreement precludes your use of any and all drawings

13     and/or documents produced by this office."  Is that

14     correct?

15         A.   Yes.

16         Q.   Now --

17         A.   And it goes on to say, "and cannot be used

18     by the owner or others for completion of this

19     project."

20         Q.   Okay.  When you drafted the termination

21     agreement in Paragraph 3, is there a reason you

22     choose to write "GAH agrees not to use any of the

23     work solely produced by WFA" instead of just the

24     language used by Charlie Cimino, saying you're

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                          12/28/2006

Page 180

1    South Miami was not completed by us.  It was

2    completed by another architect, and it actually

3    became a Hospital of the Year.

4         Q.   Is that the project you referenced earlier

5    on in response to Mr. Rosenberg's question about any

6    other litigation or disputes about ownership?

7         A.   Yes.

8              MR. McCALL:  Okay.  That's it.

9              MR. ROSENBERG:  I have a couple questions.

10                  REDIRECT EXAMINATION

11        BY MR. ROSENBERG:

12        Q.   Could Bennett build from the plans

13   developed by Warren Freedenfeld & Associates as they

14   existed at the time that you were terminated from

15   the project?

16        A.   No.

17        Q.   What more had to be done?

18        A.   I think this was asked and answered, but I

19   will repeat it.  There were a lot of details that

20   had to be completed, dimensions that had to be

21   added, interior details, exterior details, things of

22   that nature.

23        Q.   Warren Freedenfeld & Associates did not do

24   that work on this project; is that right?

c4cc9198-4728-4a22-b00d-6351dcf91f41

Warren C. Freedenfeld                              12/28/2006

Page 181

1      A.    No, we did not.

2      Q.    Do you know what plans Bennett used to

3  build from, the actual plans they had physically

4  that they were using that had those details?

5      A.    I'm assuming that he used Cormier's plans

6  to build the project.

7      Q.    Now, you were testifying a minute ago about

8  the forms that are submitted to "Veterinary

9  Economics" magazine for a merit award.  Do you know

10 whether anyone from Edward Cormier Associates filled

11 out any part of a submission to "Veterinary

12 Economics" magazine?

13     A.    I have no knowledge of that.

14        MR. ROSENBERG:  That's all I have.  Thank

15 you.

16        MR. McCALL:  Anybody else?

17        MR. ROSENBERG:  Looks like we're finished.

18        (Whereupon the deposition

19        concluded at 2:45 p.m.)

20

21

22

23

24

## Exhibit C

**Termination Agreement
(Freedenfeld Deposition Exhibit No. 11)**



Freedenfeld
EXHIBIT NO. 11
12/28/06
M.D. O'CONNOR

## TERMINATION AND MUTUAL RELEASE AGREEMENT BETWEEN GARDNER ANIMAL HOSPITAL AND WARREN FREEDENFELD & ASSOCIATES INC.

WHEREAS Michael P. McTigue, DVM, and Gardner Animal Hospital, collectively ("GAH") and Warren Freedenfeld & Associates Inc. ("WFA") had previously entered into an Owner and Architect Agreement dated 24 March 1998 ("Agreement"), for the provision of architectural services in connection with the Gardner Animal Hospital, located at 73 Eaton Street, Gardner, Massachusetts ("the Project"), and

WHEREAS the Schematic Design and partial Construction Drawings for such Project has been substantially completed, and

WHEREAS the parties desire to terminate their Agreement without the provision of any further services by WFA,

NOW THEREFORE, in consideration of the mutual agreements contained herein, the parties agree as follows:

1.  The Agreement is terminated and the parties shall have no further obligations except as set forth in this Termination and Mutual Release Agreement.

2.  Upon execution of this Agreement, GAH shall pay WFA Seven Thousand Five Hundred Dollars ($7,500.00) as final and total payment for all services provided and expenses incurred to date.  This amount shall be in addition to all previous amounts paid by GAH and/or received by WFA.

3.  GAH agrees not to use any of the work produced by WFA.  *SOLELY WFA* Article 6 of the Owner and Architect Agreement shall remain in full force and affect.

4.  GAH and WFA agree to release each other of and from all loss, expense, claim, or action of any kind arising at any time from this date forward, whether arising out of the Agreement or otherwise, intending thereby to give each other a general release of all claims each may have against each other to date, and in the future, except as to the obligations under this Termination and Mutual Release Agreement, which are not being released.

Executed as a contract under seal this ___2ND___ day of ___SEP___, 1999.

Owner:

Gardner Animal Hospital
7 Pearson Boulevard
Gardner, MA  01440

By _____
Michael P. McTigue, DVM

Witness:

By _____

Name: _Brian C. Hurley DVM_

Architect:

Warren Freedenfeld & Associates Inc.
39 Church Street
Boston, MA  02116

By _____
Warren Freedenfeld AIA, President

Witness:

By _____

Name: ___Sasha A. Chanaka___

## **Exhibit D**

**Undated letter from Michael P. McTigue
(Freedenfeld Deposition Exhibit No. 6)**



**MICHAEL P. McTIGUE, D.V.M.**



GARDNER ANIMAL HOSPITAL
7 Pearson Blvd.
Gardner, MA 01440
Telephone: (508) 632-7110

Warren Freedenfeld and Associates
39 Church Street
Boston, MA  02116
(617) 338-0050

Dear Warren:

I have reviewed your termination agreement dated July 22, 1999 and find two issues needing further clarification. First, the letter is confusing in that it discusses the invoice total as billed to date of $47,598.00 plus $147.99 of reimbursable expenses totaling $47,746.00. The letter also states that there is balance due of $18,013.70 without detailing any of the payments made. By my calculations according to these figures, you are stating that the payments made total $29,732.30. According to my documentation (cancelled checks), the following payments have been made as of this date:

| | |
|---|---|
| April 20, 1998 | $3,000.00 (Deposit) |
| July 8, 1998 | $1,513.62 |
| February 22, 1999 | $14,615.23 |
| April 7, 1999 | $7,500.00 |
| May 10, 1999 | $8,393.78 |
| Total paid | $35,022.63 |

We both agree that the total amount of service billed to date according to the June 1999 statement is $47,746.00. Taking this amount and subtracting the amount of the payments made ($47,746.00 – $35,022.63) would leave the outstanding balance of $12,723.37.

Our phone conversation pertaining to a settlement amount was based on the invoice total of $18,013.70. At that time, we agreed on a settlement amount of $9,500.00. As a result, Warren Freedenfeld and Associates accepted to issue a settlement credit amount of $8,513.70 (the difference of the invoice minus the $9,500).

Therefore, the remaining balance owed based on the documentation provided by WFA and the payments made would be for $4,209.67. This figure comes from the amount billed to date minus the amount paid to date minus the issued settlement credit agreed upon in the July 22, 1999 termination letter.

Second, although we are utilizing the services of another architect, we plan to utilize any and all the information shown on the drawings designed by WFA. Please make note of this in the general release statement.

Sincerely,

Michael P. McTigue

## **Exhibit E**

**Undated letter from Michael P. McTigue
(Freedenfeld Deposition Exhibit No. 9)**

RECEIVED  16 AUG  97



**Michael P. McTigue, D.V.M.**
**Brian C. Hurley, D.V.M.**
**Kathleen J. O'Brien, D.V.M.**

GARDNER ANIMAL HOSPITAL
7 Pearson Blvd.
Gardner, MA 01440
Telephone: (978) 632-7110

Warren Freedenfeld & Associates, Inc.
39 Church Street
Boston, MA  02116.



*Freedenfeld*

EXHIBIT NO. **9**

12/28/06

M.D. O'CONNOR

Dear Mr. Freedenfeld:

This letter is sent to you pursuant to the terms of Article 8.1 of the AIA Document B151 executed by and between us dated March 24, 1998, regarding the proposed construction of the Gardner Animal Hospital on my behalf. Furthermore, this letter is sent to you as written confirmation of the termination of the contract entered into by and between us verbally during our phone discussion on June 25, 1999, which termination was further confirmed by you in your letter of July 22, 1999 to me.

The reason for the termination action taken on June 25, 1999, and for this letter in confirmation of same, is that you failed substantially to perform in accordance with the terms of the Agreement above referenced through no fault of mine.

Some, and this list is not all inclusive, of the reasons for this termination are as follows:

1.      Although I was charged nearly $50,000 for work you purport to have done, substantial portions of that work had not, indeed, ever been completed by you. For example, foundation drawings were never developed by you, nor were the proper elevations used. Additionally, there were residual questions as to whether work you had said had been done, and billed me for, had ever actually been done.

