## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **WARREN FREEDENFELD ASSOCIATES, INC.**, as successor in interest to Warren Freedenfeld & Associates, Inc., <br><br> **Plaintiff** <br><br> v. <br><br> **MICHAEL P. MCTIGUE, DVM**, individually and as Trustee of the McTigue Family Trust, **NANCY A. MCTIGUE**, as Trustee of the McTigue Family Trust, **BRIAN C. HURLEY, DVM, GARDNER ANIMAL CARE CENTER, LLC** d/b/a Gardner Animal Hospital, **EDWARD D. CORMIER ASSOCIATES, INC.**, and **BENNETT BUILDING CORPORATION**, <br><br> **Defendants** | **CIVIL ACTION NO. 05-11573 RGS** |
| **MICHAEL P. MCTIGUE, DVM**, <br><br> **Counter-Plaintiff,** <br><br> v. <br><br> **WARREN FREEDENFELD ASSOCIATES, INC.**, as successor in interest to Warren Freedenfeld & Associates, Inc., <br><br> **Counter-Defendant.** | |
| **EDWARD D. CORMIER ASSOCIATES, INC.**, <br><br> **Counter-Plaintiff,** <br><br> v. <br><br> **WARREN FREEDENFELD ASSOCIATES, INC.**, as successor in interest to Warren Freedenfeld & Associates, Inc., <br><br> **Counter-Defendant.** | |

### STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANT EDWARD D. CORMIER ASSOCIATES INC.'S MOTION FOR SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT COUNTERCLAIM

_____

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, the defendant/counter-plaintiff, Edward D. Cormier Associates Inc. submits that for purposes of summary judgment only, the following material facts are undisputed:

1.  The plaintiff, Warren Freedenfeld Associates, Inc. ("Warren Freedenfeld Associates"), was the original architect retained by Michael McTigue ("Dr. McTigue") to assist in the design and construction of a veterinary hospital, the Gardner Animal Care Center. **Exhibit A, Deposition Testimony of Michael McTigue, at 36-37**; **Exhibit B, Deposition Testimony of Warren Freedenfeld, at 72.**

2.  Dr. McTigue eventually became dissatisfied with the plaintiff's work, in particular with the plaintiff's refusal to redesign its proposed design to bring the project within budget. **Exhibit A, McTigue Dep. at 38-39, 79-83, 85.** This occurred early on in the project, well before any construction began or any architectural renderings necessary for construction were prepared. **Exhibit A, McTigue Dep. at 79**; **Exhibit B, Freedenfeld Dep. at 65-66, 180-181.**

3.  In May 1999, Dr. McTigue orally advised the plaintiff that it was being terminated and would play no further role in the project. **Exhibit A, McTigue Dep. at 82.**

4.  After the oral termination of the plaintiff from the project, Dr. McTigue and Warren Freedenfeld Associates, primarily through its principal, Warren Freedenfeld, negotiated the terms of Warren Freedenfeld Associates' termination. **Exhibit A, McTigue Dep. at 153-157, 176-177, 183-185**; **Exhibit B, Freedenfeld Dep. at 81-98.**

5.  The negotiations focused on two specific issues, namely the amount of additional money that Dr. McTigue would pay to Warren Freedenfeld Associates and Dr. McTigue's right to make use of concepts, elements and information reflected in the several initial rough drawings for the animal hospital that were rendered by Warren Freedenfeld Associates prior to its discharge. **Exhibit A, McTigue Dep. at 183-185**; **Exhibit B, Freedenfeld Dep. at 81-98.**

6. From the date of the original oral termination in May 1999 until the execution by Warren Freedenfeld Associates and Dr. McTigue of a written termination agreement on September 2, 1999, the two sides communicated regularly, both orally and in writing, over the amount of additional compensation to be paid to Warren Freedenfeld Associates as part of the termination and Dr. McTigue's right to use the information contained in the preliminary drawings prepared by Warren Freedenfeld Associates prior to its termination from the project. **Exhibit A, McTigue Dep. at 183-185**; **Exhibit B, Freedenfeld Dep. at 81-98.**

7. Dr. McTigue and Warren Freedenfeld eventually reached agreement as to the amount of additional compensation to be paid to Warren Freedenfeld Associates, and also reached agreement as to the rights of the parties with regard to the use of the information, elements and concepts embodied in the early preliminary drawings rendered by Warren Freedenfeld Associates. **Exhibit A, McTigue Dep. at 183-185**; **Exhibit B, Freedenfeld Dep. at 81-98.**

8. All terms governing the termination of Warren Freedenfeld Associates from the project were reduced to writing in a September 2, 1999 termination agreement. **Exhibit C, Termination Agreement**.

