**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **WARREN FREEDENFELD ASSOCIATES, INC.**, as successor in interest to Warren Freedenfeld & Associates, Inc., <br>           **Plaintiff,** <br> v. <br><br> **MICHAEL P. MCTIGUE, DVM**, individually and as Trustee of the McTigue Family Trust, **NANCY A. MCTIGUE**, as Trustee of the McTigue Family Trust, **BRIAN C. HURLEY, DVM**, **GARDNER ANIMAL CARE CENTER, LLC** d/b/a Gardner Animal Hospital, **EDWARD D. CORMIER ASSOCIATES, INC.**, and **BENNETT BUILDING CORPORATION**, <br>           **Defendants.** | **CIVIL ACTION** <br> **NO. 05-11573 RGS** |
| **MICHAEL P. MCTIGUE, DVM**, <br>           **Counter-Plaintiff,** <br> v. <br><br> **WARREN FREEDENFELD ASSOCIATES, INC.**, as successor in interest to Warren Freedenfeld & Associates, Inc., <br>           **Counter-Defendant.** | |
| **EDWARD D. CORMIER ASSOCIATES, INC.**, <br>           **Counter-Plaintiff,** <br> v. <br><br> **WARREN FREEDENFELD ASSOCIATES, INC.**, as successor in interest to Warren Freedenfeld & Associates, Inc., <br>           **Counter-Defendant.** | |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT EDWARD D. CORMIER ASSOCIATES, INC.'S**
**MOTION FOR SUMMARY JUDGMENT**
**ON ITS BREACH OF CONTRACT COUNTERCLAIM**

---

**I.      INTRODUCTION**

      Defendant/Counter-Plaintiff Edward D. Cormier Associates, Inc. ("Cormier") submits this

Memorandum of Law in support of its Motion for Summary Judgment on its breach of contract

counterclaim against the plaintiff, Warren Freedenfeld Associates, Inc. ("Warren Freedenfeld Associates").  As discussed in detail below, Cormier was retained to design an animal hospital and to provide complete architectural plans necessary for construction of that facility.  Prior to Cormier's retention, the owner of the hospital had retained and then terminated the plaintiff as the architect for the project; as part of that termination, the owner agreed to pay additional disputed sums to the plaintiff, and the plaintiff and the owner contractually agreed that the owner and the replacement architect, Cormier, could use the information detailed in any plans rendered by the plaintiff prior to its termination as the project's architect.

As discussed in detail below, any limited use by Cormier or the facility's owner of the plans rendered by the plaintiff before it was terminated from the project was safely within the margins of the rights of use contractually granted to them by the plaintiff.  The plaintiff, however, sued Cormier, alleging that Cormier made use of elements and aspects of the plans rendered by the plaintiff, and had committed copyright infringement and violations of the Lanham Act by doing so. Cormier did not make any significant use of the plaintiff's renderings, as a matter of fact,[1] but for purposes of the instant motion, this need not be determined by this Court at this time.  Rather, even if the plaintiff's assertions are to be believed as to any use by Cormier of the preliminary drawings rendered by the plaintiff,  that use, even as depicted by the plaintiff, is well within the contractual rights of use granted to Cormier by the plaintiff.  As such, the plaintiff, by suing Cormier for acting in accordance with its contractual rights, has committed a breach of contract, and is liable to Cormier for breach of contract.

## II.    FACTS

The plaintiff was the original architect retained by defendant Michael McTigue ("Dr. McTigue") to assist in the design and construction of a veterinary hospital, the Gardner Animal

---

[1]There is unquestionably a great deal of difference between the animal hospital as designed by Cormier, and thereafter built, and the preliminary drawings rendered by the plaintiff.  See **Exhibit A, Deposition testimony of Michael McTigue, at 124-127**; **Exhibit B, Deposition testimony of Warren Freedenfeld, at 18-30, 32-49.**

2

Care Center.  **Exhibit A at 36-37**; **Exhibit B at 72.**  Dr. McTigue eventually became dissatisfied with the plaintiff's work, in particular with the plaintiff's refusal to redesign its proposed design to bring the project within budget. **Exhibit A at 38-39, 79-83, 85.**  This occurred early on in the project, well before any construction began or any architectural renderings necessary for construction were prepared. **Exhibit A at 79**; **Exhibit B at 65-66, 180-181.**  In May 1999, Dr. McTigue orally advised the plaintiff that it was being terminated and would play no further role in the project. **Exhibit A at 82.**

