DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05 11573 RGS

|  |  |
|---|---|
| WARREN FREEDENFELD ASSOCIATES, INC.<br>as successor in interest to WARREN FREEDENFELD<br>& ASSOCIATES, INC.,<br>      Plaintiff,<br><br>v.<br><br>MICHAEL P. MCTIGUE, DVM individually and as<br>Trustee of THE MCTIGUE FAMILY TRUST,<br>NANCY A. MCTIGUE, as Trustee of the<br>MCTIGUE FAMILY TRUST, BRIAN C. HURLEY, DVM,<br>GARDNER ANIMAL CARE CENTER, LLC<br>d/b/a GARDNER ANIMAL HOSPITAL, EDWARD D.<br>CORMIER, ASSOCIATES INC., and BENNETT<br>BUILDING CORPORATION,<br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S OPPOSITION TO THE MOTION OF THE DEFENDANTS
GARDNER ANIMAL CARE CENTER, LLC, MICHAEL MCTIGUE
INDIVIDUALLY AND AS TRUSTEE OF THE MCTIGUE FAMILY TRUST,
NANCY MCTIGUE AS TRUSTEE OF THE MCTIGUE FAMILY TRUST AND
BRIAN HURLEY TO REACH AND APPLY SETTLEMENT PROCEEDS TO BE
PAID FROM DEFENDANT EDWARD CORMIER TO THE PLAINTIFF
WARREN FREEDENFELD ASSOCIATES, INC.**

### I.    INTRODUCTION

The defendants, Gardner Animal Care Center, Michael McTigue, Nancy McTigue

the McTigue Family Trust and  Brian Hurley, DVM (collectively, the "Hospital

Defendants"), have moved to reach and apply the proceeds of a pending settlement

between the plaintiff, Warren Freedenfeld Associates, Inc. ("Freedenfeld")  and the

Hospital Defendants' replacement architect, Edward D. Cormier Associates, Inc.

("Cormier").  As grounds for the allowance of this motion, the Hospital Defendants

contend that Freedenfeld's copyright claims were "procedurally and substantively

frivolous", and that as the "prevailing parties" they are entitled to attorneys' fees pursuant to 17 U.S.C., § 505 of the Copyright Act upon final resolution of the remaining claims and counterclaims. The motion must be denied as the Hospital Defendants are totally unable to demonstrate the plaintiff's copyright claims are frivolous, or even at this stage, unsuccessful.

The facts of this case make it abundantly clear that the plaintiff's copyright claims were reasonable. Freedenfeld is the holder of a valid copyright in the subject architectural works and brought suit against the Hospital Defendants because the evidence demonstrated that each of them either directly or vicariously participated in or contributed to the infringement. While the Court did find that Freedenfeld's copyright infringement claims were time barred, this does not mean that the suit was frivolous. To the contrary, the copyright issues in this case are complex and novel, and the law in this jurisdiction is unsettled concerning the obligations of an architect to discover when his plans are being used or elements thereof are copied by a former client without the architect's permission. This is an issue that will be the subject of the plaintiff's appeal to the First Circuit.[1]

The Hospital Defendants have attempted to confuse the issues in this case by making new allegations which were not part of the motion to dismiss record. These allegations should be rejected outright because they are nothing more than bald unsupported accusations. In further support of this opposition, the plaintiff states as follows:

---

[1] A secondary but related issue which was not specifically addressed by the Court during the motion to dismiss stage is whether or not the publication of elements of the plaintiff's plans in the November 2004 *Veterinary Economics* magazine article expanded the notice period under the three years statute of limitations for copyright infringement actions.

## II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Gardner Animal Hospital Project and Article 6 of the AIA Agreement

In 1999, the defendant, Michael McTigue, DVM ("Dr. McTigue"), retained Freedenfeld to design a new veterinary facility for the Gardner Animal Hospital ("the Hospital") in Gardner, Massachusetts (the "Project").

When Dr. McTigue retained Freedenfeld to design the subject Project, the parties had agreed that Freedenfeld would retain exclusive ownership of all the designs and drawings that Freedenfeld prepared for the Project (collectively, the "Architectural Works"). Specifically, Dr. McTigue and the Hospital agreed that Freedenfeld would be the owner and the sole author of the Architectural Works and that Freedenfeld would retain all common law, statutory, and other reserved rights, including the copyright. This agreement was memorialized in the Abbreviated Form of Agreement Between Owner and Architect executed by the parties dated March 24, 1999 (the "AIA O&A Agreement"). Article 6 of AIA O&A Agreement provides in its entirety:

> 6.1.    ***The Drawings, Specifications and other documents prepared by the Architect for this Project are instruments of the Architect's service for use solely with respect to this Project, and the Architect shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright.*** The Owner shall be permitted to retain copies and other documents for information and reference in connection with the Owner's use and occupancy of the Project. The Architect's Drawings, Specifications or other documents shall not be used by the Owner or others on other projects, for additions to this Project or for completion of this Project by others, unless the Architect is adjudged to be in default under this Agreement, except by agreement in writing and with appropriate compensation to the Architect.

See  Article 6 of Abbreviated Form of Agreement Between Owner and Architect (AIA Document B151), attached hereto as **Exhibit A** at ¶ 6.1.

3

The Architectural Works were the only architectural plans and drawings that were created for the Project and all were created solely by Freedenfeld. Dr. McTigue did not prepare any sketches, renderings, blue prints, or drawings whatsoever.[2] In accordance with Article 6 of the AIA O&A Agreement, Freedenfeld retained the original versions of the Architectural Works.

After the Project gained the approval of the City of Gardner Zoning and Planning Board, Freedenfeld and McTigue had a falling out. Dr. McTigue also alleged, however incorrectly, that Freedenfeld failed to substantially perform the architectural services. As a result of the dispute, Dr. McTigue threatened to terminate Freedenfeld as the Project architect. During this period, Freedenfeld made clear to Dr. McTigue in writing that if the Hospital decided to terminate Freedenfeld that the Hospital was prohibited from using the Architectural Works to complete the Project. When Freedenfeld requested that Dr. McTigue and the Hospital return the Architectural Works, Dr. McTigue responded to Freedenfeld by letter stating that all the works that Freedenfeld prepared for the Project had been "rolled up and discarded." Dr. McTigue stated in his letter:

> ***Whatever plans, drawings etc. you did prepare have proven useless to us, and they have been rolled up and discarded.*** This is in spite of my having paid tens of thousands of dollars; unfortunately, I again have to pay another architect another tens of thousands of dollars to complete the project.

See Dr. McTigue Letter attached hereto as **Ex. B**.

---

[2] Even if Dr. McTigue did prepare any drawings (which he did not), under the terms of the AIA O&A Agreement, Freedenfeld is deemed to be the sole author of the plans and retains sole ownership over the final versions.

**B.      The Termination Agreement**

In August of 1999, to protect its rights in the Architectural Works, Freedenfeld

properly filed an application and deposited the required fee with the U.S. Copyright

Office in Washington, D.C.  The copyright was later granted to Freedenfeld for the

Architectural Works (Certificate VAU 656-367).

