# United States Court of Appeals
## For the First Circuit

No. 07-1602

WARREN FREEDENFELD ASSOCIATES, INC.,

Plaintiff, Appellant,

v.

MICHAEL P. MCTIGUE, D.V.M., ET AL.,

Defendants, Appellees.

No. 07-1603

WARREN FREEDENFELD ASSOCIATES, INC.,

Defendant in Counterclaim, Appellee,

v.

MICHAEL P. MCTIGUE, D.V.M.,

Counterclaimant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Richard G. Stearns, U.S. District Judge]

Before

Boudin, Chief Judge,
O'Connor,* Associate Justice (Ret.),
and Selya, Senior Circuit Judge.

---

*Hon. Sandra Day O'Connor, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

Garrett J. Lee and Robert A. McCall, with whom Barry S.
Scheer, Parker Scheer, LLP, Michael J. Stone, and Peabody & Arnold
LLP were on brief, for plaintiff.

Robert N. Meltzer, with whom The Mountain States Law Group,
Mary C. Casey, and The Harbor Law Group were on brief, for
defendants.

---

June 20, 2008

---

**SELYA**, **Senior Circuit Judge**.  These appeals rise, like the mythical Phoenix, out of the ashes of a failed business relationship between an architectural firm and its quondam client. They present interesting questions concerning the application of both the discovery rule and the work for hire doctrine in copyright infringement cases.

In the court below, the district judge dismissed the architectural firm's copyright infringement claim on timeliness grounds and thereafter, at the summary judgment stage, ruled that the client's counterclaims could not be proven.  He also denied, anticipatorily, the defendants' nascent but as-yet-unasserted claim for attorneys' fees.    As  framed,  the  instant  cross-appeals implicate all three rulings.

After  careful  consideration,  we  conclude  that  the district court incorrectly charged the architectural firm with inquiry notice of the alleged acts of copyright infringement and, therefore, vacate its dismissal of that cause of action.    This disposition renders moot the anticipatory denial of attorneys' fees because the defendants are no longer prevailing parties as to that copyright  infringement  claim.    Finally,  although  we  follow  a somewhat different analytic path, we affirm the lower court's entry of summary judgment on the counterclaims.

## I.  BACKGROUND

We rehearse here only those facts that are necessary to place these appeals in perspective.

In March of 1998, Michael P. McTigue, a veterinarian, hired Warren Freedenfeld Associates, Inc. (WFA), an architecture firm,[1] to design a veterinary hospital to be built in Gardner, Massachusetts.  The parties executed a design agreement using a form promulgated by the American Institute of Architects (the AIA Agreement).  Article 6 of the AIA Agreement provided that WFA would be "deemed the author" of all plans and drawings prepared for the project and would "retain all common law, statutory and other reserved rights [therein], including the copyright."

The relationship soon soured.  Warren Freedenfeld, WFA's president, complained of nonpayment; McTigue countered with a charge that WFA had failed adequately to perform required services and, in the bargain, had neglected to keep the project within budget.  During negotiations aimed at dissolving this impasse, WFA sent McTigue a letter, dated July 30, 1999, which warned that the plans and drawings produced by WFA were proprietary and that neither McTigue nor any successor architect could make use of them to complete the project.  The letter demanded that, upon arriving

---

[1]At the time, the firm was known as Warren Freedenfeld & Associates, Inc.  Because the difference between these two entities is immaterial for present purposes, we refer throughout to WFA.

-3-

at mutually acceptable terms for cancellation of the AIA Agreement, McTigue return all material previously submitted by WFA.

McTigue replied approximately two weeks later. He pronounced all of WFA's plans and drawings "useless" and declared that they had been "rolled up and discarded." Relatedly, he bemoaned the fact that he would have to pay another architect "tens of thousands of dollars" to finish the project.

As the negotiations dragged along, WFA took a prophylactic step: it secured a copyright over the plans and drawings by filing an application with the United States Copyright Office. See 17 U.S.C. § 408(a).

On September 2, 1999, the two sides finally reached an accord (the Termination Agreement). Pertinently, section 3 of that agreement stipulated that article 6 of the AIA Agreement remained "in full force and affect [sic]." Section 3 further provided that neither McTigue nor his proposed veterinary hospital (the Gardner Animal Hospital) would "use any of the work solely produced by WFA." The word "solely" was handwritten and inserted in the typewritten text. Both McTigue and Freedenfeld initialed that alteration.