2.      Whatever plans, drawings etc. You did prepare have proven to be useless to us, and they have been rolled up and discarded. This, in spite of my having paid you tens of thousands of dollars; unfortunately, I again have to pay another architect another tens of thousands of dollars to complete the project.

3.      Most importantly, you continued to refuse to recognize that a redesign of the plans, etc. was required to reduce the cost of the project to a manageable financial level. You knew full well that my bank had limited me to construction costs of $1,000,000.00, while everyone to whom I spoke in the construction industry and elsewhere indicated that the project as you had designed it could not be completed for less than approximately $1.3 million, some 30% over my project budget.

I regret having had to take this action and I wish you success in your future endeavors.

Sincerely,

Michael P. McTigue, DVM

## **Exhibit F**

**July 22, 1999 letter from Warren Freedenfeld
(Freedenfeld Deposition Exhibit No. 5)**



**Warren Freedenfeld & Associates**

Architecture
Planning
Interior Design



*Freedenfeld*
EXHIBIT NO. 5
12/28/06
M.D. O'CONNOR

39 Church Street
Boston, MA 02116
Phone: 617.338.0050
Fax: 617.426.2557

## TRANSMITTAL

| | | | |
|---|---|---|---|
| **To:** | Michael P. McTigue, DVM | **Date:** | 22 Jun 99 |
| | **Gardner Animal Care Center** | **Project No:** | 9818 |
| | 7 Pearson Boulevard | **Project:** | Gardner Animal Care Center |
| | Gardner, MA 01440 | | |
| **From:** | Warren Freedenfeld, AIA  | **Via:** | 978–632–7354 |

### Enclosures:

| Copies | Date | Description |
|---|---|---|
| 1 | 22 Jul 99 | Proposed Termination Agreement |

### Remarks:

☑ For Your Information    ☑ For Your Approval    ☑ Please Return    ☑ As Requested

\\server\server\projects\9800\9818.pj\documents\transmittals\mctiguem\mctiguem22jul99.doc

**Warren Freedenfeld & Associates**

**Architecture**
**Planning**
**Interior Design**

39 Church Street
Boston MA 02116
**Phone:** 617.338.0050
**Fax:** 617.426.2557

22 July 1999

Mike McTigue, DVM
Gardner Animal Hospital
7 Pearson Boulevard
Gardner, MA 01440

Project:  **Gardner Animal Hospital** (Project #9818)
Re:       **Termination of Owner and Architect Agreement**

Dear Mike:

This letter shall confirm our agreement to terminate our Owner and Architect Agreement.  It is understood that the current outstanding invoice (Invoice #5644) totals $18,013.70.  It is agreed that a settlement amount of $9,500.00, over and above all payments made to date, shall be considered payment, in full, for all expenses incurred and for all services rendered, to date.

It is our understanding that you intend to redesign the Project utilizing the services of another architect. We wish you the best of luck in that endeavor.

Sincerely,

Warren Freedenfeld, AIA
Principal

WF:sac

The Settlement Agreement is **approved** and **accepted**:

_____          _____
Michael McTigue, DVM                                    Date

cc:  Charles Cimino, AIA – WFA
     Richard Ahern        – WFA
     File

**<u>Exhibit G</u>**

**July 30, 1999 letter from Charles Cimino
(Freedenfeld Deposition Exhibit No. 7)**

**Warren Freedenfeld & Associates**

Architecture
Planning
Interior Design

39 Church Street
Boston MA 02116
Phone: 617.338.0050
Fax: 617.426.2557

30 July 1999

*Freedenfeld*
EXHIBIT NO. 7
12/28/06
M.D. O'CONNOR

Michael P. McTigue, DVM
Gardner Animal Hospital
7 Pearson Boulevard
Gardner, MA  01440

Project:  **Gardner Animal Hospital (Project #9818)**
Re:       **Termination Agreement**

Dear Dr. McTigue:

Warren has asked me to respond to your last correspondence (undated) regarding our Termination Agreement.  We would like to offer clarification and a summary of the transactions, to date.  In your presentation, you neglected to include reimbursable expenses from all invoices.  Therefore, the correct total billed to dated is as itemized below.

| Date | Invoice # | Amount | Payments | Check Date |
|------|-----------|--------|----------|------------|
| Retainer | N.A. | $ 3,000.00 | $ 3,000.00 | 20  Apr  98 |
| 30  Apr  98 | 5109 | 1,513.62 | 1,513.62 | 08  Jul  98 |
| 31  Jan  99 | 5500 | 14,615.23 | 14,615.23 | 22  Feb 98 |
| 28  Feb 99 | 5524 | 5,478.32 | | |
| 31  Mar 99 | 5553 | 10,340.30 | 7,500.00 | 07  Apr  99 |
| 30  Apr  99 | 5592 | 75.16 | 8,393.78 | 10  May 99 |
| 31  May 99 | 5620 | 17,865.71 | | |
| 30  Jun 99 | 5644 | 147.99 | | |
| Totals   = | | $50,036.33 | $35,022.63 | |

As noted above, your payments to date amount to $35,022.63, as stated in your letter, leaving an unpaid balance of $15,013.70.

Our offer to settle for $9,500.00 included all payments made by Gardner Animal Hospital, including the initial retainer (deposit) and falls below the break-even point for this Project.  This figure was arrived at in an attempt to cut the substantial losses that our Office has incurred on your behalf.

**Warren Freedenfeld & Associates**

Architecture
Planning
Interior Design

Michael McTigue, DVM
29 July 1999
Page 2

It is also important for you to understand that your decision to terminate our Owner and Architect Agreement precludes your use of any and all drawings and/or documents produced by this Office. These drawings and other documents are not only protected by Federal copyright laws but are also the sole legal and contractual property of this Office and cannot be used by the Owner or others for completion of this Project. I believe you know there is no dispute about this issue. In addition, any licensed architect will know the substantial jeopardy he will place his firm in by using another architect's copyrighted documents. All documents given to you by this Office must be returned upon execution of the Termination Agreement.

For whatever it's worth, Warren has asked me to, once again, convey to you his desire to continue working together toward the successful completion of this Project. He has indicated to me that he is ready and willing to resolve any issue and to do everything and anything possible to work together in harmony. If there is any possibility of this, then Warren will remain involved and available. My intervening in this matter will become necessary, only if termination is the only course open to us.

Sincerely,

Charles Cimino, AIA
Director of Operations

CC: aeb

cc:  Warren Freedenfeld, AIA
     Richard Ahern, Business Manager
     File

## Exhibit H

**Defendant Edward D. Cormier Associates, Inc.'s Responses and Objections to Plaintiff's First Set of Interrogatories**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| |
|---|
| WARREN FREEDENFELD ASSOCIATES, INC., as successor in interest to Warren Freedenfeld & Associates, Inc., |
| **Plaintiff** |
| v. |
| MICHAEL P. MCTIGUE, DVM, individually and as Trustee of the McTigue Family Trust, NANCY A. MCTIGUE, as Trustee of the McTigue Family Trust, BRIAN C. HURLEY, DVM, GARDNER ANIMAL CARE CENTER, LLC d/b/a Gardner Animal Hospital, EDWARD D. CORMIER ASSOCIATES, INC., and BENNETT BUILDING CORPORATION, |
| **Defendants** |

Civil Action No. 05-11573 RGS

**DEFENDANT EDWARD D. CORMIER ASSOCIATES, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

**I.    General Objections**

1.    Cormier objects to the instructions and definitions set forth in the Plaintiff's First Set of Interrogatories to the extent they impose upon Cormier a burden that is greater than, or inconsistent with, the applicable Rules of Civil Procedure.  Cormier will respond to  the Plaintiff's First Set of Interrogatories in accordance with the Federal Rules of Civil Procedure and the relevant Local Rules.

2.    Cormier objects to the instructions and definitions set forth in the Plaintiff's First Set of Interrogatories to the extent that they are vague, ambiguous, and seek to define terms in an expansive and overly broad manner, beyond the meaning that is given to those terms in general usage.

3.    Cormier objects to the Plaintiff's First Set of Interrogatories to the extent they seek information that is protected from disclosure by the attorney-client privilege, the work product doctrine, the joint-defense privilege or any other applicable privileges.