9. Throughout the negotiations that eventually resulted in the execution of the contract between them governing the termination, Dr. McTigue consistently and continually advised Warren Freedenfeld Associates that a new architect would be hired to redesign and complete the project, **Exhibit A, McTigue Dep. at 157-158, 176-177**; **Exhibit D, Freedenfeld Deposition Exhibit 6, Undated Letter from McTigue; Exhibit E, Freedenfeld Deposition Exhibit 9, Undated Letter from McTigue**.

10. Warren Freedenfeld Associates admits knowing in July 1999, months before the final contractual terms governing the plaintiff's termination from the project were agreed upon and a final contract was entered into by McTigue and Warren Freedenfeld Associates

governing the termination, that a different architect would be hired by Dr. McTigue to complete the project. **Exhibit F, Freedenfeld Deposition Exhibit 5, July 22, 1999 Letter from Warren Freedenfeld; Exhibit B, Freedenfeld Dep. at 86, 97**.

11. Throughout the negotiations that eventually resulted in the execution of the contract between them governing the termination, Dr. McTigue also consistently and regularly informed Warren Freedenfeld Associates that he intended "to utilize any and all [of] the information shown on the drawings" rendered by Warren Freedenfeld Associates and specifically requested that the termination agreement, when reduced to writing, so provide. **Exhibit D**. Dr. McTigue consistently advised Warren Freedenfeld Associates that, while he would not make use of the actual Warren Freedenfeld Associates drawings themselves, he was entitled to and intended to be allowed to use and rely upon the information contained in those drawings, including such elements and concepts as the traffic flow and layout, and in particular the manner in which the plans reflected the functions to be included in his animal hospital. **Exhibit A, McTigue Dep. at 183-184**.

12. Before Dr. McTigue began the project to build the Gardner Animal Care Center or retained Warren Freedenfeld Associates to begin preliminary drawings on that project, he had invested substantial time and effort into developing the design that he wanted for the floor plan of his animal hospital. **Exhibit A, McTigue Dep. at 19, 63-65**.

13. This work included touring dozens of animal hospitals and reviewing many hospital floor plans. **Exhibit A, McTigue Dep. at 63-65**. Dr. McTigue traveled to animal hospitals throughout New England to examine them and study their floor plans and flow. **Exhibit A, McTigue Dep. at 20, 63-65**.

14. Most of the floor plans and hospitals reviewed by Dr. McTigue, and which became the sources for Dr. McTigue's ideas for the hospital, were not designed by Warren Freedenfeld Associates. **Exhibit A, McTigue Dep. at 179-180.**

15. When he set out to build his own animal hospital from scratch, which eventually became the Gardner Animal Care Center, Dr. McTigue knew the elements, functions and general layout that he wanted.  **Exhibit A, McTigue Dep. at 63-65, 67-72, 74-75, 92-93, 179-180**.

16. When Warren Freedenfeld Associates was originally retained, Dr. McTigue brought the information he had developed through these years of research to the project and communicated them to Warren Freedenfeld Associates.  **Exhibit A, McTigue Dep. at 58-59, 67-72, 74-75, 83-84, 92-93, 179-180.**  This information was then reflected in the preliminary drawings rendered by Warren Freedenfeld Associates.  **Exhibit A, McTigue Dep. at 83-84, 92-93**.

17. When Dr. McTigue was forced to terminate Warren Freedenfeld Associates as the architect because of issues with its performance in that role, he did not abandon, or intend to abandon, the ideas and plans he had developed for his animal hospital.  Instead, he intended to still proceed, only now with a new architect, to develop an animal hospital that reflected the ideas and goals he had previously developed for the hospital and communicated to Warren Freedenfeld Associates, and which were reflected in the Warren Freedenfeld Associates renderings.  **Exhibit A, McTigue Dep. at 67-72, 74-75, 83-84, 92-93, 105-109**; **Exhibit B, Freedenfeld Dep. at 24-25.**

18. After Warren Freedenfeld Associates' termination from the project, Dr. McTigue consistently and without variance communicated to Warren Freedenfeld Associates his intent to make use of the information detailed in the preliminary drawings up until the time

that the actual written termination agreement was executed. **Exhibit D; Exhibit A, McTigue Dep. at 183-184**.

19. In July 1999, Warren Freedenfeld Associates advised Dr. McTigue that Warren Freedenfeld Associates did not want to grant him the right to make any use of the preliminary drawings prepared by it or the information contained therein. **Exhibit G, Freedenfeld Deposition Exhibit 7, July 30, 1999 letter from Cimino**.

20. Dr. McTigue responded to Warren Freedenfeld's position on this issue by continually insisting that any termination agreement entered into by the parties grant him such rights. **Exhibit A, McTigue Dep. at 99-103**.

21. The termination agreement was drafted by Warren Freedenfeld Associates. **Exhibit A, McTigue Dep. at 99-100**; **Exhibit B, Freedenfeld Dep. at 88, 98-99**.

22. The termination agreement was submitted by Warren Freedenfeld Associates to Dr. McTigue for him to execute. **Exhibit B, Freedenfeld Dep. at 99-101**.