Thereafter, Dr. McTigue and Warren Freedenfeld Associates, primarily through its principal, Warren Freedenfeld, negotiated the terms of Warren Freedenfeld Associates' termination. **Exhibit A at 153-157, 176-177, 183-185**; **Exhibit B at 81-98.**  The negotiations focused on two specific issues, namely the amount of additional money that Dr. McTigue would pay to Warren Freedenfeld Associates and Dr. McTigue's right to make use of concepts, elements and information reflected in the several initial rough drawings for the animal hospital that were rendered by Warren Freedenfeld Associates prior to its discharge.  **Exhibit A at 183-158**; **Exhibit B at 81-98.**  From the date of the original oral termination in May 1999 until the execution by Warren Freedenfeld Associates and Dr. McTigue of a written termination agreement on September 2, 1999, the two sides communicated regularly, both orally and in writing, over these issues.  **Exhibit A at 183-185**; **Exhibit B at 81-98.**  The parties eventually reached agreement as to the amount of additional compensation to be paid to Warren Freedenfeld Associates, and also reached agreement as to the rights of the parties with regard to the use of the information, elements and concepts embodied in the early preliminary drawings rendered by Warren Freedenfeld Associates. **Exhibit A at 183-185**; **Exhibit B at 81-98.**  All of these terms were reduced to writing in a September 2, 1999 termination agreement. **Exhibit C, Termination Agreement**.

Throughout the time period that they were negotiating, leading up to the execution of the contract between them governing the termination, Dr. McTigue consistently and continually advised Warren Freedenfeld Associates of two particularly important facts.  First, Dr. McTigue made clear

3

that a new architect would be hired to redesign and complete the project, **Exhibit A at 157-158, 176-177**; **Exhibit D, Freedenfeld Deposition Exhibit 6, Undated Letter from McTigue; Exhibit E, Freedenfeld Deposition Exhibit 9, Undated Letter from McTigue**, a fact that the plaintiff admits knowing in July 1999, months before the final contractual terms governing the plaintiff's termination from the project were agreed upon, and before a final contract was entered into by McTigue and Warren Freedenfeld Associates governing the termination. **Exhibit F, Freedenfeld Deposition Exhibit 5, July 22, 1999 Letter from Warren Freedenfeld.** In fact, the principal of Warren Freedenfeld Associates knew during the time that the parties were negotiating the terms of the termination agreement that a new architect would be retained to complete the project. **Exhibit B at 86, 97.** Warren Freedenfeld, the principal of Warren Freedenfeld Associates, expressly informed Dr. McTigue that it was his "understanding that you intend to redesign the project utilizing the services of another architect." **Exhibit F**.

Second, Dr. McTigue consistently and regularly informed Warren Freedenfeld Associates during this time period that he intended "to utilize any and all [of] the information shown on the drawings" rendered by Warren Freedenfeld Associates and specifically requested that the termination agreement, when reduced to writing, so provide. **Exhibit D**. Dr. McTigue consistently advised Warren Freedenfeld Associates that, while he would not make use of the actual Warren Freedenfeld Associates drawings themselves, he was entitled to and intended to be allowed to use and rely upon the information contained in those drawings, including such elements and concepts as the traffic flow and layout, and in particular the manner in which the plans reflected the functions to be included in his animal hospital. **Exhibit A at 183-184**.

Dr. McTigue has testified to the reason for this. Long before Dr. McTigue ever embarked on the project to build the Gardner Animal Care Center or retained Warren Freedenfeld Associates to begin preliminary drawings on that project, he had invested substantial time and effort into developing the design that he wanted for the floor plan of his animal hospital. **Exhibit A at 19, 63-65**. Dr. McTigue had toured dozens of animal hospitals and reviewed many hospital floor plans.