In September of 1999, Freedenfeld, Dr. McTigue, and the Hospital agreed to

resolve their dispute, including fees owed by the Hospital for the design services

Freedenfeld performed in connection with the Project, by entering into a Termination and

Mutual Release Agreement (the "Termination Agreement"). As part of the Termination

Agreement, Dr. McTigue and the Hospital specifically agreed that they would not use the

Architectural Works. The Termination Agreement did not modify, in any way,

Freedenfeld's exclusive ownership, proprietary rights, or right to enforce its copyright

interests in the Architectural Works.  Specifically, Paragraph 3 of the Termination

Agreement provides:

> **[the Hospital] agrees not to use any of the work solely produced by
> [Freedenfeld]. Article 6 of the [AIA O&A Agreement] shall remain in
> full force and affect [sic].**

See Termination and Mutual Release Agreement, attached hereto as **Ex. C**.

**C.      Freedenfeld's Discovery of the infringing Activity**

Freedenfeld has been a long term subscriber to a veterinary trade publication,

*Veterinary Economics* (the "Magazine"). The Magazine is an international veterinary

medicine and business management publication serving more than 50,000 subscribers in

the United States and Canada. While perusing the November 2004 issue of the Magazine,

Freedenfeld discovered an article appearing on pages 50 - 57 about the renovation and

expansion of the Gardner Animal Hospital.  According to the article, the design won a

"Merit Award" in the 2004 Veterinary Hospital Design Competition, a national and

international competition.  The article is entitled "Giving an Old House a Cutting –Edge

Extension." The article identifies the owners of the Hospital as Dr. McTigue and Brian

Hurley DVM.  Edward D. Cormier Associates Inc. is listed as the Architect.  Pages 52-53

of the article contain drawings that are nearly identical to the Architectural Works

prepared by Freedenfeld.  After further investigation in early 2005, it was determined that

the Project was built by the defendant, Bennett Building Corporation using the

Freedenfeld Architectural Works and that the land where the Project was built is owned

by the McTigue Family Trust.  Both Dr. McTigue and his wife, Nancy McTigue are

trustees of the McTigue Family Trust.

**D.      The Motions to Dismiss**

On July 22, 2005, Freedenfeld instituted the instant action against the defendants

for copyright infringement and violation of the Lanham Act.  In October of 2005, each of

the defendants filed motions to dismiss the Complaint. The Hospital Defendants argued

that Freedenfeld failed to bring suit  within the three year statute of limitations for

copyright infringement claims. In support of their motion, the Hospital Defendants took

the position  that they did not hide the building that they constructed and that the plans

were a matter of public record because they were filed with local governing bodies.

Essentially the Hospital Defendants sought to carve out an exception to the copyright

infringement "discovery rule" by arguing that an architect seeking to enforce his

copyright against a former client has an affirmative duty to go to the project site or the

local planning board to investigate whether the project was being built with his

copyrighted plans. After oral argument the Court dismissed the plaintiff's copyright

infringement claims essentially stating that the plaintiff should have been on notice

earlier relative to the defendants' infringing activity. Freedenfeld has indicated that it will

appeal the Court's dismissal of the copyright infringement claim upon final resolution of

the remaining claims and counterclaims in this case.

### III.    LAW AND ARGUMENT

**Attorneys Fees under 17 U.S.C. § 505 of the Copyright Act**

Under 17 U.S.C. § 505, the district court has judicial discretion to grant attorneys'

fees to the prevailing party in a copyright infringement action. Fogerty v. Fantasy, Inc.,

150 U.S. 517, 533 (1994). The attorney fees provisions of the Copyright Act apply

equally to the prevailing parties. Jackson v. Axton, 25 F.3d 884, 890 (9th Cir. 1994) citing

Fogerty.

In Fogerty, the U.S. Supreme Court provided a list of nonexclusive factors that

may be used to guide the District Court's discretion in determining fee awards to the

prevailing party under 17 U.S.C. § 505. These factors included "frivolousness,

motivation, objective unreasonableness (both factual and in the legal components of the

case), and the need in particular circumstances to advance the considerations of

deterrence." Fogerty, 501 U.S. 534, at n. 19, citing, Lieb v. Topstone Industries, Inc., 788

F.2d 151, 156 (1986).

In this case, the Hospital Defendants allege that the Freedenfeld's copyright

claims were both "procedurally and substantively frivolous." As set forth below, the

facts of this case, make clear that the plaintiff's copyright claims were entirely

reasonable. Freedenfeld is the holder of a valid copyright in the subject architectural

works and brought suit against the Hospital Defendants because the evidence unquestionably demonstrated that each of them either directly or vicariously participated in the infringement.

### A.    THE COPYRIGHT CLAIMS WERE <u>NOT</u> PROCEDURALLY FRIVOLOUS

To support the allegation that the copyright claims was procedurally frivolous, the Hospital Defendants first rely on the Court's February 8, 2006 which dismissed the claim on the basis of the statute of limitations.  The fact that the Court ruled that the copyright claim was time barred does not mean that the claim itself was frivolous.  The U.S. Supreme Court has held that a "frivolous claim" is one which is "clearly baseless," such as factual claims that are "fantastic or delusional." <u>Nietzke v. Williams</u>, 490 U.S. 324, 325-328 (1989).  The Supreme Court has held that though a claim is not successful, one cannot conclude that it is frivolous.  <u>Hawaiian Engraving & MFG, Inc. v. Fujikami</u>, No. 90-15997, 1991 U.S. Dist Lexis 269816 n. *2 (9th Cir. 1991).

Here, there was nothing fantastic or delusional about the suit or the timing of the suit brought by Freedenfeld to protect its intellectual property rights in the Architectural Works. It is undisputed that Freedenfeld first discovered that Architectural Works were being infringed upon when the plaintiff saw what he perceived as virtually identical copies of these works in the November 2004, edition of *Veterinary Economics Magazine*. There is absolutely no evidence to suggest that Freedenfeld knew that the defendants were infringing on the Architectural Works at anytime prior to November of 2004.

Indeed, Dr. McTigue, sent a letter to Freedenfeld in 1999 stating, in no uncertain terms, that he had no intention of using the Architectural works because, according to Dr. McTigue, the plans had "proved to be useless" and were "discarded."  While it is true

8

that the Court ruled that the Freedenfeld should have been on notice earlier relative to the Hospital Defendants' infringement, this does not mean that Freedenfeld was not justified in testing the merits of his copyright infringement claims. Quite the contrary, the issues presented by Freedenfeld relative to the duty of an architect to determine when his plans are being infringed upon by a former client were complex and novel. The novel and complex issue was whether an architect, seeking to enforce his copyright in architectural plans against a former client, had an affirmative duty to go to the project site or the local planning board to investigate whether the project was wrongfully being built with his copyrighted plans. This issue was discussed at length by the parties during the motion to dismiss stage of the case. While the Hospital Defendants were successful in this round, the final resolution of this issue will rest with a higher court.

As a second ground to support the allegation that the copyright claims were "procedurally frivolous", the Hospital Defendants take the position that the plaintiff "lacked standing" to bring the claim in 2005 due to the Chapter 11 Bankruptcy of Warren Freedenfeld & Associates, Inc. in 2000. Warren Freedenfeld & Associates, Inc. is the predecessor to the current plaintiff Warren Freedenfeld Associates, Inc. In support of this argument, the Hospital Defendants claim that "a cursory review of bankruptcy records suggest that the 2000 bankruptcy resulted in the loss of the intellectual property assets of Warren Freedenfeld & Associates, Inc." However, the Hospital Defendants have not offered, and in reality cannot offer, any bankruptcy records to support such an argument. It is also noteworthy that the Hospital Defendants have not moved to dismiss the plaintiff's remaining Lanham Act claim on these grounds via a well pled motion for

summary judgment which is the proper procedural tool for resolving this issue.

Accordingly, this argument should be rejected outright.