McTigue thereafter retained a different architectural firm, Edward D. Cormier Associates, Inc., to complete the facility. In October of 1999, the city issued a building permit and

-4-

construction proceeded apace. The veterinary hospital opened for business on or about June 9, 2000.

The next four years would prove to be the calm before the storm. In 2004, Freedenfeld came across an article in Veterinary Economics, a trade publication. It featured a drawing of the floor plan of the Gardner Animal Hospital and reported that the design had won a merit award. After obtaining a copy of the building plans from the city, Freedenfeld concluded that WFA's copyright had been infringed.

On September 26, 2005, WFA filed suit in federal district court against McTigue, the hospital, and several related parties. Its complaint alleged various counts of copyright infringement, 17 U.S.C. § 501, and violations of the Lanham Act, 15 U.S.C. § 1125(a). The defendants moved to dismiss, noting among other things the three-year statute of limitations contained in the Copyright Act. See 17 U.S.C. § 507(b).

Ruling from the bench, the district court granted this motion with respect to the copyright infringement claim. The court found "overwhelming" evidence that any "reasonably diligent person" in WFA's position would have learned of the supposed infringement no later than the date when the hospital opened. Since WFA's action had been instituted more than five years after that date, the three-year statute of limitations for copyright infringement barred its claim.

-5-

WFA's Lanham Act claim proceeded. In due course, McTigue counterclaimed, asserting copyright infringement and a gallimaufry of other federal and state-law causes of action. The common denominator of those causes of action was an assertion that WFA's continued use of the plans and drawings offended McTigue's proprietary rights under both federal and common law. While McTigue conceded that he had not personally prepared any of the plans or drawings, he posited that his contribution to the copyrighted material made him at least a co-owner of a portion of the copyrighted work.

After some skirmishing (not relevant here), WFA moved for summary judgment with respect to the counterclaims. McTigue opposed the motion. In an affidavit, he expounded on his claim that the Termination Agreement memorialized both his sole ownership of a portion of the copyrighted work and his joint ownership of other portions of that work.

The district court was unimpressed. Relying primarily on the express language of the two written agreements, it granted WFA's motion. See Warren Freedenfeld Assocs., Inc. v. McTigue, No. 05-11573, 2007 WL 757874, at *2-3 (D. Mass. Mar. 9, 2007). The court added that, in all events, McTigue's contribution to the work appeared unremarkable in light of the traditional character of the architect-client relationship. Id. at *2.

-6-

At the same time, the court granted summary judgment for
the defendants on WFA's Lanham Act claim. And although it had not
been asked to rule on the point, the court entered a separate order
declining to award attorneys' fees to the defendants with respect
to WFA's unsuccessful copyright infringement claim. See 17 U.S.C.
§ 505.

These cross-appeals followed. In them, WFA challenges
only the district court's dismissal of its copyright infringement
claim. The defendants collectively challenge the anticipatory
denial of attorneys' fees in connection with their triumphant
defense of that claim. In addition, McTigue challenges what he
characterizes as the premature termination of his counterclaims.

## II. ANALYSIS

We begin with WFA's appeal and then proceed to McTigue's
appeal. For reasons that will become apparent, we need not treat
with the order anticipatorily denying attorneys' fees.

### A. WFA's Appeal.

Because the district court dismissed WFA's copyright
infringement claim pursuant to Rule 12(b)(6), we afford de novo
review. See Rodi v. S. New Engl. Sch. of Law, 389 F.3d 5, 12 (1st
Cir. 2004). In conducting that tamisage, we accept as true all
well-pleaded facts and draw all reasonable inferences therefrom in
favor of the nonmovant (here, WFA). See Aguilar v. U.S. ICE, 510
F.3d 1, 21 (1st Cir. 2007); Educadores Puertorriqueños en Acción v.

-7-

Hernández, 367 F.3d 61, 62 (1st Cir. 2004); see also Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007). Those facts may be derived from the complaint, from documents annexed to or fairly incorporated in it, and from matters susceptible to judicial notice. See Redondo-Borges v. U.S. Dep't of HUD, 421 F.3d 1, 5 (1st Cir. 2005). Where, as here, dismissal is premised on the running of a statute of limitations, we will affirm only if the facts, so derived and viewed in the requisite perspective, "leave no doubt that an asserted claim is time-barred." LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 509 (1st Cir. 1998). These precepts frame our consideration of WFA's appeal.