4.    The answers below shall not be deemed to constitute a waiver of any claims of privilege or immunity Cormier may have as to any response, document, or thing, or of any right of objection to competency, relevancy, materiality, admissibility, or any other evidentiary objection Cormier may assert.

5.      Discovery in this matter is ongoing, and accordingly Cormier reserves the right to modify, amend, or supplement any of the answers below.

6.      The following answers and specific objections to the Interrogatories are made subject to these General Objections.


## II.      Interrogatory Responses

### INTERROGATORY NO. 1
*Please state your full name, residential address, business address, your occupation, the name and address of your employer and the duties in that position.*

**Response:**     Edward D. Cormier
                  113 Cedar Street, Suite S4
                  Milford, MA  01757

                  Administration Manager, Edward D. Cormier Associates, Inc., now retired.  In addition, Edward D. Cormier Associates, Inc. is now a voluntarily dissolved corporation.


### INTERROGATORY NO. 2
*If you or anyone on your behalf had any communication in any form, written or oral, with GAH or any person acting on its behalf relating to or concerning any of the facts, events, occurrences or allegations set forth in the Complaint, please state:*
*a.      The specific date and time (if applicable) of each such communication;*
*b.      The manner in which each such communication was made on each of the dates listed in your answer to subpart a. of this interrogatory, i.e., whether by telephone, letter, face-to-face conversation, etc.;*
*c.      The name and address of all persons who engaged or in any way participated in each such communication listed in your answer to subpart a. of this interrogatory; and*
*d.      In full and complete detail of the entire contents of each such communication made on each of the dates listed in your answer to subpart a. of this interrogatory, indicating what was said or communicated by each of the persons listed in your answer to subpart c.*
*If any of these communications were in written form, you may respond by attaching a copy of such communications to your answers to these interrogatories.*

**Response:**     Objection.   In the wake of the court's ruling of February 9, 2006 and the corresponding order of February 13, 2006, this interrogatory addresses matters that are irrelevant to what remains of the plaintiff's complaint, and is not reasonably calculated to lead to the discovery of admissible evidence.  To the extent that this interrogatory seeks communications between counsel for Cormier and counsel for GAH, Cormier further objects on the grounds of the attorney client and joint-defense privileges.  Cormier further objects that the request is unduly burdensome, in that the burden and expense of the discovery requested outweighs its likely benefit, and overbroad.  In addition, the interrogatory is vague and unclear as to certain points.

Without waiving any of the foregoing objections, Cormier answers that it is impossible to detail each communication that Cormier had in connection with the Project, in that Cormier had periodic conversations with McCarty, Bennett, or Michael McTigue (any of whom might be considered persons "acting on behalf" of GAH) regarding the progress of the hospital renovation and amendments to design drawings. However, Cormier can provide details as to the following conversations.

Cormier was first contacted telephonically by Dan McCarty of McCarty Associates, Inc. on or about July 1, 1999. At that time, McCarty advised that construction costs for the McTigue project had been determined to be in excess of $1.3 million, when only $1 million had been budgeted for the project by McTigue. On other unrelated projects, McCarty and Cormier had consulted with each other. On this project, McCarty asked Cormier to review building designs drafted by Freedenfeld to determine whether there were any areas for construction cost savings. McCarty also advised Cormier that McTigue was dissatisfied with Freedenfeld's performance and was considering terminating Freedenfeld's services. McCarty asked whether Cormier would be interested in carrying the project forward, and if so, whether Cormier could prepare a proposal. Cormier responded that it would be interested and could prepare a proposal, but only if McTigue confirmed that it had notified Freedenfeld that it had been terminated, that Freedenfeld had been paid for the design services to date, and that McTigue had the right to use the Freedenfeld design information.

On or about July 6, 1999, Cormier prepared and submitted a draft of a design proposal to McCarty for review and comment. The proposal was limited to architectural services only, including review of documents and savings, conceptual drawings, and construction documents and administration. Structural, mechanical, electrical, plumbing were a part of the draft proposal as estimated engineering fees.

On or about July 14, 1999, Cormier met with McCarty and Bennett, at which time Cormier was provided with a set of the drawings that had been prepared by Freedenfeld. The documents provided at that time appeared to be progress prints dated May 14, 1999 and June 21, 1999.

On or about July 23, 1999, Edward Cormier attended a meeting with Dan McCarty, Michael McTigue, and Walter Bennett at the office of McCarty Associates, Inc. At that time, Cormier was advised by McTigue that Freedenfeld had been notified in writing of the termination of his services, that Freedenfeld had been paid for his services, and that McTigue had the right to use the designs generated by Freedenfeld. In reliance upon these assurances, Cormier agreed to provide design services for the project. McTigue advised that many areas of the Freedenfeld layout did not meet McTigue's requirements. Therefore, Cormier agreed to design a plan that reflected those requirements.

Following Cormier's formal retention, Cormier had periodic meetings with McTigue, McCarty, and Bennett as the plans were reviewed and revised throughout the redesign, permitting, and construction phases of the project. The exact dates and the matters discussed cannot be stated with particularity at this time.

**INTERROGATORY NO. 3**

*If you or anyone on your behalf had any communication in any form, written or oral, with any of the other defendants named in this action or any person acting on their behalf relating to or concerning any of the facts, events, occurrences or allegations set forth in the Complaint, please state:*

a. *The specific date and time (if applicable) of each such communication;*

b. *The manner in which each such communication was made on each of the dates listed in your answer to subpart a. of this interrogatory, i.e., whether by telephone, letter, face-to-face conversation, etc.;*

c. *The name and address of all persons who engaged or in any way participated in each such communication listed in your answer to subpart a. of this interrogatory; and*

d. *In full and complete detail of the entire contents of each such communication made on each of the dates listed in your answer to subpart a. of this interrogatory, indicating what was said or communicated by each of the persons listed in your answer to subpart c.*

*If any of these communications were in written form, you may respond by attaching a copy of such communications to your answers to these interrogatories.*

**Response:**  Cormier incorporates its objections to Interrogatory No. 2 as its objections to Interrogatory No. 3.  Answering further, Cormier responds:

None other than those disclosed in response to Interrogatory No. 2.


**INTERROGATORY NO. 4**

*If you or anyone on your behalf had any communication in any form, written or oral, with the Publishers of Veterinary Economics Magazine or any person acting on its behalf relating to or concerning any of the facts, events, occurrences or allegations set forth in the Complaint, please state:*

a. *The specific date and time (if applicable) of each such communication;*

b. *The manner in which each such communication was made on each of the dates listed in your answer to subpart a. of this interrogatory, i.e., whether by telephone, letter, face-to-face conversation, etc.;*

c. *The name and address of all persons who engaged or in any way participated in each such communication listed in your answer to subpart a. of this interrogatory; and*

d. *In full and complete detail of the entire contents of each such communication made on each of the dates listed in your answer to subpart a. of this interrogatory, indicating what was said or communicated by each of the persons listed in your answer to subpart c.*

*If any of these communications were in written form, you may respond by attaching a copy of such communications to your answers to these interrogatories.*

**Response:**  Cormier did not have any communications with the publishers of Veterinary Economics Magazine.

**INTERROGATORY NO. 5**

*Please identify all plans, drawings, sketches, and other design related documents created by Cormier in connection with the Project or any of the structures at the Property and state the name and address of the person who created each such document.*

**Response:**    Objection.  In the wake of the court's ruling of February 9, 2006 and the corresponding order of February 13, 2006, this interrogatory addresses matters that are irrelevant to what remains of the plaintiff's complaint, and is not reasonably calculated to lead to the discovery of admissible evidence. Further objecting, as all copyright infringement claims have been dismissed from this action and this information is not relevant to the only claim remaining in this litigation, this interrogatory is overbroad and unduly burdensome.