23. The termination agreement itself, almost immediately before it was executed, was subject to further discussions between Dr. McTigue and the principal of Warren Freedenfeld Associates related to Dr. McTigue's right to make use of concepts, elements, functions and information contained in the preliminary plans rendered by Warren Freedenfeld Associates. **Exhibit A, McTigue Dep. at 156-157**; **Exhibit B, Freedenfeld Dep. at 99-103.**

24. The termination agreement drafted by Warren Freedenfeld Associates originally did not expressly grant rights to Dr. McTigue to make use of the concepts, elements, functions and information contained in the preliminary plans rendered by Warren Freedenfeld Associates and contributed to the design by Dr. McTigue. The termination agreement as originally drafted by Warren Freedenfeld Associates and submitted to Dr. McTigue for execution instead provided, with regard to the use of the drawings rendered by Warren Freedenfeld

Associates, that Dr. McTigue and the animal hospital "agrees not to use any of the work produced by [Warren Freedenfeld Associates]." **Exhibit B, Freedenfeld Dep. at 102-103; Exhibit C.**

25. Dr. McTigue objected, and insisted that this provision be revised by adding the word "solely" in between the words "work" and "produced" in this portion of the termination agreement. **Exhibit A, McTigue Dep. at 156-157**; **Exhibit B, Freedenfeld Dep. at 102-104.**

26. Warren Freedenfeld, on behalf of Warren Freedenfeld Associates, agreed to this change and the word was added to the contract. **Exhibit A, McTigue Dep. at 156-157**; **Exhibit B, Freedenfeld Dep. at 102-104; Exhibit C.**

27. As a result of this agreement between Dr. McTigue and Warren Freedenfeld Associates, the provision in the termination agreement that governs the use of the renderings provided to Dr. McTigue by Warren Freedenfeld Associates expressly provides that Dr. McTigue and the hospital "agrees not to use any of the work solely produced by [Warren Freedenfeld Associates]." **Exhibit C**.

28. The termination agreement provided for further and final payment by Dr. McTigue and the hospital to Warren Freedenfeld Associates, and further provided that each signatory fully released the other from any and all possible claims of any nature except for the specific obligations set forth in the termination agreement. **Exhibit C.**

29. Dr. McTigue proceeded with the development of the animal hospital, including only making use of the Warren Freedenfeld Associates documents in the exact manner that he insisted the termination agreement be revised to allow. **Exhibit A, McTigue Dep. at 105-109, 111-116, 150-151.**

30. A replacement architect, Edward D. Cormier Associates, Inc. ("Cormier"), was retained to complete the project. **Exhibit A, McTigue Dep. at 39, 110-113, 118.**

31. Cormier redesigned the project and prepared all necessary plans for construction of the project. **Exhibit H, Cormier's Answers to Interrogatories at Response Nos. 2, 5, 16.**

32. Dr. McTigue informed the replacement architect that he could not copy and use the actual Warren Freedenfeld Associates documents themselves, but could make use of all the information set forth therein. **Exhibit A, McTigue Dep. at 111-116, 150-151**; **Exhibit H, Cormier's Answers to Interrogatories at Response no. 2**.

33. In meeting with Cormier, the replacement architect, Dr. McTigue used the Warren Freedenfeld Associates preliminary drawings as a template for discussing with Cormier the hospital functions and elements that Dr. McTigue wanted in his hospital and which he had determined through his years of research into animal hospitals he wanted to include in his own hospital. **Exhibit A, McTigue Dep. at 117, 123, 133, 178-181**; **Exhibit H, Cormier's Answers to Interrogatories at Response no. 16**.

34. The replacement architect, Cormier, thereafter prepared new architectural plans from which the hospital was built. **Exhibit H, Cormier's Answers to Interrogatories at Response no. 16**.

35. The plans prepared by Cormier differ substantially from the preliminary drawings rendered by Warren Freedenfeld Associates. **Exhibit A, McTigue Dep. at 124-127**; **Exhibit B, Freedenfeld Dep. at 18-30, 32-49; Exhibit H, Cormier's Answers to Interrogatories at Response no. 16**.

36. Warren Freedenfeld Associates admits that the plans prepared by Cormier differ substantially from the preliminary drawings rendered by Warren Freedenfeld Associates. **Exhibit B, Freedenfeld Dep. at 18-30, 32-49**.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | **Edward D. Cormier & Associates, Inc.**<br>Defendant/Counter-Plaintiff<br>By its attorneys, |
| **Dated:**   February 1, 2007 | /s/  Stephen D. Rosenberg<br>Stephen D. Rosenberg  [BBO#558415]<br>Eric L. Brodie            [BBO#639833]<br>Shayna W. Borakove   [BBO#663670]<br>**THE MCCORMACK FIRM, LLC**<br>One International Place - 7th Floor<br>Boston, MA    02110<br>Ph:     617•951•2929<br>Fax:    617•951•2672 |

93810.1