4

**Exhibit A at 63-65**. He traveled to animal hospitals throughout New England to examine them and study their floor plans and flow.[2]  **Exhibit A at 20, 63-65**. When he set out to build his own animal hospital from scratch, which eventually became the Gardner Animal Care Center, Dr. McTigue knew the elements, functions and general layout that he wanted. **Exhibit A at 63-65, 67-72, 74-75, 92-93, 179-180**. When Warren Freedenfeld Associates was originally retained, Dr. McTigue brought this information to the project and communicated it to Warren Freedenfeld Associates. **Exhibit A at 58-59, 67-72, 74-75, 83-84, 92-93, 179-180.** This information was then reflected in the preliminary drawings rendered by Warren Freedenfeld Associates. **Exhibit A at 83-84, 92-93**. Dr. McTigue had no intention of abandoning his ideas and the plans he had for the hospital simply because he was forced to terminate Warren Freedenfeld Associates as the architect because of issues with its performance in that role. Instead, he intended to still proceed, only now with a new architect, to develop an animal hospital that reflected the ideas and goals he had previously developed for the hospital and communicated to Warren Freedenfeld Associates, which were reflected in the Warren Freedenfeld Associates renderings. **Exhibit A at 67-72, 74-75, 83-84, 92-93, 105-109**; **Exhibit B at 24-25.**

Dr. McTigue consistently and without variance communicated to Warren Freedenfeld Associates his intent to make use of the information detailed in the preliminary drawings up until the time that the actual written termination agreement was executed. Even when Warren Freedenfeld Associates, in July 1999, advised Dr. McTigue that Warren Freedenfeld Associates did not want to grant him such rights, **Exhibit G, Freedenfeld Deposition Exhibit 7, July 30, 1999 letter from Cimino**, Dr. McTigue responded by continually insisting that the termination agreement grant him such rights. **Exhibit A at 99-103**.

---

[2]Although Warren Freedenfeld Associates claims to specialize in animal hospitals, many of the floor plans and hospitals reviewed by Dr. McTigue, and which became the sources for Dr. McTigue's ideas for the hospital, were **not** designed by Warren Freedenfeld Associates. **Exhibit A at 179-180.**

Indeed, the termination agreement itself, almost immediately before it was executed, was subject to further discussions between Dr. McTigue and the principal of Warren Freedenfeld Associates related to this exact issue. **Exhibit A at 156-157**; **Exhibit B at 99-103.** The termination agreement, which was drafted by Warren Freedenfeld Associates, **Exhibit A at 99-100**; **Exhibit B at 88, 98-99,** and submitted to Dr. McTigue for him to execute, **Exhibit B at 99-101,** originally did not expressly grant such rights to Dr. McTigue. Instead, the termination agreement as originally drafted by Warren Freedenfeld Associates and submitted to Dr. McTigue for execution provided, with regard to the use of the drawings rendered by Warren Freedenfeld Associates, that Dr. McTigue and the animal hospital "agrees not to use any of the work produced by [Warren Freedenfeld Associates]." **Exhibit B at 102-103; Exhibit C.** Dr. McTigue objected, and insisted that this provision be revised by adding the word "solely" in between the words "work" and "produced" in this portion of the termination agreement. **Exhibit A at 156-157**; **Exhibit B at 102-104.** Warren Freedenfeld, on behalf of Warren Freedenfeld Associates, agreed to this change and the word was added to the contract. **Exhibit A at 156-157**; **Exhibit B at 102-104; Exhibit C.** As a result, the provision in the termination agreement that governs the use of the renderings provided to Dr. McTigue by Warren Freedenfeld Associates expressly provides that Dr. McTigue and the hospital "agrees not to use any of the work solely produced by [Warren Freedenfeld Associates]." **Exhibit C.** In addition, the termination agreement provided for further and final payment by Dr. McTigue and the hospital to Warren Freedenfeld Associates, and further provided that each signatory fully released the other from any and all possible claims of any nature except for the specific obligations set forth in the termination agreement. **Exhibit C.**

Dr. McTigue then proceeded with the development of the animal hospital, and used the Warren Freedenfeld Associates documents in the exact manner that he insisted the termination agreement be revised to allow. **Exhibit A at 105-109, 111-116, 150-151.** He informed the replacement architect that he could not copy and use the actual Warren Freedenfeld Associates documents themselves, but could make use of all the information set forth therein. **Exhibit A at**

6

**111-116, 150-151**; **Exhibit H, Cormier's Answers to Interrogatories at Response no. 2**. Dr. McTigue then used the Warren Freedenfeld Associates preliminary drawings as an exemplar for discussing with the replacement architect the hospital functions and elements that Dr. McTigue wanted in his hospital and which he had determined through his years of research into animal hospitals he wanted to include in his own hospital. **Exhibit A at 117, 123, 133, 178-181**; **Exhibit H, Cormier's Answers to Interrogatories at Response no. 16**. The replacement architect, Cormier, thereafter prepared new architectural plans from which the hospital was built. **Exhibit H, Cormier's Answers to Interrogatories at Response no. 16**. These plans differ substantially, as Warren Freedenfeld admits, from the preliminary drawings rendered by Warren Freedenfeld Associates. **Exhibit A at 124-127**; **Exhibit B at 18-30, 32-49**; **Exhibit H, Cormier's Answers to Interrogatories at Response no. 16**.