**B.    THE COPYRIGHT CLAIMS WERE <u>NOT</u> SUBSTANTIVELY FRIVOLOUS**

To support their contention that the copyright claims were "substantively

frivolous", the Hospital Defendants have attempted to confuse the issues by taking

Warren Freedenfeld's deposition testimony out of context relative to the traffic patterns

of the facility and the design of certain elements of the plans. While it is true that Warren

Freedenfeld testified that some of his concepts concerning traffic flows have, over the

years, become industry standard, the plaintiff also testified that every hospital that he

designs has "unique" design features and arrangement that could not be used from one

hospital to the next because every veterinarian that he works with has "unique goals [and]

objectives." In addition, Mr. Freedenfeld testified that the design would also be dictated

by the physical site requirements (i.e. every site is unique). Mr. Freedenfeld testified:

Q.    Okay. The drawings you made for the Gardner Animal Hospital, could those drawing be  used on other projects by you or are they only useful for Building the Gardner Animal Hospital"

A.    They are primarily for the Gardner Animal Hospital. As I said before, every project has certain unique aspects to it. So I couldn't just take those plans and use them for someone else's hospital, because every plan has unique goals, objectives, philosophies, requirements, priorities.

....

Q.    But the plans themselves, you would have to change them to fit the needs of the next client?

A.    Oh, yes.

Q.    And you'd also have to change them to fit the physical site requirements.

A.    Correct, yes.

<u>See</u> Warren Freedenfeld Dep. page. 68-69, attached hereto as **<u>Ex. D.</u>**

The Hospital Defendants have also attempted to confuse the issues in this case by asserting several defenses which they did not argue when the motion to dismiss the copyright claims were heard.  The first of these defenses is a claim of "joint authorship" in the subject plans asserted by  Dr. McTigue.  Indeed, the Hospital Defendants rely heavily on this argument in their opposition to the plaintiff's pending motion for summary judgment to dismiss the copyright infringement counterclaim brought by Dr. McTigue.  Dr. McTigue essentially argues that he cannot be liable for copyright infringement for work which he claims to have jointly authored.   However, this argument is pitifully weak because not only because Dr. McTigue admitted that he never prepared any drawings whatsoever, but also it is undisputed that Dr. McTigue never bothered to register his copyright in the Architectural Works.  Nor could he, since the Termination Agreement that he signed in 1999, makes clear that Freedenfeld would be deemed the sole author of the Architectural Works for the purposes of the Copyright Act (Article 6.1 of the AIA O& A Agreement remained in effect).

The Hospital Defendants also take issue with the fact that Freedenfeld brought suit against the McTigue Family Trust and its Trustees for contributory and vicarious copyright infringement. The Hospital Defendants contend that the McTigue Family Trust is merely the owner of the land where the facility was built using Freedenfeld's plans.  This argument is flawed because the Hospital Defendants have failed to recognize that the land was improved through the unauthorized and wrongful use of Freedenfeld's

11

plans. Accordingly, the McTigue Trust substantially benefited from the unauthorized and wrongful use of the plaintiff's plans.

The Hospital Defendants also contend that the trustees of the McTigue Family Trust did not have any involvement in the design or construction of the building. This argument is also weak since Dr. McTigue was the principal person with whom Freedenfeld dealt with on the design of the facility. It is undisputed by the Hospital Defendants that Dr. McTigue serves as both the president of the Gardner Animal Hospital and as a trustee of the McTigue Family Trust. It also follows that Nancy McTigue, as the other trustee, would have had to review and approve the designs for the facility since it was to be built on the Trust's land.   Again it is noteworthy, that the Hospital Defendants have not moved to dismiss the plaintiff's remaining Lanham Act claims on these grounds via a well pled summary judgment.

The Hospital Defendants also take issue with the naming of Brian Hurley in the lawsuit. Although, the Hospital Defendants contend that Dr. Hurley was "merely an employee at the time of the events in 1999", the Hospital Defendants have not offered any affidavits to support this argument.  However, even if the Hospital Defendants were somehow able to demonstrate, through admissible evidence, that Dr. Hurley was merely an employee in 1999, this would not absolve him from liability for the unauthorized and wrongful publishing of virtually identical elements of the Architectural Works in the November 2004 edition of *Veterinary Economics* magazine. The publication constitutes a separate act of copyright infringement. Dr. Hurley is referenced in the article as one of the co-owners of the facility. It was clear at that time that Dr. Hurley directly benefited from the unauthorized and wrongful use of the plaintiff's plans.

As a final substantive argument in support of their contention that the copyright claims were frivolous, the Hospital Defendants contend that the Termination Agreement in 1999 acknowledged that McTigue was a joint author in the Architectural Works. This position is clearly contradictory to the plain and unambiguous language of the agreement. As previously stated, the Termination Agreement did not modify, in any way, Freedenfeld's exclusive ownership, proprietary rights, or right to enforce its copyright interests in the Architectural Works. Nowhere in the Termination Agreement does it say that Dr. McTigue jointly authored anything. Again, it is noteworthy that Dr. McTigue never at anytime filed an application for a copyright with the U.S. Patent and Trademark Office relative to the Architectural Works.

The remaining arguments presented by the Hospital Defendants concerning the plaintiff's ability to pay attorney fees is not worth addressing given that the Hospital Defendants will not be able to demonstrate that the plaintiff's copyright claims were frivolous. Therefore, the Hospital Defendants' motion to reach and apply the settlement funds to be paid by Cormier to the plaintiff should be Denied.

Respectfully submitted

WARREN FREEDENFELD
ASSOCIATES, INC. as successor in
Interest to WARREN
FREEDENFELD & ASSOCIATES,
INC.,

By its attorneys,


/s/ Garrett J. Lee
Barry S. Scheer, BBO # 445100
Garrett J. Lee, BBO # 641876
PARKER │ SCHEER LLP
One Constitution Center
Boston, MA  02129
(617) 886-0500
Email: bss@parkerscheer.com
        gjl@parkerscheer.com

Dated: March 6, 2007

## CERTIFICATE OF SERVICE

I, Garrett J. Lee, attorney for the plaintiff, Warren Freedenfeld Associates, Inc. as successor in interest to Warren Freedenfeld & Associates, Inc., hereby certify that on this 1st day of March 6, 2007, a true copy of the foregoing was served on all counsel record by first-class mail postage pre-paid, addressed to:

Michael J. Stone,
Robert A. McCall
Peabody & Arnold LLP
30 Rowes Wharf
Boston, MA 02110

Robert N. Meltzer, Esq.
P.O. Box 1459
Framingham, MA 01701

Stephen D. Rosenberg
The McCormack Firm, LLC
One International Place
7th Floor
Boston, MA 02110

F. Joseph Gentili, Esq.
Capobianco & Gentili, PC
15 West Central Street
Natick, MA 01760

Robert D. City, Esq.
Michael J. Dissette, Esq.
City, Hayes & Dissette, PC
50 Congress Street
Boston, MA 02109

Mary C. Casey, Esq.
Harbor Law Group
385 South Street
Shrewsbury, MA 01545

/s/ Garrett J. Lee
Garrett J. Lee



EXHIBIT: *21*
DATE: *1.23.07*
*McTigue*
CAROL A. JACKSON

*AIA Document B151*

# Abbreviated Form of Agreement Between Owner and Architect

*for Construction Projects of Limited Scope*

### 1987 EDITION

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES; CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION.*

## AGREEMENT

made as of the          24th          day of          March          in the year of Nineteen Hundred and Ninety Eight

**BETWEEN** the Owner:
*(Name and address)*

Mike McTigue, DVM
GARDNER ANIMAL HOSPITAL
7 Pearson Boulevard
Gardner, MA  01440

and the Architect:
*(Name and address)*

WARREN FREEDENFELD & ASSOCIATES INC.
39 Church Street
Boston, MA  02116

For the following Project:   GARDNER ANIMAL HOSPITAL
*(Include detailed description of Project, location, address and scope.)*

Project Location:          2 acres of existing 19 acre lot
                           Typanny Road / Route 68
                           (Across from Walmart)
                           Gardner, Massachusetts

Scope of Work    :         New veterinary facility

The Owner and Architect agree as set forth below.