The Copyright Act provides in relevant part that no claim for copyright infringement shall be maintained "unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). This date of accrual is not always determined mechanically; in certain circumstances, accrual contemplates application of the so-called discovery rule. See, e.g., Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co., 510 F.3d 77, 81 (1st Cir. 2007); Santa-Rosa v. Combo Records, 471 F.3d 224, 227 (1st Cir. 2006). Under the aegis of this rule, a claim accrues only when a plaintiff knows or has sufficient reason to know of the conduct upon which the claim is grounded. See Santa-Rosa, 471 F.3d at 227.

-8-

The easy cases are those involving actual knowledge of an act of infringement. There, accrual begins with the acquisition of that knowledge; thus, computing the limitations period is simply a matter of checking the passage of time. See, e.g., Barrett ex rel. Estate of Barrett v. United States, 462 F.3d 28, 40-41 (1st Cir. 2006).

In the absence of actual knowledge — and there is no allegation of such knowledge in the complaint — the question becomes when a reasonably prudent person in the plaintiff's shoes would have discovered (that is, would have acquired an awareness of) the putative infringement. See Stone v. Williams, 970 F.2d 1043, 1048 (2d Cir. 1992); John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 186 F. Supp. 2d 1, 24 (D. Mass. 2002); cf. Rodríguez-Narváez v. Nazario, 895 F.2d 38, 41 n.5 (1st Cir. 1990) (indicating that civil rights action accrues "when the aggrieved party knows or has reason to know of the injury that is the basis for his action or when facts supportive of [such an] action are or should be apparent to a reasonably prudent person similarly situated").

It stands to reason that determining when a reasonable person would have become aware of a copyright infringement is a fact-sensitive enterprise. Common sense suggests, therefore, that an inquiring court must explore the idiosyncratic circumstances of each individual case. One thing is clear, however: the reasonable person standard incorporates a duty of diligence. It is not a

-9-

barrier to accrual that a plaintiff has failed to discover a cause of action if a reasonably diligent person, similarly situated, would have made such a discovery. See Taylor v. Meirick, 712 F.2d 1112, 1118 (7th Cir. 1983). In other words, a plaintiff can be charged with inquiry notice, sufficient to start the limitations clock, once he possesses information fairly suggesting some reason to investigate whether he may have suffered an injury at the hands of a putative infringer. See, e.g., Alexander v. Oklahoma, 382 F.3d 1206, 1216 (10th Cir. 2004); Wolinetz v. Berkshire Life Ins. Co., 361 F.3d 44, 48 (1st Cir. 2004); cf. Kennedy v. Josephthal & Co., 814 F.2d 798, 802 (1st Cir. 1987) (suggesting in the securities fraud context that a person is on inquiry notice when he is aware of "storm warnings" that would prompt a reasonable person to investigate the possibility of fraud).

But the duty to investigate is not always in the wind. Typically, inquiry notice must be triggered by some event or series of events that comes to the attention of the aggrieved party. See McIntyre v. United States, 367 F.3d 38, 52 (1st Cir. 2004). The familiar aphorism teaches that where there is smoke there is fire; but smoke, or something tantamount to it, is necessary to put a person on inquiry notice that a fire has started.

In the case at hand, the district court concluded that the evidence compelled a conclusion that WFA was on inquiry notice anent the alleged copyright infringement no later than the day that the

-10-

veterinary hospital opened its doors to the public (an event that transpired on or about June 9, 2000). In support of this conclusion, the court pointed out that WFA knew all along that McTigue intended to complete the project; that the plans for the construction were on file with the municipality and had become public records as early as the fall of 1999; that construction had proceeded using the same facade and on the same site as originally contemplated; and that after the veterinary hospital opened, it was at all times available for viewing by anyone who might be curious about its design.

The district court's conclusion is plausible, but it is not compelled. A searching examination of the complaint and the documents annexed thereto reveals no facts, prior to Freedenfeld's chance encounter with a trade publication in 2004, sufficient to mandate a conclusion that a reasonable person would have suspected that the copyrighted material had been used in an unauthorized manner. In the absence of some triggering event — some sign of storm clouds gathering on the horizon — WFA cannot be charged as a matter of law with inquiry notice.

The defendants asseverate that McTigue's letter, expressing his intention to complete the construction of the veterinary hospital with the help of another architect, suggested that WFA's copyrighted plans and drawings would be used. That is simply too much of a stretch. There is no presumption that failed

-11-

business relationships inevitably will give rise either to tortious conduct or disregard of proprietary rights. That a relationship between an architect and a client has become frayed and the client has decided to forge ahead with the project by engaging some other architect does not, in and of itself, serve as a harbinger of an intention to violate the original architect's copyright protection.