Subject to and without waiving this objection, this defendant identifies the following design drawings that were created by Edward D. Cormier in connection with the Project:

| Document No. | Title of Document | Date |
|---|---|---|
| A001 | Title Sheet | 8/9/1999 |
| A100 | First Floor Plan | 8/9/1999 |
| A101 | First Floor Dimension Plan | 8/9/1999 |
| A102 | Basement Floor & Ceiling Plan | 8/9/1999 |
| A103 | Roof Plan & Details | 8/9/1999 |
| A104 | First Floor Reflected Ceiling Plan | 8/9/1999 |
| A105 | First Floor - Floor Finish Plan | 8/9/1999 |
| A200 | Front and Right Side Elevations | 8/9/1999 |
| A201 | Rear and Left Side Elevations | 8/9/1999 |
| A300 | Sections #1 & #2 | 8/9/1999 |
| A301 | Wall Sections | 8/9/1999 |
| A302 | Wall Sections | 8/9/1999 |
| A303 | Wall Sections & Details | 8/9/1999 |
| A500 | Door Schedule & Details | 8/9/1999 |
| A501 | Room Finish Schedule | 8/9/1999 |
| A600 | Miscellaneous Details & Wall Types | 8/9/1999 |
| A-A1 | Alternate Truss Plan & Details | 10/7/1999 |
| A-A1a | Alternate Truss Plan & Details | 10/7/1999 |
| A111 | Reception Area Plan & Elevations | ● |
| SK100 | Partial Floor Plan | ● |
| SK101 | Partial Reflected Ceiling Plan | ● |
| SK102 | Partial Plan at Grooming Room | ● |
| SK103 | Partial Basement Plan | ● |
| SK103A | Partial Plan at Basement | ● |
| S001 | General Notes and Typical Details | 8/9/1999 |
| S100 | Foundation Plan | 8/9/1999 |
| S101 | First Floor Framing Plan & Truss Types | 8/9/1999 |
| S102 | Roof Framing Plan | 8/9/1999 |

| Document No. | Title of Document | Date |
|---|---|---|
| S300 | Sections Details | 8/9/1999 |
| T-1 | Kennel Title Sheet | ● |
| A-1 | Kennel Floor Plan & Rear Elevation | ● |
| A-2 | Kennel Roof Plan & Side Elevation | ● |
| A-3 | Kennel Wall Section | ● |
| S-1 | Kennel Foundation & Roof Framing Plan | ● |

In addition to the foregoing plans, prior draft editions of various individual drawings were revised and discarded in the routine course of the design process.  Additionally, some of the foregoing drawings were revised at various times and as indicated on the drawings themselves.

**INTERROGATORY NO. 6**
*Please identify any documents which Cormier submitted to the City of Gardner relative to the Project or the Property and include in your answer:*
> *a.    The date each document was submitted;*
> *b.    the purpose for which each document was submitted; and*
> *c.    the creator of each document.*

**Response:**    Cormier did not submit any documents to the City of Gardner.

**INTERROGATORY NO. 7**
*Please identify each and every complaint made against you, excluding this litigation. For the purposes of this interrogatory, a complaint is a court filing, administrative filing, criminal complaint, government filing, or communication, written or oral, seeking payment for any wrong allegedly committed.*

**Response:**    Objection.  This interrogatory addresses matters that are irrelevant to the issues raised in what remains of the plaintiff's complaint, nor is it reasonably calculated to lead to the discovery of admissible evidence.

**INTERROGATORY NO. 8**
*Please state the basis of each and every Affirmative Defense set forth in your Answer to the Complaint.*

**Response:**    As to Defendant's First Affirmative Defense, the factual basis includes, but is not limited to, the combination of the lack of evidence to support the Plaintiff's allegations, either as to liability or damages.

As to Defendant's Second Affirmative Defense, the factual basis includes, but is not limited to, the Plaintiff's own conduct, in particular, but not limited to, its inaction in the wake of the open and obvious construction of the Gardner Animal Hospital, and its decision to resolve all ownership claims related to the plans by means of a binding contractual agreement.

As to Defendant's Third Affirmative Defense, the factual basis includes, but is not limited to, the anticipated lack of evidence of a key element of recovery under the Lanham Act.

As to Defendant's Fourth Affirmative Defense, the factual basis includes, but is not limited to, a potential lack of evidence regarding plaintiff's status as a successor to Warren Freedenfeld & Associates, Inc.

As to Defendant's Fifth Affirmative Defense, the factual basis includes, but is not limited to, the evidence and arguments set forth in this defendant's previously filed motion to dismiss, as well as evidence expected to be elicited from witnesses concerning the same.

As to Defendant's Sixth Affirmative Defense, the factual basis includes, but is not limited to, a comparison between drawings by Freedenfeld with drawings by Cormier and testimony expected to be elicited concerning said drawings.

As to Defendant's Seventh Affirmative Defense, the factual basis includes, but is not limited to, a potential lack of evidence of a key element of recovery under the Lanham Act.

As to Defendant's Eighth Affirmative Defense, the factual basis includes, but is not limited to, Exhibit H to the Plaintiff's complaint and testimony expected to be elicited from all parties to said agreement.

Defendant Cormier Associates, Inc. reserves the right to supplement this answer with additional affirmative defenses and evidence as revealed by discovery that has yet to occur at the time of the filing of these interrogatory responses.

## INTERROGATORY NO. 9

*If it is your position that Freedenfeld did not solely produce all the plans or design documents related to the Project, please identify in complete detail the elements of the plans or designs which were solely created by Cormier or any person or entity acting on its behalf without any input from Freedenfeld and identify and state in your answer:*
  a.   *The title of the design or drawing;*
  b.   *The date(s) when such elements were created;*
  c.   *Whether such elements were rejected or accepted by GAH;*
  d.   *Whether such elements were incorporated in the plans or design drawings for the Project; and*
  e.   *The name of the person or persons who created such elements.*

**Response:**   Objection.   In the wake of the court's ruling of February 9, 2006 and the corresponding order of February 13, 2006, this interrogatory addresses matters that are irrelevant to what remains of the plaintiff's complaint, and is not reasonably calculated to lead to the discovery of admissible evidence.  Further objecting, as all copyright infringement claims have been dismissed from this action and this information is not relevant to the only claim remaining in this litigation, this interrogatory is overbroad and unduly burdensome.

Subject to and without waiving the foregoing and the general objections, Cormier states the following: See response to Interrogatory No. 5 for the titles, dates, and authors of drawings produced by Cormier in connection with the Project. All of the drawings referenced in Interrogatory No. 5 are final drawings that incorporated the requirements of the Project and their corresponding elements, all as dictated by Michael McTigue. At no time did Freedenfeld have any input into the drawings identified in Interrogatory No. 5.

## INTERROGATORY NO. 10

*Please state whether you advertised or marketed your involvement in the Project in any print, television, radio, mail, e-mail, internet or other media and identify:*

       *a.     The date of such advertisements;*
       *b.     Where such advertisements appeared;*
       *c.     The person or entity who created such advertisements;*
       *d.     The name and address or all persons who approved such advertisements or marketing material;*
       *e.     The name and address of each person or entity that received or viewed such advertisements, if available.*

**Response:**    Cormier did not advertise or market its involvement in the Project in any print, television, radio, e-mail, internet or other media.

## INTERROGATORY NO. 11

*Please state in detail how you came to be involved in the Project, and identify the date when you first became involved.*

**Response:**    See response to Interrogatory No. 2.

## INTERROGATORY NO. 12

*Please state in detail whether you were ever provided with any plans or design documents that were prepared by Freedenfeld relative to the Project and identify the title of each such document, and the name and address of the persons or entities that provided you with such design documents, and the dates when such documents were provided.*

**Response:**    Objection. In the wake of the court's ruling of February 9, 2006 and the corresponding order of February 13, 2006, this interrogatory addresses matters that are irrelevant to what remains of the plaintiff's complaint, and is not reasonably calculated to lead to the discovery of admissible evidence. Further objecting, as all copyright infringement claims have been dismissed from this action and this information is not relevant to the only claim remaining in this litigation, this interrogatory is overbroad and unduly burdensome.

Subject to and without waiving the foregoing and the general objections, Cormier states the following: On or about July 14, 1999, Dan McCarty of McCarty Associates

provided Edward D. Cormier with the following, which appeared to be progress prints:

| Document No. | Title of Document | Date |
|---|---|---|
| A1.1 | Basement Plan | 14 May 1999 |
| A2.1 | First Floor Plan | 14 May 1999 |
| A3.1 | Roof Plan | 21 Jun 1999 |
| A4.1 | Exterior Elevations | 21 Jun 1999 |
| A4.2 | Exterior Elevations | 21 Jun 1999 |
| A5.1 | Building Sections | 21 Jun 1999 |
| A9.2 | Finish Schedule | 14 May 1999 |

## INTERROGATORY. NO. 13

*Please identify all design awards that you received relative to your involvement in the Project or the design of any of the buildings on the Property, and in your answer please identify the title of each such award, date of each award, and the name, address and telephone number of the awarding authority, entity, or person.*

**Response:**    Upon information and belief, Gardner Animal Hospital received a Merit Award from the publishers of Veterinary Economics Magazine in connection with the Project. However, Cormier itself was not the direct recipient of any design awards relative to its involvement in the Project or the design of any of the buildings on the Property.