## II.    ARGUMENT

### A.    The termination agreement granted Dr. McTigue and Edward D. Cormier Associates the right to utilize the Warren Freedenfeld Associates documents in exactly the manner that they did.

Although, as discussed above, Dr. McTigue and Warren Freedenfeld Associates negotiated for some time over the terms of Warren Freedenfeld Associates' discharge from the project, the parties eventually settled on a written termination agreement, which is a binding contract between them. With regard to the use of the Warren Freedenfeld Associates drawings, the parties included Paragraph 3, which expressly provides that: "GAH [defined as Dr. McTigue and the hospital] agrees not to use any of the work solely produced by [Warren Freedenfeld Associates]. Article 6 of the owner and architect agreement shall remain in full force and effect." **Exhibit C**.

The reference to Article 6 of the owner and architect agreement is to the original contract by which Warren Freedenfeld Associates was retained by Dr. McTigue to participate in the project. Article 6 places the copyright and ownership of any plans rendered by Warren Freedenfeld Associates in Warren Freedenfeld Associates, but expressly provides that this provision can be

7

modified by a later written agreement between the parties involving compensation provided to Warren Freedenfeld Associates. **Exhibit I, Abbreviated Form of Agreement Between Owner and Architect**. The termination agreement entered into by the parties is exactly such an agreement; it expressly contains terms, namely the aforementioned Paragraph 3, governing who has what rights with regard to the use of any plans rendered by Warren Freedenfeld Associates, and it provides compensation to Warren Freedenfeld Associates.

Clearly, the ownership and rights of use with regard to the Warren Freedenfeld Associates drawings originally established in Article 6 of the first contract between the two parties did not continue to govern any and all issues related to Dr. McTigue's rights to make use of the Warren Freedenfeld Associates plans after Warren Freedenfeld Associates' termination from the project. Article 6 was clearly modified by the Termination Agreement that ended their relationship, since the termination agreement specifically contains new terms, different from those in Article 6 of that original contract, governing the use of the work produced by Warren Freedenfeld Associates. Paragraph 3 of the Termination Agreement is sheer surplusage unless it changes the rights set forth in Article 6, as otherwise nothing is achieved by adding that paragraph 3 to the termination agreement.

Thus, Article 6 of the owner and architect agreement is clearly modified by Paragraph 3. Paragraph 3 itself expressly grants to Dr. McTigue the right to make use of the Warren Freedenfeld Associates renderings to the extent that they reflect information, ideas, elements and concepts for the animal hospital that were contributed to the project by Dr. McTigue. The parties, in paragraph 3, expressly agreed that Dr. McTigue could not make use of any of the work solely produced by Warren Freedenfeld Associates. This inability to make use of work "solely" produced by Warren Freedenfeld Associates is the only express restriction imposed on Dr. McTigue's ability to make use of the Warren Freedenfeld Associates plans. The plain language in this agreement only precludes use of materials prepared by Warren Freedenfeld Associates that satisfies this requirement, and conversely allows Dr. McTigue to make use of those same plans to the extent

that they were not solely produced by Warren Freedenfeld Associates; this certainly grants Dr. McTigue the right, at a minimum, to make use of those aspects of the Warren Freedenfeld Associates plans that do not reflect the sole work product of Warren Freedenfeld Associates and instead reflect the contributions of Dr. McTigue to the design of the facility.

The construction of this contract is a matter of law for this Court, which should apply the language as expressly set forth in the agreement. The intent behind Paragraph 3 of the termination agreement is clear and unequivocal. Indeed, if, by this agreement, Warren Freedenfeld Associates was not granting Dr. McTigue the right to use the information contained in the plans that reflected Dr. McTigue's years of investigation into animal hospitals and his desires with regard to the animal hospital to be built for him, then there was no reason for the parties to agree to add the word "solely" into Paragraph 3, and instead the provision should have just read that Dr. McTigue and the hospital agree not to use any of the Warren Freedenfeld Associates drawings. Warren Freedenfeld Associates and Dr. McTigue did not agree to a termination agreement including such a broad restriction, and instead agreed on something entirely different.