Copyright 1974, 1978, ©1987 by The American Institute of Architects, 1735 New York Avenue, N.W., Washington, D.C. 20006. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will be subject to legal prosecution.

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

TERMS AND CONDITIONS OF AGREEMENT BETWEEN OWNER AND ARCHITECT

## ARTICLE 1
## ARCHITECT'S RESPONSIBILITIES

### 1.1    ARCHITECT'S SERVICES

**1.1.1** The Architect's services consist of those services performed by the Architect, Architect's employees and Architect's consultants as enumerated in Articles 2 and 3 of this Agreement and any other services included in Article 12.

**1.1.2** The Architect's services shall be performed as expeditiously as is consistent with professional skill and care and the orderly progress of the Work.

**1.1.3** The services covered by this Agreement are subject to the time limitations contained in Subparagraph 11.5.1.

## ARTICLE 2
## SCOPE OF ARCHITECT'S BASIC SERVICES

### 2.1    DEFINITION

**2.1.1.** The Architect's Basic Services consist of those described under the three phases identified below, any other services identified in Article 12, and include normal structural, mechanical and electrical engineering services.

### 2.2    DESIGN PHASE

**2.2.1** The Architect shall review with the Owner alternative approaches to design and construction of the Project.

**2.2.2** Based on the mutually agreed-upon program, schedule and construction budget requirements, the Architect shall prepare, for approval by the Owner, Design Documents consisting of drawings and other documents appropriate for the Project, and shall submit to the Owner a preliminary estimate of Construction Cost.

### 2.3    CONSTRUCTION DOCUMENTS PHASE

**2.3.1** Based on the approved Design Documents, the Architect shall prepare, for approval by the Owner, Construction Documents consisting of Drawings and Specifications setting forth in detail the requirements for the construction of the Project and shall advise the Owner of any adjustments to previous preliminary estimates of Construction Cost.

**2.3.2** The Architect shall assist the Owner in connection with the Owner's responsibility for filing documents required for the approval of governmental authorities having jurisdiction over the Project.

**2.3.3** Unless provided in Article 12, the Architect, following the Owner's approval of the Construction Documents and of the latest preliminary estimate of Construction Cost, shall assist the Owner in obtaining bids or negotiated proposals and assist in awarding and preparing contracts for construction.

### 2.4    CONSTRUCTION PHASE—ADMINISTRATION OF THE CONSTRUCTION CONTRACT

**2.4.1** The Architect's responsibility to provide Basic Services for the Construction Phase under this Agreement commences with the award of the Contract for Construction and terminates at the earlier of issuance to the Owner of the final Certificate for Payment or 60 days after the date of Substantial Completion of the Work.

**2.4.2** The Architect shall provide administration of the Contract for Construction as set forth below and in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.

**2.4.3** Duties, responsibilities and limitations of authority of the Architect shall not be restricted, modified or extended without written agreement of the Owner and Architect with consent of the Contractor, which consent shall not be unreasonably withheld.

**2.4.4** The Architect shall be a representative of and shall advise and consult with the Owner (1) during construction until final payment to the Contractor is due and (2) as an Additional Service at the Owner's direction from time to time during the correction period described in the Contract for Construction.

**2.4.5** The Architect shall visit the site at intervals appropriate to the stage of construction or as otherwise agreed by the Owner and Architect in writing to become generally familiar with the progress and quality of the Work completed and to determine in general if the Work is being performed in a manner indicating that the Work when completed will be in accordance with the Contract Documents. However, the Architect shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. On the basis of on-site observations as an architect, the Architect shall keep the Owner informed of the progress and quality of the Work, and shall endeavor to guard the Owner against defects and deficiencies in the Work. *(More extensive site representation may be agreed to as an Additional Service, as described in Paragraph 3.2.)*

**2.4.6** The Architect shall not have control over or charge of and shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's responsibility under the Contract for Construction. The Architect shall not be responsible for the Contractor's schedules or failure to carry out the Work in accordance with the Contract Documents. The Architect shall not have control over or charge of acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons performing portions of the Work.

**2.4.7** The Architect shall at all times have access to the Work wherever it is in preparation or progress.

**2.4.8** Based on the Architect's observations and evaluations of the Contractor's Applications for Payment, the Architect shall review and certify the amounts due the Contractor.

**2.4.9** The Architect's certification for payment shall constitute a representation to the Owner, based on the Architect's observations at the site as provided in Subparagraph 2.4.5 and on the

**AIA DOCUMENT B151** • ABBREVIATED OWNER-ARCHITECT AGREEMENT • THIRD EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

data comprising the Contractor's Application for Payment, that the Work, to the best of the Architect's knowledge, information and belief, has progressed to the point indicated and that quality of the Work is in accordance with the Contract Documents. The issuance of a Certificate for Payment shall not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment or (4) ascertained how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

**2.4.10** The Architect shall have authority to reject Work which does not conform to the Contract Documents and will have authority to require additional inspection or testing of the Work whenever, in the Architect's reasonable opinion, it is necessary or advisable for the implementation of the intent of the Contract Documents.

**2.4.11** The Architect shall review and approve or take other appropriate action upon Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action shall be taken with such reasonable promptness as to cause no delay. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component. When professional certification of performance characteristics of materials, systems or equipment is required by the Contract Documents, the Architect shall be entitled to rely upon such certification to establish that the materials, systems or equipment will meet the performance criteria required by the Contract Documents.

**2.4.12** The Architect shall prepare Change Orders and Construction Change Directives, with supporting documentation and data if authorized or confirmed in writing by the Owner as provided in Paragraphs 3.1 and 3.3, for the Owner's approval and execution in accordance with the Contract Documents, and may authorize minor changes in the Work not involving an adjustment in the Contract Sum or an extension of the Contract Time which are not inconsistent with the intent of the Contract Documents.

**2.4.13** The Architect shall conduct inspections to determine the dates of Substantial Completion and final completion and shall issue a final Certificate for Payment.

**2.4.14** The Architect shall interpret and decide matters concerning performance of the Owner and Contractor under the requirements of the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests shall be made with reasonable promptness and within any time limits agreed upon. When making such interpretations and initial decisions, the Architect shall endeavor to secure faithful performance by both Owner and Contractor, shall not show partiality to either, and shall not be liable for results of interpretations or decisions so rendered in good faith.

## ARTICLE 3
### ADDITIONAL SERVICES

**3.1** Additional Services shall be provided if authorized or confirmed in writing by the Owner or if included in Article 12, and

they shall be paid for by the Owner as provided in this Agreement. Such Additional Services shall include, in addition to those described in Paragraphs 3.2 and 3.3, budget analysis, financial feasibility studies, planning surveys, environmental studies, measured drawings of existing conditions, coordination of separate contractors or independent consultants, coordination of construction or project managers, detailed Construction Cost estimates, quantity surveys, interior design, planning of tenant or rental spaces, inventories of materials or equipment, preparation of record drawings, and any other services not otherwise included in this Agreement under Basic Services or not customarily furnished in accordance with generally accepted architectural practice.