At any rate, the statement in McTigue's letter cannot be read in isolation. WFA specifically warned McTigue that the plans and drawings could not be used to complete the project. It had no reason to believe that McTigue might thumb his nose at this warning. Moreover, McTigue's reply — that the plans and drawings were "useless" and had been "discarded" — would have made a reasonable person in WFA's position more secure, not less secure, in a belief that infringement was an unlikely scenario. So, too, McTigue's lament that he would have to spend "tens of thousands of dollars" for a new architect seemingly confirmed that he viewed WFA's copyrighted material as having no utility at all. Unless there is more to the story — a possibility that the parties are free to explore during future discovery — a reasonable person standing in WFA's shoes easily could have accepted McTigue's statements at face value.

The defendants' contention that the wording of the Termination Agreement should have alerted WFA to McTigue's intent to use the copyrighted material is without force. As amended,

-12-

section 3 of the Termination Agreement prohibited the defendants from using material "solely produced by WFA" — and nothing about that phraseology gave rise to a reasonable suspicion that skulduggery was afoot. The plain terms of the Termination Agreement did not authorize the defendants to use any copyrighted material, nor did those terms hint at a clandestine intention to violate the very copyright interest that the agreement preserved. Indeed, the next sentence in section 3 stipulated that article 6 of the AIA Agreement, which recognized WFA's copyright over the plans and drawings, remained in full force and effect.

This brings us to the defendants' notion that two related facts — the availability of the as-built plans and the opening of the hospital on or about June 9, 2000 — somehow combined to put WFA on inquiry notice. This notion is unfounded.

There is nothing in the record that suggests that WFA either reviewed the filed plans or toured the facility at any time before 2004. Nor is there any evidence of a triggering event that might have prompted a reasonable architect to do so. Architects have no general, free-standing duty to comb through public records or to visit project sites in order to police their copyrights.[2] Consequently, the two facts relied upon by the defendants do not, as a matter of law, serve to put a copyright holder on inquiry

_____

[2]The complaint and related materials do not speak to any relevant custom or practice that would form the basis for a finding of inquiry notice.

-13-

notice of possible infringement.  Cf. Gaiman v. McFarlane, 360
F.3d 644, 654 (7th Cir. 2004) (indicating that "unless there is a
duty of authors to read the copyright pages of works containing
their copyrighted materials . . . the [copyright] notice can
affect the accrual of the cause of action only if the victim reads
it").  While "[t]he purpose of statutes of limitations is to avoid
the difficulties inherent in litigating matters long past,"
Marcoux v. Shell Oil Prods. Co., 524 F.3d 33, 42 (1st Cir. 2008),
there is no warrant, in the name of repose, for placing special
burdens on an architect's efforts to protect his legal rights.

          We acknowledge the district court's legitimate concern
that the discovery rule has the potential to extend statutes of
limitations "ad infinitum."    But the defendants have not
challenged the general applicability of the rule in copyright
infringement cases[3] and, in any event, the rule reflects a sensible
tradeoff — a policy decision that balances the important interests
of repose against the substantial hardship that an inflexible
statute of limitations might otherwise foster.  See, e.g., Maughan

_____

[3] In TRW Inc. v. Andrews, 534 U.S. 19, 28 (2001), the Supreme
Court rejected the application of the discovery rule in "improper
disclosure" claims under the Fair Credit Reporting Act, 15 U.S.C.
§ 1681 et seq.  In the wake of that decision, a smattering of
judges and commentators have questioned the continued vitality of
the discovery rule in copyright infringement cases.  See, e.g.,
Auscape Int'l v. Nat'l Geo. Soc'y, 409 F. Supp. 2d 235, 242-48
(S.D.N.Y. 2004); 3 Melville B. Nimmer & David Nimmer, Nimmer on
Copyright § 12.05[B][2][b], at 12-150.4 to 150.8 (2007).  We need
not deal with such questions here.

-14-

v. SW Serv'g, Inc., 758 F.2d 1381, 1384 (10th Cir. 1985): see also
Skwira v. United States, 344 F.3d 64, 84 (1st Cir. 2003) (Boudin,
C.J., concurring) (observing that "the discovery rule is a
compromise between competing interests").