## INTERROGATORY NO. 14

*Please state whether you were named or covered under any policy of liability insurance effective on the date of the occurrence alleged in the Complaint and, if so, state the name of each such company, each such policy number, the effective period and the maximum liability limits for each such policy.*

**Response:**    Objection. This interrogatory is vague, as the complaint does not contain a "date of occurrence."

Answering further, Edward D. Cormier Associates, Inc. was named as an insured under a liability insurance policy issued by Travelers Property Casualty, policy number I-660-490R4568-TIA-99, with effective dates of August 17, 1999 to August 17, 2000 and applicable limits of insurance of $1,000,000. Travelers Property Casualty has issued a reservation of rights letter to Cormier in connection with the present litigation.

## INTERROGATORY NO. 15

*Please state the date in which you provided any of the plans, drawing, or other documents created by Freedenfeld in connection with the Project to any of the following parties:*
*a.    Bennett;*
*b    The Publishers of Veterinary Economic Magazine; and*

c.       Any other person, firm, or entity concerning or relating to the Project.

**Response:**    Cormier did not provide any plans, drawings, or other documents created by Freedenfeld in connection with the Project to Bennett, the Publishers of Veterinary Economic Magazine, or any other person, firm, or entity.


## INTERROGATORY NO. 16

*Please state whether you incorporated any elements of the plans or design drawings created by Freedenfeld relative to Project in any plans or design documents that you created for the Project or for any of the structures on the Property, specifying each such element copied.*

**Response:**    Objection.   In the wake of the court's ruling of February 9, 2006 and the corresponding order of February 13, 2006, this interrogatory addresses matters that are irrelevant to what remains of the plaintiff's complaint, and is not reasonably calculated to lead to the discovery of admissible evidence.  Further objecting, as all copyright infringement claims have been dismissed from this action and this information is not relevant to the only claim remaining in this litigation, this interrogatory is overbroad and unduly burdensome.

Subject to and without waiving the foregoing and the general objections, Cormier answers further:  Although McCarty initially provided Cormier with progress prints apparently drafted by Freedenfeld for purposes of securing suggestions that might bring the proposed project under budget, it is Cormier's belief that McTigue was so dissatisfied with Freedenfeld's proposed designs that Freedenfeld was terminated. The entire Project was then reworked by Cormier independent of Freedenfeld. Although there are elements that are common to the Freedenfeld progress prints and the final design drawings by Cormier, i.e. both incorporate structures that have roofs, walls, windows, doors, etc. that would be common to any structure, in reality the entire project had to be redone from scratch to embody McTigue's vision for the renovated Gardner Animal Hospital.   No element of Freedenfeld's plans was specifically copied, and the final product of Cormier's efforts differs significantly from the progress prints of Freedenfeld.


## INTERROGATORY NO. 17

*Please state the name and address of each person whom you expect to call as a witness at the time of trial and include in your answer the anticipated subject matter of each such person's testimony.*

**Response:**    Cormier has not yet decided whom it will call as a witness at the time of trial, and reserves the right to supplement this answer in a timely fashion.

Answering further, it is anticipated that Warren Freedenfeld, Edward D. Cormier, Michael McTigue, Dan McCarty, and Walter Bennett would be called as witnesses at trial.

**INTERROGATORY NO. 18**

*If you expect to call an expert witness(es) at trial, please state:*

    a.    *the name, business address and field of expertise of each such person;*

    b.    *the subject matter on which each expert is expected to testify;*

    c.    *the substance of the facts and opinions to which each expert is expected to testify; and*

    d.    *a summary of the grounds for each such opinion.*

**Response:**    Cormier has not yet decided what person or persons it will call as an expert witness or witnesses at the time of trial, and reserves the right to supplement this answer in a timely fashion.

Under penalties of perjury, the undersigned certifies that the foregoing answers are true.

Dated: April 28, 2006

Edward D. Cormier
Administration Manager
Edward D. Cormier Associates, Inc.

As to objections:

Dated: April 29, 2006

Stephen D. Rosenberg  BBO#558415
Eric L. Brodie  BBO#639833
THE McCORMACK FIRM, LLC
One International Place - 7th Floor
Boston, MA    02110
Ph:    617•951•2929
Fax:   617•951•2672

## CERTIFICATE OF SERVICE

I hereby certify that today, May __02__, 2006, I served a copy of Defendant Edward D. Cormier Associates, Inc.'s Responses and Objections to Plaintiff's First Set of Interrogatories upon all counsel of record via first class mail to:

Barry S. Scheer, Esq.
Garrett J. Lee, Esq.
**Parker Scheer, LLP**
One Constitution Center
Boston, MA     02129

Robert D. City, Esq.
Michael J. Dissette, Esq.
**City, Hayes & Dissette, PC**
50 Congress Street
Boston, MA     02109

Robert N. Meltzer, Esq.
P.O. Box 1459
Framingham, MA   01701

Mary C. Casey, Esq.
**Harbor Law Group**
385 South Street
Shrewsbury, MA     01545

_____
Eric L. Brodie

84167.1

<u>**Exhibit I**</u>

**Abbreviated Form of Agreement
Between Owner and Architect
March 24, 1998**

T H E   A M E R I C A N   I N S T I T U T E   O F   A R C H I T E C T S



*AIA Document B151*

# Abbreviated Form of Agreement Between Owner and Architect

*for Construction Projects of Limited Scope*

### 1987 EDITION

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES; CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION.*

## AGREEMENT

made as of the     24th     day of     March     in the year of Nineteen Hundred and Ninety Eight

**BETWEEN** the Owner:
*(Name and address)*

Mike McTigue, DVM
GARDNER ANIMAL HOSPITAL
7 Pearson Boulevard
Gardner, MA  01440

and the Architect:
*(Name and address)*

WARREN FREEDENFELD & ASSOCIATES INC.
39 Church Street
Boston, MA  02116

For the following Project:    GARDNER ANIMAL HOSPITAL
*(Include detailed description of Project, location, address and scope.)*

Project Location:      2 acres of existing 19 acre lot
                    Typanny Road / Route 68
                    (Across from Walmart)
                    Gardner, Massachusetts

Scope of Work    :      New veterinary facility

The Owner and Architect agree as set forth below.

Copyright 1974, 1978, ©1987 by The American Institute of Architects, 1735 New York Avenue, N.W., Washington, D.C. 20006.
Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the
copyright laws of the United States and will be subject to legal prosecution.

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

---

## TERMS AND CONDITIONS OF AGREEMENT BETWEEN OWNER AND ARCHITECT

---

## ARTICLE 1
## ARCHITECT'S RESPONSIBILITIES

### 1.1 ARCHITECT'S SERVICES

**1.1.1** The Architect's services consist of those services performed by the Architect, Architect's employees and Architect's consultants as enumerated in Articles 2 and 3 of this Agreement and any other services included in Article 12.

**1.1.2** The Architect's services shall be performed as expeditiously as is consistent with professional skill and care and the orderly progress of the Work.

**1.1.3** The services covered by this Agreement are subject to the time limitations contained in Subparagraph 11.5.1.

## ARTICLE 2
## SCOPE OF ARCHITECT'S BASIC SERVICES

### 2.1 DEFINITION

**2.1.1.** The Architect's Basic Services consist of those described under the three phases identified below, any other services identified in Article 12, and include normal structural, mechanical and electrical engineering services.

### 2.2 DESIGN PHASE

**2.2.1** The Architect shall review with the Owner alternative approaches to design and construction of the Project.

**2.2.2** Based on the mutually agreed-upon program, schedule and construction budget requirements, the Architect shall prepare, for approval by the Owner, Design Documents consisting of drawings and other documents appropriate for the Project, and shall submit to the Owner a preliminary estimate of Construction Cost.

### 2.3 CONSTRUCTION DOCUMENTS PHASE

**2.3.1** Based on the approved Design Documents, the Architect shall prepare, for approval by the Owner, Construction Documents consisting of Drawings and Specifications setting forth in detail the requirements for the construction of the Project and shall advise the Owner of any adjustments to previous preliminary estimates of Construction Cost.

**2.3.2** The Architect shall assist the Owner in connection with the Owner's responsibility for filing documents required for the approval of governmental authorities having jurisdiction over the Project.