To the extent there is any question as to exactly what rights were granted by the termination agreement to Dr. McTigue and the animal hospital with regard to the use of the Warren Freedenfeld Associates drawings, both standard rules of contract construction and the circumstances surrounding the execution of the termination agreement clearly lead only to this exact same interpretation. In the first instance, Warren Freedenfeld, the principal of Warren Freedenfeld Associates, admits that Warren Freedenfeld Associates drafted the termination agreement. **Exhibit B at 88, 98-99**. To the extent there is any ambiguity as to the extent to which the termination agreement, by its use of the language stating that Dr. McTigue agrees only not to use any work solely produced by Warren Freedenfeld Associates, grants Dr. McTigue the right to make use of the information in those plans that reflects Dr. McTigue's wishes and contributions, any such ambiguity should be construed against Warren Freedenfeld Associates as the drafter. *McAdams v. Mass. Mutual Life Ins. Co.*, 391 F.3d 287, 300 (1st Cir. 2004) (relying on

9

Massachusetts law); *Nadhemy v. Roseland Prop. Co.*, 390 F.3d 44, 52 (1st Cir. 2004) (same); *Albertini v. Summit Tech'l Servs., Inc.*, 287 F. Supp. 2d 92, 98 (D. Mass. 2003) (same); *see also Fenoglio v. Augat, Inc.*, 50 F. Supp. 2d 46, 57 (D. Mass. 1999) (same) ("Indeed, the drafter of an ambiguous contractual term is generally held to any reasonable interpretation attributed to it by the nondrafting party.").

However, this Court need not resort to this principle of contract interpretation. Instead, as detailed above, Dr. McTigue always made clear, leading up to the actual execution of the termination agreement and the final drafting of Paragraph 3, that he intended to make use of the information contained in the Warren Freedenfeld Associates plans and that the termination agreement must include his rights to do so. When Warren Freedenfeld Associates provided him with the termination agreement to execute and Dr. McTigue was not convinced that it clearly granted him that right, he insisted, as Warren Freedenfeld Associates admits, that Paragraph 3 be revised to state that Dr. McTigue and the hospital agree only "not to use any of the work solely produced by Warren Freedenfeld Associates." **Exhibit A at 156-157**; **Exhibit B at 100-104**. Even running right up to the execution of the termination agreement, Dr. McTigue was making clear to Warren Freedenfeld Associates that he would not execute a termination agreement that did not grant him the necessary rights to use the information reflected in the plans and Warren Freedenfeld Associates expressly agreed at that point to change the language to accommodate Dr. McTigue's position. **Exhibit A at 156-157**; **Exhibit B at 102-103**.

As a result, the extrinsic evidence as to the negotiations between the parties and the surrounding circumstances as to the execution of the termination agreement make it perfectly clear that the language in paragraph 3 of the termination agreement, providing that Dr. McTigue and the hospital will not "use any of the work solely produced" by Warren Freedenfeld Associates, was intended by the parties to grant Dr. McTigue and the hospital the right to make use of all of the information contained within the Warren Freedenfeld Associates plans, so that he could continue

to make use of the information that Dr. McTigue had brought to the matter and which Warren Freedenfeld Associates had included at his request in the plans for his animal hospital.

Accordingly, this Court should interpret the termination agreement, and in particular Paragraph 3, as expressly granting Dr. McTigue the right to use the information shown in those plans in the exact manner that he did.

### B. Edward D. Cormier Associates is a third-party beneficiary of the termination agreement.

As detailed above, the proper construction of the termination agreement is that Dr. McTigue had the right to make use of the Warren Freedenfeld Associates drawings to the extent of relying upon and utilizing all of the information contained within the plans, but was not entitled to simply copy the plans. At the time that Warren Freedenfeld Associates and Dr. McTigue entered into this agreement, all parties to the agreement, including Warren Freedenfeld Associates, knew that Dr. McTigue was going to proceed with the construction project, only now without the participation of Warren Freedenfeld Associates, and would proceed to construct the hospital. All parties also knew that doing so would require the use of a new architect to replace Warren Freedenfeld Associates and that in fact a new architect had been retained for this purpose. Warren Freedenfeld Associates, during the time that the termination agreement was being negotiated, was repeatedly informed that Dr. McTigue would proceed with the project with a new architect, and Warren Freedenfeld Associates admitted in writing during this time period, prior to the execution of the termination agreement, that it was aware of this fact.