**3.2** If more extensive representation at the site than is described in Subparagraph 2.4.5 is required, such additional project representation shall be provided and paid for as set forth in Articles 11 and 12.

**3.3** As an Additional Service in connection with Change Orders and Construction Change Directives, the Architect shall prepare Drawings, Specifications and other documentation and data, evaluate Contractor's proposals, and provide any other services made necessary by such Change Orders and Construction Change Directives.

## ARTICLE 4
### OWNER'S RESPONSIBILITIES

**4.1** The Owner shall provide full information, including a program which shall set forth the Owner's objectives, schedule, constraints, budget with reasonable contingencies, and criteria.

**4.2** The Owner shall furnish surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, a written legal description of the site and the services of geotechnical engineers or other consultants when such services are requested by the Architect.

**4.3** The Owner shall furnish structural, mechanical, chemical, air and water pollution tests, tests for hazardous materials, and other laboratory and environmental tests, inspections and reports required by law or the Contract Documents.

**4.4** The Owner shall furnish all legal, accounting and insurance counseling services as may be necessary at any time for the Project, including auditing services the Owner may require to verify the Contractor's Applications for Payment or to ascertain how or for what purposes the Contractor has used the money paid by the Owner.

**4.5** The foregoing services, information, surveys and reports shall be furnished at the Owner's expense, and the Architect shall be entitled to rely upon the accuracy and completeness thereof.

**4.6** Prompt written notice shall be given by the Owner to the Architect if the Owner becomes aware of any fault or defect in the Project or nonconformance with the Contract Documents.

**4.7** The proposed language of certificates or certifications requested of the Architect or Architect's consultants shall be submitted to the Architect for review and approval at least 14 days prior to execution.

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

## ARTICLE 5
## CONSTRUCTION COST

### 5.1  DEFINITION

**5.1.1**  The Construction Cost shall be the total cost or estimated cost to the Owner of all elements of the Project designed or specified by the Architect.

**5.1.2**  The Construction Cost shall include the cost at current market rates of labor and materials furnished by the Owner and equipment designed, specified, selected or specially provided for by the Architect, plus a reasonable allowance for the Contractor's overhead and profit. In addition, a reasonable allowance for contingencies shall be included for market conditions at the time of bidding and for changes in the Work during construction.

**5.1.3**  Construction Cost does not include the compensation of the Architect and Architect's consultants, the costs of the land, rights-of-way, financing or other costs which are the responsibility of the Owner as provided in Article 4.

### 5.2  RESPONSIBILITY FOR CONSTRUCTION COST

**5.2.1**  It is recognized that neither the Architect nor the Owner has control over the cost of labor, materials or equipment, over the Contractor's methods of determining bid prices, or over competitive bidding, market or negotiating conditions. Accordingly, the Architect cannot and does not warrant or represent that bids or negotiated prices will not vary from any estimate of Construction Cost or evaluation prepared or agreed to by the Architect.

**5.2.2**  No fixed limit of Construction Cost shall be established as a condition of this Agreement by the furnishing, proposal or establishment of a Project budget, unless a fixed limit has been agreed upon in writing and signed by the parties hereto. Fixed limits, if any, shall be increased in the amount of an increase in the Contract Sum occurring after execution of the Contract for Construction.

**5.2.3**  Any Project budget or fixed limit of Construction Cost may be adjusted to reflect changes in the general level of prices in the construction industry between the date of submission of the Construction Documents to the Owner and the date on which proposals are sought.

**5.2.4**  If a fixed limit of Construction Cost is exceeded by the lowest bona fide bid or negotiated proposal, the Owner shall:

.1  give written approval of an increase in such fixed limit;

.2  authorize rebidding or renegotiating of the Project within a reasonable time;

.3  if the Project is abandoned, terminate in accordance with Paragraph 8.3; or

.4  cooperate in revising the Project scope and quality as required to reduce the Construction Cost.

**5.2.5**  If the Owner chooses to proceed under Clause 5.2.4.4, the Architect, without additional charge, shall modify the Contract Documents as necessary to comply with the fixed limit, if established as a condition of this Agreement. The modification of Contract Documents shall be the limit of the Architect's responsibility arising out of the establishment of a fixed limit. The Architect shall be entitled to compensation in accordance with this Agreement for all services performed whether or not the Construction Phase is commenced.

## ARTICLE 6
## USE OF ARCHITECT'S DRAWINGS, SPECIFICATIONS AND OTHER DOCUMENTS

**6.1**  The Drawings, Specifications and other documents prepared by the Architect for this Project are instruments of the Architect's service for use solely with respect to this Project, and the Architect shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright. The Owner shall be permitted to retain copies, including reproducible copies, of the Architect's Drawings, Specifications and other documents for information and reference in connection with the Owner's use and occupancy of the Project. The Architect's Drawings, Specifications or other documents shall not be used by the Owner or others on other projects, for additions to this Project or for completion of this Project by others, unless the Architect is adjudged to be in default under this Agreement, except by agreement in writing and with appropriate compensation to the Architect.

**6.2**  Submission or distribution of documents to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the Architect's reserved rights.

## ARTICLE 7
## ARBITRATION

**7.1**  Claims, disputes or other matters in question between the parties to this Agreement arising out of or relating to this Agreement or breach thereof shall be subject to and decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise. No arbitration arising out of or relating to this Agreement shall include, by consolidation, joinder or in any other manner, an additional person or entity not a party to this Agreement, except by written consent containing a specific reference to this Agreement signed by the Owner, Architect, and any other person or entity sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by the parties to this Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

**7.2**  In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of limitations.

**7.3**  The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

## ARTICLE 8
## TERMINATION, SUSPENSION OR ABANDONMENT

**8.1**  This Agreement may be terminated by either party upon not less than seven days' written notice should the other party

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

fail substantially to perform in accordance with the terms of this Agreement through no fault of the party initiating the termination.

**8.2** If the Project is suspended by the Owner for more than 30 consecutive days, the Architect shall be compensated for services performed prior to notice of such suspension. When the Project is resumed, the Architect's compensation shall be equitably adjusted to provide for expenses incurred in the interruption and resumption of the Architect's services.

**8.3** This Agreement may be terminated by the Owner upon not less than seven days' written notice to the Architect in the event that the Project is permanently abandoned. If the Project is abandoned by the Owner for more than 90 consecutive days, the Architect may terminate this Agreement by giving written notice.

**8.4** Failure of the Owner to make payments to the Architect in accordance with this Agreement shall be considered substantial nonperformance and cause for termination.

**8.5** If the Owner fails to make payment when due the Architect for services and expenses, the Architect may, upon seven days' written notice to the Owner, suspend performance of services under this Agreement. Unless payment in full is received by the Architect within seven days of the date of the notice, the suspension shall take effect without further notice. In the event of a suspension of services, the Architect shall have no liability to the Owner for delay or damage caused the Owner because of such suspension of services.

**8.6** In the event of termination not the fault of the Architect, the Architect shall be compensated for services performed prior to termination, together with Reimbursable Expenses then due and all Termination Expenses.

**8.7** Termination Expenses are in addition to compensation for Basic and Additional Services, and include expenses which are directly attributable to termination.