To say more about WFA's appeal would be to paint the
lily. At the motion to dismiss stage, the record contained some
facts that hinted at the possibility of inquiry notice as early as
mid-2000, but no facts that justified a compelled finding that WFA
was on inquiry notice at that juncture. We therefore vacate the
district court's order of dismissal on the claim of copyright
infringement.

## B. **McTigue's Appeal**.

We turn now to the question of whether the district
court erred in granting summary judgment in favor of WFA on the
counterclaims.[4]

We review a grant of summary judgment de novo,
canvassing the record evidence in the light most flattering to the
nonmoving party (here, McTigue) and drawing all reasonable
inferences in that party's favor. See Houlton Citizens' Coal. v.
Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999). We can affirm

---

[4]McTigue and the other defendants also question the district
court's anticipatory denial of attorneys' fees.  Because this
opinion requires vacation of the judgment as to WFA's copyright
infringement claim, see supra Part II(A), the defendants are no
longer prevailing parties on that claim.  Consequently, they have
no entitlement to attorneys' fees, see 17 U.S.C. § 505, and this
ground of appeal is moot.

-15-

the entry of summary judgment only if the record discloses no genuine issue of material fact and shows with certitude that the movant is entitled to judgment as a matter of law. See Havlik v. Johnson & Wales Univ., 509 F.3d 25, 29 (1st Cir. 2007); see also Fed. R. Civ. P. 56(c). In this inquiry, we are not wedded to the lower court's rationale but may uphold the judgment on any independent ground made manifest by the record. See Houlton Citizens' Coal., 175 F.3d at 184.

Although McTigue originally mounted a cavalcade of counterclaims, his focus on appeal is such that everything hinges on one indispensable allegation: that he retained a protectable interest in some portion of the plans and drawings — an interest that WFA impugned. McTigue's arguments on appeal uniformly treat this as an allegation of copyright infringement on WFA's part.

To prevail on a copyright infringement claim, the proponent must prove ownership of a valid copyright and the unauthorized copying of constituent elements of the work that are original. See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); Latin Am. Music Co. v. Archdiocese of San Juan, 499 F.3d 32, 38 (1st Cir. 2007). Here, the viability of the counterclaims depends on the threshold question of ownership.

After studying the record, the district court concluded that McTigue could not demonstrate that he was even a joint author of any portion of the copyrighted work. See Warren Freedenfeld

Assocs., 2007 WL 757874, at *3.  Thus, McTigue could not sustain

a claim of ownership.  Id. at *3-4.  We believe that McTigue's

appeal can be resolved more readily on a different rationale — one

that does not require us to determine whether he can be regarded

as a joint author of any portion of the copyrighted material.

This approach necessitates subdividing McTigue's claim

of ownership into its two component parts.  We start with his

claim of joint ownership.

Under the Copyright Act, no copyright infringement

action lies as between joint owners of the same copyright.  See

Weissmann v. Freeman, 868 F.2d 1313, 1318 (2d Cir. 1989); Oddo v.

Ries, 743 F.2d 630, 632-33 (9th Cir. 1984); see also 1 Melville B.

Nimmer & David Nimmer, Nimmer on Copyright § 6.10[A], at 6-34 to

-35 (2007); see generally 17 U.S.C. § 501(a) (defining copyright

infringement as the violation of the "exclusive rights of the

copyright owner") (emphasis supplied).  Each co-owner of a

copyright is akin to a tenant in common and each owns a share of

an undivided whole.  See Sybersound Records, Inc. v. UAV Corp. 517

F.3d 1137, 1145 (9th Cir. 2008); Davis v. Blige, 505 F.3d 90, 98

(2d Cir. 2007); see also H.R. Rep. No. 94-1476, at 121 (1976),

reprinted in 1976 U.S.C.C.A.N. 5659, 5736.  It follows inexorably

that the co-owner of a copyright is incapable of infringing that

copyright vis-à-vis his counterpart co-owner.[5]  <u>See</u> <u>Cortner</u> v. <u>Israel</u>, 732 F.2d 267, 271 (2d Cir. 1984).  Consequently, even if McTigue and WFA are joint authors (and, thus joint owners) of some portion of the copyrighted work, no claim for copyright infringement lies.

This brings us to McTigue's contention that he is the sole owner of a different portion of the copyrighted material.  He advances two theories to support this contention: (i) that he is the owner of a least a portion of the plans and drawings pursuant to the work for hire doctrine and (ii) that the Termination Agreement bestows upon him outright ownership of at least a portion of the copyrighted work.