**2.3.3** Unless provided in Article 12, the Architect, following the Owner's approval of the Construction Documents and of the latest preliminary estimate of Construction Cost, shall assist the Owner in obtaining bids or negotiated proposals and assist in awarding and preparing contracts for construction.

### 2.4 CONSTRUCTION PHASE—ADMINISTRATION OF THE CONSTRUCTION CONTRACT

**2.4.1** The Architect's responsibility to provide Basic Services for the Construction Phase under this Agreement commences with the award of the Contract for Construction and terminates at the earlier of issuance to the Owner of the final Certificate for Payment or 60 days after the date of Substantial Completion of the Work.

**2.4.2** The Architect shall provide administration of the Contract for Construction as set forth below and in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.

**2.4.3** Duties, responsibilities and limitations of authority of the Architect shall not be restricted, modified or extended without written agreement of the Owner and Architect with consent of the Contractor, which consent shall not be unreasonably withheld.

**2.4.4** The Architect shall be a representative of and shall advise and consult with the Owner (1) during construction until final payment to the Contractor is due and (2) as an Additional Service at the Owner's direction from time to time during the correction period described in the Contract for Construction.

**2.4.5** The Architect shall visit the site at intervals appropriate to the stage of construction or as otherwise agreed by the Owner and Architect in writing to become generally familiar with the progress and quality of the Work completed and to determine in general if the Work is being performed in a manner indicating that the Work when completed will be in accordance with the Contract Documents. However, the Architect shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. On the basis of on-site observations as an architect, the Architect shall keep the Owner informed of the progress and quality of the Work, and shall endeavor to guard the Owner against defects and deficiencies in the Work. *(More extensive site representation may be agreed to as an Additional Service, as described in Paragraph 3.2.)*

**2.4.6** The Architect shall not have control over or charge of and shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's responsibility under the Contract for Construction. The Architect shall not be responsible for the Contractor's schedules or failure to carry out the Work in accordance with the Contract Documents. The Architect shall not have control over or charge of acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons performing portions of the Work.

**2.4.7** The Architect shall at all times have access to the Work wherever it is in preparation or progress.

**2.4.8** Based on the Architect's observations and evaluations of the Contractor's Applications for Payment, the Architect shall review and certify the amounts due the Contractor.

**2.4.9** The Architect's certification for payment shall constitute a representation to the Owner, based on the Architect's observations at the site as provided in Subparagraph 2.4.5 and on the

---

**AIA DOCUMENT B151** • ABBREVIATED OWNER-ARCHITECT AGREEMENT • THIRD EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**B151-1987    2**

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

data comprising the Contractor's Application for Payment, that the Work, to the best of the Architect's knowledge, information and belief, has progressed to the point indicated and that quality of the Work is in accordance with the Contract Documents. The issuance of a Certificate for Payment shall not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment or (4) ascertained how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

**2.4.10** The Architect shall have authority to reject Work which does not conform to the Contract Documents and will have authority to require additional inspection or testing of the Work whenever, in the Architect's reasonable opinion, it is necessary or advisable for the implementation of the intent of the Contract Documents.

**2.4.11** The Architect shall review and approve or take other appropriate action upon Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action shall be taken with such reasonable promptness as to cause no delay. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component. When professional certification of performance characteristics of materials, systems or equipment is required by the Contract Documents, the Architect shall be entitled to rely upon such certification to establish that the materials, systems or equipment will meet the performance criteria required by the Contract Documents.

**2.4.12** The Architect shall prepare Change Orders and Construction Change Directives, with supporting documentation and data if authorized or confirmed in writing by the Owner as provided in Paragraphs 3.1 and 3.3, for the Owner's approval and execution in accordance with the Contract Documents, and may authorize minor changes in the Work not involving an adjustment in the Contract Sum or an extension of the Contract Time which are not inconsistent with the intent of the Contract Documents.

**2.4.13** The Architect shall conduct inspections to determine the dates of Substantial Completion and final completion and shall issue a final Certificate for Payment.

**2.4.14** The Architect shall interpret and decide matters concerning performance of the Owner and Contractor under the requirements of the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests shall be made with reasonable promptness and within any time limits agreed upon. When making such interpretations and initial decisions, the Architect shall endeavor to secure faithful performance by both Owner and Contractor, shall not show partiality to either, and shall not be liable for results of interpretations or decisions so rendered in good faith.

## ARTICLE 3
## ADDITIONAL SERVICES

**3.1** Additional Services shall be provided if authorized or confirmed in writing by the Owner or if included in Article 12, and

they shall be paid for by the Owner as provided in this Agreement. Such Additional Services shall include, in addition to those described in Paragraphs 3.2 and 3.3, budget analysis, financial feasibility studies, planning surveys, environmental studies, measured drawings of existing conditions, coordination of separate contractors or independent consultants, coordination of construction or project managers, detailed Construction Cost estimates, quantity surveys, interior design, planning of tenant or rental spaces, inventories of materials or equipment, preparation of record drawings, and any other services not otherwise included in this Agreement under Basic Services or not customarily furnished in accordance with generally accepted architectural practice.

**3.2** If more extensive representation at the site than is described in Subparagraph 2.4.5 is required, such additional project representation shall be provided and paid for as set forth in Articles 11 and 12.

**3.3** As an Additional Service in connection with Change Orders and Construction Change Directives, the Architect shall prepare Drawings, Specifications and other documentation and data, evaluate Contractor's proposals, and provide any other services made necessary by such Change Orders and Construction Change Directives.

## ARTICLE 4
## OWNER'S RESPONSIBILITIES

**4.1** The Owner shall provide full information, including a program which shall set forth the Owner's objectives, schedule, constraints, budget with reasonable contingencies, and criteria.

**4.2** The Owner shall furnish surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, a written legal description of the site and the services of geotechnical engineers or other consultants when such services are requested by the Architect.

**4.3** The Owner shall furnish structural, mechanical, chemical, air and water pollution tests, tests for hazardous materials, and other laboratory and environmental tests, inspections and reports required by law or the Contract Documents.

**4.4** The Owner shall furnish all legal, accounting and insurance counseling services as may be necessary at any time for the Project, including auditing services the Owner may require to verify the Contractor's Applications for Payment or to ascertain how or for what purposes the Contractor has used the money paid by the Owner.

**4.5** The foregoing services, information, surveys and reports shall be furnished at the Owner's expense, and the Architect shall be entitled to rely upon the accuracy and completeness thereof.

**4.6** Prompt written notice shall be given by the Owner to the Architect if the Owner becomes aware of any fault or defect in the Project or nonconformance with the Contract Documents.

**4.7** The proposed language of certificates or certifications requested of the Architect or Architect's consultants shall be submitted to the Architect for review and approval at least 14 days prior to execution.

**AIA DOCUMENT B151** • ABBREVIATED OWNER-ARCHITECT AGREEMENT • THIRD EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

## ARTICLE 5
## CONSTRUCTION COST

### 5.1 DEFINITION

**5.1.1** The Construction Cost shall be the total cost or estimated cost to the Owner of all elements of the Project designed or specified by the Architect.

**5.1.2** The Construction Cost shall include the cost at current market rates of labor and materials furnished by the Owner and equipment designed, specified, selected or specially provided for by the Architect, plus a reasonable allowance for the Contractor's overhead and profit. In addition, a reasonable allowance for contingencies shall be included for market conditions at the time of bidding and for changes in the Work during construction.

**5.1.3** Construction Cost does not include the compensation of the Architect and Architect's consultants, the costs of the land, rights-of-way, financing or other costs which are the responsibility of the Owner as provided in Article 4.

### 5.2 RESPONSIBILITY FOR CONSTRUCTION COST

**5.2.1** It is recognized that neither the Architect nor the Owner has control over the cost of labor, materials or equipment, over the Contractor's methods of determining bid prices, or over competitive bidding, market or negotiating conditions. Accordingly, the Architect cannot and does not warrant or represent that bids or negotiated prices will not vary from any estimate of Construction Cost or evaluation prepared or agreed to by the Architect.

**5.2.2** No fixed limit of Construction Cost shall be established as a condition of this Agreement by the furnishing, proposal or establishment of a Project budget, unless a fixed limit has been agreed upon in writing and signed by the parties hereto. Fixed limits, if any, shall be increased in the amount of an increase in the Contract Sum occurring after execution of the Contract for Construction.

**5.2.3** Any Project budget or fixed limit of Construction Cost may be adjusted to reflect changes in the general level of prices in the construction industry between the date of submission of the Construction Documents to the Owner and the date on which proposals are sought.