Obviously, the right to make use of the information contained in the plans that was granted to Dr. McTigue by mutual assent of the parties in the termination agreement would be entirely illusory, and at a minimum pointless, unless construction professionals such as the architect needed to complete the project, and not just Dr. McTigue, could likewise make use of the information. Warren Freedenfeld Associates knew at the time that it entered into the termination agreement that a replacement architect would take over and complete the project and that Dr.

McTigue intended to make use of the information contained in the Warren Freedenfeld Associates plans to complete the project. Under these facts, there is no doubt that any other parties, such as the replacement architect, involved in the construction of the animal hospital who would play any role in Dr. McTigue's authorized use of the Warren Freedenfeld Associates drawings were also intended to be protected by Dr. McTigue's right to use the drawings and therefore were third-party beneficiaries of the termination agreement. Cormier was the architect specifically retained for the purposes of completing the project after Warren Freedenfeld Associates' termination from the project, and was therefore a third-party beneficiary of the agreement. *In re Pharm. Indus. Average Wholesale Price Litig. v. Abbott Labs.*, 339 F. Supp. 2d 165, 178 (D. Mass 2004) (relying on Massachusetts law); *Dushkin v. Desai*, 18 F. Supp. 2d 117, 122-23 (D. Mass. 1998) (same). As a third-party beneficiary, Cormier was and remains entitled to all protections granted by the contract. *See In re Pharm. Indus. Average Wholesale Price Litig.*; *Dushkin*; *Rousseau v. Diemer*, 24 F. Supp. 2d 137, 144-45 (D. Mass. 1998) (relying on Massachusetts law).

### C.    Warren Freedenfeld Associates has breached the termination agreement to the detriment of Edward D. Cormier Associates, Inc.

There is no dispute of fact as to the exact manner in which the Warren Freedenfeld Associates renderings were made use of after Warren Freedenfeld Associates was terminated from the project. Dr. McTigue showed the plans to Cormier's principal for purposes of explaining and illustrating the elements and concepts that he wanted included in his hospital, and in so doing made use of the information in the Warren Freedenfeld Associates plans that Dr. McTigue had contributed to, a use which was authorized under Paragraph 3 of the termination agreement. Dr. McTigue testified to this and there is no competing evidence anywhere in the record. Cormier thereafter proceeded with the project, including the preparation and development of the construction documents needed to construct the hospital. The plans rendered by Cormier are not, by Warren Freedenfeld's own admission, copies of the drawings rendered by Warren Freedenfeld Associates.

Accordingly, as a matter of undisputed fact, this Court can conclude that Dr. McTigue and the third-party beneficiary, Cormier, made use of the Warren Freedenfeld Associates drawings in only the exact manner specifically authorized under the termination agreement. As Warren Freedenfeld Associates, in the termination agreement, granted the rights to use the plans in that manner, Warren Freedenfeld Associates has breached the termination agreement by interfering with these parties' use of the plans in the expressly granted manner.

Cormier, in particular, has been harmed by this breach of contract, in that absent this breach of contract, Warren Freedenfeld Associates could not and would not have sued it, alleging that Cormier's use of the plans in the exact manner authorized by the termination agreement constituted copyright infringement and violations of the Lanham Act. Cormier has been damaged by having to incur multiple tens of thousands of dollars - and counting - in legal fees and defense costs as a result of this breach. This Court should therefore find that Warren Freedenfeld Associates has committed a breach of contract and is liable to Cormier for all legal fees and related defense costs incurred on its behalf in this lawsuit. In light of issues with regard to the attorney/client privilege and work product protection, Cormier does not at this time submit evidence as to those particular losses. Should this Court, as it should, grant summary judgment on the breach of contract counterclaim, Cormier will at that time submit the necessary evidence for this Court to find and enter the proper amount of damages on the counterclaim.

III.     **CONCLUSION**

For the reasons detailed above, summary judgment should be granted in favor of Edward D. Cormier Associates, Inc. on its counterclaim for breach of contract against Warren Freedenfeld Associates.

                Respectfully submitted

                **Edward D. Cormier Associates, Inc.**,
                Defendant/Counter-Plaintiff
                By its attorneys,


                */s/ Stephen D. Rosenberg*
                Stephen D. Rosenberg, Esq.   [BBO #558415]
                Eric L. Brodie, Esq.,              [BBO #639833]
                THE MCCORMACK FIRM, LLC
                One International Place
                Boston, MA   02110
                **Ph:**   617•951•2929
                **Fax:**   617•951•2672

93629.1