## ARTICLE 9
### MISCELLANEOUS PROVISIONS

**9.1** Unless otherwise provided, this Agreement shall be governed by the law of the principal place of business of the Architect.

**9.2** Terms in this Agreement shall have the same meaning as those in AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.

**9.3** Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion, or the date of issuance of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion.

**9.4** The Owner and Architect waive all rights against each other and against the contractors, consultants, agents and employees of the other for damages, but only to the extent covered by property insurance during construction, except such rights as they may have to the proceeds of such insurance as set forth in the edition of AIA Document A201, General Con-

ditions of the Contract for Construction, current as of the date of this Agreement. The Owner and Architect each shall require similar waivers from their contractors, consultants and agents.

**9.5** The Owner and Architect, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Agreement and to the partners, successors, assigns and legal representatives of such other party with respect to all covenants of this Agreement. Neither Owner nor Architect shall assign this Agreement without the written consent of the other.

**9.6** This Agreement represents the entire and integrated agreement between the Owner and Architect and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Architect.

**9.7** Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Owner or Architect.

**9.8** The Architect and Architect's consultants shall have no responsibility for the discovery, presence, handling, removal or disposal of or exposure of persons to hazardous materials in any form at the Project site, including but not limited to asbestos, asbestos products, polychlorinated biphenyl (PCB) or other toxic substances.

## ARTICLE 10
### PAYMENTS TO THE ARCHITECT

#### 10.1    DIRECT PERSONNEL EXPENSE

**10.1.1** Direct Personnel Expense is defined as the direct salaries of the Architect's personnel engaged on the Project and the portion of the cost of their mandatory and customary contributions and benefits related thereto, such as employment taxes and other statutory employee benefits, insurance, sick leave, holidays, vacations, pensions and similar contributions and benefits.

#### 10.2    REIMBURSABLE EXPENSES

**10.2.1** Reimbursable Expenses include expenses incurred by the Architect in the interest of the Project for:

  **.1** expense of transportation and living expenses in connection with out-of-town travel authorized by the Owner;

  **.2** long-distance communications;

  **.3** fees paid for securing approval of authorities having jurisdiction over the Project;

  **.4** reproductions;

  **.5** postage and handling of Drawings and Specifications;

  **.6** expense of overtime work requiring higher than regular rates, if authorized by the Owner;

  **.7** renderings and models requested by the Owner;

  **.8** expense of additional insurance coverage or limits, including professional liability insurance, requested by the Owner in excess of that normally carried by the Architect and Architect's consultants; and

  **.9** ~~expense of computer-aided design and drafting equipment time when used in connection with the Project.~~

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

**10.3    PAYMENTS ON ACCOUNT OF BASIC SERVICES**

**10.3.1** An initial payment as set forth in Paragraph 11.1 is the minimum payment under this Agreement.

**10.3.2** Subsequent payments for Basic Services shall be made monthly and, where applicable, shall be in proportion to services performed within each phase of service.

**10.3.3** If and to the extent that the time initially established in Subparagraph 11.5.1 of this Agreement is exceeded or extended through no fault of the Architect, compensation for any services rendered during the additional period of time shall be computed in the manner set forth in Subparagraph 11.3.2.

**10.3.4** When compensation is based on a percentage of Construction Cost and any portions of the Project are deleted or otherwise not constructed, compensation for those portions of the Project shall be payable to the extent services are performed on those portions, in accordance with the schedule set forth in Sub-

paragraph 11.2.2, based on (1) the lowest bona fide bid or negotiated proposal, or (2) if no such bid or proposal is received, the most recent preliminary estimate of Construction Cost or detailed estimate of Construction Cost for such protions of the Project.

**10.4    PAYMENTS ON ACCOUNT OF ADDITIONAL SERVICES AND REIMBURSABLE EXPENSES**

**10.4.1** Payments on account of the Architect's Additional Services and for Reimbursable Expenses shall be made monthly upon presentation of the Architect's statement of services rendered or expenses incurred.

**10.4    PAYMENTS WITHHELD**

**10.5.1** No deductions shall be made from the Architect's compensation on account of sums withheld from payments to contractors.

---

## ARTICLE 11
## BASIS OF COMPENSATION

The owner shall compensate the Architect as follows:

**11.1    AN INITIAL PAYMENT OF**                Three Thousand                Dollars (    $3,000.00    )
shall be made upon execution of this Agreement and credited to the Owner's account at final payment.

**11.2    BASIC COMPENSATION**

**11.2.1** FOR BASIC SERVICES, as described in Article 2, and any other services included in Article 12 as part of Basic Services, Basic Compensation shall be computed as follows:
*(Insert basis of compensation, including stipulated sums, multiples or percentages, and identify phases to which particular methods of compensation apply, if necessary.)*

The Base Fee for Architectural Services shall be $9.00 per gross square foot area of the Project.

See Article 12 for Engineering Services        $3.00 / sq ft   unfinished /empty   space   (basement, attic)

**11.2.2** Where compensation is based on a stipulated sum or percentage of Construction Cost, progress payments for Basic Services in each phase shall total the following percentages of the total Basic Compensation payable:

| | | |
|---|---|---|
| Programming | @ | $1,500.00 |
| Design Phase: | @ | 35% of Total Base Fee  less ($1,500.00)<br>(i.e. 35% x $9.00 x s. f. area of Approved Project Program) |
| Construction Documents Phase | @ | 50% of Total Base Fee<br>(i.e. 50% x $9.00 x s. f. area of Approved Project Floor Plan) |
| Construction Phase | @ | 15% of Total Base Fee<br>(i.e. 15% x $9.00 x s.f. area of Project under construction) |
| Total Basic Compensation | @ | 100% of Total Base Fee |

---

**WARNING: Unlicensed photocopying vioulates U.S. copyright laws and is subject to legal prosecution.**

**11.3    COMPENSATION FOR ADDITIONAL SERVICES**

**11.3.1**   FOR PROJECT REPRESENTATION BEYOND BASIC SERVICES, as described in paragraph 3.2, compensation shall be computed as follows:

| | | |
|---|---|---|
| Principal Time | @ | $120.00 per Hour |
| Associate Time | @ | 110.00 per Hour |
| Project Manager Time | @ | 100.00 per Hour |
| Technical Designer Time | @ | 90.00 per Hour |
| Draftsman Time | @ | 80.00 per Hour |
| Secretarial Time | @ | 70.00 per Hour |
| Consultant Time | @ | 1.2x Direct Expense |

**11.3.2**   FOR ADDITIONAL SERVICES OF THE ARCHITECT provided under Article 3 or identified in Article 12, compensation shall be computed as follows:
*(Insert basis of compensation, including rates and/or multiples of Direct Personnel Expense for Principals and employees, and identify Principals and classify employees, if required. Identify specific services to which particular methods of compensation apply, if necessary.)*

| | | |
|---|---|---|
| Principal Time | @ | $120.00 per Hour |
| Associate Time | @ | 110.00 per Hour |
| Project Manager Time | @ | 100.00 per Hour |
| Technical Designer Time | @ | 90.00 per Hour |
| Draftsman Time | @ | 80.00 per Hour |
| Secretarial Time | @ | 70.00 per Hour |
| Consultant Time | @ | 1.2x Direct Expense |
| Principal Consultation Time | @ | 200.00 per Hour (For consultation not related to an ongoing project) |

**11.3.3**   FOR ADDITIONAL SERVICES OF CONSULTANTS, including additional structural, mechanical and electrical engineering services and those provided under Article 3 or identified in Article 12 as part of Additional Services, a multiple of ( 1.2 ) times the amounts billed to the Architect for such services.
*(Identify specific types of consultants in Article 12, if required.)*

**11.4    REIMBURSABLE EXPENSES**

**11.4.1**   FOR REIMBURSABLE EXPENSES, as described in Paragraph 10.2, and any other items included in Article 12 as Reimbursable Expenses, a multiple of            One & 2/10            ( 1.2 ) times the expenses incurred by the Architect, the Architect's employees and consultants in the interest of the Project.