The first of these theories need not occupy us for long. The elementary fact is that McTigue never raised the work for hire doctrine before the district court.  "If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal." <u>Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59</u>

---

[5]This is not to say that an aggrieved co-owner of a copyright is without recourse if his counterpart co-owner acts wrongfully. The aggrieved co-owner may, for example, be able to bring a declaratory action to determine his ownership rights.  <u>See</u>, <u>e.g.</u>, <u>Santa-Rosa</u>, 471 F.3d at 225-26; <u>Gaiman</u>, 360 F.3d at 648. Alternatively, he may be able to bring a state-law claim for an accounting.  <u>See</u>, <u>e.g.</u>, <u>Cambridge Literary Props.</u>, 510 F.3d at 102; <u>Goodman</u> v. <u>Lee</u>, 78 F.3d 1007, 1012 & nn.15-16 (5th Cir. 1996). McTigue has not pursued any such remedies.

-18-

v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992).  The
circumstances here are routine, not extraordinary.

In all events, McTigue's work for hire theory suffers
from obvious flaws.  Under the Copyright Act, a work comes within
the work for hire doctrine if it consists of either (i) a work
prepared by an employee within the scope of her employment or (ii)
one prepared by an independent contractor on special order or
commission.  See 17 U.S.C. § 101; see also 1 Nimmer on Copyright,
supra § 5.03[B], at 5-14.  While McTigue refers to Freedenfeld as
his "scribe," there is no evidence that Freedenfeld was his
employee.  See Cmty. for Creative Non-Violence v. Reid, 490 U.S.
730, 750-51 (1989) (adopting the general common law of agency as
the touchstone for determining whether an employment relationship
exists).

The independent contractor niche is no more hospitable
to McTigue's claim.  For one thing, the Copyright Act enumerates
certain types of works encompassed by the work for hire doctrine,
see 17 U.S.C. § 101, and architectural drawings do not fit within
that taxonomy.  See M.G.B. Homes, Inc. v. Ameron Homes, Inc., 903
F.2d 1486, 1492 (11th Cir. 1990); Meltzer v. Zoller, 520 F. Supp.
847, 855 (D.N.J. 1981).

For another thing, a commissioned work can be considered
a work made for hire only "if the parties expressly agree in a
written instrument signed by them that the work shall be

-19-

considered a work made for hire." 17 U.S.C. § 101. Neither the AIA Agreement nor the Termination Agreement makes even a veiled reference to works for hire, nor does either contract contain any language remotely suggesting an intention to establish a work for hire relationship.

As for McTigue's claim that section 3 of the Termination Agreement confers upon him outright ownership over some portion of the copyrighted material, it is groundless. The Termination Agreement was executed in Massachusetts. Under Massachusetts law, a contract that is free from ambiguity is to be interpreted according to its plain meaning. See, e.g., Eigerman v. Putnam Invs., Inc., 450 Mass. 281, 287, 877 N.E.2d 1258, 1263 (2007). By its express language, section 3 of the Termination Agreement incorporates by reference, and preserves, article 6 of the AIA Agreement. That combination unambiguously declares WFA the author and owner of the disputed work. Nothing in the text of the Termination Agreement either modifies or dissipates this declaration.

McTigue's counter-argument is weak. He suggests that the language of the Termination Agreement restricting him from "us[ing] any of the work solely produced by WFA" necessarily confers upon him ownership of work not solely produced by WFA. This is an attempt to pass an elephant through the eye of a needle.

The Termination Agreement's text covers only the parties' rights to use the material produced by WFA in the course of the failed engagement; it does not speak to the ultimate ownership of the work. Thus, although the cited language might possibly be construed as granting McTigue a license to use some part of the material produced by WFA in conjunction with others, see John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 322 F.3d 26, 40-42 (1st Cir. 2003), it cannot be construed as dictating the ownership of that material.

To sum up, viewing the summary judgment record in the light most agreeable to McTigue, we discern no trialworthy issue as to any fact material to the resolution of the counterclaims. Accordingly, the district court did not err in terminating the counterclaims.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, we vacate the district court's dismissal of WFA's copyright infringement claim. At the same time, we affirm its entry of summary judgment in favor of WFA on McTigue's counterclaims.

**Vacated in part, affirmed in part, and remanded for further proceedings consistent with this opinion. Costs shall be taxed in favor of WFA.**