**5.2.4** If a fixed limit of Construction Cost is exceeded by the lowest bona fide bid or negotiated proposal, the Owner shall:

.1 give written approval of an increase in such fixed limit;

.2 authorize rebidding or renegotiating of the Project within a reasonable time;

.3 if the Project is abandoned, terminate in accordance with Paragraph 8.3; or

.4 cooperate in revising the Project scope and quality as required to reduce the Construction Cost.

**5.2.5** If the Owner chooses to proceed under Clause 5.2.4.4, the Architect, without additional charge, shall modify the Contract Documents as necessary to comply with the fixed limit, if established as a condition of this Agreement. The modification of Contract Documents shall be the limit of the Architect's responsibility arising out of the establishment of a fixed limit. The Architect shall be entitled to compensation in accordance with this Agreement for all services performed whether or not the Construction Phase is commenced.

## ARTICLE 6
## USE OF ARCHITECT'S DRAWINGS, SPECIFICATIONS AND OTHER DOCUMENTS

**6.1** The Drawings, Specifications and other documents prepared by the Architect for this Project are instruments of the Architect's service for use solely with respect to this Project, and the Architect shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright. The Owner shall be permitted to retain copies, including reproducible copies, of the Architect's Drawings, Specifications and other documents for information and reference in connection with the Owner's use and occupancy of the Project. The Architect's Drawings, Specifications or other documents shall not be used by the Owner or others on other projects, for additions to this Project or for completion of this Project by others, unless the Architect is adjudged to be in default under this Agreement, except by agreement in writing and with appropriate compensation to the Architect.

**6.2** Submission or distribution of documents to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the Architect's reserved rights.

## ARTICLE 7
## ARBITRATION

**7.1** Claims, disputes or other matters in question between the parties to this Agreement arising out of or relating to this Agreement or breach thereof shall be subject to and decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise. No arbitration arising out of or relating to this Agreement shall include, by consolidation, joinder or in any other manner, an additional person or entity not a party to this Agreement, except by written consent containing a specific reference to this Agreement signed by the Owner, Architect, and any other person or entity sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by the parties to this Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

**7.2** In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of limitations.

**7.3** The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

## ARTICLE 8
## TERMINATION, SUSPENSION OR ABANDONMENT

**8.1** This Agreement may be terminated by either party upon not less than seven days' written notice should the other party

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

fail substantially to perform in accordance with the terms of this Agreement through no fault of the party initiating the termination.

**8.2** If the Project is suspended by the Owner for more than 30 consecutive days, the Architect shall be compensated for services performed prior to notice of such suspension. When the Project is resumed, the Architect's compensation shall be equitably adjusted to provide for expenses incurred in the interruption and resumption of the Architect's services.

**8.3** This Agreement may be terminated by the Owner upon not less than seven days' written notice to the Architect in the event that the Project is permanently abandoned. If the Project is abandoned by the Owner for more than 90 consecutive days, the Architect may terminate this Agreement by giving written notice.

**8.4** Failure of the Owner to make payments to the Architect in accordance with this Agreement shall be considered substantial nonperformance and cause for termination.

**8.5** If the Owner fails to make payment when due the Architect for services and expenses, the Architect may, upon seven days' written notice to the Owner, suspend performance of services under this Agreement. Unless payment in full is received by the Architect within seven days of the date of the notice, the suspension shall take effect without further notice. In the event of a suspension of services, the Architect shall have no liability to the Owner for delay or damage caused the Owner because of such suspension of services.

**8.6** In the event of termination not the fault of the Architect, the Architect shall be compensated for services performed prior to termination, together with Reimbursable Expenses then due and all Termination Expenses.

**8.7** Termination Expenses are in addition to compensation for Basic and Additional Services, and include expenses which are directly attributable to termination.

## ARTICLE 9
## MISCELLANEOUS PROVISIONS

**9.1** Unless otherwise provided, this Agreement shall be governed by the law of the principal place of business of the Architect.

**9.2** Terms in this Agreement shall have the same meaning as those in AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.

**9.3** Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion, or the date of issuance of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion.

**9.4** The Owner and Architect waive all rights against each other and against the contractors, consultants, agents and employees of the other for damages, but only to the extent covered by property insurance during construction, except such rights as they may have to the proceeds of such insurance as set forth in the edition of AIA Document A201, General Con-

ditions of the Contract for Construction, current as of the date of this Agreement. The Owner and Architect each shall require similar waivers from their contractors, consultants and agents.

**9.5** The Owner and Architect, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Agreement and to the partners, successors, assigns and legal representatives of such other party with respect to all covenants of this Agreement. Neither Owner nor Architect shall assign this Agreement without the written consent of the other.

**9.6** This Agreement represents the entire and integrated agreement between the Owner and Architect and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Architect.

**9.7** Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Owner or Architect.

**9.8** The Architect and Architect's consultants shall have no responsibility for the discovery, presence, handling, removal or disposal of or exposure of persons to hazardous materials in any form at the Project site, including but not limited to asbestos, asbestos products, polychlorinated biphenyl (PCB) or other toxic substances.

## ARTICLE 10
## PAYMENTS TO THE ARCHITECT

### 10.1 DIRECT PERSONNEL EXPENSE

**10.1.1** Direct Personnel Expense is defined as the direct salaries of the Architect's personnel engaged on the Project and the portion of the cost of their mandatory and customary contributions and benefits related thereto, such as employment taxes and other statutory employee benefits, insurance, sick leave, holidays, vacations, pensions and similar contributions and benefits.

### 10.2 REIMBURSABLE EXPENSES

**10.2.1** Reimbursable Expenses include expenses incurred by the Architect in the interest of the Project for:

.1 expense of transportation and living expenses in connection with out-of-town travel authorized by the Owner;

.2 long-distance communications;

.3 fees paid for securing approval of authorities having jurisdiction over the Project;

.4 reproductions;

.5 postage and handling of Drawings and Specifications;

.6 expense of overtime work requiring higher than regular rates, if authorized by the Owner;

.7 renderings and models requested by the Owner;

.8 expense of additional insurance coverage or limits, including professional liability insurance, requested by the Owner in excess of that normally carried by the Architect and Architect's consultants; and

.9 ~~expense of computer-aided design and drafting equipment time when used in connection with the Project.~~



**AIA DOCUMENT B151** • ABBREVIATED OWNER-ARCHITECT AGREEMENT • THIRD EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

### 10.3 PAYMENTS ON ACCOUNT OF BASIC SERVICES

**10.3.1** An initial payment as set forth in Paragraph 11.1 is the minimum payment under this Agreement.

**10.3.2** Subsequent payments for Basic Services shall be made monthly and, where applicable, shall be in proportion to services performed within each phase of service.

**10.3.3** If and to the extent that the time initially established in Subparagraph 11.5.1 of this Agreement is exceeded or extended through no fault of the Architect, compensation for any services rendered during the additional period of time shall be computed in the manner set forth in Subparagraph 11.3.2.

**10.3.4** When compensation is based on a percentage of Construction Cost and any portions of the Project are deleted or otherwise not constructed, compensation for those portions of the Project shall be payable to the extent services are performed on those portions, in accordance with the schedule set forth in Sub-paragraph 11.2.2, based on (1) the lowest bona fide bid or negotiated proposal, or (2) if no such bid or proposal is received, the most recent preliminary estimate of Construction Cost or detailed estimate of Construction Cost for such portions of the Project.

### 10.4 PAYMENTS ON ACCOUNT OF ADDITIONAL SERVICES AND REIMBURSABLE EXPENSES

**10.4.1** Payments on account of the Architect's Additional Services and for Reimbursable Expenses shall be made monthly upon presentation of the Architect's statement of services rendered or expenses incurred.

### 10.4 PAYMENTS WITHHELD

**10.5.1** No deductions shall be made from the Architect's compensation on account of sums withheld from payments to contractors.

## ARTICLE 11
## BASIS OF COMPENSATION

The owner shall compensate the Architect as follows:

**11.1** AN INITIAL PAYMENT OF Three Thousand Dollars ( $3, 000.00 ) shall be made upon execution of this Agreement and credited to the Owner's account at final payment.

### 11.2 BASIC COMPENSATION

**11.2.1** FOR BASIC SERVICES, as described in Article 2, and any other services included in Article 12 as part of Basic Services, Basic Compensation shall be computed as follows:
*(Insert basis of compensation, including stipulated sums, multiples or percentages, and identify phases to which particular methods of compensation apply, if necessary.)*

The Base Fee for Architectural Services shall be $9.00 per gross square foot area of the Project.