**11.5    ADDITIONAL PROVISIONS**

**11.5.1**   IF THE BASIC SERVICES covered by this Agreement have not been completed within    Twelve ( 12 18 ) months of the date hereof, through no fault of the Architect, extension of the Architect's services beyond that time shall be compensated as provided in Subparagraphs 10.3.3 and 11.3.2.

**11.5.2**   Payments are due and payable            Ten            ( 10 ) days from the date of the Architect's invoice. Amounts unpaid            Thirty            ( 30 ) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Architect.
*(Insert rate of interest agreed upon.)*

Interest Rate shall be 1.8% per month
*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Architect's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Specific legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

**11.5.3**   The rates and multiples set forth for Additional Services shall be annually adjusted in accordance with normal salary review practices of the Architect.

WARNING: Unlicensed photocopying violautes U.S. copyright laws and is subject to legal prosecution.

OTHER CONDITIONS OR SERVICES

**12.1  SCHEMATIC DESIGN PHASE**
Once the Project Program is approved, the Schematic Design Drawings shall be developed and shall consist of Floor Plans of all levels, Exterior Elevations, and a Site Plan, if applicable. A Construction Cost Estimate, based on square foot area of the Project, shall be included. The Fee for Schematic Design shall be based on the Project Program approved by the Owner. If the Project Program is reduced by the Owner after Schematic Design has begun, then the necessary revisions to the Schematic Design Drawings shall be made as an Additional Service on an hourly basis, in addition to the initial Schematic Design Fee. If the Project Program is increased, the Schematic Design Fee shall be adjusted to include the additional square foot area of the project.

**12.2  EXISTING CONDITIONS**
The Owner shall provide the Architect with Drawings of all existing conditions of the Project. The Architect shall be entitled to rely upon the accuracy and completeness of such Drawings. If the Architect must record and document existing conditions, then such work shall be considered an Additional Service and shall be provided in accordance with Article 11.3.

**12.3  ENGINEERING SERVICES**
The Architect shall provide normal Structural Engineering Services at a not-to-exceed fee of $2,000.  The Architect shall provide normal Mechanical, Plumbing and Electrical Engineering Services in either one of two (2) ways at the Owner's option.
Option 1: the Architect shall provide performance criteria for a design/build system by the Contractor at no additional fee.
Option 2: the Architect shall provide full Engineering Services for each engineering discipline at an additional fee of not-to-exceed $2,000 per discipline.

**12.4  FEE FOR CONSTRUCTION ADMINISTRATION**
The fee for Construction Administration shall be divided into equal weekly amounts over the period of time set aside for Construction as stipulated in the Owner and Contractor Agreement. If the Construction Period goes beyond that which is stipulated in the Owner and Contractor Agreement, then the Architect shall be reimbursed for each additional week of Construction in an amount equal to each previous weekly amount until such time as Final Completion of the Project is reached. Billing for Construction Administration shall occur monthly.

**12.5  SITEWORK & SITE IMPROVEMENTS**
As part of the Architect's Basic Services, the Architect shall design an overall site plan, including a layout for vehicular parking and pedestrian walkways. However, Construction Documents for all sitework and site improvement work, outside the limit of the building perimeter foundation walls, shall be provided as an Additional Services on an hourly basis in accordance with Article 11.3.

**12.6  DISPUTE RESOLUTION LOCALE**
The locale for the resolution of any dispute between the parties to this Agreement shall be in the principal place of business of the Architect.

**12.7  PROJECT APPROVAL APPEARANCES**
One (1) appearance before local agencies that have jurisdiction over the approval of the Project is included in the Architect's fee for Basic Services. Any additional appearances shall be provided as required as an Additional Service on an hourly basis in accordance with Article 11.3.

**12.8  TAXES OR FEES ENACTED BY THE GOVERNMENT**
Any taxes or fees enacted by local, state, or Federal Government, based on gross receipts or revenues which must be paid by the Architect, will be added to amounts due under this Agreement.

**12.9  UNPAID ARCHITECTURAL FEES**
If the Architect must make a claim for unpaid architectural fees, then such claim shall be heard in arbitration, in accordance with Article 7. All other claims of any nature, including any counterclaims and/or crossclaims, shall be heard in a court of law of proper jurisdiction. The American Arbitration Association shall not have jurisdiction over any such other claims. If the Architect must expend legal fees to collect unpaid architectural fees, then such expenditures shall be considered a Reimbursable Expense in accordance with Article 11.4.

This Agreement entered into as of the day and year first written above.

OWNER

_(Signature)_ Mike McTigue, DVM

GARDNER ANIMAL HOSPITAL
_(Printed name and title)_

ARCHITECT

_(Signature)_ Warren Freedenfeld, AIA, President

WARREN FREEDENFELD & ASSOCIATES, INC.
_(Printed name and title)_

AIA DOCUMENT B151 • ABBREVIATED OWNER-ARCHITECT AGREEMENT • THIRD ADDITION • AIA® • © 1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

B151-1987  8

WARNING: Unlicensed photocopying violautes U.S. copyright laws and is subject to legal prosecution.

RECEIVED   16 AUG 99



**Michael P. McTigue, D.V.M.**
**Brian C. Hurley, D.V.M.**
**Kathleen J. O'Brien, D.V.M.**

GARDNER ANIMAL HOSPITAL
7 Pearson Blvd.
Gardner, MA 01440
Telephone: (978) 632-7110

Warren Freedenfeld & Associates, Inc.
39 Church Street
Boston, MA  02116

Dear Mr. Freedenfeld:

This letter is sent to you pursuant to the terms of Article 8.1 of the AIA Document B151 executed by and between us dated March 24, 1998, regarding the proposed construction of the Gardner Animal Hospital on my behalf.  Furthermore, this letter is sent to you as written confirmation of the termination of the contract entered into by and between us verbally during our phone discussion on June 25, 1999, which termination was further confirmed by you in your letter of July 22, 1999 to me.

The reason for the termination action taken on June 25, 1999, and for this letter in confirmation of same, is that you failed substantially to perform in accordance with the terms of the Agreement above referenced through no fault of mine.

Some, and this list is not all inclusive, of the reasons for this termination are as follows:

1.      Although I was charged nearly $50,000 for work you purport to have done, substantial portions of that work had not, indeed, ever been completed by you.  For example, foundation drawings were never developed by you, nor were the proper elevations used.  Additionally, there were residual questions as to whether work you had said had been done, and billed me for, had ever actually been done.

2.      Whatever plans, drawings etc. You did prepare have proven to be useless to us, and they have been rolled up and discarded.  This, in spite of my having paid you tens of thousands of dollars; unfortunately, I again have to pay another architect another tens of thousands of dollars to complete the project.

3.      Most importantly, you continued to refuse to recognize that a redesign of the plans, etc. was required to reduce the cost of the project to a manageable financial level.  You knew full well that my bank had limited me to construction costs of $1,000,000.00, while everyone to whom I spoke in the construction industry and elsewhere indicated that the project as you had designed it could not be completed for less than approximately $1.3 million, some 30% over my project budget.