See Article 12 for Engineering Services  ½ sq/ft unfinished space ( basement, attic) or empty & COVERED EXTERIOR



**11.2.2** Where compensation is based on a stipulated sum or percentage of Construction Cost, progress payments for Basic Services in each phase shall total the following percentages of the total Basic Compensation payable:

| | | |
|---|---|---|
| Programming | @ | $1,500.00 |
| Design Phase: | @ | 35% of Total Base Fee  less ($1,500.00)<br>(i.e. 35% x $9.00 x s. f. area of Approved Project Program) |
| Construction Documents Phase | @ | 50% of Total Base Fee<br>(i.e. 50% x $9.00 x s. f. area of Approved Project Floor Plan) |
| Construction Phase | @ | 15% of Total Base Fee<br>(i.e. 15% x $9.00 x s.f. area of Project under construction) |
| Total Basic Compensation | @ | 100% of Total Base Fee |

**AIA DOCUMENT B151** • ABBREVIATED OWNER-ARCHITECT AGREEMENT • THIRD ADDITION • AIA® • © 1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**B151-1987  6**

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

**11.3    COMPENSATION FOR ADDITIONAL SERVICES**

**11.3.1**  FOR PROJECT REPRESENTATION BEYOND BASIC SERVICES, as described in paragraph 3.2, compensation shall be computed as follows:

| | | |
|---|---|---|
| Principal Time | @ | $120.00 per Hour |
| Associate Time | @ | 110.00 per Hour |
| Project Manager Time | @ | 100.00 per Hour |
| Technical Designer Time | @ | 90.00 per Hour |
| Draftsman Time | @ | 80.00 per Hour |
| Secretarial Time | @ | 70.00 per Hour |
| Consultant Time | @ | 1.2x Direct Expense |



**11.3.2**  FOR ADDITIONAL SERVICES OF THE ARCHITECT provided under Article 3 or identified in Article 12, compensation shall be computed as follows:
*(Insert basis of compensation, including rates and/or multiples of Direct Personnel Expense for Principals and employees, and identify Principals and classify employees, if required. Identify specific services to which particular methods of compensation apply, if necessary.)*

| | | |
|---|---|---|
| Principal Time | @ | $120.00 per Hour |
| Associate Time | @ | 110.00 per Hour |
| Project Manager Time | @ | 100.00 per Hour |
| Technical Designer Time | @ | 90.00 per Hour |
| Draftsman Time | @ | 80.00 per Hour |
| Secretarial Time | @ | 70.00 per Hour |
| Consultant Time | @ | 1.2x Direct Expense |
| Principal Consultation Time | @ | 200.00 per Hour (For consultation not related to an ongoing project) |

**11.3.3**  FOR ADDITIONAL SERVICES OF CONSULTANTS, including additional structural, mechanical and electrical engineering services and those provided under Article 3 or identified in Article 12 as part of Additional Services, a multiple of ( 1.2 ) times the amounts billed to the Architect for such services.
*(Identify specific types of consultants in Article 12, if required.)*

**11.4    REIMBURSABLE EXPENSES**

**11.4.1**  FOR REIMBURSABLE EXPENSES, as described in Paragraph 10.2, and any other items included in Article 12 as Reimbursable Expenses, a multiple of   One & 2/10   ( 1.2 ) times the expenses incurred by the Architect, the Architect's employees and consultants in the interest of the Project.

**11.5    ADDITIONAL PROVISIONS**

**11.5.1**  IF THE BASIC SERVICES covered by this Agreement have not been completed within   ~~Twelve~~ EIGHTEEN ( ~~12~~ 18 ) months of the date hereof, through no fault of the Architect, extension of the Architect's services beyond that time shall be compensated as provided in Subparagraphs 10.3.3 and 11.3.2.

**11.5.2**  Payments are due and payable   Ten   ( 10 ) days from the date of the Architect's invoice. Amounts unpaid   Thirty   ( 30 ) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Architect.
*(Insert rate of interest agreed upon.)*

Interest Rate shall be 1.8% per month
*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Architect's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Specific legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

**11.5.3**  The rates and multiples set forth for Additional Services shall be annually adjusted in accordance with normal salary review practices of the Architect.

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

## ARTICLE 12
## OTHER CONDITIONS OR SERVICES

**12.1   SCHEMATIC DESIGN PHASE**

Once the Project Program is approved, the Schematic Design Drawings shall be developed and shall consist of Floor Plans of all levels, Exterior Elevations, and a Site Plan, if applicable. A Construction Cost Estimate, based on square foot area of the Project, shall be included. The Fee for Schematic Design shall be based on the Project Program approved by the Owner. If the Project Program is reduced by the Owner after Schematic Design has begun, then the necessary revisions to the Schematic Design Drawings shall be made as an Additional Service on an hourly basis, in addition to the initial Schematic Design Fee. If the Project Program is increased, the Schematic Design Fee shall be adjusted to include the additional square foot area of the project.

**12.2   EXISTING CONDITIONS**

The Owner shall provide the Architect with Drawings of all existing conditions of the Project. The Architect shall be entitled to rely upon the accuracy and completeness of such Drawings. If the Architect must record and document existing conditions, then such work shall be considered an Additional Service and shall be provided in accordance with Article 11.3.

**12.3   ENGINEERING SERVICES**

The Architect shall provide normal Structural Engineering Services at a not-to-exceed fee of $2,000.  The Architect shall provide normal Mechanical, Plumbing and Electrical Engineering Services in either one of two (2) ways at the Owner's option.
Option 1: the Architect shall provide performance criteria for a design/build system by the Contractor at no additional fee.
Option 2: the Architect shall provide full Engineering Services for each engineering discipline at an additional fee of not-to-exceed $2,000 per discipline.

**12.4   FEE FOR CONSTRUCTION ADMINISTRATION**

The fee for Construction Administration shall be divided into equal weekly amounts over the period of time set aside for Construction as stipulated in the Owner and Contractor Agreement. If the Construction Period goes beyond that which is stipulated in the Owner and Contractor Agreement, then the Architect shall be reimbursed for each additional week of Construction in an amount equal to each previous weekly amount until such time as Final Completion of the Project is reached. Billing for Construction Administration shall occur monthly.

**12.5   SITEWORK & SITE IMPROVEMENTS**

As part of the Architect's Basic Services, the Architect shall design an overall site plan, including a layout for vehicular parking and pedestrian walkways. However, Construction Documents for all sitework and site improvement work, outside the limit of the building perimeter foundation walls, shall be provided as an Additional Services on an hourly basis in accordance with Article 11.3.

**12.6   DISPUTE RESOLUTION LOCALE**

The locale for the resolution of any dispute between the parties to this Agreement shall be in the principal place of business of the Architect.

**12.7   PROJECT APPROVAL APPEARANCES**

One (1) appearance before local agencies that have jurisdiction over the approval of the Project is included in the Architect's fee for Basic Services. Any additional appearances shall be provided as required as an Additional Service on an hourly basis in accordance with Article 11.3.

**12.8   TAXES OR FEES ENACTED BY THE GOVERNMENT**

Any taxes or fees enacted by local, state, or Federal Government, based on gross receipts or revenues which must be paid by the Architect, will be added to amounts due under this Agreement.

**12.9   UNPAID ARCHITECTURAL FEES**

If the Architect must make a claim for unpaid architectural fees, then such claim shall be heard in arbitration, in accordance with Article 7. All other claims of any nature, including any counterclaims and/or crossclaims, shall be heard in a court of law of proper jurisdiction. The American Arbitration Association shall not have jurisdiction over any such other claims. If the Architect must expend legal fees to collect unpaid architectural fees, then such expenditures shall be considered a Reimbursable Expense in accordance with Article 11.4.

This Agreement entered into as of the day and year first written above.

OWNER:

_(Signature)_ Mike McTigue, DVM

ARCHITECT:

_(Signature)_ Warren Freedenfeld, AIA, President

GARDNER ANIMAL HOSPITAL
_(Printed name and title)_

WARREN FREEDENFELD & ASSOCIATES, INC.
_(Printed name and title)_

**AIA DOCUMENT B151** • ABBREVIATED OWNER-ARCHITECT AGREEMENT • THIRD ADDITION • AIA® • © 1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006          **B151-1987   8**

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**