I regret having had to take this action and I wish you success in your future endeavors.

Sincerely,

Michael P. McTigue, DVM

EXHIBIT: 29
DATE: 1.23.07
McTigue
CAROL A. JACKSON

# TERMINATION AND MUTUAL RELEASE AGREEMENT
## BETWEEN GARDNER ANIMAL HOSPITAL AND
## WARREN FREEDENFELD & ASSOCIATES INC.

WHEREAS Michael P. McTigue, DVM, and Gardner Animal Hospital, collectively ("GAH") and Warren Freedenfeld & Associates Inc. ("WFA") had previously entered into an Owner and Architect Agreement dated 24 March 1998 ("Agreement"), for the provision of architectural services in connection with the Gardner Animal Hospital, located at 73 Eaton Street, Gardner, Massachusetts ("the Project"), and

WHEREAS the Schematic Design and partial Construction Drawings for such Project has been substantially completed, and

WHEREAS the parties desire to terminate their Agreement without the provision of any further services by WFA,

NOW THEREFORE, in consideration of the mutual agreements contained herein, the parties agree as follows:

1.   The Agreement is terminated and the parties shall have no further obligations except as set forth in this Termination and Mutual Release Agreement.

2.   Upon execution of this Agreement, GAH shall pay WFA Seven Thousand Five Hundred Dollars ($7,500.00) as final and total payment for all services provided and expenses incurred to date.  This amount shall be in addition to all previous amounts paid by GAH and/or received by WFA.

3.   GAH agrees not to use any of the work _SOLELY lift (w)_ produced by WFA.  Article 6 of the Owner and Architect Agreement shall remain in full force and affect.

4.   GAH and WFA agree to release each other of and from all loss, expense, claim, or action of any kind arising at any time from this date forward, whether arising out of the Agreement or otherwise, intending thereby to give each other a general release of all claims each may have against each other to date, and in the future, except as to the obligations under this Termination and Mutual Release Agreement, which are not being released.


Executed as a contract under seal this __2 ND__ day of __SEP__, 1999.


Owner:

Gardner Animal Hospital
7 Pearson Boulevard
Gardner, MA  01440

By _____
    Michael P. McTigue, DVM


Witness:

By _____
Name: BRIAN C. HURLEY DVM


Architect:

Warren Freedenfeld & Associates Inc.
39 Church Street
Boston, MA  02116

By _____
    Warren Freedenfeld AIA, President


Witness:

By _____
Name: Sasha A. Chanaka

Page 1

VOLUME: I

PAGES: 1-183

EXHIBITS: 1-14

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

WARREN FREEDENFELD ASSOCIATES, INC., as

successor in interest to Warren Freedenfeld

& Associates, Inc.,

                Plaintiff,     C.A. No.

   v.                 05-11573 RGS

MICHAEL P. McTIGUE, DVM, individually

And as Trustee of the McTigue Family

Trust, NANCY A. McTIGUE, as Trustee of

The McTigue Family Trust, BRIAN C. HURLEY,

DVM, GARDNER ANIMAL CARE CENTER, LLC d/b/a

Gardner Animal Hospital, EDWARD A. CORMIER

ASSOCIATES, INC., and BENNETT BUILDING

CORPORATION,

                Defendants.

- - - - - - - - - - - - - - - - - - x

(Caption Continued on Page 2)

       DEPOSITION of WARREN C. FREEDENFELD

          December 28, 2006

c4cc9198-4728-4a22-b00d-6351dcf91f41

## Page 66

1  they in form to be built from or would more work
2  need to be done before construction could begin?
3      MR. McCALL: Objection.
4      A.  More work would need to be done.
5      Q.  What more work would need to be done had
6  you stayed on the project to go from these drawings
7  to as-built plans or whatever is the level of plans
8  needed for the builder to move forward?
9      A.  There is dimensions, there's material
10 identifications, there are interior details,
11 exterior details, that sort of thing.
12     Q.  Other than the "Veterinary Economics"
13 magazine, are you aware of Cormier's plans being
14 submitted to any public entity or any publication or
15 organization?
16     A.  Not that I'm aware of.
17     Q.  Have you ever seen any advertising by
18 Edward Cormier Associates?
19     A.  No.
20     Q.  Do you know whether Edward Cormier
21 Associates ever used the "Veterinary Economics"
22 magazine and merit award in its advertising?
23     A.  I don't know that.
24     Q.  Now, you testified a little bit ago about

## Page 67

1  the potential harm to you from the "Veterinary
2  Economics" magazine identifying Cormier rather than
3  Freedenfeld, and that you lost the exposure from
4  that to your potential client base; is that an
5  accurate way of putting it?
6      MR. McCALL: Objection.
7      A.  I believe that's correct.
8      Q.  Is there any other harm that Warren
9  Freedenfeld Associates suffered from Edward Cormier
10 Associates' development of their plans and work on
11 this project?
12     MR. LEE: Objection.
13     A.  Well, there would be the completion of the
14 work that we started and the fees associated with
15 that. But I think the primary harm is the lost
16 opportunity for exposure to other veterinarians, and
17 again, the loss is here in my home state.
18     Q.  So aside from the exposure to the other
19 veterinarians and potential clients, your losses
20 would have been the additional earnings you would
21 have made on this contract to build this hospital?
22     MR. LEE: Objection.
23     A.  I believe that's correct. I don't know if
24 that's the total, but that's, at least, what's

## Page 68

1  coming to mind at the moment.
2      Q.  Okay.  The drawings you made for the
3  Gardner Animal Hospital, could these drawings be
4  used on other projects by you or are they only
5  useful for building the Gardner Animal Hospital?
6      MR. McCALL: Objection.
7      A.  They are primarily for the Gardner Animal
8  Hospital. As I said before, every project has
9  certain unique aspects to it. So I couldn't just
10 take those plans and use them for someone else's
11 hospital, because every veterinarian has unique
12 goals, objectives, philosophies, requirements,
13 priorities.
14     Q.  So each animal hospital you did down the
15 road, you couldn't just use exactly the same plans
16 you had developed for the Gardner hospital; is that
17 right?
18     A.  Well, yes.  I've used the same concepts
19 throughout all of my hospitals over the past 30
20 years.
21     Q.  But the plans themselves, you would have to
22 change them to fit the needs of the next client?
23     A.  Oh, yes.
24     Q.  And you'd also have to change them to fit

## Page 69

1  the physical site requirements?
2      A.  Correct, yes.
3      Q.  Has Warren Freedenfeld Associates done work
4  outside of Massachusetts?
5      A.  Yes.
6      Q.  When did you first do a project outside of
7  Massachusetts?
8      A.  I believe the very next project after
9  Wakefield was outside of Massachusetts. I think it
10 was in New Hampshire.
11     Q.  When was the Wakefield hospital project?
12     A.  I think it was built in '75, '76.
13     Q.  Have you consistently had projects outside
14 of Massachusetts since that time?
15     A.  Oh, yes.
16     Q.  About how many projects have you done
17 outside of Massachusetts?
18     A.  I would say 90 percent of our projects are
19 outside of Massachusetts.
20     Q.  Okay. How many states have you worked in,
21 have you had projects in? Another way of putting
22 it, what states have you had projects outside of
23 Massachusetts?
24     A.  We've done projects in approximately 40 of

18  (Pages 66 to 69)

c4cc9198-4728-4a22-b00d-6351dcf91f41